2024-1370, 2024-1371

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

SWEET HARVEST FOODS, EXPORT PACKERS COMPANY LTD., HONEY HOLDING I, DBA HONEY SOULTIONS, SUNLAND TRADING INC., NATIONAL HONEY PACKERS & DEALERS ASSOCIATION,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

and

AMERICAN HONEY PRODUCERS ASSOCIATION, SIOUX HONEY ASSOCIATION,

Defendants-Appellees.

Appeal from the United States Court of International Trade
in Consol. Case No. 1:22-CV-00188
Senior Judge Leo M. Gordon

## JOINT BRIEF OF PLAINTIFFS-APPELLANTS
## NON-CONFIDENTIAL VERSION

Gregory Husisian
FOLEY & LARDNER LLP
Suite 600
3000 K Street NW
Washington DC, 20007
(202) 945-6149

Counsel to Plaintiffs-Appellants Sweet Harvest Foods, Export Packers Company Ltd., Honey Holding I, dba Honey Solutions, Sunland Trading Inc.

April 22, 2024

Gregory J. Spak
Ron Kendler
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiff-Appellant National Honey Packers & Dealers Association

**FORM 9. Certificate of Interest**                             Form 9 (p. 1)
                                                                March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---:|:---|
| **Case Number** | 24-1370 |
| **Short Case Caption** | Sweet Harvest Foods v. US |
| **Filing Party/Entity** | National Honey Packers & Dealers Association |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date:        04/22/2024            Signature:   /s/ Gregory J. Spak

                                   Name:        Gregory J. Spak

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| National Honey Packers & Dealers Association | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 3)
March 2023

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| Colin Alejandro Dilley | White & Case LLP | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☑   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

Pursuant to Federal Circuit Rule 25.1(e)(1)(B), this brief contains confidential material that has been omitted. The material omitted on page 39 concerns the declines in importer and packer inventories. The material omitted on pages 41 through 43 concerns the identity of parties and factual circumstances related to allegations of "stockpiling" of raw honey from Vietnam. The Addendum to this brief contains the nonconfidential versions of the U.S. Court of International Trade opinion and International Trade Commission majority and dissenting opinions that are the subject of this appeal. The U.S. Court of International Trade and International Trade Commission deleted from their opinions certain material determined to be confidential, pursuant to the protective order of the International Trade Commission in the underlying investigation.

STATEMENT OF RELATED CASES ...................................................................1

JURISDICTIONAL STATEMENT ........................................................................2

STATEMENT OF THE ISSUES............................................................................3

STATEMENT OF THE CASE.................................................................................4

SUMMARY OF THE ARGUMENT ....................................................................12

ARGUMENT .......................................................................................................14

    I.     STANDARD OF REVIEW....................................................................14

    II.    THE COMMISSION'S AFFIRMATIVE CRITICAL CIRCUMSTANCES DETERMINATION WAS CONTRARY TO LAW .....................................................................................................14

A.   Legal Standard ................................................................14

B.   The Plain Language of the Statute Makes Clear that the
     Commission Must Conduct a Prospective Analysis ....................16

C.   The Commission's Analysis of Inventory Levels Renders its
     Decision Contrary to Law ............................................20

     1.   The record does not contain the relevant and necessary
          inventory information required to support an
          affirmative critical circumstances determination ...............20

     2.   Absent the relevant inventory data and prospective
          analysis of the impact of imports, the Commission
          could not (and did not) comply with the statutory
          requirement of finding that imports were "likely to
          undermine seriously the remedial effect of the orde to
          be issued"................................................................25

D.   In Upholding the Commission's Critical Circumstances
     Determination, the CIT Misapplied the Statutory Standard ..........27

III.  THE COMMISSION'S AFFIRMATIVE CRITICAL
      CIRCUMSTANCES DETERMINATION WAS UNSUPPORTED
      BY SUBSTANTIAL EVIDENCE ............................................34

A.   Legal Standard ................................................................34

B.   The Commission Relied on Unreasonable Assumptions to
     Compensate for Missing Inventory Information...........................35

     1.   The Commission's affirmative determination relied on
          conclusory assertions and speculation ................................37

     2.   The Commission failed to acknowledge contradictory
          evidence concerning allegations of "stockpiling" that
          contributed to its affirmative determination ........................41

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ...............................45

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allegheny Ludlum Corp. v. United States*,
   287 F.3d 1365 (Fed. Cir. 2002) .......................................................................23

*Am. Silicon Techs. v. United States*,
   334 F.3d 1033 (Fed Cir. 2003) ........................................................................14

*Changzhou Trina Solar Energy Co. v. United States*,
   975 F.3d 1318 (Fed. Cir. 2020) ..................................................................15, 16

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)...................................................................................passim

*Coventry Health Care of Mo., Inc. v. Nevils*,
   581 U.S. 87 (2017)............................................................................................28

*Dak Ams. LLC v. United States*,
   456 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ...................................................23

*Eurodif et al. v. United States*,
   423 F.3d 1275 (Fed. Cir. 2005) .......................................................................28

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000).........................................................................................16

*FTC v. Mandel Bros., Inc.*,
   359 U.S. 385 (1959).........................................................................................18

*Gerald Metals, Inc. v. United States*,
   132 F.3d 716 (Fed. Cir. 1997) ..............................................................34, 43, 44

*Huaiyin Foreign Trade Corp. v. United States*,
   322 F.3d 1369 (Fed. Cir. 2003) .......................................................................34

*Jiaxing Brother Fastener Co. v. United States*,
   380 F. Supp. 3d 1343 (Ct. Int'l Trade 2019) ...................................................35

*JTEKT Corp. v. United States*,
   642 F.3d 1378 (Fed. Cir. 2011) .......................................................................14

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) ..............................................35, 39, 42

*Mitsubishi Elec. Corp. v. United States*,
  700 F. Supp. 538 (Ct. Int'l Trade 1988) ...............................24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .........................................................35

*Nippon Steel Corp. v. United States*,
  712, 391 F. Supp. 2d 1258 (Ct. Int'l Trade 2005)
  (*rev'd on other grounds*, 494 F.3d 1371 (2007))................26

*NSK Corp. v. United States*,
  637 F. Supp. 2d 1311 (Ct. Int'l Trade 2009) ......................35

*Procopio v. Wilkie*,
  913 F.3d 1371 (Fed. Cir. 2019) ...........................16, 18, 28

*Sweet Harvest Foods v. United States*,
  699 F. Supp. 3d 1346 (Ct. Int'l Trade 2023) ....................2, 4

*Tuan Anh Nguyen v. INS*,
  533 U.S. 53 (2001).........................................................19

*United States Capitol Police v. Office of Compliance*,
  908 F.3d 748 (Fed. Cir. 2018) ........................................18

*United States v. Eurodif S.A.*,
  555 U.S. 305 (2009).......................................................15

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951).......................................................44

*Viraj Group v. United States*,
  476 F.3d 1349 (Fed. Cir. 2007) ...............................14, 34

## STATUTES AND REGULATIONS

19 U.S.C. § 1673 .............................................................4

19 U.S.C. § 1673(b)(4)(A)(ii)(I)......................................29

19 U.S.C. § 1673(b)(4)(A)(ii)(I)(II)...............................30

19 U.S.C. § 1673b ....................................................................5

19 U.S.C. § 1673b(c)(1) ........................................................5

19 U.S.C. § 1673b(d)(1) ........................................................5

19 U.S.C. § 1673b(e) ..............................................................5

19 U.S.C. § 1673d ...............................................4, 5, 32, 33

19 U.S.C. § 1673d(a)(1) ......................................................33

19 U.S.C. § 1673d(b)(1) ......................................................33

19 U.S.C. § 1673d(b)(2)(A) ..................................................5

19 U.S.C. § 1673d(b)(4) ........................................................5

19 U.S.C. § 1673d(b)(4)(A) .............................6, 15, 16, 17

19 U.S.C. § 1673d(b)(4)(A)(i) ............................................27

19 U.S.C. § 1673d(b)(4)(A)(ii) ..........................................14

19 U.S.C. § 1673d(b)(4)(A)(ii)(II) .................15, 17, 20, 27

19 U.S.C. § 1673d(c)(4)(B) ..................................................5

19 U.S.C. § 1673e .........................................................5, 17

19 U.S.C. § 1673e(b) ..........................................................33

19 U.S.C. § 3512 ...................................................................6

28 U.S.C. § 1295(a)(5) ..........................................................2

28 U.S.C. § 1581(c) ...............................................................2

## LEGISLATIVE MATERIALS

Uruguay Round Agreements Act,
     H.R. Rep. No. 103-826(I),
     reprinted in 1994 U.S.C.C.A.N. 4040 ...............................6

# ADMINISTRATIVE DETERMINATIONS

*Raw Honey From Argentina, Brazil, India, Ukraine, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*,
86 Fed. Reg. 26,897 (May 18, 2021) ...................................................7

*Raw Honey From Argentina, Brazil, India, Ukraine, and Vietnam*,
86 Fed. Reg. 30,980 (June 10, 2021) .................................................7

*Raw Honey From the Socialist Republic of Vietnam: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*,
86 Fed. Reg. 66,526 (Nov. 23, 2021) .................................................7

*Raw Honey From the Socialist Republic of Vietnam: Preliminary Affirmative Determination of Critical Circumstances in the Less-Than-Fair-Value Investigation*,
87 Fed. Reg. 2,127 (Jan. 13, 2022) ....................................................8

*Raw Honey From the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*,
87 Fed. Reg. 22,184 (Apr. 14, 2022) .................................................8

*Raw Honey From Argentina, Brazil, India, and the Socialist Republic of Vietnam: Determinations*,
87 Fed. Reg. 33,831 (June 3, 2022) ........................................2, 4, 8, 9

*Raw Honey From Argentina, Brazil, India, and the Socialist Republic of Vietnam: Antidumping Duty Orders*,
87 Fed. Reg. 35,501 (June 10, 2022) .............................................4, 9

## **STATEMENT OF RELATED CASES**

In accordance with Rule 47.5 of the Rules of this Court, counsel for Plaintiffs-Appellants, Export Packers Company Ltd., ("Export Packers"), Honey Holding I, dba Honey Solutions ("Honey Solutions"), Sunland Trading Inc. ("Sunland"), and Sweet Harvest Foods ("Sweet Harvest") (collectively, the "Individual Importers"), and the National Honey Packers and Dealers Association ("NHPDA") (collectively, Plaintiffs-Appellants") make the following statement:

1.     No other appeal in or from the same civil action or proceeding in the lower court or body was previously before this Court or any other appellate court.

2.     No other action pending before the Court of International Trade ("CIT") may be directly affected by the Court's disposition of this appeal.

## <u>JURISDICTIONAL STATEMENT</u>

The consolidated actions filed by the Individual Importers and the NHPDA, *Sweet Harvest Foods v. United States*, Consol. Ct. No. 22-00188, which resulted in this appeal, contested the affirmative critical circumstances determination of the International Trade Commission ("Commission") with respect to imports of raw honey from Vietnam in *Raw Honey from Argentina, Brazil, India, and Vietnam*, 87 Fed. Reg. 33831 (Int'l Trade Comm. June 3, 2022). The CIT had exclusive jurisdiction over the Individual Importers' and the NHPDA's complaints under 28 U.S.C. § 1581(c).

This Court has exclusive jurisdiction over appeals from final decisions of the CIT under 28 U.S.C. § 1295(a)(5).

On November 17, 2023, the CIT issued the final decision from which this appeal was taken. The Individual Importers and the NHPDA timely filed notices of appeal on January 16, 2024. This Court thereafter consolidated the cases into the above-captioned consolidated action.

## <u>STATEMENT OF THE ISSUES</u>

**<u>Issue 1:</u>** Was the Commission's affirmative critical circumstances determination with respect to imports of raw honey from Vietnam in accordance with law, given that: (a) the statute requires a finding that relevant imports are likely to "undermine seriously the remedial effect of the antidumping order to be issued"; and (b) the record did not contain evidence of contemporaneous inventory levels, as required by the statute, that were necessary to make such a finding?

**<u>Issue 2:</u>** Was the Commission's affirmative critical circumstances determination with respect to imports of raw honey from Vietnam supported by substantial evidence, where the Commission used an unsupported assumption that had no support in the record and where the Commission failed to engage with record evidence with respect to key issues?

## <u>STATEMENT OF THE CASE</u>

This action is an appeal of the final decision of the CIT *Sweet Harvest Foods*

*v. United States*, 699 F. Supp. 3d 1346 (Ct. Int'l Trade 2023), which upheld the

Commission's final affirmative determination of critical circumstances pursuant to

19 U.S.C. § 1673d, as implemented in the antidumping duty order on raw honey

from the Socialist Republic of Vietnam ("Vietnam").  *See Raw Honey From*

*Argentina, Brazil, India, and Vietnam*, 87 Fed. Reg. 33,831 (June 3, 2022); *Raw*

*Honey From Argentina, Brazil, India, and the Socialist Republic of Vietnam:*

*Antidumping Duty Order*s, 87 Fed. Reg. 35,501 (June 10, 2022).

Pursuant to Federal Circuit Rule 28(a)(11), the CIT's and the Commission's

decisions are attached hereto in the Addendum.[1]

### <u>*Antidumping Duty Investigations and Critical Circumstances*</u>

Under the statute, antidumping duties are imposed following a bifurcated

investigation process: the Commission determines whether imports of the

merchandise subject to the investigation ("subject imports") have caused material

injury to the domestic industry producing the same product, and the Department of

Commerce ("Commerce") determines whether such imports have been "dumped"

(*i.e.*, "sold in the United States at less than . . . fair value").  *See* 19 U.S.C. § 1673.

---

[1]  Additionally, pursuant to Federal Rule of Appellate Procedure 28(f), because this
Court's "determination of the issues presented requires the study of statutes, rules,
regulations, etc.," the Addendum also includes relevant statutes.

- 4 -

Each agency makes a preliminary determination, followed by a final determination. *See* 19 U.S.C. §§ 1673b, 1673d.  If all four determinations are affirmative, then Commerce ultimately issues an order imposing antidumping duties on the subject merchandise ("antidumping duty order") at the end of the investigation.  *See* 19 U.S.C. § 1673e.

Upon Commerce's publication of its preliminary determination in the *Federal Register*, Customs and Border Protection ("CBP") suspends liquidation of subject entries and must begin collecting cash deposits, which may lead to the assessment of antidumping duties on the suspended entries.  *See* 19 U.S.C. § 1673b(d)(1). Commerce's preliminary determination must occur no later than 190 days after Commerce initiates its investigation, and months before the issuance of the antidumping duty order.  *See* 19 U.S.C. §§ 1673b(c)(1), 1673d(b)(2)(A).

If Commerce and the Commission both make affirmative final determinations of "critical circumstances" (subject to an allegation by the petitioner), then the suspension of liquidation (and the potential assessment of antidumping duties) is applied retroactively, 90 days prior to the publication of Commerce's preliminary determination.  *See* 19 U.S.C. §§ 1673b(e), 1673d(b)(4) and 1673d(c)(4)(B).

The purpose of a critical circumstances inquiry is to protect the petitioning domestic industry from injury that might otherwise not be remedied by the antidumping duty order.  Thus, a determination must be made "whether an order's

effectiveness is undermined by increasing shipments prior to the effective date of the order." Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-826(I), at 877, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4206 ("SAA").[2] To this end, the statute requires the Commission to evaluate the following in making a critical circumstances determination:

> (i) IN GENERAL. – If {Commerce makes an affirmative critical circumstances determination}, then the final determination of the Commission shall include a finding as to whether the imports subject to the affirmative determination under subsection (a)(3) are likely to undermine seriously the remedial effect of the antidumping duty order to be issued under section 1673e of this title.

> (ii) FACTORS TO CONSIDER. – In making the evaluation under clause (i), the Commission shall consider, among other factors it considers relevant–

> > (I) the timing and the volume of the imports,

> > (II) a rapid increase in inventories of the imports, and

> > (III) any other circumstances indicating that the remedial effect of the antidumping order will be seriously undermined.

19 U.S.C. § 1673d(b)(4)(A).

---

[2] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act" (*i.e.*, including the antidumping statute) "in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512.

### *Procedural Background*

On April 21, 2021, the American Honey Producers Association ("AHPA") and Sioux Honey Association ("SHA") (collectively, "Petitioners") filed a petition for the imposition of antidumping duties on raw honey from Argentina, Brazil, India, Ukraine, and Vietnam.  *See* Appx564.  The Commission published its affirmative preliminary injury determination on June 10, 2021.  *See Raw Honey From Argentina, Brazil, India, Ukraine, and Vietnam*, 86 Fed. Reg. 30,980 (June 10, 2021).

Commerce initiated its antidumping duty investigation of raw honey from Vietnam on May 11, 2021, and published its preliminary determination on November 23, 2021.  *Raw Honey From the Socialist Republic of Vietnam: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 66,526 (Nov. 23, 2021); *Raw Honey From Argentina, Brazil, India, Ukraine, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 86 Fed. Reg. 26,897 (May 18, 2021).

Following Commerce's affirmative preliminary determination, Petitioners alleged the existence of critical circumstances with respect to subject imports from Vietnam; Commerce then made affirmative preliminary and final determinations of the same, with the latter as part of its final affirmative dumping determination.  *See*

*Raw Honey From the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 87 Fed. Reg. 22,184 (Apr. 14, 2022); *Raw Honey From the Socialist Republic of Vietnam: Preliminary Affirmative Determination of Critical Circumstances in the Less-Than-Fair-Value Investigation*, 87 Fed. Reg. 2,127 (Jan. 13, 2022).

As a result of its final injury investigation – consisting of collecting industry data from market participants, conducting a hearing, and receiving briefs from interested parties[3] – the Commission made a final affirmative determination that imports of raw honey from Argentina, Brazil, India, and Vietnam materially injured the domestic industry.  *Raw Honey From Argentina, Brazil, India, and the Socialist Republic of Vietnam: Determinations*, 87 Fed. Reg. 33,831 (June 3, 2022).

Four out of five Commissioners (the "Majority") also made an affirmative critical circumstances determination with respect to imports of raw honey from Vietnam, concluding that such imports subject to Commerce's affirmative critical circumstances determination "are likely to undermine seriously the remedial effect

---

[3]  Plaintiffs-Appellants participated through the submission of questionnaire data, participation in the hearing, and submission of pre- and post-hearing briefs. Plaintiff-Appellant NHPDA is an industry association consisting of importers and packers of raw honey.  Importers purchase and import into the United States raw honey, including from Vietnam; packers process the raw honey (*i.e.*, filter out pollen, heat, strain, and grade the honey), as well as package it for particular sale and use (*e.g.*, retail or industrial food manufacturing).  *See, e.g.*, Appx46, Appx46 n.21.

of the antidumping duty order on Vietnam." *Id.* at 33,831 n.3. As a result, imports of raw honey from Vietnam are subject to CBP's cash deposit requirement as of 90 days prior to the publication of Commerce's preliminary determination – *i.e.*, August 25, 2021. *See Raw Honey From Argentina, Brazil, India, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 87 Fed. Reg. 35,501, 35,502 (June 10, 2022).

Commissioner (and current Chairman) David Johanson dissented from the Majority's decision regarding critical circumstances from Vietnam ("Dissent"). In the Dissent, Commissioner Johanson cited extensive record evidence to demonstrate how data concerning inventories of raw honey from Vietnam mandated a negative critical circumstances determination, because both supply- and demand-side factors demonstrated that raw honey imports from Vietnam were not in a position to "undermine seriously" the remedial impact of the antidumping duty order. *See generally* Appx544-553.

In particular, Commissioner Johanson demonstrated how the record established that:

- most of the Vietnamese raw honey imported during the critical circumstances period had been sold off, and thus was not in a position to "undermine seriously" the antidumping duty order, Appx547;

- any remaining stocks of Vietnamese raw honey were only a small portion of U.S. apparent consumption, *id.*;

- the impact of the small remaining stocks of Vietnamese raw honey were unlikely to have a major impact given the "substantial increase in apparent consumption" in 2021, Appx548; and

- declines in U.S. production due to drought conditions in 2021 meant that supplies of raw honey from Vietnam "were being depleted at a greater than ordinary rate." Appx549.

Commissioner Johanson thus concluded that "while subject imports and importers' inventories of subject imports from Vietnam increased after the petition, much if not all of that buildup had been physically eliminated by the time the order took effect in order to satisfy increased demand and to replace diminished volumes of domestically produced and imported honey." Appx550.

Regarding the statutory requirements, Commissioner Johanson noted that the "record lacks evidence that could resolve the exact size of any diminished amount of unfairly traded merchandise that might remain, such as evidence regarding final inventory levels of most importers and purchasers, the propensity of end users to hold inventory, actual consumption, and the rate at which fairly traded imports arrived immediately before the order to replace unfairly traded ones." Appx552-553.

Thus, because "the statute permits an affirmative critical circumstances finding only if the imports subject to the Department of Commerce's critical circumstances determination 'likely' will 'undermine seriously' the order's remedial effect," Commissioner Johanson found that the statutory requirements precluded issuing an affirmative determination. Appx553.

The Individual Importers and the NHPDA appealed the Commission's affirmative critical circumstances determination to the CIT. On November 17, 2023, the CIT affirmed the Commission's affirmative critical circumstances determination. *See* Appx1-31. This appeal followed.

## SUMMARY OF THE ARGUMENT

**Issue 1:** The Commission's affirmative critical circumstances determination with respect to Vietnam is contrary to law.  The statute directs the Commission to assess whether the imports made during the 90-day critical circumstances period are likely to "undermine seriously the remedial effect of the order to be issued" in part by evaluating inventory levels.  The Commission, however, only gathered relevant importer and packer inventory data through October of 2021 (eight months prior to the issuance of the order) and did not gather evidence regarding end-user inventories. The lack of contemporaneous inventory data made it impossible for the Commission to determine whether such imports would "seriously undermine" the remedial effect of the order to be issued – and thus precluded the Commission from meeting its statutory obligation to make an affirmative critical circumstances determination, thereby rendering that determination contrary to law.

**Issue 2:** The Commission's affirmative critical circumstances determination was unsupported by substantial evidence.  In justifying its determination, the Commission concluded that the inventories of honey at issue were "in the supply chain" and "likely to place downward pressure on prices until . . . consumed by end users."  Absent the relevant inventory data, however, the Commission instead relied on conclusory assertions and otherwise speculated regarding the existence of such inventories "in the supply chain" and the effect of such inventories on pricing.  The

Commission further accepted unsupported assertions regarding a key claim – namely, "stockpiling" by end users – that were contradicted by record evidence, as recognized by the Dissent.

# ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews the CIT's rulings *de novo*, "stepping into its shoes and applying the same standard of review."  *JTEKT Corp. v. United States*, 642 F.3d 1378, 1381 (Fed. Cir. 2011) (citation omitted).  It does so "without affording any deference to the Court of International Trade."  *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1037 (Fed Cir. 2003) (citation and internal quotation marks omitted).  This Court "must reverse a determination that is unsupported by substantial evidence on the record, or otherwise not in accordance with law."  *Viraj Group v. United States*, 476 F.3d 1349, 1354 (Fed. Cir. 2007) (citation and internal quotation marks omitted).

## II.    THE COMMISSION'S AFFIRMATIVE CRITICAL CIRCUMSTANCES DETERMINATION WAS CONTRARY TO LAW

### A.    Legal Standard

As discussed above, the Commission can issue an affirmative critical circumstances determination only if "the imports subject to {Commerce's} affirmative {critical circumstances} determination . . . are likely to ***undermine seriously*** the remedial effect of the antidumping order to be issued."  19 U.S.C. § 1673d(b)(4)(A)(ii) (emphasis added).  The statute thus sets a higher bar than it does for the Commission's material injury finding, by requiring that the extraordinary imposition of cash deposits 90 days before the publication of

Commerce's preliminary determination can occur *only* if the record demonstrates that the specific entries from that 90-day period are "likely to undermine seriously" the antidumping duty order. *See* Appx529-531.

Two statutory provisions are key to the Court's analysis: (1) the overall critical circumstances provision, 19 U.S.C. § 1673d(b)(4)(A), which establishes the basic task for the Commission when making a critical circumstances determination; and (2) the inventory provision, 19 U.S.C. § 1673d(b)(4)(A)(ii)(II), which specifically directs that the Commission evaluate the level of the critical circumstances inventories. Because review of the Commission's application of these statutory provisions and whether its determination is contrary to law involves principles of statutory construction, the Court will analyze the Commission's decision pursuant to the framework established in *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See*, *e.g.*, *Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1326 (Fed. Cir. 2020).

In accordance with that framework, in step 1 of the *Chevron* analysis, where "Congress has directly spoken to the precise question at issue," as it has here, the agency is required to follow that directive. *See id.* (citations omitted); *see also Chevron*, 467 U.S. at 842; *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009). Analysis under *Chevron* step 1 includes "*all* traditional tools of statutory interpretation," including the "the fundamental canon of statutory construction that

the words of a statute must be read in their context and with a view to their place in the overall statutory scheme{.}" *Procopio v. Wilkie*, 913 F.3d 1371, 1382-83 (Fed. Cir. 2019) (emphasis in original) (*citing Chevron*, 467 at 843 n.9 and *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000)); *see also Brown & Williamson*, 529 U.S. at 134-37 (looking to the statute "as a whole" to determine its "core objectives" under step one of *Chevron*).

Only if, after this analysis, the statutory language is "silent or ambiguous with respect to the specific issue," does the Court proceed to step 2 of the *Chevron* analysis, in which it will consider whether the Commission's "interpretation is reasonable." *See*, *e.g.*, *Changzhou Trina*, 975 F.3d at 1326 (quoting *Chevron*, 476 U.S. at 843).

### B.    The Plain Language of the Statute Makes Clear that the Commission Must Conduct a Prospective Analysis

The language of the overall critical circumstances provision, 19 U.S.C. § 1673d(b)(4)(A), is clear on its face and requires no more than step 1 of *Chevron*. Three key words require the Commission to use a forward-looking analysis to determine the impact of the critical circumstances entries once the order is issued.

First, the provision uses the word "likely," which is inherently prospective. The Commission must consider whether the critical circumstances entries will "likely" have an impact on the domestic industry that would "undermine seriously" the remedial impact of the antidumping duty order.

Second, the provision centers the "undermine seriously" analysis on the "antidumping duty order to be issued." As with "likely," the phrase "to be issued" is inherently prospective. So too is the statute's reference to the "order," which is issued only at the end of the investigation. Congress was well aware of the difference between provisional measures (imposed at the time of Commerce's preliminary determination) and the order (issued after Commerce's and the Commission's final determinations).

Third, Congress explicitly cited 19 U.S.C. § 1673e, which governs the "assessment of duty." *See* 19 U.S.C. § 1673e. By referencing this provision, which applies to an action (the imposition of duties) that takes place only after the investigation concludes, Congress made clear that the Commission's focus in a critical circumstances inquiry is the future impact of those entries and whether those entries are "likely" to "undermine seriously" the remedial impact of the "antidumping duty order to be issued." Thus, applying *Chevron* step 1, the plain language of 19 U.S.C. § 1673d(b)(4)(A) establishes that the Commission's analysis must be prospective.

The inventory provision, 19 U.S.C. § 1673d(b)(4)(A)(ii)(II), establishes that the Commission "shall consider" whether there has been "a rapid increase in inventories of the imports." Here, Congress did not explicitly identify the time period that the Commission must analyze with respect to the increase in inventories.

However, the tools of statutory construction under *Chevron* step 1 lead directly to the conclusion that the Commission must analyze the inventories that are probative of the prospective impact analysis required by the statute.

Specifically, under *Chevron* step 1, statutory language must be read consistently with the overall purpose or scheme of the statute. *See*, *e.g.*, *Procopio*, 913 F.3d at 1383. That is, the provisions must be read harmoniously and consistently. *See United States Capitol Police v. Office of Compliance*, 908 F.3d 748, 759 (Fed. Cir. 2018) (quoting *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959) ("{O}ur task is to fit, if possible, all parts into a harmonious whole.") and ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 180 (2012) ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory")).

It follows that, because the plain language of the statute establishes that the overall critical circumstances analysis is prospective, the Commission's consideration of inventory levels – a statutorily required factor in this analysis – must also be prospective. Consequently, the Commission should examine contemporaneous, not historic inventory levels, because they provide insight into whether the critical circumstances inventories are "likely" to "undermine seriously the remedial impact of the order to be issued."

Moreover, the Court should take into account that Congress is assumed to be logical in its construction of a statute. *Cf. Tuan Anh Nguyen v. INS*, 533 U.S. 53. 68 (2001) ("We ascertain the purpose of a statute by drawing logical conclusions from its text, structure, and operation."). Thus, even though the statute may not explicitly state the time period to be used in evaluating inventory levels, it is only logical that such levels at the end of the investigation are the most meaningful indicators of whether there are sufficient volumes of critical circumstances entries to "undermine seriously the remedial of the order to be issued."

If large quantities of the critical circumstances entries remain in inventory at the end of the investigation (*i.e.*, right before the order), then such inventories potentially could undermine seriously the remedial effect of the order. But if the entries are entirely or largely consumed, and thus no longer in inventory, then they are neither in a position to supplant sales by U.S. producers, nor impact the prices of those sales. Thus, the only logical construction of the statute is that the Commission evaluate inventory levels based on contemporaneous data pertinent to the final investigation.

**C.    The Commission's Analysis of Inventory Levels Renders its Decision Contrary to Law**

**1.    The record does not contain the relevant and necessary inventory information required to support an affirmative critical circumstances determination**

As stated above, the requirement to examine inventory levels is mandatory: the statute states that the Commission "shall consider" inventory levels. 19 U.S.C. § 1673d(b)(4)(A)(ii)(II).  This means that absent a proper evaluation of inventory levels – or absent evidence that allows such an evaluation – a necessary statutory element required for the issuance of an affirmative critical circumstances finding is absent.

The Commission's record contains two datasets that establish inventory levels.  The first set contains data that the Commission gathered through its questionnaires, which included information regarding the increase in subject imports from Vietnam in the six months prior to the filing of the petition in April 2021, and a comparison period six months thereafter (*i.e.*, through October 2021), as well as importers' and packers' inventory levels during that period.  *See* Appx32506-32510. Because the Commission issued its final determination in June 2022, this necessarily means that this dataset was eight months out of date when the Commission issued its determination.

The second set was submitted by importers and packers in their post-hearing brief to the Commission.  *See* Appx31762-31763, Appx31773, Appx31778,

Appx31783, Appx31788, Appx31793, Appx31798, Appx31803, Appx31808, Appx31813, Appx31817, Appx31820, Appx31824, Appx31829, Appx31833. Importers and packers are the two industry participants that sell raw honey to downstream end users, such as large bakers and food companies that use the honey as an ingredient. *See*, *e.g.*, Appx79, n.247, Appx140. This dataset was more contemporaneous, as it provided detailed inventory data for all of the critical circumstances entries through March 2022. *Compare* Appx32506-32510 (inventory data collected by the Commission in its questionnaire responses, through October 2021) *with* Appx31762-31763 (aggregated importer and packer data through March 2022). Thus, this inventory data provided close-to-real-time insight into importers' and packers' inventory levels.

Importantly, the contemporaneous importer and packer data demonstrated that nearly all of the critical circumstances entries reported had been sold off to end users. *See* Appx31762-31763. Thus, the data were not only contemporaneous, but also painted the fullest picture of the status of the critical circumstances entries and whether they were in a position to undermine seriously the remedial effect of the order to be issued.

Yet, in making its determination, the Commission relied ***solely*** on the inventory levels gathered through its questionnaire responses, which ended by October 2021, and otherwise adopted wholesale arguments made by Petitioners with

respect to why such inventory levels (which did not even cover the full 90-day period as stated in the statute) were likely to undermine seriously the remedial effect of the order to be issued. *Compare* Appx531 ("Petitioners argue that importers' inventories of subject imports from Vietnam were {much} higher in September 2021 than in September 2020.") *with* Appx538-539 (relying solely on evidence of inventories through October 2021 and comparing historical inventories in September 2021). This analysis of the inventory data suffers from three defects.

First, as detailed above, the requisite analysis is prospective, and must consider whether inventories are likely to seriously undermine the remedial effect of the order. At no point, however, did the Majority analyze or even consider inventory levels after October of 2021 – thereby cutting off the analysis eight months before the issuance of the order. *See* Appx538-542. This was a critical gap, as imports of raw honey from Vietnam are used primarily by large, industrial food producers, which are constantly purchasing and using large amounts of raw honey. *See* Appx31781, Appx31806, Appx31811, Appx31816, Appx31819, Appx31823, Appx31832 (importer and packer affidavits explaining that end users "maintain minimal inventory space for raw honey" and consume raw honey shortly after delivery). The Majority brushed this key fact aside, as if any critical circumstances entries that were in inventory in September or October of 2021 were still in inventory over half a year later.

Second, the Commission dismissed the importer and packer dataset – which was contemporaneous – and which demonstrated that the importers and packers had sold off nearly the entirety of their critical circumstances entries. *See* Appx538-542. The Commission's sole reliance on the outdated inventory data violates its statutory obligation to conduct a forward-looking analysis of the critical circumstances inventories.

Third, the record contained ***no*** information regarding the level of critical circumstances entries held by end users. This information is absent from the questionnaire inventory data (because the Commission did not request it) and absent from the importer and packer dataset (because these parties did not have access to those data). This means that the record was entirely silent regarding the most important question in this case: whether there were any critical circumstances entries held by end users available for use after the issuance of the order.

Indeed, it is unreasonable for the Commission blame the parties for failing to provide data that the Commission itself never requested. "Case law holds that it is contrary to law where the ITC actively precludes itself from receiving relevant data or takes no effort to seek relevant data . . . . The Commission, moreover, is obligated to make active, reasonable efforts to obtain relevant data." *Dak Ams. LLC v. United States*, 456 F. Supp. 3d 1340, 1360 n.12 (Ct. Int'l Trade 2020) (citing in part *Allegheny Ludlum Corp. v. United States*, 287 F.3d 1365, 1373 (Fed. Cir. 2002);

*Mitsubishi Elec. Corp. v. United States*, 700 F. Supp. 538, 564 (Ct. Int'l Trade 1988)) (internal quotation marks omitted).

More importantly, the missing data bears directly on a factual issue –inventory levels – review of which the statute provides is mandatory. Given that the statute states that the Commission "shall consider" this inventory data, the combination of the outdated importer/packer and missing end-user inventory data is critical. For instance, if the critical circumstances imports had been sold off by importers and packers to end users, and those end users had consumed those entries prior to the issuance of the order, it would be impossible for those entries to have any effect on the market – let alone one that would "seriously undermine" the remedial effect of the order – because they no longer existed. Yet, the record evidence on record indicates that this was the case here.

In short, neither inventory dataset can be interpreted to support an affirmative critical circumstances determination. The questionnaire dataset was eight months out of date, and thus offered no insight into whether there were sufficient critical circumstances inventories to "undermine seriously" the remedial effect of the order to be issued. The contemporaneous importer and packer inventory data established that they had sold off most of their inventories, which the record indicated had been consumed by end users. Thus, even though the critical circumstances statute requires that the Commission "shall consider" inventory levels, the record lacked the

evidence required to support a claim that those inventories were likely to undermine seriously the remedial effect of the order to be issued.

> **2.     Absent the relevant inventory data and prospective analysis of the impact of imports, the Commission could not (and did not) comply with the statutory requirement of finding that imports were "likely to undermine seriously the remedial effect of the order to be issued"**

As explained in Section II.C.1 above, the record did not contain, nor did the Commission seek, the necessary information to determine the amount of any remaining critical circumstances inventories and whether they were in a position to undermine seriously the remedial effect of the antidumping order. Absent such evidence, there was no basis to issue an affirmative critical circumstances determination consistent with the statute.

The Dissent recognized this flaw. As Commissioner Johanson explained with respect to the statutory requirement and the evidence on record:

> {T}he statute permits an affirmative finding of critical circumstances only if it is "likely" that the remedial effect of the order will be "seriously" undermined. In my view, the record contains clear evidence that the increase in unfairly traded subject imports in the six-month period following the petition ***was largely if not entirely eliminated in the next six months before the order***, and the domestic industry's condition sharply improved. ***The record lacks evidence that could resolve the exact size of any diminished amount of unfairly traded merchandise that might remain, such as evidence regarding final inventory levels of most importers and purchasers, the propensity of end users to hold inventory,*** actual consumption, and the rate at which fairly traded imports arrived immediately before the order to replace unfairly traded ones. While it is possible that enough remained to have an impact, ***the statute permits an affirmative critical circumstances***

*finding only if the imports subject to the Department of Commerce's critical circumstances determination "likely" will "undermine seriously" the order's remedial effect. Given the evidence in this record, I cannot find that this standard is met.*

Appx552-553 (emphasis added).

As the Dissent correctly recognized, the test for critical circumstances is necessarily focused on what impact the critical circumstances imports would have at the time the order is issued. Because the record contained neither data after October 2021, nor data regarding the level of critical circumstances entries held by end users at any point in time, the Dissent correctly concluded that the record could not resolve the "exact" quantity of such inventories, Appx552, and that it was consequently impossible to conclude, as required by the statute, that such imports or inventories thereof were in a position to "undermine seriously" the remedial effect of the order.

If the record lacks information necessary to show that a statutory requirement is satisfied, then there is no basis to issue a determination meeting that requirement. *Cf. Nippon Steel Corp. v. United States*, 712, 391 F. Supp. 2d 1258, 1275 (Ct. Int'l Trade 2005) ("Thus, in accordance with the statute, in order to find sufficient volume for there to be injury, the {Commission} must identify substantial evidence from the record demonstrating that, should the orders be revoked, it is likely that the volume of the subject imports entering the U.S. market will be significant.") (*rev'd on other grounds*, 494 F.3d 1371 (2007)). Although *Nippon Steel* addressed the material

injury standard, its holding applies here: where the application of the statute requires the existence of certain record evidence, the Commission "must identify" that evidence to establish that it has met its statutory obligation.

Here, the Commission failed to do so, for the simple reason that no such evidence exists on the record. The statute specifically requires that the Commission evaluate inventory levels as a means of determining whether, at the time of the issuance of the order, the critical circumstances entries are likely to "undermine seriously" the remedial effect of the order. *See* 19 U.S.C. § 1673d(b)(4)(A)(i), 1673d(b)(4)(A)(ii)(II).

With the record silent as to the inventory levels of the critical circumstances entries at the time of the order, or any information at any time regarding the inventories held by end users, the only proper statutory construction is the one adopted by the Dissent. That is, if the record contains no affirmative evidence to demonstrate that there are sufficient critical circumstances entries to seriously undermine the order, then there is no basis to issue an affirmative critical circumstances determination. This Court should recognize the same.

**D.    In Upholding the Commission's Critical Circumstances Determination, the CIT Misapplied the Statutory Standard**

Although this Court reviews Commission determinations *de novo*, consideration of errors in the CIT's judgment further underscores why the

Commission's critical circumstances determination is contrary to law. We summarize these errors below.

First, the CIT deemed the Commission's determination in accordance with law under *Chevron* step 2 because the statute is "silent as to what time period the ITC should use in conducting its critical circumstances inventory analysis" and it concluded that the Commission's interpretation of the inventory statutory provision was reasonable. *See* Appx18. Yet, as discussed above, consideration of this provision falls under *Chevron* step 1, based on an analysis of the statutory language, context, and "overall statutory scheme." *See Procopio*, 913 F.3d at 1383. The CIT therefore applied the wrong standard of review. *See Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 95 (2017) (concluding that the court did not need to consider whether an agency's interpretation was due *Chevron* deference where it determined that an interpretation of the statute "best comport{ed} with {the statute's} text, context, and purpose"). As a result, the CIT's decision to defer to the Commission under a *Chevron* step 2 approach is incorrect. *See Eurodif et al. v. United States*, 423 F.3d 1275, 1277 (Fed. Cir. 2005) ("{I}f we determine that the statute is unambiguous on the precise question at issue, we do not defer to the agency's interpretation, regardless of whether that interpretation is grounded in a reasonably policy choice.").

Second, the CIT concluded that Plaintiffs "appear to abandon their arguments under *Chevron* and do not address whether the ITC's interpretation comports with the statute." Appx16. This is incorrect. In both briefs and at oral argument before the CIT, Plaintiffs argued that: (1) the plain language of the critical circumstances provision requires a forward-looking analysis; (2) the inventory provision contains may not explicitly state the timeframe for analyzing inventories; but (3) interpreting this language within the context of the statute as a whole means that such analysis is likewise prospective.

Third, the CIT misapplied legislative history that applies to an issue that was not appealed, which is whether there has been a surge in imports. As discussed above, the critical circumstances provision requires that the Commission "shall consider" not only whether there has been an increase in the critical circumstances inventories, but also whether "the timing and the volume of the imports." 19 U.S.C. § 1673(b)(4)(A)(ii)(I). The CIT cited the SAA, which states that the Commission is required to determine "whether, by massively increasing imports prior to the effective date of relief, the importers have seriously undermined the remedial effect of the order." Appx17. This statement is consistent with the statutory requirement that the Commission consider the "timing and the volume of the imports" under § 1673(b)(4)(A)(ii)(I). The statute also requires, however, that the Commission evaluate the level of inventories, in recognition that the level of inventories will

determine whether any large increase in imports will have an effect after the order is issued. *See* 19 U.S.C. § 1673(b)(4)(A)(ii)(I)(II). The quoted SAA language is therefore irrelevant to the proper interpretation of the inventory provision.

The CIT further concluded that it is up to the Commission to evaluate "whether the subject imports entering during the period after the filing of the petition and prior to suspension of liquidation were likely to seriously undermine the remedial effect of the antidumping duty order." Appx14-15. Plaintiffs-Appellants agree – but, under the statute, the Commission is required to consider any increase in inventory levels as well. By requiring consideration of ***both*** the increase in imports ***and*** the inventory levels (which, as established above, should be measured at the at the time of the final determination), Congress established a structure that necessarily takes into account not only whether an increase in critical circumstances entries occurred, but also whether they remained in inventories and thus potentially could undermine the remedial effect of the order. Both provisions are logically necessary, for the simple reason that any increase in critical circumstances entries that had been consumed would not be in a position to have any adverse impact on the volume or prices of the domestic like product after the issuance of the order.

Fourth, the CIT concluded that requiring an examination of "current inventory levels . . . appears practically unworkable given the statutory deadlines and time constraints imposed on the Commission." Appx15. This conclusion disregards the

reality of Commission proceedings, in which parties regularly provide new factual information until the record is closed.  Indeed, not only did the packers and importers place evidence regarding current inventory levels on the record in their post-hearing briefs; the Commission *itself* requested updated information regarding the allegation of critical circumstances late in the final phase of the investigation.  *See* Appx33149-33153 (supplemental questionnaire issued to importers with a deadline of April 19, 2022 – eight days after the Commission's hearing).  The fact that the Commission was able to seek such information, and to receive responses to the same, shows that there is no reason such information cannot be sought within the normal period during which the record is open.

Fifth, the CIT reasons that because the inventory provision states that the Commission should consider the "increase" in inventories, there is no reason for the Commission to evaluate "what the ***remaining level*** of inventories are at some point in time after the imposition of provisional measures."  Appx17 (emphasis original).  But as Plaintiffs-Appellants pointed out to the CIT and discuss above, the inventory provision does not state ***when*** the increase should be evaluated.  To assess the relevant time period, *Chevron* step 1 requires this Court to interpret this provision in light of the context and relevant statutory scheme, which establish that the Commission should review the most contemporaneous data during the final phase of the investigation.

Sixth, while acknowledging that the statute directs that the Commission evaluate whether the "remedial effect" of the ***order to be issued***," the CIT concluded that the "effective date" of an antidumping duty order is not the first day on which an order goes into effect, but rather the date that "commences with the suspension of liquidation" (*i.e.*, at the time of Commerce's preliminary determination). Appx12 (emphasis added). According to the CIT, because the antidumping duty orders are "applicable to duties after suspension of liquidation rather than after the date of issuance of the order itself," the effective date of the order is not when the order is issued, but rather when suspension of liquidation begins. *See id.*

This interpretation effectively rewrites the statute. In effect, the CIT assumes that when Congress wrote the statute to say that the Commission is supposed to evaluate whether the critical circumstances entries "would undermine seriously the remedial effect of the order to be issued," it meant that the Commission must evaluate whether they "would undermine seriously the remedial effect of the provisional measures already in place." There is no basis for this interpretation. If Congress meant to adopt this language, it would have so written the statute.

Finally, the statement by the CIT that Congress was somehow trying to encompass all entries "after suspension of liquidation rather than after the date of issuance of the order itself" ignores that Congress was well aware of the concept of

suspension of liquidation and explicitly referenced it within the antidumping duty statute. *See, e.g.*, 19 U.S.C. § 1673e(b). Indeed, in §1673d itself – the very same section of the statute that contains the critical circumstances provision – Congress used the term "suspension of liquidation" nine different times. The fact that Congress used the term so often throughout § 1673d, but instead provided that the period of focus for the critical circumstances is the time after the issuance of the order, contradicts the CIT's interpretation of the statute.

It is also instructive to consider other provisions in § 1673d, which governs all final determinations, including the standards for the Commission's determinations regarding material injury, the threat thereof, and material retardation of the establishment of a U.S. industry. In each instance, the statute directs the Commission to make a determination of whether the U.S. industry "*is* materially injured," "*is* threatened with material injury," or whether the "establishment of an industry . . . *is* materially retarded." 19 U.S.C. § 1673d(b)(1) (emphasis added). If the Commission were supposed to evaluate critical circumstances starting at the imposition of provisional measures, then Congress would have adopted this same construction. Alternatively, Congress could have adopted the construction that it used for Commerce, which in the same provision is required to evaluate "whether the subject merchandise *is being, or is likely to be,* sold in the United States at less than its fair value." *See* 19 U.S.C. § 1673d(a)(1) (emphasis added). Yet, the critical

circumstances provision does not adopt either of these constructions, and thus remains the only place within § 1673d where the Commission is directed to consider any "likely" (*i.e.*, solely prospective) effect, and the statute is clear that the effect must be on the "order to be issued." The CIT's rewriting of the statute constitutes reversible error.

## III.    THE COMMISSION'S AFFIRMATIVE CRITICAL CIRCUMSTANCES DETERMINATION WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

### A.    Legal Standard

This Court will reverse any determination unsupported by substantial evidence. *See*, *e.g.*, *Viraj Group*, 476 F.3d at 1354. The "substantial evidence standard requires more than mere assertion of evidence which in and of itself justified the Commission's determination, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (citations, internal quotation marks, and brackets omitted).

The Court will "determine the existence of substantial evidence by considering the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence." *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (citation and internal quotation marks omitted). Consequently, a determination that fails "to

consider or discuss record evidence which supports an alternative conclusion" or "an important aspect of the problem" is not supported by substantial evidence, and the "court will not accept" such a determination.  *See Jiaxing Brother Fastener Co. v. United States*, 380 F. Supp. 3d 1343, 1360-61 n.26 (Ct. Int'l Trade 2019) (citations omitted); *NSK Corp. v. United States*, 637 F. Supp. 2d 1311, 1318 (Ct. Int'l Trade 2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Nor will the Court accept speculation; it is "well established that speculation does not constitute substantial evidence."  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009) (citation omitted).

## B.    The Commission Relied on Unreasonable Assumptions to Compensate for Missing Inventory Information

As reviewed above, the statute requires a specific finding for the Commission to make an affirmative critical circumstances determination: the imports must be likely to "undermine seriously the remedial effect of the antidumping order to be issued."  Applying the substantial evidence standard to any affirmative critical circumstances finding logically requires an evidentiary basis that is capable of satisfying the statutory test.

That is, the Commission must have an evidentiary basis for concluding what the remedial effect of the order should be, and what impact the imports in question have on that anticipated remedial effect.  In fact, the evidence must support a ***specific***

*finding* with respect to the remedial effect of the order: the relevant imports (those entering 90 days before the suspension of liquidation) must "undermine seriously" the anticipated remedial impact.  Logically, to make such a determination, the Commission must have sufficient, detailed information on what happened to the imports, and what impact they are likely to have at the time the order is issued, which occurs after any determination by the Commission.

As explained in detail below, the Commission did not explain how the evidence before it supported findings related to the expected remedial effect of the order, nor did it cite evidence supporting the conclusion that the relevant imports would "undermine seriously" that effect.  Doing so would have been impossible for the Commission, because the record contained no such evidence.

When confronted with the absence of the evidence, the Commission explained that "regardless of where the imported honey is in the supply chain, the volume associated with these inventories is large and increased substantially in the post-petition period and is likely to place downward pressure on prices until it is consumed by end users{.}"  Appx541.  The Commission's reasoning is not consistent with the substantial evidence standard: as discussed further below, it relies on conclusory assertions and speculation to compensate for missing information, and ignores contradictory information disproving end user "stockpiling," which was a key factor in the Commission's affirmative critical circumstances determination.

### 1.    The Commission's affirmative determination relied on conclusory assertions and speculation

The Commission's key justification for its affirmative critical circumstances finding references consumption of honey by the end users: "regardless of where the imported honey is in the supply chain, the volume associated with these inventories is large and increased substantially in the post-petition period and is likely to place downward pressure on prices until it is consumed by end users{.}" *Id.*

Although the Commission did not elaborate further, the focus on consumption by end users is reasonable; as consumers of the honey, they have the ability to choose between imported and domestic honey, and any "remedial effect" of the order can reasonably be measured at this point.  Presumably, the remedial effect of the order should be measured at the end-user level.  If the order enters into effect and forces the end user to pay more for the imported honey, the domestic honey becomes relatively more attractive, and the dumping order achieves its remedial effect.  If, on the other hand, end users have prepared in advance for the impact of the order and stockpiled imported honey, the remedial effect of the order could be undermined, perhaps even "seriously."  Thus, Plaintiffs-Appellants understand the Commission's focus on end-user inventories.

The problem is that the Commission did not develop evidence of end-user inventories.  Instead, it **assumed** that the inventories of honey in question were "in the supply chain" and would place "downward pressure on prices."  *Id.*  There are

several elements of this assumed conclusion that must be supported with substantial evidence. A review of the record here demonstrates that they were not.

First, the Commission stated that the "large" volumes of honey in question were "in the supply chain." But as discussed above in Section II.C.1, the Commission did not collect – and therefore did not have – information regarding the end users' inventories of honey entered during the 90-day critical circumstances period. Thus, as an initial matter, there was no evidence upon which the Commission could rely to conclude that such "large" volumes of such inventories were "in the supply chain" rather than having been promptly consumed by the end users themselves – a practice to which multiple industry participants attested. *See* Appx29680 (demonstrating that most of the imports of raw honey from Vietnam in inventory had been sold into the U.S. market well before the Commission's decision, let alone the ensuing antidumping duty order); Appx31781, Appx31806, Appx31811, Appx31816, Appx31819, Appx31823, Appx31832 (explaining that end users "maintain minimal inventory space for raw honey" and consume raw honey shortly after delivery). The Dissent recognized this as well. *See* Appx545-546.

Despite this evidence, the Commission summarily stated in a footnote that it was "likely" that the critical circumstance imports "remained in inventory{; were} somewhere in the supply chain and were not immediately consumed." Appx541, n.305. The Commission's conclusion that "large" volumes of such inventories were

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

"in the supply chain" both relied upon speculation and otherwise failed to address evidence regarding end users' practices with respect to inventories, making its conclusion unsupported by substantial evidence. *See State Farm*, 463 U.S. at 43 (failure to discuss evidence supporting an alternative conclusion or important aspect of a problem renders decision unsupported by substantial evidence); *Lucent*, 580 F.3d at 1327 (speculation does not constitute substantial evidence).

Second, the inventory evidence that *was* on the record (*i.e.*, submitted by importers and packers) established that inventories had fallen sharply – both during the 90-day period, or between that period and March 2022 (*i.e.*, as contemporaneous as possible to before the order was issued). *See* Appx31762-31763 (showing importer inventories declining by [ Num ] percent and packer inventories declining by [ Num ] percent). Moreover – and as the Dissent recognized – although "subject imports from Vietnam totaled 87.9 million pounds from May 2021 through October 2021, . . . . U.S. importers' inventories increased by only [    Number ] pounds" – such that "importers had sold off [Num.] percent of those imports by the end of October 2021 – the period that the Commission actually examined. Appx544-545.

These data, combined with the fact these same importers and packers testified to the fact that such inventories were sold off and consumed prior to the issuance of the order, further undermined the evidentiary basis for the Commission's conclusion. *See* Appx31762-31763, Appx31773, Appx31778, Appx31781, Appx31783,

Appx31788, Appx31793, Appx31798, Appx31803, Appx31806, Appx31808, Appx31811, Appx31813, Appx31816-31817, Appx31819-31820, Appx31823-31824, Appx31829, Appx31832-31833 (importer and packer affidavits and inventory data showing declining trends through March 2022). The totality of the evidence on record supported the conclusion that, rather than sitting in the inventory of either importers or end users, a significant quantity of the imported honey in question (the honey entering 90 days prior to the publication of Commerce's preliminary determination) had been, or would be, consumed prior to the issuance of the order, and consequently could not seriously undermine the order's remedial effect.

The Commission ignored this evidence in its critical circumstances determination. *See* Appx538-542. Its failure to account for this contradictory evidence likewise renders the Commission's determination unsupported by substantial evidence. *See*, *e.g.*, *State Farm*, 463 U.S. at 43 (failure to discuss evidence supporting an alternative conclusion or important aspect of a problem renders decision unsupported by substantial evidence).

Third, because the record did not establish whether or not the imports in question were, in fact, consumed by end users, that same record could not support the Commission's finding that inventories of critical circumstances entries were "likely to place downward pressure on prices until . . . consumed by end users{.}"

Appx541.  The Commission's conclusion that such inventories were likely to place such "downward pressure" was based on Petitioners' allegation that certain end users were "stockpiling" imports of raw honey from Vietnam.  *See* Appx541-542, n.306.  But as explained further in Section III.B.2 below, the Commission misconstrued such evidence regarding stockpiling, and otherwise disregarded evidence on the record.

**2.    The Commission failed to acknowledge contradictory evidence concerning allegations of "stockpiling" that contributed to its affirmative determination**

As discussed above, in concluding that inventories of honey from Vietnam would place "downward pressure" on pricing, the Commission highlighted and relied on Petitioners' allegation that "[ Circumstances related to allegations of "stockpiling" of raw honey from Vietnam.                ]" an end user that "participated in the final phase of these investigations."  *See* Appx541-542, n.306

Petitioners first raised the allegation of end-user "stockpiling" late in the investigation, in their post-hearing brief, where they argued that the inventories in question would have adverse effects because [Circumstances related to allegations of "stockpiling" of raw honey from Vietnam ].  *See* Appx31464. The allegation itself cited to Petitioners' earlier-submitted declaration concerning importers' inventories – specifically, from an industry witness who stated that [ Company ] had [Circumstance] to the honey from its supplier, [ Company    ].  *See id.*; Appx29194-29195, Appx29227 (emphasis

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

added).  In fact, then, the relevant inventories were held by the importer, not by the end user.  Yet, by the end of the proceeding, Petitioner represented to the Commission that it was the end user who had "stockpiled" this honey, which in turn the Commission accepted as a justification for its affirmative critical circumstances finding. *See* Appx541-542, n.306.

The Commission therefore simply accepted as true Petitioners' assertion of a key fact – alleged "stockpiling" by end users (and more specifically, a single end user alleged by Petitioners) with no tangible support on the record – to justify its affirmative critical circumstances determination.  The Commission again relied on speculation to reach a conclusion that, consequently, was unsupported by substantial evidence.  *Lucent*, 580 F.3d at 1327.

Beyond relying on Petitioners' unsupported assertion, the Commission disregarded record evidence that brought to light the flaws with, and otherwise disproved, the same assertion.  For example, the Dissent specifically highlighted the fact that Petitioners' cited declaration failed to support the conclusion that [ Company

] "stockpiled" the honey in question, because it concerned [ Company      ]'s practices.  Appx546.  Moreover, in their final comments to the Commission, the NHPDA and the Individual Importers demonstrated how the record – in particular, consistency in [ Company      ]'s importing patterns prior to and after the filing of the petition – contradicted Petitioners' claims of a ramp up in imports and

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

subsequent stockpiling by the end user. *See* Appx37606-37608 (concluding that "the record shows that [Company          ]'s imports in interim 2021 were basically the same as . . . in interim 2020. . . . {T}here is no basis to accept Petitioners' claim that there was a massive purchase by [     Company and date          ], let alone its claim that [  Company    ] has supposedly stockpiled those same imports to use after the imposition of an antidumping duty order.").

Faced with such evidence, the Commission faulted the end users themselves, noting that, although they participated in the investigation, "[

> Circumstances related to allegations of "stockpiling" of raw
> honey from Vietnam.

] . . . ." Appx541-542, n.306.

Yet, the record contradicted Petitioners' allegation regarding [Company    ]; and, as discussed in Section III.B.1, other record evidence, including the importers' and packers' inventory data and end users' consumption practices, corroborated the fact that importers had sold off significant quantities of inventory and that these were neither "in the supply chain" nor "stockpiled." Put simply, the Commission refused to develop and engage with this evidence. *See*, *e.g.*, *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (stating that the "substantial evidence standard requires more than mere assertion of evidence which in and of itself justified the Commission's determination, without taking into account contradictory

evidence or evidence from which conflicting inferences could be drawn.") (citations, internal quotation marks, and brackets omitted).

The Commission's finding, which relied on Petitioners' unsupported claim that end users "stockpiled" honey and otherwise dismissed clear record evidence to the contrary, was consequently unsupported by substantial evidence. This, as the Supreme Court stated in *State Farm*, amounts to an agency determination that fails "to consider an important aspect of the problem" and otherwise offers "an explanation for {the Commission's} decision that runs counter to the evidence before the agency. . . ." The Commission did not – as this Court warned that it must in *Gerald Metals* – do more than accept "mere assertion" of evidence that supported its conclusion while failing to take contradictory evidence into account. 132 F.3d at 720 (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the foregoing reasons, the Commission's affirmative critical circumstances determination with respect to imports of raw honey from Vietnam was contrary to law and unsupported by substantial evidence on the record. The Individual Importers and the NHPDA respectfully request that the Court reverse the CIT's decision, and remand to the Commission with instructions to issue a negative determination, consistent with the Court's opinion.

Respectfully submitted,

/s/ Gregory Husisian
Gregory Husisian
FOLEY & LARDNER LLP
Suite 600
3000 K Street NW
Washington DC, 20007
(202) 945-6149

Counsel to Plaintiffs-Appellants Sweet Harvest Foods, Export Packers Company Ltd., Honey Holding I, dba Honey Solutions, Sunland Trading Inc.

/s/ Gregory J. Spak
Gregory J. Spak
Ron Kendler
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiff-Appellant National Honey Packers & Dealers Association

April 22, 2024

ADDENDUM

Sweet Harvest v. United States,
Slip Op. 23-162

Non-Confidential

Appx1-32

Slip Op. 23-162

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SWEET HARVEST FOODS, <br><br>          Plaintiff, <br><br>     and <br><br> EXPORT PACKERS COMPANY LIMITED, HONEY HOLDING I, LLP DBA HONEY SOLUTIONS, SUNLAND TRADING, INC., NATIONAL HONEY PACKERS & DEALERS ASSOCIATION (NHPDA), <br><br>          Consolidated Plaintiffs, <br><br>     v. <br><br> UNITED STATES, <br><br>          Defendant, <br><br>     and <br><br> AMERICAN HONEY PRODUCERS ASSOCIATION, SIOUX HONEY ASSOCIATION, <br><br>          Defendant-Intervenors. | Before:  Leo M. Gordon, Judge <br><br> Consol. Court No. 22-00188 <br><br> **PUBLIC VERSION** |

<u>**OPINION**</u>

[Sustaining ITC's final affirmative critical circumstances determination.]

Dated: November 17, 2023

    <u>Gregory Husisian</u>, Foley & Lardner, LLP, of New York, N.Y., argued for Plaintiff Sweet Harvest Foods and Consolidated Plaintiffs Export Packers Company Limited, Honey Holding I, LLP DBA Honey Solutions, and Sunland Trading, Inc. With him on the briefs was <u>Jenlain C. Scott</u>.

    <u>Michael K. Haldenstein</u>, Attorney Advisor, U.S. International Trade Commission, of Washington, D.C., argued for Defendant United States.  With him on the brief were <u>Dominic L. Bianchi</u>, General Counsel, and <u>Andrea C. Casson</u>, Assistant General Counsel.

Consol. Court No. 22-00188          **PUBLIC VERSION**          Page 2

<u>Melissa M. Brewer</u>, Kelley Drye & Warren, LLP, of Washington, D.C., argued for Defendant-Intervenors American Honey Producers Association and Sioux Honey Association. With her on the brief were <u>R. Alan Luberda</u> and <u>Kathleen W. Cannon</u>.

Gordon, Judge: This consolidated action involves the final affirmative determination of critical circumstances by the U.S. International Trade Commission ("ITC" or "Commission") resulting from the investigation on raw honey from Vietnam. <u>See</u> <u>Raw Honey from Argentina, Brazil, India, and Vietnam</u>, 87 Fed. Reg. 33,831 (Int'l Trade Comm'n June 3, 2022) ("<u>Final Determination</u>"); <u>see also</u> <u>Views of the Commission</u>, USITC Pub. 5327, Inv. No. 701-TA-1564 (Final) (June 3, 2022), ECF No. 21-1 ("<u>Views</u>"); <u>Separate Views of Commissioner David S. Johanson</u> ("<u>Dissenting Views</u>"), ECF No. 21-2; Final Staff Report, ECF No. 21-3 ("<u>Staff Report</u>"); <u>Raw Honey from Argentina, Brazil, India, and Vietnam</u>, 87 Fed. Reg. 35,501 (Dep't of Commerce June 10, 2022) ("<u>AD Orders</u>").

Before the court is the USCIT Rule 56.2 motion for judgment on the agency record filed by Plaintiff Sweet Harvest Foods ("Sweet Harvest") and Consolidated Plaintiffs Export Packers Company Limited, Honey Holding I, LLP DBA Honey Solutions, Sunland Trading, Inc., and the National Honey Packers & Dealers Association ("NHPDA")[1] (collectively, Plaintiffs). <u>See</u> Pls.' Mot. For J. on the Agency R., ECF No. 27[2] ("Pls.' Br."); <u>see also</u> Def.'s Resp. to Pls.' Mot. For J. on the Agency R., ECF No. 29 ("Def.'s Resp.");

---

[1] "Although all cases concerning the Vietnamese critical circumstances determination are consolidated into a single action, the NHPDA is represented by its own counsel, attorneys from White & Case LLP," of Washington, D.C. Pls.' Br. at 1. The NHPDA did not file a separate brief, and supports the arguments raised by the other Plaintiffs. <u>Id.</u> Neither did NHPDA appear for oral argument.

[2] All citations to parties' briefs and the agency record are to their confidential versions unless otherwise noted.

Consol. Court No. 22-00188          **PUBLIC VERSION**          Page 3

Def.-Int.'s Resp. to Pls.' Mot. For J. on the Agency R., ECF No. 34 ("Def.-Int.'s Resp.");

Pls.' Joint Reply Brief, ECF No. 37 ("Pls.' Reply").  The court has jurisdiction pursuant to

Section 516a of the Tariff Act of 1930, as amended, 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and

1516a(a)(2)(B)(i).[3]  For the reasons set forth below, the court sustains the ITC's final

affirmative critical circumstances determination.

## I. Background

The statutory scheme governing unfair trade investigations requires a

determination by the Commission on whether imported merchandise within the scope of

a particular investigation has materially injured a domestic industry.  <u>See</u> 19 U.S.C.

§ 1673.  After its investigation, the ITC unanimously found that imports of raw honey from

Vietnam were materially injuring a domestic industry.  <u>See</u> <u>Views</u> at 74.  Having reached

that determination, the Commission noted that the U.S. Department of Commerce

("Commerce") had found in its investigation that "critical circumstances exist with respect

to certain producers/exporters in Argentina and Vietnam."  <u>Id.</u> at 61 (citing <u>Raw Honey</u>

<u>From the Socialist Republic of Vietnam</u>, 87 Fed. Reg. 22,184 (Dep't of Commerce

Apr. 14, 2022) (final affirm. AD determ. & crit. circum. determ.)[4]).  The ITC then explained

that, given Commerce's determination, coupled with the affirmative material injury

---

[3] Further citations to the Tariff Act of 1930, as amended, are to relevant provisions of Title 19 of the U.S. Code, 2018 edition.

[4] In its final determination, Commerce noted that "because we continue to find that critical circumstances exist, Commerce will instruct U.S. Customs and Border Protection (CBP) to continue to suspend liquidation of all appropriate entries of raw honey from Vietnam, … which were entered, or withdrawn from warehouse, for consumption on or after August 25, 2021, which is 90 days prior to the date of publication of the affirmative <u>Preliminary Determination</u> in the Federal Register."  87 Fed. Reg. at 22,186.

Consol. Court No. 22-00188       **PUBLIC VERSION**       Page 4

determination, the statute required the Commission to further determine "whether the imports subject to the affirmative [Commerce critical circumstances] determination … are likely to undermine seriously the remedial effect of the antidumping [and/or countervailing duty] order[s] to be issued." Id. (citing 19 U.S.C. § 1673d(b)(4)(A)(i)).

     In making a critical circumstances determination, the statute directs the Commission to consider, among other relevant factors, "(I) the timing and the volume of the imports, (II) a rapid increase in inventories of the imports, and (III) any other circumstances indicating that the remedial effect of the antidumping order will be seriously undermined." 19 U.S.C. § 1673d(b)(4)(A)(ii). As part of its analysis, the Commission is to identify "the appropriate period for comparison of pre-petition and post-petition levels of subject imports from … Vietnam." Views at 66. The ITC explained that, in the past, it has "relied on a shorter comparison period when Commerce's preliminary determination applicable to the subject imports at issue fell within the six-month post-petition period the Commission typically considers." Id. Here, however, the ITC noted that the petitions were filed on April 21, 2021 and that "Commerce's preliminary determinations were issued on November 17, 2021, after the last month in the six-month post-petition period of May 2021 through October 2021." Id. at 66–67. As a result, the ITC decided to "compare the volume of subject imports six months prior to the filing of the petitions (November 2020-April 2021) with the volume of subject imports in the six months after the filing of the petitions (May 2021-October 2021)." Id. at 67.

     Based on the timing and volume of imports, the rapid increase in and size of inventories, and the continued underselling of the domestic like product by wide margins,

Consol. Court No. 22-00188               **PUBLIC VERSION**               Page 5

the Commission reached an affirmative determination of critical circumstances. Id. at 73.

As the ITC highlighted, "[a]n affirmative critical circumstances determination by the Commission, in conjunction with an affirmative determination of material injury by reason of subject imports, [results] in the retroactive imposition of duties for those imports subject to the affirmative Commerce critical circumstances determination for a period 90 days prior to the suspension of liquidation." Views at 62. Consequently, duties on entries of raw honey from Vietnam were made retroactive and payable on entries after August 25, 2021, rather than after the date of publication of Commerce's preliminary determination on November 23, 2021. See AD Orders, 87 Fed. Reg. at 35,502. One Commissioner disagreed, finding that the record lacked evidence that "could resolve the exact size of any diminished amount of unfairly traded merchandise that might remain." See Dissenting Views at 9–10 (noting that record lacked evidence "regarding final inventory levels of most importers and purchasers, the propensity of end users to hold inventory, actual consumption, and the rate at which fairly traded imports arrived immediately before the order to replace unfairly traded ones").

Plaintiffs then challenged the ITC's affirmative critical circumstances determination, maintaining that the ITC focused on the incorrect period to evaluate whether critical circumstances existed. Plaintiffs raise several legal and factual arguments that all share a fundamental theme, namely, that the ITC failed to consider or afford adequate weight to the most recent data on the record, which, in turn demonstrated that the critical circumstances imports were not "likely to undermine seriously" the AD Orders.

Plaintiffs first argue that the ITC's determination was not in accordance with law because the agency issued its determination without analyzing contemporaneous inventory information as required by § 1673d(b)(4)(A). See Pls.' Br. At 2–3. Plaintiffs maintain that the Commission failed to correctly interpret § 1673d(b)(4)(A)(i), as well as § 1673d(b)(4)(A)(ii)(II). See id. at 8 (highlighting standard for ITC critical circumstances analysis that Commission must find that subject imports are "likely to undermine seriously the remedial effect of the antidumping order to be issued"); id. at 12 (emphasizing that "[i]t is the methodology and determination of the Majority relating to [§ 1673d(b)(4)(A)(ii)(II)] that is the subject of this appeal. Merely analyzing whether there is an increase of imports does not complete the analysis; as the statute requires, there also must be evidence to show that those imports would have a specific effect, which is to seriously undermine the remedial effect of the order."); see also Pls.' Reply at 2–11 (substantially developing argument that ITC erred by failing to properly interpret phrase "order to be issued" in § 1673d(b)(4)(A)(i)).

Plaintiffs alternatively maintain that, even if the ITC's determination is in accordance with law, the ITC incorrectly applied the statute by relying upon unreasonable assumptions to fill in missing inventory data, ignored contrary evidence on the record, and ultimately reached an unreasonable determination based on incomplete and outdated data. See Pls.' Br. at 2–4, 18–35.

## II. Standard of Review

The court sustains the Commission's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in

Consol. Court No. 22-00188          **PUBLIC VERSION**          Page 7

accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determination, findings or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting a reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2023). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2023).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–845 (1984), governs judicial review of the Commission's interpretation of the Tariff Act. See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (An agency's "interpretation governs in the absence of unambiguous

statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

### III. Discussion

### A. Legal Arguments

As a threshold matter, Plaintiffs challenge the Commission's interpretation of 19 U.S.C. § 1673d(b)(4)(A)(i), which provides that "[t]he final determination of the Commission shall include a finding as to whether the imports subject to the affirmative determination under subsection (a)(3) are likely to undermine seriously the remedial effect of the antidumping duty order to be issued under section 1673e of this title." See 19 U.S.C. § 1673d(b)(4)(A)(i). Specifically, Plaintiffs argue that the plain meaning of the words "order to be issued" in the statute clearly demonstrates congressional intent to require the ITC to engage in a forward-looking analysis to determine whether any increased critical circumstances imports at the time of the issuance of the order are in a position to "undermine seriously" the impact of the final antidumping duty order. See Pls.' Br. at 14–16, 18 (concluding that "[t]he statute specifically requires that the Commission evaluate inventory levels as a means of determining whether, at the time of the issuance of the order, there are sufficient levels of the critical circumstances entries in existence to 'undermine seriously' the remedial effect of the order. With the record containing no information regarding the inventory levels of the critical circumstances entries at the time of the order, or any information regarding the inventories held by end-users, the Dissent correctly concluded that there was no basis to determine that the statutory standard was met."); see also Oral Argument at 00:04:05–00:04:50 (July 18, 2023), ECF No. 50

Consol. Court No. 22-00188          **PUBLIC VERSION**                    Page 9

(Plaintiffs' opening argument, relying on Chevron, is that "this case, at its heart, is a case about statutory construction.… [which] starts and stops with the plain language of the statute"); Pls.' Reply at 2–11 (substantially developing argument that ITC erred by failing to properly interpret phrase "order to be issued" in § 1673d(b)(4)(A)(i)).

Plaintiffs' legal arguments are presented in a confusing manner, with Plaintiffs initially arguing that the meaning of the statute is clear, before conceding shortly thereafter that the statute is silent as to the specific timing issue challenged here. Compare Pls.' Br. at 12 (arguing that "where 'Congress has directly spoken to the precise question at issue,' as it has here, the agency is required to follow that directive" (emphasis added)), with id. at 14 (conceding that "[t]he time period to be used in evaluating inventory levels is not specified in the statute."). When asked to square this apparent contradiction, Plaintiffs maintained that their legal argument consists of two parts, with the first focusing on the clear "general intent" of the language in § 1673d(b)(4)(A)(i), and in particular, the remedial effect of the "order to be issued." See Oral Arg. at 00:06:06–00:07:17 (explaining that argument should be considered under Chevron step 1); see also Pls.' Reply Br. at 7–11 (arguing "the Statute, the Legislative History, and Recent Precedent of this Court" with respect to the statutory phrase "Remedial Effect of the Order to Be Issued"). Plaintiffs' counsel then explained that its concession as to statutory silence related to a different provision, namely § 1673d(b)(4)(A)(ii) not § 1673d(b)(4)(A)(i). Oral Arg. at 00:07:17–00:08:04, 00:15:15–00:19:41 (explaining that this more specific argument should be considered under Chevron step two). Unfortunately, counsel's attempt at oral argument in clarifying Plaintiffs' legal position does not accurately reflect

Consol. Court No. 22-00188                **PUBLIC VERSION**                Page 10

the arguments made in their briefs.  Regardless, Plaintiffs' clarification fails to persuade the court that their statutory interpretation is meritorious.

Beyond reciting the <u>Chevron</u> step one standard that an agency must follow a statutory directive where "Congress has directly spoken to the precise question at issue," Plaintiffs' arguments do not demonstrate how Congress has spoken directly, nor how the plain language of § 1673d(b)(4)(A) compels their desired outcome.  <u>See</u> Pls.' Br. at 12 (providing sole citation to <u>Chevron</u> in all of Plaintiffs' briefing); <u>see also</u> Oral Arg. at 00:06:10–00:08:02 (describing "general intent" of § 1673d(b)(4)(A)(i) as "clear," while acknowledging that § 1673d(b)(4)(A)(ii) is silent as to precisely what inventory data that ITC should be considering).  In developing their argument regarding § 1673d(b)(4)(A)(i), Plaintiffs characterize the dispute as "whether the Commission should examine the level of the critical circumstances inventories: (1) at the time that the suspension of liquidation occurs (<u>i.e.</u>, November 25, 2021, which is fairly close to the time period actually considered by the Commission majority); or (2) based on updated inventory and other data found in the record for the final phase of the investigation (as urged by Plaintiffs)." Pls.' Reply Br. at 7-8.  Plaintiffs contend that the ITC is acting unreasonably in determining that the agency need not examine "<u>any</u> inventory data that is after the suspension of liquidation (November 25, 2021), because the 'remedial effect of the order … began upon collection of duties in November 2021."  <u>Id.</u> at 8 (citing Def.'s Resp. at 3).  Plaintiffs maintain that the ITC ignored the plain language of the statute since the relevant provision specifies that the agency's critical circumstances analysis is to focus on whether the

critical circumstances entries are likely to "undermine seriously the remedial effect <u>of the antidumping order to be issued."</u>  <u>Id.</u> (quoting § 1673d(b)(4)(A) with added emphasis).

Defendant urges the court to reject Plaintiffs' view and maintains that the ITC's statutory interpretation is correct.   Defendant argues that the plain language of § 1673d(b)(4)(A), when read in the context of the statute as a whole, demonstrates that the "remedial effect of the order" refers to final duties that are effective as of suspension of liquidation.  <u>See</u> Def.'s Resp. at 11.  Defendant notes that the Commission focuses its critical circumstances inquiry on the imports that entered after the filing of the petition and prior to the suspension of liquidation, at which time relief becomes effective.  <u>Id.</u> Defendant emphasizes that "[t]he legislative history explains that the critical circumstances provision was designed 'to deter exporters whose merchandise is subject to an investigation from circumventing the intent of the law by increasing their exports to the United States during the period between initiation of an investigation and a preliminary determination by [Commerce].'"  <u>Id.</u> (quoting <u>ICC Indus., Inc. v. United States</u>, 812 F.2d 694, 700 (Fed. Cir. 1987) (quoting H.R. Rep. No. 317, 96th Cong., 1st Sess. 63 (1979)), <u>aff'g</u>, 10 CIT 181, 632 F. Supp. 36 (1986)).

Defendant specifically notes that the "Statement of Administrative Action [("SAA")] accompanying the Uruguay Round Agreements Act indicates that the Commission should analyze the period prior to the effective date of the order as the Commission's critical circumstances determination is focused 'on whether an order's effectiveness is undermined by increasing shipments prior to the effective date of the order.'"  <u>Id.</u> (citing H.R. Rep. 103-316, vol. I at 877 (1994)).  Based on this material, Defendant concludes

Consol. Court No. 22-00188          **PUBLIC VERSION**          Page 12

that the ITC's analysis of "the likely effects of the surge in imports entering <u>prior</u> to suspension of liquidation that are normally not subject to antidumping duties" is consistent with the congressional mandate to analyze whether the imports are likely to seriously undermine the remedial effect of the order. <u>Id.</u> (highlighting that SAA similarly directs Commerce to examine "the imports that entered after the filing of the petition and prior to suspension of liquidation").

Plaintiffs also cite to the SAA emphasizing that the statutory intent is for the ITC "to focus 'on whether <u>an order's effectiveness</u> is undermined by increasing shipments <u>prior to the effective date of the order</u>." Pls.' Reply at 8 (quoting the SAA, H.R. Rep. 103-316, Vol. I at 877, with added emphasis). Thus, while Plaintiffs and Defendant apparently agree that the statute directs the ITC to focus on the time period right before the "effective date of the order," the parties diverge on precisely what constitutes the "effective date" of the order. According to Plaintiffs, Defendant's determination that the "effective date of the order to be issued" commences with the suspension of liquidation is unreasonable in that it wrongfully equates the commencement of provisional measures (<u>i.e.</u>, the suspension of liquidation following the publication of the preliminary determinations of Commerce and the ITC), with the issuance and publication of the AD order (as well as the corresponding issuance of final duties) following the final determinations of Commerce and the ITC. <u>See</u> Pls.' Reply at 7–11. Plaintiffs' argument is undercut, while the Commission's interpretation is further bolstered, by the language of the <u>AD Orders</u> that provides that duties are collected on or after suspension of liquidation on November 23, 2021, except for duties on raw honey from Vietnam, which were made

retroactive by 90 days from November 23, 2021, to August 25, 2021.  See AD Orders, 87 Fed. Reg. at 35,502.  Thus, the AD Orders are, by their own terms, applicable to duties after suspension of liquidation rather than after the date of issuance of the order itself.

Plaintiffs' focus on the absence of the term "provisional measures," as well as the forward-looking nature of the phrase "order to be issued," is misplaced in light of the full context of § 1673d(b)(4)(A).  See Def.'s Resp. at 27–29.  Given the above, Plaintiffs are unable to persuade the court that the phrase "order to be issued" conveys a clear congressional intent to require the ITC to consider more contemporaneous data, i.e., data from after the suspension of liquidation.

Plaintiffs raise a separate argument relating to the interpretation of § 1673d(b)(4)(A)(i), contending that "[t]he issue before the Commission is to consider whether the exact entries of raw honey from Vietnam that entered during the ninety-day critical circumstances period are in a position to 'undermine seriously' the remedial effect of the order."  Pls.' Br. at 11.  In their reply, Plaintiffs develop this argument more fully, maintaining that "[t]he Statute Plainly States that the Entries 'Subject to the Department's Affirmative' Critical Circumstances Finding Are Exactly the Same as the Entries Where Liquidation Is Suspended Ninety Days Early."  See Pls.' Reply at 3–7.  Plaintiffs make this argument purportedly in response to Defendant's contentions that Plaintiffs have confused "the 90-day retroactive application of duties with the entries subject to Commerce's finding of critical circumstances."  Id. at 3 (quoting Def.'s Resp. at 2).  Plaintiffs begin by describing in detail Commerce's critical circumstances determination, and conclude that Defendant has apparently "confused the time period analyzed by the

Consol. Court No. 22-00188          **PUBLIC VERSION**          Page 14

Department to determine whether subject imports were 'massive' (i.e., the period between April of 2021 and November of 2021) with the actual critical circumstances entries that are "subject to the affirmative determination" (i.e., the ones that were subjected to antidumping duties by virtue of the Department's affirmative critical circumstances finding)." Id. at 6. Plaintiffs therefore contend that "there is no basis for Defendant to conclude that the Commission was supposed to analyze [whether] critical circumstances [existed] based on 'imports … entering during a longer period {than ninety days}, the period between the filing of petitions and suspension of liquidation.'" Id. at 7.

As Defendant explains, "Commerce makes its finding of critical circumstances concerning imports in the post-petition period prior to suspension of liquidation." Def.'s Resp. at 15 (citing 87 Fed. Reg. 2,127, 2,129–30 (Jan. 13, 2022) (preliminary determination of critical circumstances for Vietnam), and 87 Fed. Reg. 22,184, 22,185 (Apr. 14, 2022) (final determination of critical circumstances)). Here, the "post-petition period started in April 2021 with the filing of the petitions and ran until suspension of liquidation in November 2021." Id. The SAA directs the ITC "to determine whether the surge in imports prior to the suspension of liquidation, rather than the failure to provide retroactive relief, is likely to seriously undermine the remedial effect of the order." Id. (quoting SAA at 877). Given this, the court agrees that "the issue for the Commission was not, as Plaintiffs also incorrectly state, whether the remedial effect of the order would be seriously undermined without the retroactive application of duties for 90 days. Instead, the issue for the Commission was, as it properly analyzed, whether the subject imports entering during the period after the filing of the petition and prior to suspension of

Consol. Court No. 22-00188              **PUBLIC VERSION**              Page 15

liquidation were likely to seriously undermine the remedial effect of the antidumping duty order." Id. (internal citations omitted). This conclusion is logical given the purpose of the critical circumstances provision and the overall statutory scheme.

Plaintiffs fail to explain how or why the statute would limit the time period for the Commission's critical circumstances analysis to only the 90-day retroactive period rather than having it mirror the same period reviewed by Commerce in its critical circumstances analysis. Cf. 19 U.S.C. § 1673d(a)(3). Not only is Plaintiffs' contention that the Commission must examine current inventory levels unsupported by the statutory critical circumstances requirements, it also appears practically unworkable given the statutory deadlines and time constraints imposed on the Commission. As Defendants point out, there is a limit on the time period for which the Commission can gather data from interested parties given the statutory deadline to which it is subject and given the statutory requirements that information be released to parties and parties be permitted to comment on all record information. See Def.'s Resp. at 32–33 (explaining that Plaintiffs' demand for collecting and reviewing 2022 data "is incompatible with the Commission's final phase investigations which utilized a POI ending in September 2021," and emphasizing limitations imposed by statutory deadlines); Def.-Int.'s Resp. at 5 n.3. Overall, Plaintiffs' argument is unpersuasive as the court concludes that the ITC's statutory interpretation was not at odds with the plain language of § 1673d(b)(4)(A)(i).

Alternatively, Plaintiffs contend that the ITC misinterpreted 19 U.S.C. § 1673d(b)(4)(A)(ii)(II). See Pls.' Br. at 12. Specifically, Plaintiffs argue that, under this provision, the ITC is required to evaluate both historical data on import levels and

Consol. Court No. 22-00188            **PUBLIC VERSION**            Page 16

contemporaneous data on inventory levels, and that the ITC failed to do the latter.  Pls.'
Br. at 14–16.  Notably, Plaintiffs do not dispute that there was a substantial increase in
the "timing and volume of the imports" relevant to the ITC's critical circumstances analysis
under § 1673d(b)(4)(A)(ii)(I).  See Pls.' Br. at 12 (conceding that "Plaintiffs do not
challenge the Commission's methodology or conclusions [under § 1673d(b)(4)(A)(ii)(I)]
relating to whether imports increased."); Oral Arg. at 00:23:48-00:23:55 ("We don't
disagree that there was a big increase in imports.").  Again, the court returns to the
Chevron framework to evaluate Plaintiffs' legal argument under § 1673d(b)(4)(A)(ii)(II),
and again the court must conclude that Plaintiffs have failed to demonstrate how they can
prevail under this standard.

As previously noted, Plaintiffs correctly recite the first step of Chevron, explaining
that where "where 'Congress has directly spoken to the precise question at issue,' … the
agency is required to follow that directive."  Pls.' Br. at 12 (arguing that Congress has
indeed directly indicated its intent under § 1673d(b)(4)(A)).  However, not more than two
pages later in their opening brief, Plaintiffs expressly concede that the "time period to be
used in evaluating inventory levels is not specified in the statute."  Id. at 14.  Following
this concession, Plaintiffs appear to abandon their arguments under Chevron and do not
address whether the ITC's interpretation comports with the statute.  Instead, Plaintiffs
maintain in a conclusory manner that "logically" the forward-looking nature of the critical
circumstances inquiry demands that the Commission review contemporaneous
information as to the inventory levels specified in § 1673d(b)(4)(A)(ii)(II).  Id. at 14–15.
Plaintiffs fail to support this argument with legislative history or other sources

Consol. Court No. 22-00188          **PUBLIC VERSION**          Page 17

demonstrating that their "logical" conclusion as to the statutory interpretation renders the ITC's interpretation impermissible.

To the contrary, Defendant provides the court with legislative history that corroborates the ITC's interpretation of § 1673d(b)(4)(A)(ii)(II).    See Def.'s Resp. at 28–29.  Defendant highlights that the ITC's focus of its critical circumstances analysis, "with respect to imports and inventories in the post-petition period prior to suspension of liquidation," makes sense given that the statute directs Commerce to focus its critical circumstances analysis on the same time period.  Id. at 28; see also Def.-Int.'s Resp. at 4–5 (highlighting that § 1673d(b)(4)(A)(ii)(II) directs ITC to consider existence of "increase" in inventories, not "what the remaining level of inventories are at some point in time after the imposition of provisional measures leading up to the Commission's vote").  Defendant further notes that the "SAA confirms that the effective date of the antidumping duty order, rather than its issuance date, is the proper time for the Commission's analysis."  Def.'s Resp. at 28 (citing SAA at 877).  Specifically, the SAA provides that the ITC is required to determine "whether, by massively increasing imports prior to the effective date of relief, the importers have seriously undermined the remedial effect of the order."    Id. at 29 & n.7 (quoting, with emphasis, SAA at 877, and noting that "[t]he language quoted above from the SAA appears in nearly 100 Commission critical circumstances determinations (by Westlaw's count) indicating that it has consistently been the effective date of relief that is important in the Commission's analysis").

Given Plaintiffs' concession, there is no dispute that the interpretation of § 1673d(b)(4)(A)(ii)(II) should be resolved under Chevron step two because the statute is

Consol. Court No. 22-00188 **PUBLIC VERSION** Page 18

silent as to what time period the ITC should use in conducting its critical circumstances

inventory analysis.  Additionally, as Plaintiffs have not provided any support for their

argument as to why the ITC's interpretation is impermissible under <u>Chevron</u> step two, the

court agrees with Defendant that Plaintiffs cannot prevail on this issue.  As Defendant

explains:

> The statute provides additional guidance to the Commission, directing it to consider whether there has been "a rapid increase in inventories of the imports."  19 U.S.C. § 1673d(b)(4)(A)(ii)(II).  The Commission must therefore evaluate the <u>increase</u> in inventories of the imports subject to Commerce's determination.  The statute does not direct the Commission to evaluate the remaining level of inventories subject to Commerce's determination several months later when Commerce finally issues the antidumping duty order. The statute's specific reference to the increase in inventories indicates the Commission should evaluate their increase prior to provisional duties and not the manner in which the inventories are later sold.

Def.'s Resp. at 28.

In sum, Plaintiffs have failed to demonstrate that the ITC's interpretation of the

plain language of the statute violated express congressional intent.  <u>See</u> <u>supra</u> at pp.

8-15.  Furthermore, Plaintiffs have not shown that the ITC impermissibly interpreted the

statute by focusing its critical circumstances analysis on the period prior to suspension of

liquidation in evaluating whether subject imports are "likely to undermine seriously the

remedial effect of the antidumping duty order to be issued."  Accordingly, the court

sustains the ITC's interpretation of § 1673d(b)(4)(A).

Consol. Court No. 22-00188          **PUBLIC VERSION**          Page 19

### B. Substantial Evidence Arguments

Plaintiffs maintain that, even if the court rejects their legal challenges to the Commission's interpretation of § 1673d(b)(4)(A), the court should nevertheless remand the ITC's affirmative determination of critical circumstances as unsupported by substantial evidence. See Pls.' Br. at 13–35. Specifically, Plaintiffs contend that it was unreasonable for the ITC to reach its findings without the record containing information about "the inventory levels of the critical circumstances entries at the time of the [issuance of the] order, or any information regarding the inventories held by end-users." Id. at 16–17. Plaintiffs further insist that given the state of the record, the Commission's conclusions as to the inventory levels of critical circumstances entries were "pure guesswork." Id. at 18-29.

Plaintiffs also contend that the Commission ignored "two other key pieces of evidence: (1) information demonstrating that the U.S. industry was experiencing severe shortages and the inability to supply customers at the end of the period of investigation; and (2) information demonstrating that the U.S. producers, which do not make raw honey that directly competes with the Vietnamese imports, would not be losing any sales opportunities at the bakers who rely on Vietnamese imports." Id. at 29–35. In making these arguments, Plaintiffs rely heavily on Commissioner Johanson's dissent and urge the court to remand to allow the ITC to reach a negative final determination following the dissent's reasoning. See id. at 16–34, 36.

Consol. Court No. 22-00188          **PUBLIC VERSION**          Page 20

Before addressing the merits of Plaintiffs' substantial evidence arguments, the court will review the findings made by the Commission in reaching its affirmative critical circumstances determination.   The ITC found that:

> [R]aw honey imports from Vietnam from all Vietnamese producers/exporters are subject to Commerce's affirmative critical circumstances determination.    These imports increased from 48.0 million pounds in the pre-petition period to 87.9 million pounds in the post-petition period, an increase of 83.2 percent.  The 87.9 million pounds of subject imports in the post-petition period are equivalent to 19.1 percent of apparent U.S. consumption in the interim 2021 period. The volume of subject imports from Vietnam in four of the six months of the post-petition period (July, August, September, and October 2021) significantly exceeded the volume of subject imports from Vietnam recorded in any prior month of the POI.  In addition, subject imports from Vietnam increased rapidly in each of the first four months of the post-petition period, reversing a downward trend from December 2020 to April 2021.

Views at 69–70 (footnotes omitted).   Further, the ITC highlighted that importers' inventories of imports from Vietnam subject to Commerce's affirmative determination increased almost threefold from April 30, 2021 (the last month of the pre-petition period) to October 31, 2021 (the last month of the post-petition period).   Id. at 70–71 (noting that "[s]everal importers increased their inventories of subject imports from Vietnam from April 2021 to October 2021 before provisional duties came into effect in November 2021").

The ITC emphasized that it viewed the "timing of subject imports from Vietnam in the post-petition period as significant and probative."   Id. at 72 (reviewing import data and explaining its finding that "[t]his timing, together with the associated volume of subject imports in the post-petition period, suggest that the volume of imports was … a deliberate

effort to enter product into the U.S. market in substantial and increasing volumes while evading potential exposure to the retroactive application of antidumping duties"). The Commission further noted that "[w]hile apparent U.S. consumption was higher in interim 2021 than interim 2020 by 15.2 percent, importers' U.S. shipments of subject imports from Vietnam were only 2.8 percent higher, a modest increase that does not explain why importers would sharply increase their imports from Vietnam during the post-petition period." Id. It also observed that "notwithstanding higher prices, the domestic industry continued to report losses even with higher prices in interim 2021." Id. at 74. The ITC thus concluded that "[g]iven the volume and timing of imports, including the sharp increase in the volume of post-petition imports prior to the retroactive liability period under the critical circumstances provision, the rapid increase in and size of inventories, and the continued underselling of the domestic like product by wide margins, we find that the remedial effect of the antidumping duty order with respect to subject imports from Vietnam will likely be seriously undermined." Id.

The ITC next considered and rejected Plaintiffs' contentions that importers had sold off most of their inventory. In fact, the data available on the record did not support Plaintiffs' assertions. See Views at 73–74 & n. 306. The ITC was unconvinced by Plaintiffs' arguments that critical circumstances cannot exist when importers have "sold off" their inventories, explaining that "regardless of where the imported honey is in the supply chain, the volume associated with these inventories is large and increased substantially in the post-petition period and is likely to place downward pressure on prices until it is consumed by end users, particularly given the continued underselling by subject

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Consol. Court No. 22-00188          **PUBLIC VERSION**          Page 22

imports from Vietnam at wide margins." Id. at 73. While Plaintiffs maintain that the ITC's conclusion here was based on "assumptions" and guesswork, see Pls.' Br. at 18–20, 26-29, the ITC emphasized that the record did not support Plaintiffs' fundamental contention. See Views at 73 n.306. Specifically, the Commission noted that:

> One of the largest importers of subject imports[,] and the supplier of raw honey from Vietnam to [Customer X], [] provided an affidavit stating 'we are not aware of any real build-up of raw honey from Argentina and Vietnam, whether in the inventories of packers such as our company or in the inventories of our customers.' However, this statement is not consistent with the inventories it reported. [This large importer] reported inventories of subject imports from Vietnam of [X] million pounds in March 2022-- over twice their April 2021 level and only 7.9 percent lower than their level in October 2021.

Id. (internal citations to Pls.' administrative post-hearing brief omitted).

The ITC acknowledged that the record lacked information as to "raw honey held downstream," since even though downstream "Ingredient Purchasers fully participated in the final phase of these investigations," [[



]]." Id.

While Plaintiffs urge the court to conclude that this downstream inventory data was essential for the ITC's analysis, the court is not persuaded that the Commission acted unreasonably in reaching a final affirmative critical circumstances determination on the record presented. As pointed out by Defendant and Defendant-Intervenors, "Plaintiffs never requested that the Commission collect the data they now claim is crucial to the critical circumstances analysis." See Def.-Int's. Br. at 10; Def.'s Br. at 19–22 (responding

to Plaintiffs' argument that "the Commission should have gathered 2022 inventory information from U.S. importers and end users concerning their holdings of raw honey from Vietnam" by noting that "Plaintiffs, however, did not ask the Commission to collect this information for 2022").  The court agrees that if Plaintiffs believed this information to be essential to the ITC's critical circumstances analysis, Plaintiffs' failure to request the addition of this data to the record strongly undercuts their argument that the ITC's determination was unreasonable.[5]

Plaintiffs remaining arguments are without merit.  With respect to Plaintiffs' contention that the ITC unreasonably ignored "information demonstrating that the U.S. industry was experiencing severe shortages and the inability to supply customers at the end of the period of investigation," see Pls.' Br. at 29–33, the record simply does not support Plaintiffs' position.  Plaintiffs start by explaining the logic of their argument, noting that "[t]he entire purpose of the critical circumstances determination is to determine whether there are sufficiently large inventories of subject merchandise, entering prior to the imposition of provisional measures (and thus subject to no antidumping duties), to show that it is 'likely' that those exact entries will undermine the remedial effect of the

---

[5] At Oral Argument, the parties addressed this issue and Plaintiffs confirmed that they are no longer pressing the argument that the record was incomplete and that the ITC should have collected 2022 inventory data.  See Oral Arg. at 02:10:27–02:12:18 (Plaintiffs' counsel confirming that the collection of data issue is no longer a "live issue," maintaining that Plaintiffs remaining argument about 2022 inventory data is that ITC failed to consider data that Plaintiffs had placed on the record); cf. Pls.' Reply at 15 (acknowledging that "importers and packers provided a full set of inventory data relating to inventory levels of the critical circumstances entries," while also suggesting that "it would have been preferable for the Commission to gather such information as part of its questionnaire process").

Consol. Court No. 22-00188          **PUBLIC VERSION**          Page 24

antidumping duty order." Id. at 30. Plaintiffs reason that "[i]n light of this goal, it is critical to examine whether the U.S. industry is awash in unsold product (which would make it more 'likely' that it would lose sales to any remaining critical circumstances entries, and thus push the Commission towards issuing an affirmative critical circumstances determination) or, in the alternative, is experiencing shortages (which pushes in the opposite direction)." Id. Plaintiffs therefore maintain that because the record reflects evidence of shortages of domestically produced honey, the Commission's failure to address and account for the impact of such shortages in its affirmative critical circumstances determination is unreasonable.

Plaintiffs point to some record evidence as demonstrating support for the conclusion that the domestic industry was experiencing "severe shortages" that would indicate that increased levels of critical circumstances entries would not be likely to undermine seriously the remedial effect of the AD Orders. Id. at 30–31. First, Plaintiffs cite to the discussion in the Staff Report of U.S. importers' and producers' responses to questions about supply constraints. Id. ("When asked about supply constraints after the filing of the petition on April 21, 2021, 6 U.S. producers and 14 importers reported that they refused or declined to supply due to adverse climate conditions and increased logistics costs and delays. Fifteen of 20 responding purchasers reported being declined supply after the filing of the petition citing [ {Petitioner} SHA's ] inability to supply dark amber honey, COVID-related disruptions such as logistics, labor shortages, and lockdowns, and uncertainty in the market resulting from the petition. Four purchasers reported that [ {Petitioner} SHA ] declared a force majeure and was unable to fill orders

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Consol. Court No. 22-00188                **PUBLIC VERSION**                Page 25

in 2021." (quoting Pre-Hearing Staff Report, CR[6] 744 at II-9 (March 29, 2022))).  Second, Plaintiffs contend that "this information was amply corroborated" by the questionnaire responses of consumers like [[                    ]], "one of the largest bakers and consumers of raw honey in the United States."  Id. at 31 (quoting [[                    ]] questionnaire response that "[[



]]").    Plaintiffs further cite to the testimony of another U.S. purchaser confirming a similar experience with Sioux Honey.  Id.  Plaintiffs conclude that "the failure of the Majority to take into account this highly relevant U.S. producer shortage and inventory information provides further evidence that the Majority's analysis is unsupported by substantial evidence."  Id. at 33.

Defendant persuasively explains why Plaintiffs' arguments about shortages are without merit.  See Def.'s Resp. at 36–39.  Critically, "[n]one of th[e] evidence relied upon by Plaintiffs to show 'severe shortages' even pertains to domestically produced honey."  Id. at 37.  Rather, as was detailed in the Staff Report, the claim of force majeure, relied upon by Plaintiffs as evidence of shortages, was not the result of shortages of domestically produced honey.  Instead, it resulted from the fact that "certain shipments of imported raw honey that failed quality testing."    Id. (quoting, with added emphasis, Staff

---

[6] "PR" refers to a document in the public administrative record, which is found in ECF No. 22, unless otherwise noted.   "CR" refers to a document in the confidential administrative record, which is found in ECF No. 21, unless otherwise noted.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Consol. Court No. 22-00188              **PUBLIC VERSION**              Page 26

Report at II-9 n.21).  Similarly, Plaintiffs' reliance on the questionnaire response of [[

         ]] is misplaced as "[[

                                                        ]]."   Id. (quoting Staff Report

at III-13(b)).  Given the full context, the court does not agree with Plaintiffs that the record

reflected evidence of "severe shortages" that the Commission failed to address in its

analysis.

       Turning to Plaintiffs' contention that the ITC failed to consider "information

demonstrating that the U.S. producers, which do not make raw honey that directly

competes with the Vietnamese imports, would not be losing any sales opportunities at the

bakers who rely on Vietnamese imports," see Pl.'s Br. at 29–30, the court again concludes

that Plaintiffs' argument is unpersuasive as it does not accurately reflect the record.

Plaintiffs maintain that "The Majority Ignore[d] Uncontradicted Evidence That Any

Remaining Inventories of the Critical Circumstances Entries Could Not 'Substantially

Undermine' the Remedial Effect of the Order Because They Do Not Compete with U.S.

Production."  See Pl.'s Br. 33–35; see also Pl.'s Reply at 18–20.  Plaintiffs argue that the

Commission erred in finding that U.S. and Vietnamese raw honey were substitutable

(i.e., similar products that compete with each other in the market).  Pl.'s Br. at 33

(explaining that "the more substitutable the two types of raw honey are, the more the

Commission is pushed in the direction of an affirmative critical circumstances, because

this would increase the likelihood that any remaining inventories of the critical

circumstances entries would replace U.S. sales.").  Plaintiffs insist that the record

demonstrates that "Vietnamese raw honey has different uses than U.S.-produced raw

honey, which largely relegate them to different end uses." Id. Specifically, Plaintiffs point out that "In 2020, [a very large] percent of Vietnamese imports are light amber or amber or darker honey." Id. (citing Pre-Hearing Staff Report, CR No. 744 at E-9 (Table E-6) (March 29, 2022); NHPDA Pre-Hearing Brief, CR No. 747, at 55, n. 214 (April 5, 2022)). "In direct contrast, in 2020, only [a very small] percent of U.S. production accounted for amber and dark amber honey." Id. at 34 (citing Pre-Hearing Staff Report, CR 744, at E-4 (Table E-1) (March 29, 2022); NHPDA Pre-Hearing Brief CR No. 747, at 47, 54 (April 5, 2022)). Given this information, Plaintiffs conclude that "whatever small remaining inventories of critical circumstances raw honey existed at the time of the order were not in a position to displace sales of U.S.-produced raw honey or to push down prices for U.S.-produced raw honey, which is not even suitable for use in the baking sector that relies on Vietnamese raw honey." Id. Plaintiffs urge the court to remand the ITC's affirmative critical circumstances determination as unreasonable given "[t]he failure of the Majority to take into account this highly material information on the record." Id. at 35.

Defendant, in response, maintains that Plaintiffs' substitutability argument is meritless and relies on a misstatement of the record. See Def.'s Resp. at 41–43. As Defendant explains:

> Plaintiffs first manipulate the data by comparing the share of shipments of raw honey from Vietnam that was light amber or darker ([a very large] percent) with the share of shipments of domestically produced honey that was amber or darker [a very small] percent to argue that there was no overlap in shipments of honey types. In fact, the share of domestically produced honey that was light amber or darker was 20.1 percent in 2020. The 20.1 percent figure for light amber or darker shipments of domestically produced honey is

Consol. Court No. 22-00188        **PUBLIC VERSION**        Page 28

> appropriately compared to the [very large] percent of <u>light amber or darker</u> shipments of raw honey from Vietnam.

Def.'s Resp. at 41–42 (internal citations omitted). Moreover, as Defendant points out "[t]he Commission also discussed the overlap, observing that large producers' U.S. shipments were between 18 and 20 percent light amber from 2018 to 2020." <u>Id.</u> at 42 (citing <u>Views</u> at 58 n.248); <u>see also</u> <u>Views</u> at 58 n.248 ("Respondents assert that product from Vietnam is required in the market because of its dark color. However, over half of the product from Vietnam was of light amber honey during the POI, a product the domestic industry produces. Most of importers' shipments of subject imports were light amber or lighter as were the domestic industry's shipments. Further, the greatest increase in subject imports from 2018 to 2020 was in light amber, followed by extra light amber, and then the darkest honey, amber. Thus, it was not "dark" honey leading the increase in subject imports. Eighty percent of the increase in subject imports was in light amber and extra light amber. These two colors accounted for over 40 percent of the domestic industry's shipments." (internal citations omitted)). In light of the above, the court cannot agree that the ITC unreasonably failed to consider or address Plaintiffs' substitutability arguments.

Defendant also points out that its critical circumstances analysis in another action was recently sustained against a similar challenge. <u>See</u> Def.'s Notice of Supp. Auth., ECF No. 32 (Mar. 22, 2023) (citing <u>MTD Products, Inc. v. United States</u>, Court No. 21-264, Slip Op. 23-34, 2023 WL 2535885 (Mar. 16, 2023) ("<u>MTD Products</u>"), and noting that "[a]pplying the substantial evidence standard, the Court in <u>MTD Products</u> upheld an

Consol. Court No. 22-00188          **PUBLIC VERSION**          Page 29

affirmative critical circumstances determination in which the Commission considered inventories prior to the imposition of provisional duties.").

In MTD Products, a domestic importer filed suit challenging the Commission's affirmative critical circumstances determination resulting from the AD and CVD investigations of small vertical shaft engines from China. Plaintiff there argued that the Commission had relied on faulty data, and further argued that the majority's review of the record was unreasonable and that the dissenting view by Commissioner Johanson, i.e., that the ITC should reach a negative critical circumstances determination, was the only reasonable outcome on the record. MTD Products, 2023 WL 2535885 at *3, *6. After reviewing the record and considering Plaintiff's arguments, the court ultimately sustained the ITC's affirmative critical circumstances determination, concluding that the ITC's findings were reasonably supported by the record. MTD Products, 2023 WL 2535885 at *7.

Plaintiffs respond that MTD Products actually supports their position because in that matter "the Commission consider[ed] the potential impact of any increased critical circumstances entries on U.S. sales that would occur long after the imposition of provisional measures, [and] the CIT explicitly affirmed the Commission on that basis." Pls.' Reply at 11–12. Specifically, Plaintiffs emphasize that the ITC in MTD Products made its affirmative critical circumstances determination after considering the impact of critical circumstances imports on "future sales" (i.e., sales made after imposition of provisional measures imposed as part of investigation). Id. at 12 (citing ITC's

Consol. Court No. 22-00188            **PUBLIC VERSION**            Page 30

determination in <u>Small Vertical Shaft Engines from China</u>, Inv. Nos. 701-TA-643 and

731-TA-1493 (Final), USITC Pub. 5185 (Apr. 2021) at 50).

 While Plaintiffs are correct that the ITC engaged in a forward-looking analysis in

<u>Small Vertical Shaft Engines from China</u>, Plaintiffs have failed to persuade the court that

the ITC failed to engage in a similar analysis here. <u>Cf.</u> Def.'s Resp. at 31 (highlighting

how ITC did in fact evaluate "likely" impact of critical circumstances imports in

forward-looking analysis based off of inference from 2021 import and apparent

consumption level data). Plaintiffs further fail to recognize that the court in <u>MTD Products</u>

considered Commissioner Johanson's dissent as part of its analysis under the substantial

evidence standard. <u>See</u> <u>MTD Products</u>, 2023 WL 2535885 at *7; <u>cf.</u> Pls.' Reply at 11

(arguing that "The <u>MTD Products</u> Determination Confirms that Defendant and

Defendant-Intervenor Have Advanced a Flawed Statutory Construction"). Plaintiffs thus

err in concluding that "[b]oth the Commission's approach (considering the impact of the

increased imports on the next selling season, after the issuance of the order) and the

terms of this Court's affirmance (endorsing the analysis and emphasizing that the

Commission is statutorily required to analyze future events 'in advance'[)] demonstrates

how the Commission should have proceeded in this matter." Pls.' Reply at 13–14.

 As in <u>MTD Products</u>, the Commission here faced a record that demonstrated a

substantial increase in inventories prior to the initiation of suspension of liquidation.

In reviewing the record, Commissioner Johanson found that "the record contains clear

evidence that the increase in unfairly traded subject imports in the six-month period

following the petition was largely if not entirely eliminated in the next six months before

the order, and the domestic industry's condition sharply improved." <u>Dissenting Views</u>

at 9. Further, Commissioner Johanson observed that "[t]he record lacks evidence that

could resolve the exact size of any diminished amount of unfairly traded merchandise that

might remain, such as evidence regarding final inventory levels of most importers and

purchasers, the propensity of end users to hold inventory, actual consumption, and the

rate at which fairly traded imports arrived immediately before the order to replace unfairly

traded ones." <u>Id.</u> at 9–10. Commissioner Johanson then concluded that although it was

"possible that enough [unfairly traded subject imports] remained [in importers' inventories]

to have an impact," his review of the record did not permit him to reach an affirmative

critical circumstances finding as he could not conclude that the imports subject to the

Department of Commerce's critical circumstances determination were "likely" to

"undermine seriously" the order's remedial effect. <u>Id.</u> at 10.

     Given the record and the majority's analysis in both matters, the court determines

that the reasoning and conclusion in <u>MTD Products</u> apply equally here:

>     The Commission amply explained the reasons for its
> conclusion that a surge in subject imports threatened to
> seriously undermine the duty orders' remedial effects. And
> although [Plaintiffs] dispute[] the evidentiary sufficiency of
> those findings, and urge[] the court to adopt the dissenting
> views of Commissioner Johanson, substantial evidence
> review does not permit the court to re-weigh the evidence as
> [Plaintiffs] propose[]. "The possibility of drawing two
> inconsistent conclusions from the evidence does not prevent
> an administrative agency's finding from being supported by
> substantial evidence." <u>Siemens Energy, Inc. v. United States</u>,
> 806 F.3d 1367, 1372 (Fed. Cir. 2015) (cleaned up) (quoting
> <u>Consolo v. Fed. Mar. Comm'n</u>, 383 U.S. 607, 620 (1966)).
> Although the court agrees with [Plaintiffs] that the conclusion
> drawn by Commissioner Johanson is supported by the record,

Consol. Court No. 22-00188          **PUBLIC VERSION**          Page 32

> the conclusion drawn by the Commission majority—considering the record as a whole and the evidence that detracts from that conclusion—is also supported by the record. Under the substantial evidence standard, ties go to the agency.

MTD Products, 2023 WL 2535885 at *7. While Plaintiffs urge the court to adopt the conclusions of Commissioner Johanson's dissent as the only reasonable outcome based on the record, the court is not persuaded that the majority's determination here was unreasonable. Overall, the four corners of the record do not support Plaintiffs' arguments that the ITC's affirmative critical circumstances determination was unreasonable.

### IV. Conclusion

Based on the foregoing, the court sustains the ITC's affirmative critical circumstances finding as to raw honey from Vietnam in the Final Determination. Judgment will enter accordingly.

/s/ Leo M. Gordon
Judge Leo M. Gordon

Dated: November 17, 2023
    New York, New York

Raw Honey from Argentina, Brazil, India , and
Vietnam.

ITC Publication 5327

Appx33-470

# Raw Honey from Argentina, Brazil, India, and Vietnam

Investigation Nos. 731-TA-1560-1562 and 1564 (Final)

**Publication 5327**                              **May 2022**

## U.S. International Trade Commission



**Washington, DC 20436**

# U.S. International Trade Commission

## COMMISSIONERS

**Jason E. Kearns, Chair**
**Randolph J. Stayin, Vice Chair**
**David S. Johanson**
**Rhonda K. Schmidtlein**
**Amy A. Karpel**

---

Catherine DeFilippo
***Director of Operations***

---

*Staff assigned*

Andres Andrade, Investigator
Jordan Harriman, Investigator
Brad Gehrke, Industry Analyst
Lauren McLemore, Economist
Jennifer Brinckhaus, Accountant
Zachary Coughlin, Statistician
Michael Haldenstein, Attorney
Alexandra Felchlin, Attorney
Mary Beth Jones, Supervisory Investigator

**Address all communications to**
**Secretary to the Commission**
**United States International Trade Commission**
**Washington, DC 20436**

# U.S. International Trade Commission

Washington, DC 20436
*www.usitc.gov*

# Raw Honey from Argentina, Brazil, India, and Vietnam

Investigation Nos. 731-TA-1560-1562 and 1564 (Final)



**Publication 5327**                                    **May 2022**

# CONTENTS

Page

Determinations ......................................................................................................... 1

Views of the Commission ........................................................................................... 3

Separate Views of Commissioner David S. Johanson ............................................ 50

Part I: Introduction ................................................................................................ I-1

   Background.............................................................................................................. I-1

   Statutory criteria .................................................................................................. I-2

   Organization of report........................................................................................... I-3

   Market summary .................................................................................................. I-4

   Summary data and data sources ......................................................................... I-5

   Previous and related investigations ..................................................................... I-5

      Circumvention and country-of-origin issues ................................................. I-10

   Nature and extent of sales at LTFV ................................................................... I-10

   The subject merchandise .................................................................................... I-13

      Commerce's scope ........................................................................................ I-13

      Tariff treatment ............................................................................................. I-13

   The product .......................................................................................................... I-14

      Descriptions and uses.................................................................................... I-14

      Manufacturing processes .............................................................................. I-24

   Domestic like product issues .............................................................................. I-30

Part II: Conditions of competition in the U.S. market.......................................... II-1

   U.S. market characteristics................................................................................. II-1

   U.S. purchasers.................................................................................................... II-2

   Channels of distribution ..................................................................................... II-3

   Geographic distribution ...................................................................................... II-5

   Supply and demand considerations ................................................................... II-6

      U.S. supply ..................................................................................................... II-6

      U.S. demand ................................................................................................ II-10

i

**CONTENTS**

Page

Substitutability issues ................................................................................................ II-20

Purchase factor comparisons of domestic products, subject imports, and nonsubject imports ............................................................................................................. II-27

Comparison of U.S.-produced and imported raw honey .................................. II-34

Elasticity estimates ................................................................................................... II-40

U.S. supply elasticity ........................................................................................... II-40

U.S. demand elasticity ......................................................................................... II-41

Substitution elasticity .......................................................................................... II-41

**Part III: U.S. producers' production, shipments, and employment ..................................... III-1**

U.S. producers ...................................................................................................... III-1

U.S. production, capacity, and capacity utilization ................................................. III-14

U.S. producers' U.S. shipments and exports ........................................................ III-22

Captive consumption ............................................................................................ III-27

Transfers and sales .............................................................................................. III-27

First statutory criterion in captive consumption ............................................... III-27

Second statutory criterion in captive consumption ........................................... III-28

U.S. producers' inventories .................................................................................. III-29

U.S. producers' imports and purchases ................................................................ III-30

U.S. employment, wages, and productivity .......................................................... III-32

**Part IV: U.S. imports, apparent U.S. consumption,  and market shares .............................. IV-1**

U.S. importers ....................................................................................................... IV-1

U.S. imports .......................................................................................................... IV-4

Negligibility ........................................................................................................... IV-10

Critical circumstances ........................................................................................... IV-11

Cumulation considerations ................................................................................... IV-16

Fungibility ............................................................................................................. IV-16

Geographical markets .......................................................................................... IV-21

Presence in the market ....................................................................................... IV-23

# CONTENTS

Page

Apparent U.S. consumption ................................................................................ IV-29

    Based on quantity ..................................................................................... IV-29

    Based on value ......................................................................................... IV-32

**Part V: Pricing data ......................................................................................... V-1**

    Factors affecting prices ............................................................................... V-1

        Raw material costs .................................................................................. V-1

        Transportation costs to the U.S. market .............................................. V-2

        U.S. inland transportation costs ........................................................... V-2

    Pricing practices ........................................................................................ V-2

        Pricing methods ..................................................................................... V-2

        Sales terms and discounts .................................................................... V-5

        Price leadership ..................................................................................... V-5

    Purchase price data from Commission questionnaires ........................... V-5

        Price trends ............................................................................................ V-17

        Price comparisons ................................................................................. V-21

    Price data from USDA/AMS ....................................................................... V-22

    Lost sales and lost revenue ....................................................................... V-25

**Part VI: Financial experience of U.S. producers ....................................... VI-1**

    Background ................................................................................................. VI-1

        Cash-basis accounting ........................................................................... VI-3

    Operations on raw honey .......................................................................... VI-4

        Net sales ................................................................................................. VI-7

        Operating expenses and operating income or loss ............................. VI-9

        All other expenses and net income or loss .......................................... VI-15

    Capital expenditures, R&D expenses, assets, and return on assets ...................... VI-16

    Capital and investment .............................................................................. VI-17

**Appx38**

# CONTENTS

Page

**Part VII: Threat considerations and information on nonsubject countries**..........................VII-1

   The industry in Argentina.............................................................................................VII-3

      Changes in operations .........................................................................................VII-4

      Operations on raw honey .....................................................................................VII-5

      Alternative products.............................................................................................VII-7

      Exports.................................................................................................................VII-7

   The industry in Brazil....................................................................................................VII-10

      Changes in operations .........................................................................................VII-11

      Operations on raw honey .....................................................................................VII-12

      Alternative products.............................................................................................VII-13

      Exports.................................................................................................................VII-13

   The industry in India.....................................................................................................VII-16

      Changes in operations .........................................................................................VII-17

      Operations on raw honey .....................................................................................VII-18

      Alternative products.............................................................................................VII-19

      Exports.................................................................................................................VII-20

   The industry in Vietnam ...............................................................................................VII-22

      Changes in operations .........................................................................................VII-24

      Operations on raw honey .....................................................................................VII-25

      Alternative products.............................................................................................VII-27

      Exports.................................................................................................................VII-27

   Subject countries combined.........................................................................................VII-29

   Subject countries combined.........................................................................................VII-30

   U.S. inventories of imported merchandise ...................................................................VII-32

   U.S. importers' outstanding orders...............................................................................VII-34

   Antidumping or countervailing duty orders in third-country markets ...............................VII-34

   Information on nonsubject countries .............................................................................VII-34

# CONTENTS

**Page**

**Appendixes**

A. Federal Register notices .................................................................................. A-1

B. List of hearing witnesses ............................................................................... B-1

C. Summary data .............................................................................................. C-1

D. Questionnaire responses regarding the domestic like product .................................. D-1

E. U.S. shipments by color ................................................................................. E-1

F. U.S. shipments by product type ....................................................................... F-1

G. Apparent consumption and inventories with full year 2021 ..................................... G-1

H. Related party exclusion trade data ................................................................... H-1

J. Purchase prices for nonsubject Ukraine .............................................................. J-1

K. Excluded purchase price data from certain U.S. purchasers ...................................... K-1

L. Price data from USDA/AMS .............................................................................. L-1

M. Financial results excluding *** and *** ............................................................. M-1

N. Alternative financial results ............................................................................ N-1

O. Expanded domestic like product financial results .................................................. O-1

Note.—Information that would reveal confidential operations of individual concerns may not be published.  Such information is identified by brackets in confidential reports and is deleted and replaced with asterisks (***) in public reports.

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

Investigation Nos. 731-TA-1560-1562 and 1564 (Final)

Raw Honey from Argentina, Brazil, India, and Vietnam

**DETERMINATIONS**

On the basis of the record[1] developed in the subject investigations, the United States International Trade Commission ("Commission") determines, pursuant to the Tariff Act of 1930 ("the Act"), that an industry in the United States is materially injured by reason of imports of raw honey from Argentina, Brazil, India, and Vietnam, provided for in subheading 0409.00.00 of the Harmonized Tariff Schedule of the United States, that have been found by the U.S. Department of Commerce ("Commerce") to be sold in the United States at less than fair value ("LTFV").[2] [3]

**BACKGROUND**

The Commission instituted these investigations effective April 21, 2021, following receipt of petitions filed with the Commission and Commerce by the American Honey Producers Association ("AHPA"), Bruce, South Dakota, and the Sioux Honey Association ("SHA"), Sioux City, Iowa. The Commission scheduled the final phase of the investigations following notification of preliminary determinations by Commerce that imports of raw honey from Argentina, Brazil, India, Ukraine, and Vietnam were being sold at LTFV within the meaning of section 733(b) of the Act (19 U.S.C. 1673b(b)).[4] Notice of the scheduling of the final phase of

---

[1] The record is defined in § 207.2(f) of the Commission's Rules of Practice and Procedure (19 CFR 207.2(f)).

[2] 87 FR 22179, 87 FR 22182, 87 FR 22188, 87 FR 22184 (April 14, 2022).

[3] The Commission also finds that imports subject to Commerce's affirmative critical circumstances determination are not likely to undermine seriously the remedial effect of the antidumping duty order on Argentina. The Commission finds that imports subject to Commerce's affirmative critical circumstances determination are likely to undermine seriously the remedial effect of the antidumping duty order on Vietnam.

[4] On March 24, 2022, counsel for petitioners filed with Commerce and the Commission a withdrawal of their petition regarding imports of raw honey from Ukraine. Accordingly, the antidumping duty investigation concerning raw honey from Ukraine (Investigation No. 731-TA-1563 (Final)) was terminated. 87 FR 19855 (April 6, 2022), 87 FR 20462 (April 07, 2022).

the Commission's investigations and of a public hearing to be held in connection therewith was given by posting copies of the notice in the Office of the Secretary, U.S. International Trade Commission, Washington, DC, and by publishing the notice in the *Federal Register* of December 9, 2021 (*86 FR 70144*). The Commission conducted its hearing on April 11, 2022. All persons who requested the opportunity were permitted to participate.

# Views of the Commission

Based on the record in the final phase of these investigations, we determine that an industry in the United States is materially injured by reason of imports of raw honey from Argentina, Brazil, India, and Vietnam found by the U.S. Department of Commerce ("Commerce") to be sold in the United States at less than fair value. We find that critical circumstances exist with respect to imports of raw honey from Vietnam that are subject to Commerce's final affirmative critical circumstances determination.[1] We also find that critical circumstances do not exist with respect to imports of raw honey from Argentina that are subject to Commerce's final affirmative critical circumstances determination.

## I.    Background

The American Honey Producers Association and the Sioux Honey Association ("SHA") (collectively, "Petitioners") filed the petitions in these investigations on April 21, 2021, alleging that an industry in the United States is materially injured and threatened with material injury by reason of less-than-fair-value ("LTFV") imports of raw honey from Argentina, Brazil, India, Ukraine,[2] and Vietnam.[3] Representatives from members of the associations provided written testimony, appeared at the hearing accompanied by counsel, and submitted joint prehearing and posthearing briefs, and final comments.[4]

Several respondent entities participated in the final phase investigations. The National Honey Packers & Dealers Association ("NHPDA") provided written testimony, appeared at the hearing accompanied by counsel, and submitted prehearing and posthearing briefs, and final comments.[5] Purchasers Bimbo Bakeries USA, Inc. ("Bimbo Bakeries"), General Mills Operations, LLC ("General Mills"), Post Holdings, Inc. ("Post"), and Smithfield Foods, Inc. ("Smithfield")

---

[1] Commissioner Johanson has made a negative critical circumstances finding with respect to imports of raw honey from Vietnam that are subject to Commerce's final affirmative critical circumstances determination. *See* Separate Views of Commissioner David S. Johanson.

[2] The petition as originally filed included imports of raw honey from Ukraine. On March 24, 2022, citing the war in Ukraine, Petitioners filed a letter with the Commission and Commerce withdrawing the petition as to imports of raw honey from Ukraine. The Commission and Commerce subsequently terminated their respective investigations with respect to raw honey from Ukraine. Confidential Report, Memorandum INV-UU-043 (Apr. 28, 2022) ("CR") and Public Report, USITC Pub. 5327 (May 2022) ("PR") at Table I-1; *Raw Honey from Ukraine; Termination of Investigation*, 87 Fed. Reg. 20462 (Apr. 7, 2022).

[3] CR/PR at I-1.

[4] In light of the restrictions on access to the Commission building due to the COVID-19 pandemic, the Commission conducted its hearing through written witness testimony and a videoconference held on April 13, 2022, as set forth in procedures provided to the parties. *Raw Honey From Argentina, Brazil, India, Ukraine, and Vietnam, Scheduling of the Final Phase of Antidumping Duty Investigations,* 86 Fed. Reg. 70144 (Dec. 9, 2021).

[5] The Export Packers Company Limited and Sweet Harvest Foods, both importers of the subject merchandise, joined with NHPDA in submitting a separate appendix to NHPDA's Prehearing brief addressing critical circumstances. *See* NHPDA's Prehearing Brief, Appendix A. A representative from Sweet Harvest Honey also appeared at the hearing, accompanied by counsel.

3

(collectively, "Ingredient Purchasers") provided written testimony, appeared at the hearing accompanied by counsel, and submitted prehearing and posthearing written statements.[6]

U.S. industry data are based on data reported by the National Agriculture Statistics Services of the U.S. Department of Agriculture ("USDA/NASS") and the questionnaire responses of 84 firms that accounted for 31.2 percent of U.S. production of raw honey during 2020 as reported by USDA/NASS.[7]  U.S. imports are based on official import statistics and the questionnaire responses of 25 importers that represent 101.5 percent of U.S. imports from subject sources and 71.8 percent of U.S. imports from nonsubject sources in 2020 based on official import statistics.[8]  The Commission received 21 usable questionnaire responses from firms that had purchased raw honey during the period of investigation ("POI") (January 2018-September 2021).[9]  Foreign industry data are based on the questionnaire responses of 53 firms that reported exports to the United States equivalent to 94.3 percent of U.S. imports of raw honey from Argentina, Brazil, India, and Vietnam during 2020 as reported in official U.S. import statistics.[10]

## II.    Domestic Like Product

### A.    In General

In determining whether an industry in the United States is materially injured or threatened with material injury by reason of imports of subject merchandise, the Commission first defines the "domestic like product" and the "industry."[11]  Section 771(4)(A) of the Tariff Act of 1930, as amended ("the Tariff Act"), defines the relevant domestic industry as the "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of

---

[6] Because purchasers of the subject merchandise are not interested parties, they submitted brief written statements rather than briefs.  A representative from the American Bakers' Association also presented written testimony and appeared at the hearing in opposition to the imposition of duties.

[7] CR/PR at III-2.

[8] CR/PR at I-5, IV-1 n.2.  The ***.

[9] CR/PR at II-2.

[10] CR/PR at I-5.  Industry data for Argentina are based on 13 firms that provided foreign producer questionnaires to the Commission.  These firms' exports to the United States accounted for approximately 97.1 percent of U.S. imports of raw honey from Argentina in 2020.  CR/PR at VII-3. Industry data for Brazil are based on 10 firms that provided foreign producer questionnaires to the Commission.  These firms' exports to the United States accounted for approximately four-fifths, *i.e.*, 81.6 percent, of U.S. imports of raw honey from Brazil in 2020.  CR/PR at VII-10. Industry data for India are based on nine firms that provided foreign producer questionnaires to the Commission.  These firms' exports to the United States accounted for approximately 105.6 percent of U.S. imports of raw honey from India in 2020.  CR/PR at VII-16.  Industry data for Vietnam are based on 21 firms that provided foreign producer questionnaires to the Commission.  These firms' exports to the United States accounted for approximately 92.1 percent of U.S. imports of raw honey from Vietnam in 2020.  CR/PR at VII-22.

[11] 19 U.S.C. § 1677(4)(A).

4

the product."[12]  In turn, the Tariff Act defines "domestic like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation."[13]

By statute, the Commission's "domestic like product" analysis begins with the "article subject to an investigation," *i.e.*, the subject merchandise as determined by Commerce.[14] Therefore, Commerce's determination as to the scope of the imported merchandise that is subsidized and/or sold at less than fair value is "necessarily the starting point of the Commission's like product analysis."[15]  The Commission then defines the domestic like product in light of the imported articles Commerce has identified.[16]  The decision regarding the appropriate domestic like product(s) in an investigation is a factual determination, and the Commission has applied the statutory standard of "like" or "most similar in characteristics and uses" on a case-by-case basis.[17]  No single factor is dispositive, and the Commission may consider other factors it deems relevant based on the facts of a particular investigation.[18]  The Commission looks for clear dividing lines among possible like products and disregards minor variations.[19]

---

[12] 19 U.S.C. § 1677(4)(A).

[13] 19 U.S.C. § 1677(10).

[14] 19 U.S.C. § 1677(10).  The Commission must accept Commerce's determination as to the scope of the imported merchandise that is subsidized or sold at less than fair value. *See, e.g.*, *USEC, Inc. v. United States*, 34 Fed. App'x 725, 730 (Fed. Cir. 2002) ("The ITC may not modify the class or kind of imported merchandise examined by Commerce."); *Algoma Steel Corp. v. United States,* 688 F. Supp. 639, 644 (Ct. Int'l Trade 1988), *aff'd,* 865 F.3d 240 (Fed. Cir.), *cert. denied,* 492 U.S. 919 (1989).

[15] *Cleo Inc. v. United States,* 501 F.3d 1291, 1298 (Fed. Cir. 2007); *see also Hitachi Metals, Ltd. v. United States*, Case No. 19-1289, slip op. at 8-9 (Fed. Cir. 2020) (the statute requires the Commission to start with Commerce's subject merchandise in reaching its own like product determination).

[16] *Cleo*, 501 F.3d at 1298 n.1 ("Commerce's {scope} finding does not control the Commission's {like product} determination."); *Hosiden Corp. v. Advanced Display Mfrs.,* 85 F.3d 1561, 1568 (Fed. Cir. 1996) (the Commission may find a single like product corresponding to several different classes or kinds defined by Commerce); *Torrington Co. v. United States*, 747 F. Supp. 744, 748–52 (Ct. Int'l Trade 1990), *aff'd,* 938 F.2d 1278 (Fed. Cir. 1991) (affirming the Commission's determination defining six like products in investigations where Commerce found five classes or kinds).

[17] *See, e.g., Cleo Inc. v. United States,* 501 F.3d 1291, 1299 (Fed. Cir. 2007); *NEC Corp. v. Dep't of Commerce*, 36 F. Supp. 2d 380, 383 (Ct. Int'l Trade 1998); *Nippon Steel Corp. v. United States,* 19 CIT 450, 455 (1995); *Torrington Co. v. United States,* 747 F. Supp. 744, 749 n.3 (Ct. Int'l Trade 1990), *aff'd,* 938 F.2d 1278 (Fed. Cir. 1991) ("every like product determination 'must be made on the particular record at issue' and the 'unique facts of each case'").  The Commission generally considers a number of factors, including the following:  (1) physical characteristics and uses; (2) interchangeability; (3) channels of distribution; (4) customer and producer perceptions of the products; (5) common manufacturing facilities, production processes, and production employees; and, where appropriate, (6) price.  *See Nippon,* 19 CIT at 455 n.4; *Timken Co. v. United States,* 913 F. Supp. 580, 584 (Ct. Int'l Trade 1996).

[18] *See, e.g.*, S. Rep. No. 96-249 at 90-91 (1979).

[19] *Nippon*, 19 CIT at 455; *Torrington*, 747 F. Supp. at 748-49; *see also* S. Rep. No. 96-249 at 90-91 (Congress has indicated that the like product standard should not be interpreted in "such a narrow fashion as to permit minor differences in physical characteristics or uses to lead to the conclusion that (Continued...)

5

### B.    Product Description

Commerce defined the scope of the imported merchandise under investigation as:
> {R}aw honey.  Raw honey is honey as it exists in the beehive or as obtained by extraction, settling and skimming, or coarse straining.  Raw honey has not been filtered to a level that results in the removal of most or all of the pollen, *e.g.,* a level that removes pollen to below 25 microns.  The subject products include all grades, floral sources and colors of raw honey and also include organic raw honey.
>
> Excluded from the scope is any honey that is packaged for retail sale (*e.g.,* in bottles or other retail containers of five (5) lbs. or less).
>
> The merchandise subject to this investigation is currently classifiable under statistical subheading 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065 of the Harmonized Tariff Schedule of the United States (HTSUS).  Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of this investigation is dispositive.[20]

As is evident from the above scope description, these investigations concern raw honey, *i.e.,* honey that has not had most or all of the pollen filtered out, a process performed by "packers."[21]  Processing by packers also includes the heating, straining, and FDA grading of the honey.[22]  Once processed, the honey is packaged for retail, food service, industrial food manufacturing, and other industrial uses, such as cosmetics.[23]  In addition to the scope not including processed honey, the scope language specifically excludes any honey bottled for retail sale.

---

the product and article are not 'like' each other, nor should the definition of 'like product' be interpreted in such a fashion as to prevent consideration of an industry adversely affected by the imports under consideration.").

[20] *Raw Honey From Argentina: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances,* 87 Fed. Reg. 22179 (Apr. 14, 2022); *Raw Honey From Brazil: Final Determination of Sales at Less Than Fair Value,* 87 Fed. Reg. 22182 (Apr. 14, 2022); *Raw Honey From India: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 87 Fed. Reg. 22188 (Apr. 14, 2022); *Raw Honey From the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances,* 87 Fed. Reg. 22184 (Apr. 14, 2022).

[21] Processors of raw honey are known as packers.  CR/PR at I-27.

[22] Petitioners' Prehearing Brief at 8 n.10 and Exhibit 4, para. 7.  Beekeepers may also perform a certain amount of processing.  CR/PR at I-26 to I-27.

[23] CR/PR at I-3.  Retail honey is often labeled "raw and unfiltered" even though it has in fact been processed to some extent.  Petitioners' Prehearing Brief at 8 n.10 and Exhibit 4, para. 7.  Petitioners' witness stated that it is filtered to 150 microns instead of 25 microns.  Hearing Tr. at 144 (Blumenthal).

6

The USDA describes filtered honey as having most of the pollen grains, air bubbles, or other materials normally found in suspension, removed.[24] While the scope language provides 25 microns as an example of the level of filtration that occurs during the processing of raw honey, this level does not appear in honey grading standards or in FDA guidance documents related to the labeling of honey.[25] Rather, 25 microns is an estimate of the size of pollen grains.[26]

### C.    Arguments of the Parties

*Petitioners' Arguments*.  Petitioners argue that the Commission should define a single domestic like product, coextensive with Commerce's scope, as it did in its preliminary determinations.  They contend that the Commission correctly rejected Respondents' arguments in the preliminary phase to define the domestic like product more broadly than Commerce's scope definition to include a downstream product, processed honey.[27]

Petitioners also argue that consistent with the like product definition in the preliminary phase of these investigations, the Commission should not include raw honey packaged for retail sale in its definition of the domestic like product.  They maintain that retail packaged raw honey, which is explicitly excluded from Commerce's scope definition and represents roughly 3 percent of beekeepers' sales, differs in important ways from raw honey packaged in bulk containers.[28] Petitioners highlight a survey of market participants in the Commission's final phase questionnaires concerning the comparability of raw honey packaged in bulk and that packaged for retail sale.  They maintain that the survey results confirm that raw honey packaged for retail sale differs from raw honey sold in bulk containers.[29]

*Respondents' Arguments*.  None of the Respondents addressed the issue of the domestic like product definition in the final phase of these investigations.

---

[24] CR/PR at I-16.

[25] CR/PR at I-16.

[26] CR/PR at I-16.  The Ingredient Purchasers report that they purchase in-scope raw honey from processors or packers of raw honey for use in products such as ***.  The purchased honey is often ***. *See* Ingredient Purchasers' Posthearing Statement, Answers to Commissioner Questions at 10-13.  They maintain the honey they purchase is in-scope raw honey because ***. *See* CR/PR at II-2 n.12; Ingredient Purchasers' Posthearing Statement, Answers to Commissioner Questions at 19-21.  Petitioners dispute that Ingredient Purchasers purchase raw honey and argue that ***.  Petitioners' Prehearing Brief at 49 and Exhibit 8 at paras. 4, 6, 8, and 10 and Attachments B, C and D (***).  We assume, for the sake of argument, that the Ingredient Purchasers purchased in-scope raw honey and we have therefore included their questionnaire responses as purchasers.  We did not, however, include their pricing data in the price comparisons in order to avoid double counting, as those quantities were already included in the price comparisons as sales from importers to processor/packers.  Furthermore, the purchases by Ingredient Purchasers from processor/packers were at a different level of trade than the sales from domestic producers or importers to processor/packers.

[27] Petitioners' Prehearing Brief at 5-7.

[28] Petitioners' Prehearing Brief at 7-9.

[29] Petitioners' Prehearing Brief at 8-9.

### D.    Analysis

In its preliminary determinations, the Commission defined a single domestic like product coextensive with the scope.  It rejected Respondents' arguments that it should expand the domestic like product beyond Commerce's scope definition to include processed honey and raw honey in retail packaging.[30]

In considering Respondents' arguments that it should define the domestic like product more broadly to include processed honey, the Commission indicated that it generally does not define a domestic like product more broadly than the scope definition to include a downstream product such as processed honey.  The Commission observed that such an expansion would include firms in the domestic industry (honey packers) whose interests are adverse to the members of the industry (beekeepers) producing the articles (raw honey) subject to investigation.  It also declined to apply a semi-finished like product analysis, stating that such an analysis examines whether different articles within the scope at different stages of processing should be included in the same definition of the domestic like product.[31]

The Commission considered whether to include raw honey in retail packaging (also excluded from the scope definition) in its definition of the domestic like product.  In doing so, the Commission applied its traditional six-factor like product analysis.  The Commission found that raw honey in bulk and raw honey packaged for retail sale share the same physical characteristics other than packaging and may be produced in the same facilities and with the same employees.  It found, however, that differences in packaging and price appear to limit interchangeability as a practical matter, and that raw honey in bulk packaging and packaged for retail sale are sold through different channels of distribution.  The Commission also noted that information concerning producer and customer perceptions of raw honey in bulk and retail packaging was limited.  Finally, it stated that raw honey sold in retail packaging would necessarily be priced higher than that sold in bulk containers.[32]

Given these differences, the Commission determined in its preliminary determinations not to include raw honey in retail packaging in its domestic like product definition and defined the domestic like product coextensive with Commerce's scope definition to include raw honey other than that in retail packaging.  The Commission indicated, however, that it would seek additional information relevant to the analysis of this issue in any final phase investigations.[33]

In the final phase of the investigations, the Commission issued questionnaires designed to gather additional information concerning the comparability of raw honey in retail packaging and other raw honey from domestic producers, importers, and purchasers for each of the six domestic like product factors.[34]

---

[30] *Raw Honey from Argentina, Brazil, India, Ukraine, and Vietnam*, Inv Nos. 731-TA-1560-1564 (Preliminary), USITC Pub. 5204 (June 2021) ("Preliminary Determinations") at 10-14.

[31] Preliminary Determinations, USITC Pub. 5204 at 10, 10 n.35.

[32] Preliminary Determinations, USITC Pub. 5204 at 12-13.

[33] Preliminary Determinations, USITC Pub. 5204 at 12-13.

[34] In its comments on draft questionnaires in the final phase of the investigations, NHPDA requested that the Commission seek additional information concerning raw honey in retail packaging. NHPDA's Comments on Draft Questionnaires (Sept. 10, 2021) at 5-8.  NHPDA did not, however, pursue any domestic like product arguments in the final phase.

8

In their questionnaire responses, domestic producers generally reported that raw honey in retail packaging is not at all comparable or similar to other raw honey with respect to any of the six domestic like product factors the Commission typically analyzes.[35]  The majority of domestic producers reported that raw honey in retail packaging is "never" comparable to other raw honey for each of the six factors.[36]

A majority of purchasers reported that raw honey in different packaging is "somewhat" or "never" comparable for four domestic like product factors:  Channels of distribution, manufacturing facilities and employees, producer and customer perceptions, and price.  A majority of purchasers indicated that raw honey in different packaging is "fully" or "mostly" comparable with respect to two domestic like product factors:  physical characteristics and uses, and interchangeability.  Importers reported substantially more comparability between raw honey in different packaging: a majority of importers reported that raw honey in different packaging was "fully" or "mostly" comparable with respect to each domestic like product factor.[37]

Market participants were also asked in the questionnaires to discuss the reasons for the ratings of comparability they provided.  While there were a wide range of comments, many of the comments do not address the comparability of retail packaged raw honey and bulk raw honey and instead appear addressed to processed honey.[38]  Those comments that do make the proper comparison tend to support the Commission's findings in its preliminary investigations with respect to the six domestic like product factors.[39]

Thus, the comparability information collected in the final phase and limited additional information[40] continue to support defining a single domestic like product coextensive with

---

[35] The Commission generally considers the following factors:  (1) physical characteristics and uses; (2) interchangeability; (3) channels of distribution; (4) customer and producer perceptions of the products; (5) common manufacturing facilities, production processes, and production employees; and, where appropriate, (6) price.

[36] *See* CR/PR at Table D-1.

[37] *See* CR/PR at Table D-1.

[38] *See* CR/PR at Tables D-2 to D-4.

[39] The comments indicate that the physical characteristics of raw honey in different packaging are the same but that different packaging of raw honey limits interchangeability.  The comments also confirm that raw honey in retail packaging is sold through different channels of distribution:  raw honey in retail packaging is sold to retail customers while bulk raw honey is sold to processors.  While the comments suggest some overlap in manufacturing facilities, production processes, and production employees, the comments also indicate that raw honey in retail packaging is priced higher than bulk raw honey.  With respect to producer and customer perceptions concerning raw honey in retail packaging, market participants' opinions varied widely but suggest comparability to bulk raw honey insofar as the raw honey is the same honey despite being packaged differently.  *See* CR/PR at Tables D-2 to D-4.

[40] The record in the final phase indicates that raw honey in retail packaging is sold at higher prices than bulk honey.  The financial data staff collected on these sales reflect higher sales values for combined sales.  *Compare* CR/PR at Table VI-1 ($1.58 to $1.78 per pound) *with* Table O-1 ($1.62 to $1.82 per pound).

Petitioners have also identified new information in the final phase of the investigations pertinent to the Commission's analysis of raw honey in retail packaging.  They attach an exhibit to their (Continued...)

9

Commerce's scope, as the Commission did in its preliminary determinations.  Moreover, no party has argued to the contrary in the final phase.  Consequently, we define a single domestic like product consisting of raw honey coextensive with the scope of the investigations.

## III.    Domestic Industry

The domestic industry is defined as the domestic "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product."[41]  In defining the domestic industry, the Commission's general practice has been to include in the industry producers of all domestic production of the like product, whether toll-produced, captively consumed, or sold in the domestic merchant market.

We consider below whether appropriate circumstances exist to exclude two related parties from the domestic industry pursuant to the related parties provision.[42]  This provision of the statute allows the Commission, if appropriate circumstances exist, to exclude from the domestic industry producers that are related to an exporter or importer of subject merchandise, or which are themselves importers.[43]  Exclusion of such a producer is within the Commission's discretion based upon the facts presented in each investigation.[44]

---

prehearing brief showing higher prices for honey sold at retail than raw honey sold in bulk.  Petitioners' Prehearing Brief at 9 and Exhibit 5.  They also highlight two questionnaire responses commenting on the limited interchangeability of raw honey in retail packaging and bulk raw honey.  Petitioners' Prehearing Brief at 9 n.12.  As noted, Respondents did not address the domestic like product issue in the final phase.

[41] 19 U.S.C. § 1677(4)(A).

[42] 19 U.S.C. § 1677(4)(B).

[43] *See Torrington Co. v. United States*, 790 F. Supp. 1161, 1168 (Ct. Int'l Trade 1992), *aff'd without opinion*, 991 F.2d 809 (Fed. Cir. 1993); *Sandvik AB v. United States*, 721 F. Supp. 1322, 1331-32 (Ct. Int'l Trade 1989), *aff'd mem*., 904 F.2d 46 (Fed. Cir. 1990); *Empire Plow Co. v. United States*, 675 F. Supp. 1348, 1352 (Ct. Int'l Trade 1987).

[44] The primary factors the Commission has examined in deciding whether appropriate circumstances exist to exclude a related party include the following:

(1) the percentage of domestic production attributable to the importing producer;

(2) the reason the U.S. producer has decided to import the product subject to investigation (whether the firm benefits from the LTFV sales or subsidies or whether the firm must import in order to enable it to continue production and compete in the U.S. market);

(3) whether inclusion or exclusion of the related party will skew the data for the rest of the industry;

(4) the ratio of import shipments to U.S. production for the imported product; and

(5) whether the primary interest of the importing producer lies in domestic production or importation. *Changzhou Trina Solar Energy Co. v. USITC*, 100 F. Supp.3d 1314, 1326-31 (Ct. Int'l. Trade 2015), *aff'd*, 879 F. 3d 1377 (Fed. Cir. 2018); *see also Torrington Co.  v. United States*, 790 F. Supp. at 1168.

In the final phase of the investigations, the record indicates that *** and *** are related parties subject to possible exclusion because of their affiliation with a U.S. importer of subject merchandise.[45]

## A.    Arguments of the Parties

*Petitioners' Arguments.*  Petitioners argue that the record shows that appropriate circumstances exist to exclude *** and *** from the definition of the domestic industry because they oppose imposition of duties, produce far less raw honey domestically than imported by their affiliate, and account for a small percentage of domestic production. Petitioners also initially stated that ***, and therefore it is "not necessary" to exclude them.[46]

Petitioners, however, reversed their position in their posthearing brief, indicating that the two related parties should be excluded from the domestic industry because each of their responses to the Commission's producer questionnaire were reflective of Respondents' position and not that of domestic producers.[47]  They further observed that the domestic industry would ***.[48]

*Respondents' Arguments.*  None of the Respondents addressed the issue of related parties.

## B.    Analysis

We discuss below whether appropriate circumstances exist to exclude the two related parties from the domestic industry.[49]

*** and ***.  Both *** and *** are domestic producers controlled by an importer of subject merchandise and eligible for possible exclusion as related parties.  ***, an importer and purchaser of subject merchandise during the POI.[50]  *** is owned by the CEO and Board

---

[45] CR/PR at III-8 and Table III-2.

[46] Petitioners' Prehearing Brief at 10-11.

[47] Petitioners' Posthearing Brief at 1 n.1.

[48] Petitioners' Posthearing Brief, Answers to Commissioner Questions at 23-26.  Petitioners' reversal was in response to a question from Chair Kearns regarding the logic of not excluding a firm from the domestic industry because its effect on the data is small and whether the related parties' narrative or more qualitative responses to U.S. producer questionnaires also skewed the data collected in the staff report.  Hearing Tr. at 160-61 (Kearns).

[49] In its preliminary determinations, the Commission found that the two domestic producers – *** and *** – met the statutory definition of a related party because they were related to an importer of subject merchandise.  The Commission did not, however, find appropriate circumstances to exclude the two domestic producers because the record did not indicate that ***.  The Commission, however, stated that it would reexamine their possible exclusion from the definition of the domestic industry in any final phase investigations.  Preliminary Determinations, USITC Pub. 5204 at 14-16; *Confidential Preliminary Determinations,* EDIS Doc. 744844 at 18-22, 22 n.66.

[50] CR/PR at Table III-2; *** Producer Questionnaire at III-9.  It is therefore a related party, pursuant to 19 U.S.C. § 1677(4)(B)(ii)(II).  The firm also reported that ***.  *** Producer Questionnaire at III-9.

11

Chairman of the same importer ***.[51]  Because the importer and domestic producer are controlled by the same individual, the domestic producer *** is a related party.[52]  *** and *** accounted for *** percent and *** percent respectively of reported domestic raw honey production in 2020, and both firms *** the petition.[53]

 *** imported *** pounds of subject merchandise from *** in 2018, and *** pounds from *** in 2019; it did not import subject merchandise in 2020 or interim 2021.[54]  The ratio of its subject imports to *** U.S. production was *** percent in 2018 and *** percent in 2019,[55] and the ratio of its subject imports to *** U.S. production was *** percent in 2018 and *** percent in 2019.[56]

 *** explained that it ***.[57]  However, ***.[58]

 *** and *** also did not directly compete with subject imports; both reported ***, and all their shipments were ***.[59]  Thus, they were both arguably shielded from the effects of the subject imports during the POI.

 Moreover, the primary interests of *** and *** do not appear to have been aligned with their domestic production operations, but rather lay with their parent company's importation and purchases of subject imports.  The ratio of their parent's subject imports to their domestic production was *** for two years of the POI and their parent also purchased substantial quantities of subject merchandise throughout the POI that far exceeded the related parties' domestic production.[60]  As previously discussed, both firms oppose the petitions.  In fact, ***.[61]  We recognize that *** did not import subject merchandise during 2020 or interim

---

[51] ***.  U.S. Producer Questionnaire of *** at I-7 and I-8.  ***.  Questionnaire of *** at I-5.  ***. Importer Questionnaire of *** at 1.

[52] 19 U.S.C. § 1677(4)(B)(ii)(III).

[53] CR/PR at Table III-1.

[54] CR/PR at Table III-20.

[55] CR/PR at Table III-21.

[56] CR/PR at Table III-20.

[57] CR/PR at Tables III-20 and III-22.

[58] *** reported purchases from other importers of subject imports from *** totaling *** pounds in 2018, *** pounds in 2019, *** pounds in 2020, and *** pounds during interim 2021.  *** reported purchases from other importers of combined subject sources were *** pounds in 2018, *** pounds in 2019, *** pounds in 2020 and *** pounds during interim 2021.  It noted in its questionnaire response ***.  CR/PR at Table III-20.  Its purchaser questionnaire indicates that it *** in 2020.  *See* *** Purchaser Questionnaire at III-24.

[59] *See* U.S. Producer Questionnaires at III-5 and III-9.  These transfers are, however, reported at market value which suggests they are not entirely shielded from pricing trends in the U.S. market.  *See* U.S. Producer Questionnaires at III-9.

[60] *See* CR/PR at Table III-21.  As noted, most of the purchases do ***.

[61] *See* Hearing Tr. at 181-186 (Wenger).  Eric Wenger and Brent Barkman also appeared at the Commission's staff conference in opposition to the imposition of duties.  *See* Conf. Tr. at 163-170 (Wenger), 192 (Barkman).

12

2021,[62] and that *** and *** are both "large domestic producers,"[63] which increased their domestic production and made appreciable capital investments over the course of the POI.[64] However, ***, which were significantly more than these related producers' domestic production, along with the direct corporate control of the two related domestic producers, are (in addition to its substantial importation of subject imports from Brazil during 2018 and 2019) factors that weigh in favor of exclusion of the two related parties. Given this record, we find that appropriate circumstances exist to exclude *** and *** from the domestic industry as related parties in the final phase of these investigations.

Consequently, we define the domestic industry to consist of all domestic producers of raw honey, with the exception of *** and ***.

## IV.    Cumulation[65]

For purposes of evaluating the volume and effects for a determination of material injury by reason of subject imports, section 771(7)(G)(i) of the Tariff Act requires the Commission to cumulate subject imports from all countries as to which petitions were filed and/or investigations self-initiated by Commerce on the same day, if such imports compete with each other and with the domestic like product in the U.S. market. In assessing whether subject imports compete with each other and with the domestic like product, the Commission generally has considered four factors:

(1)    the degree of fungibility between subject imports from different countries and between subject imports and the domestic like product, including consideration of specific customer requirements and other quality related questions;

---

[62] ***. CR/PR at Table III-20 Note.

[63] Beekeepers with over 3,800 bee colonies were considered "large." Forty-seven large beekeepers reported data to the Commission. CR/PR at III-2. *** reported *** bee colonies in 2020 while *** reported *** colonies. U.S. Producer Questionnaires at III-5.

[64] *See* CR/PR at Table I-1.

[65] Pursuant to Section 771(24) of the Tariff Act, imports from a subject country of merchandise corresponding to a domestic like product that account for less than 3 percent of all such merchandise imported into the United States during the most recent 12 months for which data are available preceding the filing of the petition shall be deemed negligible. 19 U.S.C. §§ 1671b(a), 1673b(a), 1677(24)(A)(i), 1677(24)(B); *see also* 15 C.F.R. § 2013.1 (developing countries for purposes of 19 U.S.C. § 1677(36)).

During the most recent 12-month period preceding the filing of the petitions in these investigations, April 2020 through March 2021, official import statistics indicate that subject imports from Argentina accounted for 20.3 percent of total U.S. imports of raw honey, subject imports from Brazil accounted for 19.2 percent of total U.S. imports of raw honey, subject imports from India accounted for 19.2 percent of total U.S. imports of raw honey, and subject imports from Vietnam accounted for 26.1 percent of total U.S. imports of raw honey. CR/PR at Table IV-5. Because imports for all four investigations were above the negligibility threshold, we find that imports with respect to each subject investigation are not negligible.

13

(2)  the presence of sales or offers to sell in the same geographic markets of subject imports from different countries and the domestic like product;

(3)  the existence of common or similar channels of distribution for subject imports from different countries and the domestic like product; and

(4)  whether the subject imports are simultaneously present in the market.[66]

While no single factor is necessarily determinative, and the list of factors is not exclusive, these factors are intended to provide the Commission with a framework for determining whether the subject imports compete with each other and with the domestic like product.[67]  Only a "reasonable overlap" of competition is required.[68]

### A.    Arguments of the Parties

*Petitioners' Arguments.*  Petitioners argue that the Commission should cumulatively assess subject imports from Argentina, Brazil, India, and Vietnam for purposes of present material injury.[69]  They contend that there is an overlap of colors of raw honey imported from each subject country and domestically produced raw honey.  Petitioners further contend that colors of honey next to each on the color spectrum (*e.g.,* white and extra light amber) are also somewhat substitutable and the routine blending of domestically produced raw honey and the subject imports further supports a finding of substitutability of honey from subject and domestic sources.  While most raw honey from Brazil is organic, they maintain that it competes based on price with conventional raw honey from other sources.[70]

With respect to channels of distribution, Petitioners argue that raw honey from each subject country and the domestic like product are primarily sold to packers.  Petitioners argue that raw honey from domestic and subject sources is sold to all regions of United States.  Finally, Petitioners argue that subject imports from all four subject countries and the domestic like product were present in the U.S. market in each year of the POI.[71]

*Respondents' Arguments.*  Respondents do not address cumulation for present material injury.

---

[66] *See Certain Cast-Iron Pipe Fittings from Brazil, the Republic of Korea, and Taiwan*, Inv. Nos. 731-TA-278-280 (Final), USITC Pub. 1845 (May 1986), *aff'd, Fundicao Tupy, S.A. v. United States*, 678 F. Supp. 898 (Ct. Int'l Trade), *aff'd*, 859 F.2d 915 (Fed. Cir. 1988).

[67] *See, e.g., Wieland Werke, AG v. United States*, 718 F. Supp. 50 (Ct. Int'l Trade 1989).

[68] The Statement of Administrative Action (SAA) to the Uruguay Round Agreements Act (URAA), expressly states that "the new section will not affect current Commission practice under which the statutory requirement is satisfied if there is a reasonable overlap of competition."  H.R. Rep. No. 103-316, Vol. I at 848 (1994) (*citing Fundicao Tupy, S.A. v. United States*, 678 F. Supp. at 902; *see Goss Graphic Sys., Inc. v. United States*, 33 F. Supp. 2d 1082, 1087 (Ct. Int'l Trade 1998) ("cumulation does not require two products to be highly fungible"); *Wieland Werke, AG*, 718 F. Supp. at 52 ("Completely overlapping markets are not required.").

[69] Petitioners' Prehearing Brief at 12-16.

[70] Petitioners' Prehearing Brief at 13-15.

[71] Petitioners' Prehearing Brief at 15-16.

14

### B.    Analysis

As an initial matter, Petitioners filed all antidumping duty petitions on the same day,[72] April 21, 2021.[73]  In addition, we find a reasonable overlap of competition among subject imports from both subject countries, and between subject imports from each source and the domestic like product, for reasons described below.

*Fungibility*.  The record in the final phase of these investigations indicates that raw honey is at least moderately fungible, regardless of source, despite some reported limitations on interchangeability between raw honey from different sources.  The great majority of reporting U.S. producers reported that raw honey from each subject country was always interchangeable with the domestic like product as was raw honey from different subject countries.[74]  U.S. importers reported less interchangeability.  A majority of importers indicated that the domestic like product was frequently interchangeable with subject imports from Argentina.  However, a majority of importers reported that the domestic like product was never interchangeable with subject imports from Brazil and Vietnam and sometimes interchangeable with subject imports from India.[75]  In comparing subject imports from Argentina, Brazil, and India, a majority of importers indicated that they were sometimes or never interchangeable.[76]  A majority of importers reported subject imports from Vietnam were never interchangeable with subject imports from Argentina and Brazil, although they reported subject imports from Vietnam were sometimes interchangeable with subject imports from India.[77]

Purchasers also reported somewhat limited interchangeability for raw honey from domestic and subject sources.  A majority of purchasers indicated that the domestically produced product was at least sometimes interchangeable with subject imports from Argentina.[78]  However, a majority of purchasers indicated that the domestic like product was never interchangeable with subject imports from Brazil and Vietnam and a majority of purchasers reported that the domestic product was sometimes or never interchangeable with subject imports from India.[79]  A majority of purchasers reported that subject imports from Brazil were never interchangeable with subject imports from Vietnam.[80]  In contrast, a majority of purchasers reported that subject imports from Brazil and India were sometimes interchangeable.[81]  Otherwise when comparing imports from different subject countries, a majority of purchasers reported that they were sometimes or never interchangeable.[82]

---

[72] *See* 19 U.S.C. § 1677(7)(G)(i).

[73] CR/PR at Table I-1.  None of the statutory exceptions to cumulation apply.  *See* 19 U.S.C. § 1677(7)(G)(ii).

[74] CR/PR at Table II-15.

[75] CR/PR at Table II-16.

[76] CR/PR at Table II-16.

[77] CR/PR at Table II-16.

[78] CR/PR at Table II-17.

[79] CR/PR at Table II-17.

[80] CR/PR at Table II-17.

[81] CR/PR at Table II-17.

[82] CR/PR at Table II-17.

15

The interchangeability of raw honey from different sources was reported to be limited by the darker color and stronger flavor of raw honey from Vietnam, as well as an organic designation for the majority of raw honey from Brazil.[83]  Nonetheless, despite differences in the types of raw honey available from different sources,[84] there is substantial overlap in the colors and flavors[85] of raw honey for shipments of the domestic like product and imports from subject countries.  Extra light amber honey comprised 23.3 percent of U.S. shipments of domestically produced raw honey, *** percent of U.S shipments of honey from Argentina, *** percent of U.S shipments of honey from Brazil, and *** percent of U.S shipments of honey from India.[86]  While there were fewer U.S. shipments of extra light amber raw honey from Vietnam, there was overlap in light amber honey from Vietnam with honey from the other subject sources and the domestic like product.[87]  *** U.S. shipments of raw honey from Vietnam were light amber as were 18.0 percent of U.S. shipments of domestically produced raw honey, *** percent of U.S. shipments of honey from Argentina, *** percent of U.S shipments of honey from Brazil, and *** percent of U.S shipments of raw honey from India.[88]  A majority of reporting purchasers also reported that colors of raw honey next to each other on the color spectrum (white and extra light amber, extra light amber and light amber, and light amber and amber) were sometimes interchangeable.[89]

Purchasers also reported that the domestic like product and subject imports were comparable for important purchasing factors such as color and quality.  Purchasers were asked about the importance of 21 purchasing factors.  The five most important factors as reported by purchasers were:  1) availability, 2) reliability of supply, 3) quality meets industry standards, 4) color, and 5) flavor.[90]  A plurality or a majority of purchasers rated the domestic like product as comparable to subject imports from Argentina and Brazil for three of the five factors (color, flavor, and quality meets industry standards).[91]  A plurality or a majority of purchasers rated the domestic like product as comparable or superior to subject imports from India with respect to

---

[83] CR/PR at II-34 and II-41.

[84] Just under 90 percent of the subject imports from Brazil were organic raw honey while the vast majority of imports from every other subject country was conventional as was domestic production. *See* CR/PR at Table IV-11.  Nonetheless, a majority of purchasers reported that subject imports from Brazil were at least sometimes interchangeable with subject imports from Argentina and a majority of purchasers reported that subject imports from Brazil were sometimes interchangeable with subject imports from India.  CR/PR at Table II-17.

[85] CR/PR at Table IV-10 and Fig. IV-4.  In general, lighter-colored honeys (*e.g.*, clover honey) are milder than darker-colored honeys (*e.g.*, buckwheat honey) which have a stronger flavor.  CR/PR at I-23.

[86] CR/PR at Table IV-10.

[87] CR/PR at Table IV-10.

[88] CR/PR at Table IV-10.

[89] CR/PR at Table II-7.  Most U.S. producers reported that these color pairs were always interchangeable.  CR/PR at Table II-5.  U.S. importers mostly reported that the color pairs were sometimes or never interchangeable.  *See* CR/PR at Table II-6.

[90] *See* CR/PR at Table II-11.

[91] CR/PR at Table II-14.  A majority rated the domestic product as inferior to subject imports from Argentina and Brazil for availability and reliability of supply.  CR/PR at Table II-14.

three of five factors (color, flavor, and quality meets industry standards).[92]  A plurality or a majority of purchasers rated the domestic like product as comparable or superior to subject imports from Vietnam with respect to three of the five factors (color, flavor, and quality meets industry standards).[93]

The routine consolidating and blending of raw honey from different sources by packers, including different countries, suggests that raw honey from different sources is often used interchangeably despite some differences in color and flavor.[94]  Further, the pricing data show substantial numbers of pricing observations between the domestic like product and subject imports from the four subject countries for the four pricing products.[95]  Purchase price data reported by responding firms accounted for approximately 74.9 percent of U.S. producers' U.S. shipments in 2020, 87.4 percent of importers' U.S. shipments of raw honey from Argentina, 84.4 percent of shipments from Brazil, 55.8 percent from India, and 46.8 percent of raw honey from Vietnam in 2020.[96]

Thus, although there are some limitations on the interchangeability of the subject imports from each country and the domestic like product as reflected in the market participants' questionnaire responses, raw honey within each color category regardless of source can at least sometimes be used interchangeably.  Further, the overlap in raw honey colors/ flavors and the widespread practice by purchasers of blending raw honey from different sources,[97] indicate that the domestic product and subject imports have a moderate degree of fungibility.

*Channels of Distribution*.  Responding large U.S. producers and importers reported that over half of their total U.S. shipments of domestically produced raw honey were commercial shipments to firms other than co-ops, such as packers/processors.[98]

*Geographic Overlap*.  During the POI, U.S. producers reported selling raw honey to all regions of the United States and U.S. importers reported selling raw honey to all regions in the contiguous United States.[99]

---

[92] CR/PR at Table II-14.  A majority of purchasers rated the domestic product as inferior to subject imports from India for availability and reliability of supply.  CR/PR at Table II-14.

[93] CR/PR at Table II-14.  A majority of purchasers rated the domestic product as inferior to subject imports from India for availability and reliability of supply.  CR/PR at Table II-14.

[94] CR/PR at I-18, I-23, I-27, II-16.  ***.  NHPDA's Posthearing Brief, Exhibit 9 (Wenger Affidavit). The Ingredient Purchasers argue that ***.  Ingredient Purchasers' Posthearing Statement at 3-5.

[95] The pricing products were based on honey color, specifically, raw white honey, raw extra light amber honey, raw light amber honey, and raw amber honey.  CR/PR at V-6.

[96] CR/PR at V-6.

[97] CR/PR at II-16.  *See also* Petitioners' Prehearing Brief, Exhibit 7 (examples of retail honey containing blends of honey from multiple countries).

[98] *See* CR/PR at II-1, Table II-1.  A substantial portion of the domestic industry's shipments were to cooperatives which function as a packer/processor in the market. *Id.*

[99] CR/PR at Table II-2.  Importers did not report sales in Alaska, Hawaii, Puerto Rico or the U.S. Virgin Islands.  *Id.*  A substantial portion of imports from each subject country also entered the United States in the Eastern region.  *See* CR/PR at Table IV-12.

17

*Simultaneous Presence in Market*.  The record indicates that subject imports from each subject country and the domestic like product were present in the U.S. market throughout the POI.[100]

*Conclusion*.  The record indicates that the domestic like product and imports from each subject source overlap in terms of channels of distribution, geographic markets, and presence in the U.S. market.  That overlap, together with the degree of fungibility discussed above, indicate a reasonable overlap of competition.  In light of the foregoing, we find a reasonable overlap of competition between the domestic like product and imports from each subject country and among imports from each subject country.  We consequently analyze subject imports from Argentina, Brazil, India, and Vietnam on a cumulated basis for our analysis of whether there is material injury by reason of subject imports.

## V.    Material Injury by Reason of Subject Imports

Based on the record in the final phase of these investigations, we find that an industry in the United States is materially injured by reason of cumulated subject imports of raw honey from Argentina, Brazil, India, and Vietnam.

### A.    Legal Standards

In the final phase of antidumping and countervailing duty investigations, the Commission determines whether an industry in the United States is materially injured or threatened with material injury by reason of the imports under investigation.[101]  In making this determination, the Commission must consider the volume of subject imports, their effect on prices for the domestic like product, and their impact on domestic producers of the domestic like product, but only in the context of U.S. production operations.[102]  The statute defines "material injury" as "harm which is not inconsequential, immaterial, or unimportant."[103]  In assessing whether the domestic industry is materially injured by reason of subject imports, we consider all relevant economic factors that bear on the state of the industry in the United States.[104]  No single factor is dispositive, and all relevant factors are considered "within the context of the business cycle and conditions of competition that are distinctive to the affected industry."[105]

---

[100] *See* CR/PR at Table IV-13.  Imports from each subject source were present in every month during January 2018 through December 2021.  *Id.*  The pricing data also show purchases of the domestic product during each quarter from January-March 2018 to July-September 2021.  *See* CR/PR at Tables V-4 to V-7.

[101] 19 U.S.C. §§ 1671d(b), 1673d(b).

[102] 19 U.S.C. § 1677(7)(B).  The Commission "may consider such other economic factors as are relevant to the determination" but shall "identify each {such} factor ... and explain in full its relevance to the determination."  19 U.S.C. § 1677(7)(B).

[103] 19 U.S.C. § 1677(7)(A).

[104] 19 U.S.C. § 1677(7)(C)(iii).

[105] 19 U.S.C. § 1677(7)(C)(iii).

18

Although the statute requires the Commission to determine whether the domestic industry is "materially injured or threatened with material injury by reason of" unfairly traded imports,[106] it does not define the phrase "by reason of," indicating that this aspect of the injury analysis is left to the Commission's reasonable exercise of its discretion.[107]  In identifying a causal link, if any, between subject imports and material injury to the domestic industry, the Commission examines the facts of record that relate to the significance of the volume and price effects of the subject imports and any impact of those imports on the condition of the domestic industry.  This evaluation under the "by reason of" standard must ensure that subject imports are more than a minimal or tangential cause of injury and that there is a sufficient causal, not merely a temporal, nexus between subject imports and material injury.[108]

In many investigations, there are other economic factors at work, some or all of which may also be having adverse effects on the domestic industry.  Such economic factors might include nonsubject imports; changes in technology, demand, or consumer tastes; competition among domestic producers; or management decisions by domestic producers.  The legislative history explains that the Commission must examine factors other than subject imports to ensure that it is not attributing injury from other factors to the subject imports, thereby inflating an otherwise tangential cause of injury into one that satisfies the statutory material injury threshold.[109]  In performing its examination, however, the Commission need not isolate

---

[106] 19 U.S.C. §§ 1671d(b), 1673d(b).

[107] *Angus Chemical Co. v. United States*, 140 F.3d 1478, 1484-85 (Fed. Cir. 1998) ("{T}he statute does not 'compel the commissioners' to employ {a particular methodology}."), *aff'g*, 944 F. Supp. 943, 951 (Ct. Int'l Trade 1996).

[108] The Federal Circuit, in addressing the causation standard of the statute, observed that "{a}s long as its effects are not merely incidental, tangential, or trivial, the foreign product sold at less than fair value meets the causation requirement*." Nippon Steel Corp. v. USITC*, 345 F.3d 1379, 1384 (Fed. Cir. 2003).  This was further ratified in *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867, 873 (Fed. Cir. 2008), where the Federal Circuit, quoting *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 722 (Fed. Cir. 1997), stated that "this court requires evidence in the record 'to show that the harm occurred "by reason of" the LTFV imports, not by reason of a minimal or tangential contribution to material harm caused by LTFV goods.'"  *See also Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1357 (Fed. Cir. 2006); *Taiwan Semiconductor Industry Ass'n v. USITC*, 266 F.3d 1339, 1345 (Fed. Cir. 2001).

[109] SAA at 851-52 ("{T}he Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports."); S. Rep. 96-249 at 75 (1979) (the Commission "will consider information which indicates that harm is caused by factors other than less-than-fair-value imports."); H.R. Rep. 96-317 at 47 (1979) ("in examining the overall injury being experienced by a domestic industry, the ITC will take into account evidence presented to it which demonstrates that the harm attributed by the petitioner to the subsidized or dumped imports is attributable to such other factors;" those factors include "the volume and prices of nonsubsidized imports or imports sold at fair value, contraction in demand or changes in patterns of consumption, trade restrictive practices of and competition between the foreign and domestic producers, developments in technology and the export performance and productivity of the domestic industry"); *accord Mittal Steel*, 542 F.3d at 877.

19

the injury caused by other factors from injury caused by unfairly traded imports.[110]  Nor does the "by reason of" standard require that unfairly traded imports be the "principal" cause of injury or contemplate that injury from unfairly traded imports be weighed against other factors, such as nonsubject imports, which may be contributing to overall injury to an industry.[111]  It is clear that the existence of injury caused by other factors does not compel a negative determination.[112]

Assessment of whether material injury to the domestic industry is "by reason of" subject imports "does not require the Commission to address the causation issue in any particular way" as long as "the injury to the domestic industry can reasonably be attributed to the subject imports."[113]  The Commission ensures that it has "evidence in the record" to "show that the harm occurred 'by reason of' the LTFV imports," and that it is "not attributing injury from other

---

[110] SAA at 851-52 ("{T}he Commission need not isolate the injury caused by other factors from injury caused by unfair imports."); *Taiwan Semiconductor Industry Ass'n,* 266 F.3d at 1345 ("{T}he Commission need not isolate the injury caused by other factors from injury caused by unfair imports ... . Rather, the Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports." (emphasis in original)); *Asociacion de Productores de Salmon y Trucha de Chile AG v. United States*, 180 F. Supp. 2d 1360, 1375 (Ct. Int'l Trade 2002) ("{t}he Commission is not required to isolate the effects of subject imports from other factors contributing to injury" or make "bright-line distinctions" between the effects of subject imports and other causes.); *see also Softwood Lumber from Canada*, Inv. Nos. 701-TA-414 and 731-TA-928 (Remand), USITC Pub. 3658 at 100-01 (Dec. 2003) (Commission recognized that "{i}f an alleged other factor is found not to have or threaten to have injurious effects to the domestic industry, *i.e.*, it is not an 'other causal factor,' then there is nothing to further examine regarding attribution to injury"), *citing Gerald Metals,* 132 F.3d at 722 (the statute "does not suggest that an importer of LTFV goods can escape countervailing duties by finding some tangential or minor cause unrelated to the LTFV goods that contributed to the harmful effects on domestic market prices.").

[111] S. Rep. 96-249 at 74-75; H.R. Rep. 96-317 at 47.

[112] *See Nippon Steel Corp.*, 345 F.3d at 1381 ("an affirmative material-injury determination under the statute requires no more than a substantial-factor showing.  That is, the 'dumping' need not be the sole or principal cause of injury.").

[113] *Mittal Steel*, 542 F.3d at 876, 878; *see also id.* at 873 ("While the Commission may not enter an affirmative determination unless it finds that a domestic industry is materially injured 'by reason of' subject imports, the Commission is not required to follow a single methodology for making that determination ... {and has} broad discretion with respect to its choice of methodology."), *citing United States Steel Group v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996) and S. Rep. 96-249 at 75.  In its decision in *Swiff-Train v. United States*, 793 F.3d 1355 (Fed. Cir. 2015), the Federal Circuit affirmed the Commission's causation analysis as comporting with the Court's guidance in *Mittal*.

sources to the subject imports." [114] The Federal Circuit has examined and affirmed various Commission methodologies and has disavowed "rigid adherence to a specific formula." [115]

The question of whether the material injury threshold for subject imports is satisfied notwithstanding any injury from other factors is factual, subject to review under the substantial evidence standard. [116] Congress has delegated this factual finding to the Commission because of the agency's institutional expertise in resolving injury issues. [117]

## B.    Conditions of Competition and the Business Cycle

The following conditions of competition inform our analysis of whether there is material injury by reason of subject imports. [118]

### 1.    Demand Considerations

Demand for raw honey is driven by demand for the downstream products in which processed honey is used, such as cereals, baked goods, pharmaceutical products, and hair care products, as well as the demand for processed honey in the retail sector. [119]  Raw honey is sold by beekeepers and importers to packers, which process and sell honey to retailers, the food

---

[114] *Mittal Steel*, 542 F.3d at 873 (quoting from *Gerald Metals*, 132 F.3d at 722), 877-79.  We note that one relevant "other factor" may involve the presence of price-competitive nonsubject imports in the U.S. market, particularly when a commodity product is at issue.  In appropriate cases, the Commission collects information regarding nonsubject imports and producers in nonsubject countries in order to conduct its analysis.

[115] *Nucor Corp. v. United States*, 414 F.3d 1331, 1336, 1341 (Fed. Cir. 2005); *see also Mittal Steel*, 542 F.3d at 879 ("*Bratsk* did not read into the antidumping statute a Procrustean formula for determining whether a domestic injury was 'by reason' of subject imports.").

[116] We provide in our discussion below a full analysis of other factors alleged to have caused any material injury experienced by the domestic industry.

[117] *Mittal Steel*, 542 F.3d at 873; *Nippon Steel Corp.*, 458 F.3d at 1350, *citing U.S. Steel Group*, 96 F.3d at 1357; S. Rep. 96-249 at 75 ("The determination of the ITC with respect to causation is ... complex and difficult, and is a matter for the judgment of the ITC.").

[118] The parties have not addressed application of the captive production provision in the final phase of these investigations.  The captive production provision can be applied only if, as a threshold matter, significant production of the domestic like product is internally transferred and significant production is sold in the merchant market.  In the final phase of these investigations, internal consumption by larger firms ranged between 3.0 percent and 3.9 percent of the domestic industry's total U.S. shipments of raw honey during the POI, and accounted for 3.0 percent in 2020.  CR/PR at Table III-14.  While a roughly equal portion of the larger firms' shipments, between 3.0 percent and 3.5 percent, were transferred to related firms, most were reported by domestic producers, ***, which have been excluded from the domestic industry.  *See CR/PR* at Table III-14 and U.S. Producer Questionnaires at III-5.  By contrast, the commercial U.S. shipments ranged between 93.0 percent and 93.8 percent of the larger firms total U.S. shipments during the POI, and accounted for 93.8 percent in 2020.  CR/PR at Table III-14.  Because of the relatively modest amount of domestic production internally transferred, we conclude that the threshold criterion is not satisfied and that the captive production provision does not apply in the final phase of these investigations.

[119] CR/PR at I-23 and II-11.

21

service industry, and industrial customers as a bulk food ingredient.[120]  Almost all raw honey gets processed to a degree and raw honey accounts for almost all of the cost of processed honey.[121]  Purchasers reported that changes in demand for the end uses of processed honey affected the demand for raw honey.[122]

Most market participants reported that U.S. demand for raw honey had increased since January 1, 2018.[123]  Demand reportedly increased in all three categories of uses in the downstream markets.[124]  The record indicates that the COVID-19 pandemic caused demand to increase due to an increase in demand for honey products at home.[125]  Apparent U.S. consumption increased by 1.8 percent from 2018 to 2020, decreasing from 547.4 million in 2018 to 531.2 million in 2019, before increasing to 557.0 million in 2020; it was higher in interim 2021, at 459.6 million pounds, than in interim 2020, at 369.0 million pounds.[126]  In full year 2021, apparent U.S. consumption was 587.4 million pounds.[127]

## 2.    Supply Considerations

The domestic industry was the second largest source of supply to the U.S. market throughout the POI.[128]  Domestic production decreased irregularly over the POI, initially increasing from *** pounds in 2018 to *** pounds in 2019, before decreasing to *** pounds in 2020, for an overall decrease of *** percent.[129]  It was *** pounds in interim 2020 and *** pounds in interim 2021.[130]  Domestic production in full year 2021 was *** pounds.[131]  The number of colonies in the United States decreased throughout the POI from 2.8 million colonies in 2018 and 2019 to 2.7 million colonies in 2020 and full year 2021.[132]  Beekeepers usually operate at full capacity and can only increase production if they increase the number of their hives.[133]  The average yield per colony for the domestic industry also fluctuated from year-to-

---

[120] CR/PR at I-30.
[121] CR/PR at II-1, II-10.
[122] CR/PR at II-10.
[123] CR/PR at Table II-8.
[124] CR/PR at Table II-8.
[125] *See* CR/PR at II-18.  *See also*, Petitioners' Posthearing Brief at Answers to Commissioner Questions, p. 2; NHPDA's Prehearing Brief at 7-8; and Ingredient Purchasers' Prehearing Statement at 1.
[126] CR/PR at Table C-2.
[127] CR/PR at Table G-1.
[128] CR/PR at Table IV-14.
[129] CR/PR at Tables C-2 and H-1.
[130] CR/PR at Table C-2.
[131] CR/PR at Table H-1.  Interim period production is based on full year NASS data.  CR at Table C-2 n.3.  Accordingly, actual production during the nine-month interim periods was likely somewhat lower, although production is seasonal and relatively few beekeepers engage in raw honey production during the fourth quarter.  CR/PR at II-17, III-21 & Table III-2.
[132] CR/PR at Tables III-6 and III-7.
[133] CR/PR at II-6.  Petitioners estimated that it takes three to four months for a new hive to reach capacity.  *See id.*

22

year, initially increasing from \*\*\* per colony in 2018 to \*\*\* pounds per colony in 2019, before decreasing to \*\*\* pounds per colony in 2020 and \*\*\* pounds per colony in full year 2021.[134]

Raw honey production is primarily located in Midwestern states such as North Dakota and South Dakota, but beekeepers are located across the United States.[135]  As noted above, virtually all raw honey is processed and packaged.  Petitioner SHA is a cooperative that processes, packages, and markets honey for its beekeeper members.  Members are required to sell virtually all of their production to the cooperative and are paid a share of the proceeds at the end of the year.[136]  SHA reported \*\*\* pounds of production by its members in 2020.[137]

Colony collapse disorder ("CCD") and Varroa mites, which carry bee viruses, have historically been major challenges, and both remain major problems for the industry.[138]  Beekeepers reported difficulty maintaining their hives during the POI; beekeepers reported having to replace hives each year due to losses from CCD and Varroa mites.[139]

Weather is another major factor affecting yield.  Beekeepers cited weather events such as hurricanes, fires, heat, drought, excessive rain/flooding, cold/freeze, thunderstorms, and hail as reducing yield during the POI.[140]  Raw honey production is seasonal, but it is often held in inventory and sold throughout year.[141]

Beekeepers also reported that labor costs have risen because they have had difficulty in finding enough labor, and some beekeepers thus increased reliance on temporary agricultural foreign workers through the H2A visa program.[142]

The domestic industry's share of apparent U.S. consumption by quantity decreased irregularly throughout the POI, increasing from \*\*\* percent in 2018 to \*\*\* percent in 2019, before decreasing to \*\*\* percent in 2020; its share of apparent U.S. consumption was lower in

---

[134] CR/PR at H-1.

[135] CR/PR at Tables III-4 and III-5.  Over 40 percent of beekeepers' colonies were located in the Midwest throughout the POI.  *Id*. at Table III-5.  However, "{b}eekeepers are often migratory moving their hives as needed to areas in need of bees' pollination services or areas rich in certain flora to promote production of a distinct type of honey."  CR/PR at II-2.  About two-thirds of colonies are subject to migration.  CR/PR at I-25.  The migration is generally from north in the summer to south in the winter, as well as to California during almond season (January to March) and several other states for pollination of crops such as melons.  *Id*. at I-20-21 and I-25.

[136] CR/PR at I-17 and VI-7.

[137] Petition at 4, Exhibit GEN-1.  Slightly fewer than half of the reporting beekeepers were members of SHA.  CR/PR at VI-7.

[138] *See* CR/PR at Tables III-3 and III-7.  *See also id.* at I-28.  CCD became a significant problem in 2006.  *Id*.  As a result of the disorder, U.S. producers \*\*\*.  *E.g.*, CR/PR at Table III-3.  Varroa mites were introduced to the U.S. bee population in the 1980s.  *Honey from China*, Inv. No. TA-406-13, USITC Pub. 2715 (Jan. 1994) at II-7 n.12.

[139] CR/PR at Table III-3.

[140] CR/PR at Table III-3.

[141] CR/PR at II-17, II-24.  Honey can be stored in inventory for up to 20 years, but the quality of the honey may degrade.  CR/PR at II-6.

[142] CR/PR at Table III-3.

23

interim 2021, at \*\*\* percent, than in interim 2020, at \*\*\* percent.[143] Its share of apparent U.S. consumption in full year 2021 was 20.7 percent.[144]

Cumulated subject imports' share of apparent U.S. consumption increased from 56.9 percent in 2018 to 60.1 percent in 2019 and 63.1 percent in 2020; it was higher in interim 2021, at 75.9 percent, than in interim 2020, at 67.5 percent.[145] Their share of apparent U.S. consumption in full year 2021 was 69.9 percent.[146]

Nonsubject imports' share of apparent U.S. consumption decreased from 15.6 percent in 2018 to 11.1 percent in 2019, increasing to 11.4 percent in 2020; it was lower in interim 2021 than in interim 2020, at 8.7 percent and 11.9 percent, respectively.[147] Their share of apparent U.S. consumption in full year 2021 was 9.4 percent.[148] The largest sources of nonsubject imports during the POI were Canada, Mexico, and New Zealand.[149] Honey from China remains subject to an antidumping duty order.[150]

### 3. Substitutability and Other Conditions

We find that there is at least a moderate degree of substitutability between domestically produced raw honey and cumulated subject imports and that price is an important factor in purchasing decisions.

While the record indicates that product specifications are an important factor in purchasing decisions and some purchasers may have optimized their recipes to work with certain blends, it also indicates that packers blend honey from different sources and across different colors, including domestic and subject sources, suggesting interchangeability of honey from different sources.[151] Market participants indicated that honey across different colors can sometimes be used interchangeably, particularly if the colors are close, for example white and extra-light amber honey.[152] Moreover, when comparing domestic raw honey with subject imports, more than half of responding purchasers reported that the products were comparable with respect to factors pertaining to product quality and characteristics, including product quality meeting industry standards, product range, product specifications, and product consistency as well as honey color and flavor.[153]

As discussed previously, U.S. producers and importers differed in their reports of interchangeability between the domestic like product and subject imports; domestic producers

---

[143] CR/PR at Table C-2 and Table H-7.

[144] CR/PR at Table G-1.

[145] CR/PR at Tables C-2 and H-7.

[146] CR/PR at Table G-1.

[147] CR/PR at Table C-2.

[148] CR/PR at Table G-1.

[149] CR/PR at II-6.

[150] CR/PR at I-8; *Honey From the People's Republic of China: Continuation of Antidumping Duty Order*, 83 Fed. Reg. 18277 (Apr. 26, 2018).

[151] CR/PR at I-18, I-21, I-27, II-1, II-16. *See also* Hearing Tr. at 169 (Blumenthal), and 224, 226, 290 (Bash).

[152] CR/PR at II-13-14 and Tables II-5-7.

[153] CR/PR at Table II-14.

indicated that product from domestic and subject sources were generally interchangeable, while importers argued that substitutability is limited by end uses based on organic designations, honey color, and floral source.[154]  Additionally, purchaser responses were mixed on the comparability of raw honey by source.  A plurality of responding purchasers indicated that domestic raw honey, when compared to subject imports from Argentina, Brazil, and nonsubject sources, was comparable or inferior on all factors that were rated as very important to purchasers.[155]  A plurality of purchasers indicated that domestic raw honey is comparable or inferior to honey from India and Vietnam on 19 of 20 and 16 of 20 factors respectively.[156]  Eight of 21 purchasers also reported purchasing subject imports instead of the domestic like product.[157]

Raw honey is produced from nectar from different floral sources, which determines the color and flavor of the honey, and some purchasers require specific color and flavor profiles.[158] Lighter-colored processed honey is generally sold at retail, while darker honey is more often used as an ingredient in food production and, to a lesser extent, in food service applications.[159] The domestic industry mostly shipped white, extra light amber, and light amber honey, while subject imports were more of the extra light amber and light amber varietals of honey.[160] Furthermore, the production of organic honey in the United States is limited and subject imports from Brazil are primarily organic raw honey.[161]  Thus, the record indicates that customer specifications regarding the color and flavor of raw honey, as well as an organic designation, may moderate substitutability to some extent.[162]

The record further indicates that price is an important factor in purchasing decisions for raw honey.  The most frequently cited top three factors firms consider in their purchasing

---

[154] CR/PR at II-34 and Tables II-15 and II-16.  Specifically, the majority of U.S. producers indicated that product from all sources were always interchangeable.  CR/PR at II-34 and Table II-15.  On the other hand, most importers reported that the domestic like product and product from Argentina were frequently interchangeable or sometimes interchangeable, a majority of importers reported that raw honey from India is sometimes interchangeable with the domestic like product, while most importers reported that raw honey from Brazil and Vietnam is never interchangeable with the domestic like product.  CR/PR at II-34 and Table II-16.

[155] CR/PR at II-27 and Table II-14.  The one exception is the comparison of honey flavor of U.S. raw honey as compared to Brazilian raw honey, for which eight purchasers reported that the flavor of raw honey from the United States is superior and eight purchasers reported that it is comparable to raw honey from Brazil.  *Id*.

[156] CR/PR at Table II-14.

[157] CR/PR at V-27.  Five purchasers reported purchasing raw honey from Argentina instead of the domestic like product; four reported purchasing raw honey from Brazil instead of the domestic like product; six reported purchasing raw honey from India instead of the domestic like product; and seven reported purchasing raw honey from Vietnam instead of the domestic like product.  *Id*.  Only one of these purchasers, ***, reported that price was a primary reason in purchasing subject imports instead of the domestic product.  *Id*.

[158] CR/PR at I-23, II-12, II-14.

[159] CR/PR at II-11 and Table II-4.

[160] CR/PR at IV-16 and Table IV-10.

[161] CR/PR at IV-19 and Table IV-11.

[162] *See, e.g.,* CR/PR at II-11-15.

25

decisions were price/cost (14 firms), specifications/certifications (12 firms), and quality and availability (11 firms each).[163]  Fifteen of 21 purchasers reported that price is very important.[164]  Additionally, most responding purchasers (12 of 21) reported that they sometimes purchase the lowest-priced product.  Two reported that they always purchased the lowest priced product, four reported usually, and three reported never purchasing the lowest priced product.[165]

The primary components of raw honey are fructose, glucose, and water, produced by honeybees.  Beekeepers use stacked wooden "bee" boxes that contain bee colony hives; they then extract the raw honey from the boxes and seal it in 55-gallon drums for sale to packers.[166]  Virtually all raw honey is processed and packed; some beekeepers pack their own honey, while others sell to independent packers or cooperatives such as SHA.[167]  Packers or processors subsequently sell processed honey to retailers, the food service industry, and to industrial customers for bulk food ingredients.[168]

Twenty-six of 39 responding domestic producers and 17 of 23 responding importers indicated that the price of raw materials has increased during the POI, with both groups reporting the cost of lumber (used to produce the boxes containing the hives) and fuel (used to transport the hives) as factors contributing to increased raw material costs.[169]  Domestic producers also reported rising costs for bee feed and sugar and inflation as additional factors in the increasing price of raw materials.[170]

Domestic raw honey production is seasonal, with production occurring in summer, and while evidence reflects that there may be peak purchasing activity within the first six to nine months following crop production, honey can be held in inventory for sale at a later time.[171]  Many beekeepers who produce raw honey also provide commercial pollination services, primarily for almond crops in California during January to March.[172]  In addition to transporting bees for pollination services, beekeepers may transport their bees throughout the year for foraging purposes and to enhance colony survival and growth.[173]

Raw honey is primarily sold from inventory.  U.S. producers reported that most of their shipments (89.0 percent) were from U.S. inventories with reported lead times generally ranging from 7 to 45 days, while the remaining 11.0 percent were produced-to-order with lead times of 3 to 180 days.[174]  Importers reported that 48.0 percent of their shipments were from U.S. inventories, 28.7 percent were produced-to-order, and 23.4 percent were from foreign inventories.  They generally reported lead times averaging 1 to 90 days for product from U.S. inventories and 45 to 120 days from foreign inventories, and 14 to 90 days for product

---

[163] CR/PR at Table II-10.
[164] CR/PR at Table II-11.
[165] CR/PR at II-23.
[166] CR/PR at V-1.
[167] CR/PR at I-27.
[168] CR/PR at II-17.
[169] CR/PR at V-1.
[170] CR/PR at V-1.
[171] CR/PR at II-17.
[172] CR/PR at I-20-21.
[173] CR/PR at I-25.
[174] CR/PR at II-24.

26

produced-to-order.[175]  U.S. producers reported that 48.8 percent of their commercial U.S. shipments were made pursuant to annual contracts and 31.1 percent through short-term contracts, while subject importers reported that 3.6 percent of their shipments were made through annual contracts and 90.7 percent through short-term contracts.[176]

### C.    Volume of Subject Imports

Section 771(7)(C)(i) of the Tariff Act provides that the "Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."[177]

The volume of cumulated subject imports increased by 12.9 percent from 2018 to 2020, from 311.4 million pounds in 2018 to 319.2 million pounds in 2019, and to 351.7 million pounds in 2020; it was 29.6 percent higher in interim 2021 at 348.9 million pounds than in interim 2020 at 269.2 million pounds.[178]

Subject imports' share of apparent U.S. consumption, by quantity, increased by 6.2 percentage points from 2018 to 2020, increasing from 56.9 percent in 2018 to 60.1 percent in 2019, and 63.1 percent in 2020; their share was also higher in interim 2021, at 75.9 percent, than in interim 2020, at 67.5 percent.[179]  The ratio of subject imports to total domestic production increased by 37.7 percentage points from 2018 to 2020.  The ratio increased from 204.1 percent in 2018 to 206.4 percent in 2019 and 241.8 percent in 2020.[180]

---

[175] CR/PR at II-24-25.

[176] CR/PR at Table V-2.

[177] 19 U.S.C. § 1677(7)(C)(i).

[178] CR/PR at Tables C-2 and G-1.  By value, cumulated subject import volume decreased from $310.7 million in 2018 to $276.2 million in 2019 and $295.6 million in 2020; it was $222.2 million in interim 2020 and $416.3 million in interim 2021.  *Id.*

U.S. importers' shipments of cumulated subject imports increased by 24.4 percent from 2018 to 2020, from 292.2 million pounds in 2018 to 334.9 million pounds in 2019, and 363.5 million pounds in 2020; they were 10.1 percent higher in interim 2021 (303.5 million pounds) than in interim 2020 (275.7 million pounds).  CR/PR at Table E-6.

Because U.S. imports and U.S. producer shipments are based on publicly available data (official import statistics and USDA/NASS data), certain market information such as imports, and U.S. producers' production and shipments are available for all 12 months of 2021.  *See* CR/PR at Tables III-4 to III-9 and Appendix G.  The absolute volume of subject imports in 2021 was 410.5 million pounds, which is a 16.7 percent increase from 2020.  Re-exports have been subtracted from the subject import totals. CR/PR at Table IV-14, C-2.

[179] CR/PR at Table C-2.  For the full year 2021, subject imports' share of apparent U.S. consumption increased to 69.9 percent, for an overall increase of 13 percentage points from 2018 to 2021.  CR/PR at Table G-1.  By value, the market share of cumulated subject imports increased from 40.2 percent in 2018 to 40.9 percent in 2019, and 42.8 percent in 2020; it was higher in interim 2021, at 61.2 percent than in interim 2020, at 47.4 percent.  CR/PR at Table C-2.

[180] CR/PR at Table IV-3 (including all USDA/NASS production).

27

Based on the foregoing, we find that the volume of cumulated subject imports, and their increase, were significant both in absolute terms and relative to production and consumption in the United States.[181]

**D.    Price Effects of the Subject Imports**

Section 771(7)(C)(ii) of the Tariff Act provides that, in evaluating the price effects of the subject imports, the Commission shall consider whether

> (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

> (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.[182]

As previous discussed in Section V.B.3, we find that the domestic like product and cumulated subject imports have at least a moderate degree of substitutability, and that price is an important factor in purchasing decisions for raw honey.

The Commission collected quarterly purchase price data from purchasers of raw honey concerning their purchases of four different colors of raw honey: white, extra light amber, light amber, and amber in 55-gallon drums.[183] Sixteen purchasers provided usable quarterly purchase price data for the four pricing products, although not all firms reported pricing for all products for all quarters.[184] Purchase price data reported by responding firms accounted for

---

[181] Respondents have argued that the volume of subject imports was not significant because imports were needed in the U.S. market and subject imports compete only to a limited extent with domestically produced raw honey. We address these arguments and others in our discussion of the impact of the subject imports on the domestic industry in Sections VI.D and VI.E below.

[182] 19 U.S.C. § 1677(7)(C)(ii).

[183] CR/PR at V-6. The four products were defined as:

**Product 1.**-- Raw white honey (0 – 34 mm), packaged in 55-gallon drums.

**Product 2.**-- Raw extra light amber honey (35 – 50 mm), packaged in 55-gallon drums.

**Product 3.**-- Raw light amber honey (51 – 85 mm), packaged in 55-gallon drums.

**Product 4.**-- Raw amber honey (greater than 86 mm), packaged in 55-gallon drums. *Id.*

The specification in millimeters (mm) refers to the Pfund grade which indicates the darkness of the honey. CR/PR at V-6 n.19.

[184] At NHPDA's request, the Commission collected pricing data from purchasers for the four pricing products. NHPDA's Comments on Draft Questionnaires (Sept. 10, 2021) at 3, 10-11 ("Soliciting pricing data from purchasers would ensure the most comprehensive and representative dataset, because the packers account for all or nearly all sales of imported and domestically produced raw honey in the U.S. market.") (internal quotation marks omitted).

approximately three-fourths, *i.e.*, 74.9 percent, of U.S. producers' U.S. shipments and two-thirds, *i.e.*, 66.7 percent, of importers' U.S. shipments of subject imports in 2020.[185]

The Commission's pricing data show pervasive underselling. Subject imports were priced below domestically produced product in 182 of 194 available quarterly comparisons from the first quarter of 2018 through the third quarter of 2021, at margins ranging up to 60.7 percent and an average underselling margin of 37.2 percent.[186] The quantity of subject imports that undersold the domestic like product during the POI was 818.2 million pounds while 51.1 million pounds oversold the domestic like product.[187] Underselling by subject imports accounted for 94 percent of the quarterly comparisons and 94 percent of the volume encompassed by the pricing data.

The Commission also gathered price data for January 2018-September 2021 from the National Honey Report published by USDA's Agricultural Marketing Service ("AMS") for the same four colors of raw honey used for the purchaser pricing data: white, extra light amber, light amber, and amber.[188] The AMS monthly price data are consistent with the Commission's purchaser data, showing widespread underselling by the subject imports over the POI. Subject imports were sold at lower prices in 505 of 523 instances.[189] The Commission's lost sales and lost revenues survey of purchasers corroborates that subject imports were lower priced than the domestic like product during the POI.[190] Domestic producers also reported losing sales and having to lower their prices due to competition from the subject imports.

Given the importance of price in purchasing decisions, and the extensive pricing data, as well as other record information showing that cumulated subject imports were lower priced than the domestic product as reviewed above, we find that there has been significant price underselling of the domestic like product by subject imports, and as this underselling occurred, subject imports captured sales from the domestic industry and gained market share at the

---

[185] CR/PR at V-6. The data accounted for 87.4 percent of importers' U.S. shipments of raw honey from Argentina, 84.4 percent of shipments from Brazil, 55.8 percent from India, and 46.9 percent of raw honey from Vietnam in 2020. *Id.* Purchases by the Ingredient Purchasers *** were excluded from the dataset because their downstream purchases of honey from packers had already been reported as purchases by the packers and often were a blend of honey from different sources. *See* CR/PR at V-5 n.16. In addition, purchases by Ingredient Purchasers from packers are at a different level of trade than purchases by packers from producers or importers.

[186] CR/PR at Table V-11. Subject imports oversold the domestic like product at an average margin of 7.4 percent at margins ranging up to 16.2 percent. *Id.*

[187] CR/PR at Table V-11.

[188] CR/PR at V-22 and Appendix L. Unlike Commission pricing data, the AMS data do not specify container size but reported sales are generally over 10,000 pounds. CR/PR at L-3 n.1.

[189] CR/PR at V-22. The consistent underselling by the subject imports in the AMS data is most easily observed in figures V-6 to V-9. CR/PR at V-23 and V-24.

[190] Eight of 21 responding purchasers reported purchasing subject imports instead of domestic raw honey and all eight purchasers reported that subject imports were priced lower than the domestic like product. CR/PR at V-27.

29

direct expense of the domestic industry.[191]  Cumulated subject imports gained 6.2 percentage points of market share from 2018 to 2020, and the domestic industry lost *** percentage points of market share during that timeframe.[192]  In addition, cumulated subject imports gained 8.4 percentage points of market share between the interim 2020 and interim 2021 periods, while the domestic industry lost *** percentage points of market share during that timeframe.[193]

We have also considered price trends during the POI.  Although the domestic industry's raw honey prices increased during the POI as a whole, that overall trend obscures the price declines in domestically produced raw honey that occurred over the greater portion of the POI, from the first quarter of 2018 to the fourth quarter of 2020.[194]  The Commission's purchase price data for domestically produced honey indicate that the purchase price of domestically produced product 1 fell 27.6 percent, the price of product 2 fell 29.7 percent, the price of product 3 fell 13.8 percent, and the price of product 4 fell 18.6 percent over the three-year period.[195]  The purchase price data show that prices for domestically produced raw honey generally declined until the latter portion of 2020, before beginning to increase, in late 2020 and into the first three quarters of 2021.[196]  AMS data show price decreases from 2018 through 2020 for the same four colors of domestically produced raw honey with price increases not beginning until 2021.[197]  Similarly, the domestic industry's net sales average unit values

---

[191] Respondents have suggested that the higher quality of domestically produced honey may account for the underselling.  Ingredient Purchasers' Prehearing Statement at 27.  The record does not support this argument.  For instance, purchasers view domestically produced raw honey as comparable to raw honey from Argentina with respect to flavor and "quality meets minimum standards," yet raw honey from Argentina consistently undersold the domestic like product.  CR/PR at Tables II-14 and V-12.  In general, purchasers also reported that suppliers of the subject imports were more frequently able to meet minimum quality specifications than suppliers of domestically priced honey.  *See* CR/PR at Table II-12.  Respondents also argued that a preference for domestically produced local honey explains the underselling.  NHPDA's Posthearing Brief at 8.  Most purchasers, however, reported that buying locally sourced honey was not an important purchasing factor.  CR/PR at II-24, Table II-11.

[192] CR/PR at Table C-2.

[193] CR/PR at Table C-2.  From 2018 to 2021, subject imports gained 13.0 percentage points of market share and the domestic industry lost *** percentage points of market share.  CR/PR at Table G-1.  From 2018 to 2020, subject imports gained 6.2 percentage points of market share and the domestic industry lost *** percentage points of market share.  *See* CR/PR at Table C-2.  Petitioner SHA also reported that it bought subject imports instead of domestic products because of their lower price.  CR/PR at V-32.

[194] As discussed below, prices increased in interim 2021 when importers gained knowledge in late 2020 about the imminent filing of the petitions, and prices continued to increase during the pendency of the investigations.

[195] CR/PR at Table V-8 and Tables V-4 to V-7 (calculated percentage declines from first quarter 2018 to fourth quarter 2020).

[196] *See* CR/PR at Figs. V-1 to V-5.

[197] *See* CR/PR at Figs. V-6 to V-9.  The AMS data include reports from both domestic producer and purchasers while the Commission's questionnaire data are from 20 purchasers.  *See* CR/PR at V-5 and L-3 n1.

30

("AUVs") declined *** percent from 2018 to 2020.[198]  Generally, purchase price data for subject imports followed this same pattern, *i.e.*, declining from 2018 to the beginning of the POI through the latter portion of 2020, before beginning to increase in late 2020 and into the first three quarters of 2021.[199]

Given the declines in the domestic industry's prices for raw honey from 2018 to 2020, in conjunction with the pervasive underselling by subject imports, we consider whether subject imports depressed the domestic industry's prices to a significant degree during this period. Domestic producers reported having to lower their prices due to competition from the subject imports[200] during a time when declining prices would not be expected given the overall increase in demand, as discussed above.[201]  The substantial price declines also cannot be explained by domestic industry cost reductions.  Although the domestic industry experienced some cost reductions, they were small compared to price declines,[202] and its unit net sales value declined to a greater degree, causing the ratio of its operating expenses to its net sales values to remain high and over *** percent throughout the POI, and increase from 2018 to 2020.[203]  Thus, instead of being able to maintain or even increase its prices consistent with rising demand and being able also to increase prices to at least cover operating expenses, the domestic industry faced declining prices for raw honey.[204]

While prices for domestically produced raw honey did begin to increase beginning in the second half of 2020, we find that these increases were at least partly attributable to the behavior of subject imports' prices.  When importers became aware in late 2020 that petitions were likely to be filed commencing these investigations, domestic prices for both imported and domestically produced raw honey increased, and continued to increase during the pendency of

---

[198] The domestic industry's net sales values decreased from $*** per pound in 2018 to $*** per pound in 2019, before increasing to $*** per pound in 2020.  CR/PR at Table C-2.

[199] CR/PR at V-18, Fig. V-5.

[200] Responding U.S. producers generally reported having to reduce prices.  Of the 47 responding large U.S. producers, 40 reported that they had to reduce prices and 12 reported that they had to roll back announced price increases.  CR/PR at V-25.  In addition, five small producers reported that they had to reduce prices, and two reported having to roll back announced price increases.  CR/PR at V-25 nn.24 & 25.

[201] *Supra* Section V.B.1.  CR/PR at Tables C-2 and G-1.

[202] The domestic industry's unit operating expenses decreased *** percent from 2018 through 2020, while prices for the two most important domestic industry pricing products fell more than 25 percent.  CR/PR at Table C-2; CR/PR at Table V-8 and Tables V-4 to V-7 (calculated percentage declines from first quarter 2018 to fourth quarter 2020).

[203] The industry operating expenses as a ratio to net sales increased from *** percent in 2018 to *** percent in 2019 before declining to *** percent in 2020.  CR/PR at Tables C-2 and M-1.

[204] CR/PR at Tables C-2 and M-1.  Most members of the industry were already reporting losses, and certain beekeepers chose to inventory their honey rather than sell at prices they believed to be too low.  CR/PR at VI-13 to VI-14.

31

the investigations.[205]  Indeed, the ***, acknowledged the effect of these investigations on domestic prices, indicating that the investigations had an effect on pricing.[206] [207]

In our view, the increases in market prices after the filing of the petitions indicate that low-priced subject imports, which pervasively undersold the domestic product, materially contributed to the domestic price declines from 2018 to 2020.[208] [209]  Given the price declines

---

[205] *See* CR/PR at Figs. V-5 to V-9.  We recognize that the purchase price data show prices increasing earlier than the AMS data but the general trends are consistent with importer knowledge of the imminent filing of the petitions and the pendency of the investigations affecting prices in late 2020 into 2021.

[206] Petitioners' Prehearing Brief, Exhibit 4, Attachment 1 (***).  *See also* Petitioners' Prehearing Brief, Exhibit 4 at 5-6 (Blumenthal declaration) (noting 2021 improvements in market conditions); Hearing Tr at 24 Blumenthal (substantial improvements in pricing since filing of petitions as importers raised prices).

NHPDA argues that the possibility of an antidumping duty case was known in the market in early 2020, when prices were still falling, demonstrating that general knowledge regarding the filing of the petitions does not account for the improvements in prices in the market in 2021.  *See, e.g.,* Hearing Tr. at 280-81 (Campbell).  As evidence, NHPDA cites an agenda item for a January 2020 annual NHPDA meeting that purportedly concerned the possibility of a trade case being filed.  The item on the agenda, however, indicated only an overview of the AD/CVD process and did not refer to the possibility of a new trade case being filed.  *See* NHPDA's Posthearing Brief at 10 and Exhibit 10 (agenda item "Overview of Antidumping/Countervailing Duty Petition Process").  Petitioners claim that, beginning in late 2020, the prospect of the investigations led importers to increase their prices.  Hearing Tr. at 26 (Hiatt).  As Petitioners describe, it was only after a virtual meeting of the AHPA and its counsel on November 10, 2020, discussing the upcoming case at which representatives of packers and importers were present that it became known to NHPDA members with any degree of certainty that the petitions in these investigations would be imminently filed.  Petitioners' Prehearing Brief at 59, Exhibit 3 at 5-6 (Hiatt Declaration); Hearing Tr. at 352 (Cannon).  Further, ***.  Petitioners' Prehearing Brief Exhibit 3 Attachment 1.

[207] We find that the pendency of the investigations affected the pricing of the subject imports in the post-petition period.  *See* SAA at 854 ("{w}hen the Commission finds evidence on the record of a significant change in data concerning the imports or their effects subsequent to the filing of the petition or the imposition of provisional duties, the Commission may presume that such change is related to the pendency of the investigation").  *See also* 19 U.S.C. § 1677(7)(I) (Commission considers whether any change in the volume, price effects, or impact of imports of the subject merchandise since the filing of the petition is related to pendency of investigation).

[208] NHPDA has suggested that an increase in demand accounts for the increase in prices in 2021.  Hearing Tr. at 280 (Campbell).  The record does not support this argument.  While the record shows that apparent U.S. consumption was 15.2 percent higher in interim 2021 than in interim 2020, full year data for 2021 show a 5.5 percent increase.  *See* CR/PR at Tables C-2 and M-1.  In any case, the record does not indicate that there was such a substantial increase in demand that would alone account for the sharp increase in subject import prices observed in 2021.  *See* CR/PR at Fig. V-5 (subject import prices).

[209] Commissioner Schmidtlein does not agree that post-petition effects are evidence of price depression earlier in the POI before the petition was filed.  Rather, in her view, these price increases do not weigh against a finding of price depression because she accords them less weight as post-petition effects, pursuant to 19 USC § 1677(7)(I).

32

from 2018 to 2020 during a time of strong and increasing demand, in conjunction with the significant underselling detailed above, and the subject imports' dominant share of the U.S. market , we find that low-priced subject imports depressed prices for domestically produced raw honey to a significant degree.[210]

In sum, we find that the significant underselling by cumulated subject imports enabled the subject imports to gain sales and market share from the domestic industry and depressed the domestic industry's prices to a significant degree.[211]  We therefore find that cumulated subject imports had significant price effects.

### E.    Impact of the Subject Imports[212]

Section 771(7)(C)(iii) of the Tariff Act provides that examining the impact of subject imports, the Commission "shall evaluate all relevant economic factors which have a bearing on

---

[210] Respondents argue that weak demand for retail honey and the splintering of the market into local markets caused price declines.  *See* NHPDA's Posthearing Brief, Exhibit 1 at 6-7.  The record does not support their argument that demand for local honey had a large impact on the market downstream or that there were regional honey markets.  The record shows that purchasers did not view "buying local" as an important purchasing factor, and that demand for honey for sale at retail was growing as was demand for honey for use as a food ingredient and for food service.  *See* CR/PR at II-24, Tables II-8 and II-11.  Moreover, purchasers and importers almost unanimously reported that domestic retail demand increased, rather than decreased.  CR/PR at Table II-8.  In any case, we observe downward price trends for the subject imports for all four pricing products from 2018 to 2020.  *See* CR/PR at Fig. V-5.  Consequently, even if respondents were correct that different colors of honey tended to go to different downstream markets, differential demand for downstream uses would not be the cause of price declines observed for all four honey colors in the market.

[211]  Respondents also argue that subject imports did not cause the observed price declines because they were serving different downstream markets than the domestic like product.  NHPDA's Prehearing Brief at 53-55.  The record does not support NHPDA's argument of attenuated competition.  First, the record shows that there was substantial overlap in the honey colors shipped by domestic and subject sources and that domestically produced and imported raw honey were competing head-to-head for sales to the same purchasers, packers, who, in turn, consolidated and mixed raw honey from different sources to create blends of processed honey to be sold to the different end use segments – ingredient, retail, and food service industries.  CR/PR at Table IV-10 and Fig. IV-4.  NHPDA acknowledges raw honey from different sources does compete within color/product categories, arguing light amber raw honey from India and Vietnam competed vigorously for sales to packers.  NHPDA's Posthearing Brief, Exhibit 1 at 3.  We also observe that prices for the domestic like product, though higher than subject import prices, generally followed the same trends as prices for the subject imports.  *See, e.g.,* CR/PR at Figs. V-1 to V-6.  In our view, this overlap in honey colors and purchasers and correlation in prices, in addition to the large share of the market held by subject imports, indicate that the subject imports were affecting prices for the domestic like product during the POI.

[212] The statute instructs the Commission to consider the "magnitude of the dumping margin" in an antidumping proceeding as part of its consideration of the impact of imports.  19 U.S.C. § 1677(7)(C)(iii)(V).  In its final determination of sales at less than fair value concerning imports of raw honey from Argentina, Commerce found dumping margins ranging from 9.17 to 49.44 percent.  *Raw Honey From Argentina: Final Determination of Sales at Less Than Fair Value and Final Affirmative* (Continued...)

33

the state of the industry."[213]  These factors include output, sales, inventories, capacity utilization, market share, employment, wages, productivity, gross profits, net profits, operating profits, cash flow, return on investment, return on capital, ability to raise capital, ability to service debts, research and development ("R&D"), and factors affecting domestic prices.  No single factor is dispositive and all relevant factors are considered "within the context of the business cycle and conditions of competition that are distinctive to the affected industry."[214]

The domestic industry began the period with operating losses, and by many measures of its output and financial performance, its condition worsened from 2018 to 2020.[215]  As low-priced cumulated subject imports captured market share from the domestic industry and depressed its prices, the domestic industry's output indicators fell, and its financial condition deteriorated as domestic producers incurred reduced sales and revenues.  The domestic industry's financial condition improved in interim 2021 when its prices and sales values increased after the filing of the petitions.  Nonetheless, the domestic industry continued to report lower production and shipments and it continued to lose market share to lower-priced subject imports.

---

*Determination of Critical Circumstances*, 87 Fed. Reg. 22179, 22181 (Apr. 14, 2022).  In its final determination of sales at less than fair value concerning imports of raw honey from Brazil, Commerce found dumping margins of 7.89 and 83.72 percent.  *Raw Honey From Brazil: Final Determination of Sales at Less Than Fair Value*, 87 Fed. Reg. 22182, 22183 (Apr. 14, 2022).  In its final determination of sales at less than fair value concerning imports of raw honey from India, Commerce found dumping margins ranging from 5.52 to 6.24 percent*. Raw Honey From India: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances,* 87 Fed. Reg. 22188, 22189 (Apr. 14, 2022).  Finally, in its final determination of sales at less than fair value concerning imports of raw honey from Vietnam, Commerce found dumping margins ranging from 58.74 to 61.27 percent.  *Raw Honey From Vietnam: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 87 Fed. Reg. 22184, 22185 (Apr. 14, 2022).

In considering the dumping margins, we take into account in our analysis the fact that Commerce has made final findings that all subject producers in Argentina, Brazil, India, and Vietnam are selling subject imports in the United States at less than fair value.  Further, our analysis of the significant underselling of subject imports and their large underselling margins, described in both the price effects discussion and below, is particularly probative to an assessment of the impact of the subject imports.

[213] 19 U.S.C. § 1677(7)(C)(iii); *see also* SAA at 851 and 885 ("In material injury determinations, the Commission considers, in addition to imports, other factors that may be contributing to overall injury.  While these factors, in some cases, may account for the injury to the domestic industry, they also may demonstrate that an industry is facing difficulties from a variety of sources and is vulnerable to dumped or subsidized imports.").

[214] 19 U.S.C. § 1677(7)(C)(iii).  This provision was amended by the Trade Preferences Extension Act ("TPEA") of 2015, Pub. L. 114-27.

[215] As discussed above, information concerning the domestic industry is based on USDA/NASS data (colonies, yield, production, and shipments) and questionnaire data from 84 beekeepers who provided financial information to the Commission.

Despite an overall increase in apparent U.S. consumption from 2018 to 2020, the domestic industry's production[216] and U.S. shipments[217] declined *** percent and *** percent respectively.[218] Similarly, the industry's output indicators were lower in interim 2021 than in interim 2020 notwithstanding higher apparent U.S. consumption.[219] The number of beekeepers' colonies and their yield declined over the POI.[220] Even with its production declining, the domestic industry's end-of-period inventories increased by 35.6 percent from 2018 to 2020 before falling in 2021.[221] U.S. producers' reported level of inventories increased during the POI, which, as a ratio to U.S. producers' U.S. shipments, increased from *** percent in 2018 to *** percent in 2019 and to *** percent in 2020.[222]

As cumulated subject imports increased, the domestic industry's market share decreased by 6.8 percentage points from 2018 to 2021 (initially increasing from *** percent in 2018 to *** percent in 2019, before falling to *** percent in 2020 and 20.7 percent in 2021).[223]

---

[216] U.S. beekeepers' production decreased by *** percent from 2018 to 2020, increasing from *** pounds in 2018 to *** pounds in 2019 and then decreasing to *** pounds in 2020. CR/PR at Table C-2.

[217] U.S. beekeepers' U.S. shipments decreased by *** percent from 2018 to 2020, increasing from *** pounds in 2018 to *** pounds in 2019 and then decreasing to *** pounds in 2020. CR/PR at Table C-2. The industry's exports, a relatively small portion of its total shipments, increased from 3.2 million pounds in 2018 to 5.9 million pounds in 2020. CR/PR at Table III-13.

[218] According to the Commission's questionnaire data, the quantity of the domestic industry's net sales increased from 2018 to 2020 despite NASS data showing that the broader industry's U.S. shipments declined over the same period. *See* CR/PR at Table C-2 and III-13. It is likely that the inconsistency resulted from the net sales quantities being reported by just over 30 percent of the industry. The net sales quantities of the broader industry likely declined along with its U.S. shipments.

[219] U.S. beekeepers' production was lower in interim 2021 (*** pounds) than in interim 2020 (*** pounds). CR/PR at Table C-2. Beekeepers' U.S. shipments were *** percent lower in interim 2021 (*** pounds) than in interim 2020 (*** pounds). CR/PR at Table C-2.

[220] The number of beekeepers' colonies declined over the period from 2.8 million colonies in 2018 and 2019 to 2.7 million colonies in 2020 and 2021. CR/PR at Table III-6. Production yield increased from 54.5 pound per colony in 2018 to 55.8 pound per colony in 2019; yield then fell to 54.5 pound per colony in 2020 and 46.9 pound per colony in 2021. CR/PR at Table III-8.

[221] Beekeepers' end-of-period inventories increased from 29.3 million pounds in 2018 to 40.9 million pounds in 2019 and 39.7 million pounds in 2020; they were lower in 2021 at 23.5 million pounds. CR/PR at Table G-3 (NASS data). Data from the Commission's questionnaires show the same trends. *See* CR/PR at Table III-19. *** domestic producer, ***, and *** declined to sell their honey or found that packers were no longer interested in their honey due to low market prices. CR/PR at VI-13 to VI-14. *See also* Hearing Tr. at 253 (Campbell) (domestic producers holding inventory in anticipation of higher prices after filing of petitions).

[222] CR/PR at Table C-2. According to the NASS data, the domestic producers' ratio of inventory to U.S. shipments increased from 19.4 percent in 2018 to 26.7 percent in 2019 and 28.0 percent in 2020 before decreasing to 19.3 percent in full year 2021. CR/PR at Table G-3.

[223] CR/PR at Tables C-2 and G-1.

35

The industry's market share was also lower in interim 2021 (*** percent) than in interim 2020 (*** percent).[224]

The domestic industry's financial indicia generally deteriorated from 2018 to 2020 and were somewhat improved in interim 2021 compared to interim 2020.[225] Revenues declined by *** percent from 2018 to 2020, first decreasing from $*** in 2018 to $*** in 2019, and then increasing to $*** in 2020.[226] The industry's operating expenses declined by *** percent from 2018 to 2020, decreasing from $*** in 2018 to $*** in 2019 and $*** in 2020.[227] The domestic industry's ratio of operating expenses to net sales increased from *** percent in 2018 to *** percent in 2019, before falling to *** percent in 2020.[228]

The domestic industry's operating losses increased from $*** in 2018 to $*** in 2019, and then decreased to $*** in 2020.[229] The industry's operating income margin was negative *** percent in 2018, negative *** percent in 2019, and negative *** percent in 2020.[230]

The domestic industry's increased income from government programs enabled it to reduce its net losses from 2018 to 2020.[231] It reported net losses of $*** in 2018, $*** in 2019 and $*** in 2020.[232] The industry's net income margin was negative *** percent in 2018, negative *** percent in 2019, and negative *** percent in 2020.[233] Total net assets by large producers increased, while the industry's negative return on assets fluctuated from 2018 to

---

[224] CR/PR at Table C-2. By value, the domestic industry's market share increased overall by *** percentage points from 2018 to 2020, first increasing from *** percent in 2018 to *** percent in 2019 before decreasing to *** percent in 2020; it was lower in interim 2021 (*** percent) than in interim 2020 (*** percent). *Id.*

[225] CR/PR at Table C-2. Large beekeepers are firms that reported having 3,800 or more bee colonies during the POI. CR/PR at III-2. They were asked to report more information (including interim data) than firms with fewer than 3,800 colonies. CR/PR at VI-1 n.4. Thus, the interim data of the 41 large beekeepers is not necessarily comparable with full-year data reported by the 79 beekeepers that includes data from smaller beekeepers.

[226] Large beekeepers reported greater revenue in interim 2021 ($***) than in interim 2020 ($***). CR/PR at Table C-2.

[227] CR/PR at Table C-2. Large beekeepers reported higher operating expenses in interim 2021 ($***) than in interim 2020 ($***). *Id.*

[228] CR/PR at Table C-2. Large beekeepers' ratio of operating expenses to net sales revenues was *** percent in interim 2020 and *** percent in interim 2021. CR/PR at Table C-2.

[229] CR/PR at Table C-2. The large producers reported operating losses of $*** in interim 2020 and $*** in interim 2021. *Id.* *** of 78 beekeepers reported operating losses in 2018, *** reported losses in 2019, and *** reported losses in 2020. CR/PR at Table M-1.

[230] CR/PR at Table C-2. Large beekeepers' operating income margin was negative *** percent in interim 2020 and negative *** percent in interim 2021. *Id.*

[231] Certain government programs provide assistance to beekeepers. *See* CR/PR at VI-15 n.43. Income received from these programs decreased from $*** in 2018 to $*** in 2019 and then increased to $*** in 2020. CR/PR at Table M-1.

[232] CR/PR at Table C-2. The large producers reported net losses of $*** in interim 2020 and $*** in interim 2021. *Id.*

[233] CR/PR at Table C-2. Large beekeepers' net income margin was negative *** percent in interim 2020 and negative *** percent in interim 2021.

2020.[234]  Capital expenditures reported by large beekeepers increased from $*** in 2018 to $*** in 2019, and then fell to $*** in 2020.[235]

In contrast to its other indicators, the domestic industry's employment indicators showed some improvement from 2018 to 2020.  Information from questionnaires showed that the domestic industry's employment (measured in production-related workers ("PRWs")) increased from *** PRWs in 2018 to *** PRWs in 2019 and *** PRWs in 2020.[236]  Hours worked  increased from 2018 to 2020, increasing from *** hours in 2018 to *** hours in 2019 and 2020.[237]  Wages paid increased from $*** in 2018 to $*** in 2019 and $*** in 2020.[238]  Productivity (measured in pounds per 1,000 hours) increased from *** pounds in 2018 to *** pounds in 2019, and then fell to *** pounds in 2020.[239]

In sum, the record shows that the domestic industry's increasingly poor performance from 2018 to 2020 occurred as low-priced cumulated subject imports increased in volume and captured sales and market share from the domestic industry.  Cumulated subject imports significantly undersold the domestically produced raw honey and depressed domestic producers' prices.  Because of the significant depression of domestic producers' prices and the industry's reduced sales, the industry's revenues were lower than they otherwise would have been.  Even with an increase in apparent U.S. consumption the domestic industry's production, shipments, prices, revenues, and market share all declined overall from 2018 to 2020.  As a result, the domestic industry reported relatively large operating and net losses from 2018 to 2020.  In interim 2021 after the petitions were filed, the industry continued to lose market share to the subject imports although its losses diminished due to increased revenues from higher raw honey prices.[240]

Respondents argue that beekeepers earn much of their income from pollination services and that the Commission should evaluate the industry's performance based on financial results for both honey production and pollination services.[241]  Doing so, however, would be improper

---

[234] *See* CR/PR at VI-16.  Large beekeepers' reported total assets were *** in 2018, *** in 2019 and *** in 2020.  CR/PR at Table C-2.

[235] CR/PR at Table C-2.  Large beekeepers' capital expenditures were $*** in interim 2020 and $*** in interim 2021.  CR/PR at Table C-2.  Large firms reported capital expenditures of $*** interim 2020 and $*** in interim 2021.  *Id.*  Large firms incurred R&D expenses of $*** in 2018, $*** in 2019 and $*** in 2020.  CR/PR at Table C-2.  Their R&D expenses were $*** in interim 2020 and $*** in interim 2021.  *Id.*

[236] CR/PR at Table C-2.  Large beekeepers reported employing *** workers in interim 2020 and *** workers in interim 2021.  *Id.*

[237] CR/PR at Table C-2.  Large beekeepers reported *** hours worked in interim 2020, and in interim 2021.  *Id.*

[238] CR/PR at Table C-2.  Large beekeepers reported $*** wages paid in interim 2020 $*** paid in interim 2021.  *Id.*

[239] CR/PR at Table C-2.  Large beekeepers reported productivity of *** pounds per hour in interim 2020 and *** pounds per hour in interim 2021.  *Id.*

[240] *See* CR/PR at VI-2.  Many domestic producers reported negative effects on their operations and investment as a result of low raw honey prices due to the subject imports.  CR/PR at Tables VI-7 and VI-8.

[241] NHPDA's Prehearing Brief at 71-72; NHPDA's Posthearing Brief at 31.

under the statute,[242] and the record does not support Respondents' argument that beekeepers are significantly sacrificing their raw honey production in order to provide pollination services.[243]

Respondents additionally observe that subject imports are needed to serve the U.S. market because apparent U.S. consumption exceeds the domestic industry's production and shipments. However, Respondents' claims ignore the domestic industry's declining U.S. shipments and growing inventories of raw honey[244] during the POI as the domestic industry's raw honey was undersold by the subject imports.[245]

_____

[242] The statute states that "{t}he effect of dumped imports … shall be assessed in relation to the United States production of a domestic like product if available data permit the separate identification of production in terms of such criteria as the production process or the producer's profits." 19 U.S.C. 1677(4)(D). In accordance with the statute, we focus on beekeepers' raw honey operations and do not broaden our consideration of beekeepers' operations to include pollination services as urged by NHPDA. As is often the case in Commission investigations, firms such as steel producers, use their assets to produce more than one product, and expenses and revenue must be allocated among the different products. CR/PR at VI-10, VI-10 n.23. In these investigations, staff indicated that the amount of production costs that were allocated to raw honey were likely somewhat understated because of the difference in the amount of time spent between commercial pollination and raw honey production, particularly for companies that reported only shared operating expenses (*i.e.,* all small producers and some large producers). CR/PR at VI-10 n.26.

[243] Beekeepers provide pollination for a relatively short period January-March during the offseason for raw honey production. Raw honey production primarily occurs during April-September. CR/PR at III-21, VI-8 n.14. While the domestic industry's yield per colony was lower than honey industries in Brazil, India, and Vietnam, this is not unexpected. The domestic industry's yield per colony is lower than that of honey industries in countries with a tropical climate permitting honey production during more months of the year. *See* Prehearing Report, Memorandum INV-UU-031 at Table II-3 (domestic industry's yield similar to yield Argentina and Ukraine); CR/PR at II-17; Hearing Tr. 200 (Crown) (noting longer production seasons in India and Vietnam).

[244] As noted, some beekeepers chose not to sell their honey at prevailing market prices or found that packers were no longer interested in their raw honey due to low market prices. CR/PR at VI-13 to VI-14.

[245] The Commission has repeatedly explained that "there is no short supply provision in the statute" and "the fact that the domestic industry may not be able to supply all of demand does not mean the industry may not be materially injured or threatened with material injury by reason of subject imports." *Softwood Lumber from Canada*, Inv. Nos. 701-TA-414 and 731-TA-928 (Article 1904 NAFTA Remand) at 108, n.310 (Dec. 2003). *See also, Small Diameter Graphite Electrodes from China*, Inv. No. 731-TA-1143 (Final), USITC Pub. 4062 (Feb. 2009) at 22-23; *Sodium Hexametaphosphate from China,* Inv. No. 731-TA-1110 (Final), USITC Pub. 3984 (March 2008) at 27, n.109); *Electrolytic Manganese Dioxide from China and Australia*, Inv. Nos. 731-TA-1124-25 (Preliminary), USITC Pub. 3955 (Oct. 2007) at 18, n.122; *Certain Lined Paper School Supplies from China, India, and Indonesia*, Inv. Nos. 701-TA-442-443 and 731-TA-10995-1097 (Final), USITC Pub. 3884 (Sept. 2006) at 25, n.192, and at 58, n.49; *Certain Activated Carbon from China*, Inv. No. 731-TA-1103 (Preliminary), USITC Pub. 3852 (May 2006) at 19, n.134; *Metal Calendar Slides from Japan*, Inv. No. 731-TA-1094 (Preliminary), USITC Pub. 3792 (Aug. 2005) at 9, n.45 ("To the extent that Respondents claim that the Commission is legally unable to make an affirmative finding of material injury by reason of subject imports because the domestic industry is incapable of supplying domestic demand, they are incorrect.").

Respondents further contend that subject imports were needed to serve the downstream ingredient market (food manufacturers) which they claim the domestic industry cannot serve.[246]  However, Ingredient Purchasers' purchases do not explain the volume of subject imports during the POI.[247]  Respondents' arguments also overlook the substantial overlap in extra light amber and light amber raw honey produced domestically and which accounted for the majority of the subject imports.[248]  Respondents further argue that darker colored raw honey in general, and darker raw honey from Vietnam in particular, is needed by certain food manufacturers because of its floral sources and flavor profile.[249]  The record indicates, however, that the Ingredient Purchasers purchased low-priced blended honey from multiple countries.[250]  Rather than particular flavors or floral sources, the greater availability and lower prices of the subject imports primarily account for the Ingredient Purchasers'

---

[246] Ingredient Purchasers' Prehearing Statement at 12; NHPDA's Prehearing Brief at 4-5, 37-38; NHPDA's Posthearing Brief at 1-2.

[247] The Ingredient Purchasers' reported purchases of subject imports totaled *** from January 2018 to September 2021—less than *** percent of subject imports that entered during the period.  *See* CR/PR at Tables V-13 and C-2.  The Ingredient Purchasers acknowledge that their purchases were of blended honey from various countries and that all of their purchases were from packers or processors of raw honey rather than beekeepers.  Despite purchasing honey from processors, they insist the honey has not been filtered to 25 microns, so it remains raw honey rather than processed honey.  *See* CR/PR at II-2 n.12; Ingredient Purchasers' Posthearing Statement, Answers to Commissioner Questions at 19-21.

[248] CR/PR at Fig. IV-4; Table E-6.  Respondents assert that product from Vietnam is required in the market because of its dark color.  However, over half of the product from Vietnam was of light amber honey during the POI, a product the domestic industry produces.  *See* CR/PR at Tables E-1 and E-5 (large producers' U.S. shipments were between 18 and 20 percent light amber from 2018 to 2020).  Most of importers' shipments of subject imports were light amber or lighter as were the domestic industry's shipments.  CR/PR at Tables E-1 and E-6.  Further, the greatest increase in subject imports from 2018 to 2020 was in light amber, followed by extra light amber, and then the darkest honey, amber.  CR/PR at Table E-6.  Thus, it was not "dark" honey leading the increase in subject imports.  Eighty percent of the increase in subject imports was in light amber and extra light amber.  These two colors accounted for over 40 percent of the domestic industry's shipments.  *See* CR/PR at Tables E-1 and E-6.

[249] *See* Ingredient Purchasers' Prehearing Statement at 6-8, NHPDA's Prehearing Brief at 53-55.

[250] Bimbo Bakeries Purchaser's Questionnaire at 11; General Mill's Purchaser's Questionnaire at 12-13, 35, 37; Post' Purchaser's Questionnaire at 12, 14; Smithfield Purchaser's Questionnaire at 10.  The Ingredient Purchasers' *** suggests their purchases were not motivated by flavor or floral sources.  CR/PR at V-6 to V-7 n.16.  Indeed, their purchase contracts specify price, source, and color but often not floral categories or usually flavors.  NHPDA's Posthearing Brief Exhibit 10 (contracts); Petitioner's Posthearing Brief Exhibit 1 at 10, Ex. 4 paras 6-7. (Blumenthal Declaration).

39

purchases.[251]  While NHPDA also claims that imports of organic raw honey from subject sources do not take sales from domestic raw honey, the record does not support this claim.[252]

NHPDA additionally argues that Petitioner SHA imported from subject sources and negotiated low prices, and that SHA was therefore partly responsible for the increase in subject imports and their low prices.[253]  We disagree with Respondents' interpretation of the record. The imports by SHA (a cooperative of U.S. beekeepers) instead demonstrate that the SHA needed low-priced imports in order to compete in the U.S. market due to low prices.[254]

---

[251] The record shows that amber raw honey from Vietnam was generally the lowest-priced raw honey from subject sources suggesting it is not a specialty product.  *See* CR/PR at Tables E-2 to E-5.  *See also* CR/PR at Figs. V-3 to V-4 and Appendix K (Ingredient Purchasers') (downstream purchase prices lower than domestic producers' prices).  Moreover, the Ingredient Purchasers do not claim that the flavor of their products was improved by switching sources of honey.  *See* Hearing Tr. at 232 (Bash), 233-34 (Bertrand, Pizer), 234 (Crown).  In explaining their purchases, three of four of the Ingredient Purchasers' questionnaire responses report that greater availability accounts for their purchases of raw honey from Vietnam.  Two of the four also indicate that either subject imports were low-priced or that domestic honey is a "premium" product.  *See* CR/PR at Table V-15 (***).  Petitioners provide ***. Petitioners Prehearing Brief, Exhibit 8 and Attachment D.

[252] Respondents highlight that the majority of the subject imports from Brazil are of organic raw honey and there is virtually no domestically produced organic raw honey.  They maintain, therefore, that organic raw honey from Brazil is not competing with domestic raw honey.  *See* NHPDA's Prehearing Brief at 9-11; NHPDA's Posthearing Brief at 6-7.  First, however, it is clear that some processed organic honey from Brazil is directly competing with processed conventional honey at retail.  To this extent, organic honey is competing with conventional honey regardless of the organic label.  *See* NHPDA's Prehearing Brief, Exhibit 51 (samples of retail honey from grocery stores).  While organic honey may be required as an ingredient in certain foods, the portion of demand that requires organic honey rather than conventional honey is unclear.  *See* NHPDA's Posthearing Brief, Exhibit 1 at 12 (estimating *** to *** percent of shipments of organic honey were to the retail market).  Organic raw honey from Brazil was also competing no differently than other subject imports in the U.S. market in terms of pricing. Even though approximately 90 percent of raw honey from Brazil was organic honey, its prices tracked imports from other subject countries that were overwhelmingly not organic.  *See* Figs. IV-5, V-2, and V-3. Importers' shipments of raw organic honey from Brazil were lower priced than conventional honey from Brazil suggesting that major raw honey purchasers do not treat raw organic honey from Brazil as a premium product in the U.S. market.  *See* CR/PR at Table F-3.  Purchasers also indicated raw honey from Brazil was at least sometimes interchangeable with that from Argentina and India.  CR/PR at Table II-17. Thus, the record does not indicate, as Respondents argue, that raw honey from Brazil is not competing with other raw honey in the U.S. market.

[253] NHPDA's Final Comments at 3-4.

[254] SHA explained that domestically produced raw honey from its members could not compete at the price level of subject imports, so it had to blend imports with domestic honey in order to meet competition from the subject imports.  Petitioners' Posthearing Brief, Exhibit 1 at 5-7 (citing increasing demands of customers for lower-priced honey).  *See also Wooden Bedroom Furniture from China*, Inv. No. 731-TA-1058 (Final), USITC Pub. 3743 (Dec. 2004) at 27, *quoting* S. Rep. No. 100-171, 100th Cong., 1st Sess. 117 (1988) ("The domestic industry may be materially injured by reason of unfair imports even if some producers themselves import in order to stay in business").  The emails also in fact show that ***.  *See* NHPDA's Prehearing Brief, Exhibit 50 (collecting emails).

40

In our analysis of the impact of cumulated subject imports on the domestic industry, we have taken into account whether there are other factors that may have had an adverse impact on the industry during the POI to ensure that we are not attributing injury from other factors to cumulated subject imports.  Accordingly, we have examined the role of nonsubject imports and demand.  Nonsubject imports accounted for a much smaller share of the market as compared to subject imports.[255]  Furthermore, they declined overall during the POI in absolute terms and as a share of the U.S market as subject imports were increasing.[256]  Nonsubject imports supplied 15.6 percent of the market in 2018, 11.1 percent in 2019, and 11.4 percent in 2020.[257]  We also note that the AUVs for nonsubject imports were well above the AUVs for subject imports throughout the POI and nonsubject imports' AUVs declined only slightly from 2018 to 2020 while subject imports' AUVs declined to a much greater extent.[258]  Thus, the worsening of the domestic industry's condition due to low prices for raw honey cannot be explained by nonsubject imports.  Further, as noted above, apparent U.S. consumption for raw honey generally increased during the POI.  Accordingly, changes in consumption trends do not explain the industry's deteriorating condition.[259]  We consequently conclude that other causes cannot explain the injury we have attributed to the cumulated subject imports.

We accordingly find that cumulated subject imports had a significant impact on the domestic industry.

## VI.    Critical Circumstances

### A.    Legal Standards

In its final antidumping duty determinations concerning raw honey from Argentina and Vietnam, Commerce found that critical circumstances exist with respect to certain producers/exporters in Argentina and Vietnam.[260]  Because we have determined that the domestic industry is materially injured by reason of subject imports from Argentina and Vietnam, we must further determine "whether the imports subject to the affirmative

---

[255] CR/PR at Tables IV-14 and C-2.

[256] CR/PR at Tables IV-14 and C-2.

[257] CR/PR at Tables IV-14 and C-2.  They accounted for 11.9 percent of apparent U.S. consumption in interim 2020 and 8.7 percent in interim 2021.  *Id.*

[258] The AUVs for nonsubject imports were $1.49 per pound in 2018, $1.55 per pound in 2019, $1.46 per pound in 2020, $1.49 per pound in interim 2020, and $2.05 per pound in interim 2021.  By contrast, the AUVs for subject imports were $1.00 per pound in 2018, $0.87 per pound in 2019, $0.84 per pound in 2020, $0.83 per pound in interim 2020, and $1.19 per pound in interim 2021.  *Id.*  While imports of raw honey from Ukraine were priced below the domestic product during the POI, the volume of those imports was substantially less than the subject imports.  *See* CR/PR at Figs. J-1 to J-3 and Table IV-14.  The market share of nonsubject imports from Ukraine increased from 3.3 percent in 2018 to 3.6 percent in 2019 and 4.3 percent in 2020.  Their share was 4.2 percent in interim 2020 and 2.8 percent in interim 2021.

[259] CR/PR at Tables IV-14 and C-2.  As we have discussed, we do not find that there was a decline in consumption in the downstream retail market for honey that would explain the observed declines in the industry's shipments and market share during the POI.

[260] 87 Fed. Reg. 22179 and 87 Fed. Reg. 22184.

{Commerce critical circumstances} determination ... are likely to undermine seriously the remedial effect of the antidumping {and/or countervailing duty} order{s} to be issued."[261]  The SAA indicates that the Commission is to determine "whether, by massively increasing imports prior to the effective date of relief, the importers have seriously undermined the remedial effect of the order" and specifically "whether the surge in imports prior to the suspension of liquidation, rather than the failure to provide retroactive relief, is likely to seriously undermine the remedial effect of the order."[262]  The legislative history for the critical circumstances provision indicates that the provision was designed "to deter exporters whose merchandise is subject to an investigation from circumventing the intent of the law by increasing their exports to the United States during the period between initiation of an investigation and a preliminary determination by {Commerce}."[263]  An affirmative critical circumstances determination by the Commission, in conjunction with an affirmative determination of material injury by reason of subject imports, would normally result in the retroactive imposition of duties for those imports subject to the affirmative Commerce critical circumstances determination for a period 90 days prior to the suspension of liquidation.

The statute provides that, in making this determination, the Commission shall consider, among other factors it considers relevant,

> (I) the timing and the volume of the imports,
>
> (II) a rapid increase in inventories of the imports, and
>
> (III) any other circumstances indicating that the remedial effect of the {order} will be seriously undermined.[264]

In considering the timing and volume of subject imports, the Commission's practice is to consider import quantities prior to the filing of the petitions and those subsequent to the filing of the petitions using monthly statistics on the record regarding those firms for which Commerce has made an affirmative critical circumstances determination.[265]

### B.    Party Arguments

*Petitioners' Arguments.*  Petitioners argue that the Commission should make affirmative findings with respect to subject imports from Argentina and Vietnam subject to Commerce's affirmative critical circumstances determinations.  They claim that subject imports from

---

[261] 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii).

[262] SAA at 877.

[263] *ICC Industries, Inc. v United States,* 812 F.2d 694, 700 (Fed. Cir. 1987), *quoting* H.R. Rep. No. 96-317 at 63 (1979), *aff'g* 632 F. Supp. 36 (Ct. Int'l Trade 1986).  *See* 19 U.S.C. §§ 1671b(e)(2), 1673b(e)(2).

[264] 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii).

[265] *See Lined Paper School Supplies from China, India, and Indonesia,* Inv. Nos. 701-TA-442-43, 731-TA-1095-97, USITC Pub. 3884 at 46-48 (Sept. 2006); *Carbazole Violet Pigment from China and India,* Inv. Nos. 701-TA-437 and 731-TA-1060-61 (Final), USITC Pub. 3744 at 26 (Dec. 2004); *Certain Frozen Fish Fillets from Vietnam,* Inv. No. 731-TA-1012 (Final), USITC Pub. 3617 at 20-22 (Aug. 2003).

42

Vietnam surged into the United States after the filing of the petitions in April 2021 and before Commerce's preliminary determination in November 2021. Using six-month pre- and post-periods, they calculate that subject imports from Vietnam increased to almost 88 million pounds in the 6 months after the petition was filed, an increase of 83 percent compared to the six months prior to the filing of the petition.[266]

Petitioners argue that importers' inventories of subject imports from Vietnam were *** percent higher in September 2021 than in September 2020. They also claim that *** is stockpiling raw honey from Vietnam, importing *** pounds in August 2021.[267] Petitioners contend that such a stockpiling of imports is the type of behavior that the critical circumstances provision is designed to deter. They also observe that subject imports from Vietnam continued to undersell the domestic product in interim 2021, and will further injure a U.S. industry that is already extremely vulnerable.[268]

Petitioners similarly argue that imports from Argentina subject to Commerce's critical circumstances determination increased by 55.3 percent in the six months after the filing of the petition in April 2021. Petitioners view the increase, from *** pounds to over *** pounds, as designed to "beat" the imposition of provisional duties in November 2021. They also calculate that end-of-period inventories held by importers were *** percent higher in September 2021 at *** pounds than in September 2020. Moreover, they claim that underselling by the subject imports from Argentina continued during interim 2021 and the domestic industry remains vulnerable to further injury.[269]

Finally, Petitioners maintain that imports subject to Commerce's critical circumstances determinations are substantial relative to the U.S. market for raw honey. They calculate the post-petition imports from Vietnam and Argentina subject to Commerce's critical circumstances determination are equivalent to one-fifth and 13 percent, respectively of apparent U.S. consumption in interim 2021.[270]

*Respondents' Arguments.* NHPDA, Sweet Harvest Foods, and Export Packers Company Limited (collectively, "Joint Respondents") argue that while there have been post-petition increases in the imports and inventories of raw honey from Argentina and Vietnam, the moderately increased quantities are unlikely to have much impact on the U.S. market, as they are small compared to the U.S. market, and are needed to fill a gap caused by the decline in non-subject imports over the POI and the withdrawal of imports from Ukraine from the U.S. market. They argue that packers and other customers are not holding excess levels of raw honey in inventory and that the majority of the increase in subject imports subject to critical circumstances has been sold out of inventory and will no longer affect the market.[271]

---

[266] Petitioners' Prehearing Brief at 105-108.
[267] Petitioners argue that ***. Petitioners' Posthearing Brief, Exhibit 2, Slide 36.
[268] Petitioners' Prehearing Brief at 108-111.
[269] Petitioners' Prehearing Brief at 111-114.
[270] Petitioners' Posthearing Brief at 14-15.
[271] *See* NHPDA's Posthearing Brief at 14.

43

Joint Respondents also argue that the increases reflect seasonal import patterns and supply chain disruptions.[272]  They urge the Commission to recognize that domestic raw honey prices have been rising during 2021 as demand increases, and the domestic industry is profitable and increasing its U.S. shipments, which, they claim, indicates that increased imports are unlikely to undermine import relief.[273]  Joint Respondents  assert that the domestic industry also serves a relatively small portion of the market and imports are needed to serve the market, particularly given the war in Ukraine's likely constraining effect on imports from Ukraine.[274]

### C.    Analysis

On April 7, 2022, Commerce issued its final affirmative determinations in its antidumping duty investigations regarding Argentina and Vietnam.[275]  For raw honey from Argentina, Commerce found that critical circumstances exist for raw honey from ACA Coop, Haedo, CIPSA, and other producers/exporters with the exception of NEXCO.[276]  For raw honey from Vietnam, Commerce found that critical circumstances exist for raw honey from Ban Me Thuot and DakHoney, the eligible separate rate companies, and the Vietnam-wide entity.[277]

We first consider the appropriate period for comparison of pre-petition and post-petition levels of subject imports from Argentina and Vietnam.  The petitions were filed on April 21, 2021.[278]  In previous investigations, the Commission has relied on a shorter comparison

---

[272] NHPDA's Prehearing Brief, Appendix A at 12-16.  *See also* NHPDA's Posthearing Brief, Exhibit 2, Answer 3.

[273] *See* NHPDA's Posthearing Brief, Exhibit 2, Answer 1.

[274] NHPDA's Prehearing Brief, Appendix A at 21-27.  NHPDA's Posthearing Brief, Exhibit 2, Answers 4 and 5.  Specifically, Respondents assert that the cessation of exports from Ukraine has tightened global supply, necessitating an increased need for subject imports to fill that gap ("there is no support for an affirmative critical circumstances finding, in the face of declining non-subject (including Ukrainian) imports, which are far greater in quantity than the post-petition increases in Vietnamese and Argentinean imports, as well as any remaining inventories thereof.").  NHPDA's Prehearing Brief, Appendix A at 26-27.

[275] *Raw Honey From Argentina: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances,* 87 Fed. Reg. 22179 (Apr. 14, 2022); *Raw Honey From the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 87 Fed. Reg. 22184 (Apr. 14, 2022).

[276] *Raw Honey From Argentina: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances,* 87 Fed. Reg. 22180 (Apr. 14, 2022); CR/PR at IV-11.

[277] Thus, all producers/exporters are included in Commerce's affirmative critical circumstances determination.  *Raw Honey From the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 87 Fed. Reg. 22185 (Apr. 14, 2022); CR/PR at IV-11.

[278] Because the petition was filed in the second half of April, that month is included in the "pre-petition" comparison period, consistent with Commission practice. *See, e.g., Small Vertical Shaft Engines from China*, Inv. Nos. 701-TA-643 and 731-TA-1493 (Final), USITC Pub. 5185 at 43; *Carbon and Certain Alloy Steel Wire Rod from South Africa and Ukraine*,  Inv. Nos. 731-TA-1353 and 1356 (Final), USITC Pub. 4766 at 8, n.20 (March 2018); *Steel Wire Garment Hangers from Vietnam*, Inv. Nos. 701-TA-487 and 731-TA-1198 (Final), USITC Pub. 4371 at 6 (January 2013).

44

period when Commerce's preliminary determination applicable to the subject imports at issue fell within the six-month post-petition period the Commission typically considers.[279]  This is not the case in these investigations, however, as Commerce's preliminary determinations were issued on November 17, 2021, after the last month in the six-month post-petition period of May 2021 through October 2021.[280]  We therefore compare the volume of subject imports six months prior to the filing of the petitions (November 2020-April 2021) with the volume of subject imports in the six months after the filing of the petitions (May 2021-October 2021) for purposes of our critical circumstances analysis in both investigations.

### 1.  Argentina Investigation

Subject imports from Argentina subject to Commerce's affirmative critical circumstances determination increased from *** pounds in the pre-petition period to *** pounds in the post-petition period, an increase of *** percent.[281]  The post-petition imports were equivalent to *** percent of apparent U.S. consumption in interim 2021.[282]

End-of-period inventories of subject merchandise from Argentina held by U.S. importers increased from *** pounds on April 21, 2021 to *** pounds on October 31, 2021, a 274 percent increase.[283]  Ending inventories of subject imports from Argentina subject to Commerce's critical circumstances determination held by importers were *** pounds on September 30, 2021, representing 2.5 percent of apparent U.S. consumption in the interim 2021 period.[284]

As we have discussed above in Section V.E, prices for the domestic like product and subject imports increased in interim 2021 in response to general knowledge of the imminent filing of the petitions and the pendency of the investigations.  Prices for white, extra light amber, and light amber raw honey from Argentina increased from the first quarter of 2021 (January through March) through the second and third quarter of 2021 (April through September) (a rough equivalence to the six-month post-petition period) to a level that either oversold the domestic like product or undersold the domestic like product during the post-

---

[279] *Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United Kingdom,* Inv. Nos. 701-TA-545-547, 731-TA-1291-1297 (Final), USITC Pub. 4638 at 49-50 (Sept. 2016); *Certain Corrosion-Resistance Steel Products from China, India, Italy, Korea, and Taiwan*, Inv. No. 701-TA-534-537 and 731-TA-1274-1278 (Final), USITC Pub. 4630 at 35-40 (July 2016); *Carbon and Certain Steel Wire Rod from China*, Inv. Nos. 701-TA-512, 731-TA-1248 (Final), USITC Pub. 4509 at 25-26 (Jan. 2015) (using five-month periods because preliminary Commerce countervailing duty determination was during the sixth month after the petition).

[280] CR/PR at Table I-1.  Petitioners and Respondents agreed that six-month comparison periods are appropriate.  *See* Petitioners' Prehearing Brief at 105, 111; NHPDA's Posthearing Brief, Exhibit 2, Answer 3.

[281] CR/PR at Table IV-6.

[282] CR/PR at Tables IV-6 and C-2.

[283] CR/PR at Table IV-7.

[284] CR/PR at Tables IV-7 and C-2.  The inventories of subject imports from Argentina subject to Commerce's critical circumstances determination increased by *** pounds from September to October 2021, from *** pounds as of September 30, 2021 to *** pounds as of October 31, 2021.  If this volume were included in the calculation above, the volume of inventories as of October 31, 2021 as a share of U.S. consumption in interim 2021 would be *** percent.  CR/PR Tables IV-7 and C-2.

petition period.[285]  Prices of subject imports from Argentina were higher than domestic prices for pricing products 1, 2 and 3 in the second quarter of 2021, and the underselling margins recorded for these imports in the third quarter of 2021 were significantly below those recorded in nearly all prior quarters of the POI.

Although there was an increase in the volume of subject imports from Argentina subject to Commerce's critical circumstances determination and U.S. inventories of imports from Argentina during the post-petition period, apparent U.S. consumption was higher in interim 2021 than interim 2020 by 15.2 percent, and the increase in import volume from Argentina continued the upward pre-petition trend that began in January 2021.[286]  Moreover, the import volume totals fluctuated on a month-to-month basis during the post-petition period, with an increase recorded in some months and a decrease recorded in others, but each of the post-petition monthly volume totals remained within a limited range of each other.[287]  Inventories of imports from Argentina subject to Commerce's critical circumstances determination (*** pounds) were not disproportionate relative to inventories from other subject sources.[288]  With respect to pricing in the post-petition period,[289] prices of subject imports from Argentina increased to levels above those in the pre-petition period and the margins of underselling were significantly below those recorded in nearly all prior quarters of the POI.[290]  These data do not clearly indicate a "rush" by Argentinian producers to export substantial volumes of product to the U.S. market at lower prices before a deposit requirement takes effect.

In light of these considerations, we find that the imports from Argentina subject to Commerce's affirmative critical circumstances determination will not seriously undermine the remedial effect of the antidumping duty order with respect to raw honey from Argentina.  We therefore make a negative critical circumstances finding with respect to subject imports from Argentina subject to Commerce's affirmative determination of critical circumstances.

### 2.  Vietnam Investigation

As noted above, raw honey imports from Vietnam from all Vietnamese producers/exporters are subject to Commerce's affirmative critical circumstances determination.  These imports increased from 48.0 million pounds in the pre-petition period to

---

[285] *See* CR/PR at Figs. V-1 to V-3.

[286] CR/PR at Figure IV-2.  Moreover, we observe that the volume of imports from Argentina subject to Commerce's affirmative critical circumstances in the post-petition period (*** pounds), was *** the volume of total Argentinian subject imports during the equivalent period in 2020 (49.7 million pounds), and less than the volume recorded in the equivalent period in 2018 (53.0 million pounds). CR/PR at Tables IV-6 and IV-13.

[287] CR/PR at Table IV-6.

[288] The inventory total for Argentina (*** pounds) sits within the range of inventories of subject imports as of September 30, 2021 from Brazil (*** pounds) and from India (*** pounds), and well below the total for Vietnam (at *** pounds), as further discussed below.  CR/PR at Table C-2.

[289] *See* CR/PR at Table E-2.

[290] CR/PR at Tables V-4, V-5 and V-6.

87.9 million pounds in the post-petition period, an increase of 83.2 percent.[291]  The 87.9 million pounds of subject imports in the post-petition period are equivalent to 19.1 percent of apparent U.S. consumption in the interim 2021 period.[292]  The volume of subject imports from Vietnam in four of the six months of the post-petition period (July, August, September, and October 2021) significantly exceeded the volume of subject imports from Vietnam recorded in any prior month of the POI.[293]

In addition, subject imports from Vietnam increased rapidly in each of the first four months of the post-petition period, reversing a downward trend from December 2020 to April 2021.[294]  The volume of subject imports from Vietnam increased by 53 percent from April to May 2021, by 23 percent further from May to June 2021, by 85 percent further from June to July 2021, and by 97 percent further from July to August 2021.[295]  Subject imports from Vietnam then receded during the last two months of the post-petition period, *i.e.*, from August to September 2021, and again from September to October 2021.[296]

Importers' inventories of subject imports from Vietnam subject to Commerce's affirmative determination increased from *** pounds on April 30, 2021 (the last month of the pre-petition period) to *** pounds on October 31, 2021 (the last month of the post-petition period),[297] almost a threefold increase over their April 2021 level.[298]  Several importers increased their inventories of subject imports from Vietnam from April 2021 to October 2021 before provisional duties came into effect in November 2021.[299]  The volume of inventories as of September 30, 2021 was equivalent to *** percent of apparent U.S. consumption during the interim 2021 period.[300]

In addition, as reviewed above, prices for the domestic like product and subject imports increased in interim 2021 in response to general knowledge of the imminent filing of the

---

[291] CR/PR at Table IV-8.

[292] *See* CR/PR at Tables IV-8 and C-2.

[293] CR/PR at Table IV-13.

[294] *See* CR/PR at

[295] *See* CR/PR at Table IV-8.  Rather than continuing to increase at a steady rate, monthly subject imports from Vietnam surged to period highs, increasing from 3.9 million pounds in April 2021 to 27.1 million pounds in August 2021, almost seven times the April level.

[296] As discussed, even while receding, the volumes recorded in September and October 2021 still remained higher than the volume recorded in any prior month of the period of investigation aside from the immediately preceding month (August 2021).

[297] CR/PR at Table IV-9.

[298] The inventories on September 30, 2021 also were more than twice that of total inventories of subject merchandise from Vietnam on September 30, 2020.  *See* CR at Tables IV-9 and VII-22.

[299] Specifically, *** pounds; *** pounds; *** pounds; *** pounds; *** pounds; *** pounds; the *** pounds; and *** pounds.  Supplemental Importer Questionnaires at I-3.  As noted, honey can be stored for many years.  CR/PR at II-6.

[300] Calculated from CR/PR at Table IV-9 and Table C-2.  The volume of inventories of subject imports from Vietnam increased by *** pounds from September to October 2021, from *** pounds as of September 30, 2021 to *** pounds as of October 31, 2021.  If this volume were included in the calculation above, the volume of inventories as of October 31, 2021 as a share of U.S. consumption in interim 2021 would be *** percent.  CR/PR Tables IV-9 and C-2.

47

petitions and the pendency of the investigations.  However, unlike subject imports from Argentina, subject imports from Vietnam continued to undersell the domestic like product by wide margins during the second and third quarters of 2021 (again, a rough equivalence to the six-month post-petition period).[301]

The Commission views the timing of subject imports from Vietnam in the post-petition period as significant and probative.  While apparent U.S. consumption was higher in interim 2021 than interim 2020 by 15.2 percent, importers' U.S. shipments of subject imports from Vietnam were only 2.8 percent higher, a modest increase that does not explain why importers would sharply increase their imports from Vietnam during the post-petition period.[302] Moreover, the rapid increase in subject imports from Vietnam occurred during the first four months of the post-petition period, which precede the retroactive liability period under the critical circumstances provision (*i.e.*, 90 days prior to the date of publication of Commerce's preliminary antidumping determination on November 23, 2021, which is August 25, 2021).  This timing, together with the associated volume of subject imports in the post-petition period, suggest that the volume of imports in the post-petition period was not simply responding to increased demand or a continued upward trend of imports from Vietnam, but rather a deliberate effort to enter product into the U.S. market in substantial and increasing volumes while evading potential exposure to the retroactive application of antidumping duties.  Further, the volume and increase in volume of subject imports from Vietnam in the post-petition period is substantial, with subject import volumes from Vietnam in the post-petition period comprising nearly *** percent of apparent U.S. consumption.[303] [304]  The rapid and substantial increase in

---

[301] *See* CR/PR at Figs. V-3 and V-4. Importers' shipments of subject imports from Vietnam were only $*** per pound higher at $*** per pound in interim 2021 than $*** per pound in interim 2020. *See* CR/PR at Table E-5.  This price increase was less than that recorded by any of the other countries subject to these investigations: an increase of $*** per pound for imports from Argentina; an increase of $*** per pound for imports from Brazil; and an increase of $*** per pound for imports from India. *See* CR/PR at Table E-2, Table E-3, and Table E-4.

[302] *See* CR/PR at Tables C-2 and E-5.

[303] As noted, the post-petition period (May - October 2021) import volume for Vietnam was 87.9 million pounds.  NHPDA argues the increase reflects seasonal variation in import patterns and imports from Vietnam have previously increased by similar amounts when comparing import totals from the same pre- and post-petition periods in previous years.  NHPDA's Posthearing Brief, Exhibit 2, Answer 3. In our view, there is no clear and substantiated seasonality pattern to imports of raw honey.  Even if there is some seasonality, when comparing subject imports from Vietnam in the same months as the post-petition and pre-petition periods in past years, they are not as large as the 83 percent increase in 2021. Petitioners' Posthearing Brief, Exhibit 1 at 40; Petitioners' Final Comments at 12.  *See also* CR/PR at Figs. IV-6 and IV-7.  Moreover, unlike the case with Argentina, the post-petition volume was well above the volumes recorded in the same period of the prior years of the period of investigation (61.7 million pounds in May-October 2020; 44.5 million pounds in May-October 2019; and 50.5 million pounds in May-October 2018).  CR/PR at Table IV-13.

[304] We also do not find Respondents' explanation that imports were needed to serve the market, particularly given the war in Ukraine, to be persuasive.  Russia's invasion of Ukraine did not occur until the end of February 2022, well after the surge of imports from Vietnam during the post-petition period. (Continued...)

48

inventories of subject imports from Vietnam provides further evidence that importers were stockpiling subject imports rather than just responding to U.S. market conditions.[305]

Respondents argue that importers have now sold off much of their inventory, but regardless of where the imported honey is in the supply chain, the volume associated with these inventories is large and increased substantially in the post-petition period and is likely to place downward pressure on prices until it is consumed by end users, particularly given the continued underselling by subject imports from Vietnam at wide margins.[306]  Moreover, notwithstanding higher prices, the domestic industry continued to report losses even with higher prices in interim 2021.  Its operating expenses-to-net sales ratio remained at over *** percent.  The industry's shipments declined, and it continued to lose market share.

Given the volume and timing of imports, including the sharp increase in the volume of post-petition imports prior to the retroactive liability period under the critical circumstances provision, the rapid increase in and size of inventories, and the continued underselling of the domestic like product by wide margins, we find that the remedial effect of the antidumping duty order with respect to subject imports from Vietnam will likely be seriously undermined.  We therefore make an affirmative critical circumstances finding with respect to subject imports from Vietnam subject to Commerce's affirmative determination of critical circumstances.

## VII.  Conclusion

For the reasons stated above, we determine that an industry in the United States is materially injured by reason of subject imports of raw honey from Argentina, Brazil, India, and Vietnam found by Commerce to be sold in the United States at less than fair value.  We find that critical circumstances exist with respect to imports of raw honey from Vietnam that are subject to Commerce's final affirmative critical circumstances determination.[307]  We also find that critical circumstances do not exist with respect to imports of raw honey from Argentina that are subject to Commerce's final affirmative critical circumstances determination.

---

Nor does the record support Respondents' claim that shipping delays caused the increase in subject imports.  Respondents have only offered evidence of general shipping delays rather than particular delayed orders.  They do not provide with sufficient specificity how the timing of the shipping delays corresponded to increases in the monthly volume of subject imports during the post-petition period.  NHPDA's Prehearing Brief, Appendix A at 12-16.

[305] Raw honey from Vietnam typically is used as an ingredient in food products. NHPDA's Prehearing Brief at 37.  The honey, however, is a relatively small share of the total cost of the food product, and demand for the honey is relatively inelastic. CR/PR at II-11 to II-12 and II-41.  It is therefore likely that the increased imports and inventories of subject imports from Vietnam remained in inventory somewhere in the supply chain and were not immediately consumed.

[306] *See* NHPDA's Prehearing Brief, Appendix A at 10-12, 19-20; NHPDA's Posthearing Brief at 14-15.  One of the largest importers of subject imports and ***"  NHPDA's Posthearing Br. Exh. 4 at para 14 (Nubern Affidavit).  However, this statement ***. ***.  NHPDA's Posthearing Br. Exh. 4.

As to raw honey held downstream, we note that the Ingredient Purchasers fully participated in the final phase of these investigations, yet ***, one of the Ingredient Purchasers who participated in the final phase of these investigations.

[307] Commissioner Johanson dissenting.

**Separate Views of Commissioner David S. Johanson**

While I join the Commission's Views on material injury in their entirety, I write separately as I do not join the Commission's affirmative determination of critical circumstances regarding Vietnam and instead make a negative critical circumstances determination with regard to raw honey from that country.  I join, however, the majority's discussion of the legal standards and the parties' arguments regarding critical circumstances (Sections VI.A. and VI.B.) as well as the majority's reasoning regarding the use of a 6-month period of comparison and its negative critical circumstances determination regarding raw honey imports from Argentina (Section VI.C.1.).

As discussed below, I do not find that the increase in imports and inventories of subject raw honey from Vietnam in the post-petition comparison period would be likely to "undermine seriously the remedial effect of the antidumping order" as (1) increased imports were consumed prior to the order and thus could no longer compete against domestic products; and (2) the petition and order have already proven they can provide relief to the domestic industry.

## I.    Unfairly traded imports in the post-petition period were consumed

### A.    Importer and purchaser stockpiles of unfairly traded products were depleted by the time of the order

Subject imports from Vietnam during the six months following the filing of the petition exceeded the increase in U.S. importers' U.S. inventories of raw honey from Vietnam: subject imports from Vietnam totaled 87.9 million pounds from May 2021 through October 2021, while U.S. importers' inventories increased by only \*\*\* pounds.[1] Thus, importers had sold off \*\*\* percent of those imports by the end of October 2021.[2] Respondents assert that from November 2021 to March 2022, importers' inventories of raw honey from Vietnam decreased another \*\*\* percent as they sold off products to purchasers, based on data from eight importers.[3] Respondents also assert that packers' inventories decreased \*\*\* percent, based on data from five packers.[4]

Petitioners assert that Respondents' data regarding inventory declines may not be representative of importers and purchasers as a whole, based on the claim that \*\*\*.[5] The evidence, however, does not support Petitioners' claim.

---

[1] NHPDA Post-Hearing Br. 13; CR/PR at Tables IV-8 & IV-9.

[2] Calculated from CR/PR at Tables IV-8 & IV-9.

[3] NHPDA Posthrg. Br. 14.

[4] NHPDA Posthrg. Br. 14.

[5] Pet. Posthearing Br. 14. Petitioners also point out that Respondents did not provide data regarding final inventory levels from \*\*\*. Pet. Final Comments 14. \*\*\*. \*\*\* Importer QR at II-9a; CR/PR at Table V-13.

50

1.        \*\*\*

\*\*\* reported purchasing \*\*\* pounds of raw honey from Vietnam in 2018, \*\*\* pounds in 2019, and \*\*\* in 2020, at an average rate of about \*\*\* pounds per quarter.[6]  It sourced about \*\*\*.[7]

According to Petitioners' prehearing brief, \*\*\*.[8] In their posthearing brief, Petitioners intimated that this honey may be \*\*\*.[9] Yet, the declarations that Petitioners supplied to support their assertions instead attest only that \*\*\*.[10] That does not support that \*\*\*.[11]

Recent inventory figures for \*\*\* are on the record. It reported that it possessed \*\*\*.[12] \*\*\*.[13]

I do not find that the existence of the remaining \*\*\* inventories in themselves is likely to undermine seriously the remedial effect of the order for two reasons. First, the \*\*\* pounds of honey from Vietnam that \*\*\* had in stock at the end of the first quarter of 2022 equaled only \*\*\* percent of U.S. apparent consumption in 2021.[14]

Second, even if these inventories had not been available to \*\*\*, that would not necessarily mean that \*\*\* would have bought domestic products instead. In the case of \*\*\*.[15] Only two percent or less of U.S. producers' shipments are amber or darker.[16] Due to some purchasers' continued preference for honey from Vietnam, importers including \*\*\* continued to import and sell honey from Vietnam even with interim deposit requirements in place and at higher prices than domestically produced honey.[17] Purchasers buying Vietnamese honey with 400 percent interim deposit requirements would be more likely to buy it at final deposit rates of about 60 percent.[18]

2.        **Increasing demand has and will absorb more domestic production**

An additional factor that explains why inventories of imports from Vietnam have been drawn down so extensively, also mitigating any impact that remaining stocks of unfairly traded

---

[6] \*\*\* purchaser QR at II-2f. \*\*\*. \*\*\* purchaser QR at III-31(c).

[7] \*\*\* purchaser QR at II-7.

[8] Petitioner Prehearing Br. 109-110 (emphasis added, citations omitted).

[9] Pet. Posthearing Br. 14. *See also* Pet. Posthearing Br. answers at 30 (\*\*\*).

[10] Pet. Prehearing Br. Exh. 5 at ¶ 24 \*\*\*.

[11] \*\*\* Purchaser QR at II-2f; Petitioner Prehearing Br. 110. \*\*\*. \*\*\* Purchaser QR at 13.

[12] NHPDA Posthearing Br. Exh. 4 at Nubern Dec. attachment 2.

[13] NHPDA Posthearing Br. Exh. 4 at Nubern Dec. ¶¶ 9-10.

[14] Calculated from CR/PR at Table G-1 and NHPDA Posthearing Br. Exh. 4 at Nubern Dec. attachment 2.

[15] \*\*\* purchaser QR at III-31c.

[16] CR/PR at Table E-1.

[17] Hearing Tr. 213 & 229-30 (Nubern), 275 (Neves); Ingredient Purchasers' Post-Hearing Br. 10-12.

[18] Raw Honey from the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, 87 Fed. Reg. 22,184, 22,185 (Dep't Commerce April 14, 2022) (final duty rates).

imports may have, is that demand for honey increased in 2021 and is likely to continue to increase indefinitely. Apparent consumption of raw honey was 587.4 million pounds in 2021, an increase of 5.5 percent or 30.4 million pounds from apparent consumption in 2020.[19] Apparent consumption is an imperfect guide to actual consumption, but there was a strong consensus among market participants that actual demand for honey was and is rising due to a number of factors that are leading Americans to consume more honey.[20] Thus, at least some of the substantial increase in apparent consumption likely reflected increased actual consumption.

### 3.    Poor honey yield in the United States in 2021, and orders on other subject countries, led to more rapid diminution of import inventories

Yet another factor eliminating inventories prior to the order is that the U.S. industry produced and shipped significantly less domestic honey in 2021 than it had in 2020 because U.S. production decreased by *** percent or *** pounds from 2020 to 2021.[21] This production decline occurred primarily as 2021 was a bad year for honey production in the United States: overall U.S. producers' average yield per colony decreased 13.9 percent from 2020 to 2021, likely due at least in part to drought conditions in some important states and unusually high honeybee mortality in 2020-2021.[22] Some U.S. producers liquidated inventory to meet the supply shortfall, but overall apparent consumption of U.S.- produced honey declined 20 million pounds from 2020 to 2021.[23]

After the six-month post-petition period ended, little honey from Vietnam was imported because of provisional deposit requirements of over 400 percent imposed in November – and what was imported subject to those requirements was fairly traded. Thus, even ordinary consumption levels prior to the issuance of the order in April 2022 would have greatly depleted the additional supplies of subject imports that had arrived after the petition. Further, as discussed above, those supplies were being depleted at a greater than ordinary rate.  With less domestically produced honey on the market than in previous years (and little new U.S. production feasible until spring), consumers would have had to consume millions of pounds more imported raw honey in 2021 and early 2022 just to maintain their previous levels of honey consumption, let alone to increase it. While imports and inventories of honey from other

---

[19] CR/PR Table G-1.

[20] *See supra* Section V.B.2; CR/PR at II-18 ("U.S. producers cited two main reasons for increases in both U.S. and foreign demand for honey: perceived health benefits and the desire to 'eat local.' Importers and purchasers cited similar reasons … including population growth, perceived health/nutrition benefits of honey, and the impact of the COVID-19 pandemic.").

[21] CR/PR at Table C-2. Interim production data in table C-2 are actually for the full year 2021. CR/PR at Table C-2 fn.3.

[22] Hrg. Tr. 185 (Wenger) (drought); CR/PR at Tables III-3 & III-8 (low yield); Nathalie Steinhauer et al., "United States Honey Bee Colony Losses 2020-2021: Preliminary Results" at 1-2 (June 23, 2021), EDIS Doc. No. 766825.

[23] CR/PR at Table G-1.

countries also increased, and were higher in interim 2021 than in interim 2020,[24] those increases also would be likely to be matched by reduced imports following imposition of interim deposit requirements on honey imports from Argentina, Brazil, and India at the same time as Vietnam, further exacerbating market shortages.

### 4.    Supply shortages following the petitions confirm that inventories of subject merchandise were being exhausted

A majority of purchasers (15 of 20) reported that suppliers declined to supply them following the filing of the petition, while six U.S. producers and 14 importers reported refusing to supply purchasers during that period.[25] When purchasers could not get sufficient supply after the petition was filed, they would have drawn down their own stockpiles.

Thus, while subject imports and importers' inventories of subject imports from Vietnam increased after the petition, much if not all of that buildup had been physically eliminated by the time the order took effect in order to satisfy increased demand and to replace diminished volumes of domestically produced and imported honey.

## II.    Improved Market Conditions and Performance of the Domestic Industry

Another factor relevant to whether post-petition imports are likely to "seriously undermine" the remedial effect of the order is that both market conditions and the domestic industry's performance have improved markedly since the petition was filed, or even before the petition when market participants learned it was imminent.

Comparing interim 2021 to interim 2020, large domestic producers' net sales were *** percent higher, and their operating and net losses were smaller, their operating margin improved from negative *** percent to negative *** percent, and their net margin improved from negative *** percent to negative *** percent.[26]

The industry still incurred operating losses during the interim 2021 period, but I attach less weight to this fact than I otherwise would for three reasons.

First, domestic honey yields in 2021 were much lower than in previous years for reasons largely unrelated to subject imports, as discussed above.

Second, reliable access to government programs such as disaster assistance makes net profits relatively more important than they are for other industries for purposes such as investment decisions. Net losses were considerably smaller than operating losses.

Third, beekeepers on average make less money from honey production than they do from commercial pollination fees; they also sell other products such as beeswax.[27] Our injury analysis focuses on the domestic like product, raw honey, but provision of pollination services

---

[24] Imports from all subject sources other than Vietnam were 61.3 million pounds greater in interim 2021 than in interim 2020. Calculated from CR/PR Table C-2. Nonsubject imports were 7.5 million pounds lower in interim 2021 than in interim 2020. Calculated from CR/PR Table C-2.

[25] CR/PR at II-9.

[26] CR/PR at Table C-2. Interim period financial data was not collected from small producers but these represented a small share of the total production represented in questionnaire responses.

[27] CR/PR at Table VI-5.

by beekeepers is a condition of competition that affects how honey producers respond to price increases. For purposes of deciding how many colonies to operate, beekeepers will consider how much they will earn from all sources of beekeeping revenue that those colonies can generate. As beekeepers normally operate at full capacity and cannot increase honey production without increasing the number of hives they use,[28] this means that decisions to increase honey production also depend on income from other products. Thus, producers would invest more in bee colonies and honey production when prices increase even if they still earn a small loss on honey production. Thus, any "undermining" that could be associated with small losses on honey production is less "serious."

Finally, the domestic industry's condition has continued to improve since the end of interim 2021. As the president of Sioux Honey declared,

> The filing of this case has had a substantial beneficial impact on pricing in the U.S. market. … {W}e had set our plan to offer an average price of ***. These increases have proven very beneficial to our member beekeepers and the communities in which they operate.[29]

As noted above, domestic producers' inventories were at the lowest levels on record by the end of 2021,[30] and rising demand will give domestic producers even more opportunity to liquidate inventories and raise prices. The recent reduction of imports from Ukraine will put additional upward pressure on U.S. honey prices.[31]

## III.    The Critical Circumstances Standard Has Not Been Satisfied

Finally, I note that the statute permits an affirmative finding of critical circumstances only if it is "likely" that the remedial effect of the order will be "seriously" undermined. In my view, the record contains clear evidence that the increase in unfairly traded subject imports in the six-month period following the petition was largely if not entirely eliminated in the next six months before the order, and the domestic industry's condition sharply improved. The record lacks evidence that could resolve the exact size of any diminished amount of unfairly traded merchandise that might remain, such as evidence regarding final inventory levels of most importers and purchasers, the propensity of end users to hold inventory, actual consumption, and the rate at which fairly traded imports arrived immediately before the order to replace unfairly traded ones. While it is possible that enough remained to have an impact, the statute permits an affirmative critical circumstances finding only if the imports subject to the Department of Commerce's critical circumstances determination "likely" will "undermine seriously" the order's remedial effect. Given the evidence in this record, I cannot find that this standard is met.

---

[28] CR/PR at II-6.
[29] Pet. Prehearing Br. Exh. 4 (Blumenthal Dec.) ¶ 22.
[30] CR/PR at Table G-3.
[31] CR/PR at II-18.

# Part I: Introduction

## Background

These investigations result from petitions filed with the U.S. Department of Commerce ("Commerce") and the U.S. International Trade Commission ("USITC" or "Commission") by the American Honey Producers Association ("AHPA"), Bruce, South Dakota, and the Sioux Honey Association ("SHA"), Sioux City, Iowa, on April 21, 2021, alleging that an industry in the United States is materially injured and threatened with material injury by reason of less-than-fair-value ("LTFV") imports of raw honey[1] from Argentina, Brazil, India, Ukraine, and Vietnam.[2] Table I-1 presents information relating to the background of these investigations.[3] [4]

**Table I-1**
**Raw honey: Information relating to the background and schedule of this proceeding**

| Effective date | Action |
|---|---|
| April 21, 2021 | Petitions filed with Commerce and the Commission; institution of the Commission's investigations (86 FR 22265, April 27, 2021) |
| May 11, 2021 | Commerce's notice of initiation (86 FR 26897, May 18, 2021) |
| June 7, 2021 | Commission's preliminary determinations (86 FR 30980, June 10, 2021) |
| November 23, 2021 | Commerce's preliminary determinations (86 FR 66524, 86 FR 66526, 86 FR 66528, 86 FR 66531, and 86 FR 66533; November 23, 2021; 87 FR 2127; January 13, 2022); scheduling of final phase of Commission investigations (86 FR 70144, December 9, 2021) |
| March 31, 2022 | Commission's termination of the investigation on raw honey from Ukraine (87 FR 20462, April 07, 2022) |
| April 6, 2022 | Commerce's termination of the LTFV investigation on raw honey from Ukraine (87 FR 19855, April 06, 2022) |
| April 12, 2022 | Commission's hearing |
| April 14, 2022 | Commerce's final determinations (87 FR 22179, 87 FR 22182, 87 FR 22188, 87 FR 22184, April 14, 2022) |
| May 11, 2022 | Commission's vote |
| May 27, 2022 | Commission's views |

---

[1] See the section entitled "The subject merchandise" in Part I of this report for a complete description of the merchandise subject in this proceeding.

[2] On March 24, 2022, Petitioners' withdrew the petition on raw honey from Ukraine. The Commission and Commerce subsequently terminated their investigations of raw honey from Ukraine.

[3] Pertinent Federal Register notices are referenced in appendix A and may be found at the Commission's website (www.usitc.gov).

[4] Appendix B presents the witnesses that appeared at the Commission's hearing.

## Statutory criteria

Section 771(7)(B) of the Tariff Act of 1930 (the "Act") (19 U.S.C. § 1677(7)(B)) provides that in making its determinations of injury to an industry in the United States, the Commission--

> shall consider (I) the volume of imports of the subject merchandise, (II) the effect of imports of that merchandise on prices in the United States for domestic like products, and (III) the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States; and. . . may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports.

Section 771(7)(C) of the Act (19 U.S.C. § 1677(7)(C)) further provides that--[5]

> In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States is significant.. . .In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whether. . .(I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.. . . In examining the impact required to be considered under subparagraph (B)(i)(III), the Commission shall evaluate (within the context of the business cycle and conditions of competition that are distinctive to the affected industry) all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to. . . (I) actual and potential decline in output, sales, market share, gross profits, operating profits, net profits, ability to service debt, productivity, return on investments, return on assets, and utilization of capacity, (II) factors affecting domestic prices, (III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment, (IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more

---

[5] Amended by PL 114-27 (as signed, June 29, 2015), Trade Preferences Extension Act of 2015.

*advanced version of the domestic like product, and (V) in {an antidumping investigation}, the magnitude of the margin of dumping.*

*In addition, Section 771(7)(J) of the Act (19 U.S.C. § 1677(7)(J)) provides that—*[6]

*(J) EFFECT OF PROFITABILITY.—The Commission may not determine that there is no material injury or threat of material injury to an industry in the United States merely because that industry is profitable or because the performance of that industry has recently improved.*

## Organization of report

Part I of this report presents information on the subject merchandise, subsidy and dumping margins, and domestic like product. Part II of this report presents information on conditions of competition and other relevant economic factors. Part III presents information on the condition of the U.S. industry, including data on capacity, production, shipments, inventories, and employment. Parts IV and V present the volume of subject imports and pricing of domestic and imported products, respectively. Part VI presents information on the financial experience of U.S. producers. Part VII presents the statutory requirements and information obtained for use in the Commission's consideration of the question of threat of material injury as well as information regarding nonsubject countries.

---

[6] Amended by PL 114-27 (as signed, June 29, 2015), Trade Preferences Extension Act of 2015.

## Market summary

Raw honey as described in the scope of these investigations is generally used as an input to be processed and packaged for retail, food service, industrial food manufacturing, and other industrial uses, such as cosmetics. The largest U.S. producers of raw honey for which questionnaire data were received include ***, ***, and ***. Leading exporters of raw honey to the United States include ***, ***, and *** of Argentina; ***, ***, and *** of Brazil; ***, ***, and *** of India; and ***, ***, and *** of Vietnam. The leading U.S. importers of raw honey from subject sources are ***, ***, and ***. Leading importers of raw honey from nonsubject countries include ***, ***, and ***. U.s. purchasers of raw honey are firms that process and pack raw honey or use honey in their products; leading purchasers include ***, ***, and SHA.

Apparent U.S. consumption of raw honey totaled 557.0 million pounds ($690.1 million) in 2020. U.S. producers' U.S. shipments of raw honey totaled 141.7 million pounds ($301.6 million) in 2020 and accounted for 25.4 percent of apparent U.S. consumption by quantity and 43.7 percent by value. U.S. shipments of imports from subject sources totaled 351.7 million pounds ($295.6 million) in 2020 and accounted for 63.1 percent of apparent U.S. consumption by quantity and 42.8 percent by value. U.S. shipments of imports from nonsubject sources totaled 63.6 million pounds ($92.9 million) in 2020 and accounted for 11.4 percent of apparent U.S. consumption by quantity and 13.5 percent by value.

## Summary data and data sources

A summary of data collected in these investigations is presented in appendix C, table C-1. Except as noted, U.S. industry data are based on data reported by the National Agriculture Statistics Services of the U.S. Department of Agriculture ("USDA/NASS") and the questionnaire responses of 84 firms that accounted for 31.2 percent of U.S. production of raw honey during 2020 as reported by USDA/NASS. U.S. imports are based on U.S. import statistics of the U.S. Department of Commerce provided for in the Harmonized Tariff Schedule of the United States ("HTS") under statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065 and the questionnaire responses of 25 companies that represented 101.5 percent of U.S. imports from subject sources and 71.8 percent of U.S. imports from nonsubject sources in 2020 based on official import statistics.[7] Foreign industry data are based on the questionnaire response of 53 firms that reported exports to the United States equivalent to 94.3 percent of U.S. imports of raw honey from Argentina, Brazil, India, and Vietnam during 2020 as reported in official U.S. import statistics.

## Previous and related investigations

### Section 201 honey investigation

In 1976, the Commission conducted an investigation concerning honey under section 201 of the Trade Act of 1974. At that time, the Commission determined that honey was being imported into the United States in such increased quantities as to be a substantial cause of the threat of serious injury to the domestic industry producing articles like or directly competitive with the imported article. The Commission found that a tariff-rate quota system was necessary to prevent the threatened injury.[8] On August 28, 1976, President Ford advised Congress that, "import relief for the U.S. industry engaged in the commercial production and extraction of honey is not in the national economic interest."[9]

---

[7] Usable questionnaire responses from U.S. importers represented 97.0 percent of U.S. imports from all sources in 2020.
[8] *Honey, Report to the President on Investigation No. TA-201-14 Under Section 201 of the Trade Act of 1974*, USITC Publication 781, June 1976.
[9] 41 FR 36787, August 28, 1976.

**Section 406(a) honey investigation**

On October 6, 1993, following a request from the U.S. Trade Representative, the Commission instituted an investigation under the provisions of section 406(a) of the Trade Act of 1974. As a result of the investigation, the Commission determined that imports of honey from China were increasing rapidly so as to be a significant cause of market disruption to a domestic industry in the United States. On January 7, 1994, the Commission reported its determinations and recommendations to the President.[10] On April 21, 1994, President Clinton determined that import relief for honey was not in the national interest of the United States and directed the U.S. Trade Representative to develop a plan to monitor imports of honey from China.[11]

**China AD investigation and suspension agreement**

On October 3, 1994, the American Beekeeping Federation ("ABF") and the AHPA filed a petition alleging that an industry in the United States was materially injured and threatened with material injury by reason of LTFV imports of honey from China. The Commission subsequently made an affirmative preliminary determination,[12] and Commerce issued a preliminary determination finding dumping margins ranging from 127.52 to 157.16 percent ad valorem.[13]

On August 2, 1995, Commerce and representatives of the government of China concluded an agreement that suspended the investigations being conducted by the Commission and Commerce concerning honey from China. The suspension agreement obligated the government of China to restrict the volume of honey exports to the United States from all Chinese producers/exporters[14] and establish a pricing mechanism for Chinese exports.[15] Specifically, Chinese honey exported to the United States could not be sold at a price less than a reference price, which the agreement defined to be "92 percent of the weighted-

---

[10] *Honey From China*, Investigation No. TA-406-13, USITC Publication 2715, January 1994.

[11] 59 FR 19627, April 25, 1994.

[12] *Honey from the People's Republic of China*, Investigation No. 731-TA-722 (Preliminary), USITC Publication 2832, November 1994.

[13] 60 FR 14725, March 20, 1995.

[14] The export limit was set at 43.925 million pounds plus or minus a maximum of 6 percent per year based on changes in the U.S. market for honey. 60 FR 42522, August 16, 1995.

[15] 60 FR 42521, August 16, 1995.

average of the honey unit import values from all other countries for the most recent six months of data available at the time the reference price is calculated."[16]

On July 3, 2000, the Commission and Commerce instituted five-year reviews concerning the suspended investigation on honey from China.[17] The U.S. industry elected not to participate in the sunset review of the suspended investigation because it believed that the reference price mechanism of the suspension agreement was unsuccessful in establishing price stability. Because no domestic interested party expressed a willingness to participate in the five-year sunset review, Commerce published a notice on July 28, 2000, terminating the suspended investigation concerning honey from China.[18]

**Argentina and China AD/CVD investigations**

On September 29, 2000, AHPA and SHA filed petitions with Commerce and the Commission alleging that an industry in the United States was materially injured and threatened with material injury by reason of LTFV imports of honey from Argentina and China and by reason of subsidized imports of honey from Argentina. The Commission completed these investigations on November 19, 2001, determining that an industry in the United States was materially injured by reason of imports of honey from Argentina that were found by Commerce to be subsidized by the Government of Argentina and by reason of imports of honey from Argentina and China that were found by Commerce to be sold at LTFV.[19] On December 10, 2001, Commerce issued its antidumping duty order on China with the final weighted-average dumping margins ranging from 25.88 to 183.80 percent.[20] On December 10, 2001, Commerce issued its antidumping and countervailing duty orders on Argentina with the final weighted-average dumping margins ranging from 27.04 to 55.15 percent and an estimated countervailable subsidy rate of 4.53 percent.[21]

---

[16] Following consultation and negotiation between China and the United States, an agreement was reached to change the period for the calculation of the reference price. Beginning on July 1, 1998, the reference price was based on the most recent three months of data.

[17] 65 FR 41053, July 3, 2000 and 56 FR 41085, July 3, 2000.

[18] 65 FR 46426, July 28, 2000.

[19] *Honey from Argentina and China: Investigation Nos. 701-TA-402 and 731-TA-892-893 (Final)*, USITC Publication 3470, November 2001, p. 1.

[20] 66 FR 63670, December 10, 2001.

[21] 66 FR 63672, December 10, 2001.

In November 2006, the Commission instituted the first five-year reviews on honey from Argentina and China.[22] On February 5, 2007, the Commission determined that it would conduct expedited five-year reviews of the antidumping duty orders on honey from Argentina and China and the countervailing duty order on honey from Argentina.[23] On March 7, 2007, Commerce published its determination that revocation of the antidumping duty orders on honey from Argentina and China and the countervailing duty order on honey from Argentina would be likely to lead to continuation or recurrence of dumping and of a countervailable subsidy.[24] On July 18, 2007, the Commission notified Commerce of its determination that material injury would be likely to continue or recur within a reasonably foreseeable time.[25] Following affirmative determinations in the first five-year reviews by Commerce and the Commission, effective August 2, 2007, Commerce issued a continuation of the antidumping duty orders on imports of honey from Argentina and China and the countervailing duty order on imports of honey from Argentina.[26]

On July 2, 2012, the Commission instituted the second five-year reviews on honey from Argentina and China.[27] On September 21, 2012, Commerce published notice that it was revoking the countervailing duty and antidumping duty orders on honey from Argentina because no domestic interested party responded to the sunset review notice of initiation.[28] Subsequently, the Commission terminated the reviews concerning honey from Argentina effective September 27, 2012.[29]

---

[22] 71 FR 64292, November 1, 2006.
[23] 72 FR 6745, February 13, 2007.
[24] 72 FR 10150, March 7, 2007.
[25] 72 FR 39445, July 18, 2007.
[26] 72 FR 42384, August 2, 2007.
[27] 77 FR 39257, July 2, 2012.
[28] 77 FR 58524, September 21, 2012.
[29] 77 FR 64827, October 23, 2012.

I-8

On October 5, 2012, the Commission determined that it would conduct an expedited review of the antidumping duty order on honey from China.[30] On October 1, 2012, Commerce published its determination that revocation of the antidumping duty order on honey from China would be likely to lead to continuation or recurrence of dumping.[31] On November 29, 2012, the Commission notified Commerce of its determination that material injury would be likely to continue or recur within a reasonably foreseeable time.[32] Following affirmative determinations in the five-year review by Commerce and the Commission, effective December 13, 2012, Commerce issued a continuation of the antidumping duty order on imports of honey from China.[33]

On November 1, 2017, the Commission instituted a third five-year review of the antidumping duty order on honey from China,[34] and on February 5, 2018, the Commission determined that it would conduct an expedited review of the order.[35] On March 9, 2018, Commerce published its determination that revocation of the antidumping duty order on honey from China would be likely to lead to continuation or recurrence of dumping.[36] On April 19, 2018, the Commission notified Commerce of its determination that material injury would be likely to continue or recur within a reasonably foreseeable time.[37] Following affirmative determinations in the third five-year review by Commerce and the Commission, effective April 26, 2018, Commerce issued a continuation of the antidumping duty order on imports of honey from China.[38]

---

[30] 77 FR 65204, October 25, 2012.
[31] 77 FR 59896, October 1, 2012.
[32] 77 FR 72385, December 5, 2012.
[33] 77 FR 74173, December 13, 2012.
[34] 82 FR 50683, November 1, 2017.
[35] 83 FR 11562, March 15, 2018.
[36] 83 FR 10432, March 9, 2018.
[37] 83 FR 17445, April 19, 2018.
[38] 83 FR 18277, April 26, 2018.

**Circumvention and country-of-origin issues**

Effective August 21, 2012, Commerce made an affirmative final determination of circumvention of the antidumping duty order on honey from China.[39] Additionally, Congress has taken steps to prevent illegal Chinese honey transshipments from entering the United States and facilitating the verification of country-of-origin markings of imported honey. As part of the Trade Facilitation and Trade Enforcement Act of 2015, Congress directed U.S. Customs and Border Protection ("CBP") to address concerns that honey is being imported into the United States in violation of the customs and trade laws of the United States. Congress directed CBP to compile a database of the individual characteristics of honey produced in foreign countries, engage with foreign governments, and consult with the U.S. honey industry to facilitate the verification of country-of-origin markings of imported honey.[40]

## Nature and extent of sales at LTFV

On November 23, 2021, Commerce published a notice in the Federal Register of its preliminary determinations of sales at LTFV with respect to imports from Argentina, Brazil, India, Ukraine, and Vietnam.[41] On April 14, 2022, Commerce published a notice of its final determinations of sales at LTFV with respect to imports from Argentina, Brazil, India, and Vietnam. Tables I-2 through I-6 present Commerce's dumping margins with respect to imports of product from Argentina, Brazil, India, and Vietnam.

---

[39] Commerce found that blends of honey and rice syrup, regardless of the percentage of honey they contain, from China are later-developed merchandise, and instructed U.S. Customs and Border Protection to suspend liquidation of all entries of blends of honey and rice syrup, from China that were entered, or withdrawn from warehouse, for consumption on or after December 7, 2011. 77 FR 50464, August 21, 2012.

[40] Congress outlines measures to prevent honey transshipment into the United States and to ensure that imported honey meet certain health and safety standards. *Trade Facilitation and Trade Enforcement Act of 2015*, Public Law 114-125, 114th Congress, sec. 608, February 24, 2016.

[41] 86 FR 66531, 86 FR 66533, 86 FR 66528, 86 FR 66524, and 86 FR 66526, November 23, 2021.

**Table I-2**
**Raw honey: Commerce's final weighted-average LTFV margins with respect to imports from Argentina**

| Exporter/producer | Final dumping margin (percent) |
|---|---|
| Asociacion De Cooperativas Argentinas Cooperativa Limitada | 24.67 |
| NEXCO S.A. | 9.17 |
| Industrias Haedo S.A. | 49.44 |
| Compañia Inversora Platense S.A. | 49.44 |
| All others | 16.92 |

Source: 87 FR 22179, April 14, 2022.

**Table I-3**
**Raw honey: Commerce's final weighted-average LTFV margins with respect to imports from Brazil**

| Exporter/producer | Final dumping margin (percent) |
|---|---|
| Melbras Importadora E Exportadora Agroindustrial Ltda | 7.89 |
| Apiario Diamante Comercial Exportadora Ltda/Apiario Diamante Producao e Comercial de Mel Ltda (Supermel) | 83.72 |
| All others | 7.89 |

Source: 87 FR 22182, April 14, 2022

Note: Commerce determined that Apiario Diamante Comercial Exportadora Ltda and Apiario Diamante Producao e Comercial de Mel Ltda are affiliated and should be treated as a single entity.

**Table I-4**
**Raw honey: Commerce's final weighted-average LTFV margins with respect to imports from India**

| Exporter/producer | Final dumping margin (percent) |
|---|---|
| Allied Natural Product | 6.24 |
| Ambrosia Natural Products (India) Private Limited/Ambrosia Enterprise/Sunlite India Agro Producer Co. Ltd | 5.52 |
| All others | 5.87 |

Source: 87 FR 22188, April 14, 2022.

**Table I-6**
**Raw honey: Commerce's final weighted-average LTFV margins with respect to imports from Vietnam**

| Exporter | Producer | Final dumping margin (percent) |
|---|---|---|
| Ban Me Thuot Honeybee Joint Stock Company | Ban Me Thuot Honeybee Joint Stock Company | 61.27 |
| Daklak Honeybee Joint Stock Company | Daklak Honeybee Joint Stock Company | 58.74 |
| Dak Nguyen Hong Exploitation of Honey Company Limited TA, Nguyen Hong Honey Co., LTDTA | Dak Nguyen Hong Exploitation of Honey Company Limited TA, Nguyen Hong Honey Co., LTDTA | 60.03 |
| Nhieu Loc Company Limited | Nhieu Loc Company Limited | 60.03 |
| Hoang Tri Honey Bee Company Limited (a.k.a. Hoang Tri Honey Bee Co., Ltd), H. T Honey Co., Ltd | Hoang Tri Honey Bee Company Limited (a.k.a. Hoang Tri Honey Bee Co., Ltd), H. T Honey Co., Ltd | 60.03 |
| Viet Thanh Food Technology Development Investment Company Limited, Viet Thanh Food Co., Ltd | Viet Thanh Food Technology Development Investment Company Limited, Viet Thanh Food Co., Ltd | 60.03 |
| Dongnai HoneyBee Corporation | Dongnai HoneyBee Corporation | 60.03 |
| Sai Gon Bees Limited Company, Saigon Bees Co., Ltd., Sai Gon Bees Co., Ltd | Sai Gon Bees Limited Company, Saigon Bees Co., Ltd., Sai Gon Bees Co., Ltd | 60.03 |
| Huong Rung Trading—Investment and Export Company, Huong Rung Co., Ltd | Huong Rung Trading—Investment and Export Company, Huong Rung Co., Ltd | 60.03 |
| Hai Phong Honeybee Company Limited | Hai Phong Honeybee Company Limited | 60.03 |
| Bao Nguyen Honeybee Co., Ltd | Bao Nguyen Honeybee Co., Ltd | 60.03 |
| Southern Honey Bee Company LTD | Southern Honey Bee Company LTD | 60.03 |
| Golden Bee Company Limited | Golden Bee Company Limited | 60.03 |
| Than Hao Bees Company Limited | Than Hao Bees Company Limited | 60.03 |
| Daisy Honey Bee Joint Stock Company, Daisy Honey Bee JSC, Daisy Honey Bee J.S.C | Daisy Honey Bee Joint Stock Company, Daisy Honey Bee JSC, Daisy Honey Bee J.S.C | 60.03 |
| Bee Honey Corporation of Ho Chi Minh City, Bee Honey Corp. of Ho Chi Minh City, Behonex Corp | Bee Honey Corporation of Ho Chi Minh City, Bee Honey Corp. of Ho Chi Minh City, Behonex Corp | 60.03 |
| Phong Son Limited Company, Phong Son Co., Ltd | Phong Son Limited Company, Phong Son Co., Ltd | 60.03 |
| Hoa Viet Honeybee One Member Company Limited, Hoa Viet Honey Bee Co., Ltd., Hoa Viet Honeybee Co., Ltd | Hoa Viet Honeybee One Member Company Limited, Hoa Viet Honey Bee Co., Ltd., Hoa Viet Honeybee Co., Ltd | 60.03 |
| Vietnam-wide Entity | Vietnam-wide Entity | 60.03 |

Source: 87 FR 22184, April 14, 2022.

I-12

## The subject merchandise

### Commerce's scope

In the current proceeding, Commerce has defined the scope as follows:[42]

*Raw honey is honey as it exists in the beehive or as obtained by extraction, settling and skimming, or coarse straining. Raw honey has not been filtered to a level that results in the removal of most or all of the pollen, e.g., a level that removes pollen to below 25 microns. The subject products include all grades, floral sources and colors of raw honey and also include organic raw honey.*

*Excluded from the scope is any honey that is packaged for retail sale (e.g., in bottles or other retail containers of five (5) lbs. or less).*

### Tariff treatment

Based upon the scope set forth by Commerce, information available to the Commission indicates that the merchandise subject to these investigations are provided for in HTS heading 0409.00.00, natural honey. More specifically, subject raw honey is imported under the following HTS statistical reporting numbers: (1) 0409.00.0005 natural honey that is certified organic (regardless of color), (2) 0409.00.0035 for other natural honey that is white or lighter in color, (3) 0409.00.0045 for other natural honey that is extra light amber in color, (4) 0409.00.0056 for other natural honey that is light amber in color, and (5) 0409.00.0065 for other natural honey that is amber or darker in color.[43]  The 2022 general rate of duty is 1.9 cents per kilogram for imports classified under HTS subheading 0409.00.00.[44]

---

[42] 86 FR 66524, 86 FR 66526, 86 FR 66528, 86 FR 66531, and 86 FR 66533, November 23, 2021

[43] USITC, *Harmonized Tariff Schedule of the United States (2022 Revision 2)*, p. 4-89.

[44] None of the subject countries are eligible for special rates of duty for imports classified under HTS 0409.00.00. Furthermore, GSP treatment for heading 0409.00.00 is limited to the least-developed countries and none of the subject countries are listed as least-developed beneficiary countries. Legal authorization for the GSP program expired on December 31, 2020. USTR, "Generalized System of Preferences (GSP), Program information, 2021 Expiration," https://ustr.gov/issue-areas/preference-programs/generalized-system-preferences-gsp/program-information/2021-expiration, accessed March 28, 2022; 83 FR 17561; USITC, *Harmonized Tariff Schedule of the United States (2022 Revision 2)*, General Note 4, GN pp. 11-13.

In addition to the general rate, U.S imports of honey produced in China that are classified under heading 0409.00.00 were included in the modified Section 301 action against China as of September 21, 2018 (List 3).[45] Items on this list were subject to additional duties of 10 percent *ad valorem* as of September 24, 2018, with this additional duty increasing to 25 percent *ad valorem* as of January 1, 2019.[46] The 25 percent additional duties were twice postponed, but eventually implemented as of May 10, 2019 and continue to be in effect.[47] Decisions on the tariff classification and treatment of imported goods are within the authority of U.S. Customs and Border Protection.

## The product

### Descriptions and uses[48]

Honey is a sweet viscous fluid derived from the nectar of flowers collected by bees and processed in their honey sacs. Honey is an invert sugar, composed of approximately 39 percent fructose; 33 percent glucose; 11 percent maltose, sucrose and other sugars; and 17 percent water.[49]

---

[45] 83 FR 47974, September 21, 2018.

[46] 83 FR 47974; USITC, *Harmonized Tariff Schedule of the United States (2022 Revision 2)*, U.S. Note 20(f) to Chapter 99, pp. 99-III-26-28.

[47] 83 FR 65198; 84 FR 7966; 84 FR 20459; USITC, *Harmonized Tariff Schedule of the United States (2002 Revision 2)*, U.S. Note 20(f) to Chapter 99, pp. 99-III-26-28.

[48] Unless indicated otherwise the discussion in this section is based on information contained in *Raw Honey from Argentina, Brazil, India, Ukraine, and Vietnam; Inv. Nos. 731-TA-1560-1564 (Preliminary), USITC Publication 5204, June 2021 ("Preliminary publication"), pp. I-11-15; Raw Honey from China, Inv. No. 731-TA-893 (Third Review), USITC Publication 4776, April 2018, pp. I-7-9; Honey from Argentina and China, Inv. Nos. 701-TA-402 & 731-TA-892-893 (Review), USITC Publication 3929, June 2007; Honey From China 731-TA-893 (Second Review), USITC Publication 4364, November 2012, pp. I-16-18;* and Bradbear, Nicola, *Bees and Their Role in Forest Livelihoods, FAO, Rome, 2009.*

[49] Honey contains trace amounts of acids, minerals, protein, and enzymes. Bradbear, Nicola, *Bees and Their Role in Forest Livelihoods, FAO, Rome, 2009, p. 85.*

**USDA standards**

The USDA has issued voluntary standards for grades of (1) Comb Honey, and (2) Extracted Honey.[50] These standards define the comb as being the wax-like cellular structure that bees use as storage for honey and pollen and describe extracted honey as honey that has been separated from the comb by centrifugal force, gravity, or by other means. The scope of these investigations defines raw honey as including "honey as it exists in the beehive" or comb honey as defined by USDA, and "as obtained by extraction, settling and skimming, or coarse straining" or extracted honey as defined by USDA.

In the extracted honey standards, USDA further describes styles of extracted honey as being filtered or strained. Filtered honey has been filtered to the extent that all or most of pollen grains, air bubbles or other materials normally found in suspension, have been removed. Strained honey has been strained such that most of the comb, propolis, or other defects normally found in honey have been removed.[51] Straining does not normally remove grains of pollen, small air bubbles, and other very fine particles. These standards do not make a distinction based on the micron level of filtration.

While the scope of raw honey in these investigations gives 25 microns as an example of the level that removes most or all pollen from honey, this level of filtration does not appear in USDA documents related to honey grading standards or in FDA guidance documents related to the labeling of honey.[52] USDA references micron level in its Commercial Item Description (CID) for honey, but only in reference to the maximum level of filtration for filtered honey, stating:

---

[50] USDA, AMS, *United States Standards for Grades of Extracted Honey,* May 23, 1985; USDA, AMS, *United States Standards for Grades of Comb Honey, May 24, 1967.*

[51] Propolis is a gum like substance created by honeybees from collected tree resins that has been shown to have antimicrobial properties. Wild honeybee colonies use it to coat the inner surface of cavities (propolis envelop) where they build nests, and it is believed to provide health benefits. While managed bees produce propolis to seal cracks in the commercial hive, they do not produce a propolis envelop. Pass the Honey, "What is Propolis," August 29, 2019, https://passthehoney.com/blogs/the-buzz/what-is-propolis, accessed March 21, 2022; Simone-Finstrom, Michael et al., "Conference Report: Proceedings of the 2019 American Bee Research Conference," Insects, https://www.mdpi.com/2075-4450/11/2/88, accessed March 21, 2022.

[52] USDA, AMS, United States Standards for Grades of Extracted Honey, May 23, 1985; USDA, AMS, United States Standards for Grades of Comb Honey, May 24, 1967; FDA, "Proper Labeling of Honey and Honey Products: Guidance for Industry," February 2018, https://www.fda.gov/files/food/published/PDF---Guidance-for-Industry--Proper-Labeling-of-Honey-and-Honey-Products.pdf, (accessed May 24, 2021).

"Such honey is not filtered to less than 1.0 micron (μm)."[53] Several commercial honey sites, as well as the *Young Naturalist,* identified 25 microns as the average size of pollen grains without attribution.[54]

**Honey Color**

The color of honey is influenced by many factors including: phenolics, carotenoids, sugars, minerals, pollens, water content, floral and geographic origin, temperature and time conditions of processing/handling/storage, and age.[55] Though USDA standards for extracted honey include color designations, the color of extracted honey is not a factor of quality for the purpose of USDA honey grades.[56] Nonetheless, color is an important attribute of honey that plays a significant role in consumer perceptions and choices, and historically has been a price-defining property.[57]

---

[53] Commercial Item Descriptions (CIDs) are product descriptions that concisely describe the most important characteristics of a commercial product. CIDs are official U.S. Government procurement documents that are: (1) uniquely numbered in a Federal series, (2) prominently dated for easy reference; (3) appropriately titled (according to current Federal labeling policies). USDA, "Commercial Item Description, Honey," A-A-20380, October 23, 2019, https://www.ams.usda.gov/grades-standards/cids, (accessed May 24, 2021).

[54] Foxhound Bee Company, "Does Straining Honey Remove the Pollen?" https://www.foxhoundbeecompany.com/does-filtering-or-straining-honey-remove-pollen-from-honey/, (accessed May 24, 2021; Stone's Farm, "Pollen in Honey," http://www.stonefamilyfarms.com/blog/143-pollen-in-honey, (accessed May 24, 2021); Huney Grams Honey Bee, LLC, "Do we 'filter' our honey," https://huneygramshoneybees.wordpress.com/2019/01/16/do-we-filter-our-honey/, (accessed May 24, 2021); Hiller, Ilo, *Young Naturalist,* "Airborne Pollen."

[55] Hasnul Hadi, M.H. et. al., "The Amber-Colored Liquid: A Review on the Color Standards, Methods of Detection, Issues and Recommendations, *Sensors 2021*, 21, 6866, https://doi.org/10.3390/s21206866, accessed April 19, 2022, p.21; Bodor, Zsanett et. al., "Colour of Honey: Can We Trust the Pfund Scale?" *LWT–Food Science and Technology*, 149 (2021) 111859, https://www.researchgate.net/publication/352154739_Colour_of_honey_can_we_trust_the_Pfund_scale_-_An_alternative_graphical_tool_covering_the_whole_visible_spectra, accessed April 19, 2022, p.7.

[56] USDA, AMS, p.5.

[57] Hasnul Hadi, M.H. et. al., "The Amber-Colored Liquid: A Review on the Color Standards, Methods of Detection, Issues and Recommendations, *Sensors 2021*, 21, 6866, https://doi.org/10.3390/s21206866, accessed April 19, 2022, p.2; Bodor, Zsanett et. al., "Colour of Honey: Can We Trust the Pfund Scale?" *LWT–Food Science and Technology*, 149 (2021) 111859, https://www.researchgate.net/publication/352154739_Colour_of_honey_can_we_trust_the_Pfund_scale_-_An_alternative_graphical_tool_covering_the_whole_visible_spectra, accessed April 19, 2022, p.1.

The Pfund Scale is a commonly used visual technique for evaluating the color of honey and is used to differentiate honey color into seven categories in the USDA honey color system (table I-7). The Pfund system expresses color intensity in millimeters (mm) with an arbitrary range from 1 mm, being the lightest color, to 140 mm being the darkest color.[58] The method has been criticized for (1) variation among devices due to scale limitations, (2) less sensitivity to detect slight differences between samples, and (3) some samples being outside of the device's color range.[59]

**Table I-7**
**Raw honey: USDA Color Designations of Extracted Honey**

| USDA Color Standards Designations | Color Range USDA Color Standards | Color Range Pfund Scales Millimeters* | Optical Density* |
|---|---|---|---|
| Water White | Honey that is Water White or lighter in color | 8 or less | 0.0945 |
| Extra White | Honey that is darker than Water White, but not darker than Extra White in color | Over 8 to and including 17 | 0.189 |
| White | Honey that is darker than Extra White, but not darker than White in color | Over 17 to and including 34 | 0.378 |
| Extra Light Amber | Honey that is darker than White, but not darker than Extra Light Amber in color | Over 34 to and including 50 | 0.595 |
| Light Amber | Honey that is darker than Extra Light Amber, but not darker the Light Amber in color | Over 50 to and including 85 | 1.389 |
| Amber | Honey that is darker than Light Amber, but not darker than Amber in color | Over 85 to and including 114 | 3.008 |
| Dark Amber | Honey that is darker than Amber in color | Over 114 | n/a |

Source: USDA, AMS, "United States Standards for Grades of Extracted Honey," May 23, 1985.

Note: Optical Density (absorbance) = $\log_{10}$ (100/percent transmittance), at 560 nm for 3.15 cm thickness for caramel-glycerin solutions measured versus an equal cell containing glycerin.

---

[58] The measuring device consists of an amber-colored glass wedge and a wedge-shaped cell to hold the honey sample. The millimeters unit is the distance that the wedge must be moved for the color of the sample to match the color scale. Hasnul Hadi, M.H. et. al., "The Amber-Colored Liquid: A Review on the Color Standards, Methods of Detection, Issues and Recommendations, *Sensors 2021*, 21, 6866, https://doi.org/10.3390/s21206866, accessed April 19, 2022, p.7.

[59] Hasnul Hadi, M.H. et. al., "The Amber-Colored Liquid: A Review on the Color Standards, Methods of Detection, Issues and Recommendations, *Sensors 2021*, 21, 6866, https://doi.org/10.3390/s21206866, accessed April 19, 2022, p.2; Bodor, Zsanett et. al., "Colour of Honey: Can We Trust the Pfund Scale?" *LWT–Food Science and Technology*, 149 (2021) 111859, https://www.researchgate.net/publication/352154739_Colour_of_honey_can_we_trust_the_Pfund_scale_-_An_alternative_graphical_tool_covering_the_whole_visible_spectra, accessed April 19, 2022, p.1.

Generally, light-colored honey is milder in taste and dark-colored honey is stronger in taste.[60] In addition, selected floral sources are associated with lighter or darker colors.[61] For example, alfalfa honey is light in color with a mild flavor and aroma, whereas buckwheat honey is dark in color with a full-bodied flavor.[62] Economic research as early as 1998 demonstrated that consumers were willing to pay premiums for selected honey characteristics. Though this research did not specifically evaluate premiums associated with color, it found that consumers were willing to pay a 65 percent higher price for characteristics associated with unique floral sources.[63]

While many different types of honey are packaged and available for retail sale, most honey, especially honey supplied in bulk, is blended to create a unique and consistent taste and color.[64] Moreover, blended honey is often used as a generic ingredient in manufactured food products where many of honey's characteristics, including floral source and color, become unobservable to the final consumer.

---

[60] National Honey Board, "Honey Color and Flavor," https://honey.com/newsroom/presskit/honey-color-and-flavor, accessed April 19, 2022.

[61] National Honey Board, "Honey Color and Flavor," https://honey.com/newsroom/presskit/honey-color-and-flavor, accessed April 19, 2022.

[62] National Honey Board, "Honey Color and Flavor," https://honey.com/newsroom/presskit/honey-color-and-flavor, accessed April 19, 2022.

[63] Unnevenhr, Laurian J., and Fatoumata C. Gouzou, "Retail Premiums for Honey Characteristics," *Agribusiness,* Vol. 14, No. 1, January/February 1998, https://web.s.ebscohost.com/ehost/detail/detail?vid=2&sid=ca95adb2-27c7-4962-8844-ef4b6224b7d0%40redis&bdata=JnNpdGU9ZWhvc3QtbGl2ZQ%3d%3d#AN=782426&db=bth, accessed April 19, 2021, p.54.

[64] National Honey Board, "Honey Color and Flavor," https://honey.com/newsroom/presskit/honey-color-and-flavor, accessed April 19, 2022.

**Organic honey[65]**

Organic honey production in the United States is limited by several factors, including the fact that the National Organic Program ("NOP") has not adopted specific organic standards for apiculture, including beekeeping and honey production.[66] For honey sold in the United States to bear the USDA Organic Seal, producers and handlers must be certified according to NOP standards. Though organic standards for apiculture were recommended by the National Organic Standards Board ("NOSB") at their fall meeting in 2001 and again in the fall of 2010, these standards were not adopted by the NOP.[67] Thus, producers that receive USDA organic certification typically do so by using other standards; as bees meet the definition of livestock, organic certifiers have been using existing livestock standards as a baseline for certifying organic apiculture operations in the United States.[68]

A second factor limiting organic honey production in the United States is the concept of an organic forage zone. Foraging honeybees must visit about 5 million flowers to produce a pint

---

[65] In its preliminary determination, the Commission stated it would seek additional information regarding organic honey, including its role in the U.S. market, standards for the organic designation, and the degree of competition between organic and conventional raw honey. Thus, this section has been expanded substantially from the preliminary phase report. *Preliminary publication, p. 30.*

[66] The National Organic Program ("NOP") is a federal regulatory program that develops and enforces consistent national standards for organically produced products sold in the United States. NOP also accredits third-party organizations to certify that farms and businesses meet the national organic standards. These certifiers and USDA work together to enforce the standards, ensuring a level playing field for producers and protecting consumer confidence in the integrity of the USDA Organic Seal. USDA, AMS, "National Organic Program," https://www.ams.usda.gov/about-ams/programs-offices/national-organic-program, accessed March 2, 2022.

[67] Producers and handlers that knowingly label or sell a product as "organic" except in accordance with the Organic Foods Product Act of 1990 or NOP standards are subject to a maximum fine of $18,730 for each violation. 7 CFR § 3.91 (b) (1) (xxxvi); USDA, AMS, "The Organic Seal," https://www.ams.usda.gov/rules-regulations/organic/organic-seal, accessed March 2, 2022.The NOSB "Recommendations Library" currently classifies the rulemaking for apiculture standards as "closed," and notes that the proposed rule was not published and that consideration of the proposed rule is not on the Regulatory Agenda; USDA, NOSB, "NOSB Recommendations" https://www.ams.usda.gov/sites/default/files/media/NOSBRecommendationsLibrary.pdf, accessed March 1, 2022; USDA, NOSB, "NOSB Recommendations: Fall 2010," https://www.ams.usda.gov/sites/default/files/media/NOP%20Livestock%20Final%20Rec%20Apiculture.pdf, accessed March 1, 2022; USDA, NOSB, "NOSB Recommendations: Fall 2001," https://www.ams.usda.gov/sites/default/files/media/Rec%20Apiculture%20Standards.pdf, accessed March 1, 2022.

[68] USDA, NOSB, "NOSB Recommendations: Fall 2010," https://www.ams.usda.gov/sites/default/files/media/NOP%20Livestock%20Final%20Rec%20Apiculture.pdf, accessed March 1, 2022, p. 3.

of honey; while bees may fly up to 5 miles per day to collect food, most search within a one- to two-mile radius of the hive.[69] Organic certification standards in the European Union ("EU") and Canada define an organic forage zone to be a 3-kilometer or 1.8-mile radius around the apiary.[70] According to EU rules, for an apiary to be certified as organic, the organic forage zone must be predominately covered by natural vegetation or organically managed land which is especially relevant when bees will be visiting field crops or orchards to collect pollen.[71]

The difficulty of establishing and maintaining commercially sized, certified organic beekeeping operations in the contiguous United States can be demonstrated by considering the interdependence between forage conditions in North Dakota ("ND")—the number one honey-producing state—and California ("CA")—the number one state for pollination services demand. A 1.8-mile (3-km) radius organic forage zone encompasses about 10 square miles or about 6,515 acres. At this rate, the certified organic farmland in ND in 2019 could have supported about 725 organic bee colonies.[72] Conservation Reserve Program ("CRP") land is concentrated

---

[69] Blake, Cary, "Better Understanding of Honey Bees Benefits Everyone," *Western Farm Press,* November 19, 2016, pp. 6-7.

[70] The standards proposed by the NOSB attempted to harmonize requirements for an organic forage zone, organic surveillance zone, and organic transition period with EU and Canadian organic apiculture standards and thus proposed the same 1.8-mile or 3-kilometer radius. As a major exporter of organic honey, including to the European Union ("EU"), organic apiaries in Brazil are generally certified to EU standards. USDA, NOSB, "NOSB Recommendations: Fall 2010," https://www.ams.usda.gov/sites/default/files/media/NOP%20Livestock%20Final%20Rec%20Apiculture.pdf, accessed March 1, 2022, p. 3.

[71] Similarly in the United States, for apiculture certification inspections, NOP expects organic certifiers to (1) completely review and understand the management of organic forage zones; (2) verify that organic forage zones are organically managed, i.e., contain wild areas or only certified organic crops; and (3) inspect all forage areas to ensure that all bee forage is organically managed. Certified organic crops must be produced without the use of genetically engineered inputs, thus, certified organic honey would also be considered to be non-GMO. USDA, AMS, NOP, "Organic Regulations Standards Update," February 10, 2015.

[72] North Dakota requires that beekeepers annually register the locations of their apiaries. The most recent registration list included at least 15,000 registered locations (505 pages with at least 30 locations per page). USDA's 2019 organic census reported a total of about 71,000 acres of organically certified farmland in ND. At 6,515 acres per forage zone, assuming a 50 percent overlap, the organic farmland in ND—assuming it were contiguous—would accommodate about 22 organic forage zones. The average number of colonies per location in ND during July and September 2018—2020 was about 34. Thus, certified organic farmland in ND could, theoretically, accommodate up to 726 organic colonies. USDA, AMS, NOP, "Organic Regulations Standards Update," February 10, 2015; North Dakota Department of Agriculture, *List of Registered Locations in North Dakota*, Apiary (Honey Bees), https://www.nd.gov/ndda/plant-industries/apiary-honey-bees, accessed March 7, 2022; USDA, NASS, Quick Stats Database, accessed March 7, 2022.

in the Northern Great Plains, including ND, and could potentially offer additional locations meeting requirements to be certified as organic forage areas.[73] However, most commercial beekeeping operations that produce honey in the Northern Great Plains also participate in the almond pollination services market in California, where, unfortunately, the total organic almond acreage harvested in 2019 would have been insufficient to establish even one certified organic forage zone.[74] Consequently, bee colonies that are located in ND to produce honey during the summer and are transported to California to provide pollination services would not meet certification requirements for organic production. Thus, organic honey production in the United States—outside of four certified organic operations identified in Hawaii[75]—is likely limited to beekeepers selling less than $5,000 worth of organic honey directly to consumers because the exemption does not allow this self-certified honey to be used as an ingredient in a

---

[73] The CRP gives farmers incentives to take sensitive land out of agricultural production and plant species that improve environmental quality, including bee forage. Thus, beekeepers actively target CRP land to locate apiaries for their abundant floral resources and lack of pesticide exposure. Bond, Jennifer K. et. al., *Honey Bees on the Move: From Pollination to Honey Production and Back*, USDA, ERS, Economic Research Report Number 290, June 2021, pp. 1-2. Crops are not actively harvested and sold from CRP acres; therefore, owners have no incentive to seek organic certification of CRP acres. Nonetheless, CRP acres could potentially qualify as organic bee forage areas depending on active management practices. Midwest Organic and Sustainable Education Service (MOSES), "Converting CRP Land to Organic Production," https://mosesorganic.org/publications/organic-fact-sheets/, accessed March 7, 2022.

[74] The 2019 organic census reported that there were 5,915 acres of organic almonds harvested in California. USDA, NASS, Quick Stats Database, accessed March 7, 2022.

[75] A search of USDA's Organic Integrity Database (OID) for certified organic operations that included "bees" certified under NOP livestock standards identified four operations in the United States that held organic certificates for bees based on NOP livestock standards. All four of these operations are based in Hawaii and are also certified as handlers of organic honey. Searching for operations that are certified to handle organic honey is less precise. A search based on "raw honey" identified 86 records, while a search including just "honey" identified 888 records; likely because this includes any certified organic product (e.g., bread) that has honey as an ingredient. USDA, OID, https://organic.ams.usda.gov/integrity/SAearch.aspx. Additional internet searches revealed that all four Hawaiian operations generally produce and package their honey for local distribution and online sales. Captain Cook Honey (a.k.a. Big Island Bees) states on their web site that they operate about 2,500 hives, based on USDA average production during 2018-20 this producer would account for about 14 percent of all honey produced in Hawaii (240,000 of 1.663 million pounds). Big Island Bees, Raw & Organic Honey, https://bigislandbees.com/ (accessed May 24, 2021); Hawaii Harvest Honey, https://www.hawaiiharvesthoney.com/ (accessed May 24, 2021); Pu'U O Hoku Ranch, https://puuohoku.com/ (accessed May 24, 2021); Rare Hawaiian Honey Company (a.k.a., Volcano Island Honey Company), https://www.rarehawaiianhoney.com/contact-us/ (accessed May 24, 2021).

processed product produced and sold by another certified organic production or handling operation.[76]

Imported organic honey must also comply with NOP standards. The EU is among the world's largest importers of honey; thus, the EU standards are the basis for certification of most of the organic honey in the world and beekeepers and honey producers in Latin America are familiar with the EU standards. The primary difference between EU organic standards and U.S. NOP livestock standards as they are applied to bees and honey are the use of two pest control products for control of *Varroa* mites. These two products are certified for use under the EU standards but are not certified for use under U.S. NOP standards. Hence, bees and honey that meet EU standards for organic certification are generally certified to meet U.S. NOP standards by confirming that these two methods of *Varroa* mite control have not been applied.[77] A search of the USDA OID identified 149 operations in the subject countries with a certification for livestock and handling that included bees or honey; of these, 52 were in Brazil and 89 were in Argentina.[78]

By regulation, all certified organic honey is non-GMO; however, conventionally produced honey may also be certified as non-GMO. Nonetheless, the production of conventionally certified non-GMO honey in the United States appears to be limited as most sellers certified to label their honey with the Non-GMO Project's logo appear to be sourcing honey from foreign sources, including both subject and non-subject countries.[79]

---

[76] A production or handling operation that sells agricultural products as "organic" but whose gross agricultural income from organic sales totals $5,000 or less annually is exempt from certification under subpart E of this part and from submitting an organic system plan for acceptance or approval under § 205.201 but must comply with the applicable organic production and handling requirements of subpart C of this part and the labeling requirements of § 205.310. The products from such operations shall not be used as ingredients identified as organic in processed products produced by another handling operation; thus, organic beekeeping operations with less than $5,000 gross annual organic sales are exempt from obtaining organic certification prior to making an organic claim. 7 CFR § 205.101 (a)(1). See also USDA, AMS, "What farms and businesses are exempt from organic certification?," https://www.ams.usda.gov/sites/default/files/media/2%20Exempt%20Producers%20FINAL%20RGK%20V2.pdf, accessed March 7, 2022.

[77] Staff email correspondence, Garth Kahl, International Organic Inspectors Association ("IOIA") Accredited Inspector, Independent Organic Services, Inc., EDIS Document 768824.

[78] USDA, OID, https://organic.ams.usda.gov/integrity/SAearch.aspx.

[79] Conference Transcript, (Foott) pp. 155–156; NON-GMO Project, verified products database, https://www.nongmoproject.org/find-non-gmo/verified-products/?brand_id=12975, accessed March 21, 2022.

**Honey classification**

Honey, regardless of its country of origin, is generally classified by its individual characteristics (e.g., floral source, color, season, physical state, and means of preparation).[80] There are over 300 unique varieties of honey that are produced in the United States, differing in flavor and color.[81] Honey may be classified as monofloral (i.e., the nectar is primarily extracted from a specific blossom type) or polyfloral (i.e., the nectar is extracted from multiple botanical sources, with no single predominant floral source). The floral source gives honey its distinctive flavor (e.g., wildflower, orange blossom, alfalfa, clover, and buckwheat) and color (e.g., white and dark amber). Generally, lighter-colored honeys (e.g., clover honey) possess a milder flavor, while darker-colored honeys (e.g., buckwheat honey) possess a stronger flavor.

In bulk applications, honey is primarily valued based on floral source and color, and in the United States the light-colored and milder-tasting honeys are considered to be more valuable based on consumer preferences. While many varieties of honey exist on the market, most honey is blended to achieve a desired color and flavor,[82] as well as to provide a uniform product throughout a given market and/or to lower costs.

Most natural honey produced in the United States is marketed in liquid form, which is honey that is extracted from the comb by centrifugal force, gravity, or straining. Natural honey is also marketed as cream honey (also called "creamed," "whipped," or "spun"), which consists of pure honey in which dextrose crystallization has been encouraged; comb honey, which is honey marketed in the beeswax comb, both of which are edible; cut comb honey, which is liquid honey that has been packaged with chunks of honey comb; and dry honey (also known as "dried" or "powdered"), which is made by removing the water found in liquid honey by drum or spray-drying.[83] As a sweetener, honey appears in a variety of products such as bread and other baked goods, cereal, condiments, and candy. Non-food applications for honey include use in pharmaceutical products, and non-food processed products including as an input in hair care products. Honey also contains mild antiseptic properties when used on the skin.

---

[80] *The Hive and the Honey Bee*, Dadant & Sons, Inc., Hamilton, IL, 1992, p. 869.

[81] National Honey Board, Honey Varietals, https://honey.com/about-honey/honey-varietals.

[82] National Honey Board,  Honey Varietals, https://honey.com/about-honey/honey-varietals, (accessed May 24, 2021).

[83] National Honey Board, "Definition of Honey and Honey Products," Updated September 27, 2003, https://honey.com/images/files/Honey-Definitions.pdf (accessed May 24, 2021).

**Other forms of honey and honey substitutes**

The term "artificial honey," as defined in the explanatory notes to the HTS, applies to mixtures based on sucrose, glucose, or invert sugar, generally flavored or colored and prepared to imitate natural honey. Artificial honey could include a variety of products such as honey mixed with refined sugar, high fructose corn syrup, and other sweeteners. Artificial honey mixtures of natural and artificial honey are not included in the scope of these investigations. Artificial honey exists in relatively small amounts in the U.S. market and is supplied by both foreign and domestic producers.

Flavored honey, like artificial honey, is outside the scope of these investigations. Flavored honey is most likely sold as a specialty product for retail consumption and not for industrial use.

## Manufacturing processes

Honey is produced in a beehive by a colony of honeybees. A typical colony of commercial honeybees in the United States contains one queen, 500 to 1,000 drones (male bees without stingers whose single purpose is to mate with the queen), and approximately 40,000 to 60,000 workers (female bees that perform the work of the colony including cleaning the nursery, caring for larvae, collecting nectar, making wax, and guarding and cooling the hive). The beehive is a series of combs composed of hexagonal cells that are made from wax produced in the stomach of the worker bees. The wax cells are used for storage. The worker bees naturally construct a core nest where the brood[84] are stored and then create a layer of insulation above the nest consisting of pollen and honey.

The production of honey begins with the bees gathering nectar from various plants. Bees may forage for several miles from their hive to find nectar.[85] Each bee may make several trips for nectar per day, weather permitting. Upon returning to the hive, the bee regurgitates the nectar into the mouth of a specialized "house" bee. The house bee adds enzymes and places the unripe honey into the hexagonal cells of the comb. The unripe honey is often spread among several cells to help in moisture evaporation, which the house bees promote by fanning their wings. Cells are then capped with a thin layer of wax, and the honey is allowed to ripen.

---

[84] The young and immature honeybees are collectively called brood.
[85] The EU standard for organic honey is based on a 3.0-kilometer (1.8-mile) radius of the hive. Staff email correspondence, Garth Kahl, IOIA Accredited Inspector, Independent Organic Services, Inc.

**U.S. beekeeper operations**

Beekeepers maintain bee colonies and extract honey from them. United States commercial beekeeping operations are often migratory with migratory patterns driven by the provision of pollination services (valued at $250 million to $320 million annually, 80 percent from California almonds); the search for forage to produce honey (valued at about $330 million annually); and the need to enhance colony survival and growth.[86] In the United States, it has been estimated that approximately two-thirds of all commercial colonies are on the road each year to pollinate crops and to produce honey and beeswax.[87] These migration patterns are dominated by movement from all other regions of the United States to California for the almond pollination season during February and March.[88] Colonies then disperse to other regions and states to provide pollination services for other fruit and vegetable crops, such as melons that require pollination to produce fruit, and other crops such as tomatoes, apples, blueberries, cherries, and canola where bee pollination increases yields and can improve quality.[89] Finally, many colonies travel to the Northern Great Plains in the summer for access to superior forage to focus on honey production.[90]

Beekeepers in the United States keep their bees in constructed wooden hives that are relatively easy to transport. Hives are often placed on wooden pallets for ease of handling by forklifts. Bees live in the core nest of beekeepers' artificially constructed hives and store the honey, intended to serve as food for the colony, in wooden frames known as "supers." To prevent the queen from laying brood in the supers containing the honey, beekeepers place an "excluder" between the lower core nest and the supers above. Worker bees produce more honey than required for use by the colony, so the excess honey can be harvested without harming the colony.

---

[86] Bond, Jennifer K. et. al., *Honey Bees on the Move: From Pollination to Honey Production and Back,* USDA, ERS, Economic Research Report Number 290, June 2021.

[87] Pollination Facts, American Beekeeping Federation, https://www.abfnet.org/page/PollinatorFacts June 14, 2016; Bond, Jennifer K. et. al., *Honey Bees on the Move: From Pollination to Honey Production and Back,* USDA, ERS, Economic Research Report Number 290, June 2021, p.4.

[88] Bond, Jennifer K. et. al., *Honey Bees on the Move: From Pollination to Honey Production and Back,* USDA, ERS, Economic Research Report Number 290, June 2021.

[89] Bond, Jennifer K. et. al., *Honey Bees on the Move: From Pollination to Honey Production and Back,* USDA, ERS, Economic Research Report Number 290, June 2021, p.1.

[90] Bond, Jennifer K. et. al., *Honey Bees on the Move: From Pollination to Honey Production and Back,* USDA, ERS, Economic Research Report Number 290, June 2021.

Honey is harvested by driving the bees out of the super down into the core nest via smoke, chemicals, or low-pressure air. Then the wooden frames contained in the super are removed from the hive. The frames are removed when the honeycomb cells are fully capped with wax, which ensures that the honey is fully ripened and free of excess water. After removal of the frames, almost all honey is extracted from the combs, although some remains in the form of "comb" or "chunk" honey.

The liquid honey is exposed by "uncapping" the combs–removing the wax capping that covers the honeycomb frames. Combs are uncapped using either hot knives or power uncappers. The wax from caps is used for the production of beeswax foundation and the sale of beeswax for candles and other uses. Any remaining honey left in the caps is separated via centrifugal force by a wax spinner or mechanically squeezed out by a cap compressing system. Separation of honey from the uncapped cells is done by an "extractor" (a centrifuge, a.k.a. wax spinner). The uncapped frames are placed in the extractor where the honey is spun out of the comb. As honey flows from the extractor, it contains particles of wax, bees, and other hive matter.

After being extracted from the comb, honey may be strained to remove the largest particles of wax, propolis, bees and bee parts and other hive matter. Honey strainers are available in a wide range of mesh sizes, from 200 microns to 1,875 microns.[91] Standard sizes widely available to small beekeepers include 200-, 400- and 600-micron strainers.[92] Straining does not typically involve the direct application of heat or pressure to the honey, though beekeepers may keep processing areas at higher ambient temperatures to facilitate gravitational flow of honey. Commercial honey filters typically apply heat and pressure via pumps to filter honey more efficiently through screens and filters of less than 200 microns.[93]

---

[91] Foxhound Bee Company, "Does Filtering or Straining Honey Remove Pollen from Honey," https://blog.foxhoundbeecompany.com/does-filtering-or-straining-honey-remove-pollen-from-honey/, accessed April 20, 2022.

[92] Foxhound Bee Company, "Does Filtering or Straining Honey Remove Pollen from Honey," https://blog.foxhoundbeecompany.com/does-filtering-or-straining-honey-remove-pollen-from-honey/, accessed April 20, 2022.

[93] Russell Finex, "Filtering Liquid Honey," https://www.russellfinex.com/en/industries/food-and-beverage/filtering-honey/, accessed April 20, 2022; Alibaba.com, Honey Processing Machines, https://www.alibaba.com/product-detail/Honey-Filtering-Equipment-1-Ton-Honey_1600478438961.html?spm=a2700.7724857.topad_creative.d_title.10e83838Tpa6Sz, accessed April 20, 2022.

After straining, the honey is still considered "raw" or "unprocessed." It is then either placed in large drums and transported to an independent packer for further processing; further processed by beekeeper-packers and bottled for local sale; or left in its raw form and bottled by the beekeeper for local sale.

Virtually all U.S. packers of honey are either beekeeper-packers, which are keepers of bee colonies that extract honey from those colonies and then process or pack the honey, or independent packers that purchase honey and then process or pack that honey. A few packers are both beekeeper-packers and independent packers, but even these firms are predominantly one or the other. In addition, SHA is operated on a cooperative basis to process, pack, and market honey for its beekeeper members.

Once individual beekeepers sell their honey to packers, blending is inevitable as packers are also consolidators and combine honey from many beekeepers based on selected characteristics, such as color or floral source. Selected varieties of honey, such as higher value monofloral sources, may be segregated to take advantage of consumer preferences that exist in the market; for example, orange blossom honey. However, most honey, especially bulk honey to be used as an ingredient, is blended to achieve a desired color and flavor,[94] as well as to provide a uniform product throughout a given market and/or to lower costs.

---

[94] National Honey Board, Honey Varietals, https://honey.com/about-honey/honey-varietals, (accessed May 24, 2021).

**Colony Collapse Disorder**

In 2006, significant changes to the overwinter survivability of European honeybees occurred in North America; this phenomenon has become known as Colony Collapse Disorder (or "CCD").[95] CCD is characterized by an unexplained rapid loss of a colony's adult population, while the queen, a small number of young workers, the brood, and food stores remain in the hive.[96] Before 2006, estimates of overwinter loss rates in the United States ranged from 15 to 23 percent, and as low as 10 percent before the arrival of the honeybee mites *Acarapis woodi* and *Varroa destructor* in the mid-1980s.[97] After the identification of CCD from 2006 to 2014, estimates of overwinter loss rates range from 23 percent to 36 percent.

Underwood and van Engelsdrop argue that CCD is not a new condition, having identified descriptions and documentation of about 20 large-scale colony loss episodes, many with similar symptoms to CCD, since 1869.[98] While research into the specific cause of CCD is ongoing, the current dominant theory is that CCD is caused by multiple factors and cannot be explained by a single causal agent.[99]

Thus, commercial beekeepers had experience in replacing lost hives even prior to CCD. One of the primary methods of replacing lost hives involves splitting a healthy, full-strength, hive into two parts. The beekeeper will move a portion (typically less than 50 percent) of the brood and adult bees from a healthy hive to a new hive known as nuclei colonies ("nucs" or "splits"). A new fertilized queen (purchased from commercial queen breeders) is added to the new hive, though the new hive may be allowed to produce their own queens. A second method

---

[95] Underwood and van Engelsdorp documented nearly 20 episodes of major colony losses in the United States since the late 1860s.

[96] Underwood, Robyn, and Dennis van Engelsdorp, "Colony Collapse Disorder: Have We Seen This Before?" January 2007, https://www.researchgate.net/publication/235257051_Colony_Collapse_Disorder_Have_we_seen_this_before, accessed March 14, 2022.

[97] Rucker, Randal R. et. al., "Colony Collapse and the Economic Consequences of Bee Disease," North Carolina Center for Environmental and Resource Policy, January 2016, pp. 6–7.

[98] Underwood, Robyn, and Dennis van Engelsdorp, "Colony Collapse Disorder: Have We Seen This Before?" January 2007, https://www.researchgate.net/publication/235257051_Colony_Collapse_Disorder_Have_we_seen_this_before, accessed March 14, 2022.

[99] Rucker, Randal R. et. al., "Colony Collapse and the Economic Consequences of Bee Disease," North Carolina Center for Environmental and Resource Policy, January 2016, p 9.

is to purchase packaged bees, roughly 12,000 workers and a fertilized queen, typically from the same commercial breeders that produce fertilized queens.[100]

In contrast to much of the literature and media reports concerning CCD, an economic analysis by Rucker et. al. found that the impact of CCD on honey production, input prices, and bee colony numbers was small or not measurable based on the data available in 2016.[101] The largest measurable impact they found was on the pollination fees for almonds in California, with relatively smaller impacts on the pollination fees for early cherries and plums in California.

---

[100] Rucker, Randal R. et. al., "Colony Collapse and the Economic Consequences of Bee Disease," North Carolina Center for Environmental and Resource Policy, January 2016, pp. 10–11.

[101] Rucker, Randal R. et. al., "Colony Collapse and the Economic Consequences of Bee Disease," North Carolina Center for Environmental and Resource Policy, January 2016, p. 3.

## Domestic like product issues

The petitioners proposed in the preliminary phase of these investigations that the Commission should define a single domestic like product coextensive with the scope of these investigations. The scope does not cover processed honey that has been heated, filtered, or otherwise processed and packaged for retail, food service or industrial use by honey packers. Nor does the scope include raw honey packaged for retail sale. Instead, the scope covers raw honey in the form it is produced by beekeepers.

In the preliminary phase of these investigations the Commission defined the domestic like product to be coextensive with the scope of the investigations. It rejected Respondents' arguments that the Commission define the domestic like product more broadly to include out-of-scope processed honey or out-of-scope raw honey packaged for retail sale in its definition. It indicated that it would gather additional information concerning raw honey packaged for retail sale in any final phase investigations.[102]

Appendix D contains numeric and narrative responses summarizing U.S. producers', U.S. importers', and purchasers' responses to questions about the Commission's six-factor domestic like product analysis comparing in-scope raw honey to raw honey packaged for retail sale. A significant majority of domestic producers said the products were never interchangeable, while importers were more likely to say fully or mostly on most factors, and purchasers were divided. Respondents have not raised any arguments concerning the definition of the domestic like product in the final phase of these investigations.

---

[102] Preliminary publication, pp. 10-14.

# Part II: Conditions of competition in the U.S. market

## U.S. market characteristics

      Raw honey is sold by beekeepers and importers primarily in 55-gallon drums to packers but is also sold in larger totes and bulk tankers to end users and may be blended.[1] Packers, in turn, sell processed honey to retailers, to the food service industry, and to industrial customers as a bulk food ingredient.[2] Raw honey is typically categorized by color (white, extra light amber, amber, or dark amber), origin, and floral source.[3] Lighter colored and mildly flavored honey typically receives a higher price than darker and strongly favored honey.[4] Shipments from different country sources tended to be concentrated in particular colors, with a majority of U.S. producer and Argentine shipments being white and extra light amber; Indian and Ukrainian shipments being mostly of extra light and light amber; and Brazilian and Vietnamese shipments being mostly of light amber or amber colors (see Part IV). In addition, most shipments from Brazil were organic honey.[5]

      Over 200 U.S. beekeepers are members of Sioux Honey Association ("SHA") cooperative ("co-op"), which has packing operations in California, Iowa, and North Carolina.[6] Member beekeepers are required to transfer the vast majority of their honey production to the cooperative at a price set by the co-op and receive a share of the proceeds through several installments throughout the year. SHA also processes imported honey.[7] Large independent U.S. packers and/or processors include ***; these firms purchase honey from a variety of domestic and import sources.

      Seven of 47 U.S. producers and 12 of 23 importers reported changes to the product mix or marketing of raw honey since January 1, 2018. Among firms reporting changes, U.S. producers reported lower market prices, more imported product, more blending by packers of

---

[1] Purchasers' prehearing written statement, p. 12.

[2] Petition, pp. 10, 17, Exhibit GEN-1; Conference transcript, pp. 13-14 (Luberda), p. 18 (Kendler), pp. 151-152 (Foott); NHPDA postconference brief, p. 10; Argentine postconference brief, p. 11.

[3] Petition, p. 10.

[4] Petition, p. 9. Respondents stated that darker honeys are preferred for their robust flavors in food ingredients, while lighter colored honeys are preferred by consumers in the retail market. Conference transcript, p. 149 (Stickevers), pp. 154, 159-160 (Foott); NHPDA postconference brief, pp. 21-22. Petitioners stated that honey of different colors may be blended and sold to different end uses. Petitioners' postconference brief, p. 23.

[5] See Part IV; Conference transcript, p. 125 (Hiatt). There is minimal production of organic honey in the United States.

[6] Petition, p. 10.

[7] Conference transcript, pp. 24-25 (Coy).

less-expensive foreign honey with domestic honey, increased demand for organic and non-GMO honey, and varieties such as orange blossom, and regional preferences ("such as 100 percent Texas"). Importers reported increased demand for organic honey and non-GMO honey; growth in demand for locally produced honey;[8] marketing of raw and unfiltered honey direct-to-consumers; an emphasis on varieties such as orange blossom, coffee, and clover; and new uses for honey such as in health food products, beers, snacks, and spirits. Several importers reported that the emphasis on local and regional honey has caused large increases in demand for raw honey from highly populated regions of the country and decreased demand for the clover varietal produced in the Dakotas and Montana.

Apparent U.S. consumption of raw honey fluctuated during 2018-20. Overall, apparent U.S. consumption in 2020 was 1.8 percent higher than in 2018. Apparent consumption was 15.2 percent higher in January-September 2021 than in January-September 2020.

## U.S. purchasers

The Commission received 21 usable questionnaire responses from firms that had purchased raw honey during January 2018-September 2021.[9] [10] [11] Fifteen responding purchasers are packers/processors, four are end users that use raw honey as an ingredient (***),[12] one is a honey retailer (***), one is a distributor (***), and one is a trading firm (***). Most responding U.S. purchasers were located in the Midwest, although purchasers were represented throughout the contiguous United States. The responding purchasers represented firms in a variety of domestic industries, including honey processing and packing and end users

---

[8] Petitioners and respondents stated that demand for local honey is driven by retail end users rather than industrial food product end users. Conference transcript, p. 94 (Blumenthal), p. 154 (Foott).

[9] The following firms provided purchaser questionnaire responses: ***.

[10] Of the 21 responding purchasers, 16 purchased domestic raw honey, 10 purchased imports of the subject merchandise from Argentina, 17 from Brazil, 15 from India, and 16 from Vietnam.

[11] Nineteen purchasers indicated they had marketing/pricing knowledge of domestic product, 12 of raw honey from Argentina, 19 from Brazil, 17 from India, 18 from Vietnam, and 11 from nonsubject sources including Canada (8), Mexico (7), Uruguay (6), Thailand (4), Chile, China, New Zealand, Romania, Sierra Leone, Taiwan, and Turkey (1 each).

[12] Ingredient end users confirmed that the raw honey they purchased fell within scope because the products had not been filtered to a level that removes pollen to below 25 microns. See email from Douglas Heffner, counsel to General Mills, Bimbo Bakeries, Post Holdings, and Smithfield, April 15, 2022, EDIS Document 768676 and Purchasers' posthearing written statement, Answers to Commissioner Questions, pp. 19-22.

of honey in the production of food products. Large purchasers of raw honey include packers *** and ***. Purchasers reported that their customers include packers, retailers, food service companies, bakeries, and meat processors.

Responding purchasers also provided information regarding their top five suppliers and indicated that they purchase raw honey from a combination of U.S. beekeepers, U.S. packers, and importers.

## Channels of distribution

Responding large U.S. producers[13] and importers reported that over half of their total U.S. shipments of domestically produced raw honey were commercial shipments to firms other than co-ops, including packers, processors, and end users (table II-1). Slightly over one-third of U.S. producers' shipments were to co-ops in 2020, which decreased from over half in 2018. A small share of U.S. producers' shipments were internally consumed (i.e., processed and packaged for retail sale). A majority of importers' U.S. shipments of raw honey from Argentina, Brazil, and India in 2020 were commercial shipments to firms other than co-ops, including packers, processors, and end users. Similarly, most U.S. shipments of raw honey from Vietnam were to firms other than co-ops, such as packers, processors, and end users, but a substantial share of shipments from Vietnam were internally consumed.

---

[13] Firms that produced raw honey using 3,800 colonies or more in the United States annually in 2018, 2019, or 2020 or using 3,800 colonies or more in Jan.-Sept. 2021.

**Table II-1**
**Raw honey: Share of U.S. shipments by channel of distribution within source, by period**

Shares in percent

| Source | Channel | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|--------|---------|------|------|------|--------------|--------------|
| United States | Commercial: cooperatives | *** | *** | *** | *** | *** |
| United States | Commercial: all other | *** | *** | *** | *** | *** |
| United States | IC: retail packaging | *** | *** | *** | *** | *** |
| United States | IC: all other | *** | *** | *** | *** | *** |
| United States | Transfers | *** | *** | *** | *** | *** |
| Argentina | Commercial: cooperatives | *** | *** | *** | *** | *** |
| Argentina | Commercial: all other | *** | *** | *** | *** | *** |
| Argentina | IC: retail packaging | *** | *** | *** | *** | *** |
| Argentina | IC: all other | *** | *** | *** | *** | *** |
| Argentina | Transfers | *** | *** | *** | *** | *** |
| Brazil | Commercial: cooperatives | *** | *** | *** | *** | *** |
| Brazil | Commercial: all other | *** | *** | *** | *** | *** |
| Brazil | IC: retail packaging | *** | *** | *** | *** | *** |
| Brazil | IC: all other | *** | *** | *** | *** | *** |
| Brazil | Transfers | *** | *** | *** | *** | *** |
| India | Commercial: cooperatives | *** | *** | *** | *** | *** |
| India | Commercial: all other | *** | *** | *** | *** | *** |
| India | IC: retail packaging | *** | *** | *** | *** | *** |
| India | IC: all other | *** | *** | *** | *** | *** |
| India | Transfers | *** | *** | *** | *** | *** |
| Vietnam | Commercial: cooperatives | *** | *** | *** | *** | *** |
| Vietnam | Commercial: all other | *** | *** | *** | *** | *** |
| Vietnam | IC: retail packaging | *** | *** | *** | *** | *** |
| Vietnam | IC: all other | *** | *** | *** | *** | *** |
| Vietnam | Transfers | *** | *** | *** | *** | *** |
| Subject sources | Commercial: cooperatives | *** | *** | *** | *** | *** |
| Subject sources | Commercial: all other | *** | *** | *** | *** | *** |
| Subject sources | IC: retail packaging | *** | *** | *** | *** | *** |
| Subject sources | IC: all other | *** | *** | *** | *** | *** |
| Subject sources | Transfers | *** | *** | *** | *** | *** |
| Ukraine | Commercial: cooperatives | *** | *** | *** | *** | *** |
| Ukraine | Commercial: all other | *** | *** | *** | *** | *** |
| Ukraine | IC: retail packaging | *** | *** | *** | *** | *** |
| Ukraine | IC: all other | *** | *** | *** | *** | *** |
| Ukraine | Transfers | *** | *** | *** | *** | *** |
| All import sources | Commercial: cooperatives | *** | *** | *** | *** | *** |
| All import sources | Commercial: all other | *** | *** | *** | *** | *** |
| All import sources | IC: retail packaging | *** | *** | *** | *** | *** |
| All import sources | IC: all other | *** | *** | *** | *** | *** |
| All import sources | Transfers | *** | *** | *** | *** | *** |

Source:  Compiled from data submitted in response to Commission questionnaires.
Note:  Shares and ratios shown as "0.0" represent values greater than zero, but less than "0.05" percent.
United States data reflect only large U.S. producers. IC = Internal consumption. Transfers are to related firms.

# Geographic distribution

U.S. producers reported selling raw honey to all U.S. regions, with the Midwest the most frequently reported market (table II-2).[14] Importers reported selling to all markets in the contiguous United States. For U.S. producers, 2.4 percent of sales were within 100 miles of their production facility, 53.2 percent were between 101 and 1,000 miles, and 44.3 percent were over 1,000 miles. Importers sold 59.0 percent within 100 miles of their U.S. point of shipment, 33.0 percent between 101 and 1,000 miles, and 8.0 percent over 1,000 miles.

**Table II-2**
**Raw honey: Count of U.S. producers' and U.S. importers' presence in geographic markets, by source and by region**

Count in number of firms reporting

| Region | U.S. producers | Argentina | Brazil | India | Vietnam | Subject sources | Ukraine |
|---|---|---|---|---|---|---|---|
| Northeast | 10 | 9 | 10 | 6 | 6 | 12 | 4 |
| Midwest | 31 | 8 | 9 | 8 | 10 | 15 | 6 |
| Southeast | 8 | 10 | 5 | 7 | 9 | 13 | 2 |
| Central Southwest | 14 | 6 | 6 | 6 | 5 | 8 | 5 |
| Mountains | 14 | 2 | 5 | 2 | 1 | 9 | 2 |
| Pacific Coast | 15 | 5 | 6 | 4 | 4 | 7 | 3 |
| Other | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| All regions (except Other) | 2 | 1 | 2 | 1 | 0 | 3 | 1 |
| Reporting firms | 41 | 11 | 14 | 11 | 12 | 18 | 7 |

Source: Compiled from data submitted in response to Commission questionnaires.

Note: Other U.S. markets include AK, HI, PR, and VI.

---

[14] Half of U.S. raw honey production in 2020 was in the Midwest (see Part III).

# Supply and demand considerations

## U.S. supply

Raw honey production is limited by the number of beehives, by crop and forage areas, and the challenges presented by Varroa mites, which carry bee viruses.[15] Since the nature of beekeeping is to produce as much honey from beehives as possible, beekeepers usually operate at full capacity and cannot increase production without increasing the number of hives they use. Additional capacity in the form of new hives can be added, and Petitioner estimated that it takes three to four months for a new hive to reach capacity.[16] Petitioner stated that capacity can be increased by buying more hives, splitting hives, purchasing more queens, and buying more land.[17] Honey can be stored in inventory for up to 20 years, but the quality of the honey may degrade.[18]

Table II-3 provides a summary of the factors affecting raw honey supply from domestic and subject producers. Production in the subject countries combined was much higher than production in the United States. Argentina had the highest production quantity among the individual subject countries in 2018 and 2020. Production yields per colony varied greatly among the countries, with Vietnam and Brazil having the highest yields and India the lowest yield. U.S. production was almost entirely consumed in the U.S. home market in 2020. Data from reporting firms in subject countries indicated that the U.S. market was also the largest market for each of the subject countries. Firms generally indicated a small share of shipments to their home market, except for India in 2020. Most reporting firms in the United States and subject countries reported that they are unable to shift production between raw honey and other products.

---

[15] Conference transcript, pp. 152-153 (Foott), p. 183 (Spak); Honey from China, Inv. No. TA-406-13, USITC Publication 2715, January 1994.

[16] Petitioner posthearing brief, Exh. 1 Answers to Commissioner Questions, p. 46.

[17] Hearing transcript, pp. 19, 31 (Hiatt, Rodenberg).

[18] Hearing transcript, p. 91 (Spears).

**Table II-3**
**Raw honey:  Supply factors that affect the ability to increase shipments to the U.S. market, by factor and by country**

Quantity in 1,000 pounds; yield in pounds per colony; ratios in percent

| Factor | Measure | United States | Argentina | Brazil | India | Vietnam | Subject suppliers |
|---|---|---|---|---|---|---|---|
| Production 2018 | Quantity | 154,008 | 175,197 | 93,185 | 137,121 | 45,007 | 450,510 |
| Production 2020 | Quantity | 147,594 | 164,030 | 113,556 | 136,977 | 47,399 | 461,963 |
| Production yield 2018 | Yield | 54.5 | 58.9 | 91.4 | 11.3 | 177.4 | 27.5 |
| Production yield 2020 | Yield | 54.5 | 55.0 | 110.1 | 11.2 | 187.3 | 28.0 |
| Ending inventories to total shipments 2018 | Ratio | *** | *** | *** | *** | *** | *** |
| Ending inventories to total shipments 2020 | Ratio | *** | *** | *** | *** | *** | *** |
| Home market 2020 | Ratio | *** | *** | *** | *** | *** | *** |
| Non-U.S. export markets 2020 | Ratio | *** | *** | *** | *** | *** | *** |
| Ability to shift production | Count | *** | *** | *** | *** | *** | *** |

Source: Production and yield data are from USDA for the United States and from FAO for subject countries (see Parts III and VII). All other data are compiled from data submitted in response to Commission questionnaires.

Note: These data for the U.S. market include large U.S. producers only.

Note: Responding U.S. producers accounted for less than one-third of U.S. production of raw honey in 2020. Responding foreign producer/exporter firms accounted for almost all U.S. imports of raw honey from Argentina, more than 75 percent of imports from Brazil, all imports from India, and more than 75 percent of imports from Vietnam. For additional data on the number of responding firms and their share of U.S. production and of U.S. imports from each subject country, please refer to Part I, "Summary Data and Data Sources."

**Domestic production**

Based on available information, U.S. producers of raw honey have the ability to respond to changes in demand with small changes in the quantity of shipments of U.S.-produced raw honey to the U.S. market. The main contributing factor to this degree of responsiveness of supply is increased inventories. Factors mitigating responsiveness of supply include decreased production, limited capacity and a limited ability to increase capacity in the short-term, an inability to shift shipments from alternate markets, and a limited ability to shift production to or from alternate products.

U.S. production declined and production yield did not change between 2018 and 2020. Most firms reported that they were unable to produce other products using the same equipment as raw honey. A few firms reported that they use the same labor for raw honey production, pollination services, mated queens, and wax.

Eleven of 20 responding purchasers reported that the availability of U.S.-produced raw honey had changed since 2018, citing increased demand with limited overall supply and

declining production. One *** purchaser *** indicated that demand for U.S. honey increased, but the available supply decreased, and another *** purchaser *** reported that it is forecasting a record low production in 2022 due to drought across many states. Purchaser *** reported that "while there has not been significant change in availability of raw honey... the United States only produces enough honey to satisfy demand for 25 percent of total U.S. consumption. That honey is sold through the highest margin channels in the market and meets retail consumer expectations of color and flavor."

**Imports from subject countries**

Based on available information, producers of raw honey in subject countries have the ability to respond to changes in demand with moderate changes in the quantity of shipments of raw honey to the U.S. market. The main contributing factors to this degree of responsiveness of supply are slightly increased overall production in subject countries and some ability for producers in subject countries to shift shipments from alternate markets. Factors mitigating responsiveness of supply include decreased production and a limited ability to shift production to or from alternate products.

Overall production in subject countries increased by 2.5 percent from 2018 to 2020. Production in Brazil increased by over 20 percent and production in Vietnam increased by approximately 5 percent, while production in Argentina decreased by 6 percent and production in India decreased by 0.1 percent. Production yield for combined subject sources remained constant. Production yield decreased for producers in Argentina and India (decreases less than 7 percent), while yields increased for Brazil (21 percent) and Vietnam (6 percent). Responding exporter/foreign producers reported that the U.S. market was their largest country market for all subject countries in 2020. Exports to third-country markets were a small share of shipments for India and Vietnam (less than 7 percent), a larger share for Argentina and Brazil (approximately 40 and 20 percent, respectively). Very few responding firms in subject countries reported being able to shift production from raw honey to other products.

Most U.S. purchasers reported that there were no changes in supply from subject sources since 2018. Some purchasers reported fluctuating availability of raw honey due to weather and harvest conditions both in the United States and in subject countries and COVID-related supply chain issues that affected availability.

**Imports from nonsubject sources**

Imports of raw honey from nonsubject sources accounted for 15.3 percent of total U.S. imports in 2020, a reduction from 21.9 percent in 2018.[19] The largest sources of imports from nonsubject sources during 2018-20 were New Zealand, Canada, and Mexico (in order of size). Combined, these countries accounted for approximately 43.7 percent of imports from nonsubject sources in 2020, by quantity.[20]

**Supply constraints**

Nearly all responding U.S. producers (43 of 46) and most responding importers (15 of 24) and purchasers (13 of 20) reported no supply constraints prior to the filing of the petition on April 21, 2021, although as noted previously, raw honey production is limited by certain capacity constraints (see "Domestic production"). Of the firms that reported experiencing supply constraints, U.S. producers reported being constrained by the production of their bees and adverse climate conditions. Importers reported experiencing shipment delays due to adverse climate conditions around the world, container shortages, labor shortages, and increased transport costs. Importer *** reported supply constraints resulting from insufficient quantities of orange blossom and mesquite honey from Texas and white and extra light amber honey from the northern Midwest. Purchasers primarily reported shipping delays and increased logistics costs. Purchaser *** reported several limitations on availability since 2020 including poor crop performance in the United States, and shipping delays and lockdowns in India and Vietnam.

When asked about supply constraints after the filing of the petition on April 21, 2021, 6 U.S. producers and 14 importers reported that they refused or declined to supply due to adverse climate conditions and increased logistics costs and delays. Fifteen of 20 responding purchasers reported being declined supply after the filing of the petition citing SHA's inability to supply dark amber honey, COVID-related disruptions such as logistics, labor shortages, and lockdowns, and uncertainty in the market resulting from the petition. Four purchasers reported that SHA declared a force majeure and was unable to fill orders in 2021.[21] Purchaser *** reported that following the filing of the petition, suppliers have been unable to provide reliable or consistent "forward" pricing which has led to supply constraints.

---

[19] Based on official statistics (see Part IV, table IV-2).

[20] Based on official statistics.

[21] Petitioner SHA stated that this was a short-term issue, not because of any market shortage of domestic or imported raw honey, but rather due to ***. Petitioner posthearing brief, Exh. 1 Answers to Commissioner Questions, p. 26.

**New suppliers**

Most purchasers reported that no new suppliers entered the U.S. market since January 1, 2018. Four of 21 purchasers indicated that new suppliers entered the market since January 1, 2018. Two purchasers, ***, reported Prairie Imports as a new supplier, and the remaining two purchasers reported that new suppliers regularly enter the market.

## U.S. demand

Based on available information, the overall demand for raw honey and downstream products (processed honey and honey-sweetened food products) is likely to experience small changes in response to changes in price. The main contributing factors to the low degree of responsiveness of demand are the limited substitutability of honey with other sweeteners for both retail consumers and in the food service sector, and moderate end-use cost share as a food ingredient.

While U.S. production of honey has remained relatively steady, U.S. demand for honey has gradually increased over the past few decades.[22] During the preliminary phase of these investigations, petitioners and respondents stated that demand for honey in the retail sector had remained flat but strong, and that demand had increased in non-retail sectors.[23] This trend reflects growing health concerns regarding sugar and artificial sweeteners, resulting in a substitution towards natural sweeteners like honey.[24] Moreover, much of the consumer demand for honey is driven by its perceived health benefits, including its potential to combat local allergens and boost immunity.[25] These health benefits reportedly have contributed to increased demand in raw, local, and organic honey.[26] Fourteen of 20 responding purchasers reported that the demand for end uses of honey increased and the remaining 6 purchasers reported that the demand for end uses fluctuated. All responding purchasers reported that changes in the demand of end uses affected the demand for raw honey. Two purchasers

---

[22] USDA Economic Research Service, Food Availability (Per Capita) Data System, Sugar and sweeteners (added), https://www.ers.usda.gov/webdocs/DataFiles/50472/sugar.xls?v=1561.1, accessed March 10, 2022.

[23] Conference transcript, pp. 89-90 (Blumenthal, Mammen); Petitioners' postconference brief, pp. 15-16; NHPDA postconference brief, pp. 11-12.

[24] Conference transcript, p. 17 (Kendler); National Honey Board. "Market Research Overview," https://honey.com/honey-industry/research/market-research, accessed May 21, 2021.

[25] Healthline, "Honey for Allergies," https://www.healthline.com/health/allergies/honey-remedy, accessed May 21, 2021.

[26] NHPDA postconference brief, pp. 14-17.

specifically cited the increase in working and learning from home in the increased demand for end uses such as \*\*\*.

**End uses and cost share**

U.S. demand for raw honey depends on the demand for U.S.-produced downstream products as well as the demand for processed honey in the retail sector. Raw honey accounts for almost all of the cost of processed honey for retail but processed honey accounts for a small cost share of end-use products when used as an ingredient. Responding firms reported a wide range of reported cost shares for honey when used as an ingredient (ranging from 1 percent to 99 percent). Purchasers reporting specific end uses such as cereals, baked goods, \*\*\*, and \*\*\*, reported that raw honey accounted for less than 10 percent of the total cost. Most responding U.S. producers, importers, and purchasers reported that raw honey costs accounted for 70 percent or greater of total cost of honey sold for retail and used in food service, with some exceptions. [27] Approximately one-third of responding firms reported that 95 percent or more of total cost of honey sold for retail was attributed to raw honey.

*Honey color and flavor*

Firms were asked which colors of honey (white, extra light, light amber, or amber) could be used in retail, ingredient, and food service applications (table II-4). U.S. producers generally reported that all colors could be used for any application, although many producers acknowledged that generally lighter colored honeys are preferable in retail applications for the lighter and mellow taste. Importers and purchasers reported that certain colors tend to be used in certain applications. Specifically, most responding importers and purchasers reported that typically the darker colors of honey (light amber and amber) are used as ingredients, and that extra light or light amber honey is typically used in food service. Respondents stated that the world's market for darker honey falls in the light amber category and any prices for amber will follow those of light amber. [28]

Among purchasers, most packers reported that all four color types (white, extra light amber, light amber, and amber honey) could be used in retail end uses. Most packers and ingredient end users reported that light amber honey could be used in ingredient applications,

---

[27] Two U.S. producers reported that raw honey accounted for 14-40 percent of the total cost of honey sold for retail. Four importers reported that raw honey accounted for 20-69 percent and three purchasers reported that raw honey accounted for 60-69 percent of the total cost of honey sold for retail.

[28] Hearing transcript, pp. 222-23 (Nubern).

and most packers reported that extra light or light amber honey could be used in food service applications. Ingredient end user *** reported that "amber, inclusive of dark amber, honey characteristics are essential to ***" of *** and continued that although it uses extra light amber, light amber, and amber honeys, these are not interchangeable. Its use of a certain honey color is driven by "pre-established customer specifications that originated from floral selections for a specific taste profile. Purchaser *** stated that its honey color preference is limited ***."

Ingredient end users stated that their specifications and recipes do not change often: Bimbo Bakeries has not changed its specifications for over seven years, and General Mills and Post have not changed their formulations for 10 years.[29] General Mills and Post stated that only in extreme circumstances and cost increases would they risk changing their ingredients; these purchasers have continued to purchase amber honey from Vietnam despite the 400 percent provisional duty assessed during the preliminary determination.[30] Ingredient end users stated that flavor specifications can be more subjective than color, so while flavor profiles may not be spelled out in specifications, they may send samples to suppliers so that flavor can be matched, or will describe flavors, such as ***.[31] Petitioner SHA shared a sample flavor specification from ***.[32]

Petitioner stated that prices for one color influence prices of other colors, citing a study by the National Honey Board that stated that prices of white honey, extra light amber honey, and amber honey were correlated with values ranging between 0.98 and 0.99.[33] Respondent Impex stated that there is approximately a $50 per metric ton price difference between colors and that prices for the various colors generally move in tandem.[34]

---

[29] Hearing transcript, pp. 229, 231, 234 (Bertrand, Bash, Crown), Purchasers' posthearing written statement, Answers to Commissioner Questions, pp. 1-3.
[30] Purchasers' posthearing written statement, pp. 10-11.
[31] Purchasers' posthearing written statement, Answers to Commissioner Questions, pp. 5-7.
[32] Petitioner posthearing brief, p. 14.
[33] Petitioner posthearing brief, Exh. 1 Answers to Commissioner Questions, p. 16.
[34] Hearing transcript, pp. 274-54 (Martin).

**Table II-4**

**Raw honey:  Color of raw honey used in end use applications, by firm type and end use**

Count in number of firms reporting

| End use | Firm type | White | Extra light | Light amber | Amber |
|---|---|---|---|---|---|
| Retail | U.S. producers | 30 | 32 | 34 | 24 |
| Retail | Importers | 17 | 17 | 11 | 1 |
| Retail | Purchasers | 14 | 14 | 10 | 2 |
| Ingredients | U.S. producers | 24 | 24 | 29 | 28 |
| Ingredients | Importers | 2 | 7 | 16 | 16 |
| Ingredients | Purchasers | 5 | 8 | 16 | 17 |
| Food service | U.S. producers | 26 | 27 | 29 | 27 |
| Food service | Importers | 4 | 11 | 16 | 4 |
| Food service | Purchasers | 5 | 10 | 12 | 7 |

Source: Compiled from data submitted in response to Commission questionnaires.

U.S. producers, importers, and purchasers were also asked if the different colors of raw honey are interchangeable (i.e., can they physically be used in the same applications), shown in tables II-5 through II-7. The large majority of U.S. producers reported that all colors of raw honey can be used interchangeably, while the large majority importers and purchasers reported that different colors of honey may only sometimes or never be used interchangeably. Generally, importers and purchasers reported that end use applications and customer specifications constrain interchangeability of different colors. Colors on the opposite ends of the continuum (i.e., white raw honey compared to amber raw honey) have the least interchangeability according to importers and purchasers, but there is sometimes interchangeability between colors that are closer together on the spectrum (i.e., white compared to extra light amber, extra light amber compared to light amber, or light amber compared to amber).

**Table II-5**
**Raw honey:  Interchangeability between different colors of raw honey reported by U.S. producers, by color pair**

Count in number of firms reporting

| Color pair | Always | Frequently | Sometimes | Never |
|---|---|---|---|---|
| White vs. Extra light amber | 35 | 5 | 4 | 1 |
| White vs. Light amber | 35 | 4 | 5 | 1 |
| White vs. Amber | 33 | 4 | 5 | 3 |
| Extra light amber vs. Light amber | 34 | 5 | 5 | 0 |
| Extra light amber vs. Amber | 33 | 4 | 6 | 1 |
| Light amber vs. Amber | 33 | 5 | 6 | 0 |

Source:  Compiled from data submitted in response to Commission questionnaires.

**Table II-6**
**Raw honey:  Interchangeability between different colors of raw honey reported by U.S. importers, by color pair**

Count in number of firms reporting

| Color pair | Always | Frequently | Sometimes | Never |
|---|---|---|---|---|
| White vs. Extra light amber | 1 | 5 | 9 | 7 |
| White vs. Light amber | 1 | 0 | 7 | 14 |
| White vs. Amber | 0 | 0 | 1 | 21 |
| Extra light amber vs. Light amber | 1 | 4 | 13 | 3 |
| Extra light amber vs. Amber | 0 | 1 | 5 | 15 |
| Light amber vs. Amber | 1 | 4 | 7 | 9 |

Source:  Compiled from data submitted in response to Commission questionnaires.

**Table II-7**
**Raw honey:  Interchangeability between different colors of raw honey reported by U.S. purchasers, by color pair**

Count in number of firms reporting

| Color pair | Always | Frequently | Sometimes | Never |
|---|---|---|---|---|
| White vs. Extra light amber | 2 | 1 | 13 | 3 |
| White vs. Light amber | 1 | 2 | 7 | 10 |
| White vs. Amber | 1 | 1 | 3 | 15 |
| Extra light amber vs. Light amber | 1 | 3 | 12 | 5 |
| Extra light amber vs. Amber | 1 | 1 | 5 | 14 |
| Light amber vs. Amber | 1 | 3 | 13 | 4 |

Source:  Compiled from data submitted in response to Commission questionnaires.

Purchaser *** stated that "Color rarely plays a role in our acceptance or rejection of a load of honey - unless it deviates a great deal from what we expect the floral to be (color range).  The color may be part of our specifications, but they operate in ranges. These ranges are designed as an indirect way of assuring the quality of the honey, florals, and taste are met. We understand that certain florals will fall within a color range. The reason why it is sometimes interchangeable is that the underlying floral can straddle different color ranges." Purchaser Bimbo Bakeries stated that *** and added that it "uses light amber and amber honey as an industrial ingredient because of the color and flavor profiles enhanced during the Maillard reaction of our baking. The Maillard reaction between the amino acids in reducing sugars gives the browned food its distinctive flavor. White and extra-light amber honey do not impart the same distinctive browning and flavor."[35] Other purchasers stated that when colors are identified in customer specifications, different colors are never interchangeable. Importer and purchaser *** stated that "From a production standpoint, blending of different honey colors is acceptable as long as the color spec

---

[35] Transcript, pp. 195-96 (Bertrand).

of the final product is maintained {but that floral} source is the most important factor when evaluating the differences in honey. The nectar from the flower will impact color, moisture, sugar content, taste, aroma, and many other characteristics." Importer and purchaser *** reported that color interchangeability depends on the application, illustrating that a consumer wouldn't want to replace white honey with amber honey if putting on a biscuit, and that amber honey might be preferred to white honey when brewing a dark beer.

Petitioner stated that there is competition between colors and that customers are accepting a wider range of colors in both lighter and darker colors.[36]

### Organic and conventional raw honey

Firms were also asked if end uses for organic and conventional raw honey differ. Most U.S. producers (39 of 44) reported that they did not, while most importers (19 of 21) and purchasers (16 of 20) reported that they did. Generally, firms reported that organic honey is required for any end use products that are marketed as organic. Organic honey is used in retail, food service and industrial segments, and according to importer ***, there are markets for organic raw honey in "all" segments. Organic raw honey may be used in conventional end uses, but conventional honey may not be used in any product that is certified organic.

Approximately 20 percent of U.S. shipments in 2020 were of organic raw honey (for more information see Part IV, table IV-11). Purchasers were asked to estimate the share of their purchases that were organic and other than organic in 2020, and to explain any preferences or specific end uses that require organic raw honey. Eighteen purchasers reported purchasing organic raw honey in 2020, 17 of which reported purchasing organic raw honey from Brazil, ranging from 13 percent to 100 percent of their total purchases of product from Brazil. Purchasers cited labeling requirements and customer preferences as reasons for using organic honey in end-use products.

Four purchasers reported purchasing organic raw honey from India, ranging from 4 percent to 38 percent of their total purchases from India. Purchaser *** reported that India is the largest supplier of conventional non-GMO project verified honey and a secondary supplier of organic honey, relative to Brazil. It added that "these honeys are used by food manufacturers that produce end products that are organic and non-GMO project verified." One purchaser *** reported that organic raw honey from Argentina accounted for *** percent of its total purchases from Argentina in 2020, and that Argentina produces some organic clover honey that its customers prefer.

---

[36] Hearing transcript, p. 111 (Luberda).

Petitioner argues that honey is "an intrinsically non-GMO single-ingredient product, and that because all honey is non-GMO honey, a requirement to purchase only non-GMO products cannot be an important factor in honey purchasing decisions."[37]

Respondents stated that organic honey from Brazil is very robust and not best suited for the retail segment, which respondents argue is where raw honey can be sold at higher prices.[38]

### *Blending and processing*

Almost all honey is blended, and even a pure U.S.-produced raw honey is likely a blend of multiple U.S. beekeepers' honey.[39] Purchasers may buy honey from importers or packers that is a blend from multiple colors, floral sources, and country sources and may include both organic and non-organic honeys. Ingredient end user General Mills stated that blending helps with crystallization issues and to provide consistency to smooth any year-to-year variation.[40]

Petitioner stated that private label honey represents about half of processed honey sold at the retail level, is largely sold as a generic product, and most are blends from multiple countries.[41] However respondent Barkman Honey stated that some of its customers with private label brands will only sell U.S.-produced honey.[42] Petitioner argued that private label accounts are driven by price and will blend U.S. raw honey with imported raw honey to reduce price.[43]

Raw honey, as defined by the scope, has not been filtered to a level that results in the removal of most or all of the pollen, e.g., a level that removes pollen to below 25 microns. Petitioner noted that honey that is sold in retail as "raw and unfiltered" honey is still processed, but rather than reducing to 25 microns like filtered raw honey, it only filters down to 150 microns and leaves in pollen.[44] Petitioner stated that demand for the "raw and unfiltered" honey is the fastest growing sector within retail.[45]

---

[37] Petitioner prehearing brief, pp. 43-44.
[38] Hearing transcript, p. 300 (Wenger).
[39] Hearing transcript, p. 169 (Blumenthal).
[40] Hearing transcript, pp. 224, 226, 290 (Bash).
[41] Hearing transcript, p. 22 (Blumenthal).
[42] Hearing transcript, p. 182 (Wenger).
[43] Hearing transcript, p. 23 (Blumenthal).
[44] Hearing transcript, p. 70 (Blumenthal).
[45] Hearing transcript, p. 144 (Blumenthal).

*Country-of-origin labeling*

According to Petitioner, U.S.-produced raw honey does not need to be labeled. However, if the honey is imported from another source or includes honeys from foreign sources in a blend, it requires labeling.[46] If a label indicates that it is "U.S. Grade A" but includes honeys from non-U.S. sources, these countries-of-origin are required to be presented adjacent to the U.S. labeling and in a similar font.[47]

**Business cycles**

Most U.S. producers (34 of 45) reported that raw honey is not subject to business cycles while most importers (19 of 23) and purchasers (17 of 20) reported that it is subject to business cycles. Firms reporting that raw honey is subject to business cycles reported that raw honey production is seasonal, with production occurring in summer and is dependent on the weather and the health of the hives and environment, and that the business cycle follows the crop cycles of the floral sources. One U.S. producer reported that "beekeeping relies on the harmony of good hives, good weather, good environment, and good logistics." Importer and purchaser *** reported that while honey does not spoil as other {agricultural products} might, the seasonal nature of production drives peak purchasing activity within the first 6-9 months following crop production, followed by a period of reduced activity as most supply has been exhausted. Importers reported that tropical countries have a longer production season and that countries in the southern hemisphere have production during the winter whereas U.S. production occurs in the summer with product available in late fall.

Most U.S. producers (32 of 45) and importers (16 of 23) reported that raw honey is not subject to distinct conditions of competition, and 9 of 20 purchasers also reported that it is not subject to distinct conditions of competition. Several U.S. producers cited import competition as a distinct condition. Conditions reported by importers include the long shelf life/storability of honey, such that producers can hold onto inventory for long periods of time in anticipation of price changes; varying harvest amounts and weather cycles which impact the available supply from each country; lower consumer demand in summer than in winter; and lack of "sophisticated price discovery tools like futures markets." Purchaser *** reported that certification status is critical in the market, including certified organic or non-GMO project verified. Purchaser *** reported that SHA exerts pricing control on a large portion of U.S.-produced honey, which influences U.S. honey prices.

---

[46] Hearing transcript, p. 86 (Luberda).
[47] Hearing transcript, p. 87 (Blumenthal).

Most U.S. producers (20 of 35) reported that there had not been a change to business cycles or conditions of competition since 2018; most importers (13 of 22) and purchasers (13 of 20) reported that there had. U.S. producers reporting that there had been a change since 2018 cited increased import competition, and U.S. producer *** reported that although it was hurt by higher shipping costs, these increased costs also affected imports and helped domestic prices to rise. Importers cited increased demand, increased logistics costs, and weather changes. Purchasers reported increased shipping costs, unpredictable production, transportation, and supply challenges. Purchaser *** reported that "abundant" foreign supply of honey helps to fill a supply gap in the United States for light amber and amber honey, which is not produced domestically in commercially viable quantities. Purchaser *** reported that there is increased consumer demand for locally produced products. Purchasers *** submitted statements describing the impact and anticipated effects of the current crisis in Ukraine, stating that "the elimination of Ukraine as a global honey supplier has left a vacuum in the market both in the United States and Europe that domestic suppliers simply cannot fill because they do not produce amber honey used as an ingredient, and further, because they have made strategic choices to use their bee populations for pollination services rather than honey production."[48]

**Demand trends**

Most responding firms reported an increase in both U.S. demand and foreign demand for raw honey since January 1, 2018 (table II-8). Beyond general population growth, U.S. producers cited two main reasons for increases in both U.S. and foreign demand for honey: perceived health benefits and the desire to "eat local." Importers and purchasers cited similar reasons for increases in U.S. and foreign demand for honey, including population growth, perceived health/nutrition benefits of honey, and the impact of the COVID-19 pandemic. Importers and purchasers were asked about overall demand trends, and about demand trends in retail, ingredient, and food service markets. In all markets, most importers and purchasers reported that demand trends increased similarly to overall demand.

---

[48] Purchaser *** Questionnaire Addendum, March 18, 2022 and purchaser *** Questionnaire Addendum, March 25, 2022.

**Table II-8**
**Raw honey:  Count of firms' responses regarding overall domestic and foreign demand, by firm type and by market**

Count in number of firms reporting

| Market | Firm type | Increase | No change | Decrease | Fluctuate |
|---|---|---|---|---|---|
| Domestic demand: Overall | U.S. producers | 27 | 1 | 2 | 5 |
| Domestic demand: Overall | Importers | 21 | 1 | 0 | 1 |
| Domestic demand: Retail | Importers | 18 | 2 | 0 | 0 |
| Domestic demand: Ingredient | Importers | 17 | 1 | 0 | 1 |
| Domestic demand: Food service | Importers | 11 | 1 | 6 | 1 |
| Domestic demand: Overall | Purchasers | 13 | 0 | 0 | 2 |
| Domestic demand: Retail | Purchasers | 12 | 0 | 0 | 0 |
| Domestic demand: Ingredient | Purchasers | 13 | 0 | 1 | 1 |
| Domestic demand: Food service | Purchasers | 5 | 0 | 1 | 6 |
| Foreign demand: Overall | U.S. producers | 4 | 2 | 0 | 2 |
| Foreign demand: Overall | Importers | 8 | 0 | 0 | 0 |
| Foreign demand: Retail | Importers | 5 | 0 | 0 | 0 |
| Foreign demand: Ingredient | Importers | 4 | 0 | 0 | 1 |
| Foreign demand: Food service | Importers | 1 | 1 | 2 | 1 |
| Foreign demand: Overall | Purchasers | 1 | 0 | 0 | 0 |
| Foreign demand: Retail | Purchasers | 0 | 0 | 0 | 0 |
| Foreign demand: Ingredient | Purchasers | 1 | 0 | 0 | 0 |
| Foreign demand: Food service | Purchasers | 0 | 0 | 0 | 0 |
| Demand for end use products | Purchasers | 14 | 0 | 0 | 6 |

Source: Compiled from data submitted in response to Commission questionnaires.

**Substitute products**

Substitutes for raw honey are somewhat limited and can depend on the end use. Firms were asked if other products can be substituted for raw honey in the production of packaged honey and if other products can be substituted for raw honey by the consumer for raw honey or packaged honey. Virtually all U.S. producers (46 of 47), importers (22 of 22), and purchasers (17 of 18) reported that other products cannot be substituted for raw honey in the production of packaged honey. Most U.S. producers (42 of 47) but a minority of importers (8 of 22) and purchasers (7 of 19) reported that other products cannot be substituted by the consumer for raw honey or packaged honey. Among firms that identified substitutes for raw honey or packaged honey by the consumer, products listed included sugar, sweetening syrups (including maple, corn, and agave), and artificial sweeteners. No U.S. producers, slightly more than half of responding importers, and about half of responding purchasers reported that changes in the price of substitutes had affected the price for raw honey, generally indicating that alternative sweeteners were lower priced than raw honey. Firms noted that substitution can take place

among consumers, restaurants, and industrial users, and that when honey prices rise, these users may switch to less expensive sweeteners.

Purchaser *** stated that when used as an ingredient, "alternate sweeteners usually replace honey in this way: Honey will be the first sweetener by volume, and other sweeteners will be added as a second, third and fourth sweetener. The retail customer purchasing the product…will read the ingredient portion of the label and interpret it as honey being the major sweetener when, in fact, the alternate sweeteners… constitute the vast majority of the sweeteners used in the product. Obviously, the higher the price of honey gets compared to its sweetener substitutes, the more likely this scenario happens."

## Substitutability issues

The degree of substitution between domestic and imported raw honey depends upon such factors as relative prices, quality (e.g., grade standards, defect rates, etc.), and conditions of sale (e.g., price discounts/rebates, lead times between order and delivery dates, reliability of supply, product services, etc.). Based on available data, staff believes that there is a moderate degree of substitutability between domestically produced raw honey and raw honey imported from subject sources.[49] [50] Factors contributing to this level of substitutability include similar quality and lead times for raw honey from inventory. Factors reducing substitutability include strong country preferences by purchasers, depending on availability of certain floral sources, honey colors, and certifications in different countries. Specifically, darker honey color and flavor profiles of raw honey imported from subject sources, as well as organic and non-GMO certifications, may be less substitutable with U.S.-produced raw honey and raw honey from subject sources.

**Purchaser decisions based on source**

As shown in table II-9, most purchasers always or usually make purchasing decisions based on the producer or country of origin. Purchasers reported that most of their customers

---

[49] The degree of substitution between domestic and imported raw honey depends upon the extent of product differentiation between the domestic and imported products and reflects how easily purchasers can switch from domestically produced raw honey to the raw honey imported from subject countries (or vice versa) when prices change. The degree of substitution may include such factors as relative prices (discounts/rebates), quality differences (e.g., grade standards, defect rates, etc.), and differences in sales conditions (e.g., lead times between order and delivery dates, reliability of supply, product services, etc.).

[50] Petitioner argued that there is a moderate-to-high degree of substitutability between domestically produced raw honey and raw honey imported from subject sources. Petitioner prehearing brief, pp. 34-35.

never make purchasing decisions based on producer but a plurality of responding purchasers reported that their customers sometimes make purchasing decisions based on the country of origin. Most purchasers (including all four end users) reported that they or their customers always make decisions based on the manufacturer cited testing requirements, certifications such as True Source, [51] and approved lists of suppliers for quality. Responding end user purchasers *** source from countries that supply light amber or amber honeys. Other purchasers reported sourcing from countries that had True Source certifications, sourcing darker color honey for ingredient applications and certain customer specifications. Purchaser *** reported that if its customers require organic honey, it must source from Brazil or nonsubject source Mexico; if customers are using honey in industrial applications, it sources from Asia; and if customers are purchasing table honey, it will source from Argentina or Europe.

**Table II-9**
**Raw honey:  Purchasing decisions based on producer and country of origin**

Count in number of firms reporting

| Firm making decision | Decision based on | Always | Usually | Sometimes | Never |
|---|---|---|---|---|---|
| Purchaser | Producer | 10 | 3 | 4 | 4 |
| Customer | Producer | 3 | 2 | 4 | 10 |
| Purchaser | Country | 11 | 8 | 2 | 0 |
| Customer | Country | 5 | 4 | 7 | 1 |

Source: Compiled from data submitted in response to Commission questionnaires.

Responding purchasers reported having a country preference for their honey purchases due to color and flavor variations, specific specifications and certifications, and organic availability. Purchaser *** reported that its customers have specified Brazil and nonsubject source Uruguay for organic uses, U.S.-produced honey for white and extra light purposes, and India and Vietnam for darker, bolder flavors for ingredient use. Purchaser *** similarly reported that clover-based honey in the United States and Argentina provides a light and sweet taste profile while India supplies extra light amber honey with mild

---

[51] True Source Certified voluntary system of traceability for those participants who wish to demonstrate through an independent 3rd party that their sourcing practices are in full compliance with requirements of the True Source Certified Standard. This system permits honey to be tracked from the consumer back through the supply chain to the country of origin and the Beekeeper that harvested the honey from the beehive. True Source Honey, True Source Certified Standards V6.1, January 1, 2021. https://truesourcehoney.com/true-source-certified/standards-2021-01-01.pdf, accessed May 27, 2021.
Purchaser *** reported that many U.S. producers are not True Source Honey members, which limits its ability to source domestically.

flavors, and Brazil and Vietnam are known for bolder honey flavors associated with darker honeys. Purchaser *** reported that as a ***, its customer preferences are codified in their product specifications. These product specifications establish exact sources/origins of raw honey and the proportions at which they are permitted to be used in the packaged finished goods.[52] Lastly, purchaser *** reported that it has *** that require light amber honey because "it is only color of honey available in adequate commercially available quantities." It reported that it decreased its purchases of honey from the United States in favor of countries with tropical climates where the conditions allow for a greater abundance of light amber honey production. The firm also noted that it does not purchase from China or other countries associated with adulterated honey supply.

Twenty of 21 responding purchasers reported that certain grades, types, sizes, and/or colors of raw honey are only available from certain country sources. Purchasers reported that organic raw honey is only available from Brazil and small quantities from India, and stronger flavors and darker colors are available from India and Vietnam. Purchaser *** reported that floral source is the most important factor when evaluating honey, and floral sources vary by country source.

**Importance of purchasing domestic product**

Fifteen of 21 purchasers reported that most or all of their purchases did not require purchasing U.S.-produced product. Two purchasers reported that domestic product was required by law (for 20 and 100 percent of their purchases), 11 reported it was required by their customers (generally for 30 percent of their purchases or less), and 4 reported other preferences for domestic product. Reasons cited for preferring domestic product included: food labeling requirements or brand claims.

**Most important purchase factors**

As shown in table II-10, the most often cited top three factors firms consider in their purchasing decisions for raw honey were price/cost (14 firms); customer specifications or required certifications, such as flavor, color, organic, or True Source certified (12 firms);

---

[52] According to ***.

availability/seasonality and quality (11 firms each);[53] and origin requirements (4 firms). Quality was the most frequently cited first-most important factor (cited by 7 firms), customer specifications or required certifications was the most frequently reported second-most important factor (7 firms); and price/cost was the most frequently reported third-most important factor (10 firms). Respondent NHPDA provided email exchanges showing that raw honey purchasers, ***, consider country of origin, floral sources, and regions within a particular country, when considering sourcing decisions.[54]

**Table II-10**
**Raw honey: Count of ranking of factors used in purchasing decisions as reported by purchasers, by factor**

Count in number of firms reporting

| Factor | First | Second | Third | Total |
|---|---|---|---|---|
| Price / Cost | 2 | 2 | 10 | 14 |
| Specifications/certifications | 5 | 7 | 0 | 12 |
| Quality | 7 | 3 | 1 | 11 |
| Availability / Seasonality | 2 | 6 | 3 | 11 |
| Origin requirements | 2 | 0 | 2 | 4 |
| All other factors | 2 | 3 | 5 | NA |

Source: Compiled from data submitted in response to Commission questionnaires.

Note: Other factors include unadulterated (2 firms), service (2 firms), extension of credit, on-time deliveries, suppliers' market expertise, and glyphosate levels.

Most purchasers (12 of 21) reported that they only sometimes purchase the lowest-priced product. Two purchasers reported always, four reported usually, and three reported never purchasing the lowest priced product.

**Importance of specified purchase factors**

Purchasers were asked to rate the importance of 21 factors in their purchasing decisions (table II-11). The factors rated as very important by more than half of responding purchasers were availability (21 firms), reliability of supply (20 firms), quality meets industry standards (19 firms), honey color and honey favor (18 firms each), product consistency (17 firms), price (15 firms), organic (14 firms), delivery time (13 firms), payment terms (12 firms), delivery terms and quality exceeds industry standards (11 firms).

---

[53] Purchasers listed quality characteristics including moisture, granulation, taste, lack of pesticides and lead, pollen, free of adulterants and pesticides, fructose glucose rations, enzyme levels, 5-hydroxymethylfurfural (HMF) levels, and other technical measurements.
[54] Respondent NHPDA posthearing brief, p. 10.

**Table II-11**
**Raw honey:  Count of importance of purchase factors, as reported by U.S. purchasers, by factor**

Count in number of firms reporting

| Factor | Very important | Somewhat important | Not important |
|---|---|---|---|
| Availability | 21 | 0 | 0 |
| Crystallization | 4 | 9 | 7 |
| Delivery terms | 11 | 10 | 0 |
| Delivery time | 13 | 8 | 0 |
| Discounts offered | 4 | 4 | 12 |
| Honey color | 18 | 3 | 0 |
| Honey flavor | 18 | 3 | 0 |
| Locally sourced | 2 | 7 | 12 |
| Minimum quantity requirements | 6 | 6 | 7 |
| Monofloral source | 3 | 10 | 7 |
| Organic | 14 | 3 | 3 |
| Packaging | 6 | 13 | 2 |
| Payment terms | 12 | 7 | 2 |
| Price | 15 | 6 | 0 |
| Product consistency | 17 | 4 | 0 |
| Product range | 4 | 7 | 9 |
| Quality meets industry standards | 19 | 2 | 0 |
| Quality exceeds industry standards | 11 | 6 | 3 |
| Reliability of supply | 20 | 2 | 0 |
| Technical support/service | 4 | 12 | 5 |
| U.S. transportation costs | 4 | 12 | 5 |

Source: Compiled from data submitted in response to Commission questionnaires.

**Local honey**

As seen in previous table II-11, most responding purchasers reported that locally sourced honey was not an important purchasing factor. However, respondents emphasized that U.S. producers are able to supply a particular retail segment for local honey. Respondents stated that local honey markets are strongest in population-dense regions, and that prices vary by state or region.[55]

**Lead times**

Raw honey is primarily sold from inventory.[56] U.S. producers reported that most of their shipments (89.0 percent) were from U.S. inventories with reported lead times generally ranging from of 7 to 45 days, and the remaining 11.0 percent were produced-to-order, with lead times

---

[55] Hearing transcript, pp. 12, 183-84 (Kendler, Wenger).

[56] Some firms stated that honey has a long shelf-life. See *Raw Honey from Argentina, Brazil, India, Ukraine, and Vietnam*, Staff Report, Inv. Nos. 731-TA-1560-1564 (Preliminary), p. II-9.

of 3 to 180 days. Importers reported that 48.0 percent of their shipments were from U.S. inventories, 28.7 percent were produced-to-order, and 23.4 percent were from foreign inventories. Importers generally reported average lead times of 1 to 90 days from U.S. inventories, 45 to 120 days from foreign inventories, and 14 to 90 days for produced-to-order product.

**Supplier certification**

Fourteen of 20 responding purchasers require their suppliers to become certified or qualified to sell raw honey to their firm. Purchasers indicated registering for True Source, requiring organic certifications, GFSI and third-party audits, non-GMO Project Verified certifications, and site visits. Most purchasers reported that the time to qualify a new supplier was one month or less.[57] Purchasers also described their qualification processes, which include surveys, onsite audits, compliance with policies and procedures, R&D lab analysis, benchtop testing, food safety documentation, and traceability reporting. Qualification processes generally were reported to take 10 to 180 days to complete.

Seven of 20 responding purchasers reported that a domestic or foreign supplier had failed in its attempt to qualify raw honey or had lost its approved status since 2018. Purchasers listed lack of True Source Certification, failure to meet quality standards, presence of bee feeding syrups, condition of the drums used to package the honey, lack of current third-party audits or food safety certifications, failures of analytical testing or adequate food safety documentation, or failed adulteration and authenticity tests.

**Minimum quality specifications**

As can be seen from table II-12, purchaser responses concerning U.S. producers' ability to meet minimum quality specifications were mixed, with the plurality of responding purchasers reporting that U.S. producers usually meet minimum quality specifications. The majority of responding purchasers reported that raw honey from Brazil always meets minimum quality specifications and that raw honey from Argentina and India usually meets minimum quality specifications. Purchasers' responses were equally divided regarding raw honey from Vietnam always or usually meeting minimum quality. Purchaser *** reported that a considerable percentage of U.S. honey fails to meet quality specifications because it is adulterated with cheaper sweeteners, failed the specification for microbiological reasons, or

---

[57] Seven of 13 responding purchasers reported that the time to qualify a supplier was less than one month; 3 purchasers reported that the time to qualify ranged from 120 to 180 days; and 2 purchasers reported that the time varies and did not provide an estimate.

exceeded the acceptable levels of extraneous matter. Purchaser *** reported that U.S.-produced raw honey was occasionally rejected due to sugar adulteration, Argentine raw honey was occasionally rejected because the color was out of specification, Brazilian and Indian raw honey was occasionally rejected because of issues with the flavor profile, and Vietnamese raw honey occasionally exceeds moisture levels. Purchaser *** reported that pesticides or antibiotic residues are often found in raw honey from the United States.

Purchasers listed quality characteristics including moisture, granulation, taste, lack of pesticides and lead, pollen, free of adulterants and pesticides, fructose glucose ratios, enzyme levels, HMF, and other technical measurements.

**Table II-12**
**Raw honey:  Count of firms' responses regarding suppliers' ability to meet minimum quality specifications, by source**

Count in number of firms reporting

| Source of purchases | Always | Usually | Sometimes | Rarely or never |
|---|---|---|---|---|
| United States | 4 | 8 | 4 | 3 |
| Argentina | 5 | 7 | 1 | 0 |
| Brazil | 12 | 8 | 0 | 0 |
| India | 7 | 10 | 0 | 1 |
| Vietnam | 9 | 9 | 0 | 0 |
| Nonsubject Ukraine | 8 | 4 | 1 | 0 |
| All other sources | 2 | 3 | 1 | 0 |

Source: Compiled from data submitted in response to Commission questionnaires.

Ingredient end users stated that their specifications cite color, flavor profile, and blending.[58]

**Changes in purchasing patterns**

Purchasers were asked about changes in their purchasing patterns from different sources since 2018 (table II-13). A plurality of purchasers reported increased purchases from the United States, Brazil, India, and Vietnam, although responses were mixed for all sources. Purchasers reported mixed responses for Argentina, with four purchasers each reporting decreasing, increasing, and fluctuating purchases since 2018. Many purchasers cited increased demand generally, fluctuating availability from different sources, and some purchasers reported increased purchases from Brazil (and on a smaller scale, India) as demand for organic products increases. Purchaser *** reported that availability of supply is the primary driver of its purchasing patterns and that U.S. producers have not been able to supply sufficient

---

[58] Hearing transcript, pp. 225-26 (Bash, Bertrand, Haines).

quantities to support its *** so its domestic honey purchases have declined.

**Table II-13**
**Raw honey:  Count of changes in purchase patterns from U.S., subject, and nonsubject countries**

Count in number of firms reporting

| Source of purchases | Decreased | Increased | Constant | Fluctuated | Did not purchase |
|---|---|---|---|---|---|
| United States | 4 | 10 | 1 | 4 | 3 |
| Argentina | 4 | 4 | 1 | 4 | 5 |
| Brazil | 2 | 9 | 5 | 4 | 0 |
| India | 5 | 7 | 3 | 2 | 2 |
| Vietnam | 1 | 8 | 5 | 3 | 2 |
| Nonsubject Ukraine | 3 | 4 | 3 | 3 | 5 |
| All other sources | 7 | 1 | 2 | 7 | 1 |
| Sources unknown | 0 | 0 | 0 | 0 | 10 |

Source: Compiled from data submitted in response to Commission questionnaires.

Note: Purchasers were asked how often domestically produced or imported raw honey meets minimum quality specifications for their own or their customers' uses.

Ten of 21 responding purchasers reported that they had changed suppliers since January 1, 2018. Specifically, firms cited changing end use needs, customer specifications, available certifications, and availability as reasons for changing suppliers.

## Purchase factor comparisons of domestic products, subject imports, and nonsubject imports

Purchasers were asked a number of questions comparing raw honey produced in the United States, subject countries, and nonsubject countries. First, purchasers were asked for a country-by-country comparison on the same 21 factors (table II-14) for which they were asked to rate the importance. Purchaser responses were mixed on the comparability of raw honey from the United States, subject, and nonsubject sources. The plurality of responding purchasers reported that when compared to raw honey from Argentina, Brazil,[59] nonsubject Ukraine, and other nonsubject sources, U.S.-produced honey was comparable or inferior on all factors that were rated as "very important" to purchasers (shown in table II-11). U.S.-produced raw honey was considered by a plurality of purchasers to be comparable or inferior to raw honey from India on all factors, with the exception of honey flavor, for which U.S.-produced honey was

---

[59] One exception is the comparison of honey flavor of U.S. raw honey to Brazilian raw honey, for which eight purchasers reported honey flavor of raw honey from the United States is superior and eight purchasers reported that raw honey from the United States is comparable to raw honey from Brazil.

superior, and U.S.-produced raw honey was considered comparable or inferior to raw honey from Vietnam for all factors, except honey flavor and honey color. In comparisons with raw honey from all subject sources, U.S.-produced honey was considered inferior in terms of availability, organic, price, product consistency, and reliability of supply.

**Table II-14**
**Raw honey:  Count of purchasers' responses comparing U.S.-produced and imported product, by factor and by country pair**

Count in number of firms reporting

| Factor | Country pair | Superior | Comparable | Inferior |
|---|---|---|---|---|
| Availability | U.S. vs Argentina | 0 | 4 | 8 |
| Crystallization | U.S. vs Argentina | 0 | 10 | 1 |
| Delivery terms | U.S. vs Argentina | 0 | 7 | 4 |
| Delivery time | U.S. vs Argentina | 2 | 4 | 5 |
| Discounts offered | U.S. vs Argentina | 0 | 6 | 2 |
| Honey color | U.S. vs Argentina | 0 | 11 | 1 |
| Honey flavor | U.S. vs Argentina | 2 | 9 | 1 |
| Minimum quantity requirements | U.S. vs Argentina | 1 | 5 | 5 |
| Monofloral source | U.S. vs Argentina | 3 | 7 | 0 |
| Organic | U.S. vs Argentina | 0 | 4 | 5 |
| Packaging | U.S. vs Argentina | 0 | 5 | 6 |
| Payment terms | U.S. vs Argentina | 2 | 7 | 2 |
| Price | U.S. vs Argentina | 1 | 1 | 10 |
| Product consistency | U.S. vs Argentina | 0 | 5 | 6 |
| Product range | U.S. vs Argentina | 2 | 7 | 3 |
| Quality meets industry standards | U.S. vs Argentina | 1 | 6 | 4 |
| Quality exceeds industry standards | U.S. vs Argentina | 1 | 5 | 5 |
| Reliability of supply | U.S. vs Argentina | 0 | 4 | 7 |
| Technical support/service | U.S. vs Argentina | 0 | 2 | 6 |
| U.S. transportation costs | U.S. vs Argentina | 0 | 7 | 3 |

Table continued.

**Table II-14 Continued**
**Raw honey:  Count of purchasers' responses comparing U.S.-produced and imported product, by factor and by country pair**

Count in number of firms reporting

| Factor | Country pair | Superior | Comparable | Inferior |
|---|---|---|---|---|
| Availability | U.S. vs Brazil | 2 | 3 | 15 |
| Crystallization | U.S. vs Brazil | 0 | 15 | 2 |
| Delivery terms | U.S. vs Brazil | 0 | 12 | 5 |
| Delivery time | U.S. vs Brazil | 3 | 7 | 7 |
| Discounts offered | U.S. vs Brazil | 0 | 10 | 3 |
| Honey color | U.S. vs Brazil | 7 | 10 | 3 |
| Honey flavor | U.S. vs Brazil | 8 | 8 | 3 |
| Minimum quantity requirements | U.S. vs Brazil | 3 | 9 | 5 |
| Monofloral source | U.S. vs Brazil | 4 | 11 | 0 |
| Organic | U.S. vs Brazil | 1 | 1 | 16 |
| Packaging | U.S. vs Brazil | 0 | 7 | 10 |
| Payment terms | U.S. vs Brazil | 5 | 9 | 3 |
| Price | U.S. vs Brazil | 2 | 2 | 14 |
| Product consistency | U.S. vs Brazil | 2 | 7 | 8 |
| Product range | U.S. vs Brazil | 3 | 9 | 4 |
| Quality meets industry standards | U.S. vs Brazil | 2 | 9 | 6 |
| Quality exceeds industry standards | U.S. vs Brazil | 2 | 7 | 8 |
| Reliability of supply | U.S. vs Brazil | 1 | 5 | 11 |
| Technical support/service | U.S. vs Brazil | 0 | 6 | 8 |
| U.S. transportation costs | U.S. vs Brazil | 0 | 12 | 4 |

Table continued.

**Table II-14 Continued**
**Raw honey:  Count of purchasers' responses comparing U.S.-produced and imported product, by factor and by country pair**

Count in number of firms reporting

| Factor | Country pair | Superior | Comparable | Inferior |
|---|---|---|---|---|
| Availability | U.S. vs India | 1 | 4 | 12 |
| Crystallization | U.S. vs India | 3 | 12 | 0 |
| Delivery terms | U.S. vs India | 0 | 11 | 4 |
| Delivery time | U.S. vs India | 4 | 5 | 6 |
| Discounts offered | U.S. vs India | 0 | 9 | 3 |
| Honey color | U.S. vs India | 4 | 11 | 3 |
| Honey flavor | U.S. vs India | 7 | 6 | 4 |
| Minimum quantity requirements | U.S. vs India | 2 | 8 | 5 |
| Monofloral source | U.S. vs India | 6 | 7 | 1 |
| Organic | U.S. vs India | 0 | 6 | 9 |
| Packaging | U.S. vs India | 0 | 7 | 8 |
| Payment terms | U.S. vs India | 2 | 10 | 3 |
| Price | U.S. vs India | 1 | 2 | 13 |
| Product consistency | U.S. vs India | 1 | 6 | 8 |
| Product range | U.S. vs India | 3 | 9 | 3 |
| Quality meets industry standards | U.S. vs India | 2 | 8 | 5 |
| Quality exceeds industry standards | U.S. vs India | 2 | 7 | 6 |
| Reliability of supply | U.S. vs India | 0 | 5 | 10 |
| Technical support/service | U.S. vs India | 0 | 5 | 7 |
| U.S. transportation costs | U.S. vs India | 0 | 11 | 3 |

Table continued.

**Table II-14 Continued**
**Raw honey:  Count of purchasers' responses comparing U.S.-produced and imported product, by factor and by country pair**

Count in number of firms reporting

| Factor | Country pair | Superior | Comparable | Inferior |
|---|---|---|---|---|
| Availability | U.S. vs Vietnam | 2 | 2 | 14 |
| Crystallization | U.S. vs Vietnam | 1 | 12 | 2 |
| Delivery terms | U.S. vs Vietnam | 0 | 10 | 5 |
| Delivery time | U.S. vs Vietnam | 4 | 6 | 5 |
| Discounts offered | U.S. vs Vietnam | 0 | 9 | 3 |
| Honey color | U.S. vs Vietnam | 8 | 5 | 5 |
| Honey flavor | U.S. vs Vietnam | 8 | 6 | 4 |
| Minimum quantity requirements | U.S. vs Vietnam | 3 | 7 | 5 |
| Monofloral source | U.S. vs Vietnam | 8 | 5 | 1 |
| Organic | U.S. vs Vietnam | 0 | 8 | 2 |
| Packaging | U.S. vs Vietnam | 0 | 6 | 9 |
| Payment terms | U.S. vs Vietnam | 3 | 8 | 3 |
| Price | U.S. vs Vietnam | 1 | 2 | 13 |
| Product consistency | U.S. vs Vietnam | 2 | 5 | 8 |
| Product range | U.S. vs Vietnam | 9 | 5 | 0 |
| Quality meets industry standards | U.S. vs Vietnam | 0 | 11 | 4 |
| Quality exceeds industry standards | U.S. vs Vietnam | 3 | 7 | 5 |
| Reliability of supply | U.S. vs Vietnam | 0 | 5 | 10 |
| Technical support/service | U.S. vs Vietnam | 0 | 5 | 7 |
| U.S. transportation costs | U.S. vs Vietnam | 1 | 9 | 3 |

Table continued.

**Table II-14 Continued**
**Raw honey:  Count of purchasers' responses comparing U.S.-produced and imported product, by factor and by country pair**

Count in number of firms reporting

| Factor | Country pair | Superior | Comparable | Inferior |
|---|---|---|---|---|
| Availability | U.S. vs Nonsubject Ukraine | 2 | 4 | 6 |
| Crystallization | U.S. vs Nonsubject Ukraine | 5 | 6 | 0 |
| Delivery terms | U.S. vs Nonsubject Ukraine | 0 | 7 | 4 |
| Delivery time | U.S. vs Nonsubject Ukraine | 3 | 6 | 2 |
| Discounts offered | U.S. vs Nonsubject Ukraine | 0 | 6 | 2 |
| Honey color | U.S. vs Nonsubject Ukraine | 3 | 8 | 2 |
| Honey flavor | U.S. vs Nonsubject Ukraine | 3 | 7 | 2 |
| Minimum quantity requirements | U.S. vs Nonsubject Ukraine | 0 | 6 | 5 |
| Monofloral source | U.S. vs Nonsubject Ukraine | 5 | 3 | 1 |
| Organic | U.S. vs Nonsubject Ukraine | 0 | 5 | 1 |
| Packaging | U.S. vs Nonsubject Ukraine | 0 | 3 | 8 |
| Payment terms | U.S. vs Nonsubject Ukraine | 3 | 6 | 2 |
| Price | U.S. vs Nonsubject Ukraine | 0 | 2 | 10 |
| Product consistency | U.S. vs Nonsubject Ukraine | 1 | 2 | 8 |
| Product range | U.S. vs Nonsubject Ukraine | 7 | 3 | 1 |
| Quality meets industry standards | U.S. vs Nonsubject Ukraine | 0 | 7 | 4 |
| Quality exceeds industry standards | U.S. vs Nonsubject Ukraine | 2 | 5 | 4 |
| Reliability of supply | U.S. vs Nonsubject Ukraine | 0 | 4 | 7 |
| Technical support/service | U.S. vs Nonsubject Ukraine | 0 | 0 | 8 |
| U.S. transportation costs | U.S. vs Nonsubject Ukraine | 0 | 7 | 3 |

Table continued.

**Table II-14 Continued**
**Raw honey:  Count of purchasers' responses comparing U.S.-produced and imported product, by factor and by country pair**

Count in number of firms reporting

| Factor | Country pair | Superior | Comparable | Inferior |
|---|---|---|---|---|
| Availability | U.S. vs Other Nonsubject | 1 | 5 | 5 |
| Crystallization | U.S. vs Other Nonsubject | 1 | 8 | 1 |
| Delivery terms | U.S. vs Other Nonsubject | 0 | 7 | 3 |
| Delivery time | U.S. vs Other Nonsubject | 3 | 5 | 2 |
| Discounts offered | U.S. vs Other Nonsubject | 0 | 6 | 2 |
| Honey color | U.S. vs Other Nonsubject | 3 | 7 | 1 |
| Honey flavor | U.S. vs Other Nonsubject | 5 | 6 | 2 |
| Minimum quantity requirements | U.S. vs Other Nonsubject | 0 | 6 | 4 |
| Monofloral source | U.S. vs Other Nonsubject | 4 | 5 | 0 |
| Organic | U.S. vs Other Nonsubject | 0 | 4 | 4 |
| Packaging | U.S. vs Other Nonsubject | 0 | 4 | 6 |
| Payment terms | U.S. vs Other Nonsubject | 2 | 7 | 1 |
| Price | U.S. vs Other Nonsubject | 0 | 3 | 8 |
| Product consistency | U.S. vs Other Nonsubject | 1 | 3 | 5 |
| Product range | U.S. vs Other Nonsubject | 3 | 6 | 1 |
| Quality meets industry standards | U.S. vs Other Nonsubject | 0 | 7 | 3 |
| Quality exceeds industry standards | U.S. vs Other Nonsubject | 1 | 6 | 3 |
| Reliability of supply | U.S. vs Other Nonsubject | 0 | 4 | 5 |
| Technical support/service | U.S. vs Other Nonsubject | 0 | 2 | 5 |
| U.S. transportation costs | U.S. vs Other Nonsubject | 0 | 7 | 2 |

Source: Compiled from data submitted in response to Commission questionnaires.

End user purchasers clarified that U.S.-produced raw honey is generally better tasting and better suited for retail, but inferior to raw honey from certain subject sources in the robustness of flavor and other attributes that make raw honey from other sources preferable for use as an ingredient. Purchaser *** stated that it considers U.S.-produced honey inferior in terms of color and flavor because the U.S. primarily produces white and extra-light amber honey which are inferior honey for ***. These differences also make white and extra-light amber honey much more palatable when directly consumed, therefore the vast majority of white and extra-light amber honey is packaged for retail which has higher profit opportunities. It continued that there is virtually no availability of light amber honey in the United States, let alone light amber honey that has the unique color and flavor profile of Vietnamese honey.

Purchaser *** also stated that the amber honey from India and Vietnam is unique in flavor and color profile and ideal for industrial ingredient use and added that honey produced in the United States is typically diverted to retail due to its sweeter flavor and light color. For

those reasons, it may be considered higher quality in the market as a whole, but it is not ideal for ingredient use.

## Comparison of U.S.-produced and imported raw honey

In order to determine whether U.S.-produced raw honey can generally be used in the same applications as imports from subject countries, U.S. producers, importers, and purchasers were asked whether the products can always, frequently, sometimes, or never be used interchangeably. As shown in table II-15, the vast majority of U.S. producers reported that raw honey from all sources was always interchangeable. Importers' and purchasers' responses varied depending on source (see tables II-16 and II-17). Most importers reported that raw honey from Argentina can frequently be used interchangeably with U.S.-produced honey, and a plurality of purchasers reported that Argentinian honey is sometimes interchangeable with U.S.-produced honey. Most importers and purchasers reported that raw honey from Brazil and Vietnam can never be used interchangeably with U.S.-produced honey, and a plurality of responding importers and purchasers reported that raw honey from India can sometimes be used interchangeably with raw honey produced in the United States.

Factors reported by importers and purchasers that limited interchangeability between domestic and subject imported raw honey include organic and other classifications, available color and flavor profiles, end use requirements, and "eat local" campaigns. U.S. importer *** stated that interchangeability is based on factors like market channel, customer specification, organoleptic properties,[60] fructose glucose ratios, and conventional versus organic, citing an example of the retail market needing a two-year shelf life which requires higher fructose glucose ratios in honey that is available only in Argentina and Brazil. Importers generally reported that raw honey from all five subject countries is generally interchangeable for food service and industrial uses, but distinct flavor and color profiles for honey from India and Vietnam make them less suitable for retail use. It added that U.S. consumers prefer lighter and milder honey in retail stores, while honey from India and Vietnam tends to be darker with bolder flavors. Purchaser *** reported that Vietnamese honey has a unique color and flavor characteristics due to "rubber acacia trees, and other ecological influences such as heat and moisture that create a signature experience for its consumers at limits interchangeability with other countries, however it also reported that it receives ***. Purchaser *** reported that Vietnam is the only source that

---

[60] Organoleptic properties are the aspects of food, water or other substances that create an individual experience via the senses—including taste, sight, smell, and touch.

is able to supply an adequate quantity of darker honey that is antibiotic- and pesticide residue-free, and although it sources small amounts of Brazilian and Indian honey ***, these sources do not have adequate amounts of light amber honey to supply the U.S. market.

**Table II-15**
**Raw honey: Interchangeability between raw honey produced in the United States and in other countries reported by U.S. producers, by country pair**

Count in number of firms reporting

| Country pair | Always | Frequently | Sometimes | Never |
|---|---|---|---|---|
| United States vs. Argentina | 36 | 6 | 2 | 1 |
| United States vs. Brazil | 36 | 6 | 0 | 3 |
| United States vs. India | 36 | 5 | 3 | 1 |
| United States vs. Vietnam | 36 | 5 | 3 | 1 |
| United States vs. Nonsubject Ukraine | 36 | 5 | 3 | 1 |
| Argentina vs. Brazil | 37 | 3 | 1 | 2 |
| Argentina vs. India | 37 | 3 | 2 | 0 |
| Argentina vs. Vietnam | 37 | 3 | 2 | 0 |
| Argentina vs. Nonsubject Ukraine | 37 | 3 | 2 | 0 |
| Brazil vs. India | 37 | 3 | 0 | 2 |
| Brazil vs. Vietnam | 37 | 3 | 0 | 2 |
| Brazil vs. Nonsubject Ukraine | 37 | 3 | 0 | 2 |
| India vs. Vietnam | 37 | 3 | 2 | 0 |
| India vs. Nonsubject Ukraine | 37 | 3 | 2 | 0 |
| Nonsubject Ukraine vs. Vietnam | 37 | 3 | 2 | 0 |
| United States vs. Other | 35 | 5 | 2 | 1 |
| Argentina vs. Other | 36 | 3 | 2 | 0 |
| Brazil vs. Other | 36 | 3 | 0 | 2 |
| India vs. Other | 35 | 3 | 2 | 0 |
| Vietnam vs. Other | 34 | 3 | 2 | 0 |
| Nonsubject Ukraine vs. Other | 35 | 3 | 2 | 0 |

Source: Compiled from data submitted in response to Commission questionnaires.

**Table II-16**
**Raw honey:  Interchangeability between raw honey produced in the United States and in other countries reported by U.S. importers, by country pair**

Count in number of firms reporting

| Country pair | Always | Frequently | Sometimes | Never |
|---|---|---|---|---|
| United States vs. Argentina | 2 | 9 | 3 | 2 |
| United States vs. Brazil | 0 | 0 | 5 | 13 |
| United States vs. India | 0 | 0 | 9 | 7 |
| United States vs. Vietnam | 0 | 0 | 5 | 11 |
| United States vs. Nonsubject Ukraine | 3 | 3 | 7 | 3 |
| Argentina vs. Brazil | 1 | 1 | 6 | 8 |
| Argentina vs. India | 0 | 2 | 6 | 7 |
| Argentina vs. Vietnam | 0 | 2 | 2 | 12 |
| Argentina vs. Nonsubject Ukraine | 2 | 3 | 6 | 3 |
| Brazil vs. India | 0 | 1 | 9 | 8 |
| Brazil vs. Vietnam | 0 | 0 | 2 | 17 |
| Brazil vs. Nonsubject Ukraine | 0 | 0 | 2 | 14 |
| India vs. Vietnam | 0 | 7 | 10 | 1 |
| India vs. Nonsubject Ukraine | 0 | 7 | 8 | 0 |
| Nonsubject Ukraine vs. Vietnam | 0 | 2 | 5 | 10 |
| United States vs. Other | 0 | 0 | 9 | 2 |
| Argentina vs. Other | 0 | 1 | 8 | 2 |
| Brazil vs. Other | 0 | 1 | 6 | 4 |
| India vs. Other | 0 | 1 | 8 | 1 |
| Vietnam vs. Other | 0 | 1 | 7 | 3 |
| Nonsubject Ukraine vs. Other | 0 | 1 | 8 | 1 |

Source:  Compiled from data submitted in response to Commission questionnaires.

**Table II-17**
**Raw honey:  Interchangeability between raw honey produced in the United States and in other countries reported by U.S. purchasers, by country pair**

Count in number of firms reporting

| Country pair | Always | Frequently | Sometimes | Never |
|---|---|---|---|---|
| United States vs. Argentina | 2 | 3 | 5 | 2 |
| United States vs. Brazil | 1 | 0 | 4 | 13 |
| United States vs. India | 1 | 0 | 8 | 7 |
| United States vs. Vietnam | 1 | 0 | 6 | 9 |
| United States vs. Nonsubject Ukraine | 3 | 1 | 5 | 5 |
| Argentina vs. Brazil | 1 | 2 | 5 | 5 |
| Argentina vs. India | 1 | 1 | 6 | 5 |
| Argentina vs. Vietnam | 1 | 1 | 5 | 6 |
| Argentina vs. Nonsubject Ukraine | 2 | 1 | 8 | 2 |
| Brazil vs. India | 1 | 1 | 10 | 5 |
| Brazil vs. Vietnam | 1 | 0 | 5 | 11 |
| Brazil vs. Nonsubject Ukraine | 1 | 1 | 5 | 9 |
| India vs. Vietnam | 3 | 4 | 8 | 2 |
| India vs. Nonsubject Ukraine | 1 | 3 | 9 | 2 |
| Nonsubject Ukraine vs. Vietnam | 1 | 0 | 6 | 8 |
| United States vs. Other | 1 | 0 | 7 | 1 |
| Argentina vs. Other | 1 | 0 | 5 | 1 |
| Brazil vs. Other | 1 | 0 | 5 | 3 |
| India vs. Other | 1 | 0 | 7 | 1 |
| Vietnam vs. Other | 1 | 0 | 6 | 2 |
| Nonsubject Ukraine vs. Other | 1 | 0 | 6 | 1 |

Source:  Compiled from data submitted in response to Commission questionnaires.

In addition, U.S. producers, importers, and purchasers were asked to assess how often differences other than price were significant in sales of raw honey from the United States, subject, or non-subject countries. As seen in table II-18, most U.S. producers reported that such differences between sources were never significant in their sales whereas importers most frequently reported that differences other than price were always significant between raw honey produced in subject countries, and most purchasers reported that differences other than price were always significant (see tables II-19 and II-20).[61] Differences other than price include product quality and certification, organic/non-GMO specifications, volume and duration of contracts, customer requirements, and flavor profiles. U.S. importer *** noted that imported honey faces more rigorous testing for quality and adulteration parameters than domestic honey, which is not necessarily tested by U.S. beekeepers. Importer ***'s response also discussed the importance of quality assurance, including True Source

---

[61] Two exceptions were for comparisons between India/nonsubject Ukraine and India/Vietnam, for which most purchasers reported that factors other than price are only sometimes significant.

Certified sourcing standards. Importer *** stated that honey from Brazil may be organic, and honey from Brazil, India, or Vietnam may be non-GMO certified. Similarly, differences other than price reported by purchasers include color and flavor differences, organic/non-GMO specifications, product consistency, and availability of supply.

**Table II-18**
**Raw honey:  Perceived importance of factors other than price between product produced in the United States and in other countries reported by U.S. producers, by country pair**

Count in number of firms reporting

| Country pair | Always | Frequently | Sometimes | Never |
|---|---|---|---|---|
| United States vs. Argentina | 5 | 0 | 2 | 38 |
| United States vs. Brazil | 5 | 0 | 2 | 38 |
| United States vs. India | 4 | 0 | 2 | 38 |
| United States vs. Vietnam | 4 | 0 | 2 | 38 |
| United States vs. Nonsubject Ukraine | 4 | 0 | 2 | 38 |
| Argentina vs. Brazil | 3 | 0 | 2 | 38 |
| Argentina vs. India | 2 | 0 | 2 | 38 |
| Argentina vs. Vietnam | 2 | 0 | 2 | 38 |
| Argentina vs. Nonsubject Ukraine | 2 | 0 | 2 | 38 |
| Brazil vs. India | 2 | 0 | 2 | 38 |
| Brazil vs. Vietnam | 2 | 0 | 2 | 38 |
| Brazil vs. Nonsubject Ukraine | 2 | 0 | 2 | 38 |
| India vs. Vietnam | 2 | 0 | 2 | 38 |
| India vs. Nonsubject Ukraine | 2 | 0 | 2 | 38 |
| Nonsubject Ukraine vs. Vietnam | 2 | 0 | 2 | 38 |
| United States vs. Other | 4 | 0 | 2 | 38 |
| Argentina vs. Other | 2 | 0 | 2 | 38 |
| Brazil vs. Other | 2 | 0 | 2 | 38 |
| India vs. Other | 2 | 0 | 2 | 38 |
| Vietnam vs. Other | 2 | 0 | 2 | 38 |
| Nonsubject Ukraine vs. Other | 2 | 0 | 2 | 38 |

Source:  Compiled from data submitted in response to Commission questionnaires.

**Table II-19**
**Raw honey:  Perceived importance of factors other than price between product produced in the United States and in other countries reported by U.S. importers, by country pair**

Count in number of firms reporting

| Country pair | Always | Frequently | Sometimes | Never |
|---|---|---|---|---|
| United States vs. Argentina | 7 | 3 | 5 | 0 |
| United States vs. Brazil | 12 | 2 | 2 | 1 |
| United States vs. India | 10 | 3 | 2 | 1 |
| United States vs. Vietnam | 11 | 4 | 1 | 1 |
| United States vs. Nonsubject Ukraine | 7 | 5 | 4 | 0 |
| Argentina vs. Brazil | 9 | 0 | 3 | 3 |
| Argentina vs. India | 7 | 2 | 4 | 1 |
| Argentina vs. Vietnam | 10 | 2 | 3 | 1 |
| Argentina vs. Nonsubject Ukraine | 7 | 2 | 5 | 0 |
| Brazil vs. India | 10 | 1 | 3 | 3 |
| Brazil vs. Vietnam | 13 | 2 | 2 | 2 |
| Brazil vs. Nonsubject Ukraine | 12 | 0 | 3 | 2 |
| India vs. Vietnam | 5 | 0 | 11 | 2 |
| India vs. Nonsubject Ukraine | 5 | 0 | 10 | 1 |
| Nonsubject Ukraine vs. Vietnam | 9 | 1 | 6 | 1 |
| United States vs. Other | 5 | 1 | 3 | 0 |
| Argentina vs. Other | 4 | 0 | 5 | 0 |
| Brazil vs. Other | 6 | 0 | 2 | 1 |
| India vs. Other | 4 | 0 | 5 | 0 |
| Vietnam vs. Other | 5 | 0 | 4 | 0 |
| Nonsubject Ukraine vs. Other | 3 | 0 | 5 | 0 |

Source:  Compiled from data submitted in response to Commission questionnaires.

**Table II-20**
**Raw honey:  Perceived importance of factors other than price between product produced in the United States and in other countries reported by U.S. purchasers, by country pair**

Count in number of firms reporting

| Country pair | Always | Frequently | Sometimes | Never |
|---|---|---|---|---|
| United States vs. Argentina | 6 | 1 | 2 | 2 |
| United States vs. Brazil | 14 | 1 | 1 | 1 |
| United States vs. India | 12 | 2 | 1 | 1 |
| United States vs. Vietnam | 12 | 3 | 0 | 1 |
| United States vs. Nonsubject Ukraine | 8 | 1 | 2 | 2 |
| Argentina vs. Brazil | 6 | 1 | 2 | 2 |
| Argentina vs. India | 6 | 2 | 2 | 2 |
| Argentina vs. Vietnam | 7 | 2 | 1 | 2 |
| Argentina vs. Nonsubject Ukraine | 4 | 2 | 2 | 3 |
| Brazil vs. India | 8 | 2 | 5 | 2 |
| Brazil vs. Vietnam | 12 | 2 | 2 | 1 |
| Brazil vs. Nonsubject Ukraine | 8 | 2 | 3 | 1 |
| India vs. Vietnam | 5 | 0 | 9 | 3 |
| India vs. Nonsubject Ukraine | 6 | 1 | 7 | 1 |
| Nonsubject Ukraine vs. Vietnam | 8 | 2 | 4 | 1 |
| United States vs. Other | 4 | 0 | 2 | 1 |
| Argentina vs. Other | 2 | 0 | 2 | 1 |
| Brazil vs. Other | 4 | 0 | 2 | 1 |
| India vs. Other | 2 | 0 | 4 | 1 |
| Vietnam vs. Other | 3 | 0 | 4 | 1 |
| Nonsubject Ukraine vs. Other | 2 | 0 | 3 | 1 |

Source:  Compiled from data submitted in response to Commission questionnaires.

# Elasticity estimates

This section discusses elasticity estimates; parties were encouraged to comment on these estimates and Petitioner did so.

## U.S. supply elasticity

The domestic supply elasticity for raw honey measures the sensitivity of the quantity supplied by U.S. producers to changes in the U.S. market price of raw honey. The elasticity of domestic supply depends on several factors including the level of excess capacity, the ease with which producers can alter capacity, producers' ability to shift to production of other products, the existence of inventories, and the availability of alternate markets for U.S.-produced raw honey. While limited in their ability to increase production (because of limitations of bees' production and climate, among other factors) and limited alternate markets, U.S. producers have relatively large inventories. Analysis of these factors above indicates that the U.S. industry

has a low-to-moderate ability to increase or decrease shipments to the U.S. market; an estimate in the range of 1 to 3 is suggested.

## U.S. demand elasticity

The U.S. demand elasticity for raw honey measures the sensitivity of the overall quantity demanded to a change in the U.S. market price of raw honey. This estimate depends on factors discussed above such as the existence, availability, and commercial viability of substitute products, as well as the cost share of raw honey in the production of downstream products. Based on the available information, including limited substitute products and a wide range of cost share in end uses, the aggregate demand for raw honey is likely to be moderately inelastic; a range of -0.25 to -1.0 is suggested, with raw honey for retail uses falling on the lower end of the range and raw honey for ingredient end uses falling on the higher end of the range.

## Substitution elasticity

The elasticity of substitution depends upon the extent of product differentiation between the domestic and imported products.[62] Product differentiation, in turn, depends upon such factors as quality (e.g., chemistry, appearance, etc.), organic certifications, color and flavor profiles, and conditions of sale (e.g., availability, sales terms/discounts/promotions, etc.). Based on available information, the elasticity of substitution between U.S.-produced raw honey and imported raw honey is likely to be in the range of 2 to 4.[63] [64]Specifically, darker honey color and flavor profiles for product from Vietnam, as well as organic and non-GMO certifications for product from Brazil and India, may limit substitutability of U.S.-produced raw honey and raw honey from subject sources. Raw honey from Argentina may be on the higher end of the range, due to more similar color and flavor profiles to U.S.-produced honey.

---

[62] The substitution elasticity measures the responsiveness of the relative U.S. consumption levels of the subject imports and the domestic like products to changes in their relative prices. This reflects how easily purchasers switch from the U.S. product to the subject products (or vice versa) when prices change.

[63] Based on additional information provided in purchaser questionnaires during the final phase, staff lowered its estimate in the preliminary phase of these investigations of moderate-to-high substitutability. Refer to "Sustainability Issues" section above.

[64] Petitioner argued that there is a moderate-to-high degree of substitutability between domestically produced raw honey and raw honey imported from subject sources. Petitioner prehearing brief, pp. 34-35.

# Part III: U.S. producers' production, shipments, and employment

The Commission analyzes a number of factors in making injury determinations (see 19 U.S.C. §§ 1677(7)(B) and 1677(7)(C)). Information on the dumping margins was presented in *Part I* of this report and information on the volume and pricing of imports of the subject merchandise is presented in *Part IV* and *Part V*. Information on the other factors specified is presented in this section and/or *Part VI* and (except as noted) is based on the questionnaire responses of 84 firms that accounted for 31.2 percent of U.S. production of raw honey during 2020 as reported by USDA/NASS.

## U.S. producers

Both petitioner organizations (AHPA and SHA) are recognized in the U.S. beekeeping industry as representatives of the interests of commercial honey producers.[1] AHPA classifies its U.S. beekeeper members as hobbyists (1-75 hives), sideliners (76-300 hives), or commercial beekeepers (301+ hives).[2] According to USDA, hobbyist beekeepers generally keep bees for a hobby or for small-scale pollination of orchard or field crops. Most honey produced by hobbyists is consumed at home, given away, or sold directly by the beekeeper. Part-time or sideliner beekeepers generally market their honey either through direct sales to consumers or retail outlets, or through bulk sales to honey processors.[3] Most raw honey produced by commercial beekeepers is sold to packers who process the honey and sell it to food manufacturers or retailers.

USDA collects data on honey producing operations from a stratified sample of all known operations with at least five honeybee colonies that also meet USDA's definition of a farm.[4] In 2016, operations with five or more colonies produced more than 99 percent of honey in the United States. However, the USDA estimates that 44 percent of apiary workers labored on farms with less than five colonies. This proportion includes unpaid workers and hobbyists.[5]

---

[1] Petition, pp. 2-3.

[2] AHPA website, https://www.ahpanet.com/, accessed May 17, 2021.

[3] Canada, Carol and Jasper Womach, CRS Report for Congress, *Farm Commodity Programs: Honey*, October 4, 2006, p. CRS-3.

[4] National Agricultural Statistics Service (NASS), Agricultural Statistics Board, United States Department of Agriculture (USDA) Honey Report, March 18, 2021, p. 5.

[5] *Honey*, NASS, USDA, Agriculture Statistics Board, March 22, 2017.

In addition to the production of raw honey, beekeepers can provide pollination services to supplement their incomes and to gain access to other sources of nectar for honey production. As such, beekeepers are often migratory, moving their hives as needed to areas in need of bees' pollination services or areas rich in certain flora to promote production of a distinct type of honey.[6] In addition, some full-time beekeepers specialize in the production of queen bees, packaged bees, nucleus colonies ("nucs"), or may focus on the production of beeswax or propolis to further augment their income.[7]

The Commission issued a U.S. producer questionnaire to 333 firms based on information contained in the petition and staff research. As noted above, 84 firms provided usable data on their operations. Staff believe that these responses represent 31.2 percent of U.S. production of raw honey during 2020 as reported by USDA/NASS.

In the Commission's U.S. producer questionnaire, firms were asked to identify if their firm produced raw honey using fewer than 3,800 colonies in the United States throughout the period of investigation (i.e., never exceeded 3,800 colonies in any given year). Firms that met these criteria (hereinafter, "smaller" firms) were allowed to submit an abbreviated version of the questionnaire providing general trade, financial, and employment data, while firms that produced raw honey using more than 3,800 colonies in the United States at any point during the period of investigation (hereinafter, "larger" firms) were required to complete a more detailed version of the questionnaire.

Table III-1 lists U.S. producers of raw honey, their production locations, positions on the petition, and shares of total production. Of the 84 responding U.S. producers, 74 are members of one of the petitioning organizations. Of the 10 firms that reported not to be a member of one of the petitioning organizations, *** the petition (*** and ***), *** the petition, and *** on the petition (***). The number of U.S. producers identifying as larger firms totaled 47 while the number of U.S. producers identifying as smaller firms totaled 37. Larger U.S. producers' share of total reported production was more than 90 percent in 2020.

---

[6] Pollination Facts, American Beekeeping Federation, June 14, 2016.

[7] National Agricultural Statistics Service (NASS), Agricultural Statistics Board, United States Department of Agriculture (USDA) Honey Report, March 18, 2021, pp. 1 and 4.

**Table III-1**
**Raw honey: U.S. producers, their positions on the petition, production locations, and shares of reported production, 2020**

Share and ratio in percent

| Firm | Position on petitions | Production location(s) | Firm Type | Share of reported production | Ratio to NASS overall production |
|---|---|---|---|---|---|
| 2J Honey | *** | Powers Lake, ND | *** | *** | *** |
| Adee Honey | Petitioner | Bruce, SD<br>Roscoe, SD | *** | *** | *** |
| Arnold Apiaries | Petitioner | Deckerville, MI | *** | *** | *** |
| Artesian Honey | *** | Artesian, SD | *** | *** | *** |
| B&B Apiaries | Petitioner | Buhl, ID | *** | *** | *** |
| Barkman | *** | Blountstown, FL<br>Bainbridge, GA<br>Weidman, MI<br>Victor, NY | *** | *** | *** |
| Bauer Honey | Petitioner | Fertile MN | *** | *** | *** |
| Beekman Apiaries | Petitioner | Fresno CA<br>Sanger CA<br>San Luis Obispo CA<br>Bakersfield CA | *** | *** | *** |
| Beeline Honey | Petitioner | Choteau, MT | *** | *** | *** |
| Belliston Bros Apiaries | Petitioner | Burley, ID | *** | *** | *** |
| Brady Bees | Petitioner | Liberty, TX<br>Cayuga, TX<br>Kennmare, ND | *** | *** | *** |
| Browning Honey | Petitioner | Idaho Falls, ID<br>Jamestown, ND | *** | *** | *** |
| Bryant Honey | Petitioner | Worland, WY | *** | *** | *** |
| Buhmann Apiaries | Petitioner | Zurich, MT | *** | *** | *** |
| California Apiaries | Petitioner | Hughson, CA<br>Selz, ND | *** | *** | *** |
| Captain Cook | Petitioner | Captain Cook, HI | *** | *** | *** |
| Cary's Honey | Petitioner | Lindsay, CA | *** | *** | *** |
| Chip's Bees | Petitioner | Fillmore, CA<br>Lakota, ND | *** | *** | *** |
| Collins Honey | Petitioner | Evadale, TX | *** | *** | *** |
| Cox Honey | Petitioner | Lewiston, UT | *** | *** | *** |
| Coy Bee | Petitioner | Wiggins, MS | *** | *** | *** |
| Coy's Honey | Petitioner | Jonesboro, AR | *** | *** | *** |

Table continued.

**Table III-1 Continued**
**Raw honey: U.S. producers, their positions on the petition, production locations, and shares of reported production, 2020**

Share and ratio in percent

| Firm | Position on petitions | Production location(s) | Firm Type | Share of reported production | Ratio to NASS overall production |
|---|---|---|---|---|---|
| Dan's Honey | Petitioner | Perham, MN | *** | *** | *** |
| Dennis Schiltgen | Petitioner | Martell, WI | *** | *** | *** |
| Duff Apiaries | Petitioner | Hampton, MN | *** | *** | *** |
| Eau Galle Apiaries | Petitioner | Eau Galle, WI | *** | *** | *** |
| Evergreen Honey | Petitioner | Bunkie, LA Jennings, LA | *** | *** | *** |
| Fairview Honey | Petitioner | Fairview MT Westmorland CA | *** | *** | *** |
| Golden Prairie | Petitioner | Manhattan, KS | *** | *** | *** |
| Gunter Honey | Petitioner | Towner, ND | *** | *** | *** |
| Harvest Honey | Petitioner | Baldwin, ND | *** | *** | *** |
| Hawaii Harvest Honey | Petitioner | Paauilo, HI | *** | *** | *** |
| Hawaii Island Honey | Petitioner | Keaau,HI St. Martinville, LA | *** | *** | *** |
| Hiatt Honey | Petitioner | Bowman, ND Madera, CA Ephrata, WA | *** | *** | *** |
| Hidden Hive | Petitioner | Rocky Ford | *** | *** | *** |
| Honl's Bees | Petitioner | Winthrop, MN | *** | *** | *** |
| Horton's Hives | Petitioner | Selah, WA | *** | *** | *** |
| Indian Summer | *** | Germantown, WI Webster, FL | *** | *** | *** |
| Integribees | Petitioner | Danbury, TX | *** | *** | *** |
| J&J Bee | Petitioner | Gobles, MI | *** | *** | *** |
| Jim's Honey | *** | Bakersfield, CA. Onida, SD. | *** | *** | *** |
| Johnson Apiaries | Petitioner | Iowa Illinois Wisconsin | *** | *** | *** |
| Jon Holte | Petitioner | Harris, Minnesota | *** | *** | *** |
| Jubilee HoneyBee | Petitioner | Camarillo, CA Ojai, CA Montpilier, ID Preston, ID | *** | *** | *** |

Table continued.

**Table III-1 Continued**
**Raw honey: U.S. producers, their positions on the petition, production locations, and shares of reported production, 2020**

Share and ratio in percent

| Firm | Position on petitions | Production location(s) | Firm Type | Share of reported production | Ratio to NASS overall production |
|---|---|---|---|---|---|
| Kona Queen | *** | Kailua Kona, HI Captain Cook, HI Ocean View, HI Hilo, HI | *** | *** | *** |
| Lambs Honey Farm | Petitioner | Mohall, ND Jasper, TX | *** | *** | *** |
| Larson Apiaries | Petitioner | Billings, MT | *** | *** | *** |
| LB Werks | Petitioner | Bancroft, WI Carthage, TX | *** | *** | *** |
| Monda Honey | Petitioner | East Grand Forks, MN | *** | *** | *** |
| Morlock Honey | Petitioner | Casselton, ND | *** | *** | *** |
| Mountain Avenue | Petitioner | Fontana, CA Garrison, ND Colome, SD Stanford, MT | *** | *** | *** |
| MW Maxwell Honey | Petitioner | Turtle Lake, ND Lake City, FL | *** | *** | *** |
| Newswander Apiaries | Petitioner | Preston, ID | *** | *** | *** |
| Northern Bloom | Petitioner | Wolf Point, MT | *** | *** | *** |
| Noyes Apiaries | Petitioner | Turtle Lake, ND Fruitland, ID | *** | *** | *** |
| Olivarez Honey | Petitioner | Big Timber, MT Roundup, MT Broadus, MT Alturas, CA Kona, HI | *** | *** | *** |
| Olsen Honey | Petitioner | Albany, OR | *** | *** | *** |
| Rick and Terri | Petitioner | Los Banos, CA | *** | *** | *** |
| Rittenhouse | Petitioner | Paynesville, MN | *** | *** | *** |
| River Road Honey | Petitioner | Greybull, WY Greybull, WY | *** | *** | *** |
| Rufers Apiaries | Petitioner | Waverly, MN Cokato, MN Howard Lake, MN Dassel, MN Litchfield, MN Paynesville, MN | *** | *** | *** |

Table continued.

**Table III-1 Continued**
**Raw honey: U.S. producers, their positions on the petition, production locations, and shares of reported production, 2020**

Share and ratio in percent

| Firm | Position on petitions | Production location(s) | Firm Type | Share of reported production | Ratio to NASS overall production |
|---|---|---|---|---|---|
| Sadler Honey | Petitioner | Apollo Beach, FL | *** | *** | *** |
| Selby Honey | Petitioner | Java, SD | *** | *** | *** |
| Shoreline Honey | Petitioner | Hudsonville MI | *** | *** | *** |
| Smith Revocable Trust | Petitioner | Eau Galle, WI | *** | *** | *** |
| Smoot Honey | Petitioner | Power, MT | *** | *** | *** |
| Steve E Park | Petitioner | Harlowton, MT<br>Palo Cedro, CA | *** | *** | *** |
| Stoddard Honey | Petitioner | Delta, UT | *** | *** | *** |
| Strachan Apiaries | Petitioner | Yuba City, CA<br>Choteau, MT | *** | *** | *** |
| Stroope Honey | Petitioner | Brazoria County, TX<br>Galveston County, TX<br>Uvalde County, TX<br>Floyd County, TX<br>Cavalier County, ND | *** | *** | *** |
| Sundberg Apiaries | Petitioner | Fergus Falls, MN | *** | *** | *** |
| Sweet Bee Honey | Petitioner | Milton Freewater, OR | *** | *** | *** |
| Sweet River | Petitioner | Beeville, Texas<br>Glen Ullin, ND | *** | *** | *** |
| Sweetland Honey | *** | Mapleton, UT | *** | *** | *** |

Table continued.

III-6

**Table III-1 Continued**
**Raw honey: U.S. producers, their positions on the petition, production locations, and shares of reported production, 2020**

Share and ratio in percent

| Firm | Position on petitions | Production location(s) | Firm Type | Share of reported production | Ratio to NASS overall production |
|---|---|---|---|---|---|
| Thomas Honey | Petitioner | Liberty, TX<br>Langdon, ND | *** | *** | *** |
| Three Bears | *** | Fargo, ND<br>Harwood, ND<br>Lake Park, MN<br>Hitterdal, MN<br>Hawley, MN<br>Glyndon, MN | *** | *** | *** |
| Tim Fenston | Petitioner | Madera, CA | *** | *** | *** |
| Treasure Valley | *** | Parma, ID<br>Nampa, ID<br>Nyssa, OR<br>Vale, OR<br>Colstrip, MT<br>Hay Springs, NE | *** | *** | *** |
| Ubees California | *** | Kerman, CA | *** | *** | *** |
| Ubees South Dakota | Petitioner | Redfield, SD | *** | *** | *** |
| Vazza | Petitioner | Clarno, OR<br>Hermiston, OR | *** | *** | *** |
| Wee Bee Honey | Petitioner | NY<br>FL | *** | *** | *** |
| Wilmer | Petitioner | Warroad, MN<br>Baudette, MN<br>Grygla, MN<br>Badger, MN<br>Lancaster, MN<br>Roseau, MN | *** | *** | *** |
| Wooten's Honey Bees | Petitioner | Crawford, NE<br>Hettinger, ND | *** | *** | *** |
| All large producers | Various | Various | Count--47 | *** | *** |
| All small producers | Various | Various | Count--37 | *** | *** |
| All producers | Petitioner--74;<br>Support--7;<br>Oppose--2 | Various | Count--84 | 100.0 | 31.2 |

Source:  Compiled from data submitted in response to Commission questionnaires.

Note:  Shares and ratios shown as "0.0" represent values greater than zero, but less than "0.05" percent. Zeroes, null values, and undefined calculations are suppressed and shown as "---".

As indicated in table III-2, two U.S. producers (\*\*\* and \*\*\*) are related to a U.S. importer of the subject merchandise (\*\*\*), and 10 firms reported common ownership or relationships with each other.[8] In addition, 38 of the 84 responding firms reported being members of the SHA cooperative.

**Table III-2**
**Raw honey: U.S. producers' ownership, related and/or affiliated firms**

\*       \*       \*       \*       \*       \*       \*

Source: Compiled from data submitted in response to Commission questionnaires.

---

[8] The following firms reported common ownership or relationships with each other: \*\*\*, \*\*\*, \*\*\*, \*\*\*, \*\*\*, and \*\*\*.

Table III-3 presents U.S. producers' reported changes in operations since January 1, 2018. Several U.S. producers reported reductions in the number of colonies due to colony collapse disorder or *Varroa* mites. Some U.S. producers reported expanding their number of colonies in response to low honey prices while others reported low honey prices as an obstacle to replacing colonies lost during the period of investigation. In addition, several U.S. producers reported issues with labor availability and increasing costs with the H-2A visa program.

**Table III-3**
**Raw honey: Larger U.S. producers' reported changes in operations, since January 1, 2018**

| Item | Firm name and narrative response on changes in operations |
|---|---|
| Expansion in number of colonies/ hives | *** |
| Expansion in number of colonies/ hives | *** |
| Expansion in number of colonies/ hives | *** |
| Expansion in number of colonies/ hives | *** |
| Expansion in number of colonies/ hives | *** |
| Expansion in number of colonies/ hives | *** |
| Expansion in number of colonies/ hives | *** |
| Expansion in number of colonies/ hives | *** |
| Expansion in number of colonies/ hives | *** |
| Expansion in number of colonies/ hives | *** |
| Expansion in number of colonies/ hives | *** |
| Expansion in number of colonies/ hives | *** |
| Expansion in number of colonies/ hives | *** |
| Expansion in number of colonies/ hives | *** |

| Item | Firm name and narrative response on changes in operations |
|---|---|
| Expansion in number of colonies/ hives | *** |
| Expansion in number of colonies/ hives | *** |
| Expansion in number of colonies/ hives | *** |
| Reduction in number of colonies/ hives | *** |
| Reduction in number of colonies/ hives | *** |
| Reduction in number of colonies/ hives | *** |
| Reduction in number of colonies/ hives | *** |
| Reduction in number of colonies/ hives | *** |
| Reduction in number of colonies/ hives | *** |
| Reduction in number of colonies/ hives | *** |
| Reduction in number of colonies/ hives | *** |
| Reduction in number of colonies/ hives | *** |
| Reduction in number of colonies/ hives | *** |
| Reduction in number of colonies/ hives | *** |
| Reduction in number of colonies/ hives | *** |
| Reduction in number of colonies/ hives | *** |
| Reduction in number of colonies/ hives | *** |
| Reduction in number of colonies/ hives | *** |
| Reduction in number of colonies/ hives | *** |
| Began basic filtering operations | *** |

| Item | Firm name and narrative response on changes in operations |
|---|---|
| Began basic filtering operations | *** |
| Began basic filtering operations | *** |
| Ceased basic filtering operations | *** |
| Ceased basic filtering operations | *** |
| Weather related events | *** |
| Weather related events | *** |
| Weather related events | *** |
| Weather related events | *** |
| Weather related events | *** |
| Weather related events | *** |
| Weather related events | *** |
| Weather related events | *** |
| Weather related events | *** |
| Weather related events | *** |
| Weather related events | *** |
| Weather related events | *** |
| Weather related events | *** |
| Weather related events | *** |
| Weather related events | *** |
| Weather related events | *** |
| Weather related events | *** |
| Disease or pest-related events | *** |
| Disease or pest-related events | *** |
| Disease or pest-related events | *** |
| Disease or pest-related events | *** |
| Disease or pest-related events | *** |
| Disease or pest-related events | *** |

| Item | Firm name and narrative response on changes in operations |
|---|---|
| Disease or pest-related events | *** |
| Disease or pest-related events | *** |
| Disease or pest-related events | *** |
| Disease or pest-related events | *** |
| Disease or pest-related events | *** |
| Disease or pest-related events | *** |
| Disease or pest-related events | *** |
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |

| Item | Firm name and narrative response on changes in operations |
|---|---|
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |
| Other (e.g., technology) | *** |
| Other (e.g., technology) | *** |
| Other (e.g., technology) | *** |
| Other (e.g., technology) | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

## U.S. production, capacity, and capacity utilization

Table III-4 presents U.S. producers' production and production shares, by state and by period as reported by USDA/NASS. Table III-5 presents the same production and production share data but grouped by region.[9] As reported by USDA/NASS, U.S. production of raw honey totaled 154.0 million pounds in 2018, increased to 156.9 million pounds in 2019 (a 1.9 percent increase), declined to 147.6 million pounds in 2020, and then further declined to 126.5 million pounds in 2021 (resulting in a 17.9 percent net decrease in total production from 2018 to 2021).

More than 36 percent of 2020 honey production occurred in North or South Dakota, and eight states (North Dakota, South Dakota, California, Texas, Montana, Florida, Minnesota, and Michigan) were responsible for more than 70 percent of total 2020 U.S. honey production. As presented in Table III-5, the Midwest region accounted for nearly half of 2020 raw honey production in the United States. The next largest honey producing region was the Pacific Coast (representing 13.6 percent of 2020 production), followed by the Mountains region (11.7 percent) and the Southeast region (11.3 percent).

**Table III-4**
**Raw honey: U.S. producers' production, by state and period**

Production in 1,000 pounds

| State | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|
| North Dakota | 39,600 | 33,800 | 38,610 | 28,325 |
| South Dakota | 11,985 | 19,440 | 14,945 | 12,250 |
| California | 13,735 | 16,080 | 13,760 | 9,570 |
| Texas | 7,392 | 7,560 | 8,949 | 7,672 |
| Montana | 14,720 | 14,878 | 8,910 | 6,669 |
| Florida | 10,535 | 9,225 | 8,832 | 8,492 |
| Minnesota | 7,259 | 6,962 | 5,940 | 7,125 |
| Michigan | 4,268 | 4,700 | 4,465 | 5,151 |
| All other states | 44,514 | 44,277 | 43,183 | 41,212 |
| All states | 154,008 | 156,922 | 147,594 | 126,466 |

Table continued.

---

[9] The following region definitions are used: Northeast: ME, VT, NH, MA, RI, CT, NY, NJ, PA; Midwest: OH, IN, MI, IL, WI, MN, IA, MO, KS, NE, SD, ND; Southeast: MD,DE, WV, VA, KY, NC, SC, TN, GA, FL, AL, MS; Central Southwest: LA, AR, OK, TX; Mountains: CO, NM, AZ, UT, NV, ID, MT, WY; Pacific Coast: WA, OR, CA; and Other: all other U.S. markets, including AK, HI, PR, and VI.

**Table III-4 Continued**
**Raw honey: U.S. producers' production, by state and period**

Share of production in percent

| State | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|
| North Dakota | 25.7 | 21.5 | 26.2 | 22.4 |
| South Dakota | 7.8 | 12.4 | 10.1 | 9.7 |
| California | 8.9 | 10.2 | 9.3 | 7.6 |
| Texas | 4.8 | 4.8 | 6.1 | 6.1 |
| Montana | 9.6 | 9.5 | 6.0 | 5.3 |
| Florida | 6.8 | 5.9 | 6.0 | 6.7 |
| Minnesota | 4.7 | 4.4 | 4.0 | 5.6 |
| Michigan | 2.8 | 3.0 | 3.0 | 4.1 |
| All other states | 28.9 | 28.2 | 29.3 | 32.6 |
| All states | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from data reported by the National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), accessed March 20, 2022.

**Table III-5**
**Raw honey: U.S. producers' production, by region and period**

Production in 1,000 pounds

| Region | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|
| Northeast | 4,647 | 5,605 | 5,176 | 5,089 |
| Midwest | 72,194 | 74,094 | 73,244 | 61,326 |
| Southeast | 17,843 | 17,104 | 16,620 | 16,235 |
| Central Southwest | 12,527 | 12,548 | 12,206 | 10,668 |
| Mountains | 23,346 | 23,174 | 17,257 | 15,096 |
| Pacific Coast | 20,301 | 21,699 | 20,141 | 15,308 |
| Other | 3,150 | 2,698 | 2,950 | 2,744 |
| All Regions | 154,008 | 156,922 | 147,594 | 126,466 |

Table continued.

**Table III-5 Continued**
**Raw honey: U.S. producers' production, by region and period**

Share of production in percent

| Region | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|
| Northeast | 3.0 | 3.6 | 3.5 | 4.0 |
| Midwest | 46.9 | 47.2 | 49.6 | 48.5 |
| Southeast | 11.6 | 10.9 | 11.3 | 12.8 |
| Central Southwest | 8.1 | 8.0 | 8.3 | 8.4 |
| Mountains | 15.2 | 14.8 | 11.7 | 11.9 |
| Pacific Coast | 13.2 | 13.8 | 13.6 | 12.1 |
| Other | 2.0 | 1.7 | 2.0 | 2.2 |
| All Regions | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from data reported by the National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), accessed March 20, 2022.

Table III-6 presents U.S. producers' colony numbers and colony shares, by state and by period, as reported by USDA/NASS. Table III-7 presents the same colony and colony share data but by region. U.s. producers' colonies totaled 2.83 million in 2018 and steadily declined to 2.7 million colonies in 2021 (representing a 4.7 percent net decrease in colonies from 2018 to 2021). Like the USDA/NASS production data, the USDA/NASS colony data shows a large share of colonies located in North and South Dakota (with 27.3 percent of the estimated total 2020 colonies). Additionally, California and Florida also have a large estimated concentration of colonies (11.8 and 7.1 percent of total 2020 colonies, respectively).

**Table III-6**
**Raw honey: U.S. producers' number of colonies, by state and period**

Number of colonies in 1,000 colonies

| State | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|
| North Dakota | 550 | 520 | 495 | 515 |
| South Dakota | 255 | 270 | 245 | 250 |
| California | 335 | 335 | 320 | 290 |
| Texas | 132 | 126 | 157 | 137 |
| Montana | 160 | 173 | 110 | 117 |
| Florida | 215 | 205 | 192 | 193 |
| Minnesota | 119 | 118 | 108 | 125 |
| Michigan | 97 | 94 | 95 | 101 |
| All other states | 965 | 971 | 984 | 968 |
| All states | 2,828 | 2,812 | 2,706 | 2,696 |

Table continued.

**Table III-6 Continued**
**Raw honey: U.S. producers' number of colonies, by state and period**

Shares in percent

| State | 2018 | 2019 | 2020 | 2021 |
|-------|------|------|------|------|
| North Dakota | 19.4 | 18.5 | 18.3 | 19.1 |
| South Dakota | 9.0 | 9.6 | 9.1 | 9.3 |
| California | 11.8 | 11.9 | 11.8 | 10.8 |
| Texas | 4.7 | 4.5 | 5.8 | 5.1 |
| Montana | 5.7 | 6.2 | 4.1 | 4.3 |
| Florida | 7.6 | 7.3 | 7.1 | 7.2 |
| Minnesota | 4.2 | 4.2 | 4.0 | 4.6 |
| Michigan | 3.4 | 3.3 | 3.5 | 3.7 |
| All other states | 34.1 | 34.5 | 36.4 | 35.9 |
| All states | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from data reported by the National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), accessed March 20, 2022.

**Table III-7**
**Raw honey: U.S. producers' number of colonies, by region and period**

Number of colonies in 1,000 colonies

| Region | 2018 | 2019 | 2020 | 2021 |
|--------|------|------|------|------|
| Northeast | 107 | 114 | 107 | 110 |
| Midwest | 1,196 | 1,177 | 1,112 | 1,161 |
| Southeast | 386 | 391 | 378 | 378 |
| Central Southwest | 205 | 200 | 210 | 191 |
| Mountains | 376 | 381 | 338 | 341 |
| Pacific Coast | 505 | 503 | 513 | 472 |
| Other | 53 | 46 | 48 | 43 |
| All Regions | 2,828 | 2,812 | 2,706 | 2,696 |

Table continued.

**Table III-7 Continued**
**Raw honey: U.S. producers' number of colonies, by state and period**

Shares in percent

| Region | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|
| Northeast | 3.8 | 4.1 | 4.0 | 4.1 |
| Midwest | 42.3 | 41.9 | 41.1 | 43.1 |
| Southeast | 13.6 | 13.9 | 14.0 | 14.0 |
| Central Southwest | 7.2 | 7.1 | 7.8 | 7.1 |
| Mountains | 13.3 | 13.5 | 12.5 | 12.6 |
| Pacific Coast | 17.9 | 17.9 | 19.0 | 17.5 |
| Other | 1.9 | 1.6 | 1.8 | 1.6 |
| All Regions | 100.0 | 100.0 | 100.0 | 100.0 |

Source:  Compiled from data reported by the National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), accessed March 20, 2022.

Table III-8 presents U.S. producers' average production per colony, by state and by period as reported by USDA/NASS. Table III-9 presents the same average production per colony but grouped by region. Figure III-1 shows U.S. producers' total production and production per colony by period as reported by USDA/NASS. Average production per colony remained stable at 54.5 pounds per colony between 2018 and 2020 (with a slight increase to 55.8 pounds per colony in 2019) before decreasing to 46.9 pounds per colony in 2021. Among the states, Montana had the highest reported average production per colony with 81.0 pounds per colony in 2020. The Midwest had the highest reported average production per colony of the regions with 65.9 pounds per colony in 2020.

**Table III-8**
**Raw honey: U.S. producers' average yield per colony, by state and period**

Yield in pounds per colony

| State | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|
| North Dakota | 72.0 | 65.0 | 78.0 | 55.0 |
| South Dakota | 47.0 | 72.0 | 61.0 | 49.0 |
| California | 41.0 | 48.0 | 43.0 | 33.0 |
| Texas | 56.0 | 60.0 | 57.0 | 56.0 |
| Montana | 92.0 | 86.0 | 81.0 | 57.0 |
| Florida | 49.0 | 45.0 | 46.0 | 44.0 |
| Minnesota | 61.0 | 59.0 | 55.0 | 57.0 |
| Michigan | 44.0 | 50.0 | 47.0 | 51.0 |
| All other states | 46.1 | 45.6 | 43.9 | 42.6 |
| All states | 54.5 | 55.8 | 54.5 | 46.9 |

Source:  Compiled from data reported by the National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), accessed March 20, 2022.

**Table III-9**
**Raw honey: U.S. producers' average yield per colony, by region and period**

Yield in pounds per colony

| Region | 2018 | 2019 | 2020 | 2021 |
|--------|------|------|------|------|
| Northeast | 43.4 | 49.2 | 48.4 | 46.3 |
| Midwest | 60.4 | 63.0 | 65.9 | 52.8 |
| Southeast | 46.2 | 43.7 | 44.0 | 42.9 |
| Central Southwest | 61.1 | 62.7 | 58.1 | 55.9 |
| Mountains | 62.1 | 60.8 | 51.1 | 44.3 |
| Pacific Coast | 40.2 | 43.1 | 39.3 | 32.4 |
| Other | 59.4 | 58.7 | 61.5 | 63.8 |
| All Regions | 54.5 | 55.8 | 54.5 | 46.9 |

Source:  Compiled from data reported by the National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), accessed March 20, 2022.

**Figure III-1**
**Raw honey: U.S. producers' total production and yield per colony, by period**



Source:  Compiled from data reported by the National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), accessed March 20, 2022.

Table III-10 presents larger U.S. producers' number of colonies, production, and yield in pounds per colony of raw honey production based on questionnaire data. Larger U.S. producers' reported number of colonies increased by about 9,100 colonies (1.8 percent) during 2018-20, while production and yields increased by 2.8 million pounds (7.1 percent) and 6.0 pounds per colony (7.8 percent) during 2018-19 before decreasing by 525,700 pounds (1.2 percent) and 3.0 pounds per colony (3.6 percent) during 2019-20. Larger U.S. producers' production and yields were 7.9 million pounds (21.0 percent) lower and 18.5 pounds per colony (24.8 percent) lower respectively during January-September 2021 compared to January-September 2020.

Table III-11 presents both larger and smaller U.S. producers' number of colonies, production, and yield in pounds per colony. Smaller U.S. producers' production and yields increased by about 878,000 pounds (19.7 percent) and 13.1 pounds per colony (19.5 percent) during 2018-19, then decreased by about 932,000 pounds (17.5 percent) and 9.2 pounds per colony (11.4 percent) during 2019-20. Smaller U.S. producers' reported colonies remained steady during 2018-19 then decreased by about 5,000 colonies (6.9 percent) during 2019-20.

**Table III-10**
**Raw honey: Larger U.S. producers' number of colonies, production and yield, by period**

Production in 1,000 pounds; Colonies in 1,000 colonies; Yield in pounds per colony

| Item | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|------|------|------|------|--------------|--------------|
| Production | 39,414 | 42,214 | 41,688 | 37,835 | 29,888 |
| Colonies | 511 | 508 | 520 | 508 | 533 |
| Yield | 77.1 | 83.1 | 80.2 | 74.5 | 56.0 |

Source: Compiled data submitted in response to Commission questionnaires.

**Table III-11**
**Raw honey: U.S. producers' number of colonies, production and yield, by producer size and period**

Production in 1,000 pounds; Colonies in 1,000 colonies; Yield in pounds per colony

| Item | Producer type | 2018 | 2019 | 2020 |
|------|---------------|------|------|------|
| Production | Large | 39,414 | 42,214 | 41,688 |
| Production | Small | 4,450 | 5,328 | 4,396 |
| Production | All sizes | 43,864 | 47,542 | 46,085 |
| Colonies | Large | 511 | 508 | 520 |
| Colonies | Small | 66 | 66 | 61 |
| Colonies | All sizes | 577 | 574 | 581 |
| Yield | Large | 77.1 | 83.1 | 80.2 |
| Yield | Small | 67.6 | 80.7 | 71.5 |
| Yield | All sizes | 76.1 | 82.9 | 79.3 |

Source:  Compiled data submitted in response to Commission questionnaires.

Table III-12 presents U.S. producers' colony/hive activity by month and activity type. Most U.S. producers reported engaging in commercial pollination during January-March, raw honey production during April-September, and then other activities during October-December.[10]

**Table III-12**
**Raw honey: Count of U.S. producers indicating colony/hive activity, by month and activity type**

Count in number of firms reporting

| Month | Raw honey production | Commercial pollination | Other |
|-------|---------------------:|-----------------------:|------:|
| January | 15 | 33 | 33 |
| February | 14 | 60 | 16 |
| March | 15 | 56 | 19 |
| April | 39 | 13 | 29 |
| May | 59 | 8 | 23 |
| June | 73 | 8 | 7 |
| July | 75 | 6 | 5 |
| August | 75 | 6 | 4 |
| September | 64 | 2 | 11 |
| October | 33 | 1 | 34 |
| November | 21 | 8 | 42 |
| December | 16 | 12 | 45 |

Source: Compiled data submitted in response to Commission questionnaires.

---

[10] U.S. producer *** stated honey production in South Dakota takes place during June-August while shipment of honey is dependent on when the crop is sold. ***'s producer questionnaire response, section III-7.

## U.S. producers' U.S. shipments and exports

Table III-13 presents U.S. producers' U.S. shipments, export shipments, and total shipments by quantity and value based on USDA/NASS and Census data. U.S. producers' U.S. shipments decreased irregularly between 2018 and 2020 with U.S. shipments increasing from 150.8 million pounds in 2018 to 153.2 million pounds in 2019 (a 1.6 percent increase) and then decreasing to 141.7 million pounds in 2020 (for a net decline of 6.0 percent from 2018 to 2020). U.S. producers' U.S. shipments were 11.6 million pounds (14.1 percent) lower during January-September 2021 compared to January-September 2020. By value, U.S. shipment values decreased from $335.1 million in 2018, to $307.2 million in 2019, and to $301.6 million in 2020 (representing a net decline of 10.0 percent from 2018 to 2020). U.S. shipment values were $6.9 million (4.0 percent) higher during January-September 2021 compared to January-September 2020.

Export shipments increased from 3.2 million pounds in 2018 to 5.9 million pounds in 2020 (representing an 82.7 percent increase from 2018-20) but were about 472,000 pounds (11.9 percent) lower during January-September 2021 compared to January-September 2020. Export shipment values increased irregularly from $5.2 million in 2018, then decreased to $5.1 million in 2019, and increased to $8.4 million in 2020 (representing a 59.9 percent increase from 2018 to 2020). Export shipment values were slightly lower, by about $18,000 (0.3 percent), during January-September 2021 compared to January-September 2020.

Total shipment values decreased from 2018 to 2020: from $340.4 million in 2018 to $312.3 million in 2019 and to $309.9 million in 2020 (representing an 8.9 percent total decrease in total shipment values from 2018 to 2020).

Unit values for U.S. shipments, export shipments, and total shipments all decreased between 2018 and 2020 (by 4.2, 12.4, and 5.0 percent, respectively) but were higher (21.0, 13.2, and 20.8 percent, respectively) during January-September 2021 compared to January-September 2020. U.S. producers' export shipments as a share of U.S. producers' total shipments was between 2.1 and 4.0 percent by quantity and 1.5 and 2.7 percent by value between 2018 and 2020.

**Table III-13**
**Raw honey: U.S. producers' shipments by location of shipment, by period**

Quantity in 1,000 pounds; value in 1,000 dollars; unit value in dollars per pounds; shares in percent

| Item | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|------|---------|------|------|------|--------------|--------------|
| U.S. shipments | Quantity | 150,778 | 153,222 | 141,694 | 82,357 | 70,732 |
| Export shipments | Quantity | 3,230 | 3,700 | 5,900 | 3,966 | 3,494 |
| Total shipments | Quantity | 154,008 | 156,922 | 147,594 | 86,324 | 74,226 |
| U.S. shipments | Value | 335,134 | 307,192 | 301,592 | 175,295 | 182,237 |
| Export shipments | Value | 5,224 | 5,083 | 8,355 | 5,578 | 5,560 |
| Total shipments | Value | 340,358 | 312,275 | 309,947 | 180,873 | 187,798 |
| U.S. shipments | Unit value | 2.22 | 2.00 | 2.13 | 2.13 | 2.58 |
| Export shipments | Unit value | 1.62 | 1.37 | 1.42 | 1.41 | 1.59 |
| Total shipments | Unit value | 2.21 | 1.99 | 2.10 | 2.10 | 2.53 |
| U.S. shipments | Share of quantity | 97.9 | 97.6 | 96.0 | 95.4 | 95.3 |
| Export shipments | Share of quantity | 2.1 | 2.4 | 4.0 | 4.6 | 4.7 |
| Total shipments | Share of quantity | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| U.S. shipments | Share of value | 98.5 | 98.4 | 97.3 | 96.9 | 97.0 |
| Export shipments | Share of value | 1.5 | 1.6 | 2.7 | 3.1 | 3.0 |
| Total shipments | Share of value | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Source: Total shipments based on utilized production data reported by the National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), accessed March 20, 2022, and export shipments based on domestic U.S. exports reported by the Census Bureau of the U.S. Department of Commerce using schedule B number 0409.00.0055, accessed February 22, 2022.

Note:  Partial year period U.S. shipments are derived using the full year NASS data for 2020 and 2021 adjusted down for the partial year period using the share of annual U.S. producer shipments reported between January to September in questionnaire responses to the preliminary investigation.

Table III-14 presents larger U.S. producers' U.S. shipments by type as reported by the U.S. producers that provided questionnaire responses. As discussed above, 38 of the 84 responding U.S. producers were members of the SHA which operates on a cooperative basis to process, pack, and market honey for its beekeeper members.[11] The SHA cooperative requires its members to ship the vast majority of their shipments to the cooperative. Larger U.S. producers categorized between 32.8 and 51.8 percent of their U.S. shipments by quantity and between 27.5 and 45.5 percent of their U.S. shipments by value as commercial shipments to cooperatives from January 2018 to September 2021. Comparatively, larger U.S. producers categorized between 41.3 and 60.3 percent of their U.S. shipments by quantity and between 46.0 and 63.7 percent of their U.S. shipments by value as commercial shipments to non-

---

[11] Over 200 independent beekeepers are SHA members. *SHA webpage,* https://siouxhoney.com/our-honey/, retrieved March 28, 2022.

cooperatives from January 2018 to September 2021. Throughout the period of investigation, less than seven percent of larger U.S. producers' reported U.S. shipments by quantity were transfers to related firms or internally consumed.

The share of larger U.S. producers' commercial shipments to cooperatives by quantity decreased by *** percentage points during 2018-20 and was *** percentage points lower during January-September 2021 compared to January-September 2020.[12] The share of larger U.S. producers' commercial shipments to non-cooperatives by quantity increased by *** percentage points during 2018-20 and was *** percentage points higher during January-September 2021 compared to January-September 2020. Unit values for larger U.S. producers' commercial shipments to non-cooperatives declined during 2018-20 but were higher during January-September 2021 compared to January-September 2020 and were consistently higher than unit values for shipments to cooperative firms throughout the period of investigation.

**Table III-14**
**Raw honey: Larger U.S. producers' U.S. shipments, by type and period**

Quantity in 1,000 pounds; Value in 1,000 dollars

| U.S. shipments type | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| Commercial to cooperatives | Quantity | *** | *** | *** | *** | *** |
| Commercial to all other | Quantity | *** | *** | *** | *** | *** |
| All commercial | Quantity | 32,680 | 32,049 | 35,432 | 27,673 | 31,121 |
| Internal consumption for retail packaging | Quantity | *** | *** | *** | *** | *** |
| Internal consumption for all other | Quantity | *** | *** | *** | *** | *** |
| All internal consumption | Quantity | 1,228 | 1,356 | 1,133 | 982 | 1,020 |
| Transfers to related firms | Quantity | 1,220 | 1,025 | 1,202 | 1,039 | 1,301 |
| All U.S. shipments | Quantity | 35,128 | 34,431 | 37,768 | 29,694 | 33,442 |
| Commercial to cooperatives | Value | *** | *** | *** | *** | *** |
| Commercial to all other | Value | *** | *** | *** | *** | *** |
| All commercial | Value | 57,021 | 48,791 | 54,872 | 42,843 | 51,395 |
| Internal consumption for retail packaging | Value | *** | *** | *** | *** | *** |
| Internal consumption for all other | Value | *** | *** | *** | *** | *** |
| All internal consumption | Value | 2,689 | 2,853 | 2,500 | 2,099 | 2,287 |
| Transfers to related firms | Value | 2,611 | 2,269 | 2,223 | 1,897 | 2,689 |
| All U.S. shipments | Value | 62,320 | 53,913 | 59,595 | 46,839 | 56,371 |

---

[12] U.S. producers *** and *** reported ending their SHA membership during the period of investigation. *** stated they could not make enough money as a member due to import prices. *** stated they ended their membership due to the co-op's payment over time to beekeepers and the possibility that the price offered by SHA would decline. ***'s producer questionnaire response, section IV-19. Email from ***.

**Table III-14 Continued**
**Raw honey: Larger U.S. producers' shipments by location of shipment, by period**

Unit values in dollars per pound

| U.S. shipments type | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| Commercial to cooperatives | Unit value | *** | *** | *** | *** | *** |
| Commercial to all other | Unit value | *** | *** | *** | *** | *** |
| All commercial | Unit value | 1.74 | 1.52 | 1.55 | 1.55 | 1.65 |
| Internal consumption for retail packaging | Unit value | *** | *** | *** | *** | *** |
| Internal consumption for all other | Unit value | *** | *** | *** | *** | *** |
| All internal consumption | Unit value | 2.19 | 2.10 | 2.21 | 2.14 | 2.24 |
| Transfers to related firms | Unit value | 2.14 | 2.21 | 1.85 | 1.82 | 2.07 |
| All U.S. shipments | Unit value | 1.77 | 1.57 | 1.58 | 1.58 | 1.69 |

Table continued.

**Table III-14 Continued**
**Raw honey: Larger U.S. producers' shipments by location of shipment, by period**

Shares in percent

| U.S. shipments type | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| Commercial to cooperatives | Share of quantity | *** | *** | *** | *** | *** |
| Commercial to all other | Share of quantity | *** | *** | *** | *** | *** |
| All commercial | Share of quantity | 93.0 | 93.1 | 93.8 | 93.2 | 93.1 |
| Internal consumption for retail packaging | Share of quantity | *** | *** | *** | *** | *** |
| Internal consumption for all other | Share of quantity | *** | *** | *** | *** | *** |
| All internal consumption | Share of quantity | 3.5 | 3.9 | 3.0 | 3.3 | 3.0 |
| Transfers to related firms | Share of quantity | 3.5 | 3.0 | 3.2 | 3.5 | 3.9 |
| All U.S. shipments | Share of quantity | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Commercial to cooperatives | Share of value | *** | *** | *** | *** | *** |
| Commercial to all other | Share of value | *** | *** | *** | *** | *** |
| All commercial | Share of value | 91.5 | 90.5 | 92.1 | 91.5 | 91.2 |
| Internal consumption for retail packaging | Share of value | *** | *** | *** | *** | *** |
| Internal consumption for all other | Share of value | *** | *** | *** | *** | *** |
| All internal consumption | Share of value | 4.3 | 5.3 | 4.2 | 4.5 | 4.1 |
| Transfers to related firms | Share of value | 4.2 | 4.2 | 3.7 | 4.0 | 4.8 |
| All U.S. shipments | Share of value | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from data submitted in response to Commission questionnaires.

**Table III-15**
**Raw honey: U.S. producers' U.S. shipments, by producer size and period**

Quantity in 1,000 pounds; Value in 1,000 dollars; Unit value in dollars per pound; Shares in percent

| Producer type | Measure | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| Large | Quantity | 35,128 | 34,431 | 37,768 |
| Small | Quantity | 4,081 | 4,760 | 3,953 |
| All sizes | Quantity | 39,209 | 39,191 | 41,721 |
| Large | Value | 62,320 | 53,913 | 59,595 |
| Small | Value | 7,712 | 7,824 | 6,673 |
| All sizes | Value | 70,032 | 61,737 | 66,268 |
| Large | Unit value | 1.77 | 1.57 | 1.58 |
| Small | Unit value | 1.89 | 1.64 | 1.69 |
| All sizes | Unit value | 1.79 | 1.58 | 1.59 |
| Large | Share of quantity | 89.6 | 87.9 | 90.5 |
| Small | Share of quantity | 10.4 | 12.1 | 9.5 |
| All sizes | Share of quantity | 100.0 | 100.0 | 100.0 |
| Large | Share of value | 89.0 | 87.3 | 89.9 |
| Small | Share of value | 11.0 | 12.7 | 10.1 |
| All sizes | Share of value | 100.0 | 100.0 | 100.0 |

Source: Compiled from data submitted in response to Commission questionnaires.

## Captive consumption

Section 771(7)(C)(iv) of the Act states that—[13]

*If domestic producers internally transfer significant production of the domestic like product for the production of a downstream article and sell significant production of the domestic like product in the merchant market, and the Commission finds that—*

*(I)    the domestic like product produced that is internally transferred for processing into that downstream article does not enter the merchant market for the domestic like product,*

*(II)    the domestic like product is the predominant material input in the production of that downstream article, and*

*then the Commission, in determining market share and the factors affecting financial performance . . ., shall focus primarily on the merchant market for the domestic like product.*

### Transfers and sales

As reported in table III-14 above, internal consumption accounted for between 3.0 percent and 3.9 percent of U.S. producers' U.S. shipments of raw honey. [14]

### First statutory criterion in captive consumption

The first requirement for application of the captive consumption provision is that the domestic like product that is internally transferred for processing into that downstream article not enter the merchant market for the domestic like product. As reported in table III-16, during the period of investigation the share of larger U.S. producers' reported internal consumption that was subsequently sold as is (i.e. as merchandise that was diverted back into the market for raw honey) ranged between *** percent and *** percent while the combined share of larger U.S. producers' reported internal consumption that was packaged into retail size containers or processed into retail honey (i.e. went into the production of downstream products) ranged between *** and *** percent.

---

[13] Amended by PL 114-27 (as signed, June 29, 2015), Trade Preferences Extension Act of 2015.

[14] During the preliminary phase, responding U.S. producers generally categorized their U.S. shipments to cooperatives as non-commercial (as internal consumption or transfers to related firms). Preliminary publication, p. III-22. During the final phase, staff requested U.S. producers report their shipments to cooperatives as commercial shipments.

**Table III-16**
**Raw honey: Larger U.S. producers' internal consumption and transfers to related firms by disposition**

Quantity in 1,000 pounds; Shares in percent

| Item | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| Sold as is (raw honey) | Quantity | *** | *** | *** | *** | *** |
| Packaged into retail containers <= 5 lbs. | Quantity | *** | *** | *** | *** | *** |
| Processed into retail honey | Quantity | *** | *** | *** | *** | *** |
| Unaccounted for | Quantity | *** | *** | *** | *** | *** |
| All non-commercial transactions | Quantity | *** | *** | *** | *** | *** |
| Sold as is (raw honey) | Share | *** | *** | *** | *** | *** |
| Packaged into retail containers <= 5 lbs. | Share | *** | *** | *** | *** | *** |
| Processed into retail honey | Share | *** | *** | *** | *** | *** |
| Unaccounted for | Share | *** | *** | *** | *** | *** |
| All non-commercial transactions | Share | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from data submitted in response to Commission questionnaires.

## Second statutory criterion in captive consumption

The second criterion of the captive consumption provision concerns whether the domestic like product is the predominant material input in the production of the downstream article that is captively produced. With respect to the downstream articles resulting from captive production, raw honey reportedly comprises 89.2 percent of the finished cost of downstream products.

**Table III-17**
**Raw honey: U.S. producers' share of raw honey accounted or out of all material inputs into retail honey, 2020**

Shares in percent

| Item | Share of value | Share of quantity |
|---|---|---|
| Raw honey | 89.2 | 94.0 |
| Other material inputs | 10.8 | 6.0 |
| All material inputs | 100.0 | 100.0 |

Source: Compiled from data submitted in response to Commission questionnaires.

# U.S. producers' inventories

Table III-18 present larger U.S. producers' end-of-period inventories and the ratio of these inventories to larger U.S. producers' production, U.S. shipments, and total shipments. Table III-19 presents inventory data by producer size and period.[15] Larger U.S. producers' end-of-period inventories increased by 11.6 million pounds (149.8 percent) during 2018-20 but were 7.0 million pounds (31.5 percent) lower in September 2021 compared to September 2020. The ratio of larger U.S. producers' inventories to U.S. production and shipments increased by 26.7 percentage points and 29.2 percentage points, respectively.

During 2018-20, smaller U.S. producers' end-of-period inventories increased by about 120,000 pounds while their ratio of end-of-period inventories to U.S. production and U.S. shipments increased by 2.8 percentage points and 3.3 percentage points, respectively.

**Table III-18**
**Raw honey: Larger U.S. producers' inventories and their ratio to select items, by period**

Quantity in 1,000 pounds; value in 1,000 dollars; unit value in dollars per pounds; shares in percent

| Item | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|------|------|------|------|--------------|--------------|
| End-of-period inventory quantity | 7,740 | 14,779 | 19,335 | 22,238 | 15,233 |
| Inventory ratio to U.S. production | 19.6 | 35.0 | 46.4 | 58.8 | 51.0 |
| Inventory ratio to U.S. shipments | 22.0 | 42.9 | 51.2 | 56.2 | 34.2 |
| Inventory ratio to total shipments | 22.0 | 42.9 | 51.2 | 56.2 | 34.2 |

Source: Compiled from data submitted in response to Commission questionnaires.

**Table III-19**
**Raw honey: U.S. producers' inventories and their ratio to select items, by producer size and period**

Quantity in 1,000 pounds; inventory ratios in percent

| Item | Producer type | 2018 | 2019 | 2020 |
|------|---------------|------|------|------|
| End-of-period inventory quantity | Large | 7,740 | 14,779 | 19,335 |
| Inventory ratio to U.S. production | Large | 19.6 | 35.0 | 46.4 |
| Inventory ratio to U.S. shipments | Large | 22.0 | 42.9 | 51.2 |
| Inventory ratio to total shipments | Large | 22.0 | 42.9 | 51.2 |
| End-of-period inventory quantity | Small | 272 | 330 | 392 |
| Inventory ratio to U.S. production | Small | 6.1 | 6.2 | 8.9 |
| Inventory ratio to U.S. shipments | Small | 6.7 | 6.9 | 9.9 |
| End-of-period inventory quantity | All sizes | 8,012 | 15,109 | 19,728 |
| Inventory ratio to U.S. production | All sizes | 18.3 | 31.8 | 42.8 |
| Inventory ratio to U.S. shipments | All sizes | 20.4 | 38.6 | 47.3 |

Source:  Compiled from data submitted in response to Commission questionnaires.

[15] Appendix G presents U.S. producer inventory data including full year 2021 as reported by NASS.

# U.S. producers' imports and purchases

Two related U.S. producers, \*\*\* and \*\*\*, reported imports of raw honey from a related importer during the period of investigation. \*\*\*'s imports of raw honey are presented in table III-20 while \*\*\*'s imports of raw honey are presented in table III-21. \*\*\*'s and \*\*\*'s reasons for importing are presented in table III-22.

**Table III-20**
**Raw honey: \*\*\*'s U.S. production, U.S. imports, and ratio of imports to production by period**

Quantity in 1,000 pounds; inventory ratios in percent

| Item | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|------|---------|------|------|------|--------------|--------------|
| U.S. production | Quantity | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Related importer \*\*\* imports from Brazil | Quantity | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Imports from Brazil to U.S. production | Ratio | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |

Source:  Compiled from data submitted in response to Commission questionnaires.

Note:  Shares and ratios shown as "0.0" represent values greater than zero, but less than "0.05" percent. Zeroes, null values, and undefined calculations are suppressed and shown as "---".

Note: \*\*\*

**Table III-21**
**Raw honey: \*\*\*'s U.S. production, U.S. imports, and ratio of imports to production by period**

Quantity in 1,000 pounds; inventory ratios in percent

| Item | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| U.S. production | Quantity | *** | *** | *** | *** | *** |
| Related importer *** imports from Brazil | Quantity | *** | *** | *** | *** | *** |
| Imports from Brazil to U.S. production | Ratio | *** | *** | *** | *** | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

Note:  Shares and ratios shown as "0.0" represent values greater than zero, but less than "0.05" percent. Zeroes, null values, and undefined calculations are suppressed and shown as "---".

Note: \*\*\*

**Table III-22**
**Raw honey: U.S. producers' reasons for importing; by firm**

| Item | Narrative response on reasons for importing |
|---|---|
| \*\*\*'s reason for importing | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

# U.S. employment, wages, and productivity

Table III-23 shows larger U.S. producers' employment-related data while tables III-24 and table III-25 show employment-related data for smaller U.S. producers' and all U.S. producers respectively.

**Table III-23**
**Raw honey: Larger U.S. producers' employment related information, by item, worker type and period**

| Item | Worker type | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|------|-------------|------|------|------|--------------|--------------|
| Production and related workers (PRWs) (number) | Compensated | *** | *** | *** | *** | *** |
| Total hours worked (1,000 hours) | Compensated | *** | *** | *** | *** | *** |
| Wages paid ($1,000) | Compensated | *** | *** | *** | *** | *** |
| Hours worked per PRW (hours) | Compensated | *** | *** | *** | *** | *** |
| Hourly wages (dollars per hour) | Compensated | *** | *** | *** | *** | *** |
| Production and related workers (PRWs) (number) | Non-compensated | *** | *** | *** | *** | *** |
| Total hours worked (1,000 hours) | Non-compensated | *** | *** | *** | *** | *** |
| Estimated wages paid ($1,000) | Non-compensated | *** | *** | *** | *** | *** |
| Hours worked per PRW (hours) | Non-compensated | *** | *** | *** | *** | *** |
| Estimated hourly wages (dollars per hour) | Non-compensated | *** | *** | *** | *** | *** |

Table continued.

**Table III-23 Continued**
**Raw honey: Larger U.S. producers' employment related information, by item, worker type and period**

| Item | Worker type | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| Production and related workers (PRWs) (number) | All workers | 1,112 | 1,168 | 1,165 | 1,154 | 1,132 |
| Total hours worked (1,000 hours) | All workers | 1,928 | 2,003 | 2,005 | 1,621 | 1,598 |
| Wages paid ($1,000) | All workers | 37,865 | 39,547 | 42,264 | 31,344 | 30,899 |
| Hours worked per PRW (hours) | All workers | 1,734 | 1,715 | 1,721 | 1,404 | 1,411 |
| Hourly wages (dollars per hour) | All workers | $19.64 | $19.74 | $21.08 | $19.34 | $19.34 |
| Productivity (pounds per hour) | All workers | 20.4 | 21.1 | 20.8 | 23.3 | 18.7 |
| Unit labor costs (dollars per pound) | All workers | $0.96 | $0.94 | $1.01 | $0.83 | $1.03 |

Source: Compiled from data submitted in response to Commission questionnaires.

Note: Wage based metrics for non-compensated workers were estimated using the company's reported number of hours worked by non-compensated workers and the company's average hourly wages of compensated workers. The all workers total then combines the reported wages for compensated workers and estimated non-compensated worker wages.

**Table III-24**
**Raw honey: Smaller U.S. producers' employment related information, by item and period**

| Item | 2018 | 2019 | 2020 |
|---|---|---|---|
| Production and related workers (PRWs) (number) | 181 | 190 | 195 |
| Total hours worked (1,000 hours) | 267 | 296 | 294 |
| Hours worked per PRW (hours) | 1,477 | 1,556 | 1,507 |
| Wages paid ($1,000) | 5,248 | 5,832 | 6,193 |
| Hourly wages (dollars per hour) | $19.63 | $19.73 | $21.07 |
| Productivity (pounds per hour) | 16.6 | 18.0 | 15.0 |
| Unit labor costs (dollars per pound) | $1.18 | $1.09 | $1.41 |

Source: Compiled from data submitted in response to Commission questionnaires.

Note: Small producers wages paid are derived using their reported hours worked and the average hourly wages of compensated workers for large U.S. producers.

**Table III-25**
**Raw honey: All U.S. producers' employment related information, by item and period**

| Item | 2018 | 2019 | 2020 |
|---|---|---|---|
| Production and related workers (PRWs) (number) | 1,293 | 1,358 | 1,360 |
| Total hours worked (1,000 hours) | 2,196 | 2,299 | 2,299 |
| Hours worked per PRW (hours) | 1,698 | 1,693 | 1,691 |
| Wages paid ($1,000) | 43,114 | 45,379 | 48,456 |
| Hourly wages (dollars per hour) | $19.64 | $19.74 | $21.07 |
| Productivity (pounds per hour) | 20.0 | 20.7 | 20.0 |
| Unit labor costs (dollars per pound) | $0.98 | $0.95 | $1.05 |

Source: Compiled from data submitted in response to Commission questionnaires.

Note: Wage based metrics for all U.S. producers include large producer compensated, the estimated large producer non-compensated, and derived small producers' wage data.

# Part IV: U.S. imports, apparent U.S. consumption, and market shares

## U.S. importers

The Commission issued importer questionnaires to 43 firms believed to be importers of subject raw honey, as well as to all U.S. producers of raw honey.[1] Usable questionnaire responses were received from 25 companies, representing 97.0 percent of U.S. imports in 2020 under HTS statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065.[2] Table IV-1 lists all responding U.S. importers of raw honey from Argentina, Brazil, India, Vietnam and other sources, their locations, and their shares of U.S. imports, in 2020.

---

[1] The Commission issued questionnaires to those firms identified in the petition, along with firms that, based on a review of data from third-party sources, may have accounted for more than one percent of total imports under HTS statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065 in 2018-20.

[2] Usable questionnaire responses represented 101.5 percent of U.S. imports from subject sources and 71.8 percent of U.S. imports from nonsubject sources in 2020 under HTS statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065.

**Table IV-1**
**Raw honey: U.S. importers, their headquarters, and share of imports within each source, 2020**

Share in percent

| Firm | Headquarters | Argentina | Brazil | India | Vietnam |
|------|--------------|-----------|--------|-------|---------|
| Apis Nativa | Ararangua, BR | *** | *** | *** | *** |
| Barkman Honey | Hillsboro, KS | *** | *** | *** | *** |
| Bees Brothers | Coral Gables, FL | *** | *** | *** | *** |
| Best Food Supplies | Coral Gables, FL | *** | *** | *** | *** |
| Bloom Honey | Westlake Village, CA | *** | *** | *** | *** |
| Burleson's | Waxahachie, TX | *** | *** | *** | *** |
| CM Goettsche | Basking Ridge, NJ | *** | *** | *** | *** |
| Delta Food | Laguna Niguel, CA | *** | *** | *** | *** |
| GloryBee | Eugene, OR | *** | *** | *** | *** |
| Honey Solutions | Baytown, TX | *** | *** | *** | *** |
| Honey Tree | Onsted, MI | *** | *** | *** | *** |
| Honeywheel | Gilbert, AZ | *** | *** | *** | *** |
| Impex | Tustin, CA | *** | *** | *** | *** |
| Lamex | Bloomington, MN | *** | *** | *** | *** |
| Natural Honey Importers | North Brunswick, NJ | *** | *** | *** | *** |
| Odem | Rosemere, QC | *** | *** | *** | *** |
| Prairie | Hillsboro, KS | *** | *** | *** | *** |
| Pure Sweet Honey | Verona, WI | *** | *** | *** | *** |
| Queen of America | Belleview, FL | *** | *** | *** | *** |
| Sarah Impex | Green Brook, NJ | *** | *** | *** | *** |
| Smitty Bee Honey | Defiance, IA | *** | *** | *** | *** |
| Sunland Trading | New Canaan, CT | *** | *** | *** | *** |
| Sweet Harvest Foods | Cannon Falls, MN | *** | *** | *** | *** |
| Toshoku America | Irvine, CA | *** | *** | *** | *** |
| Wholesome Sweeteners | Sugar Land, TX | *** | *** | *** | *** |
| All firms | Various | 100.0 | 100.0 | 100.0 | 100.0 |

Table continued.

**Table IV-1 Continued**
**Raw honey: U.S. importers, their headquarters, and share of imports within each source, 2020**

Share in percent

| Firm | Headquarters | Subject sources | Nonsubject Sources | All import sources |
|------|------|------|------|------|
| Apis Nativa | Ararangua, BR | *** | *** | *** |
| Barkman Honey | Hillsboro, KS | *** | *** | *** |
| Bees Brothers | Coral Gables, FL | *** | *** | *** |
| Best Food Supplies | Coral Gables, FL | *** | *** | *** |
| Bloom Honey | Westlake Village, CA | *** | *** | *** |
| Burleson's | Waxahachie, TX | *** | *** | *** |
| CM Goettsche | Basking Ridge, NJ | *** | *** | *** |
| Delta Food | Laguna Niguel, CA | *** | *** | *** |
| GloryBee | Eugene, OR | *** | *** | *** |
| Honey Solutions | Baytown, TX | *** | *** | *** |
| Honey Tree | Onsted, MI | *** | *** | *** |
| Honeywheel | Gilbert, AZ | *** | *** | *** |
| Impex | Tustin, CA | *** | *** | *** |
| Lamex | Bloomington, MN | *** | *** | *** |
| Natural Honey Importers | North Brunswick, NJ | *** | *** | *** |
| Odem | Rosemere, QC | *** | *** | *** |
| Prairie | Hillsboro, KS | *** | *** | *** |
| Pure Sweet Honey | Verona, WI | *** | *** | *** |
| Queen of America | Belleview, FL | *** | *** | *** |
| Sarah Impex | Green Brook, NJ | *** | *** | *** |
| Smitty Bee Honey | Defiance, IA | *** | *** | *** |
| Sunland Trading | New Canaan, CT | *** | *** | *** |
| Sweet Harvest Foods | Cannon Falls, MN | *** | *** | *** |
| Toshoku America | Irvine, CA | *** | *** | *** |
| Wholesome Sweeteners | Sugar Land, TX | *** | *** | *** |
| All firms | Various | 100.0 | 100.0 | 100.0 |

Source: Compiled from data submitted in response to Commission questionnaires.

Note: Shares and ratios shown as "0.0" represent values greater than zero, but less than "0.05" percent. Data shown as "---" represents an item for which no information was reported, whether that be a true zero, null, or non-response.

## U.S. imports

Table IV-2, table IV-3, and figure IV-1 present data for U.S. imports of raw honey from Argentina, Brazil, India, Vietnam, and all other sources. During 2018-20, imports from Argentina and Brazil increased by 9.7 percent and 44.9 percent, respectively, with most of the growth occurring in 2020.[3] During 2018-19, imports from India increased by 13.6 percent but then decreased by 24.4 percent during 2019-20 for a net decrease of 14.1 percent during 2018-20. During 2018-19, imports from Vietnam decreased by 5.6 percent but then increased by 36.6 percent during 2019-20 for a net increase of 29.0 percent during 2018-20.[4] U.S imports from all subject sources were higher during January-September 2021 compared to January-September 2020. U.S. imports from combined subject sources increased by 13.5 percent during 2018-20 and were 29.2 percent higher during January-September 2021 compared to January-September 2020. In contrast, the quantity of U.S. imports from nonsubject sources decreased by 26.7 percent during 2018-20, reflecting a 73.7 percent decrease in imports from Canada, and were 15.5 percent lower during January-September 2021 compared to January-September 2020. U.S. imports from all sources decreased by 4.3 percent during 2018-19 before increasing by 9.4 percent during 2019-20. The share of imports by quantity from subject sources increased from 78.1 percent in 2018 to 89.8 percent during January-September 2021. The ratio of imports from subject sources to U.S. production increased from 204.1 percent in 2018 to 241.8 percent in 2020.

Unit values for imports from Argentina decreased by 7.2 percent during 2018-19, then increased by 6.4 percent during 2019-20, and were 50.1 percent higher during January-September 2021 compared to January-September 2020. During 2018-20, unit values for imports from Brazil, India, and Vietnam decreased by 38.4 percent, 9.9 percent, and 14.2 percent, respectively. Unit values for combined subject sources decreased by 15.6 percent during 2018-20 but were 43.6 percent higher during January-September 2021 compared to January-September 2020. Unit values for combined nonsubject sources remained relatively stable during 2018-20 and were 37.2 percent higher during January-September 2021 compared to January-September 2020.

---

[3] U.S. importer *** stated its 2020 sales volume and imports increased by 22 percent year-over-year due to the hoarding of food products. *** importer questionnaire response, section II-2b.

[4] U.S. importer *** stated honey imports from Asia struggled to enter the United States due to an investigation on honey imports launched by CBP in 2018. *** importer questionnaire response, section II-2a.

**Table IV-2**
**Raw honey: U.S. imports by source and period**

Quantity in 1,000 pounds; value in 1,000 dollars; unit value in dollars per pound

| Source | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|--------|---------|------|------|------|--------------|--------------|
| Argentina | Quantity | 79,839 | 80,382 | 87,574 | 68,139 | 78,703 |
| Brazil | Quantity | 52,009 | 52,693 | 75,371 | 59,068 | 68,843 |
| India | Quantity | 96,215 | 109,312 | 82,617 | 65,566 | 106,903 |
| Vietnam | Quantity | 86,325 | 81,526 | 111,356 | 81,063 | 99,475 |
| Subject sources | Quantity | 314,387 | 323,913 | 356,918 | 273,836 | 353,925 |
| Canada | Quantity | 33,216 | 17,010 | 8,735 | 6,891 | 3,983 |
| Ukraine | Quantity | 18,168 | 19,051 | 24,161 | 16,652 | 12,883 |
| All other sources | Quantity | 36,676 | 25,134 | 31,631 | 23,929 | 23,256 |
| Nonsubject sources | Quantity | 88,061 | 61,196 | 64,528 | 47,473 | 40,122 |
| All import sources | Quantity | 402,448 | 385,109 | 421,446 | 321,309 | 394,047 |
| Argentina | Value | 89,457 | 83,588 | 96,880 | 73,591 | 127,592 |
| Brazil | Value | 81,982 | 58,128 | 73,220 | 54,657 | 109,415 |
| India | Value | 81,011 | 86,271 | 62,641 | 49,858 | 105,647 |
| Vietnam | Value | 61,769 | 52,830 | 68,358 | 49,519 | 79,950 |
| Subject sources | Value | 314,218 | 280,817 | 301,100 | 227,624 | 422,605 |
| Canada | Value | 46,980 | 24,355 | 13,106 | 10,018 | 7,369 |
| Ukraine | Value | 17,067 | 17,381 | 20,139 | 13,799 | 13,296 |
| All other sources | Value | 66,766 | 53,606 | 61,372 | 46,967 | 61,414 |
| Nonsubject sources | Value | 130,813 | 95,342 | 94,618 | 70,784 | 82,079 |
| All import sources | Value | 445,031 | 376,160 | 395,718 | 298,408 | 504,684 |
| Argentina | Unit value | 1.12 | 1.04 | 1.11 | 1.08 | 1.62 |
| Brazil | Unit value | 1.58 | 1.10 | 0.97 | 0.93 | 1.59 |
| India | Unit value | 0.84 | 0.79 | 0.76 | 0.76 | 0.99 |
| Vietnam | Unit value | 0.72 | 0.65 | 0.61 | 0.61 | 0.80 |
| Subject sources | Unit value | 1.00 | 0.87 | 0.84 | 0.83 | 1.19 |
| Canada | Unit value | 1.41 | 1.43 | 1.50 | 1.45 | 1.85 |
| Ukraine | Unit value | 0.94 | 0.91 | 0.83 | 0.83 | 1.03 |
| All other sources | Unit value | 1.82 | 2.13 | 1.94 | 1.96 | 2.64 |
| Nonsubject sources | Unit value | 1.49 | 1.56 | 1.47 | 1.49 | 2.05 |
| All import sources | Unit value | 1.11 | 0.98 | 0.94 | 0.93 | 1.28 |

Table continued.

**Table IV-2 Continued**
**Raw honey: U.S. imports by source and period**

Share in percent

| Source | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|--------|---------|------|------|------|--------------|--------------|
| Argentina | Share of quantity | 19.8 | 20.9 | 20.8 | 21.2 | 20.0 |
| Brazil | Share of quantity | 12.9 | 13.7 | 17.9 | 18.4 | 17.5 |
| India | Share of quantity | 23.9 | 28.4 | 19.6 | 20.4 | 27.1 |
| Vietnam | Share of quantity | 21.4 | 21.2 | 26.4 | 25.2 | 25.2 |
| Subject sources | Share of quantity | 78.1 | 84.1 | 84.7 | 85.2 | 89.8 |
| Canada | Share of quantity | 8.3 | 4.4 | 2.1 | 2.1 | 1.0 |
| Ukraine | Share of quantity | 4.5 | 4.9 | 5.7 | 5.2 | 3.3 |
| All other sources | Share of quantity | 9.1 | 6.5 | 7.5 | 7.4 | 5.9 |
| Nonsubject sources | Share of quantity | 21.9 | 15.9 | 15.3 | 14.8 | 10.2 |
| All import sources | Share of quantity | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Argentina | Share of value | 20.1 | 22.2 | 24.5 | 24.7 | 25.3 |
| Brazil | Share of value | 18.4 | 15.5 | 18.5 | 18.3 | 21.7 |
| India | Share of value | 18.2 | 22.9 | 15.8 | 16.7 | 20.9 |
| Vietnam | Share of value | 13.9 | 14.0 | 17.3 | 16.6 | 15.8 |
| Subject sources | Share of value | 70.6 | 74.7 | 76.1 | 76.3 | 83.7 |
| Canada | Share of value | 10.6 | 6.5 | 3.3 | 3.4 | 1.5 |
| Ukraine | Share of value | 3.8 | 4.6 | 5.1 | 4.6 | 2.6 |
| All other sources | Share of value | 15.0 | 14.3 | 15.5 | 15.7 | 12.2 |
| Nonsubject sources | Share of value | 29.4 | 25.3 | 23.9 | 23.7 | 16.3 |
| All import sources | Share of value | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Table continued.

**Table IV-2 Continued**
**Raw honey: U.S. imports by source and period**

Change in percent

| Source | Measure | 2018-20 | 2018-19 | 2019-20 | Jan-Sep 2020-21 |
|---|---|---|---|---|---|
| Argentina | %Δ Quantity | ▲9.7 | ▲0.7 | ▲8.9 | ▲15.5 |
| Brazil | %Δ Quantity | ▲44.9 | ▲1.3 | ▲43.0 | ▲16.5 |
| India | %Δ Quantity | ▼(14.1) | ▲13.6 | ▼(24.4) | ▲63.0 |
| Vietnam | %Δ Quantity | ▲29.0 | ▼(5.6) | ▲36.6 | ▲22.7 |
| Subject sources | %Δ Quantity | ▲13.5 | ▲3.0 | ▲10.2 | ▲29.2 |
| Canada | %Δ Quantity | ▼(73.7) | ▼(48.8) | ▼(48.6) | ▼(42.2) |
| Ukraine | %Δ Quantity | ▲33.0 | ▲4.9 | ▲26.8 | ▼(22.6) |
| All other sources | %Δ Quantity | ▼(13.8) | ▼(31.5) | ▲25.8 | ▼(2.8) |
| Nonsubject sources | %Δ Quantity | ▼(26.7) | ▼(30.5) | ▲5.4 | ▼(15.5) |
| All import sources | %Δ Quantity | ▲4.7 | ▼(4.3) | ▲9.4 | ▲22.6 |
| Argentina | %Δ Value | ▲8.3 | ▼(6.6) | ▲15.9 | ▲73.4 |
| Brazil | %Δ Value | ▼(10.7) | ▼(29.1) | ▲26.0 | ▲100.2 |
| India | %Δ Value | ▼(22.7) | ▲6.5 | ▼(27.4) | ▲111.9 |
| Vietnam | %Δ Value | ▲10.7 | ▼(14.5) | ▲29.4 | ▲61.5 |
| Subject sources | %Δ Value | ▼(4.2) | ▼(10.6) | ▲7.2 | ▲85.7 |
| Canada | %Δ Value | ▼(72.1) | ▼(48.2) | ▼(46.2) | ▼(26.4) |
| Ukraine | %Δ Value | ▲18.0 | ▲1.8 | ▲15.9 | ▼(3.6) |
| All other sources | %Δ Value | ▼(8.1) | ▼(19.7) | ▲14.5 | ▲30.8 |
| Nonsubject sources | %Δ Value | ▼(27.7) | ▼(27.1) | ▼(0.8) | ▲16.0 |
| All import sources | %Δ Value | ▼(11.1) | ▼(15.5) | ▲5.2 | ▲69.1 |
| Argentina | %Δ Unit value | ▼(1.3) | ▼(7.2) | ▲6.4 | ▲50.1 |
| Brazil | %Δ Unit value | ▼(38.4) | ▼(30.0) | ▼(11.9) | ▲71.8 |
| India | %Δ Unit value | ▼(9.9) | ▼(6.3) | ▼(3.9) | ▲30.0 |
| Vietnam | %Δ Unit value | ▼(14.2) | ▼(9.4) | ▼(5.3) | ▲31.6 |
| Subject sources | %Δ Unit value | ▼(15.6) | ▼(13.3) | ▼(2.7) | ▲43.6 |
| Canada | %Δ Unit value | ▲6.1 | ▲1.2 | ▲4.8 | ▲27.3 |
| Ukraine | %Δ Unit value | ▼(11.3) | ▼(2.9) | ▼(8.6) | ▲24.5 |
| All other sources | %Δ Unit value | ▲6.6 | ▲17.2 | ▼(9.0) | ▲34.5 |
| Nonsubject sources | %Δ Unit value | ▼(1.3) | ▲4.9 | ▼(5.9) | ▲37.2 |
| All import sources | %Δ Unit value | ▼(15.1) | ▼(11.7) | ▼(3.9) | ▲37.9 |

Source: Compiled from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022. U.S. import statistics are based on imports for consumption and landed duty paid value.

Note: Shares and ratios shown as "0.0" percent represent non-zero values less than "0.05" percent (if positive) and greater than "(0.05)" percent (if negative). Zeroes, null values, and undefined calculations are suppressed and shown as "---". Period changes preceded by a "▲" represent an increase, while period changes preceded by a "▼" represent a decrease.

**Table IV-3**
**Raw honey: U.S. imports ratio to NASS U.S. production, by source and period**

Ratios in percent

| Source | Measure | 2018 | 2019 | 2020 |
|--------|---------|------|------|------|
| Argentina | Ratio | 51.8 | 51.2 | 59.3 |
| Brazil | Ratio | 33.8 | 33.6 | 51.1 |
| India | Ratio | 62.5 | 69.7 | 56.0 |
| Vietnam | Ratio | 56.1 | 52.0 | 75.4 |
| Subject sources | Ratio | 204.1 | 206.4 | 241.8 |
| Canada | Ratio | 21.6 | 10.8 | 5.9 |
| Ukraine | Ratio | 11.8 | 12.1 | 16.4 |
| All other sources | Ratio | 23.8 | 16.0 | 21.4 |
| Nonsubject sources | Ratio | 57.2 | 39.0 | 43.7 |
| All import sources | Ratio | 261.3 | 245.4 | 285.5 |

Source: Compiled from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022 and from data reported by the National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), accessed March 20, 2022.  U.S. import statistics are based on imports for consumption.

**Table IV-4**
**Raw honey: U.S. re-exports, by period**

Quantity in 1,000 pounds; value in 1,000 dollars; unit value in dollars per pound

| Item | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|------|---------|------|------|------|--------------|--------------|
| Re-exports | Quantity | 5,838 | 7,137 | 6,154 | 4,686 | 5,191 |
| Re-exports | Value | 7,168 | 8,880 | 7,218 | 5,467 | 6,542 |
| Re-exports | Unit value | 1.23 | 1.24 | 1.17 | 1.17 | 1.26 |

Source: Compiled from official U.S. export statistics of the U.S. Department of Commerce using schedule B number 0409.00.0055, accessed February 22, 2022. U.S. exports statistics are based on foreign-origin exports (also known as re-exports).

**Figure IV-1**
**Raw honey: U.S. import quantities and average unit values, by source and period**



Source: Compiled from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022. U.S. import statistics are based on imports for consumption.

# Negligibility

The statute requires that an investigation be terminated without an injury determination if imports of the subject merchandise are found to be negligible.[5] Negligible imports are generally defined in the Act, as amended, as imports from a country of merchandise corresponding to a domestic like product where such imports account for less than 3 percent of the volume of all such merchandise imported into the United States in the most recent 12-month period for which data are available that precedes the filing of the petition or the initiation of the investigation. However, if there are imports of such merchandise from a number of countries subject to investigations initiated on the same day that individually account for less than 3 percent of the total volume of the subject merchandise, and if the imports from those countries collectively account for more than 7 percent of the volume of all such merchandise imported into the United States during the applicable 12-month period, then imports from such countries are deemed not to be negligible.[6] Imports from Argentina, Brazil, India, and Vietnam accounted for 84.8 percent of total imports of raw honey by quantity during April 2020 through March 2021, with country-specific shares ranging from 19.2 percent (Brazil and India) to 26.1 percent (Vietnam).

**Table IV-5**
**Raw honey: U.S. imports in the twelve-month period preceding the filing of the petition, April 2020 through March 2021**

Quantity in 1,000 pounds; share in percent

| Source of imports | Quantity | Share of quantity |
|---|---|---|
| Argentina | 89,037 | 20.3 |
| Brazil | 84,326 | 19.2 |
| India | 84,225 | 19.2 |
| Vietnam | 114,560 | 26.1 |
| All other sources | 66,402 | 15.1 |
| All import sources | 438,549 | 100.0 |

Source: Compiled from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022. U.S. import statistics are based on imports for consumption.

---

[5] Sections 703(a)(1), 705(b)(1), 733(a)(1), and 735(b)(1) of the Act (19 U.S.C. §§ 1671b(a)(1), 1671d(b)(1), 1673b(a)(1), and 1673d(b)(1)).

[6] Section 771 (24) of the Act (19 U.S.C § 1677(24)).

# Critical circumstances

On April 14, 2022, Commerce issued its final determination that "critical circumstances" exist with regard to imports from Argentina of raw honey from ACA Coop, Haedo, CIPSA, and other producers/exporters except NEXCO. Commerce also determined that "critical circumstances" exist with regard to imports from Vietnam of raw honey from Ban Me Thuot Honeybee, Honeybee Daklak, and other producers/exporters.[7] [8] In these investigations, if both Commerce and the Commission make affirmative final critical circumstances determinations, certain subject imports may be subject to antidumping duties retroactive by 90 days from November 23, 2021, the effective date of Commerce's preliminary affirmative LTFV determination. Tables IV-6 through IV-9 and figures IV-2 through IV-3 present data concerning imports and inventories subject to Commerce's final affirmative critical circumstances determinations.

---

[7] 87 FR 22179, 87 FR 22184, April 14, 2022.

[8] On November 23, 2021, Commerce issued its preliminary determination that "critical circumstances" exist with regard to imports from Argentina of raw honey from ACA Coop, Haedo, CIPSA, and other producers/exporters except NEXCO. On January 13, 2022, Commerce issued its preliminary determination that "critical circumstances" exist with regard to imports from Vietnam of raw honey from Ban Me Thuot Honeybee, Honeybee Daklak, and other producers/exporters. 86 FR 66531, November 23, 2021; 87 FR 2127, January 13, 2022, referenced in app. A. When petitioners file timely allegations of critical circumstances, Commerce examines whether there is a reasonable basis to believe or suspect that (1) either there is a history of dumping and material injury by reason of dumped imports in the United States or elsewhere of the subject merchandise, or the person by whom, or for whose account, the merchandise was imported knew or should have known that the exporter was selling the subject merchandise at LTFV and that there was likely to be material injury by reason of such sales; and (2) there have been massive imports of the subject merchandise over a relatively short period.

**Table IV-6**
**U.S. imports from Argentina subject to Commerce's affirmative final critical circumstances determination, by period**

Quantity in 1,000 pounds

| Month | Relation to petition | Quantity |
|---|---|---|
| November 2020 | Before | *** |
| December 2020 | Before | *** |
| January 2021 | Before | *** |
| February 2021 | Before | *** |
| March 2021 | Before | *** |
| April 2021 | Before | *** |
| May 2021 | After | *** |
| June 2021 | After | *** |
| July 2021 | After | *** |
| August 2021 | After | *** |
| September 2021 | After | *** |
| October 2021 | After | *** |

Table continued.

**Table IV-6 Continued**
**Raw honey: U.S. imports from Argentina subject to Commerce's affirmative final critical circumstances determination, by period**

Quantity in 1,000 pounds

| Comparison pre- and post-petition periods | Cumulative before period quantity | Cumulative after period quantity | Difference in percent |
|---|---|---|---|
| 1 month | *** | *** | *** |
| 2 months | *** | *** | *** |
| 3 months | *** | *** | *** |
| 4 months | *** | *** | *** |
| 5 months | *** | *** | *** |
| 6 months | *** | *** | *** |

Source: Compiled from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022 and from data submitted in response to Commission questionnaires. U.S. import statistics are based on imports for consumption.

**Figure IV-2**
**Raw honey: U.S. imports from Argentina subject to Commerce's final critical circumstances determination, by period**

\*       \*       \*       \*       \*       \*       \*

Source: Compiled from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022 and from data submitted in response to Commission questionnaires. U.S. import statistics are based on imports for consumption.

**Table IV-7**
**Raw honey: U.S. importers' U.S. inventories of subject imports from Argentina subject to Commerce's final affirmative critical circumstances determination, by date**

Quantity in 1,000 pounds; index in percent

| Date | Quantity | Index |
|------|----------|-------|
| April 30, 2021 | *** | *** |
| May 31, 2021 | *** | *** |
| June 30, 2021 | *** | *** |
| July 31, 2021 | *** | *** |
| August 31, 2021 | *** | *** |
| September 30, 2021 | *** | *** |
| October 31, 2021 | *** | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

Note: Index based on end of period inventories on April 30, 2021, equal to 100.0 percent.

IV-13

**Table IV-8**
**Raw honey: U.S. imports from Vietnam subject to Commerce's affirmative final critical circumstances determination, by period**

Quantity in 1,000 pounds

| Month | Relation to petition | Quantity |
|-------|---------------------|----------|
| November 2020 | Before | 9,887 |
| December 2020 | Before | 10,932 |
| January 2021 | Before | 9,308 |
| February 2021 | Before | 7,480 |
| March 2021 | Before | 6,430 |
| April 2021 | Before | 3,949 |
| May 2021 | After | 6,053 |
| June 2021 | After | 7,460 |
| July 2021 | After | 13,773 |
| August 2021 | After | 27,136 |
| September 2021 | After | 17,886 |
| October 2021 | After | 15,619 |

Table continued.

**Table IV-8 Continued**
**Raw honey: U.S. imports from Vietnam subject to Commerce's affirmative final critical circumstances determination, by period**

Quantity in 1,000 pounds

| Comparison pre- and post- petition period | Cumulative before period quantity | Cumulative after period quantity | Difference in percent |
|-------------------------------------------|-----------------------------------|----------------------------------|-----------------------|
| 1 month | 3,949 | 6,053 | 53.3 |
| 2 months | 10,379 | 13,513 | 30.2 |
| 3 months | 17,859 | 27,285 | 52.8 |
| 4 months | 27,167 | 54,422 | 100.3 |
| 5 months | 38,099 | 72,308 | 89.8 |
| 6 months | 47,986 | 87,926 | 83.2 |

Source: Compiled from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022. U.S. import statistics are based on imports for consumption.

**Figure IV-3**
**Raw honey: U.S. imports from Vietnam subject to Commerce's final critical circumstances determination, by period**



Source: Compiled from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022. U.S. import statistics are based on imports for consumption.

**Table IV-9**
**Raw honey: U.S. importers' U.S. inventories of subject imports from Vietnam subject to Commerce's final affirmative critical circumstances determination, by date**

Quantity in 1,000 pounds; index in percent

| Date | Quantity | Index |
|------|----------|-------|
| April 30, 2021 | *** | *** |
| May 31, 2021 | *** | *** |
| June 30, 2021 | *** | *** |
| July 31, 2021 | *** | *** |
| August 31, 2021 | *** | *** |
| September 30, 2021 | *** | *** |
| October 31, 2021 | *** | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

Note: Index based on end of period inventories on April 30, 2021, equal to 100.0 percent.

# Cumulation considerations

In assessing whether imports should be cumulated, the Commission determines whether U.S. imports from the subject countries compete with each other and with the domestic like product and has generally considered four factors: (1) fungibility, (2) presence of sales or offers to sell in the same geographical markets, (3) common or similar channels of distribution, and (4) simultaneous presence in the market. Information regarding channels of distribution, market areas, and interchangeability appear in Part II. Additional information concerning fungibility, geographical markets, and simultaneous presence in the market is presented below.

## Fungibility

Table IV-10 and figure IV-4 present data for U.S. shipments of raw honey by source and color in 2020.[9] In 2020, U.S. producers reported U.S. shipments of raw honey in all four colors. The largest share of U.S. producers' U.S. shipments was in white or lighter, 20.9 million pounds (56.6 percent), while the smallest share of U.S. producers' U.S. shipments was for amber or darker honey, 790,000 pounds (2.1 percent). U.S. importers reported U.S. shipments in all four colors for imports of raw honey from Argentina, Brazil, and India but reported no U.S. shipments of white or lighter raw honey for imports from Vietnam. U.S. imports from Vietnam accounted for the large majority of U.S. shipments of amber or darker raw honey (*** percent). U.S. importers' U.S. shipments from subject sources made up at least *** percent of U.S. shipments for light amber and amber or darker, *** percent of U.S. shipments for extra light amber, and *** percent of U.S. shipments for white or lighter raw honey.

---

[9] Data for U.S. shipments by source, color and time period are presented in Appendix E.

**Table IV-10**
**Raw honey: U.S. producers' and U.S. importers' U.S. shipments, by source and color, 2020**

Quantity in 1,000 pounds

| Source | White or lighter | Extra light amber | Light amber | Amber or darker | All colors |
|---|---|---|---|---|---|
| U.S. producers | 20,926 | 8,604 | 6,671 | 790 | 36,992 |
| Argentina | *** | *** | *** | *** | *** |
| Brazil | *** | *** | *** | *** | *** |
| India | *** | *** | *** | *** | *** |
| Vietnam | *** | *** | *** | *** | *** |
| Subject sources | *** | *** | *** | *** | *** |
| Nonsubject sources | *** | *** | *** | *** | *** |
| All import sources | *** | *** | *** | *** | *** |
| All sources | *** | *** | *** | *** | *** |

Table continued.

**Table IV-10 Continued**
**Raw honey: U.S. producers' and U.S. importers' U.S. shipments, by source and color, 2020**

Share across in percent

| Source | White or lighter | Extra light amber | Light amber | Amber or darker | All colors |
|---|---|---|---|---|---|
| U.S. producers | 56.6 | 23.3 | 18.0 | 2.1 | 100.0 |
| Argentina | *** | *** | *** | *** | 100.0 |
| Brazil | *** | *** | *** | *** | 100.0 |
| India | *** | *** | *** | *** | 100.0 |
| Vietnam | *** | *** | *** | *** | 100.0 |
| Subject sources | *** | *** | *** | *** | 100.0 |
| Nonsubject sources | *** | *** | *** | *** | 100.0 |
| All import sources | *** | *** | *** | *** | 100.0 |
| All sources | *** | *** | *** | *** | 100.0 |

Table continued.

**Table IV-10 Continued**
**Raw honey: U.S. producers' and U.S. importers' U.S. shipments, by source and color, 2020**

Share down in percent

| Source | White or lighter | Extra light amber | Light amber | Amber or darker | All colors |
|---|---|---|---|---|---|
| U.S. producers | *** | *** | *** | *** | *** |
| Argentina | *** | *** | *** | *** | *** |
| Brazil | *** | *** | *** | *** | *** |
| India | *** | *** | *** | *** | *** |
| Vietnam | *** | *** | *** | *** | *** |
| Subject sources | *** | *** | *** | *** | *** |
| Nonsubject sources | *** | *** | *** | *** | *** |
| All import sources | *** | *** | *** | *** | *** |
| All sources | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from data submitted in response to Commission questionnaires.

**Figure IV-4**
**Raw honey: U.S. producers' and U.S. importers' U.S. shipments, by source and color, 2020**

\*        \*        \*        \*        \*        \*        \*

Source: Compiled from data submitted in response to Commission questionnaires and official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022. U.S. import statistics are based on imports for consumption.

Table IV-11 and figure IV-5 present data for U.S. shipments of raw honey by source and product type in 2020.[10] U.S. imports from subject sources accounted for 90.3 percent of U.S. shipments of organic honey and 75.2 percent of U.S. shipments of conventional honey. U.S. imports from Brazil accounted for the large majority (81.8 percent) of U.S. shipments of organic honey while imports from Vietnam, Argentina, and India accounted for the largest shares of U.S. shipments of conventional honey (29.3 percent, 22.2 percent, and 21.2 percent, respectively). U.S. producers reported no U.S. shipments of organic honey in 2020.

**Table IV-11**
**Raw honey: U.S. producers' and U.S. importers' U.S. shipments, by source and product type, 2020**

Quantity in 1,000 pounds

| Source | Organic | Conventional | All product types |
|---|---|---|---|
| U.S. producers | --- | 36,992 | 36,992 |
| Argentina | 3,687 | 83,887 | 87,574 |
| Brazil | 65,844 | 9,528 | 75,371 |
| India | 2,653 | 79,964 | 82,617 |
| Vietnam | 502 | 110,854 | 111,356 |
| Subject sources | 72,686 | 284,233 | 356,918 |
| Nonsubject sources | 7,775 | 56,752 | 64,528 |
| All import sources | 80,461 | 340,985 | 421,446 |
| All sources | 80,461 | 377,977 | 458,438 |

Table continued.

**Table IV-11 Continued**
**Raw honey: U.S. producers' and U.S. importers' U.S. shipments, by source and product type, 2020**

Share across in percent

| Source | Organic | Conventional | All product types |
|---|---|---|---|
| U.S. producers | --- | 100.0 | 100.0 |
| Argentina | 4.2 | 95.8 | 100.0 |
| Brazil | 87.4 | 12.6 | 100.0 |
| India | 3.2 | 96.8 | 100.0 |
| Vietnam | 0.5 | 99.5 | 100.0 |
| Subject sources | 20.4 | 79.6 | 100.0 |
| Nonsubject sources | 12.0 | 88.0 | 100.0 |
| All import sources | 19.1 | 80.9 | 100.0 |
| All sources | 17.6 | 82.4 | 100.0 |

Table continued.

---

[10] Data for U.S. shipments by source, product type, and time period are presented in Appendix F.

**Table IV-11 Continued**
**Raw honey: U.S. producers' and U.S. importers' U.S. shipments, by source and product type, 2020**

Share down in percent

| Source | Organic | Conventional | All product types |
|---|---|---|---|
| U.S. producers | --- | 9.8 | 8.1 |
| Argentina | 4.6 | 22.2 | 19.1 |
| Brazil | 81.8 | 2.5 | 16.4 |
| India | 3.3 | 21.2 | 18.0 |
| Vietnam | 0.6 | 29.3 | 24.3 |
| Subject sources | 90.3 | 75.2 | 77.9 |
| Nonsubject sources | 9.7 | 15.0 | 14.1 |
| All import sources | 100.0 | 90.2 | 91.9 |
| All sources | 100.0 | 100.0 | 100.0 |

Source: Compiled from data submitted in response to Commission questionnaires and official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022. U.S. import statistics are based on imports for consumption.

**Figure IV-5**
**Raw honey: U.S. producers' and U.S. importers' U.S. shipments, by source and product type, 2020**



Source: Compiled from data submitted in response to Commission questionnaires and official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022. U.S. import statistics are based on imports for consumption.

## Geographical markets

U.S. imports from each subject source entered through all four border entries in 2020. The most common border of entry for imports from each subject source was through the East. The least common border of entry for imports from Argentina and Brazil was through the North while the least common border of entry for imports from India and Vietnam were through the South and West, respectively.

**Table IV-12**
**Raw honey: U.S. imports by source and border of entry, 2020**

Quantity in 1,000 pounds

| Source | East | North | South | West | All borders |
|---|---|---|---|---|---|
| Argentina | 55,887 | 778 | 29,471 | 1,438 | 87,574 |
| Brazil | 38,582 | 3,030 | 30,402 | 3,358 | 75,371 |
| India | 36,007 | 28,105 | 6,735 | 11,770 | 82,617 |
| Vietnam | 34,403 | 26,343 | 26,030 | 24,579 | 111,356 |
| Subject sources | 164,879 | 58,255 | 92,639 | 41,145 | 356,918 |
| Canada | 656 | 8,005 | --- | 75 | 8,735 |
| Ukraine | 8,818 | 2,320 | 8,991 | 4,031 | 24,161 |
| All other sources | 11,947 | 891 | 15,239 | 3,554 | 31,631 |
| Nonsubject sources | 21,421 | 11,216 | 24,230 | 7,660 | 64,528 |
| All import sources | 186,301 | 69,471 | 116,869 | 48,805 | 421,446 |

Table continued.

**Table IV-12 Continued**
**Raw honey: U.S. imports by source and border of entry, 2020**

Share across in percent

| Source | East | North | South | West | All borders |
|---|---|---|---|---|---|
| Argentina | 63.8 | 0.9 | 33.7 | 1.6 | 100.0 |
| Brazil | 51.2 | 4.0 | 40.3 | 4.5 | 100.0 |
| India | 43.6 | 34.0 | 8.2 | 14.2 | 100.0 |
| Vietnam | 30.9 | 23.7 | 23.4 | 22.1 | 100.0 |
| Subject sources | 46.2 | 16.3 | 26.0 | 11.5 | 100.0 |
| Canada | 7.5 | 91.6 | --- | 0.9 | 100.0 |
| Ukraine | 36.5 | 9.6 | 37.2 | 16.7 | 100.0 |
| All other sources | 37.8 | 2.8 | 48.2 | 11.2 | 100.0 |
| Nonsubject sources | 33.2 | 17.4 | 37.6 | 11.9 | 100.0 |
| All import sources | 44.2 | 16.5 | 27.7 | 11.6 | 100.0 |

Table continued.

**Table IV-12 Continued**
**Raw honey: U.S. imports by source and border of entry, 2020**

Share down in percent

| Source | East | North | South | West | All borders |
|---|---|---|---|---|---|
| Argentina | 30.0 | 1.1 | 25.2 | 2.9 | 20.8 |
| Brazil | 20.7 | 4.4 | 26.0 | 6.9 | 17.9 |
| India | 19.3 | 40.5 | 5.8 | 24.1 | 19.6 |
| Vietnam | 18.5 | 37.9 | 22.3 | 50.4 | 26.4 |
| Subject sources | 88.5 | 83.9 | 79.3 | 84.3 | 84.7 |
| Canada | 0.4 | 11.5 | --- | 0.2 | 2.1 |
| Ukraine | 4.7 | 3.3 | 7.7 | 8.3 | 5.7 |
| All other sources | 6.4 | 1.3 | 13.0 | 7.3 | 7.5 |
| Nonsubject sources | 11.5 | 16.1 | 20.7 | 15.7 | 15.3 |
| All import sources | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022. U.S. import statistics are based on imports for consumption.

Note:  Shares and ratios shown as "0.0" represent values greater than zero, but less than "0.05" percent. Zeroes, null values, and undefined calculations are suppressed and shown as "---".

## Presence in the market

Table IV-13, figure IV-6, and figure IV-7 present data on the monthly entries of U.S. imports of raw honey by source during January 2018 through December 2021. Imports from all subject sources were present in every month during January 2018 through December 2021.

**Table IV-13**
**Raw honey: Quantity of U.S. imports, by source and month**

Quantity in 1,000 pounds

| Year | Month | Argentina | Brazil | India | Vietnam |
|------|-------|-----------|--------|-------|---------|
| 2018 | January | 1,894 | 3,607 | 2,805 | 5,389 |
| 2018 | February | 2,163 | 3,777 | 2,895 | 2,908 |
| 2018 | March | 4,211 | 2,192 | 5,500 | 3,202 |
| 2018 | April | 5,351 | 3,757 | 11,599 | 3,607 |
| 2018 | May | 10,963 | 5,864 | 15,516 | 4,987 |
| 2018 | June | 4,614 | 2,823 | 11,686 | 6,078 |
| 2018 | July | 9,938 | 4,611 | 9,462 | 7,850 |
| 2018 | August | 6,296 | 6,453 | 8,478 | 10,157 |
| 2018 | September | 4,774 | 5,809 | 5,926 | 9,001 |
| 2018 | October | 16,373 | 4,105 | 6,611 | 12,417 |
| 2018 | November | 9,098 | 4,635 | 6,787 | 12,859 |
| 2018 | December | 4,165 | 4,376 | 8,949 | 7,870 |
| 2019 | January | 5,553 | 4,271 | 7,021 | 7,919 |
| 2019 | February | 3,227 | 3,325 | 3,844 | 5,300 |
| 2019 | March | 4,667 | 3,349 | 7,983 | 3,705 |
| 2019 | April | 9,290 | 3,088 | 13,545 | 4,033 |
| 2019 | May | 8,143 | 3,424 | 15,729 | 4,251 |
| 2019 | June | 7,866 | 3,548 | 8,028 | 5,711 |
| 2019 | July | 6,526 | 6,266 | 8,087 | 8,667 |
| 2019 | August | 5,635 | 5,203 | 9,764 | 9,510 |
| 2019 | September | 6,975 | 5,885 | 8,370 | 6,573 |
| 2019 | October | 7,588 | 4,482 | 8,739 | 9,823 |
| 2019 | November | 8,216 | 5,692 | 10,179 | 6,537 |
| 2019 | December | 6,696 | 4,160 | 8,023 | 9,497 |

Table continued.

**Table IV-13 Continued**
**Raw honey: Quantity of U.S. imports, by source and month**

Quantity in 1,000 pounds

| Year | Month | Argentina | Brazil | India | Vietnam |
|------|-------|-----------|--------|-------|---------|
| 2020 | January | 6,756 | 5,078 | 8,191 | 10,367 |
| 2020 | February | 4,254 | 3,268 | 7,048 | 5,929 |
| 2020 | March | 7,055 | 6,545 | 5,511 | 3,719 |
| 2020 | April | 8,153 | 6,347 | 6,063 | 8,834 |
| 2020 | May | 10,943 | 6,918 | 6,023 | 11,765 |
| 2020 | June | 8,114 | 6,396 | 6,391 | 9,610 |
| 2020 | July | 7,909 | 8,039 | 5,610 | 8,392 |
| 2020 | August | 8,335 | 7,822 | 7,211 | 11,718 |
| 2020 | September | 6,621 | 8,657 | 13,518 | 10,730 |
| 2020 | October | 7,741 | 5,708 | 5,338 | 9,475 |
| 2020 | November | 5,912 | 5,187 | 4,728 | 9,887 |
| 2020 | December | 5,781 | 5,409 | 6,985 | 10,932 |
| 2021 | January | 4,546 | 5,977 | 6,183 | 9,308 |
| 2021 | February | 6,490 | 8,950 | 4,346 | 7,480 |
| 2021 | March | 8,491 | 8,917 | 11,829 | 6,430 |
| 2021 | April | 8,852 | 8,880 | 6,364 | 3,949 |
| 2021 | May | 11,608 | 7,619 | 15,101 | 6,053 |
| 2021 | June | 10,649 | 12,193 | 13,238 | 7,460 |
| 2021 | July | 10,357 | 6,190 | 18,664 | 13,773 |
| 2021 | August | 9,065 | 5,133 | 19,421 | 27,136 |
| 2021 | September | 8,644 | 4,984 | 11,757 | 17,886 |
| 2021 | October | 11,295 | 5,154 | 11,463 | 15,619 |
| 2021 | November | 3,060 | 1,687 | 3,162 | 5,172 |
| 2021 | December | 1,279 | 468 | 2,394 | 2,958 |

Table continued.

**Table IV-13 Continued**
**Raw honey: Quantity of U.S. imports, by source and month**

Quantity in 1,000 pounds

| Year | Month | Subject sources | Canada | Ukraine | All other sources | Nonsubject sources | All import sources |
|------|-------|-----------------|--------|---------|-------------------|--------------------|--------------------|
| 2018 | January | 13,695 | 2,049 | 1,959 | 3,822 | 7,830 | 21,525 |
| 2018 | February | 11,743 | 2,602 | 843 | 2,593 | 6,038 | 17,781 |
| 2018 | March | 15,105 | 4,220 | 167 | 2,903 | 7,290 | 22,395 |
| 2018 | April | 24,313 | 3,137 | 875 | 2,484 | 6,496 | 30,809 |
| 2018 | May | 37,330 | 2,939 | 541 | 3,734 | 7,214 | 44,544 |
| 2018 | June | 25,201 | 2,219 | 541 | 4,634 | 7,394 | 32,595 |
| 2018 | July | 31,861 | 2,837 | 888 | 2,560 | 6,285 | 38,146 |
| 2018 | August | 31,384 | 3,163 | 547 | 2,607 | 6,317 | 37,701 |
| 2018 | September | 25,510 | 1,876 | 1,422 | 2,600 | 5,899 | 31,409 |
| 2018 | October | 39,506 | 4,272 | 4,229 | 2,762 | 11,264 | 50,769 |
| 2018 | November | 33,379 | 2,923 | 2,658 | 2,946 | 8,527 | 41,906 |
| 2018 | December | 25,360 | 978 | 3,498 | 3,031 | 7,508 | 32,868 |
| 2019 | January | 24,764 | 1,346 | 3,747 | 1,942 | 7,034 | 31,798 |
| 2019 | February | 15,697 | 2,064 | 2,653 | 1,884 | 6,602 | 22,299 |
| 2019 | March | 19,704 | 2,185 | 1,180 | 1,649 | 5,013 | 24,717 |
| 2019 | April | 29,956 | 1,898 | 2,928 | 2,344 | 7,170 | 37,126 |
| 2019 | May | 31,546 | 1,080 | 2,128 | 2,524 | 5,732 | 37,278 |
| 2019 | June | 25,154 | 1,279 | 1,050 | 3,066 | 5,394 | 30,548 |
| 2019 | July | 29,546 | 939 | 1,010 | 2,359 | 4,307 | 33,853 |
| 2019 | August | 30,113 | 1,865 | 928 | 2,279 | 5,072 | 35,184 |
| 2019 | September | 27,803 | 1,025 | 773 | 1,483 | 3,281 | 31,084 |
| 2019 | October | 30,632 | 1,051 | 1,601 | 2,096 | 4,748 | 35,380 |
| 2019 | November | 30,624 | 924 | 463 | 1,750 | 3,137 | 33,762 |
| 2019 | December | 28,375 | 1,357 | 591 | 1,757 | 3,705 | 32,081 |

Table continued.

**Table IV-13 Continued**
**Raw honey: Quantity of U.S. imports, by source and month**

Quantity in 1,000 pounds

| Year | Month | Subject sources | Canada | Ukraine | All other sources | Nonsubject sources | All import sources |
|------|-------|----------------|--------|---------|-------------------|--------------------|--------------------|
| 2020 | January | 30,392 | 519 | 684 | 2,289 | 3,493 | 33,885 |
| 2020 | February | 20,498 | 826 | 2,477 | 1,668 | 4,971 | 25,470 |
| 2020 | March | 22,829 | 991 | 1,097 | 2,483 | 4,572 | 27,400 |
| 2020 | April | 29,396 | 435 | 2,940 | 2,379 | 5,754 | 35,149 |
| 2020 | May | 35,649 | 506 | 3,169 | 2,630 | 6,304 | 41,953 |
| 2020 | June | 30,512 | 369 | 3,612 | 2,565 | 6,546 | 37,057 |
| 2020 | July | 29,950 | 82 | 1,752 | 3,609 | 5,443 | 35,394 |
| 2020 | August | 35,085 | 1,788 | 749 | 3,342 | 5,878 | 40,963 |
| 2020 | September | 39,526 | 1,375 | 173 | 2,964 | 4,512 | 44,038 |
| 2020 | October | 28,262 | 936 | 1,136 | 2,721 | 4,794 | 33,056 |
| 2020 | November | 25,714 | 465 | 1,388 | 3,136 | 4,990 | 30,703 |
| 2020 | December | 29,107 | 443 | 4,984 | 1,845 | 7,272 | 36,378 |
| 2021 | January | 26,014 | 326 | 2,479 | 2,325 | 5,130 | 31,144 |
| 2021 | February | 27,266 | 391 | 2,057 | 1,954 | 4,402 | 31,668 |
| 2021 | March | 35,668 | 172 | 2,536 | 2,670 | 5,378 | 41,046 |
| 2021 | April | 28,045 | 120 | 1,123 | 2,136 | 3,379 | 31,424 |
| 2021 | May | 40,381 | 421 | 1,759 | 1,665 | 3,845 | 44,226 |
| 2021 | June | 43,541 | 89 | 945 | 4,174 | 5,209 | 48,749 |
| 2021 | July | 48,984 | 543 | 932 | 3,057 | 4,532 | 53,516 |
| 2021 | August | 60,756 | 928 | 841 | 2,941 | 4,710 | 65,466 |
| 2021 | September | 43,271 | 993 | 210 | 2,334 | 3,537 | 46,807 |
| 2021 | October | 43,531 | 300 | 10 | 3,995 | 4,305 | 47,837 |
| 2021 | November | 13,082 | 1,559 | --- | 4,201 | 5,760 | 18,842 |
| 2021 | December | 7,098 | 389 | 131 | 4,738 | 5,257 | 12,356 |

Source: Compiled from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022. U.S. import statistics are based on imports for consumption.

**Figure IV-6**
**Raw honey: U.S. imports from individual subject sources, by source and by month**



Source: Compiled from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022. U.S. import statistics are based on imports for consumption.

**Figure IV-7**
**Raw honey: U.S. imports from aggregated subject source and nonsubject sources, by month**



Source: Compiled from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022. U.S. import statistics are based on imports for consumption.

# Apparent U.S. consumption

## Based on quantity

Table IV-14 and figure IV-8 present data on apparent U.S. consumption and U.S. market shares for raw honey by quantity.[11] During 2018-19, apparent consumption by quantity decreased by 3.0 percent before increasing by 4.9 percent during 2019-20 (a net increase of 1.8 percent during 2018-20) and was 15.2 percent higher during January-September 2021 compared to January-September 2020. Subject source imports' combined market share by quantity increased by 6.2 percentage points during 2018-20 and was 8.4 percentage points higher during January-September 2021 compared to January-September 2020. U.S. producers' market share by quantity increased by 1.3 percentage points during 2018-19, then decreased by 3.4 percentage points during 2019-20, and was 5.3 percentage points lower during January-September 2021 compared to January-September 2020. The market share of imports by quantity for each subject source except India increased during 2018-20, while the market share of imports from Canada, the largest nonsubject source at the beginning of the period of investigation, decreased from 5.9 percent to 1.5 percent during the same time period. Nonsubject imports declined from 15.6 percent in 2018 to 11.4 percent in 2020.

---

[11] Appendix G presents data on apparent U.S. consumption and U.S. market shares including full year 2021.

**Table IV-14**
**Raw honey: Apparent U.S. consumption and market shares based on quantity, by source and period**

Quantity in 1,000 pounds; shares in percent

| Source | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|--------|---------|------|------|------|-------------|-------------|
| U.S. producers | Quantity | 150,778 | 153,222 | 141,694 | 82,357 | 70,732 |
| Argentina | Quantity | 79,839 | 78,083 | 84,935 | 65,788 | 78,703 |
| Brazil | Quantity | 52,009 | 52,693 | 75,371 | 59,068 | 64,776 |
| India | Quantity | 96,215 | 106,910 | 79,997 | 63,231 | 105,902 |
| Vietnam | Quantity | 83,335 | 81,526 | 111,356 | 81,063 | 99,475 |
| Subject sources | Quantity | 311,397 | 319,212 | 351,660 | 269,150 | 348,856 |
| Canada | Quantity | 32,142 | 16,333 | 8,614 | 6,891 | 3,971 |
| Ukraine | Quantity | 18,168 | 19,051 | 24,161 | 16,652 | 12,883 |
| All other sources | Quantity | 34,902 | 23,375 | 30,857 | 23,929 | 23,146 |
| Nonsubject sources | Quantity | 85,212 | 58,760 | 63,633 | 47,473 | 40,000 |
| All import sources | Quantity | 396,609 | 377,972 | 415,292 | 316,622 | 388,856 |
| All sources | Quantity | 547,387 | 531,194 | 556,986 | 398,979 | 459,587 |
| U.S. producers | Share | 27.5 | 28.8 | 25.4 | 20.6 | 15.4 |
| Argentina | Share | 14.6 | 14.7 | 15.2 | 16.5 | 17.1 |
| Brazil | Share | 9.5 | 9.9 | 13.5 | 14.8 | 14.1 |
| India | Share | 17.6 | 20.1 | 14.4 | 15.8 | 23.0 |
| Vietnam | Share | 15.2 | 15.3 | 20.0 | 20.3 | 21.6 |
| Subject sources | Share | 56.9 | 60.1 | 63.1 | 67.5 | 75.9 |
| Canada | Share | 5.9 | 3.1 | 1.5 | 1.7 | 0.9 |
| Ukraine | Share | 3.3 | 3.6 | 4.3 | 4.2 | 2.8 |
| All other sources | Share | 6.4 | 4.4 | 5.5 | 6.0 | 5.0 |
| Nonsubject sources | Share | 15.6 | 11.1 | 11.4 | 11.9 | 8.7 |
| All import sources | Share | 72.5 | 71.2 | 74.6 | 79.4 | 84.6 |
| All sources | Share | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from official U.S. agricultural statistics National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022 and from official U.S. export statistics of the U.S. Department of Commerce using schedule B number 0409.00.0055, accessed February 22, 2022. U.S. import statistics are based on imports for consumption and landed duty paid value and U.S. exports statistics are based on foreign-origin exports (also known as re-exports). Re-exports are deducted from each individual country source based on submitted export shipments by source as reported in U.S. importer questionnaire responses. Domestic exports (not shown separately in the table) are netted out of the NASS data used for U.S. producers.

Note: Partial year period U.S. shipments are derived using the full year NASS data for 2020 and 2021 adjusted down for the partial year period using the share of annual U.S. producer shipments reported between January to September in questionnaire responses to the preliminary phase investigations.

**Figure IV-7**
**Raw honey: Apparent U.S. consumption based on quantity, by source and period**



Source: Compiled from official U.S. agricultural statistics National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022 and from official U.S. export statistics of the U.S. Department of Commerce using schedule B number 0409.00.0055, accessed February 22, 2022. U.S. import statistics are based on imports for consumption and landed duty paid value and U.S. exports statistics are based on foreign-origin exports (also known as re-exports). Re-exports are deducted from each individual country source based on submitted export shipments by source as reported in U.S. importer questionnaire responses. Domestic exports are netted out of the NASS data used for U.S. producers.

Note: Partial year period U.S. shipments are derived using the full year NASS data for 2020 and 2021 adjusted down for the partial year period using the share of annual U.S. producer shipments reported between January to September in questionnaire responses to the preliminary phase investigations.

**Based on value**

Table IV-15 and figure IV-9 present data on apparent U.S. consumption and U.S. market shares by value.[12] During 2018-19, apparent consumption by value decreased by 12.7 percent before increasing by 2.3 percent during 2019-20 (a net decrease of 10.7 percent during 2018-20) but was 45.3 percentage points higher during January-September 2021 compared to January-September 2020. Subject source imports combined market share by value increased by 2.6 percentage points during 2018-20 and was 13.7 percentage points higher during January-September 2021 compared to January-September 2020. U.S. producers' market share by value increased by 2.2 percentage points during 2018-19, then decreased by 1.8 percentage points during 2019-20, and was 10.7 percentage points lower during January-September 2021 compared to January-September 2020. The market share of imports by value from Argentina and Vietnam increased during 2018-20 by 2.1 percentage points and 2.4 percentage points, respectively. The market share of imports by value from Brazil decreased by 2.0 percentage points during 2018-19 before increasing by 2.0 percentage points during 2019-20, while the market share of imports by value from India increased by 2.0 percentage points during 2018-19 before decreasing by 3.8 percentage points during 2019-20. Nonsubject imports declined from 16.4 percent in 2018 to 13.5 percent in 2020.

---

[12] Appendix G presents data on apparent U.S. consumption and U.S. market shares including full year 2021.

**Table IV-15**
**Raw honey: Apparent U.S. consumption and market shares based on value, by source and period**

Value in 1,000 dollars; shares in percent

| Source | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| U.S. producers | Value | 335,134 | 307,192 | 301,592 | 175,295 | 182,237 |
| Argentina | Value | 89,457 | 81,194 | 94,106 | 70,852 | 127,592 |
| Brazil | Value | 81,982 | 58,128 | 73,220 | 54,657 | 103,908 |
| India | Value | 81,011 | 84,015 | 59,877 | 47,129 | 104,878 |
| Vietnam | Value | 58,289 | 52,830 | 68,358 | 49,519 | 79,950 |
| Subject sources | Value | 310,738 | 276,168 | 295,562 | 222,157 | 416,328 |
| Canada | Value | 45,656 | 23,275 | 12,873 | 10,018 | 7,345 |
| Ukraine | Value | 17,067 | 17,381 | 20,139 | 13,799 | 13,296 |
| All other sources | Value | 64,403 | 50,456 | 59,925 | 46,967 | 61,172 |
| Nonsubject sources | Value | 127,125 | 91,112 | 92,938 | 70,784 | 81,814 |
| All import sources | Value | 437,863 | 367,279 | 388,500 | 292,941 | 498,141 |
| All sources | Value | 772,997 | 674,471 | 690,092 | 468,236 | 680,379 |
| U.S. producers | Share | 43.4 | 45.5 | 43.7 | 37.4 | 26.8 |
| Argentina | Share | 11.6 | 12.0 | 13.6 | 15.1 | 18.8 |
| Brazil | Share | 10.6 | 8.6 | 10.6 | 11.7 | 15.3 |
| India | Share | 10.5 | 12.5 | 8.7 | 10.1 | 15.4 |
| Vietnam | Share | 7.5 | 7.8 | 9.9 | 10.6 | 11.8 |
| Subject sources | Share | 40.2 | 40.9 | 42.8 | 47.4 | 61.2 |
| Canada | Share | 5.9 | 3.5 | 1.9 | 2.1 | 1.1 |
| Ukraine | Share | 2.2 | 2.6 | 2.9 | 2.9 | 2.0 |
| All other sources | Share | 8.3 | 7.5 | 8.7 | 10.0 | 9.0 |
| Nonsubject sources | Share | 16.4 | 13.5 | 13.5 | 15.1 | 12.0 |
| All import sources | Share | 56.6 | 54.5 | 56.3 | 62.6 | 73.2 |
| All sources | Share | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from official U.S. agricultural statistics National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022 and from official U.S. export statistics of the U.S. Department of Commerce using schedule B number 0409.00.0055, accessed February 22, 2022. U.S. import statistics are based on imports for consumption and landed duty paid value and U.S. exports statistics are based on foreign-origin exports (also known as re-exports). Re-exports are deducted from each individual country source based on submitted export shipments by source as reported in U.S. importer questionnaire responses. Domestic exports (not shown separately in the table) are netted out of the NASS data used for U.S. producers.

Note:  Partial year period U.S. shipments are derived using the full year NASS data for 2020 and 2021 adjusted down for the partial year period using the share of annual U.S. producer shipments reported between January to September in questionnaire responses to the preliminary phase investigations.

**Figure IV-8**
**Raw honey: Apparent U.S. consumption based on value, by source and period**



Source: Compiled from official U.S. agricultural statistics National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022 and from official U.S. export statistics of the U.S. Department of Commerce using schedule B number 0409.00.0055, accessed February 22, 2022. U.S. import statistics are based on imports for consumption and landed duty paid value and U.S. exports statistics are based on foreign-origin exports (also known as re-exports). Re-exports are deducted from each individual country source based on submitted export shipments by source as reported in U.S. importer questionnaire responses. Domestic exports are netted out of the NASS data used for U.S. producers.

Note: Partial year period U.S. shipments are derived using the full year NASS data for 2020 and 2021 adjusted down for the partial year period using the share of annual U.S. producer shipments reported between January to September in questionnaire responses to the preliminary phase investigations.

# Part V: Pricing data

## Factors affecting prices

### Raw material costs

The primary components of raw honey are fructose, glucose, and water, produced by honeybees.[1] To collect raw honey, beekeepers use stacked wooden "bee" boxes that contain bee colonies' hives. Beekeepers then extract the raw honey from the boxes, with larger operations using a honey "extractor." Extracted raw honey is sealed in 55-gallon drums for shipment.[2] [3]

Most firms (26 of 39 responding U.S. producers and 17 of 23 importers)[4] reported that raw material prices increased since January 1, 2018. U.S. producers identified rising costs for lumber, bee feed and sugar, fuel, and inflation as the main factors contributing to increasing raw material prices. Importers reported that climate, freight costs, the cost of drums and lumber, and the COVID-19 pandemic had all impacted raw material prices. Petitioner also noted that fuel costs have recently become more expensive in the transportation of hives to different sites[5] and also noted increased lumber costs for boxes and increased labor costs.[6]

Seven of the 21 responding purchasers reported that they were familiar with raw material costs and seven also reported that information on raw material prices affected their negotiations or contracts to purchase raw honey since 2018. Purchaser *** reported that its negotiations involve a "bid ask" process where both buyers and sellers "do not have a significant pricing influence" and purchaser *** reported that brokers, exporters, and U.S. honey producers have told them that raw material costs are "ever increasing."

---

[1] Petition, p. 10.

[2] Petition, p. 12.

[3] Ingredient end users that submitted purchaser questionnaires reported purchasing raw honey in ***.

[4] The Commission received 84 U.S. producer questionnaire responses (47 from "large" U.S. producers with more than 3,800 beehives) and 25 importer questionnaires, but not all firms responded to all questions. Only large U.S. producers were asked to complete the full questionnaire. For more information, please see Part I.

[5] Hearing transcript, pp. 154-55 (Spears).

[6] Hearing transcript, p. 156 (Halbgewachs).

**Transportation costs to the U.S. market**

Transportation costs for raw honey shipped from the subject countries to the United States averaged 6.5 percent of customs value during 2020 and averaged 4.0 percent for all nonsubject import sources. Transportation costs ranged from 3.7 percent for imports from Argentina to 11.9 percent for imports from Vietnam. These estimates were derived from official import data and represent the transportation and other charges on imports.[7]

**U.S. inland transportation costs**

Most responding U.S. producers (33 of 37 firms) reported that their purchasers typically arrange transportation, while most importers (11 of 17 firms)[8] reported that they typically arrange transportation to their customers. U.S. producers reported that their U.S. inland transportation costs ranged from 1.0 percent of the total cost of raw honey to 20.0 percent, while importers reported costs of 1.5 percent to 15.0 percent.

## Pricing practices

**Pricing methods**

U.S. producers reported setting prices using primarily transaction-by-transaction negotiations and other methods, such as honey cooperatives ("co-ops"), while importers reported setting prices primarily through contracts and transaction-by-transaction negotiations (table V-1). Of the U.S. producers that reported setting prices by other methods, firms reported selling to the Sioux Honey Association ("SHA") or to other large honey packers that typically set the price. In particular, SHA members provide virtually all of their honey to the co-op. The co-op then pays an initial advance on delivery, followed by several installments throughout the year, with a final payment at the end of the summer.[9] U.S. producer *** reported that payments from the co-op are spread throughout the entire crop year based on an advance schedule, including an initial payment in December, followed by payments in February, April, June, and August. U.S. producer *** added that it takes about one year for a member to receive its total payment because most honey is delivered in late summer or early fall.

---

[7] The estimated transportation costs were obtained by subtracting the customs value from the c.i.f. value of the imports for 2020 and then dividing by the customs value based on the HTS statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065. Accessed February 24, 2022.

[8] Importer *** reported that both it and its purchasers may arrange transportation.

[9] Conference transcript, pp. 24-25 (Coy) and p. 101 (Mammen).

Petitioner stated that SHA members often do not know the price that they will receive for their honey until the end of the year.[10]

**Table V-1**
**Raw honey: Count of U.S. producers' and importers' reported price setting methods**

| Method | U.S. producers | U.S. importers |
|---|---|---|
| Transaction-by-transaction | 20 | 11 |
| Contract | 8 | 15 |
| Set price list | 6 | 1 |
| Other | 19 | 2 |
| Responding firms | 43 | 20 |

Source: Compiled from data submitted in response to Commission questionnaires.

Note: The sum of responses down may not add up to the total number of responding firms as each firm was instructed to check all applicable price setting methods employed.

Note: This includes responses of importers that also imported from Ukraine.

U.S. producers reported selling mostly under annual or short-term contracts.[11] Importers reported selling the vast majority of their raw honey under short-term contracts (table V-2). In contrast, purchasers reported that approximately two-thirds of purchases of U.S.-produced raw honey were through short-term contracts, while the vast majority of purchases of raw honey from subject sources was purchases through short-term contracts (table V-3).[12] Several purchasers indicated that they generally purchase domestic raw honey on the spot market because U.S. producers are able to produce only small loads at a time.

---

[10] Hearing transcript, p. 34 (Spears).

[11] Twelve of the 28 U.S. producers reporting sales through annual or long-term contracts are members of SHA.

[12] Staff calculated these shares by weighting firms' responses with their reported purchases. End user purchasers (***), purchaser *** and *** are not included in these calculations because their purchase price data were either excluded from the analysis (see "Purchase price data from Commission questionnaires" below) or because the firm did not provide purchase price data. Purchasers (***) reported that 100 percent of their purchases from subject sources were purchased through annual contracts. Purchaser *** reported that 100 percent of its purchases of raw honey from subject sources were through short-term contracts, and purchaser *** reported that 50 percent of its purchases of U.S.-produced honey were through short-term contracts and the remaining 50 percent were through long-term contracts.

**Table V-2**
**Raw honey: U.S. producers' and importers' shares of commercial U.S. shipments by type of sale, 2020**

Share in percent

| Item | U.S. producers | Subject U.S. importers |
|---|---|---|
| Long-term contracts | 6.4 | --- |
| Annual contract | 48.8 | 3.6 |
| Short-term contracts | 31.1 | 90.7 |
| Spot sales | 13.7 | 5.7 |

Source: Compiled from data submitted in response to Commission questionnaires.

Note: Because of rounding, figures may not add to the totals shown.

Note: This includes responses of importers that also imported from Ukraine.

**Table V-3**
**Raw honey:  U.S. purchasers' shares of purchases by type of sale and source, 2020**

Share in percent

| Item | Domestic | Argentina | Brazil | India | Vietnam |
|---|---|---|---|---|---|
| Long-term contracts | *** | *** | *** | *** | *** |
| Annual contract | *** | *** | *** | *** | *** |
| Short-term contracts | *** | *** | *** | *** | *** |
| Spot sales | *** | *** | *** | *** | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

Among responding U.S. producers, importers, and purchasers, most firms reported that their short-term contracts do not allow for price renegotiation, that both quantity and price are fixed, and that prices are not indexed to raw materials. Petitioner stated that packers set prices and there is very little room for negotiation.[13] U.S. producer Sweet River Company stated that it receives emails from multiple packers during different honey seasons announcing the price that they are offering, and that these prices vary little between packers.[14]

Three purchasers reported that they purchase raw honey daily, eight purchase weekly, seven purchase monthly, one purchases quarterly, and one purchases annually. Purchaser (***) reported that it makes purchases based on seasonality and availability of offers. Fifteen of 21 purchasers reported that their frequency of purchases had not changed since 2018. Six purchasers reported that it had, with three purchasers reporting that their frequency of purchases had changed due to inconsistent monthly deliveries, supply chain

---

[13] Hearing transcript, pp. 17, 27 (Hiatt, Blumenthal).
[14] Hearing transcript, p. 117 (Halbgewachs).

challenges, and short U.S. honey crops. Most (13 of 21) purchasers contact between one to five suppliers before making a purchase.

## Sales terms and discounts

Most firms offer no discounts, with most responding U.S. producers (30 of 39) and importers (17 of 18) reporting no specific discount policy. U.S. producers and importers were mixed in whether they reported quoting prices on f.o.b. or delivered bases. Some firms reported that they will quote either on an f.o.b. basis or delivered basis, depending on customer needs.

## Price leadership

Six of 21 purchasers reported price leaders in the raw honey market, including SHA (3 purchasers), Sunland Trading (2), Odem International, Lamex Foods, Adee Honey Farms, and Impex (1 each). Purchasers reporting SHA explained that SHA is able to lower its pricing to be more competitive because it does not provide a guaranteed price for its members, and that because co-ops bargain collectively on behalf of their members, the prices paid by the co-op are often viewed as the price floor for the raw honey market. Six purchasers reported no price leaders, due to the wide range in quality of honey, a honey market that is "fractured" by geographic location, and the large number of producers in the industry.

# Purchase price data from Commission questionnaires

The Commission requested purchasers provide quarterly purchase price data for the total quantity and delivered value of the following raw honey products purchased from unrelated U.S. suppliers since January 1, 2018.

Sixteen purchasers provided usable purchase price data for purchases of the requested products, although not all firms reported pricing for all products for all quarters.[15] [16]

---

[15] Per-unit pricing data are calculated from total quantity and total value data provided by U.S. producers and importers. The precision and variation of these figures may be affected by rounding, limited quantities, and producer or importer estimates.

[16] The purchase price data reported by five U.S. purchasers *** are excluded. Data are excluded for purchaser *** because many other purchasers reported sourcing their purchases from the firm. Purchase price data reported by *** was minimal and accounted for less than *** percent of reported purchases of responding purchasers. Additionally, purchase price data from ingredient and end users *** were excluded because they sourced from packers that had already reported

*(continued...)*

Purchase price data reported by responding firms accounted for approximately 74.9 percent of U.S. producers' U.S. shipments in 2020.[17] Purchase price data accounted for 87.4 percent of importers' U.S. shipments of raw honey from Argentina, 84.4 percent of shipments from Brazil, 55.8 percent from India, and 46.9 percent of raw honey from Vietnam in 2020.[18] Purchase prices for nonsubject Ukraine are shown in Appendix J.

Price data for products 1-4 are presented in tables V-4 to V-7 and figures V-1 to V-4.

***Product 1.*** Raw white honey (0 – 34 mm),[19] packaged in 55-gallon drums.

***Product 2.*** Raw extra light amber honey (35 – 50 mm), packaged in 55-gallon drums.

***Product 3.*** Raw light amber honey (51 – 85 mm), packaged in 55-gallon drums.

***Product 4.*** Raw amber honey (greater than 86 mm), packaged in 55-gallon drums.

---

purchase price data, reported purchase prices for products that were ***, and were only able to report prices for product sold in bulk containers rather than 55-gallon drums, as specified in the purchase price product definitions (see Appendix H for purchase price data reported by these firms).

[17] Petitioner ***. Petitioner posthearing brief, Exh. 1, p. 48.

[18] Purchase price coverage is calculated by dividing responding U.S. purchasers' purchase price data by U.S. shipments reported by U.S. producers and importers. See Parts III and IV.

[19] Honey colors are measured on the Pfund scale. The Pfund grade is determined by how many millimeters ("mm") that spot deviates from the far left of the chart. "The Color of Honey: No More Bickering," Brendan I Koerner, New York Times, https://www.nytimes.com/2005/07/31/business/yourmoney/the-color-of-honey-no-more-bickering.html, July 31, 2005. Accessed May 27, 2021.

**Table V-4**
**Raw honey: Weighted-average purchase prices and quantities of domestic and imported product**
**1 and margins of underselling/(overselling), by source and quarter**

Price in dollars per pound, quantity in 1,000 pounds, margin in percent.

| Period | U.S. purchase price | U.S. quantity | Argentina purchase price | Argentina quantity | Argentina margin | Brazil purchase price | Brazil quantity | Brazil margin |
|---|---|---|---|---|---|---|---|---|
| 2018 Q1 | 2.06 | 4,648 | 1.36 | 1,561 | 34.2 | *** | *** | *** |
| 2018 Q2 | *** | *** | 1.32 | 7,526 | *** | 1.84 | 293 | *** |
| 2018 Q3 | 2.01 | 9,296 | 1.30 | 4,638 | 35.6 | *** | *** | *** |
| 2018 Q4 | 1.95 | 8,867 | 1.25 | 5,767 | 35.9 | *** | *** | *** |
| 2019 Q1 | 1.98 | 1,245 | 1.20 | 1,619 | 39.4 | *** | *** | *** |
| 2019 Q2 | *** | *** | 1.21 | 4,635 | *** | *** | *** | *** |
| 2019 Q3 | 1.78 | 11,904 | 1.14 | 4,387 | 35.9 | *** | *** | *** |
| 2019 Q4 | 1.68 | 8,578 | 1.14 | 7,191 | 32.2 | *** | *** | *** |
| 2020 Q1 | 1.60 | 4,450 | 1.13 | 4,901 | 29.7 | *** | *** | *** |
| 2020 Q2 | *** | *** | 1.18 | 4,978 | *** | *** | *** | *** |
| 2020 Q3 | 1.55 | 13,635 | 1.21 | 4,490 | 22.1 | *** | *** | *** |
| 2020 Q4 | 1.49 | 14,589 | 1.26 | 3,862 | 15.4 | 1.27 | 507 | 15.1 |
| 2021 Q1 | 1.70 | 4,099 | 1.49 | 3,706 | 12.1 | *** | *** | *** |
| 2021 Q2 | *** | *** | 1.79 | 7,390 | *** | *** | *** | *** |
| 2021 Q3 | 2.29 | 8,311 | 1.84 | 3,723 | 20.0 | *** | *** | *** |

| Period | U.S. purchase price | U.S. quantity | India purchase price | India quantity | India margin | Subject purchase price | Subject quantity | Subject margin |
|---|---|---|---|---|---|---|---|---|
| 2018 Q1 | 2.06 | 4,648 | *** | *** | *** | 1.40 | *** | 32.1 |
| 2018 Q2 | *** | *** | 0.97 | 4,478 | *** | 1.20 | *** | *** |
| 2018 Q3 | 2.01 | 9,296 | 0.98 | 1,190 | 51.3 | 1.23 | *** | 38.7 |
| 2018 Q4 | 1.95 | 8,867 | 0.96 | 882 | 50.6 | 1.21 | *** | 37.9 |
| 2019 Q1 | 1.98 | 1,245 | *** | *** | *** | 1.05 | *** | 47.0 |
| 2019 Q2 | *** | *** | 0.92 | 6,108 | *** | 1.04 | *** | *** |
| 2019 Q3 | 1.78 | 11,904 | 0.86 | 5,010 | 52.1 | 0.99 | *** | 44.5 |
| 2019 Q4 | 1.68 | 8,578 | 0.81 | 1,624 | 52.0 | 1.08 | *** | 35.8 |
| 2020 Q1 | 1.60 | 4,450 | *** | *** | *** | 1.07 | *** | 33.1 |
| 2020 Q2 | *** | *** | 0.86 | 874 | *** | 1.10 | *** | *** |
| 2020 Q3 | 1.55 | 13,635 | *** | *** | *** | 1.06 | *** | 31.8 |
| 2020 Q4 | 1.49 | 14,589 | *** | *** | *** | 1.15 | *** | 23.2 |
| 2021 Q1 | 1.70 | 4,099 | *** | *** | *** | 1.38 | *** | 19.0 |
| 2021 Q2 | *** | *** | 1.04 | 6,872 | *** | 1.43 | *** | *** |
| 2021 Q3 | 2.29 | 8,311 | 1.16 | 5,842 | 49.6 | 1.43 | *** | 37.7 |

Source: Compiled from data submitted in response to Commission questionnaires.

Note: Product 1: Raw white honey (0 – 34 mm), packaged in 55-gallon drums.

Note: There were no reported purchase price data for Vietnam for pricing product 1.

**Table V-5**
**Raw honey: Weighted-average purchase prices and quantities of domestic and imported product 2 and margins of underselling/(overselling), by source and quarter**

Price in dollars per pound, quantity in 1,000 pounds, margin in percent.

| Period | U.S. purchase price | U.S. quantity | Argentina purchase price | Argentina quantity | Argentina margin | Brazil purchase price | Brazil quantity | Brazil margin |
|---|---|---|---|---|---|---|---|---|
| 2018 Q1 | 2.16 | 4,977 | 1.32 | 5,315 | 39.1 | *** | *** | *** |
| 2018 Q2 | 1.86 | 11,935 | 1.27 | 9,678 | 32.1 | *** | *** | *** |
| 2018 Q3 | 2.05 | 6,140 | 1.26 | 10,115 | 38.6 | *** | *** | *** |
| 2018 Q4 | 2.01 | 4,586 | 1.20 | 13,537 | 40.0 | 1.63 | 546 | 18.6 |
| 2019 Q1 | 1.89 | 1,384 | 1.21 | 6,763 | 36.0 | 1.44 | 1,266 | 23.7 |
| 2019 Q2 | 1.70 | 10,432 | 1.19 | 11,736 | 29.9 | 1.30 | 1,210 | 23.3 |
| 2019 Q3 | 1.89 | 5,246 | 1.14 | 10,626 | 39.8 | 1.18 | 1,772 | 37.7 |
| 2019 Q4 | 1.82 | 2,223 | 1.13 | 11,813 | 38.0 | 1.23 | 1,048 | 32.5 |
| 2020 Q1 | 1.59 | 1,056 | 1.13 | 10,847 | 29.0 | 1.04 | 2,004 | 34.5 |
| 2020 Q2 | *** | *** | 1.20 | 16,025 | *** | 1.02 | 1,906 | *** |
| 2020 Q3 | *** | *** | 1.24 | 13,012 | *** | 1.08 | 1,677 | *** |
| 2020 Q4 | 1.52 | 6,752 | 1.27 | 13,583 | 16.6 | 1.37 | 2,014 | 9.7 |
| 2021 Q1 | 1.78 | 4,629 | 1.54 | 10,387 | 13.3 | 1.57 | 1,851 | 11.6 |
| 2021 Q2 | 1.68 | 7,400 | 1.78 | 14,507 | (6.0) | 1.79 | 2,299 | (6.4) |
| 2021 Q3 | 2.24 | 5,620 | 1.87 | 10,271 | 16.7 | 1.90 | 974 | 15.4 |

| Period | U.S. purchase price | U.S. quantity | India purchase price | India quantity | India margin | Vietnam purchase price | Vietnam quantity | Vietnam margin |
|---|---|---|---|---|---|---|---|---|
| 2018 Q1 | 2.16 | 4,977 | 0.96 | 1,589 | 55.7 | *** | *** | *** |
| 2018 Q2 | 1.86 | 11,935 | 0.93 | 7,418 | 50.1 | *** | *** | *** |
| 2018 Q3 | 2.05 | 6,140 | 1.02 | 5,628 | 50.4 | *** | *** | *** |
| 2018 Q4 | 2.01 | 4,586 | 0.91 | 6,962 | 54.6 | *** | *** | *** |
| 2019 Q1 | 1.89 | 1,384 | 0.91 | 1,694 | 51.6 | *** | *** | *** |
| 2019 Q2 | 1.70 | 10,432 | 0.89 | 4,757 | 47.9 | *** | *** | *** |
| 2019 Q3 | 1.89 | 5,246 | 0.84 | 9,666 | 55.6 | *** | *** | *** |
| 2019 Q4 | 1.82 | 2,223 | 0.82 | 4,921 | 54.9 | *** | *** | *** |
| 2020 Q1 | 1.59 | 1,056 | 0.80 | 3,706 | 49.5 | *** | *** | *** |
| 2020 Q2 | *** | *** | 0.78 | 3,842 | *** | *** | *** | *** |
| 2020 Q3 | *** | *** | 0.77 | 5,601 | *** | *** | *** | *** |
| 2020 Q4 | 1.52 | 6,752 | 0.79 | 3,882 | 48.1 | *** | *** | *** |
| 2021 Q1 | 1.78 | 4,629 | 0.91 | 3,601 | 48.9 | *** | *** | *** |
| 2021 Q2 | 1.68 | 7,400 | 1.08 | 7,194 | 35.6 | *** | *** | *** |
| 2021 Q3 | 2.24 | 5,620 | 1.17 | 6,855 | 47.9 | *** | *** | *** |

Table continued.

**Table V-5 Continued**
**Raw honey: Weighted-average purchase prices and quantities of domestic and imported product 2 and margins of underselling/(overselling), by source and quarter**

| Period | U.S. purchase price | U.S. quantity | Subject purchase price | Subject quantity | Subject margin |
|---|---|---|---|---|---|
| 2018 Q1 | 2.16 | 4,977 | *** | *** | *** |
| 2018 Q2 | 1.86 | 11,935 | *** | *** | *** |
| 2018 Q3 | 2.05 | 6,140 | *** | *** | *** |
| 2018 Q4 | 2.01 | 4,586 | *** | *** | *** |
| 2019 Q1 | 1.89 | 1,384 | *** | *** | *** |
| 2019 Q2 | 1.70 | 10,432 | *** | *** | *** |
| 2019 Q3 | 1.89 | 5,246 | *** | *** | *** |
| 2019 Q4 | 1.82 | 2,223 | *** | *** | *** |
| 2020 Q1 | 1.59 | 1,056 | *** | *** | *** |
| 2020 Q2 | *** | *** | *** | *** | *** |
| 2020 Q3 | *** | *** | *** | *** | *** |
| 2020 Q4 | 1.52 | 6,752 | *** | *** | *** |
| 2021 Q1 | 1.78 | 4,629 | *** | *** | *** |
| 2021 Q2 | 1.68 | 7,400 | *** | *** | *** |
| 2021 Q3 | 2.24 | 5,620 | *** | *** | *** |

Source: Compiled from data submitted in response to Commission questionnaires.
Note: Product 2: Raw extra light amber honey (35 – 50 mm), packaged in 55-gallon drums.

**Table V-6**
**Raw honey: Weighted-average purchase prices and quantities of domestic and imported product 3 and margins of underselling/(overselling), by source and quarter**

Price in dollars per pound, quantity in 1,000 pounds, margin in percent.

| Period | U.S. purchase price | U.S. quantity | Argentina purchase price | Argentina quantity | Argentina margin | Brazil purchase price | Brazil quantity | Brazil margin |
|---|---|---|---|---|---|---|---|---|
| 2018 Q1 | 1.95 | 988 | 1.12 | 1,009 | 42.8 | 1.95 | 3,296 | 0.4 |
| 2018 Q2 | *** | *** | *** | *** | *** | 1.77 | 6,617 | *** |
| 2018 Q3 | 1.98 | 2,288 | 1.05 | 1,500 | 46.9 | 1.66 | 11,351 | 16.3 |
| 2018 Q4 | 1.87 | 3,339 | 1.13 | 3,745 | 39.5 | 1.53 | 8,182 | 18.4 |
| 2019 Q1 | 1.79 | 1,406 | 1.05 | 1,999 | 41.4 | 1.40 | 9,028 | 21.7 |
| 2019 Q2 | *** | *** | 1.07 | 2,675 | *** | 1.29 | 6,266 | *** |
| 2019 Q3 | 1.85 | 3,015 | 1.06 | 2,664 | 42.5 | 1.25 | 10,722 | 32.4 |
| 2019 Q4 | 1.80 | 3,406 | 1.01 | 1,646 | 43.9 | 1.15 | 8,997 | 36.0 |
| 2020 Q1 | 1.54 | 1,433 | 1.02 | 1,587 | 33.8 | 0.98 | 11,371 | 36.5 |
| 2020 Q2 | 1.30 | 7,055 | 1.07 | 1,744 | 17.8 | 0.97 | 13,782 | 25.7 |
| 2020 Q3 | 1.70 | 4,573 | *** | *** | *** | 0.98 | 16,279 | 42.4 |
| 2020 Q4 | 1.68 | 2,892 | 1.14 | 1,914 | 32.0 | 1.07 | 13,146 | 36.1 |
| 2021 Q1 | 1.79 | 1,331 | 1.54 | 1,867 | 13.9 | 1.54 | 14,403 | 14.0 |
| 2021 Q2 | 1.60 | 4,613 | 1.82 | 1,638 | (13.8) | 1.74 | 17,475 | (8.4) |
| 2021 Q3 | 2.10 | 3,046 | 1.83 | 922 | 13.2 | 1.78 | 7,894 | 15.2 |

Table continued.

**Table V-6 Continued**
**Raw honey: Weighted-average purchase prices and quantities of domestic and imported product**
**3 and margins of underselling/(overselling), by source and quarter**

| Period | U.S. purchase price | U.S. quantity | India purchase price | India quantity | India margin | Vietnam purchase price | Vietnam quantity | Vietnam margin |
|---|---|---|---|---|---|---|---|---|
| 2018 Q1 | 1.95 | 988 | 1.01 | 7,953 | 48.3 | 0.93 | 4,654 | 52.6 |
| 2018 Q2 | *** | *** | 0.91 | 17,160 | *** | 0.91 | 4,931 | *** |
| 2018 Q3 | 1.98 | 2,288 | 0.89 | 7,367 | 55.0 | 0.85 | 11,291 | 56.9 |
| 2018 Q4 | 1.87 | 3,339 | 0.89 | 8,954 | 52.7 | 0.83 | 13,982 | 55.5 |
| 2019 Q1 | 1.79 | 1,406 | 0.90 | 5,781 | 49.9 | 0.84 | 10,017 | 52.8 |
| 2019 Q2 | *** | *** | 0.88 | 9,248 | *** | 0.82 | 5,396 | *** |
| 2019 Q3 | 1.85 | 3,015 | 0.84 | 5,451 | 54.8 | 0.81 | 5,593 | 56.2 |
| 2019 Q4 | 1.80 | 3,406 | 0.79 | 8,965 | 56.3 | 0.76 | 7,508 | 57.6 |
| 2020 Q1 | 1.54 | 1,433 | 0.78 | 6,146 | 49.5 | 0.74 | 8,526 | 51.8 |
| 2020 Q2 | 1.30 | 7,055 | 0.78 | 6,641 | 39.9 | 0.72 | 10,391 | 44.5 |
| 2020 Q3 | 1.70 | 4,573 | 0.77 | 5,734 | 54.7 | 0.72 | 11,990 | 57.6 |
| 2020 Q4 | 1.68 | 2,892 | 0.75 | 7,413 | 55.4 | 0.73 | 10,518 | 56.3 |
| 2021 Q1 | 1.79 | 1,331 | 0.80 | 7,045 | 55.1 | 0.77 | 10,026 | 56.9 |
| 2021 Q2 | 1.60 | 4,613 | 1.05 | 8,401 | 34.6 | 0.89 | 7,477 | 44.2 |
| 2021 Q3 | 2.10 | 3,046 | 1.20 | 9,779 | 42.8 | 1.04 | 15,322 | 50.7 |

Price in dollars per pound, quantity in 1,000 pounds, margin in percent.

| Period | U.S. purchase price | U.S. quantity | Subject purchase price | Subject quantity | Subject margin |
|---|---|---|---|---|---|
| 2018 Q1 | 1.95 | 988 | 1.18 | 16,911 | 39.8 |
| 2018 Q2 | *** | *** | *** | *** | *** |
| 2018 Q3 | 1.98 | 2,288 | 1.16 | 31,510 | 41.3 |
| 2018 Q4 | 1.87 | 3,339 | 1.04 | 34,863 | 44.3 |
| 2019 Q1 | 1.79 | 1,406 | 1.06 | 26,825 | 40.9 |
| 2019 Q2 | *** | *** | 0.99 | 23,583 | *** |
| 2019 Q3 | 1.85 | 3,015 | 1.04 | 24,431 | 44.0 |
| 2019 Q4 | 1.80 | 3,406 | 0.91 | 27,116 | 49.2 |
| 2020 Q1 | 1.54 | 1,433 | 0.86 | 27,629 | 44.0 |
| 2020 Q2 | 1.30 | 7,055 | 0.86 | 32,559 | 34.2 |
| 2020 Q3 | 1.70 | 4,573 | *** | *** | *** |
| 2020 Q4 | 1.68 | 2,892 | 0.90 | 32,990 | 46.7 |
| 2021 Q1 | 1.79 | 1,331 | 1.16 | 33,340 | 35.6 |
| 2021 Q2 | 1.60 | 4,613 | 1.40 | 34,992 | 12.9 |
| 2021 Q3 | 2.10 | 3,046 | 1.28 | 33,917 | 39.2 |

Source: Compiled from data submitted in response to Commission questionnaires.

Note: Product 3: Raw light amber honey (51 – 85 mm), packaged in 55-gallon drums.

Note: Petitioner raised potential decimal issue for U.S. purchase price of pricing product 3 for Q4 2020 reported by ***. Staff contacted the firm for a revision and removed the anomalous data after receiving no response.

**Table V-7**
**Raw honey: Weighted-average purchase prices and quantities of domestic and imported product 4 and margins of underselling/(overselling), by source and quarter**

Price in dollars per pound, quantity in 1,000 pounds, margin in percent.

| Period | U.S. purchase price | U.S. quantity | Argentina purchase price | Argentina quantity | Argentina margin | Brazil purchase price | Brazil quantity | Brazil margin |
|--------|------|------|------|------|------|------|------|------|
| 2018 Q1 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2018 Q2 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2018 Q3 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2018 Q4 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2019 Q1 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2019 Q2 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2019 Q3 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2019 Q4 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2020 Q1 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2020 Q2 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2020 Q3 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2020 Q4 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2021 Q1 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2021 Q2 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2021 Q3 | *** | *** | *** | *** | *** | *** | *** | *** |

| Period | U.S. purchase price | U.S. quantity | India purchase price | India quantity | India margin | Vietnam purchase price | Vietnam quantity | Vietnam margin |
|--------|------|------|------|------|------|------|------|------|
| 2018 Q1 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2018 Q2 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2018 Q3 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2018 Q4 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2019 Q1 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2019 Q2 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2019 Q3 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2019 Q4 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2020 Q1 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2020 Q2 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2020 Q3 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2020 Q4 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2021 Q1 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2021 Q2 | *** | *** | *** | *** | *** | *** | *** | *** |
| 2021 Q3 | *** | *** | *** | *** | *** | *** | *** | *** |

Table continued.

V-11

**Table V-7 Continued**
**Raw honey: Weighted-average purchase prices and quantities of domestic and imported product 4 and margins of underselling/(overselling), by source and quarter**

| Period | U.S. purchase price | U.S. quantity | Subject purchase price | Subject quantity | Subject margin |
|---|---|---|---|---|---|
| 2018 Q1 | *** | *** | *** | *** | *** |
| 2018 Q2 | *** | *** | *** | *** | *** |
| 2018 Q3 | *** | *** | *** | *** | *** |
| 2018 Q4 | *** | *** | *** | *** | *** |
| 2019 Q1 | *** | *** | *** | *** | *** |
| 2019 Q2 | *** | *** | *** | *** | *** |
| 2019 Q3 | *** | *** | *** | *** | *** |
| 2019 Q4 | *** | *** | *** | *** | *** |
| 2020 Q1 | *** | *** | *** | *** | *** |
| 2020 Q2 | *** | *** | *** | *** | *** |
| 2020 Q3 | *** | *** | *** | *** | *** |
| 2020 Q4 | *** | *** | *** | *** | *** |
| 2021 Q1 | *** | *** | *** | *** | *** |
| 2021 Q2 | *** | *** | *** | *** | *** |
| 2021 Q3 | *** | *** | *** | *** | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

Note: Product 4: Raw amber honey (greater than 86 mm), packaged in 55-gallon drums.

**Figure V-1**
**Raw honey: Weighted-average f.o.b. prices and quantities of domestic and imported product 1, by source and quarter**

\*        \*        \*        \*        \*        \*        \*

**Figure V-2**
**Raw honey: Weighted-average f.o.b. prices and quantities of domestic and imported product 2, by source and quarter**

*     *     *     *     *     *     *

**Figure V-3**
**Raw honey: Weighted-average f.o.b. prices and quantities of domestic and imported product 3, by source and quarter**

* * * * * * *

**Figure V-4**
**Raw honey: Weighted-average f.o.b. prices and quantities of domestic and imported product 4, by source and quarter**

\*      \*      \*      \*      \*      \*      \*

**Price trends**

In general, purchase prices increased for raw honey from the United States and each subject country except for Brazil during January 2018-September 2021. U.S. purchase prices generally decreased through June 2020 and then increased between June 2020 and September 2021, with upticks in purchase prices during the late summer each year (see figure V-5 and tables V-8 and V-9). Purchase prices for raw honey from subject sources also decreased through June 2020 and increased sharply in the latter part of 2020. Purchase prices of U.S. and subject raw honey were higher in the third quarter of 2021 than in the first quarter of 2018.

Table V-10 summarizes the purchase price trends, by country and by product. As shown in the table, domestic purchase price increases ranged from 3.5 percent to 11.2 percent. Purchase price increases for raw honey from individual subject countries ranged from 11.8 percent to 63.4 percent. Purchase price decreases for raw honey from Brazil ranged from *** percent to 8.4 percent.

**Figure V-5**
**Raw honey: Indexed purchase prices, January 2018-September 2021**





Source:  Compiled from data submitted in response to Commission questionnaires.

**Table V-8**
**Raw honey:  Indexed U.S. purchasers' domestic purchase prices, by quarter and product**

Indexed purchases prices in percent

| Period | Product 1 | Product 2 | Product 3 | Product 4 |
|---|---|---|---|---|
| 2018 Q1 | 100.0 | 100.0 | 100.0 | 100.0 |
| 2018 Q2 | 84.7 | 86.1 | 94.6 | 109.0 |
| 2018 Q3 | 87.1 | 89.8 | 98.7 | 91.0 |
| 2018 Q4 | 85.8 | 82.4 | 88.6 | 84.3 |
| 2019 Q1 | 74.7 | 87.9 | 89.9 | 97.3 |
| 2019 Q2 | 73.5 | 82.6 | 84.6 | 83.3 |
| 2019 Q3 | 69.6 | 74.6 | 88.1 | 80.6 |
| 2019 Q4 | 75.7 | 77.6 | 77.7 | 73.6 |
| 2020 Q1 | 76.3 | 77.4 | 73.5 | 69.9 |
| 2020 Q2 | 79.4 | 82.1 | 72.9 | 76.5 |
| 2020 Q3 | 75.4 | 81.3 | 74.1 | 75.4 |
| 2020 Q4 | 81.7 | 87.6 | 76.1 | 75.1 |
| 2021 Q1 | 98.6 | 103.6 | 98.2 | 79.4 |
| 2021 Q2 | 100.6 | 116.2 | 118.6 | 128.0 |
| 2021 Q3 | 100.0 | 118.5 | 108.8 | 117.6 |

Source:  Compiled from data submitted in response to Commission questionnaires.

Note:  Prices are indexed off the January to March 2018 starting period.

**Table V-9**
**Raw honey:  Indexed U.S. purchasers' subject source purchase prices, by quarter and product**

Indexed purchases prices in percent

| Period | Product 1 | Product 2 | Product 3 | Product 4 |
|---|---|---|---|---|
| 2018 Q1 | 100.0 | 100.0 | 100.0 | 100.0 |
| 2018 Q2 | 84.7 | 86.1 | 94.6 | 109.0 |
| 2018 Q3 | 87.1 | 89.8 | 98.7 | 91.0 |
| 2018 Q4 | 85.8 | 82.4 | 88.6 | 84.3 |
| 2019 Q1 | 74.7 | 87.9 | 89.9 | 97.3 |
| 2019 Q2 | 73.5 | 82.6 | 84.6 | 83.3 |
| 2019 Q3 | 69.6 | 74.6 | 88.1 | 80.6 |
| 2019 Q4 | 75.7 | 77.6 | 77.7 | 73.6 |
| 2020 Q1 | 76.3 | 77.4 | 73.5 | 69.9 |
| 2020 Q2 | 79.4 | 82.1 | 72.9 | 76.5 |
| 2020 Q3 | 75.4 | 81.3 | 74.1 | 75.4 |
| 2020 Q4 | 81.7 | 87.6 | 76.1 | 75.1 |
| 2021 Q1 | 98.6 | 103.6 | 98.2 | 79.4 |
| 2021 Q2 | 100.6 | 116.2 | 118.6 | 128.0 |
| 2021 Q3 | 100.0 | 118.5 | 108.8 | 117.6 |

Source:  Compiled from data submitted in response to Commission questionnaires.

Note:  Prices are indexed off the January to March 2018 starting period.

**Table V-10**
**Raw honey:  Number of quarters containing observations, low purchase price, high purchase price, and change in purchase price over period, by product and source, January 2018 through September 2021**

Quantity in 1,000 pounds, price in dollars per pound, change in percent

| Product | Source | Number of quarters | Quantity | Low purchase price | High purchase price | First quarter purchase price | Last quarter purchase price | Change over period |
|---|---|---|---|---|---|---|---|---|
| Product 1 | United States | 15 | *** | *** | *** | 2.06 | 2.29 | 11.2 |
| Product 1 | Argentina | 15 | *** | *** | *** | 1.36 | 1.84 | 35.1 |
| Product 1 | Brazil | 15 | *** | *** | *** | *** | *** | *** |
| Product 1 | India | 15 | *** | *** | *** | *** | *** | *** |
| Product 1 | Vietnam | --- | *** | *** | *** | *** | *** | *** |
| Product 2 | United States | 15 | *** | *** | *** | 2.16 | 2.24 | 3.5 |
| Product 2 | Argentina | 15 | *** | *** | *** | 1.32 | 1.87 | 41.7 |
| Product 2 | Brazil | 15 | *** | *** | *** | *** | *** | *** |
| Product 2 | India | 15 | *** | *** | *** | 0.96 | 1.17 | 21.9 |
| Product 2 | Vietnam | 3 | *** | *** | *** | *** | *** | *** |
| Product 3 | United States | 15 | *** | *** | *** | 1.95 | 2.10 | 7.7 |
| Product 3 | Argentina | 15 | *** | *** | *** | 1.12 | 1.83 | 63.4 |
| Product 3 | Brazil | 15 | *** | *** | *** | 1.95 | 1.78 | (8.4) |
| Product 3 | India | 15 | *** | *** | *** | 1.01 | 1.20 | 19.1 |
| Product 3 | Vietnam | 15 | *** | *** | *** | 0.93 | 1.04 | 11.8 |
| Product 4 | United States | 15 | *** | *** | *** | *** | *** | *** |
| Product 4 | Argentina | 7 | *** | *** | *** | *** | *** | *** |
| Product 4 | Brazil | 13 | *** | *** | *** | *** | *** | *** |
| Product 4 | India | 6 | *** | *** | *** | *** | *** | *** |
| Product 4 | Vietnam | 15 | *** | *** | *** | *** | *** | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

Note: Percent change column is percentage change from the first quarter 2018 to the last quarter in 2021.

## Price comparisons

As shown in tables V-11 and V-12, prices for product imported from subject sources were below those for U.S.-produced product in 182 of 194 instances (818 million pounds); margins of underselling ranged from 0.4 percent to 60.7 percent. In the remaining 12 instances (51 million pounds), prices for product from subject sources were between 0.1 percent and 16.2 percent above prices for the domestic product.

Subject imports were priced lower than the domestic product in the majority of instances across all four pricing products and across all four subject countries. The highest volume and greatest number of instances of lower priced purchases were for pricing product 3 (light amber). The sources with the highest volume of lower priced purchases were Argentina and India. There were instances for which imported raw honey from Argentina and Brazil were higher priced than U.S.-produced raw honey, but there were no such instances for the remaining subject sources.

**Table V-11**
**Raw honey:  Instances of lower/(higher) imported purchase prices compared to U.S. purchase prices and the range and average of margins, by product**

Quantity in 1,000 pounds; margins in percent

| Products | Type | Number of quarters | Quantity | Average margin | Minimum margin | Maximum margin |
|---|---|---|---|---|---|---|
| Product 1 | Lower than U.S. | 40 | *** | *** | *** | *** |
| Product 2 | Lower than U.S. | 46 | *** | *** | *** | *** |
| Product 3 | Lower than U.S. | 57 | *** | *** | *** | *** |
| Product 4 | Lower than U.S. | 39 | *** | *** | *** | *** |
| All products | Lower than U.S. | 182 | 818,170 | 37.2 | 0.4 | 60.7 |
| Product 1 | Higher than U.S. | 5 | *** | *** | *** | *** |
| Product 2 | Higher than U.S. | 2 | *** | *** | *** | *** |
| Product 3 | Higher than U.S. | 3 | *** | *** | *** | *** |
| Product 4 | Higher than U.S. | 2 | *** | *** | *** | *** |
| All products | Higher than U.S. | 12 | 51,134 | (7.4) | (0.1) | (16.2) |

Source**:** Compiled from data submitted in response to Commission questionnaires.

Note: These data include only quarters in which there is a comparison between the U.S. and subject product.

**Table V-12**
**Raw honey:  Instances of lower/(higher) imported purchase prices compared to U.S. purchase prices and the range and average of margins, by country**

Quantity in 1,000 pounds; margins in percent

| Sources | Type | Number of quarters | Quantity | Average margin | Minimum margin | Maximum margin |
|---------|------|-------------------|----------|----------------|----------------|----------------|
| Argentina | Lower than U.S. | 49 | *** | *** | *** | *** |
| Brazil | Lower than U.S. | 49 | *** | *** | *** | *** |
| India | Lower than U.S. | 51 | *** | *** | *** | *** |
| Vietnam | Lower than U.S. | 33 | *** | *** | *** | *** |
| All subject sources | Lower than U.S. | 182 | 818,170 | 37.2 | 0.4 | 60.7 |
| Argentina | Higher than U.S. | 3 | *** | *** | *** | *** |
| Brazil | Higher than U.S. | 9 | *** | *** | *** | *** |
| India | Higher than U.S. | --- | *** | *** | *** | *** |
| Vietnam | Higher than U.S. | --- | *** | *** | *** | *** |
| All subject sources | Higher than U.S. | 12 | 51,134 | (7.4) | (0.1) | (16.2) |

Source**:** Compiled from data submitted in response to Commission questionnaires.

Note: These data include only quarters in which there is a comparison between the U.S. and subject product.

## Price data from USDA/AMS

The U.S. Department of Agriculture's Agricultural Marketing Service ("USDA/AMS") publishes monthly domestic and import prices in the National Honey Report that align closely to the defined pricing products. The National Honey Report publishes prices by color, floral source, and U.S. state or import country, and presents either a single price or a low and high price depending on the number of transactions in that month.[20] AMS price data and calculated margins are presented in Appendix J. Consistent with the collected purchase price data, subject imports undersold U.S.-produced honey in the vast majority of instances (505 of 523 instances).

Price data calculated by staff from USDA/AMS National Honey Report data for the four raw honey products that closely align[21] with the pricing products are presented figures V-6 to V-9, and in the tables presented in Appendix J.

---

[20] Staff calculated simple averages for each month, by origin and color, by dividing the sum of prices by the number of observations. The National Honey Report does not have quantities associated with each price or price range; therefore, staff are unable to calculate weighted average prices using USDA/AMS data.

[21] Pricing products included container size in the pricing product definitions, while the four products presented in AMS data do not have container size included in the AMS product definitions.

**Figure V-6**
**Raw honey: Prices of domestic and imported White honey (0 – 34 mm), by month, January 2018 through September 2021**



Source: Compiled from Agricultural Marketing Service (AMS) data, part of the U.S. Department of Agriculture (USDA), accessed November 23, 2021.

**Figure V-7**
**Raw honey: Prices of domestic and imported Extra light amber honey (35 – 50 mm), by month, January 2018 through September 2021**



Source: Compiled from Agricultural Marketing Service (AMS) data, part of the U.S. Department of Agriculture (USDA), accessed November 23, 2021.

**Figure V-8**
**Raw honey: Prices of domestic and imported Light amber honey (51 – 85 mm), by month, January 2018 through September 2021**



Source: Compiled from Agricultural Marketing Service (AMS) data, part of the U.S. Department of Agriculture (USDA), accessed November 23, 2021.

**Figure V-9**
**Raw honey: Prices of domestic and imported Amber honey (greater than 86 mm), by month, January 2018 through September 2021**



Source: Compiled from Agricultural Marketing Service (AMS) data, part of the U.S. Department of Agriculture (USDA), accessed November 23, 2021.

## Lost sales and lost revenue

In the preliminary phase of the investigation, the Commission requested that U.S. producers of raw honey report purchasers with which they experienced instances of lost sales or revenue due to competition from imports of raw honey from subject countries during 2018-20. Three U.S. producers and petitioner SHA submitted lost sales and lost revenue allegations in the petition.[22] These firms identified 15 purchasers with which they lost sales or revenue; 12 consisted of lost sales allegations and three consisted of both lost sales and lost revenue allegations. In the preliminary phase, 20 purchasers submitted lost sale/lost revenue questionnaire responses.

In the final phase of the investigation, of the 47 responding large U.S. producers,[23] 40 reported that they had to reduce prices[24] and 12 reported that they had to roll back announced price increases.[25] Twenty-nine large U.S. producers reported that they had lost sales.[26]

Staff contacted 33 purchasers and received purchaser questionnaire responses from 21 purchasers. Purchasers' reported purchases of U.S.-produced raw honey and raw honey from subject sources, and the change in the domestic share of each firm's purchases from 2018 to 2020 are shown in table V-13.[27]

---

[22] U.S. producers *** submitted allegations. In addition, ***.

[23] Firms that produced raw honey using 3,800 colonies or more in the United States annually in 2018, 2019, or 2020 or using 3,800 colonies or more in Jan.-Sept. 2021.

[24] Five small producers also reported that they had to reduce prices.

[25] Two small producers also reported that they had to roll back announced price increases.

[26] Five small producers also reported that they had lost sales.

[27] Three purchasers (***) submitted lost sales lost revenue survey responses in the preliminary phase but did not submit purchaser questionnaire responses in the final phase.

**Table V-13**
**Raw honey:  U.S. purchasers' U.S. purchase quantity and changes in firm-level shares, by source, January 2018 - September 2021**

Quantity in 1,000 pounds; change in shares in percentage points

| Firm | Domestic quantity | Argentina quantity | Brazil quantity | India quantity | Vietnam quantity | Subject sources quantity | Change in domestic share (2018-2020) |
|---|---|---|---|---|---|---|---|
| *** | *** | *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** | *** | *** |

Source: Compiled from data submitted in response to Commission questionnaires.
Note: The five purchasers (***) that were excluded from the purchase price data analysis are included in this table. End user purchasers *** reported that their honey purchases from *** are blended and may include raw honey from other sources.

Most purchasers reported that they had not purchased imports instead of domestically produced raw honey. Eight of the 21 responding purchasers reported that they had purchased subject imports instead of domestic product. Five purchasers reported purchasing imported raw honey from Argentina instead of U.S.-produced product, four reported purchasing raw honey from Brazil, six reported purchasing raw honey from India, and seven reported purchasing raw honey from Vietnam. Eight of these purchasers reported that subject import prices were lower than U.S.-produced product, but only one responded that price was a primary reason for the decision to purchase imported product instead of U.S.-produced product.[28] Purchaser *** estimated the quantity of raw honey from subject sources purchased instead of domestic product ranged from *** pounds from *** to *** pounds from *** (tables V-14 and V-15). Purchasers identified honey color and flavor profiles, organic requirements, insufficient domestic volume, more consistent quality from Argentina, and strained honey from imports, as non-price reasons for purchasing imported rather than U.S.-produced product. Responding end user purchasers highlighted that darker honeys are preferable for ingredient use and are not available in sufficient volumes from domestic producers. Purchaser *** reported that U.S.-produced raw honey is purchased directly from the beekeeper and is un-strained (filled with insect parts and wax), while imported honey has been strained to remove these. It also added that imported honey offers a blended and consistent flavor, whereas domestic honey can vary greatly from drum to drum, and exporters offer product with completed residue, origin and authenticity analysis that is unavailable prior to purchase of U.S.-produced honey.

---

[28] Two of five responding purchasers reported that raw honey from Brazil was not priced lower than U.S.-produced raw honey, while all responding purchasers reported that prices for Argentina, India, and Vietnam were lower.

**Table V-14**
**Raw honey:  Purchasers' responses to purchasing subject instead of domestic, by source**

Count in number of firms reporting; quantity in 1,000 pounds

| Source | Purchased subject imports instead of domestic | Imports priced lower | Choice based on price | Quantity |
|---|---|---|---|---|
| Argentina | 5 | 5 | 1 | *** |
| Brazil | 4 | 3 | 1 | *** |
| India | 6 | 6 | 1 | *** |
| Vietnam | 7 | 7 | 1 | *** |
| Subject sources | 8 | 8 | 1 | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

**Table V-15**
**Raw honey:  Purchasers' responses to purchasing subject instead of domestic, by firm**

Quantity in 1,000 pounds

| Firm | Purchased subject imports instead of domestic | Imports priced lower | Choice based on price | Quantity | Narrative on reasons for purchasing imports |
|------|-----------------------------------------------|----------------------|-----------------------|----------|---------------------------------------------|
| *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** |

Table continued.

**Table V-15 Continued**
**Raw honey:  Purchasers' responses to purchasing subject instead of domestic, by firm**

Quantity in 1,000 pounds

| Firm | Purchased subject imports instead of domestic | Imports priced lower | Choice based on price | Quantity | Narrative on reasons for purchasing imports |
|------|------|------|------|------|------|
| *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** |

Table continued.

**Table V-15 Continued**
**Raw honey:  Purchasers' responses to purchasing subject instead of domestic, by firm**

Quantity in 1,000 pounds

| Firm | Purchased subject imports instead of domestic | Imports priced lower | Choice based on price | Quantity | Narrative on reasons for purchasing imports |
|------|-----------------------------------------------|----------------------|-----------------------|----------|---------------------------------------------|
| *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** |

Table continued.

**Table V-15 Continued**
**Raw honey:  Purchasers' responses to purchasing subject instead of domestic, by firm**

Quantity in 1,000 pounds

| Firm | Purchased subject imports instead of domestic | Imports priced lower | Choice based on price | Quantity | Narrative on reasons for purchasing imports |
|------|------|------|------|------|------|
| *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** |
| *** | *** | *** | *** | *** | *** |
| All firms | Yes--8;  No--13 | Yes--8;  No--0 | Yes--1; No--8 | *** | NA |

Source: Compiled from data submitted in response to Commission questionnaires.

Of the 21 responding purchasers, one purchaser, (***), reported that U.S. producers had reduced prices in order to compete with lower-priced imports from subject countries; two purchasers reported that they did not know. Purchaser *** reported an estimated price reduction of *** percent. Purchaser *** noted that the U.S. raw honey market and the import market work independently of each other and that one price does not dictate the other. Eighteen purchasers reported that U.S. producers had not lowered prices in order to compete with lower-priced imports.

In responding to the lost sales lost revenue survey, some purchasers provided additional information on purchases and market dynamics.

Purchaser *** stated:

USA honey is not a reliable source of honey in terms of quality, continuous supply, consistency, supplier reliability, and authenticity.  However, some customers find 'Made in the USA' overweighs the costs of USA honey.  On the other hand, all commercial consumers know that U.S. honey is not a reliable source, and a growing number of retail consumers are transitioning their specifications from a USA only blend to USA, Canadian, Argentina or USA, South American or simply the best value for the consumer.  In the last 20 years, USA honey producers have transitioned their efforts from honey production to pollination. Some producers have even transitioned to focus on pollination or to produce bees for sale.  While there are many factors that can plague honey production, the honey producers have proved it is possible to produce an oversupply after a record high price which in turn drove down prices. This is during a time where energy, goods and commodity prices were at the lowest point they have been in some time. Honey is only consumed at a little over 1 lb. per person per year.  This is not enough consumption where supply can easily dictate the price.  Even if $'s for Organic or other conventional South American crops are higher than USA honey, consumer behavior and consumption will not change because retail grocers know there is simply not enough reliable supply in the US to promote a consistent honey program.  Responses to III-4 are reasonable estimates. Actual overheads costs of commercial, food service and retail honey are not available at the time of this report.

Purchaser *** stated:

Availability of supply is the primary driver of *** purchasing patterns following its consolidation and product unification efforts in 2018.  White and extra-light amber honey produced in the United States is a premium honey with the vast majority dedicated to retail sales where there are greater opportunities for profit compared to the ingredient sector. As such, the United States does not produce adequate amounts of honey to support the standardization of *** formula and for this reason, *** domestic honey purchases have declined.  In order to acquire the necessary volume of honey for a standardized formula and product unification, *** transitioned to using a predominately light amber

honey formulation as it is more widely available than the white or extra-light amber honey produced in the United States.

# Part VI: Financial experience of U.S. producers

## Background[1]

Eighty-one firms provided usable financial results on their raw honey operations.[2] [3] Thirty-six of the usable responses were from small U.S. producers and the remaining 45 responses were from large U.S. producers.[4] The majority of responding beekeepers reported their financial data on the requested calendar-year basis.[5] Thirty-three of the 45 large U.S. producers provided their financial data on a cash basis.[6] Small U.S. producers were not asked to provide their accounting basis, but based on responses in the preliminary phase of these investigations the vast majority use cash-basis accounting.

---

[1] The following abbreviations may be used in the tables and/or text of this section: generally accepted accounting principles ("GAAP"), fiscal year ("FY"), net sales ("NS"), cost of goods sold ("COGS"), selling, general, and administrative expenses ("SG&A expenses"), average unit values ("AUVs"), research and development expenses ("R&D expenses"), and return on assets ("ROA").

[2] Three other companies (one small U.S. producer and two large U.S. producers) provided questionnaire responses that did not have usable financial results. These U.S. producers were ***. These companies produced a combined *** of raw honey in 2020, and accounted for *** percent of total reported 2020 production. U.S. producers' questionnaire responses, sections II-1 and III-5.

[3] As of the writing of this report, there were two responses to revision requests that were not received. As such, staff made the following adjustments in order to make their responses usable. The data were adjusted as follows: (1.) *** reported incomplete interim-period financial data. All interim-period financial data for this company were removed. In addition, ***. Staff allocated these *** to its raw honey operations based on sales revenue. (2.) The net sales quantity and value of raw honey reported by *** appeared to be the number of its colonies and net sales quantity, respectively. Staff replaced the quantity and value of the company's raw honey net sales with the reported quantity and value of its total shipments. U.S. producers' questionnaire responses, sections II-I, II-2, IV-9a, and IV-9e.

[4] As previously discussed in Part III, small U.S. producers were allowed to submit a short-form version of the questionnaire that collected general trade, financial, and employment data for the full year periods (2018, 2019, and 2020), while the large U.S. producers were required to submit the full questionnaire, which included data for the full year periods (2018, 2019, and 2020), as well as the interim periods (January-September 2020 and January-September 2021).

Due to the narrower focus of the information requested from the small U.S. producers, capital expenditures, R&D expenses, net assets, and all interim period data will be based only on the responses of the large U.S. producers.

[5] A few firms were unable to provide their data on a calendar-year basis and reported their data based on their firm's fiscal year.

[6] Nine of the large U.S. producers reported their financial data on an accrual basis and three of the large U.S producers did not respond to this question.

Revenue primarily reflects commercial sales, but also includes internal consumption and transfers to related firms. Internal consumption and transfers to related firms accounted for 3.1 percent and 3.3 percent, respectively, of large producers' total U.S. shipments in 2020 and are not shown separately in this section of the report.[7]

Figure VI-1 shows that the large U.S. producers accounted for 88.8 percent of reported net sales quantity in 2020, while the small U.S. producers accounted for 11.2 percent.

**Figure VI-1**
**Raw honey: Share of net sales quantity in 2020, by firm**



Source: Compiled from data submitted in response to Commission questionnaires.

---

[7] U.S. producers' questionnaire responses, section III-5. The majority of the internal consumption was reported to be raw honey that was packaged for retail. Ibid.

**Cash-basis accounting**

As previously mentioned, the majority of responding firms reported their financial data on a cash basis. One of the main differences between accrual accounting (the accounting basis required by GAAP) and cash-basis accounting is the timing of when revenue and expenses are recognized. This impacts the reported financial results as follows:

(1) Inventory effects: With cash-basis accounting, expenses are recorded when they are paid, and do not always appear in the same period in which any corresponding revenues are recorded.[8] With a product that can be held in inventory, such as raw honey, any changes in inventory year-over-year will result in an over- or under-statement of profitability when compared to accrual accounting. This is because in cash-basis accounting, expenses are recorded based on the amount of honey produced, rather than the amount that is sold. Any raw honey that is produced for inventory will result in production expenses incurred in the period in which the raw honey was produced with no associated revenue. Conversely, for honey sold from a previous period's inventory, with cash-basis accounting, profitability for this product would be overstated in the year sold because the associated operating expenses would have already been recorded in the period produced. Therefore, during the period the product is sold, the company would record revenue with no associated operating expenses.

(2) Payment timing: In cash-basis accounting, revenue is recorded when the cash is received rather than when the product is sold.[9] If cash for a sale is received in a period other than when the product is sold a company's reported revenue will not necessarily reflect the amount of product actually sold in a given period. In addition, if a company is paid for their product in a period following the period in which the product is sold, the effect any changes in price will have on profitability won't be seen in the company's financial results until the period following the sale.

These cash-basis accounting differences, and their impact on the raw honey financial results are discussed further in the relevant sections, below.

---

[8] In accrual accounting, the "Matching Principle" requires companies to record expenses in the period in which the related revenues are earned. This allows expenses and revenues to be matched on the income statement for a given period to accurately analyze a company's performance. *Accounting Tools*, https://www.accountingtools.com/articles/2017/5/14/the-matching-principle, retrieved May 24, 2021.

[9] In accrual accounting, the "Revenue Recognition Principle" requires companies to recognize (record) revenue in the period when realized and earned – not necessarily when cash is received. *Accounting Tools,* https://www.accountingtools.com/articles/2017/5/15/the-revenue-recognition-principle, retrieved May 24, 2021.

## Operations on raw honey

Table VI-1 presents aggregated data for all U.S. producers' operations in relation to raw honey, while table VI-2 presents the corresponding changes in AUVs. Table VI-3 presents aggregated data for the large U.S. producers' operations in relation to raw honey, while table VI-4 presents the corresponding changes in AUVs.

**Table VI-1**
**Raw honey: Results of operations of <u>all U.S. producers</u>, by item and period**

Quantity in 1,000 pounds; value in 1,000 dollars; ratios in percent; unit values in dollars per pound; count in number of firms reporting

| Item | Measure | 2018 | 2019 | 2020 |
|------|---------|------|------|------|
| Total net sales | Quantity | 38,425 | 38,348 | 40,897 |
| Total net sales | Value | 68,583 | 60,439 | 65,513 |
| Operating expenses | Value | 79,354 | 77,842 | 77,195 |
| Operating income or (loss) | Value | (10,771) | (17,404) | (11,682) |
| All other expenses | Value | 2,016 | 3,435 | 2,385 |
| Insurance/government program income | Value | 3,157 | 2,025 | 6,183 |
| All other income | Value | 1,219 | 1,877 | 2,201 |
| Net income or (loss) | Value | (8,411) | (16,938) | (5,684) |
| Operating expenses | Ratio to NS | 115.7 | 128.8 | 117.8 |
| Operating income or (loss) | Ratio to NS | (15.7) | (28.8) | (17.8) |
| All other expenses | Ratio to NS | 2.9 | 5.7 | 3.6 |
| Insurance/government program income | Ratio to NS | 4.6 | 3.3 | 9.4 |
| All other income | Ratio to NS | 1.8 | 3.1 | 3.4 |
| Net income or (loss) | Ratio to NS | (12.3) | (28.0) | (8.7) |
| Total net sales | Unit value | 1.78 | 1.58 | 1.60 |
| Operating expenses | Unit value | 2.07 | 2.03 | 1.89 |
| Operating income or (loss) | Unit value | (0.28) | (0.45) | (0.29) |
| All other expenses | Unit value | 0.05 | 0.09 | 0.06 |
| Insurance/government program income | Unit value | 0.08 | 0.05 | 0.15 |
| All other income | Unit value | 0.03 | 0.05 | 0.05 |
| Net income or (loss) | Unit value | (0.22) | (0.44) | (0.14) |
| Operating losses | Count | 42 | 50 | 47 |
| Net losses | Count | 37 | 47 | 35 |
| Data | Count | 80 | 80 | 79 |

Source: Compiled from data submitted in response to Commission questionnaires.

Note: While these data include responses from 81 companies, the data count is less than 81 in each year because not all companies had sales of raw honey in every year.

**Table VI-2**
**Raw honey: Changes in AUVs for <u>all U.S. producers</u> between comparison periods**

Unit values in dollars per pound

| Item | Changes Measured In | 2018-20 | 2018-19 | 2019-20 |
|---|---|---|---|---|
| Total net sales | Percent | ▼(10.3) | ▼(11.7) | ▲1.6 |
| Operating expenses | Percent | ▼(8.6) | ▼(1.7) | ▼(7.0) |
| Total net sales | Unit value | ▼(0.18) | ▼(0.21) | ▲0.03 |
| Operating expenses | Unit value | ▼(0.18) | ▼(0.04) | ▼(0.14) |
| Operating income or (loss) | Unit value | ▼(0.01) | ▼(0.17) | ▲0.17 |
| All other expenses | Unit value | ▲0.01 | ▲0.04 | ▼(0.03) |
| Insurance/government program income | Unit value | ▲0.07 | ▼(0.03) | ▲0.10 |
| All other income | Unit value | ▲0.02 | ▲0.02 | ▲0.00 |
| Net income or (loss) | Unit value | ▲0.08 | ▼(0.22) | ▲0.30 |

Source: Compiled from data submitted in response to Commission questionnaires.

Note:  Unit values shown as "0.00" represent non-zero values that are less than "0.005."

VI-5

**Table VI-3**
**Raw honey: Results of operations of <u>large U.S. producers</u>, by item and period**

Quantity in 1,000 pounds; value in 1,000 dollars; ratios in percent; unit values in dollars per pound; count in number of firms reporting

| Item | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| Total net sales | Quantity | 34,017 | 33,185 | 36,320 | 28,610 | 32,090 |
| Total net sales | Value | 60,487 | 51,832 | 58,296 | 44,610 | 53,976 |
| Operating expenses | Value | 71,098 | 69,949 | 69,559 | 52,907 | 55,546 |
| Operating income or (loss) | Value | (10,611) | (18,117) | (11,263) | (8,296) | (1,570) |
| All other expenses | Value | 1,852 | 3,235 | 2,198 | 775 | 1,121 |
| Insurance/government program income | Value | 2,660 | 1,668 | 5,286 | 3,173 | 2,615 |
| All other income | Value | 1,104 | 1,783 | 2,148 | 975 | 181 |
| Net income or (loss) | Value | (8,699) | (17,901) | (6,028) | (4,924) | 104 |
| Depreciation/amortization | Value | 5,764 | 5,537 | 5,263 | 1,864 | 2,189 |
| Cash flow | Value | (2,936) | (12,364) | (764) | (3,060) | 2,293 |
| Operating expenses | Ratio to NS | 117.5 | 135.0 | 119.3 | 118.6 | 102.9 |
| Operating income or (loss) | Ratio to NS | (17.5) | (35.0) | (19.3) | (18.6) | (2.9) |
| All other expenses | Ratio to NS | 3.1 | 6.2 | 3.8 | 1.7 | 2.1 |
| Insurance/government program income | Ratio to NS | 4.4 | 3.2 | 9.1 | 7.1 | 4.8 |
| All other income | Ratio to NS | 1.8 | 3.4 | 3.7 | 2.2 | 0.3 |
| Net income or (loss) | Ratio to NS | (14.4) | (34.5) | (10.3) | (11.0) | 0.2 |
| Total net sales | Unit value | 1.78 | 1.56 | 1.61 | 1.56 | 1.68 |
| Operating expenses | Unit value | 2.09 | 2.11 | 1.92 | 1.85 | 1.73 |
| Operating income or (loss) | Unit value | (0.31) | (0.55) | (0.31) | (0.29) | (0.05) |
| All other expenses | Unit value | 0.05 | 0.10 | 0.06 | 0.03 | 0.03 |
| Insurance/government program income | Unit value | 0.08 | 0.05 | 0.15 | 0.11 | 0.08 |
| All other income | Unit value | 0.03 | 0.05 | 0.06 | 0.03 | 0.01 |
| Net income or (loss) | Unit value | (0.26) | (0.54) | (0.17) | (0.17) | 0.00 |
| Operating losses | Count | 26 | 32 | 29 | 24 | 23 |
| Net losses | Count | 23 | 32 | 22 | 20 | 21 |
| Data | Count | 44 | 44 | 44 | 42 | 42 |

Source: Compiled from data submitted in response to Commission questionnaires.

Note: All 45 large U.S. producers provided full-year data and 43 of them provided usable interim-period results. The full- and partial-year data counts show 44 and 42, respectively, because not every company that provided usable data had sales of raw honey in every period.

Note: The interim period financial results are affected by cash-basis accounting. Some companies reported significantly higher or lower profitability in their interim period results compared with their full-year results. In response to questions from staff, this was usually a timing issue. For example, one company reported that it sold all of its honey in January-September, but its expenses were spread throughout the year. Another company reported that it typically sells the large majority of its honey in the fourth quarter, but still incurs/paid a large share of its expenses during January-September. Email from ***, February 24, 2022; Email from ***, March 15, 2022.

**Table VI-4**
**Raw honey: Changes in AUVs for <u>large U.S. producers</u> between comparison periods**

Unit values in dollars per pound

| Item | Changes Measured In | 2018-20 | 2018-19 | 2019-20 | Jan-Sep 2020-21 |
|---|---|---|---|---|---|
| Total net sales | Percent | ▼(9.7) | ▼(12.2) | ▲2.8 | ▲7.9 |
| Operating expenses | Percent | ▼(8.4) | ▲0.8 | ▼(9.1) | ▼(6.4) |
| Total net sales | Unit value | ▼(0.17) | ▼(0.22) | ▲0.04 | ▲0.12 |
| Operating expenses | Unit value | ▼(0.17) | ▲0.02 | ▼(0.19) | ▼(0.12) |
| Operating income or (loss ) | Unit value | ▲0.00 | ▼(0.23) | ▲0.24 | ▲0.24 |
| All other expenses | Unit value | ▲0.01 | ▲0.04 | ▼(0.04) | ▲0.01 |
| Insurance or government program income | Unit value | ▲0.07 | ▼(0.03) | ▲0.10 | ▼(0.03) |
| All other income | Unit value | ▲0.03 | ▲0.02 | ▲0.01 | ▼(0.03) |
| Net income or (loss) | Unit value | ▲0.09 | ▼(0.28) | ▲0.37 | ▲0.18 |

Source: Compiled from data submitted in response to Commission questionnaires.

Note:  Unit values shown as "0.00" represent non-zero values that are less than "0.0005."

## Net sales

As seen in table VI-1, the net sales quantity of raw honey increased irregularly between 2018 and 2020, while the net sales value decreased irregularly during the same period. This resulted in the per-pound net sales AUV decreasing from $1.78 in 2018 to $1.56 in 2019 and increasing slightly to $1.60 in 2020.[10] On a company-specific basis, the net sales trends were mixed. For companies that reported net sales in both 2018 and 2020, 43 of 78 reported an increase in net sales quantity between 2018 and 2020, and 45 of 78 companies reported a decrease in their net sales revenue during the same period. However, the company-specific trends for net sales AUVs were more uniform. For companies that reported net sales in both 2018 and 2020, 60 of 78 companies experienced a decrease in their net sales AUVs from 2018 to 2020.[11]

Slightly fewer than half of the beekeepers that reported usable financial data were members of Sioux Honey Association Cooperative ("SHA"). SHA processes, packs, and sells the raw honey, and distributes any profit back to the members. SHA members are required to send virtually all of their raw honey production to the cooperative each year. Upon delivery,

---

[10] Between the comparable interim periods, large U.S. producers reported higher net sales quantity and value, in January-September 2021 than in January-September 2020. The net sales AUV was also higher in interim 2021, at $1.68 per pound, compared with $1.56 per pound in interim 2020 (table VI-3).

[11] Of the 41 large U.S. producers that provided usable interim-period financial results for both interim periods, 26 reported a higher net sales AUV in interim 2021 than in interim 2020, 14 reported a lower net sales AUV, and 1 company reported no change.

members receive an initial advance payment, and then receive the remainder of the payment in four or five installments throughout the year, with a final payment in July or August.[12] [13]

Many commercial beekeepers that produce raw honey also engage their honeybee colonies in other revenue-producing activities. Table VI-5 shows the share of total beekeeping sales revenue accounted for by each of these revenue-producing activities. The most common of these, commercial pollination, has grown in importance and represented 44.8 percent of total beekeeping revenue in 2020, compared to 42.2 percent in 2018.[14] [15] In addition, many companies also reported selling other products related to their beekeeping activities, such as queen bees, nucs, package bees, and beeswax.[16] [17]

**Table VI-5**
**Raw honey: U.S. producers' revenue-producing activities, by item and period**

Shares in percent and represent share of total beekeeping revenue

| Item | 2018 | 2019 | 2020 |
|------|------|------|------|
| Sales of raw honey | 41.8 | 38.2 | 38.7 |
| Commercial pollination fees | 42.2 | 45.8 | 44.8 |
| Sales of other related products | 16.0 | 15.9 | 16.4 |
| Revenue from all beekeeping activities | 100.0 | 100.0 | 100.0 |

Source: Compiled from data submitted in response to Commission questionnaires.

---

[12] Conference transcript pp. 24-26 (Coy).

[13] With cash-basis accounting, this delay in payment means a portion of the revenue from the honey delivered to the cooperative each year will not be recorded until the following year. However, this causes the most distortion in profitability when there are large changes to the amount of product being sold year to year. SHA producers' aggregate net sales quantity did not fluctuate to a great degree, with sales between 17.9 million and 19.3 million pounds from 2018-20.

[14] Commercial pollination is a service provided in which honeybee colonies are placed near crops that require pollination. It is most common during January-March, which is considered the off-season for raw honey production. U.S. producers must transport their honeybee colonies to the locations that require the service, with California being the most common for almond pollination.

[15] During the period examined, 67 of the 81 U.S. producers provided commercial pollination. Of the 67 companies that provided commercial pollination, 65 reported their commercial pollination revenue during the final phase of these investigations. The remaining two companies (***) reported that they provided commercial pollination during 2018-20 in their questionnaire responses during the preliminary phase of these investigations. U.S. producers' questionnaire responses (preliminary), section III-7. These 67 companies had raw honey net sales quantities that accounted for 96.8 percent of the total raw honey sales volume in 2020.

[16] A nuc, short for a nucleus colony, is a small functioning beehive with 4-5 frames of bees. Package bees are a box of bees that can be easily shipped. They include a queen, but the bees are typically unrelated and from different colonies. BeekeeperFacts webpage, https://beekeeperfacts.com/what-is-the-difference-between-a-nuc-and-a-package-of-bees/, retrieved March 22, 2022.

[17] During the period examined, 52 of the 81 U.S. producers reported sales of other beekeeping-related products.

## Operating expenses and operating income or loss

**Expense allocations**

Most beekeepers are able to isolate net sales values by revenue-producing activity, but the majority do not track and/or allocate operating expenses by revenue source.[18] During the preliminary phase of these investigations, many beekeepers reported that producing raw honey was their primary business, whether or not raw honey represented the majority of their revenue. This had an impact on the way in which these companies allocated their expenses, and it resulted in the U.S. producers using a wide range of allocation methods. In an effort to have more consistency, combined profit-and-loss data for all revenue-producing activities were collected during the final phase of these investigations, and staff has allocated shared expenses.

Each of the revenue-generating activities have direct costs that are attributable only to that product or service.[19] However, most of a beekeepers' expenses involve the caretaking of the bees and the maintenance of the beehives, which are necessary expenses whether a company is producing raw honey, providing commercial pollination services, or selling other beekeeping-related products.[20]

Staff notes that while commercial pollination and the production of raw honey are typically achieved using the same bee colonies, the engagement in one of these revenue-producing activities does not result in the other.[21] This means that even though many U.S. producers consider commercial pollination a byproduct and assigned it a relatively smaller share of their company's total expenses in the preliminary phase of these investigations,[22] for the purposes of financial analysis and expense allocations, commercial pollination is not being

---

[18] Raw Honey from Argentina, Brazil, India, Ukraine, and Vietnam, Inv. Nos. 731-TA-1560-1564 (Preliminary), USITC Publication 5204, June 2021 ("Preliminary publication"), p. VI-9.

[19] Preliminary publication, p. VI-10. Examples of these direct costs include transportation and labor costs to transport bees to pollination locations for commercial pollination services or labor and supplies to extract honey for the production of honey.

[20] For all U.S. producers, revenues were collected separately for raw honey, commercial pollination, and for all other beekeeping-related products, but expenses were collected on a combined basis for all products and services. All companies with commercial pollination revenue were asked to report the share of their colonies used in commercial pollination services in each period. Large U.S. producers were also asked to provide further detail on their expenses, including any direct operating expenses by revenue-producing activity and the portion of all other non-operating expenses, all other income, and insurance proceeds/government program income that should be allocated to raw honey.

[21] Commercially-viable raw honey is not typically produced during commercial pollination. The types of crops that bees pollinate affects the amount and flavor of the raw honey produced. The crops that typically require commercial pollination often only provide bees with enough raw honey to feed themselves, but not enough to sell commercially. Hearing transcript, pp. 16, 57 (Hiatt).

[22] Preliminary publication, p. VI-10.

treated as a byproduct of raw honey production. Instead, it is being treated in a manner similar to an out-of-scope product produced with shared assets and employees.[23]

Shared operating expenses were allocated to raw honey based on a combination of the share of colonies used in commercial pollination services and sales revenue.[24] [25] Shared operating expenses were allocated in the same way for large and small U.S. producers. However, while all small U.S. producers' operating expenses were classified as "shared," and thus allocated, large U.S. producers' shared operating expenses were the portion of total operating expenses that remained once the direct operating expenses, by activity, were removed.[26]

---

[23] One way in which a company can account for a byproduct is by charging the revenues received for the product against total COGS. This results in all profitability being assigned to the main product, as the revenue and COGS for the byproduct cancel out. Accounting for Management website, https://www.accountingformanagement.org/recognition-of-gross-revenue-method-of-costing-by-products/, retrieved April 22, 2022. Conversely, with shared equipment or employees, costs would be assigned and allocated between the revenue-producing activities using the most appropriate method, and profitability is shared between the products.

[24] For more information on the formula used for these allocations, *see* EDIS Document 766815, *Allocation of U.S. Producers' Shared Operating Expenses Reported at Questions II-2 and IV-9d*.

[25] Companies with commercial pollination revenue that did not provide the share of their colonies used for this service in response to staff questions, were assumed to have used all colonies in commercial pollination services. For large U.S. producers, any reported direct operating expenses for raw honey production were added to the allocated portion of shared operating expenses to calculate the raw honey operating expense.

[26] Petitioners consider the allocation method to be conservative because it doesn't account for the amount of time spent conducting each activity, which they indicated was six months for honey production and three months for commercial pollination. Petitioners' prehearing brief, pp. 57-58. Direct labor, which represents a large share of a beekeepers' production costs, is an example of a cost that would be more accurately allocated based on time than on sales revenue. According to a report cited in respondents' prehearing brief, direct labor can account for 50 percent of a beekeepers' production costs. Respondents' prehearing brief, Exh. 25, p. 36. In addition, overhead production costs are also frequently allocated to a product based on the relative number of direct labor hours used. Lanen, L., Anderson, S., Maher, M. (2014). *Fundamentals of Cost Accounting* (4th ed.). McGraw-Hill/Irwin, pp. 212-214.

Therefore, staff agrees that the amount of production costs that were allocated to the raw honey financial results are likely somewhat understated because of the difference in the amount of time spent between commercial pollination and raw honey production, particularly for companies that reported only shared operating expenses (i.e., all small producers and some large producers). However, SG&A expenses, which are also included in operating expenses, are more commonly allocated based on sales revenue. Since production costs and SG&A expenses were collected combined (as operating expenses), it is not possible to allocate production costs based on time and SG&A costs based on sales revenue.

**Operating expenses and results**

As seen in table VI-1, operating expenses for raw honey decreased from 2018 to 2020.[27] As a ratio to net sales, operating expenses increased from 115.7 percent in 2018 to 128.8 percent in 2019, and then decreased to 117.8 percent in 2020.[28] On a per-pound basis, operating expenses decreased from $2.07 in 2018 to $1.89 in 2020.

While a majority of U.S. producers (50) reported a decrease in their operating expense AUVs between 2018 and 2020,[29] the overall decrease in the operating expense AUVs was largely the result of decreases reported by three U.S. producers and was also somewhat attributable to the allocation of expenses between commercial pollination and raw honey production. Despite there being an increase in the amount of honey sold from 2018 to 2020, the amount of operating expenses that were allocated to raw honey production decreased because of a decrease in the total net sales value of raw honey and an increase in the commercial pollination revenue. Additionally, for reasons discussed further below, *** had high operating expenses with relatively low net sales quantities in the three annual-year periods. However, the company had a ***, which resulted in the company's operating expense AUV decreasing from $*** per pound in 2018 to $*** per pound in 2020. The two other large U.S. producers that had the most impact on the total operating expense AUVs were *** and ***, which each reported decreases of $*** and $*** per pound, respectively, between 2018 and 2020. Both companies reported increases in their ***

---

[27] The traditional components of total operating expenses (COGS and SG&A expenses) were not collected separately because of the way in which records are kept by many companies in agricultural industries (namely, many farmers rely on their IRS Schedule F, "Profit or Loss from Farming," to report requested financial information).

[28] The large U.S. producers reported higher operating expenses in interim 2021 than during the same period in 2020 (table VI-3). The large U.S. producers' operating expenses as a ratio to net sales was 118.6 percent in interim 2020 and 102.9 percent in interim 2021.

[29] The large U.S. producers' operating expense AUV was $1.85 per pound in interim 2020 and $1.73 per pound in interim 2021 (table VI-3). The higher operating expense AUV in interim 2020 was largely attributable to ***. The company reported per-pound operating expense AUVs of $*** in interim 2020 and $*** in interim 2021. Excluding this company, the large U.S. producers' operating expense AUVs were $*** per pound in interim 2020 and $*** per pound in interim 2021.

*** between 2018 and 2020, which would at least partially explain the decreases in their operating expense AUVs.[30] [31]

Operating income worsened irregularly; it was a loss of $10.8 million in 2018, a loss of $17.4 million in 2019, and a loss of $11.7 million in 2020. The number of U.S. producers reporting operating losses was 42 of 80 companies with reportable financial results in 2018, 50 of 80 companies in 2019, and 47 of 79 companies in 2020.[32] [33]

---

[30] *** net sales matched its production volumes in each year examined. *** net sales did not always match its production volume, but it sold slightly less than it produced in 2018 and slightly more than it produced in 2020. U.S. producers' questionnaire responses, section III-5. In response to questions from Staff, *** also indicated that its 2018 operating expenses were higher due to ***. Email from ***.

[31] If the data from these three companies were excluded, the raw honey operating expense AUVs would have decreased by $0.06 per pound, rather than $0.18 per pound, between 2018 and 2020. In addition to the exclusion of these companies' data, if the allocation of the total operating expense had remained at the 2018 level throughout the annual year periods, the operating expense AUVs would have decreased by $0.02 per pound between 2018 and 2020.

[32] As seen in table VI-3, the large U.S. producers reported operating losses of $8.3 million and $1.6 million in interim 2020 and interim 2021, respectively. The number of large U.S. producers reporting an operating loss was lower in interim 2021 (23 of 40 large U.S. producers) than during interim 2020 (24 of 40 large U.S. producers).

[33] Respondents assert that commercial pollination can have negative effects on a beekeepers' raw honey operations by causing a decline in bee health and lower honey production. Respondents' prehearing brief, pp. 22-23, 70; Respondents' posthearing brief, Exh. 1, pp. 23-25. While petitioners disagreed with this characterization at the hearing, if commercial pollination does, in fact, negatively affect raw honey production, it would mean that any increase by beekeepers in the amount of commercial pollination services provided could result in a decrease in the amount of honey revenue received per colony. While staff cannot quantify these effects, it should also be noted that based on the way in which costs were allocated, a decrease in honey revenue because of an increase in commercial pollination would also decrease the amount of shared operating expenses allocated to raw honey operations. This would slightly lessen, but not remove, the overall negative effect on raw honey profitability if an increase in commercial pollination results in a decrease in raw honey yield.

**Cash-basis adjustments**

As discussed previously, cash-basis accounting can have numerous effects on the reliability of using a company's profit and loss data for financial analysis. For the profitability of raw honey, the most pronounced impact is from companies that produced honey that was held for sale in later years, or, in interim 2021, sales of raw honey that was produced in previous periods.

*** of the U.S. producers reported a net sales quantity that differed from their production quantity in at least one full- or partial-year period, however, there were three *** companies, ***, that had an outsized impact on these data.[34] These companies reported that ***.

***, produced between *** and *** pounds of honey in 2018-2020. However, the company *** sold ***, ***, and *** percent of the quantity it produced in 2018, 2019, and 2020, respectively. The company reported that its sales were *** in those years because it ***. The company further reported that ***.[35] Conversely, in interim 2021 the company sold *** than it produced, which would make the company *** profitable than it would if accrual accounting had been used.[36]

*** reported selling *** of its 2018 production of raw honey in that year, but reported *** sales of raw honey in 2019 and 2020 despite producing *** and *** pounds in those years, respectively. In response to questions from staff, the company indicated that ***. The company further reported that ***.[37] Conversely, in interim 2021 the company sold *** than it produced, which would make the company appear *** than it would if accrual accounting had been used.[38]

---

[34] These companies are the *** largest U.S. producers, by 2020 production. U.S. producers' questionnaire responses, section III-5.

[35] Email from ***. *** U.S. producers' questionnaire response, section III-5.

[36] *** U.S. producers' questionnaire response, sections III-5 and IV-9a.

[37] Email from ***.

[38] *** U.S. producers' questionnaire response, sections III-5 and IV-9a.

*** reported selling *** of its 2018 production and selling *** than it produced in 2020. However, in 2019 the company sold *** pounds of raw honey it produced. In response to questions by staff, the company reported that in 2019 ***.[39] [40] Conversely, in interim 2021, the company reported selling *** percent *** than it produced, which would make the company appear *** profitable than it would if accrual accounting had been used.[41]

Converting these companies' financial results from a cash-basis to accrual-accounting is not possible with the data available. Instead, Appendix N shows the industry's financial results excluding these companies, as well as what the industry's financial results would have been had these companies decided to, or in the case of ***, sell all of their production in each period.

---

[39] Email from ***.

[40] Staff notes that *** reported using GAAP as its accounting basis, which requires accrual accounting. However, when staff asked the company ***. This response seems to indicate that the company relied on *** for its financial results. Email from ***.

[41] *** U.S. producers' questionnaire response, sections III-5 and IV-9a.

**All other expenses and net income or loss**

Below operating income are all other non-operating expenses, insurance proceeds/ government program income, and all other income.[42] As seen in table VI-1, all other expenses increased irregularly between 2018 and 2020. Insurance proceeds and government program income decreased from $3.2 million in 2018 to $2.0 million in 2019 and then increased to $6.2 million in 2020.[43] This income category was reported by 36 companies in 2018, 34 companies in 2019, and 48 companies in 2020.[44] The last post-operating income item, all other income, increased from 2018 to 2020. The combined post-operating income items were more than all other expenses in each period, which resulted in the industry's net losses being smaller than its operating losses. The industry's net losses increased from a loss of $8.4 million in 2018 to a loss of $16.9 million in 2019, before decreasing to a loss of $5.7 million in 2020.[45] Similarly, because of post-operating income, fewer companies reported net losses than reported operating losses in each period.[46]

---

[42] For post-operating income line items, large U.S. producers were asked to identify the amounts that should be allocated to raw honey, whereas staff allocated these items for the small U.S. producers based on sales revenue.

[43] Certain government programs can provide financial assistance to beekeepers.  The Emergency Assistance for Livestock, Honey Bees, and Farm-raised Fish program ("ELAP") provides financial assistance to eligible producers of honeybees for losses due to disease, certain adverse weather events or loss conditions, including blizzards and wildfires. ELAP General Fact Sheet, Farm Service Agency, https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/FactSheets/elap-general-fact-sheet.pdf, retrieved May 25, 2021. The Noninsured Crop Disaster Assistance Program provides financial assistance to producers of uninsurable crops, including honey, when low yields, loss of inventory, or prevented planting occur due to natural disasters. Noninsured Crop Disaster Assistance Program Fact Sheet, Farm Service Agency, https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/FactSheets/noninsured_crop_disaster_assistance_program-nap-fact_sheet.pdf, retrieved May 24, 2021.

[44] *** companies reported receiving government funds in 2020 from the U.S. Small Business Administration-backed Paycheck Protection Program. U.S. producers' questionnaire responses, sections II-2 and IV-9a.

[45] The large U.S. producers reported a net income of $104,000 in interim 2021, which was an improvement from the loss of $4.9 million reported in interim 2020.

[46] A variance analysis is not shown due to the variety of cost structures and accounting bases used among the reporting firms, as well as having interim period data for some, but not all, companies.

## Capital expenditures, R&D expenses, assets, and return on assets

Table VI-6 presents data on the large U.S. producers' capital expenditures, R&D expenses, total net assets, and the operating ROA. Capital expenditures were reported by 26 large U.S. producers. The companies that reported capital expenditures described them as: vehicles/forklifts (15 companies); bee equipment/bee boxes/beehives (9 companies); honey extraction buildings/equipment (6 companies); other buildings/employee housing/land (8 companies); storage buildings/equipment/tanks (3 companies), and honey bees (two companies).[47]

R&D expenses were reported by 3 large U.S. producers. One of the companies described its R&D expenses as ***. The second company described these expenses as being used to ***. The last company reported its R&D expenses were fees associated with ***.[48]

Total net assets were reported by 38 of 45 large U.S. producers. The increase in reported assets was mainly attributable to an increase in net assets reported by ***, which reported a $*** increase from 2018 to 2020. The company described its net assets as ***.[49] A large share of the increase in the company's assets is likely attributable to the increase in its ***. The company's *** increased by *** between 2018 and 2020. If the company were to *** based on its *** in each year, the value of its *** account would have increased by $*** from 2018 to 2020.[50] The large U.S. producers' operating ROA was negative 6.2, negative 10.4, and negative 6.0 percent in 2018, 2019, and 2020, respectively.[51]

---

[47] U.S. producers' questionnaire responses, section IV-13b.

[48] *** U.S. producers' questionnaire response, section IV-13b. Bee Informed Partnership is a "national collaboration of leading research labs and universities in agricultural science to better understand honey bee declines in the United States." The nonprofit provides independent colony health assessments, colony sampling, full pest and pathogen diagnostics, and reporting of assessments. Bee Informed webpage, https://beeinformed.org/about/, retrieved March 16, 2022.

[49] *** U.S. producers' questionnaire response, section IV-12b.

[50] Calculated from *** U.S. producers' questionnaire response, section III-5.

[51] The operating ROA is calculated as operating income divided by total assets. With respect to a firm's overall operations, the total asset value reflects an aggregation of a number of assets which are generally not product specific. Thus, high-level allocations are generally required in order to report a total asset value for a specific product.

**Table VI-6**
**Raw honey: Large U.S. producers' capital expenditures, R&D costs, total net assets, and ROA, by item and period**

Values in 1,000 dollars; ratio in percent

| Item | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|------|------|------|------|--------------|--------------|
| Capital expenditures | 14,923 | 15,725 | 12,059 | 7,791 | 6,071 |
| R&D expenses | *** | *** | *** | *** | *** |
| Total net assets | 152,912 | 156,425 | 168,154 | | |
| Operating ROA | (6.2) | (10.4) | (6.0) | | |

Source: Compiled from data submitted in response to Commission questionnaires.

Note: The operating ROA represents the ratio of operating income or loss to net assets. The operating income or loss of companies that did not report total net assets were not included in the calculation of operating ROA.

## Capital and investment

The Commission requested U.S. producers of raw honey to describe any actual or potential negative effects of imports of raw honey from Argentina, Brazil, India, Ukraine, and Vietnam on their firms' growth, investment, ability to raise capital, development and production efforts, or the scale of capital investments. Table VI-7 presents the number of firms reporting an impact in each category and table VI-8 provides the U.S. producers' narrative responses.

**Table VI-7**
**Raw honey: Count of firms indicating actual and anticipated negative effects of imports from subject sources on investment, growth, and development since January 1, 2018, by effect**

Number of firms reporting

| Effect | Category | Count |
|---|---|---|
| Cancellation, postponement, or rejection of expansion projects | Investment | 10 |
| Denial or rejection of investment proposal | Investment | 3 |
| Reduction in the size of capital investments | Investment | 16 |
| Return on specific investments negatively impacted | Investment | 14 |
| Other investment effects | Investment | 18 |
| Any negative effects on investment | Investment | 45 |
| Rejection of bank loans | Growth | 5 |
| Lowering of credit rating | Growth | 2 |
| Problem related to the issue of stocks or bonds | Growth | 1 |
| Ability to service debt | Growth | 11 |
| Other growth and development effects | Growth | 27 |
| Any negative effects on growth and development | Growth | 41 |
| Anticipated negative effects of imports | Future | 45 |

Source: Compiled from data submitted in response to Commission questionnaires.

Note: In addition to the 45 large U.S. producers, responses to these questions are included from the 2 large U.S. producers that did not provide usable financial data, as well as 1 small U.S. producer that provided responses to these questions.

**Table VI-8**
**Raw honey: Narratives relating to actual and anticipated negative effects of imports on investment, growth, and development, since January 1, 2018**

| Item | Firm name and narrative on impact of imports |
|---|---|
| Cancellation, postponement, or rejection of expansion projects | *** |
| Cancellation, postponement, or rejection of expansion projects | *** |
| Cancellation, postponement, or rejection of expansion projects | *** |
| Cancellation, postponement, or rejection of expansion projects | *** |
| Cancellation, postponement, or rejection of expansion projects | *** |
| Cancellation, postponement, or rejection of expansion projects | *** |
| Cancellation, postponement, or rejection of expansion projects | *** |
| Cancellation, postponement, or rejection of expansion projects | *** |
| Denial or rejection of investment proposal | *** |
| Reduction in the size of capital investments | *** |
| Reduction in the size of capital investments | *** |
| Reduction in the size of capital investments | *** |
| Reduction in the size of capital investments | *** |
| Reduction in the size of capital investments | *** |
| Reduction in the size of capital investments | *** |

| Item | Firm name and narrative on impact of imports |
|------|----------------------------------------------|
| Reduction in the size of capital investments | *** |
| Reduction in the size of capital investments | *** |
| Reduction in the size of capital investments | *** |
| Reduction in the size of capital investments | *** |
| Reduction in the size of capital investments | *** |
| Return on specific investments negatively impacted | *** |
| Return on specific investments negatively impacted | *** |
| Return on specific investments negatively impacted | *** |
| Return on specific investments negatively impacted | *** |
| Return on specific investments negatively impacted | *** |
| Return on specific investments negatively impacted | *** |
| Return on specific investments negatively impacted | *** |
| Return on specific investments negatively impacted | *** |
| Return on specific investments negatively impacted | *** |
| Return on specific investments negatively impacted | *** |
| Return on specific investments negatively impacted | *** |
| Return on specific investments negatively impacted | *** |

| Item | Firm name and narrative on impact of imports |
|------|---------------------------------------------|
| Other negative effects on investments | *** |
| Other negative effects on investments | *** |
| Other negative effects on investments | *** |
| Other negative effects on investments | *** |
| Other negative effects on investments | *** |
| Other negative effects on investments | *** |
| Other negative effects on investments | *** |
| Other negative effects on investments | *** |
| Other negative effects on investments | *** |
| Other negative effects on investments | *** |
| Other negative effects on investments | *** |
| Other negative effects on investments | *** |
| Other negative effects on investments | *** |
| Other negative effects on investments | *** |
| Other negative effects on investments | *** |
| Other negative effects on investments | *** |
| Rejection of bank loans | *** |
| Rejection of bank loans | *** |
| Rejection of bank loans | *** |
| Rejection of bank loans | *** |

VI-21

| Item | Firm name and narrative on impact of imports |
|------|----------------------------------------------|
| Rejection of bank loans | *** |
| Lowering of credit rating | *** |
| Lowering of credit rating | *** |
| Problem related to the issue of stocks or bonds | *** |
| Ability to service debt | *** |
| Ability to service debt | *** |
| Ability to service debt | *** |
| Ability to service debt | *** |
| Ability to service debt | *** |
| Ability to service debt | *** |
| Ability to service debt | *** |
| Ability to service debt | *** |
| Ability to service debt | *** |
| Ability to service debt | *** |
| Ability to service debt | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |

| Item | Firm name and narrative on impact of imports |
|---|---|
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Other effects on growth and development | *** |
| Anticipated effects of imports | *** |

VI-23

| Item | Firm name and narrative on impact of imports |
|------|----------------------------------------------|
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |

| Item | Firm name and narrative on impact of imports |
|------|----------------------------------------------|
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |

| Item | Firm name and narrative on impact of imports |
|---|---|
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |
| Anticipated effects of imports | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

# Part VII: Threat considerations and information on nonsubject countries

Section 771(7)(F)(i) of the Act (19 U.S.C. § 1677(7)(F)(i)) provides that—

*In determining whether an industry in the United States is threatened with material injury by reason of imports (or sales for importation) of the subject merchandise, the Commission shall consider, among other relevant economic factors[1]--*

*(I)   if a countervailable subsidy is involved, such information as may be presented to it by the administering authority as to the nature of the subsidy (particularly as to whether the countervailable subsidy is a subsidy described in Article 3 or 6.1 of the Subsidies Agreement), and whether imports of the subject merchandise are likely to increase,*

*(II)  any existing unused production capacity or imminent, substantial increase in production capacity in the exporting country indicating the likelihood of substantially increased imports of the subject merchandise into the United States, taking into account the availability of other export markets to absorb any additional exports,*

*(III) a significant rate of increase of the volume or market penetration of imports of the subject merchandise indicating the likelihood of substantially increased imports,*

*(IV) whether imports of the subject merchandise are entering at prices that are likely to have a significant depressing or suppressing effect on domestic prices, and are likely to increase demand for further imports,*

*(V)  inventories of the subject merchandise,*

---

[1] Section 771(7)(F)(ii) of the Act (19 U.S.C. § 1677(7)(F)(ii)) provides that "The Commission shall consider {these factors} . . . as a whole in making a determination of whether further dumped or subsidized imports are imminent and whether material injury by reason of imports would occur unless an order is issued or a suspension agreement is accepted under this title. The presence or absence of any factor which the Commission is required to consider . . . shall not necessarily give decisive guidance with respect to the determination. Such a determination may not be made on the basis of mere conjecture or supposition."

(VI)     the potential for product-shifting if production facilities in the
         foreign country, which can be used to produce the subject
         merchandise, are currently being used to produce other products,

(VII)    in any investigation under this title which involves imports of both
         a raw agricultural product (within the meaning of paragraph
         (4)(E)(iv)) and any product processed from such raw agricultural
         product, the likelihood that there will be increased imports, by
         reason of product shifting, if there is an affirmative determination
         by the Commission under section 705(b)(1) or 735(b)(1) with
         respect to either the raw agricultural product or the processed
         agricultural product (but not both),

(VIII)   the actual and potential negative effects on the existing
         development and production efforts of the domestic industry,
         including efforts to develop a derivative or more advanced version
         of the domestic like product, and

(IX)     any other demonstrable adverse trends that indicate the
         probability that there is likely to be material injury by reason of
         imports (or sale for importation) of the subject merchandise
         (whether or not it is actually being imported at the time).[2]

Information on the volume and pricing of imports of the subject merchandise is
presented in *Parts IV* and *V*; and information on the effects of imports of the subject
merchandise on U.S. producers' existing development and production efforts is presented in
*Part VI*. Information on inventories of the subject merchandise; foreign producers' operations,
including the potential for "product-shifting"; any other threat indicators, if applicable; and any
dumping in third-country markets, follows. Also presented in this section of the report is
information obtained for consideration by the Commission on nonsubject countries.

---

[2] Section 771(7)(F)(iii) of the Act (19 U.S.C. § 1677(7)(F)(iii)) further provides that, in antidumping
investigations, ". . . the Commission shall consider whether dumping in the markets of foreign countries
(as evidenced by dumping findings or antidumping remedies in other WTO member markets against the
same class or kind of merchandise manufactured or exported by the same party as under investigation)
suggests a threat of material injury to the domestic industry."

## The industry in Argentina

The Commission issued foreign producers' or exporters' questionnaires to 14 firms believed to produce and/or export raw honey from Argentina.[3] Thirteen firms provided usable responses to the Commission's questionnaire: Asociación de Cooperativas Argentinas C.L. ("ACA Coop"), Compania Inversora Platense S.A. ("Cipsa"), D'ambros Maria De Los Angeles D'ambros Maria Daniela SH ("D'Ambros Maria"), Geomiel S.A. ("Geomiel), Gruas San Blas S.A. ("Gruas San Blas"), Industrial Haedo S.A. ("Haedo"), Honey & Grains SRL ("Honey and Grains"), Naiman S.A. ("Naiman"), Newsan S.A. ("Newsan"), Nexco S.A. ("Nexco"), Patagonik Food S.A. ("Patagonik"), Promiel SRL ("Promiel"), and Villamora S.A. ("Villamora"). These firms' exports to the United States accounted for approximately 97.1 percent of U.S. imports of raw honey from Argentina in 2020. According to industry information for Argentina from the Food and Agriculture Organization of the United Nations (FAO), the procurement of raw honey in Argentina reported in questionnaires is equivalent to 84.4 percent of overall production of raw honey in Argentina in 2020.[4] Table VII-1 presents information on the raw honey operations of the responding producers and exporters in Argentina while table VII-2 presents industry information for Argentina from FAO during 2018-20. According to estimates requested of the responding producers, the procurement of raw honey in Argentina reported by individual firms ranges between *** and *** percent of overall production of raw honey in Argentina.

---

[3] These firms were identified through a review of information submitted in the petition and presented in third-party sources.

[4] As the vast majority of responding foreign firms process and export raw honey collected from independent beekeepers, the foreign producers' questionnaires in these investigations requested that responding firms report the amount of raw honey the firms procured from both independent beekeepers and their own beekeeping operations.

**Table VII-1**
**Raw honey: Summary data for producers in Argentina, 2020**

| Firm | Procurement from beekeepers (1,000 pounds) | Share of reported procurement (percent) | Exports to the United States (1,000 pounds) | Share of reported exports to the United States (percent) | Total shipments (1,000 pounds) | Share of firm's total shipments exported to the United States (percent) |
|---|---|---|---|---|---|---|
| ACA Coop | *** | *** | *** | *** | *** | *** |
| Cipsa | *** | *** | *** | *** | *** | *** |
| D'Ambros Maria | *** | *** | *** | *** | *** | *** |
| Geomiel | *** | *** | *** | *** | *** | *** |
| Gruas San Blas | *** | *** | *** | *** | *** | *** |
| Haedo | *** | *** | *** | *** | *** | *** |
| Honey and Grains | *** | *** | *** | *** | *** | *** |
| Naiman | *** | *** | *** | *** | *** | *** |
| Newsan | *** | *** | *** | *** | *** | *** |
| Nexco | *** | *** | *** | *** | *** | *** |
| Patagonik | *** | *** | *** | *** | *** | *** |
| Promiel | *** | *** | *** | *** | *** | *** |
| Villamora | *** | *** | *** | *** | *** | *** |
| All firms | 138,501 | 100.0 | 85,032 | 100.0 | 146,088 | 58.2 |

Source: Compiled from data submitted in response to Commission questionnaires.

**Table VII-2**
**Raw honey:  Total industry information from FAO for Argentina, by period**

| Item | 2018 | 2019 | 2020 |
|---|---|---|---|
| Production population (1,000 beehives) | 2,974 | 2,979 | 2,983 |
| Production (1,000 pounds) | 175,197 | 173,821 | 164,030 |
| Yield (pounds per beehive) | 58.9 | 58.4 | 55.0 |

Source:  Food and Agriculture Organization statistics, accessed February 28, 2022.

## Changes in operations

As presented in table VII-3 producers in Argentina reported several operational and organizational changes since January 1, 2018.

**Table VII-3**
**Raw honey: Reported changes in operations in Argentina since January 1, 2018, by firm**

| Item | Firm name and accompanying narrative response |
|------|-----------------------------------------------|
| Expansion in availability from beekeeper suppliers | *** |
| Reduction in availability from beekeeper suppliers | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

## Operations on raw honey

Table VII-4 presents information on the raw honey operations of the responding producers and exporters in Argentina. Procurement increased irregularly by 4.5 percent during 2018-20 and was roughly equivalent in January-September ("interim") 2020 and interim 2021. Procurement is projected to be 12.2 percent higher in 2022 than in 2020. End-of-period inventories decreased by 38.5 percent during 2018-20 and were 8.0 percent higher in interim 2021 than in interim 2020. They are projected to be 35.3 percent higher in 2022 than in 2020. Inventories as a ratio to procurement decreased by 9.3 percentage points from 2018-20, were 1.1 percentage points higher in interim 2021 than in interim 2020, and are projected to be 2.7 percentage points higher in 2022 than in 2020.

Aggregate home market shipments for responding producers in Argentina increased by 135.6 percent during 2018-20 and were 16.0 percent higher in interim 2021 than in interim 2020. They are projected to decrease by 39.0 percent in 2022 than in 2020. (The share of home market shipments devoted to internal consumption was never more than *** percent in any period.) Exports to the United States increased by 25.9 percent during 2018-20 and were 12.6 percent higher in interim 2021 than in interim 2020. Exports to the United States are projected to be 5.1 percent lower in 2022 than in 2020. Exports to all other markets decreased by 2.3 percent during 2018-20 and were 25.6 percent lower in interim 2021 than in interim 2020, but are projected to be 20.3 percent higher in 2022 than in 2020.

During 2018-20, the share of exports to the United States ranged between 52.4 and 61.2 percent of all shipments, it was 66.1 percent in interim 2021, and it is projected to decrease 5.5 percentage points from 2020 to 2022. The ratio of inventories to total shipments decreased during 2018-20 by 10.6 percentage points and was 1.6 percentage points higher in interim 2021

than in interim 2020. This ratio is projected to increase by 3.7 percentage points from 2020 to 2022.

**Table VII-4**
**Raw honey: Data on industry in Argentina, by period**

Quantity in 1,000 pounds

| Item | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 | Projection 2021 | Projection 2022 |
|---|---|---|---|---|---|---|---|
| Procurement from beekeepers | 132,509 | 124,528 | 138,501 | 116,787 | 116,240 | 135,599 | 155,456 |
| End-of-period inventories | 29,948 | 24,502 | 18,409 | 20,024 | 21,636 | 25,369 | 24,900 |
| Internal consumption | *** | *** | *** | *** | *** | *** | *** |
| Commercial home market shipments | *** | *** | *** | *** | *** | *** | *** |
| Home market shipments | 736 | 1,117 | 1,734 | 954 | 1,106 | 1,215 | 1,058 |
| Exports to the United States | 67,565 | 79,549 | 85,032 | 65,292 | 73,499 | 78,390 | 80,716 |
| Exports to all other markets | 60,718 | 49,386 | 59,323 | 49,256 | 36,641 | 47,479 | 71,344 |
| Export shipments | 128,283 | 128,934 | 144,355 | 114,547 | 110,140 | 125,868 | 152,059 |
| Total shipments | 129,019 | 130,051 | 146,088 | 115,501 | 111,247 | 127,083 | 153,117 |

Table continued.

**Table VII-4 Continued**
**Raw honey: Data on industry in Argentina, by period**

Shares and ratios in percent

| Item | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 | Projection 2021 | Projection 2022 |
|---|---|---|---|---|---|---|---|
| Inventory ratio to procurement | 22.6 | 19.7 | 13.3 | 12.9 | 14.0 | 18.7 | 16.0 |
| Inventory ratio to total shipments | 23.2 | 18.8 | 12.6 | 13.0 | 14.6 | 20.0 | 16.3 |
| Internal consumption share | *** | *** | *** | *** | *** | *** | *** |
| Commercial home market shipments share | *** | *** | *** | *** | *** | *** | *** |
| Home market shipments share | 0.6 | 0.9 | 1.2 | 0.8 | 1.0 | 1.0 | 0.7 |
| Exports to the United States share | 52.4 | 61.2 | 58.2 | 56.5 | 66.1 | 61.7 | 52.7 |
| Exports to all other markets share | 47.1 | 38.0 | 40.6 | 42.6 | 32.9 | 37.4 | 46.6 |
| Export shipments share | 99.4 | 99.1 | 98.8 | 99.2 | 99.0 | 99.0 | 99.3 |
| Total shipments share | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from data submitted in response to Commission questionnaires.

## Alternative products

Responding Argentine firms did not appear to produce other products on the same equipment and machinery used to produce raw honey.[5]

## Exports

According to GTA, the leading export markets for natural honey[6] from Argentina are the United States, Germany, and Japan (table VII-5). During 2020, the United States was the leading export market for raw honey from Argentina, accounting for 60.3 percent of exports, followed by Germany, accounting for 22.5 percent, and then followed by Japan, accounting for 6.8 percent. Unit values for exports of raw honey from Argentina to the United States decreased from $1.06 per pound to $0.97 per pound during 2018-19 and then increased to $1.04 per pound in 2020. Unit values for exports to all destination markets decreased from $1.12 per pound to $1.01 per pound during 2018-19 and then increased to $1.08 in 2020.

---

[5] ***.

[6] Natural honey classified under HTS subheading 0409.00 includes all forms of honey and may include raw, processed, and honey packaged for retail sale; thus, this subheading may include product outside the scope of these investigations.

**Table VII-5**
**Natural Honey: Exports from Argentina, by destination market and by period**

Quantity in 1,000 pounds; value in 1,000 dollars

| Destination market | Measure | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| United States | Quantity | 83,293 | 82,127 | 85,682 |
| Germany | Quantity | 28,565 | 20,169 | 31,975 |
| Japan | Quantity | 8,253 | 10,672 | 9,689 |
| Belgium | Quantity | 5,279 | 5,465 | 4,671 |
| France | Quantity | 1,945 | 5,254 | 4,358 |
| Italy | Quantity | 4,819 | 3,523 | 3,322 |
| Spain | Quantity | 3,821 | 1,745 | 1,138 |
| Saudi Arabia | Quantity | 145 | --- | 519 |
| Switzerland | Quantity | 1,167 | 1,200 | 448 |
| All other destination markets | Quantity | 1,802 | 884 | 187 |
| All destination markets | Quantity | 139,089 | 131,039 | 141,989 |
| United States | Value | 88,204 | 79,534 | 89,302 |
| Germany | Value | 35,144 | 21,569 | 36,026 |
| Japan | Value | 10,418 | 12,747 | 11,740 |
| Belgium | Value | 6,081 | 5,658 | 4,954 |
| France | Value | 2,292 | 5,765 | 4,950 |
| Italy | Value | 5,475 | 3,727 | 3,702 |
| Spain | Value | 4,310 | 1,662 | 1,233 |
| Saudi Arabia | Value | 172 | --- | 577 |
| Switzerland | Value | 1,408 | 1,199 | 442 |
| All other destination markets | Value | 2,082 | 828 | 195 |
| All destination markets | Value | 155,586 | 132,689 | 153,120 |

Table continued.

**Table VII-5 Continued**
**Natural Honey: Exports from Argentina, by destination market and by period**

Unit values in dollars per pound; shares in percent

| Destination market | Measure | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| United States | Unit value | 1.06 | 0.97 | 1.04 |
| Germany | Unit value | 1.23 | 1.07 | 1.13 |
| Japan | Unit value | 1.26 | 1.19 | 1.21 |
| Belgium | Unit value | 1.15 | 1.04 | 1.06 |
| France | Unit value | 1.18 | 1.10 | 1.14 |
| Italy | Unit value | 1.14 | 1.06 | 1.11 |
| Spain | Unit value | 1.13 | 0.95 | 1.08 |
| Saudi Arabia | Unit value | 1.18 | --- | 1.11 |
| Switzerland | Unit value | 1.21 | 1.00 | 0.99 |
| All other destination markets | Unit value | 1.16 | 0.94 | 1.05 |
| All destination markets | Unit value | 1.12 | 1.01 | 1.08 |
| United States | Share of quantity | 59.9 | 62.7 | 60.3 |
| Germany | Share of quantity | 20.5 | 15.4 | 22.5 |
| Japan | Share of quantity | 5.9 | 8.1 | 6.8 |
| Belgium | Share of quantity | 3.8 | 4.2 | 3.3 |
| France | Share of quantity | 1.4 | 4.0 | 3.1 |
| Italy | Share of quantity | 3.5 | 2.7 | 2.3 |
| Spain | Share of quantity | 2.7 | 1.3 | 0.8 |
| Saudi Arabia | Share of quantity | 0.1 | --- | 0.4 |
| Switzerland | Share of quantity | 0.8 | 0.9 | 0.3 |
| All other destination markets | Share of quantity | 1.3 | 0.7 | 0.1 |
| All destination markets | Share of quantity | 100.0 | 100.0 | 100.0 |

Source:  Official exports statistics under HS subheading 0409.00 as reported by Argentina's National Institute of Statistics & Census (INDEC) in the Global Trade Atlas database, accessed February 28, 2022.

Note: United States is shown at the top, all remaining top export destinations shown in descending order of 2020 data.  Data include honey packaged for retail level sale.

## The industry in Brazil

The Commission issued foreign producers' or exporters' questionnaires to 15 firms believed to produce and/or export raw honey from Brazil.[7] Ten firms provided usable responses to the Commission's questionnaire: Apidouro Comercial Exportadora e Importadora Ltda ("Apiduoro"), Apis Nativa Agroindustrial Exportadora Ltda. ("Apis Nativa"), Breyer E Cia Ltda ("Breyer"), Central de Cooperativas Apícolas do Semiárido Brasileiro, ("CASA APIS"), Cooperativa Mista dos Apicultores da Microrregiao de Simplicio Mendes ("Comapi"), Flora Néctar Industria Comércio Importação Exportação Ltda ("Flora Nectar"), Matrunita da Amazônia Apicultura LTDA ("Matrunita"), Melbras Importadora e Exportadora Agroindústria Ltda ("Melbras"), Minamel Agroindústria Ltda. ("Minamel"), and Apiario Diamante Comercial Exportadora Ltda ("Super Mel").[8] These firms' exports to the United States accounted for approximately 81.6 percent of U.S. imports of raw honey from Brazil in 2020. According to industry information for Brazil from the FAO, the procurement of raw honey in Brazil reported in questionnaires is equivalent to 80.2 percent of overall production of raw honey in Brazil in 2020.[9] Table VII-6 presents information on the raw honey operations of the responding producers and exporters in Brazil while table VII-7 presents industry information for Brazil from FAO during 2018-20. According to estimates requested of the responding producers, the procurement of raw honey in Brazil reported by individual firms ranges between *** and *** percent of overall production of raw honey in Brazil.

---

[7] These firms were identified through a review of information submitted in the petition and presented in third-party sources.

[8] Wenzel's Apicultura Comercio Industria Importação e Exportação Ltda. ("Wenzel's"), a company which responded in the preliminary phase of these investigations, provided correspondence to staff with certain information on its operations for this final phase investigation. The company reported procuring *** pounds of raw honey in 2020, of which *** pounds (or *** percent) was exported to the U.S. The firm estimates it accounted for *** percent of exports to the U.S. in 2020.

[9] As the vast majority of responding foreign firms process and export raw honey collected from independent beekeepers, the foreign producers' questionnaires in these investigations requested that responding firms report the amount of raw honey the firms procured from both independent beekeepers and their own beekeeping operations.

**Table VII-6**
**Raw honey: Summary data for producers in Brazil, 2020**

| Firm | Procurement from beekeepers (1,000 pounds) | Share of reported procurement (percent) | Exports to the United States (1,000 pounds) | Share of reported exports to the United States (percent) | Total shipments (1,000 pounds) | Share of firm's total shipments exported to the United States (percent) |
|---|---|---|---|---|---|---|
| Apidouro | *** | *** | *** | *** | *** | *** |
| Apis Nativa | *** | *** | *** | *** | *** | *** |
| Breyer | *** | *** | *** | *** | *** | *** |
| CASA APIS | *** | *** | *** | *** | *** | *** |
| Comapi | *** | *** | *** | *** | *** | *** |
| Flora Nectar | *** | *** | *** | *** | *** | *** |
| Matrunita | *** | *** | *** | *** | *** | *** |
| Melbras | *** | *** | *** | *** | *** | *** |
| Minamel | *** | *** | *** | *** | *** | *** |
| Super Mel | *** | *** | *** | *** | *** | *** |
| All firms | 91,119 | 100.0 | 61,524 | 100.0 | 84,734 | 72.6 |

Source: Compiled from data submitted in response to Commission questionnaires.

**Table VII-7**
**Raw honey:  Total industry information from FAO for Brazil, by period**

| Item | 2018 | 2019 | 2020 |
|---|---|---|---|
| Production population (1,000 beehives) | 1,020 | 1,025 | 1,031 |
| Production (1,000 pounds) | 93,185 | 100,974 | 113,556 |
| Yield (pounds per beehive) | 91.4 | 98.5 | 110.1 |

Source:  Food and Agriculture Organization statistics, accessed February 28, 2022.

## Changes in operations

As presented in table VII-8 producers in Brazil reported several operational and organizational changes since January 1, 2018.

**Table VII-8**
**Raw honey: Reported changes in operations in Brazil since January 1, 2018, by firm**

| Item | Firm name and accompanying narrative response |
|---|---|
| Expansion in availability from beekeeper suppliers | *** |
| Weather related events | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

## Operations on raw honey

Table VII-9 presents information on the raw honey operations of the responding producers and exporters in Brazil. Procurement increased by 50.8 percent during 2018-20 and was 9.4 percent lower in interim 2021 than in interim 2020. Procurement is projected to be 7.5 percent lower in 2022 than in 2020. End-of-period inventories increased by 47.6 percent during 2018-20 and were 38.3 percent lower in interim 2021 than in interim 2020. They are projected to be 25.3 percent lower in 2022 than in 2020. Inventories as a ratio to procurement decreased by 0.5 percentage points from 2018-20, were 7.0 percentage points lower in interim 2021 than in interim 2020, and are projected to be 4.1 percentage points lower in 2022 than in 2020.

Aggregate home market shipments for responding producers in Brazil increased by 20.4 percent during 2018-20 and were 1.1 percent lower in interim 2021 than in interim 2020. They are projected to decrease by 4.3 percent from 2020 to 2022. The share of home market shipments devoted to internal consumption ranged from *** to *** percent in any period. Exports to the United States increased by 34.5 percent during 2018-20 and were 8.2 percent higher in interim 2021 than in interim 2020. Exports to the United States are projected to be 7.3 percent lower in 2022 than in 2020. Exports to all other markets increased by 75.6 percent during 2018-20 and were 36.8 percent higher in interim 2021 than in interim 2020, and are projected to be 25.4 percent higher in 2022 than in 2020.

During 2018-20, the share of exports to the United States ranged between 72.6 and 81.5 percent of all shipments, it was 68.5 percent in interim 2021, and it is projected to decrease 5.4 percentage points from 2020 to 2022. The ratio of inventories to total shipments increased during 2018-20 by 1.0 percentage point and was 11.4 percentage points lower in interim 2021 than in interim 2020. This ratio is projected to decrease by 5.8 percentage points from 2020 to 2022.

**Table VII-9**
**Raw honey: Data on industry in Brazil, by period**

Quantity in 1,000 pounds

| Item | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 | Projection 2021 | Projection 2022 |
|---|---|---|---|---|---|---|---|
| Procurement from beekeepers | 60,427 | 62,141 | 91,119 | 70,817 | 64,133 | 80,876 | 84,268 |
| End-of-period inventories | 13,032 | 14,041 | 19,237 | 20,700 | 12,778 | 16,077 | 14,371 |
| Internal consumption | *** | *** | *** | *** | *** | *** | *** |
| Commercial home market shipments | *** | *** | *** | *** | *** | *** | *** |
| Home market shipments | 3,757 | 3,100 | 4,523 | 4,078 | 4,034 | 4,809 | 4,328 |
| Exports to the United States | 45,746 | 49,438 | 61,524 | 44,674 | 48,347 | 56,475 | 57,008 |
| Exports to all other markets | 10,642 | 8,131 | 18,687 | 13,303 | 18,197 | 22,481 | 23,441 |
| Export shipments | 56,388 | 57,569 | 80,211 | 57,977 | 66,544 | 78,956 | 80,448 |
| Total shipments | 60,145 | 60,669 | 84,734 | 62,054 | 70,578 | 83,765 | 84,776 |

Table continued.

**Table VII-9 Continued**
**Raw honey: Data on industry in Brazil, by period**

Shares and ratios in percent

| Item | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 | Projection 2021 | Projection 2022 |
|---|---|---|---|---|---|---|---|
| Inventory ratio to procurement | 21.6 | 22.6 | 21.1 | 21.9 | 14.9 | 19.9 | 17.1 |
| Inventory ratio to total shipments | 21.7 | 23.1 | 22.7 | 25.0 | 13.6 | 19.2 | 17.0 |
| Internal consumption share | *** | *** | *** | *** | *** | *** | *** |
| Commercial home market shipments share | *** | *** | *** | *** | *** | *** | *** |
| Home market shipments share | 6.2 | 5.1 | 5.3 | 6.6 | 5.7 | 5.7 | 5.1 |
| Exports to the United States share | 76.1 | 81.5 | 72.6 | 72.0 | 68.5 | 67.4 | 67.2 |
| Exports to all other markets share | 17.7 | 13.4 | 22.1 | 21.4 | 25.8 | 26.8 | 27.7 |
| Export shipments share | 93.8 | 94.9 | 94.7 | 93.4 | 94.3 | 94.3 | 94.9 |
| Total shipments share | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from data submitted in response to Commission questionnaires.

## Alternative products

Responding Brazilian firms did not appear to produce other products on the same equipment and machinery used to produce raw honey.

## Exports

According to GTA, the leading export markets for natural honey from Brazil are the United States, Germany, and Canada (table VII-10). During 2020, the United States was the

leading export market for raw honey from Brazil, accounting for 74.6 percent of exports, followed by Germany, accounting for 11.7 percent, and then followed by Canada, accounting for 3.9 percent. Unit values for exports of raw honey from Brazil to the United States decreased from $1.48 per pound to $1.02 per pound during 2018-19 and then decreased to $0.95 per pound in 2020. Unit values for exports to all destination markets decreased from $1.52 per pound to $1.03 per pound during 2018-19 and then decreased to $0.98 in 2020.

**Table VII-10**
**Natural honey: Exports from Brazil, by destination market and by period**

Quantity in 1,000 pounds; value in 1,000 dollars

| Destination market | Measure | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| United States | Quantity | 49,851 | 53,300 | 75,240 |
| Germany | Quantity | 6,438 | 4,109 | 11,823 |
| Canada | Quantity | 2,107 | 2,778 | 3,941 |
| Australia | Quantity | 83 | 741 | 3,339 |
| Belgium | Quantity | 668 | 1,021 | 1,867 |
| Netherlands | Quantity | 1,067 | 1,065 | 1,197 |
| United Kingdom | Quantity | 981 | 1,408 | 1,139 |
| Denmark | Quantity | 350 | 573 | 637 |
| Panama | Quantity | 141 | 337 | 371 |
| All other destination markets | Quantity | 1,198 | 893 | 1,259 |
| All destination markets | Quantity | 62,885 | 66,224 | 100,814 |
| United States | Value | 73,751 | 54,213 | 71,265 |
| Germany | Value | 11,107 | 4,765 | 13,222 |
| Canada | Value | 3,229 | 3,001 | 4,285 |
| Australia | Value | 156 | 703 | 3,043 |
| Belgium | Value | 1,047 | 1,155 | 1,870 |
| Netherlands | Value | 1,735 | 1,035 | 1,193 |
| United Kingdom | Value | 1,474 | 1,520 | 1,159 |
| Denmark | Value | 518 | 659 | 671 |
| Panama | Value | 112 | 172 | 358 |
| All other destination markets | Value | 2,278 | 1,160 | 1,495 |
| All destination markets | Value | 95,408 | 68,384 | 98,560 |

Table continued.

**Table VII-10 Continued**
**Natural honey:  Exports from Brazil, by destination market and by period**

Unit value in dollars per pound; shares in percent

| Destination market | Measure | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| United States | Unit value | 1.48 | 1.02 | 0.95 |
| Germany | Unit value | 1.73 | 1.16 | 1.12 |
| Canada | Unit value | 1.53 | 1.08 | 1.09 |
| Australia | Unit value | 1.88 | 0.95 | 0.91 |
| Belgium | Unit value | 1.57 | 1.13 | 1.00 |
| Netherlands | Unit value | 1.63 | 0.97 | 1.00 |
| United Kingdom | Unit value | 1.50 | 1.08 | 1.02 |
| Denmark | Unit value | 1.48 | 1.15 | 1.05 |
| Panama | Unit value | 0.79 | 0.51 | 0.97 |
| All other destination markets | Unit value | 1.90 | 1.30 | 1.19 |
| All destination markets | Unit value | 1.52 | 1.03 | 0.98 |
| United States | Share of quantity | 79.3 | 80.5 | 74.6 |
| Germany | Share of quantity | 10.2 | 6.2 | 11.7 |
| Canada | Share of quantity | 3.4 | 4.2 | 3.9 |
| Australia | Share of quantity | 0.1 | 1.1 | 3.3 |
| Belgium | Share of quantity | 1.1 | 1.5 | 1.9 |
| Netherlands | Share of quantity | 1.7 | 1.6 | 1.2 |
| United Kingdom | Share of quantity | 1.6 | 2.1 | 1.1 |
| Denmark | Share of quantity | 0.6 | 0.9 | 0.6 |
| Panama | Share of quantity | 0.2 | 0.5 | 0.4 |
| All other destination markets | Share of quantity | 1.9 | 1.3 | 1.2 |
| All destination markets | Share of quantity | 100.0 | 100.0 | 100.0 |

Source:  Official exports statistics under HS subheading 0409.00 as reported by Brazil's Foreign Trade Secretariat (SECEX) in the Global Trade Atlas database, accessed February 28, 2022.

Note: United States is shown at the top, all remaining top export destinations shown in descending order of 2020 data.  Data include honey packaged for retail level sale.

## The industry in India

The Commission issued foreign producers' or exporters' questionnaires to 13 firms believed to produce and/or export raw honey from India.[10] Nine firms provided usable responses to the Commission's questionnaire: Allied Natural Product ("Allied Natural"), Ambrosia Natural Products India Pvt Ltd ("Ambrosia"), Apis India Limited ("Apis"), Brij Honey Private Limited ("Brij Honey"), Ganpati Natural Products ("Ganpati"), Indocan Honey Pvt Ltd ("Indocan"), Kejriwal Bee Care India Private Limited ("Kejriwal"), Shakti ApiFoods Pvt. Ltd. ("Shakti Apifoods"), and Yieppie Internationals ("Yieppie"). These firms' exports to the United States accounted for approximately 105.6 percent of U.S. imports of raw honey from India in 2020. According to industry information for India from the FAO, the procurement of raw honey in India reported in questionnaires is equivalent to 130.1 percent of overall production of raw honey in India in 2020.[11] Table VII-11 presents information on the raw honey operations of the responding producers and exporters in India while table VII-12 presents industry information for India from FAO during 2018-20. According to estimates requested of the responding producers, the procurement of raw honey in India reported by individual firms ranges between *** and *** percent of overall production of raw honey in India.

---

[10] These firms were identified through a review of information submitted in the petition and presented in third-party sources.

[11] As the vast majority of responding foreign firms process and export raw honey collected from independent beekeepers, the foreign producers' questionnaires in these investigations requested that responding firms report the amount of raw honey the firms procured from both independent beekeepers and their own beekeeping operations.
    ***.

**Table VII-11**
**Raw honey: Summary data for producers in India, 2020**

| Firm | Procurement from beekeepers (1,000 pounds) | Share of reported procurement (percent) | Exports to the United States (1,000 pounds) | Share of reported exports to the United States (percent) | Total shipments (1,000 pounds) | Share of firm's total shipments exported to the United States (percent) |
|---|---|---|---|---|---|---|
| Allied Natural | *** | *** | *** | *** | *** | *** |
| Ambrosia | *** | *** | *** | *** | *** | *** |
| Apis | *** | *** | *** | *** | *** | *** |
| Brij Honey | *** | *** | *** | *** | *** | *** |
| Ganpati | *** | *** | *** | *** | *** | *** |
| Indocan | *** | *** | *** | *** | *** | *** |
| Kejriwal | *** | *** | *** | *** | *** | *** |
| Shakti Apifoods | *** | *** | *** | *** | *** | *** |
| Yieppie | *** | *** | *** | *** | *** | *** |
| All firms | 178,176 | 100.0 | 87,280 | 100.0 | 173,562 | 50.3 |

Source: Compiled from data submitted in response to Commission questionnaires.

**Table VII-12**
**Raw honey:  Total industry information from FAO for India, by period**

| Item | 2018 | 2019 | 2020 |
|---|---|---|---|
| Production population (1,000 beehives) | 12,107 | 12,166 | 12,203 |
| Production (1,000 pounds) | 137,121 | 136,825 | 136,977 |
| Yield (pounds per beehive) | 11.3 | 11.2 | 11.2 |

Source:  Food and Agriculture Organization statistics, accessed February 28, 2022.

## Changes in operations

As presented in table VII-13 producers in India reported several operational and organizational changes since January 1, 2018.

**Table VII-13**
**Raw honey: Reported changes in operations in India since January 1, 2018, by firm**

| Item | Firm name and accompanying narrative response |
|---|---|
| Expansion in availability from beekeeper suppliers | *** |
| Changes in labor availability or costs | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

## Operations on raw honey

Table VII-14 presents information on the raw honey operations of the responding producers and exporters in India. Procurement increased by 12.5 percent during 2018-20 and was 31.3 percent higher in interim 2021 than in interim 2020. Procurement is projected to be 50.5 percent higher in 2022 than in 2020. End-of-period inventories decreased by 37.0 percent during 2018-20 and were 22.4 percent lower in interim 2021 than in interim 2020. They are projected to be 82.6 percent higher in 2022 than in 2020. Inventories as a ratio to procurement decreased by 5.4 percentage points from 2018-20, were 4.0 percentage points lower in interim 2021 than in interim 2020, and are projected to be 1.5 percentage points higher in 2022 than in 2020.

Aggregate home market shipments for responding producers in India increased by 19.9 percent during 2018-20 and were 21.5 percent higher in interim 2021 than in interim 2020. They are projected to increase by 23.1 percent from 2020 to 2022. The share of home market shipments devoted to internal consumption ranged from *** to *** percent in any period. Exports to the United States decreased by 12.5 percent during 2018-20 and were 58.6 percent higher in interim 2021 than in interim 2020. Exports to the United States are projected to be 77.2 percent higher in 2022 than in 2020. Exports to all other markets decreased by 17.6 percent during 2018-20, and were 3.1 percent lower in interim 2021 than in interim 2020, and are projected to be 25.3 percent higher in 2022 than in 2020.

During 2018-20, the share of exports to the United States ranged between 50.3 and 66.4 percent of all shipments, it was 59.6 percent in interim 2021, and it is projected to increase 9.0 percentage points from 2020 to 2022. The ratio of inventories to total shipments decreased during 2018-20 by 4.1 percentage points and was 4.7 percentage points lower in interim 2021 than in interim 2020. This ratio is projected to increase by 1.5 percentage points from 2020 to 2022.

**Table VII-14**
**Raw honey: Data on industry in India, by period**

Quantity in 1,000 pounds; ratio and share in percent

| Item | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 | Projection 2021 | Projection 2022 |
|---|---|---|---|---|---|---|---|
| Procurement from beekeepers | 158,340 | 178,118 | 178,176 | 132,668 | 174,258 | 221,243 | 268,210 |
| End-of-period inventories | 19,474 | 14,751 | 12,266 | 17,399 | 13,497 | 14,837 | 22,403 |
| Internal consumption | *** | *** | *** | *** | *** | *** | *** |
| Commercial home market shipments | *** | *** | *** | *** | *** | *** | *** |
| Home market shipments | 67,242 | 55,579 | 80,608 | 55,038 | 66,859 | 101,383 | 99,238 |
| Exports to the United States | 99,788 | 118,217 | 87,280 | 65,689 | 104,186 | 110,740 | 154,624 |
| Exports to all other markets | 6,886 | 4,331 | 5,674 | 3,773 | 3,655 | 6,324 | 7,108 |
| Export shipments | 106,675 | 122,548 | 92,954 | 69,462 | 107,841 | 117,063 | 161,732 |
| Total shipments | 173,916 | 178,127 | 173,562 | 124,500 | 174,699 | 218,446 | 260,970 |

Table continued.

**Table VII-14 Continued**
**Raw honey: Data on industry in India, by period**

Shares and ratios in percent

| Item | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 | Projection 2021 | Projection 2022 |
|---|---|---|---|---|---|---|---|
| Inventory ratio to procurement | 12.3 | 8.3 | 6.9 | 9.8 | 5.8 | 6.7 | 8.4 |
| Inventory ratio to total shipments | 11.2 | 8.3 | 7.1 | 10.5 | 5.8 | 6.8 | 8.6 |
| Internal consumption share | *** | *** | *** | *** | *** | *** | *** |
| Commercial home market shipments share | *** | *** | *** | *** | *** | *** | *** |
| Home market shipments share | 38.7 | 31.2 | 46.4 | 44.2 | 38.3 | 46.4 | 38.0 |
| Exports to the United States share | 57.4 | 66.4 | 50.3 | 52.8 | 59.6 | 50.7 | 59.2 |
| Exports to all other markets share | 4.0 | 2.4 | 3.3 | 3.0 | 2.1 | 2.9 | 2.7 |
| Export shipments share | 61.3 | 68.8 | 53.6 | 55.8 | 61.7 | 53.6 | 62.0 |
| Total shipments share | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from data submitted in response to Commission questionnaires.

## Alternative products

No firms in India reported producing other products on the same equipment and machinery used to produce raw honey.

## Exports

According to GTA, the leading export markets for natural honey from India are the United States, United Arab Emirates, and Saudi Arabia (table VII-15). During 2020, the United States was the leading export market for raw honey from India, accounting for 75.6 percent of exports, followed by United Arab Emirates, accounting for 4.7 percent, and then followed by Saudi Arabia, accounting for 4.7 percent. Unit values for exports of raw honey from India to the United States decreased from $0.75 per pound to $0.65 per pound during 2018-19 and then decreased to $0.60 per pound in 2020. Unit values for exports to all destination markets decreased from $0.80 per pound to $0.70 per pound during 2018-19 and then decreased to $0.69 in 2020.

**Table VII-15**
**Natural honey:  Exports from India, by destination market and by period**

Quantity in 1,000 pounds; value in 1,000 dollars

| Destination market | Measure | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| United States | Quantity | 105,383 | 119,820 | 91,379 |
| United Arab Emirates | Quantity | 3,993 | 4,579 | 5,676 |
| Saudi Arabia | Quantity | 4,535 | 4,621 | 5,656 |
| Nepal | Quantity | 1,294 | 1,607 | 2,649 |
| Morocco | Quantity | 1,493 | 2,318 | 2,391 |
| Canada | Quantity | 1,353 | 1,727 | 2,163 |
| Bangladesh | Quantity | 1,066 | 1,413 | 1,949 |
| Qatar | Quantity | 947 | 1,513 | 1,555 |
| Libya | Quantity | 1,190 | 749 | 1,023 |
| All other destination markets | Quantity | 7,108 | 5,729 | 6,473 |
| All destination markets | Quantity | 128,361 | 144,075 | 120,914 |
| United States | Value | 78,778 | 77,420 | 54,906 |
| United Arab Emirates | Value | 3,978 | 4,234 | 5,124 |
| Saudi Arabia | Value | 4,853 | 4,893 | 5,750 |
| Nepal | Value | 1,201 | 1,209 | 1,766 |
| Morocco | Value | 1,211 | 1,703 | 1,606 |
| Canada | Value | 1,179 | 1,609 | 1,956 |
| Bangladesh | Value | 863 | 1,139 | 1,645 |
| Qatar | Value | 1,403 | 1,777 | 1,856 |
| Libya | Value | 1,020 | 718 | 919 |
| All other destination markets | Value | 7,935 | 6,276 | 7,580 |
| All destination markets | Value | 102,421 | 100,978 | 83,109 |

Table continued.

**Table VII-15 Continued**
**Natural honey:  Exports from India, by destination market and by period**

Unit value in dollars per pound; shares in percent

| Destination market | Measure | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| United States | Unit value | 0.75 | 0.65 | 0.60 |
| United Arab Emirates | Unit value | 1.00 | 0.92 | 0.90 |
| Saudi Arabia | Unit value | 1.07 | 1.06 | 1.02 |
| Nepal | Unit value | 0.93 | 0.75 | 0.67 |
| Morocco | Unit value | 0.81 | 0.73 | 0.67 |
| Canada | Unit value | 0.87 | 0.93 | 0.90 |
| Bangladesh | Unit value | 0.81 | 0.81 | 0.84 |
| Qatar | Unit value | 1.48 | 1.17 | 1.19 |
| Libya | Unit value | 0.86 | 0.96 | 0.90 |
| All other destination markets | Unit value | 1.12 | 1.10 | 1.17 |
| All destination markets | Unit value | 0.80 | 0.70 | 0.69 |
| United States | Share of quantity | 82.1 | 83.2 | 75.6 |
| United Arab Emirates | Share of quantity | 3.1 | 3.2 | 4.7 |
| Saudi Arabia | Share of quantity | 3.5 | 3.2 | 4.7 |
| Nepal | Share of quantity | 1.0 | 1.1 | 2.2 |
| Morocco | Share of quantity | 1.2 | 1.6 | 2.0 |
| Canada | Share of quantity | 1.1 | 1.2 | 1.8 |
| Bangladesh | Share of quantity | 0.8 | 1.0 | 1.6 |
| Qatar | Share of quantity | 0.7 | 1.1 | 1.3 |
| Libya | Share of quantity | 0.9 | 0.5 | 0.8 |
| All other destination markets | Share of quantity | 5.5 | 4.0 | 5.4 |
| All destination markets | Share of quantity | 100.0 | 100.0 | 100.0 |

Source:  Official exports statistics under HS subheading 0409.00 as reported by India's Ministry of Commerce in the Global Trade Atlas database, accessed February 28, 2022.

Note: United States is shown at the top, all remaining top export destinations shown in descending order of 2020 data.  Data include honey packaged for retail level sale.

## The industry in Vietnam

The Commission issued foreign producers' or exporters' questionnaires to 25 firms believed to produce and/or export raw honey from Vietnam.[12] Usable responses to the Commission's questionnaire were received from 21 firms: Ban Me Thuot Honeybee Joint Stock Company ("Ban Me Thuot Honeybee"), Bao Nguyen Honeybee Co., Ltd ("Bao Nguyen Honey Bee"), Bee Honey Corporation of Ho Chi Minh City ("Bee Honey Ho Chi Minh"), Daisy Honey Bee JSC ("Daisy Honey"), Dak Nguyen Hong Exploitation of Honey Company Limited TA ("Dak Nguyen"), Dongnai Honeybee Corporation ("Dongnai Honey Bee"), Hai Phong Honeybee Company Limited ("Hai Phong Honey Bee"), Hanoi Honey Bee Joint Stock Company ("Hanoi JSC Honey Bee"), Hung Binh Phat Bees Company Limited / Hung Binh Phat Co., Ltd. ("HBP Honey Bee"), Hoa Viet Honey Bee Co., Ltd ("Hoa Viet Honey Bee"), Hoang Tri Honey Bee Co., Ltd ("Hoang Tri"), DakLak Honeybee Joint Stock Company ("Honey Bee Dak Lak"), Huong Rung Co., Ltd ("Huong Rung"), Nhieu Loc Company Limited ("Nhieu Loc"), Phongson Co., Ltd ("Phongson"), Saigon Bees Co., Ltd. ("Saigon Bees"), Southern Honey Bee Company Limited ("Southern Honey"), Thanh Hao Bees Company Limited ("Thanh Hao Bees"), Viet Thanh Food Co., Ltd ("Viet Thanh"), Vinawax Producing Trading and Service Company Limited ("Vinawax"), and Worldwide Vietfoods Co., Ltd ("Worldwide Vietfoods"). These firms' exports to the United States accounted for approximately 92.1 percent of U.S. imports of raw honey from Vietnam in 2020. According to industry information for Vietnam from the FAO, the procurement of raw honey in Vietnam reported in questionnaires is equivalent to 246.5 percent of overall production of raw honey in Vietnam in 2020.[13] Table VII-16 presents information on the raw honey operations of the responding producers and exporters in Vietnam while table VII-17 presents industry information for Vietnam from FAO during 2018-20. According to estimates requested of the responding producers, the procurement of raw honey in Vietnam reported by individual firms ranges between *** and *** percent of overall production of raw honey in Vietnam.

---

[12] These firms were identified through a review of information submitted in the petition and presented in third-party sources.

[13] As the vast majority of responding foreign firms process and export raw honey collected from independent beekeepers, the foreign producers' questionnaires in these investigations requested that responding firms report the amount of raw honey the firms procured from both independent beekeepers and their own beekeeping operations.

**Table VII-16**
**Raw honey: Summary data for producers in Vietnam, 2020**

| Firm | Procurement from beekeepers (1,000 pounds) | Share of reported procurement (percent) | Exports to the United States (1,000 pounds) | Share of reported exports to the United States (percent) | Total shipments (1,000 pounds) | Share of firm's total shipments exported to the United States (percent) |
|---|---|---|---|---|---|---|
| Ban Me Thuot Honeybee | *** | *** | *** | *** | *** | *** |
| Bao Nguyen Honey Bee | *** | *** | *** | *** | *** | *** |
| Bee Honey Ho Chi Minh | *** | *** | *** | *** | *** | *** |
| Daisy Honey | *** | *** | *** | *** | *** | *** |
| Dak Nguyen | *** | *** | *** | *** | *** | *** |
| Dongnai Honey Bee | *** | *** | *** | *** | *** | *** |
| Hai Phong Honey Bee | *** | *** | *** | *** | *** | *** |
| Hanoi JSC Honey Bee | *** | *** | *** | *** | *** | *** |
| HBP Honey Bee | *** | *** | *** | *** | *** | *** |
| Hoa Viet Honey Bee | *** | *** | *** | *** | *** | *** |
| Hoang Tri | *** | *** | *** | *** | *** | *** |
| Honey Bee Dak Lak | *** | *** | *** | *** | *** | *** |
| Huong Rung | *** | *** | *** | *** | *** | *** |
| Nhieu Loc | *** | *** | *** | *** | *** | *** |
| Phongson | *** | *** | *** | *** | *** | *** |
| Saigon Bees | *** | *** | *** | *** | *** | *** |
| Southern Honey | *** | *** | *** | *** | *** | *** |
| Thanh Hao Bees | *** | *** | *** | *** | *** | *** |
| Viet Thanh | *** | *** | *** | *** | *** | *** |
| Vinawax | *** | *** | *** | *** | *** | *** |
| Worldwide Vietfoods | *** | *** | *** | *** | *** | *** |
| All firms | 116,855 | 100.0 | 102,598 | 100.0 | 118,510 | 86.6 |

Source: Compiled from data submitted in response to Commission questionnaires.

**Table VII-17**
**Raw honey:  Total industry information from FAO for Vietnam, by period**

| Item | 2018 | 2019 | 2020 |
|------|------|------|------|
| Production population (1,000 beehives) | 254 | 253 | 253 |
| Production (1,000 pounds) | 45,007 | 48,164 | 47,399 |
| Yield (pounds per beehive) | 177.4 | 190.5 | 187.3 |

Source:  Food and Agriculture Organization statistics, accessed February 28, 2022.

## Changes in operations

As presented in table VII-18 producers in Vietnam reported several operational and organizational changes since January 1, 2018.

**Table VII-18**
**Raw honey: Reported changes in operations in Vietnam since January 1, 2018, by firm**

| Item | Firm name and accompanying narrative response |
|------|-----------------------------------------------|
| Expansion in availability from beekeeper suppliers | *** |
| Expansion in availability from beekeeper suppliers | *** |
| Expansion in availability from beekeeper suppliers | *** |
| Reduction in availability from beekeeper suppliers | *** |
| Began basic filtering operations | *** |
| Ceased basic filtering operations | *** |
| Ceased basic filtering operations | *** |
| Ceased basic filtering operations | *** |

| Item | Firm name and accompanying narrative response |
|---|---|
| Weather related events | *** |
| Weather related events | *** |
| Disease or pest-related events | *** |
| Disease or pest-related events | *** |
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |
| Changes in labor availability or costs | *** |
| Other (e.g., technology) | *** |
| Other (e.g., technology) | *** |
| Other (e.g., technology) | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

## Operations on raw honey

Table VII-19 presents information on the raw honey operations of the responding producers and exporters in Vietnam. Procurement increased by 57.6 percent during 2018-20 and was 2.3 percent lower in interim 2021 than in interim 2020. Procurement is projected to be 26.0 percent lower in 2022 than in 2020. End-of-period inventories decreased by 29.7 percent during 2018-20 and were 63.4 percent lower in interim 2021 than in interim 2020. They are projected to be 46.9 percent lower in 2022 than in 2020. Inventories as a ratio to procurement decreased by 14.6 percentage points from 2018-20, were 14.9 percentage points lower in interim 2021 than in interim 2020, and are projected to be 3.3 percentage points lower in 2022 than in 2020.

Aggregate home market shipments for responding producers in Vietnam increased by 48.4 percent during 2018-20 and were 12.9 percent higher in interim 2021 than in interim 2020. They are projected to decrease by 18.4 percent from 2020 to 2022. The share of home market shipments devoted to internal consumption ranged from *** to *** percent in 2018-20. Exports to the United States increased by 52.7 percent during 2018-20 and were 18.2 percent higher in interim 2021 than in interim 2020. Exports to the United States are projected to be 50.0 percent lower in 2022 than in 2020. Exports to all other markets increased by 62.7 percent during 2018-20, were 25.9 percent higher in interim 2021 than in interim 2020, and are projected to be 198.4 percent higher in 2022 than in 2020.

During 2018-20, the share of exports to the United States ranged between 86.6 and 87.1 percent of all shipments, it was 86.7 percent in interim 2021, and it is projected to decrease 23.1 percentage points from 2020 to 2022. The ratio of inventories to total shipments decreased during 2018-20 by 13.6 percentage points and was 19.5 percentage points lower in interim 2021 than in interim 2020. This ratio is projected to decrease by 2.6 percentage points from 2020 to 2022.

**Table VII-19**
**Raw honey: Data on industry in Vietnam, by period**

Quantity in 1,000 pounds; ratio and share in percent

| Item | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 | Projection 2021 | Projection 2022 |
|---|---|---|---|---|---|---|---|
| Procurement from beekeepers | 74,149 | 75,278 | 116,855 | 102,831 | 100,473 | 107,740 | 86,468 |
| End-of-period inventories | 19,510 | 20,774 | 13,722 | 32,681 | 11,949 | 7,968 | 7,283 |
| Internal consumption | *** | *** | *** | *** | *** | *** | *** |
| Commercial home market shipments | *** | *** | *** | *** | *** | *** | *** |
| Home market shipments | 5,575 | 5,843 | 8,276 | 7,000 | 7,901 | 9,012 | 6,756 |
| Exports to the United States | 67,200 | 62,969 | 102,598 | 75,267 | 89,003 | 97,436 | 51,346 |
| Exports to all other markets | 4,693 | 3,498 | 7,636 | 4,570 | 5,754 | 6,398 | 22,789 |
| Export shipments | 71,892 | 66,468 | 110,234 | 79,836 | 94,757 | 103,834 | 74,135 |
| Total shipments | 77,467 | 72,311 | 118,510 | 86,836 | 102,658 | 112,846 | 80,891 |

Table continued.

**Table VII-19 Continued**
**Raw honey: Data on industry in Vietnam, by period**

Shares and ratios in percent

| Item | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 | Projection 2021 | Projection 2022 |
|---|---|---|---|---|---|---|---|
| Inventory ratio to procurement | 26.3 | 27.6 | 11.7 | 23.8 | 8.9 | 7.4 | 8.4 |
| Inventory ratio to total shipments | 25.2 | 28.7 | 11.6 | 28.2 | 8.7 | 7.1 | 9.0 |
| Internal consumption share | *** | *** | *** | *** | *** | *** | *** |
| Commercial home market shipments share | *** | *** | *** | *** | *** | *** | *** |
| Home market shipments share | 7.2 | 8.1 | 7.0 | 8.1 | 7.7 | 8.0 | 8.4 |
| Exports to the United States share | 86.7 | 87.1 | 86.6 | 86.7 | 86.7 | 86.3 | 63.5 |
| Exports to all other markets share | 6.1 | 4.8 | 6.4 | 5.3 | 5.6 | 5.7 | 28.2 |
| Export shipments share | 92.8 | 91.9 | 93.0 | 91.9 | 92.3 | 92.0 | 91.6 |
| Total shipments share | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from data submitted in response to Commission questionnaires.

## Alternative products

No responding firms in Vietnam produced other products on the same equipment and machinery used to produce raw honey.

## Exports

According to GTA, the leading export markets for natural honey from Vietnam are the United States, the United Kingdom, and Indonesia (table VII-20). During 2020, the United States was the leading export market for raw honey from Vietnam, accounting for 91.3 percent of exports, followed by the United Kingdom, accounting for 3.5 percent, and then followed by Indonesia, accounting for 1.7 percent. Unit values for exports of raw honey from Vietnam to the United States decreased from $0.65 per pound to $0.58 per pound during 2018-19 and then decreased to $0.54 per pound in 2020. Unit values for exports to all destination markets decreased from $0.66 per pound to $0.59 per pound during 2018-19 and then decreased to $0.56 in 2020.

**Table VII-20**
**Natural honey:  Exports from Vietnam, by destination market and by period**

Quantity in 1,000 pounds; value in 1,000 dollars

| Destination market | Measure | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| United States | Quantity | 86,325 | 81,526 | 111,706 |
| United Kingdom | Quantity | 2,953 | 3,673 | 4,225 |
| Indonesia | Quantity | 651 | 1,053 | 2,129 |
| Canada | Quantity | 476 | 285 | 1,200 |
| Thailand | Quantity | 658 | 381 | 761 |
| Taiwan | Quantity | 1,025 | 961 | 587 |
| Germany | Quantity | 187 | 315 | 436 |
| Austria | Quantity | 266 | 67 | 321 |
| Poland | Quantity | 392 | 359 | 259 |
| All other destination markets | Quantity | 1,359 | 1,095 | 778 |
| All destination markets | Quantity | 94,291 | 89,715 | 122,402 |
| United States | Value | 56,197 | 47,306 | 60,430 |
| United Kingdom | Value | 2,283 | 2,536 | 2,865 |
| Indonesia | Value | 588 | 867 | 1,545 |
| Canada | Value | 372 | 209 | 1,010 |
| Thailand | Value | 623 | 325 | 634 |
| Taiwan | Value | 820 | 761 | 489 |
| Germany | Value | 141 | 249 | 343 |
| Austria | Value | 208 | 53 | 235 |
| Poland | Value | 223 | 210 | 150 |
| All other destination markets | Value | 1,184 | 823 | 604 |
| All destination markets | Value | 62,638 | 53,340 | 68,305 |

Table continued.

**Table VII-20 Continued**
**Natural honey:  Exports from Vietnam, by destination market and by period**

Unit value in dollars per pound; shares in percent

| Destination market | Measure | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| United States | Unit value | 0.65 | 0.58 | 0.54 |
| United Kingdom | Unit value | 0.77 | 0.69 | 0.68 |
| Indonesia | Unit value | 0.90 | 0.82 | 0.73 |
| Canada | Unit value | 0.78 | 0.73 | 0.84 |
| Thailand | Unit value | 0.95 | 0.85 | 0.83 |
| Taiwan | Unit value | 0.80 | 0.79 | 0.83 |
| Germany | Unit value | 0.75 | 0.79 | 0.79 |
| Austria | Unit value | 0.78 | 0.79 | 0.73 |
| Poland | Unit value | 0.57 | 0.59 | 0.58 |
| All other destination markets | Unit value | 0.87 | 0.75 | 0.78 |
| All destination markets | Unit value | 0.66 | 0.59 | 0.56 |
| United States | Share of quantity | 91.6 | 90.9 | 91.3 |
| United Kingdom | Share of quantity | 3.1 | 4.1 | 3.5 |
| Indonesia | Share of quantity | 0.7 | 1.2 | 1.7 |
| Canada | Share of quantity | 0.5 | 0.3 | 1.0 |
| Thailand | Share of quantity | 0.7 | 0.4 | 0.6 |
| Taiwan | Share of quantity | 1.1 | 1.1 | 0.5 |
| Germany | Share of quantity | 0.2 | 0.4 | 0.4 |
| Austria | Share of quantity | 0.3 | 0.1 | 0.3 |
| Poland | Share of quantity | 0.4 | 0.4 | 0.2 |
| All other destination markets | Share of quantity | 1.4 | 1.2 | 0.6 |
| All destination markets | Share of quantity | 100.0 | 100.0 | 100.0 |

Source:  Official import statistics of imports from Vietnam (constructed export statistics for Vietnam) under HS subheading 0409.00 as reported by various statistical reporting authorities in the Global Trade Atlas database, accessed March 25, 2022.

Note: United States is shown at the top, all remaining top export destinations shown in descending order of 2020 data.  Data include honey packaged for retail level sale.

## Subject countries combined

Table VII-21 presents summary data on raw honey operations of the reporting subject producers in the subject countries. Procurement in the subject countries increased by 23.3 percent during 2018-20 and was 7.6 percent higher in interim 2021 than in interim 2020. Procurement is projected to be 13.3 percent higher in 2022 than in 2020. End-of-period inventories in the subject countries decreased by 22.4 percent during 2018-20 and were 34.1 percent lower in interim 2021 than in interim 2020. They are projected to be 8.4 percent higher in 2022 than in 2020. Inventories as a ratio to procurement decreased by 7.1 percentage points from 2018-20, were 6.2 percentage points lower in interim 2021 than in interim 2020, and are projected to be 0.5 percentage points lower in 2022 than in 2020.

Aggregate home market shipments for responding producers in subject countries increased by 23.1 percent during 2018-20 and were 19.1 percent higher in interim 2021 than in interim 2020. They are projected to increase by 17.1 percent from 2020 to 2022. The share of home market shipments devoted to internal consumption ranged from 7.4 to 9.7 percent in 2018-20. Exports to the United States increased by 20.0 percent during 2018-20 and were 25.6 percent higher in interim 2021 than in interim 2020. Exports to the United States are projected to be 2.2 percent higher in 2022 than in 2020. Exports to all other markets increased by 10.1 percent during 2018-20, were 9.4 percent lower in interim 2021 than in interim 2020, and are projected to be 36.5 percent higher in 2022 than in 2020.

During 2018-20, the share of exports to the United States ranged between 63.6 and 70.3 percent of all shipments, it was 68.6 percent in interim 2021, and it is projected to decrease 5.1 percentage points from 2020 to 2022. The ratio of inventories to total shipments decreased during 2018-20 by 6.4 percentage points and was 7.7 percentage points lower in interim 2021 than in interim 2020. This ratio is projected to decrease by 0.3 percentage points from 2020 to 2022.

**Table VII-21**
**Raw honey: Data on the industry in subject countries, by period**

Quantity in 1,000 pounds

| Item | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 | Projection 2021 | Projection 2022 |
|---|---|---|---|---|---|---|---|
| Procurement from beekeepers | 425,425 | 440,065 | 524,651 | 423,104 | 455,104 | 545,457 | 594,402 |
| End-of-period inventories | 81,963 | 74,068 | 63,634 | 90,804 | 59,859 | 64,250 | 68,956 |
| Internal consumption | 42,159 | 32,617 | 50,677 | 32,424 | 36,250 | 72,141 | 64,334 |
| Commercial home market shipments | 35,151 | 33,021 | 44,463 | 34,645 | 43,650 | 44,278 | 47,047 |
| Home market shipments | 77,310 | 65,638 | 95,140 | 67,069 | 79,900 | 116,419 | 111,380 |
| Exports to the United States | 280,299 | 310,173 | 336,435 | 250,922 | 315,035 | 343,040 | 343,694 |
| Exports to all other markets | 82,939 | 65,347 | 91,320 | 70,900 | 64,247 | 82,682 | 124,680 |
| Export shipments | 363,238 | 375,520 | 427,754 | 321,822 | 379,282 | 425,722 | 468,374 |
| Total shipments | 440,548 | 441,158 | 522,894 | 388,891 | 459,182 | 542,141 | 579,755 |

Table continued.

**Table VII-21 Continued**
**Raw honey: Data on the industry in subject countries, by period**

Shares and ratios in percent

| Item | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 | Projection 2021 | Projection 2022 |
|---|---|---|---|---|---|---|---|
| Inventory ratio to procurement | 19.3 | 16.8 | 12.1 | 16.1 | 9.9 | 11.8 | 11.6 |
| Inventory ratio to total shipments | 18.6 | 16.8 | 12.2 | 17.5 | 9.8 | 11.9 | 11.9 |
| Internal consumption share | 9.6 | 7.4 | 9.7 | 8.3 | 7.9 | 13.3 | 11.1 |
| Commercial home market shipments share | 8.0 | 7.5 | 8.5 | 8.9 | 9.5 | 8.2 | 8.1 |
| Home market shipments share | 17.5 | 14.9 | 18.2 | 17.2 | 17.4 | 21.5 | 19.2 |
| Exports to the United States share | 63.6 | 70.3 | 64.3 | 64.5 | 68.6 | 63.3 | 59.3 |
| Exports to all other markets share | 18.8 | 14.8 | 17.5 | 18.2 | 14.0 | 15.3 | 21.5 |
| Export shipments share | 82.5 | 85.1 | 81.8 | 82.8 | 82.6 | 78.5 | 80.8 |
| Total shipments share | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from data submitted in response to Commission questionnaires.

# U.S. inventories of imported merchandise

Table VII-22 presents data on U.S. importers' reported inventories of raw honey. Inventories from all subject sources decreased 16.7 percent from 2018 to 2020 and were 74.8 percent higher in interim 2021 than in interim 2020. As a ratio to imports and U.S. shipments of imports, respectively, inventories from subject sources fell 4.0 percentage points and 4.6 percentage points from 2018-20, and were 4.5 percentage points and 5.7 percentage points higher in interim 2021 than in interim 2020. Inventories from subject sources accounted for between 76.8 and 82.2 percent of all U.S. importers' inventories from 2018-20; in interim 2021, inventories from subject sources accounted for 91.6 percent of all inventories.

**Table VII-22**
**Raw honey: U.S. importers' inventories and their ratio to select items, by source and period**

Quantity in 1,000 pounds; ratios in percent

| Measure | Source | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| Inventories quantity | Argentina | *** | *** | *** | *** | *** |
| Ratio to imports | Argentina | *** | *** | *** | *** | *** |
| Ratio to U.S. shipments of imports | Argentina | *** | *** | *** | *** | *** |
| Ratio to total shipments of imports | Argentina | *** | *** | *** | *** | *** |
| Inventories quantity | Brazil | *** | *** | *** | *** | *** |
| Ratio to imports | Brazil | *** | *** | *** | *** | *** |
| Ratio to U.S. shipments of imports | Brazil | *** | *** | *** | *** | *** |
| Ratio to total shipments of imports | Brazil | *** | *** | *** | *** | *** |
| Inventories quantity | India | *** | *** | *** | *** | *** |
| Ratio to imports | India | *** | *** | *** | *** | *** |
| Ratio to U.S. shipments of imports | India | *** | *** | *** | *** | *** |
| Ratio to total shipments of imports | India | *** | *** | *** | *** | *** |
| Inventories quantity | Vietnam | *** | *** | *** | *** | *** |
| Ratio to imports | Vietnam | *** | *** | *** | *** | *** |
| Ratio to U.S. shipments of imports | Vietnam | *** | *** | *** | *** | *** |
| Ratio to total shipments of imports | Vietnam | *** | *** | *** | *** | *** |

Table continued.

**Table VII-22 Continued**
**Raw honey: U.S. importers' inventories and their ratio to select items, by source and period**

Quantity in 1,000 pounds; ratios in percent

| Measure | Source | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| Inventories quantity | Subject sources | 40,379 | 34,647 | 33,654 | 35,204 | 61,525 |
| Ratio to imports | Subject sources | 13.3 | 10.5 | 9.3 | 9.5 | 14.0 |
| Ratio to U.S. shipments of imports | Subject sources | 13.8 | 10.3 | 9.3 | 9.6 | 15.3 |
| Ratio to total shipments of imports | Subject sources | 13.8 | 10.3 | 9.3 | 9.6 | 15.3 |
| Inventories quantity | Ukraine | *** | *** | *** | *** | *** |
| Ratio to imports | Ukraine | *** | *** | *** | *** | *** |
| Ratio to U.S. shipments of imports | Ukraine | *** | *** | *** | *** | *** |
| Ratio to total shipments of imports | Ukraine | *** | *** | *** | *** | *** |
| Inventories quantity | All other sources | *** | *** | *** | *** | *** |
| Ratio to imports | All other sources | *** | *** | *** | *** | *** |
| Ratio to U.S. shipments of imports | All other sources | *** | *** | *** | *** | *** |
| Ratio to total shipments of imports | All other sources | *** | *** | *** | *** | *** |
| Inventories quantity | Nonsubject sources | 12,182 | 7,491 | 9,237 | 7,975 | 5,620 |
| Ratio to imports | Nonsubject sources | 18.0 | 16.3 | 19.9 | 17.6 | 16.6 |
| Ratio to U.S. shipments of imports | Nonsubject sources | 17.4 | 14.8 | 20.7 | 17.9 | 14.6 |
| Ratio to total shipments of imports | Nonsubject sources | 17.4 | 14.8 | 20.6 | 17.9 | 14.6 |
| Inventories quantity | All import sources | 52,561 | 42,137 | 42,891 | 43,179 | 67,146 |
| Ratio to imports | All import sources | 14.1 | 11.2 | 10.5 | 10.4 | 14.2 |
| Ratio to U.S. shipments of imports | All import sources | 14.5 | 10.9 | 10.5 | 10.5 | 15.3 |
| Ratio to total shipments of imports | All import sources | 14.5 | 10.9 | 10.5 | 10.5 | 15.3 |

Source: Compiled from data submitted in response to Commission questionnaires.

# U.S. importers' outstanding orders

The Commission requested that importers indicate whether they imported or arranged for the importation of raw honey after September 30, 2021. Their reported data are presented in table VII-23.

**Table VII-23**
**Raw honey: U.S. importers' arranged imports, by source and period**

Quantity in 1,000 pounds

| Source | Oct-Dec 2021 | Jan-Mar 2022 | Apr-Jun 2022 | Jul-Sept 2022 | Total |
|---|---|---|---|---|---|
| Argentina | *** | *** | *** | *** | *** |
| Brazil | *** | *** | *** | *** | *** |
| India | *** | *** | *** | *** | *** |
| Vietnam | *** | *** | *** | *** | *** |
| Subject sources | 58,037 | 63,493 | 22,699 | 4,455 | 148,684 |
| Nonsubect sources | *** | *** | *** | *** | *** |
| All import sources | *** | *** | *** | *** | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

# Antidumping or countervailing duty orders in third-country markets

There are no known trade remedy actions on natural honey classified under HTS subheading 0409.00 from Argentina, Brazil, India, Ukraine, or Vietnam in third-country markets.[14]

# Information on nonsubject countries

The top 15 honey producers globally include three subject countries according to data reported by FAO (table VII-24). Vietnam, the remaining subject country, ranked 17th with 45,529 thousand pounds produced in 2020. The top 15 represent 76.6 percent of total global production in 2020 with nonsubject countries in the top 15 accounting for 65.1 percent and subject countries among the top 15 accounting for 11.5 percent of total global production (with Vietnam, subject countries account for 12.8 percent of total global production in 2020).

---

[14] Natural honey classified under HTS subheading 0409.00 includes all forms of honey and may include raw, processed, and honey packaged for retail sale; thus, this subheading may include product outside the scope of these investigations.

**Table VII-24**
**Raw honey: Leading producing countries, by period, ranked by 2020 production**

Quantity in 1,000 pounds

| Market | Source | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| China | Nonsubject | 925,621 | 904,928 | 944,460 |
| Turkey | Nonsubject | 218,497 | 221,352 | 210,717 |
| Iran | Nonsubject | 156,682 | 157,866 | 161,879 |
| Argentina | Subject | 160,893 | 159,629 | 150,638 |
| Ukraine | Nonsubject | 144,313 | 141,596 | 137,731 |
| United States | Domestic | 141,434 | 144,111 | 135,544 |
| Russia | Nonsubject | 131,613 | 128,616 | 134,370 |
| India | Subject | 125,925 | 125,654 | 125,794 |
| Mexico | Nonsubject | 130,088 | 125,498 | 109,664 |
| Brazil | Subject | 85,577 | 92,730 | 104,284 |
| Canada | Nonsubject | 87,239 | 79,558 | 76,128 |
| Tanzania | Nonsubject | 62,541 | 63,063 | 63,583 |
| Spain | Nonsubject | 73,684 | 63,089 | 61,777 |
| Korea | Nonsubject | 53,478 | 60,220 | 59,473 |
| New Zealand | Nonsubject | 40,492 | 46,566 | 54,665 |
| Top 15 Total | NA | 2,538,078 | 2,514,476 | 2,530,708 |
| Global Total | NA | 3,696,974 | 3,509,935 | 3,302,152 |

Source: UN FAO, 2020 the latest available data from FAO Stats.

Note: Data from FAO Stats indicates that Vietnam produced 41,333 thousand pounds, 44,232 thousand pounds, and 43,529 thousand pounds, in 2018, 2019, and 2020, respectively. These were identified in the FAO Stats Database as "official data" meaning they were supplied by governments through national publications and FAO questionnaires. Exports reported in Table VII-25, however, suggest that Vietnamese honey production may be greater than was reported.

   The top 15 natural honey exporters include all four subject countries (Table VII-25). The top 15 represent 83.9 percent of total exports reported for 2020 with subject countries among the top 15 accounting for 29.7 percent of total exports and all other countries in the top 15 accounting for 54.2 percent of reported exports in 2020.

**Table VII-25**
**Natural honey: Leading exporting countries ranked by 2020 exports, by period, ranked by 2020 export volume.**

Quantity in 1,000 pounds

| Market | Source | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| China | Nonsubject | 272,221 | 266,418 | 292,045 |
| Ukraine | Nonsubject | 109,001 | 122,949 | 178,293 |
| Argentina | Subject | 139,089 | 131,039 | 141,989 |
| Vietnam | Subject | 94,291 | 89,715 | 122,402 |
| India | Subject | 128,361 | 144,075 | 120,914 |
| Brazil | Subject | 62,885 | 66,224 | 100,814 |
| Germany | Nonsubject | 50,239 | 55,823 | 65,570 |
| Spain | Nonsubject | 52,008 | 50,858 | 62,669 |
| Poland | Nonsubject | 32,419 | 37,120 | 54,875 |
| Mexico | Nonsubject | 122,741 | 48,604 | 49,863 |
| Belgium | Nonsubject | 43,733 | 42,601 | 49,631 |
| Hungary | Nonsubject | 46,148 | 42,745 | 43,275 |
| Uruguay | Nonsubject | 12,653 | 17,152 | 35,129 |
| Romania | Nonsubject | 23,169 | 23,143 | 29,068 |
| Bulgaria | Nonsubject | 23,632 | 28,550 | 28,293 |
| Top 15 Total | NA | 1,212,591 | 1,167,016 | 1,374,827 |
| Global Total | NA | 1,497,840 | 1,413,296 | 1,638,802 |

Source:  Official exports statistics under HS subheading 0409.00 as reported by various national statistical authorities in the Global Trade Atlas database, accessed February 28, 2022 and official global imports statistics from Vietnam under HS subheading 0409.00 as reported by various national statistical authorities in the Global Trade Atlas database, accessed March 25, 2022.

Notes: These data include natural honey classified under HTS subheading 0409.00 which may include raw, processed, and honey packaged for retail sale; thus, this subheading may include product outside the scope of these investigations. U.S. imports of honey from China are subject to countervailing duty orders and additional Section 301 duties. Exports from Vietnam are mirror data (total imports from Vietnam reported by importing partner countries). Export data reported by Vietnam to the *UN Comtrade Database* were 30,051 thousand pounds, 27,771 thousand pounds, and 29,605 thousand pounds, for 2018, 2019 and 2020, respectively.

**APPENDIX A**

**FEDERAL REGISTER NOTICES**

The Commission makes available notices relevant to its investigations and reviews on its website, www.usitc.gov.  In addition, the following tabulation presents, in chronological order, Federal Register notices issued by the Commission and Commerce during the current proceeding.

| Citation | Title | Link |
|---|---|---|
| 86 FR 22265, April 27, 2021 | *Raw Honey From Argentina, Brazil, India, Ukraine, and Vietnam; Institution of Antidumping Duty Investigations and Scheduling of Preliminary Phase Investigations* | https://www.govinfo.gov/content/pkg/FR-2021-04-27/pdf/2021-08742.pdf |
| 86 FR 26897, May 11, 2021 | *Raw Honey From Argentina, Brazil, India, Ukraine, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations* | https://www.govinfo.gov/content/pkg/FR-2021-05-18/pdf/2021-10440.pdf |
| 86 FR 30980, June 10, 2021 | *Raw Honey From Argentina, Brazil, India, Ukraine, and Vietnam* | https://www.govinfo.gov/content/pkg/FR-2021-06-10/pdf/2021-12223.pdf |
| 86 FR 66524, November 23, 2021 | *Raw Honey from Ukraine: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures* | https://www.govinfo.gov/content/pkg/FR-2021-11-23/pdf/2021-25594.pdf |
| 86 FR 66526, November 23, 2021 | *Raw Honey From the Socialist Republic of Vietnam: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures* | https://www.govinfo.gov/content/pkg/FR-2021-11-23/pdf/2021-25596.pdf |
| 86 FR 66528, November 23, 2021 | *Raw Honey from India: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures* | https://www.govinfo.gov/content/pkg/FR-2021-11-23/pdf/2021-25593.pdf |

Table continued.

| Citation | Title | Link |
|---|---|---|
| 86 FR 66531, November 23, 2021 | *Raw Honey From Argentina: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures* | https://www.govinfo.gov/content/pkg/FR-2021-11-23/pdf/2021-25597.pdf |
| 86 FR 66533, November 23, 2021 | *Raw Honey From Brazil: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures* | https://www.govinfo.gov/content/pkg/FR-2021-11-23/pdf/2021-25592.pdf |
| 86 FR 70144, December 9, 2021 | *Raw Honey From Argentina, Brazil, India, Ukraine, and Vietnam; Scheduling of the Final Phase of Anti-Dumping Duty Investigations* | https://www.govinfo.gov/content/pkg/FR-2021-12-09/pdf/2021-26688.pdf |
| 87 FR 2127, January 13, 2022 | *Raw Honey From the Socialist Republic of Vietnam: Preliminary Affirmative Determination of Critical Circumstances in the Less-Than-Fair-Value Investigation* | https://www.govinfo.gov/content/pkg/FR-2022-01-13/pdf/2022-00579.pdf |
| 87 FR 19855, April 06 | *Raw Honey From Ukraine: Termination of Less-Than-Fair-Value Investigation* | https://www.govinfo.gov/content/pkg/FR-2022-04-06/pdf/2022-07270.pdf |
| 87 FR 20462, April 07, 2022 | *Raw Honey From Ukraine; Termination of Investigation* | https://www.govinfo.gov/content/pkg/FR-2022-04-07/pdf/2022-07351.pdf |
| 87 FR 22179, April 14, 2022 | *Raw Honey From Argentina: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances* | https://www.govinfo.gov/content/pkg/FR-2022-04-14/pdf/2022-07995.pdf |
| 87 FR 22182, April 14, 2022 | *Raw Honey From Brazil: Final Determination of Sales at Less Than Fair Value* | https://www.govinfo.gov/content/pkg/FR-2022-04-14/pdf/2022-07996.pdf |

Table continued.

A-4

| Citation | Title | Link |
|---|---|---|
| 87 FR 22188, April 14, 2022 | *Raw Honey From India: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances* | https://www.govinfo.gov/content/pkg/FR-2022-04-14/pdf/2022-07994.pdf |
| 87 FR 22184, April 14, 2022 | *Raw Honey From the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances* | https://www.govinfo.gov/content/pkg/FR-2022-04-14/pdf/2022-07993.pdf |

A-5

**APPENDIX B**

**LIST OF HEARING WITNESSES**

# CALENDAR OF PUBLIC HEARING

Those listed below are scheduled to appear in the United States International Trade Commission's hearing via videoconference:

|  |  |
|---|---|
| **Subject:** | Raw Honey from Argentina, Brazil, India, and Vietnam |
| **Inv. Nos.:** | 731-TA-1560-1562 and 1564 (Final) |
| **Date and Time:** | April 12, 2022 - 9:30 a.m. |

| | **TIME** |
|---|---|
| **OPENING REMARKS:** | **ALLOCATION:** |

| | |
|---|---|
| Petitioner (**R. Alan Luberda**, Kelley Drye & Warren LLP) | 5 minutes |
| Respondents (**Ron Kendler**, White & Case LLP) | 5 minutes |

| | **TIME** |
|---|---|
| **In Support of the Imposition of** | **ALLOCATION:** |
| **Antidumping Duty Orders:** | |

| | |
|---|---|
| Kelley Drye & Warren LLP | 60 minutes |
| Washington, DC | |
| <u>on behalf of</u> | |

American Honey Producers Association
Sioux Honey Association

**Chris Hiatt**, Owner, Hiatt Honey LLC and President,
   American Honey Producers Association

**Alex Blumenthal**, President and Chief Executive Officer,
   Sioux Honey Association

**Ron Spears**, President, Mountain Avenue Bees

**Matt Halbgewachs**, Owner and Manager, Sweet River Company

**Craig Rodenberg**, Vice President, Honeyland and Northern Bloom Honey

**Michael T. Kerwin**, Assistant Director, International Trade,
   Georgetown Economic Services, LLC

**In Support of the Imposition of**
    **Antidumping Duty Orders (continued):**

        **Nereus Joubert**, Trade Analyst, International Trade, Georgetown
            Economic Services, LLC

        **Jacob Jones**, Trade Analyst, International Trade, Georgetown
            Economic Services, LLC

| | |
|---|---|
| **R. Alan Luberda** | ) |
| **Kathleen W. Cannon** | ) |
| | ) – OF COUNSEL |
| **Melissa M. Brewer** | ) |
| **Julia Kuelzow** | ) |

**In Opposition of the Imposition of**                    **TIME**
    **Antidumping Duty Orders:**                **ALLOCATION:**

                                              60 minutes total

Foley & Lardner LLP
Washington, DC
<u>on behalf of</u>

Sweet Harvest Honey

        Chris Nubern, Chief Procurement Officer. Sweet Harvest Honey

| | |
|---|---|
| **Gregory Husisian** | ) |
| | ) – OF COUNSEL |
| **Jenlain Scott** | ) |

White & Case LLP
Washington, DC
<u>on behalf of</u>

National Honey Packers & Dealers Association ("NHPDA")

        **Melissa Foott**, President, American Honey

        **Brent Barkman**, Chief Executive Officer, Barkman Honey, LLC

        **Eric Wenger**, Director of Procurement, Barkman Honey, LLC

**In Opposition of the Imposition of**
     **Antidumping Duty Orders (continued):**

     **Maren Martin**, President, The Impex Group, Inc.

     **Sarah Neves**, Operation Manager, The Impex Group, Inc.

     **Marie Jose Karam**, Vice President and General Manager, Odem
          International Inc.

     **Normand Bernier**, Senior Adviser (and former President),
          Odem International Inc.

     **Nick Sargeantson**, President, Sunland Trading, Inc.

     **Andrew Sargeantson**, Director, Sunland Trading, Inc.

     **Chris Nubern**, Chief Procurement Officer, Sweet Harvest Foods

|  |  |
|---|---|
| **Gregory J. Spak** | ) |
| **Jay. C. Campbell** | ) |
|  | ) – OF COUNSEL |
| **Ron Kendler** | ) |
| **C. Alex Dilley** | ) |

Faegre Drinker Biddle & Reath LLP
Washington, DC
<u>on behalf of</u>

Bimbo Bakeries USA Inc. ("Bimbo Bakeries")
General Mills Operations LLC ("General Mills")
Post Holdings, Inc. ("Post")
Smithfield Foods, Inc. ("Smithfield")

     **Sabra Bertrand**, Senior Director of Procurement - Ingredients,
          Bimbo Bakeries

     **Craig Pizer**, Vice President & General Counsel, Bimbo Bakeries

     **Brent Bash**, Director - Sourcing Grains (North America),
          General Mills

     **Drew Felz**, Government Affairs Representative, General Mills

     **Thomas Crown**, Director of Procurement, Ingredients, Post

**In Opposition of the Imposition of**
    <u>**Antidumping Duty Orders (continued):**</u>

        **Jill Bollettieri**, Senior Vice President, General Counsel
            & External Relations, Post

        **Randy Haines**, Chief Procurement Officer, Smithfield

        **Jim Monroe**, Vice President, Corporate Affairs, Smithfield

        **Peter Tabor**, Senior Policy Advisor, Holland & Knight LLP

        **Zachary Decker**, Government Relations Manager, American
            Bakers Association

                **Douglas J. Heffner**       )
                **Richard P. Ferrin**      ) – OF COUNSEL
                **Carrie B. Connolly**      )

<u>**REBUTTAL/CLOSING REMARKS:**</u>

Petitioners (**Kathleen W. Cannon**, Kelley Drye & Warrren LLP)
    5 minutes + time remaining from direct
Respondents (**Jay C. Campbell**, White & Case LLP; **Richard Ferrin**, Faegre Drinker Biddle &
Reath LLP; and **Gregory Husisian**, Foley & Lardner LLP)
    5 minutes + time remaining from direct

                    **-END-**

**APPENDIX C**

**SUMMARY DATA**

Table C-1: Raw honey:  Summary data concerning the U.S. market, by period ........................C-3

Table C-2: Raw honey:  Summary data concerning the U.S. market excluding two U.S. producers *** and ***, by period ...........................................................................................................C-6

**All U.S. producers**

Table C-1
**Raw honey:  Summary data concerning the U.S. market, by period**
Quantity=1,000 pounds; Value=1,000 dollars; Yield=pounds per colony; Unit values, unit labor costs, and unit expenses=dollars per pound; Period changes=percent--exceptions noted

| | Reported data | | | | | Period changes | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Calendar year | | | Jan-Sep | | Comparison years | | Jan-Sep |
| | 2018 | 2019 | 2020 | 2020 | 2021 | 2018-20 | 2018-19 | 2019-20 | 2020-21 |
| **U.S. consumption quantity:** | | | | | | | | | |
| Amount | 547,387 | 531,194 | 556,986 | 398,979 | 459,587 | ▲1.8 | ▼(3.0) | ▲4.9 | ▲15.2 |
| Producers' share (fn1) | 27.5 | 28.8 | 25.4 | 20.6 | 15.4 | ▼(2.1) | ▲1.3 | ▼(3.4) | ▼(5.3) |
| Importers' share (fn1): | | | | | | | | | |
| Argentina | 14.6 | 14.7 | 15.2 | 16.5 | 17.1 | ▲0.7 | ▲0.1 | ▲0.5 | ▲0.6 |
| Brazil | 9.5 | 9.9 | 13.5 | 14.8 | 14.1 | ▲4.0 | ▲0.4 | ▲3.6 | ▼(0.7) |
| India | 17.6 | 20.1 | 14.4 | 15.8 | 23.0 | ▼(3.2) | ▲2.5 | ▼(5.8) | ▲7.2 |
| Vietnam | 15.2 | 15.3 | 20.0 | 20.3 | 21.6 | ▲4.8 | ▲0.1 | ▲4.6 | ▲1.3 |
| Subject sources | 56.9 | 60.1 | 63.1 | 67.5 | 75.9 | ▲6.2 | ▲3.2 | ▲3.0 | ▲8.4 |
| Canada | 5.9 | 3.1 | 1.5 | 1.7 | 0.9 | ▼(4.3) | ▼(2.8) | ▼(1.5) | ▼(0.9) |
| Ukraine | 3.3 | 3.6 | 4.3 | 4.2 | 2.8 | ▲1.0 | ▲0.3 | ▲0.8 | ▼(1.4) |
| All other sources | 6.4 | 4.4 | 5.5 | 6.0 | 5.0 | ▼(0.8) | ▼(2.0) | ▲1.1 | ▼(1.0) |
| Nonsubject sources | 15.6 | 11.1 | 11.4 | 11.9 | 8.7 | ▼(4.1) | ▼(4.5) | ▲0.4 | ▼(3.2) |
| All import sources | 72.5 | 71.2 | 74.6 | 79.4 | 84.6 | ▲2.1 | ▼(1.3) | ▲3.4 | ▲5.3 |
| **U.S. consumption value:** | | | | | | | | | |
| Amount | 772,997 | 674,471 | 690,092 | 468,236 | 680,379 | ▼(10.7) | ▼(12.7) | ▲2.3 | ▲45.3 |
| Producers' share (fn1) | 43.4 | 45.5 | 43.7 | 37.4 | 26.8 | ▲0.3 | ▲2.2 | ▼(1.8) | ▼(10.7) |
| Importers' share (fn1): | | | | | | | | | |
| Argentina | 11.6 | 12.0 | 13.6 | 15.1 | 18.8 | ▲2.1 | ▲0.5 | ▲1.6 | ▲3.6 |
| Brazil | 10.6 | 8.6 | 10.6 | 11.7 | 15.3 | ▲0.0 | ▼(2.0) | ▲2.0 | ▲3.6 |
| India | 10.5 | 12.5 | 8.7 | 10.1 | 15.4 | ▼(1.8) | ▲2.0 | ▼(3.8) | ▲5.3 |
| Vietnam | 7.5 | 7.8 | 9.9 | 10.6 | 11.8 | ▲2.4 | ▲0.3 | ▲2.1 | ▲1.2 |
| Subject sources | 40.2 | 40.9 | 42.8 | 47.4 | 61.2 | ▲2.6 | ▲0.7 | ▲1.9 | ▲13.7 |
| Canada | 5.9 | 3.5 | 1.9 | 2.1 | 1.1 | ▼(4.0) | ▼(2.5) | ▼(1.6) | ▼(1.1) |
| Ukraine | 2.2 | 2.6 | 2.9 | 2.9 | 2.0 | ▲0.7 | ▲0.4 | ▲0.3 | ▼(1.0) |
| All other sources | 8.3 | 7.5 | 8.7 | 10.0 | 9.0 | ▲0.4 | ▼(0.9) | ▲1.2 | ▼(1.0) |
| Nonsubject sources | 16.4 | 13.5 | 13.5 | 15.1 | 12.0 | ▼(3.0) | ▼(2.9) | ▼(0.0) | ▼(3.1) |
| All import sources | 56.6 | 54.5 | 56.3 | 62.6 | 73.2 | ▼(0.3) | ▼(2.2) | ▲1.8 | ▲10.7 |
| **Adjusted U.S. imports from (fn2):** | | | | | | | | | |
| Argentina: | | | | | | | | | |
| Quantity | 79,839 | 78,083 | 84,935 | 65,788 | 78,703 | ▲6.4 | ▼(2.2) | ▲8.8 | ▲19.6 |
| Value | 89,457 | 81,194 | 94,106 | 70,852 | 127,592 | ▲5.2 | ▼(9.2) | ▲15.9 | ▲80.1 |
| Unit value | $1.12 | $1.04 | $1.11 | $1.08 | $1.62 | ▼(1.1) | ▼(7.2) | ▲6.6 | ▲50.5 |
| Ending inventory quantity | *** | *** | *** | *** | *** | ▼*** | ▼*** | ▼*** | ▲*** |
| Brazil: | | | | | | | | | |
| Quantity | 52,009 | 52,693 | 75,371 | 59,068 | 64,776 | ▲44.9 | ▲1.3 | ▲43.0 | ▲9.7 |
| Value | 81,982 | 58,128 | 73,220 | 54,657 | 103,908 | ▼(10.7) | ▼(29.1) | ▲26.0 | ▲90.1 |
| Unit value | $1.58 | $1.10 | $0.97 | $0.93 | $1.60 | ▼(38.4) | ▼(30.0) | ▼(11.9) | ▲73.4 |
| Ending inventory quantity | *** | *** | *** | *** | *** | ▼*** | ▼*** | ▼*** | ▲*** |
| India: | | | | | | | | | |
| Quantity | 96,215 | 106,910 | 79,997 | 63,231 | 105,902 | ▼(16.9) | ▲11.1 | ▼(25.2) | ▲67.5 |
| Value | 81,011 | 84,015 | 59,877 | 47,129 | 104,878 | ▼(26.1) | ▲3.7 | ▼(28.7) | ▲122.5 |
| Unit value | $0.84 | $0.79 | $0.75 | $0.75 | $0.99 | ▼(11.1) | ▼(6.7) | ▼(4.8) | ▲32.9 |
| Ending inventory quantity | *** | *** | *** | *** | *** | ▲*** | ▲*** | ▲*** | ▲*** |
| Vietnam: | | | | | | | | | |
| Quantity | 83,335 | 81,526 | 111,356 | 81,063 | 99,475 | ▲33.6 | ▼(2.2) | ▲36.6 | ▲22.7 |
| Value | 58,289 | 52,830 | 68,358 | 49,519 | 79,950 | ▲17.3 | ▼(9.4) | ▲29.4 | ▲61.5 |
| Unit value | $0.70 | $0.65 | $0.61 | $0.61 | $0.80 | ▼(12.2) | ▼(7.4) | ▼(5.3) | ▲31.6 |
| Ending inventory quantity | *** | *** | *** | *** | *** | ▼*** | ▼*** | ▼*** | ▲*** |
| Subject sources: | | | | | | | | | |
| Quantity | 311,397 | 319,212 | 351,660 | 269,150 | 348,856 | ▲12.9 | ▲2.5 | ▲10.2 | ▲29.6 |
| Value | 310,738 | 276,168 | 295,562 | 222,157 | 416,328 | ▼(4.9) | ▼(11.1) | ▲7.0 | ▲87.4 |
| Unit value | $1.00 | $0.87 | $0.84 | $0.83 | $1.19 | ▼(15.8) | ▼(13.3) | ▼(2.9) | ▲44.6 |
| Ending inventory quantity | 40,379 | 34,647 | 33,654 | 35,204 | 61,525 | ▼(16.7) | ▼(14.2) | ▼(2.9) | ▲74.8 |

Table continued.

**Table C-1 Continued**
**Raw honey:  Summary data concerning the U.S. market, by period**
Quantity=1,000 pounds; Value=1,000 dollars; Yield=pounds per colony; Unit values, unit labor costs, and unit expenses=dollars per pound; Period changes=percent--exceptions noted

| | Reported data | | | | | Period changes | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2018 | Calendar year | | | Jan-Sep | | Comparison years | | | Jan-Sep |
| | 2018 | 2019 | 2020 | 2020 | 2021 | 2018-20 | 2018-19 | 2019-20 | 2020-21 |
| **Adjusted U.S. imports from (fn2): Continued** | | | | | | | | | |
| Canada: | | | | | | | | | |
| Quantity............................................ | 32,142 | 16,333 | 8,614 | 6,891 | 3,971 | ▼(73.2) | ▼(49.2) | ▼(47.3) | ▼(42.4) |
| Value............................................... | 45,656 | 23,275 | 12,873 | 10,018 | 7,345 | ▼(71.8) | ▼(49.0) | ▼(44.7) | ▼(26.7) |
| Unit value....................................... | $1.42 | $1.42 | $1.49 | $1.45 | $1.85 | ▲5.2 | ▲0.3 | ▲4.9 | ▲27.2 |
| Ukraine: | | | | | | | | | |
| Quantity............................................ | 18,168 | 19,051 | 24,161 | 16,652 | 12,883 | ▲33.0 | ▲4.9 | ▲26.8 | ▼(22.6) |
| Value............................................... | 17,067 | 17,381 | 20,139 | 13,799 | 13,296 | ▲18.0 | ▲1.8 | ▲15.9 | ▼(3.6) |
| Unit value....................................... | $0.94 | $0.91 | $0.83 | $0.83 | $1.03 | ▼(11.3) | ▼(2.9) | ▼(8.6) | ▲24.5 |
| Ending inventory quantity............... | *** | *** | *** | *** | *** | ▼*** | ▲*** | ▲*** | ▼*** |
| All other sources: | | | | | | | | | |
| Quantity............................................ | 34,902 | 23,375 | 30,857 | 23,929 | 23,146 | ▼(11.6) | ▼(33.0) | ▲32.0 | ▼(3.3) |
| Value............................................... | 64,403 | 50,456 | 59,925 | 46,967 | 61,172 | ▼(7.0) | ▼(21.7) | ▲18.8 | ▲30.2 |
| Unit value....................................... | $1.85 | $2.16 | $1.94 | $1.96 | $2.64 | ▲5.2 | ▲17.0 | ▼(10.0) | ▲34.7 |
| Nonsubject sources: | | | | | | | | | |
| Quantity............................................ | 85,212 | 58,760 | 63,633 | 47,473 | 40,000 | ▼(25.3) | ▼(31.0) | ▲8.3 | ▼(15.7) |
| Value............................................... | 127,125 | 91,112 | 92,938 | 70,784 | 81,814 | ▼(26.9) | ▼(28.3) | ▲2.0 | ▲15.6 |
| Unit value....................................... | $1.49 | $1.55 | $1.46 | $1.49 | $2.05 | ▼(2.1) | ▲3.9 | ▼(5.8) | ▲37.2 |
| Ending inventory quantity............... | 12,182 | 7,491 | 9,237 | 7,975 | 5,620 | ▼(24.2) | ▼(38.5) | ▲23.3 | ▼(29.5) |
| All import sources: | | | | | | | | | |
| Quantity............................................ | 396,609 | 377,972 | 415,292 | 316,622 | 388,856 | ▲4.7 | ▼(4.7) | ▲9.9 | ▲22.8 |
| Value............................................... | 437,863 | 367,279 | 388,500 | 292,941 | 498,141 | ▼(11.3) | ▼(16.1) | ▲5.8 | ▲70.0 |
| Unit value....................................... | $1.10 | $0.97 | $0.94 | $0.93 | $1.28 | ▼(15.3) | ▼(12.0) | ▼(3.7) | ▲38.5 |
| Ending inventory quantity............... | 52,561 | 42,137 | 42,891 | 43,179 | 67,146 | ▼(18.4) | ▼(19.8) | ▲1.8 | ▲55.5 |
| | | | | | | | | | |
| **U.S. producers' data based on third-party data sources:** | | | | | | | | | |
| Producer quantity (fn3)................... | 154,008 | 156,922 | 147,594 | 147,594 | 126,466 | ▼(4.2) | ▲1.9 | ▼(5.9) | ▼(14.3) |
| Production yield (fn3)....................... | 54.5 | 55.8 | 54.5 | 54.5 | 46.9 | ▲0.1 | ▲1.3 | ▼(1.3) | ▼(7.6) |
| **U.S. shipments (fn4):** | | | | | | | | | |
| Quantity............................................ | 150,778 | 153,222 | 141,694 | 82,357 | 70,732 | ▼(6.0) | ▲1.6 | ▼(7.5) | ▼(14.1) |
| Value............................................... | 335,134 | 307,192 | 301,592 | 175,295 | 182,237 | ▼(10.0) | ▼(8.3) | ▼(1.8) | ▲4.0 |
| Unit value....................................... | $2.22 | $2.00 | $2.13 | $2.13 | $2.58 | ▼(4.2) | ▼(9.8) | ▲6.2 | ▲21.0 |
| Export shipments: | | | | | | | | | |
| Quantity............................................ | 3,230 | 3,700 | 5,900 | 3,966 | 3,494 | ▲82.7 | ▲14.5 | ▲59.5 | ▼(11.9) |
| Value............................................... | 5,224 | 5,083 | 8,355 | 5,578 | 5,560 | ▲59.9 | ▼(2.7) | ▲64.4 | ▼(0.3) |
| Unit value....................................... | $1.62 | $1.37 | $1.42 | $1.41 | $1.59 | ▼(12.4) | ▼(15.1) | ▲3.1 | ▲13.2 |
| | | | | | | | | | |
| **U.S. producers' data based on Commission questionnaires:** | | | | | | | | | |
| Large U.S. producers': | | | | | | | | | |
| Ending inventory quantity............... | 7,740 | 14,779 | 19,335 | 22,238 | 15,233 | ▲149.8 | ▲90.9 | ▲30.8 | ▼(31.5) |
| Inventories/U.S. shipments (fn1)..... | 22.0 | 42.9 | 51.2 | 56.2 | 34.2 | ▲29.2 | ▲20.9 | ▲8.3 | ▼(22.0) |
| Production workers.......................... | 1,112 | 1,168 | 1,165 | 1,154 | 1,132 | ▲4.8 | ▲5.0 | ▼(0.3) | ▼(1.9) |
| Hours worked (1,000s).................... | 1,928 | 2,003 | 2,005 | 1,621 | 1,598 | ▲4.0 | ▲3.9 | ▲0.1 | ▼(1.4) |
| Wages paid ($1,000)....................... | 37,865 | 39,547 | 42,264 | 31,344 | 30,899 | ▲11.6 | ▲4.4 | ▲6.9 | ▼(1.4) |
| Hourly wages (dollars per hour)...... | $19.64 | $19.74 | $21.08 | $19.34 | $19.34 | ▲7.3 | ▲0.5 | ▲6.8 | ▼(0.0) |
| Productivity (pounds per hour)........ | 20.4 | 21.1 | 20.8 | 23.3 | 18.7 | ▲1.7 | ▲3.1 | ▼(1.3) | ▼(19.9) |
| Unit labor costs.............................. | $0.96 | $0.94 | $1.01 | $0.83 | $1.03 | ▲5.5 | ▼(2.5) | ▲8.2 | ▲24.8 |
| All U.S. producers': | | | | | | | | | |
| Ending inventory quantity............... | 8,012 | 15,109 | 19,728 | fn5 | fn5 | ▲146.2 | ▲88.6 | ▲30.6 | fn5 |
| Inventories/U.S. shipments (fn1)..... | 20.4 | 38.6 | 47.3 | fn5 | fn5 | ▲26.9 | ▲18.1 | ▲8.7 | fn5 |
| Production workers.......................... | 1,293 | 1,358 | 1,360 | fn5 | fn5 | ▲5.2 | ▲5.0 | ▲0.1 | fn5 |
| Hours worked (1,000s).................... | 2,196 | 2,299 | 2,299 | fn5 | fn5 | ▲4.7 | ▲4.7 | ▲0.0 | fn5 |
| Wages paid ($1,000)....................... | 43,114 | 45,379 | 48,456 | fn5 | fn5 | ▲12.4 | ▲5.3 | ▲6.8 | fn5 |
| Hourly wages (dollars per hour)...... | $19.64 | $19.74 | $21.07 | fn5 | fn5 | ▲7.3 | ▲0.5 | ▲6.8 | fn5 |
| Productivity (pounds per hour)........ | 20.0 | 20.7 | 20.0 | fn5 | fn5 | ▲0.3 | ▲3.5 | ▼(3.1) | fn5 |
| Unit labor costs.............................. | $0.98 | $0.95 | $1.05 | fn5 | fn5 | ▲7.0 | ▼(2.9) | ▲10.2 | fn5 |

Table continued.

**Table C-1 Continued**
**Raw honey:  Summary data concerning the U.S. market, by period**
Quantity=1,000 pounds; Value=1,000 dollars; Yield=pounds per colony; Unit values, unit labor costs, and unit expenses=dollars per pound; Period changes=percent--exceptions noted

| | Reported data | | | | | Period changes | | | |
| | Calendar year | | | Jan-Sep | | Comparison years | | | Jan-Sep |
| | 2018 | 2019 | 2020 | 2020 | 2021 | 2018-20 | 2018-19 | 2019-20 | 2020-21 |
|---|---|---|---|---|---|---|---|---|---|
| **Large U.S. producers':** | | | | | | | | | |
| Net sales: | | | | | | | | | |
| Quantity............................................... | 34,017 | 33,185 | 36,320 | 28,610 | 32,090 | ▲6.8 | ▼(2.4) | ▲9.4 | ▲12.2 |
| Value................................................... | 60,487 | 51,832 | 58,296 | 44,610 | 53,976 | ▼(3.6) | ▼(14.3) | ▲12.5 | ▲21.0 |
| Unit value........................................... | $1.78 | $1.56 | $1.61 | $1.56 | $1.68 | ▼(9.7) | ▼(12.2) | ▲2.8 | ▲7.9 |
| Operating expenses................................ | 71,098 | 69,949 | 69,559 | 52,907 | 55,546 | ▼(2.2) | ▼(1.6) | ▼(0.6) | ▲5.0 |
| Operating income or (loss) (fn6)............... | (10,611) | (18,117) | (11,263) | (8,296) | (1,570) | ▼fn6 | ▼fn6 | ▲fn6 | ▲fn6 |
| Net income or (loss) (fn6)....................... | (8,699) | (17,901) | (6,028) | (4,924) | 104 | ▲fn6 | ▲fn6 | ▲fn6 | ▲fn6 |
| Unit operating expenses.......................... | $2.09 | $2.11 | $1.92 | $1.85 | $1.73 | ▼(8.4) | ▲0.8 | ▼(9.1) | ▼(6.4) |
| Unit operating income or (loss) (fn6).......... | $(0.31) | $(0.55) | $(0.31) | $(0.29) | $(0.05) | ▲fn6 | ▼fn6 | ▲fn6 | ▲fn6 |
| Unit net income or (loss) (fn6)................. | $(0.26) | $(0.54) | $(0.17) | $(0.17) | $0.00 | ▲fn6 | ▼fn6 | ▲fn6 | ▲fn6 |
| Operating expenses/sales (fn1)................. | 117.5 | 135.0 | 119.3 | 118.6 | 102.9 | ▲1.8 | ▲17.4 | ▼(15.6) | ▼(15.7) |
| Operating income or (loss)/sales (fn1)........ | (17.5) | (35.0) | (19.3) | (18.6) | (2.9) | ▼(1.8) | ▼(17.4) | 15.6 | 15.7 |
| Net income or (loss)/sales (fn1)............... | (14.4) | (34.5) | (10.3) | (11.0) | 0.2 | ▲4.0 | ▼(20.2) | ▲24.2 | ▲11.2 |
| Capital expenditures.............................. | 14,923 | 15,725 | 12,059 | 7,791 | 6,071 | ▼(19.2) | ▲5.4 | ▼(23.3) | ▼(22.1) |
| Research and development expenses........ | *** | *** | *** | *** | *** | ▼*** | ▲*** | ▲*** | ▲*** |
| Net assets............................................ | 152,912 | 156,425 | 168,154 | NA | NA | ▲10.0 | ▲2.3 | ▲7.5 | NA |
| **All U.S. producers':** | | | | | | | | | |
| Net sales: | | | | | | | | | |
| Quantity............................................... | 38,425 | 38,348 | 40,897 | fn5 | fn5 | ▲6.4 | ▼(0.2) | ▲6.6 | fn5 |
| Value................................................... | 68,583 | 60,439 | 65,513 | fn5 | fn5 | ▼(4.5) | ▼(11.9) | ▲8.4 | fn5 |
| Unit value........................................... | $1.78 | $1.58 | $1.60 | fn5 | fn5 | ▼(10.3) | ▼(11.7) | ▲1.6 | fn5 |
| Operating expenses................................ | 79,354 | 77,842 | 77,195 | fn5 | fn5 | ▼(2.7) | ▼(1.9) | ▼(0.8) | fn5 |
| Operating income or (loss) (fn6)............... | (10,771) | (17,404) | (11,682) | fn5 | fn5 | ▼fn6 | ▼fn6 | ▲fn6 | fn5 |
| Net income or (loss) (fn6)....................... | (8,411) | (16,938) | (5,684) | fn5 | fn5 | ▲fn6 | ▲fn6 | ▲fn6 | fn5 |
| Unit operating expenses.......................... | $2.07 | $2.03 | $1.89 | fn5 | fn5 | ▼(8.6) | ▼(1.7) | ▼(7.0) | fn5 |
| Unit operating income or (loss) (fn6).......... | $(0.28) | $(0.45) | $(0.29) | fn5 | fn5 | ▼fn6 | ▼fn6 | ▲fn6 | fn5 |
| Unit net income or (loss) (fn6)................. | $(0.22) | $(0.44) | $(0.14) | fn5 | fn5 | ▲fn6 | ▼fn6 | ▲fn6 | fn5 |
| Operating expenses/sales (fn1)................. | 115.7 | 128.8 | 117.8 | fn5 | fn5 | ▲2.1 | ▲13.1 | ▼(11.0) | fn5 |
| Operating income or (loss)/sales (fn1)........ | (15.7) | (28.8) | (17.8) | fn5 | fn5 | ▼(2.1) | ▼(13.1) | 11.0 | fn5 |
| Net income or (loss)/sales (fn1)............... | (12.3) | (28.0) | (8.7) | fn5 | fn5 | ▲3.6 | ▼(15.8) | 19.3 | fn5 |

Note.--Shares and ratios shown as "0.0" percent represent non-zero values less than "0.05" percent (if positive) and greater than "(0.05)" percent (if negative). Zeroes, null values, and undefined calculations are suppressed and shown as "---". Period changes preceded by a " ▲ " represent an increase, while period changes preceded by a " ▼ " represent a decrease.

fn1.--Reported data are in percent and period changes are in percentage points.
fn2.--Imports data were adjusted to remove re-exports as reported in official U.S. export statistics of the U.S. Department of Commerce. See Part IV for more detail.
fn3.--Domestic production and yield interim period data are the annual data for each period as reported by NASS.
fn4.--U.S. shipments are NASS production adjusted to remove domestic exports as reported in official U.S. export statistics of the U.S Department of Commerce. Interim period derived using full year NASS data adjusted for January to September using monthly shipments data from questionnaire responses to the preliminary investigation. See part III for more detail.
fn5.--Interim period not shown for all producers as Commission questionnaire did not collect interim data for small raw honey producers.
fn6.--Percent changes only calculated when both comparison values represent profits;  The directional change in profitability provided when one or both comparison values represent a loss.

Source: Compiled from official U.S. agricultural statistics National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, 0409.00.0065, accessed February 18, 2022, from official U.S. export statistics of the U.S. Department of Commerce using schedule B number 0409.00.0055, accessed February 22, 2022, and from data submitted in response to Commission questionnaires. U.S. import statistics are based on imports for consumption and associated values are reported on a landed duty paid value basis.

**Related party exclusion**

Table C-2
**Raw honey: Summary data concerning the U.S. market excluding two U.S. producers \*\*\*, by period**
  Quantity=1,000 pounds; Value=1,000 dollars; Yield=pounds per colony; Unit values, unit labor costs, and unit expenses=dollars per pound; Period changes=percent--exceptions noted

| | Reported data | | | | | Period changes | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Calendar year | | | Jan-Sep | | Comparison years | | Jan-Sep |
| | 2018 | 2019 | 2020 | 2020 | 2021 | 2018-20 | 2018-19 | 2019-20 | 2020-21 |
| **U.S. consumption quantity:** | | | | | | | | | |
| Amount............................ | 547,387 | 531,194 | 556,986 | 398,979 | 459,587 | ▲1.8 | ▼(3.0) | ▲4.9 | ▲15.2 |
| Producers' share (fn1): | | | | | | | | | |
| Included producers............ | *** | *** | *** | *** | *** | ▲*** | ▲*** | ▲*** | ▼*** |
| Excluded producers........... | *** | *** | *** | *** | *** | ▲*** | ▼*** | ▲*** | ▲*** |
| All producers.................. | 27.5 | 28.8 | 25.4 | 20.6 | 15.4 | ▼(2.1) | ▲1.3 | ▼(3.4) | ▼(5.3) |
| Importers' share (fn1): | | | | | | | | | |
| Argentina......................... | 14.6 | 14.7 | 15.2 | 16.5 | 17.1 | ▲0.7 | ▲0.1 | ▲0.5 | ▲0.6 |
| Brazil.............................. | 9.5 | 9.9 | 13.5 | 14.8 | 14.1 | ▲4.0 | ▲0.4 | ▲3.6 | ▼(0.7) |
| India............................... | 17.6 | 20.1 | 14.4 | 15.8 | 23.0 | ▼(3.2) | ▲2.5 | ▼(5.8) | ▲7.2 |
| Vietnam........................... | 15.2 | 15.3 | 20.0 | 20.3 | 21.6 | ▲4.8 | ▲0.1 | ▲4.6 | ▲1.3 |
| Subject sources.............. | 56.9 | 60.1 | 63.1 | 67.5 | 75.9 | ▲6.2 | ▲3.2 | ▲3.0 | ▲8.4 |
| Canada............................ | 5.9 | 3.1 | 1.5 | 1.7 | 0.9 | ▼(4.3) | ▼(2.8) | ▼(1.5) | ▼(0.9) |
| Ukraine........................... | 3.3 | 3.6 | 4.3 | 4.2 | 2.8 | ▲1.0 | ▲0.3 | ▲0.8 | ▼(1.4) |
| All other sources............... | 6.4 | 4.4 | 5.5 | 6.0 | 5.0 | ▼(0.8) | ▼(2.0) | ▲1.1 | ▼(1.0) |
| Nonsubject sources......... | 15.6 | 11.1 | 11.4 | 11.9 | 8.7 | ▼(4.1) | ▼(4.5) | ▲0.4 | ▼(3.2) |
| All import sources........... | 72.5 | 71.2 | 74.6 | 79.4 | 84.6 | ▲2.1 | ▼(1.3) | ▲3.4 | ▲5.3 |
| **U.S. consumption value:** | | | | | | | | | |
| Amount............................ | 772,997 | 674,471 | 690,092 | 468,236 | 680,379 | ▼(10.7) | ▼(12.7) | ▲2.3 | ▲45.3 |
| Producers' share (fn1): | | | | | | | | | |
| Included producers............ | *** | *** | *** | *** | *** | ▲*** | ▲*** | ▲*** | ▼*** |
| Excluded producers........... | *** | *** | *** | *** | *** | ▲*** | ▼*** | ▲*** | ▼*** |
| All producers.................. | 43.4 | 45.5 | 43.7 | 37.4 | 26.8 | ▲0.3 | ▲2.2 | ▼(1.8) | ▼(10.7) |
| Importers' share (fn1): | | | | | | | | | |
| Argentina......................... | 11.6 | 12.0 | 13.6 | 15.1 | 18.8 | ▲2.1 | ▲0.5 | ▲1.6 | ▲3.6 |
| Brazil.............................. | 10.6 | 8.6 | 10.6 | 11.7 | 15.3 | ▲0.0 | ▼(2.0) | ▲2.0 | ▲3.6 |
| India............................... | 10.5 | 12.5 | 8.7 | 10.1 | 15.4 | ▼(1.8) | ▲2.0 | ▼(3.8) | ▲5.3 |
| Vietnam........................... | 7.5 | 7.8 | 9.9 | 10.6 | 11.8 | ▲2.4 | ▲0.3 | ▲2.1 | ▲1.2 |
| Subject sources.............. | 40.2 | 40.9 | 42.8 | 47.4 | 61.2 | ▲2.6 | ▲0.7 | ▲1.9 | ▲13.7 |
| Canada............................ | 5.9 | 3.5 | 1.9 | 2.1 | 1.1 | ▼(4.0) | ▼(2.5) | ▼(1.6) | ▼(1.1) |
| Ukraine........................... | 2.2 | 2.6 | 2.9 | 2.9 | 2.0 | ▲0.7 | ▲0.4 | ▲0.3 | ▼(1.0) |
| All other sources............... | 8.3 | 7.5 | 8.7 | 10.0 | 9.0 | ▲0.4 | ▼(0.9) | ▲1.2 | ▼(1.0) |
| Nonsubject sources......... | 16.4 | 13.5 | 13.5 | 15.1 | 12.0 | ▼(3.0) | ▼(2.9) | ▼(0.0) | ▼(3.1) |
| All import sources........... | 56.6 | 54.5 | 56.3 | 62.6 | 73.2 | ▼(0.3) | ▼(2.2) | ▲1.8 | ▲10.7 |
| **Adjusted U.S. imports from (fn2):** | | | | | | | | | |
| Argentina: | | | | | | | | | |
| Quantity....................... | 79,839 | 78,083 | 84,935 | 65,788 | 78,703 | ▲6.4 | ▼(2.2) | ▲8.8 | ▲19.6 |
| Value........................... | 89,457 | 81,194 | 94,106 | 70,852 | 127,592 | ▲5.2 | ▼(9.2) | ▲15.9 | ▲80.1 |
| Unit value.................... | $1.12 | $1.04 | $1.11 | $1.08 | $1.62 | ▼(1.1) | ▼(7.2) | ▲6.6 | ▲50.5 |
| Ending inventory quantity..... | *** | *** | *** | *** | *** | ▲*** | ▲*** | ▼*** | ▲*** |
| Brazil: | | | | | | | | | |
| Quantity....................... | 52,009 | 52,693 | 75,371 | 59,068 | 64,776 | ▲44.9 | ▲1.3 | ▲43.0 | ▲9.7 |
| Value........................... | 81,982 | 58,128 | 73,220 | 54,657 | 103,908 | ▼(10.7) | ▼(29.1) | ▲26.0 | ▲90.1 |
| Unit value.................... | $1.58 | $1.10 | $0.97 | $0.93 | $1.60 | ▼(38.4) | ▼(30.0) | ▼(11.9) | ▲73.4 |
| Ending inventory quantity..... | *** | *** | *** | *** | *** | ▼*** | ▲*** | ▼*** | ▲*** |
| India: | | | | | | | | | |
| Quantity....................... | 96,215 | 106,910 | 79,997 | 63,231 | 105,902 | ▼(16.9) | ▲11.1 | ▼(25.2) | ▲67.5 |
| Value........................... | 81,011 | 84,015 | 59,877 | 47,129 | 104,878 | ▼(26.1) | ▲3.7 | ▼(28.7) | ▲122.5 |
| Unit value.................... | $0.84 | $0.79 | $0.75 | $0.75 | $0.99 | ▼(11.1) | ▼(6.7) | ▼(4.8) | ▲32.9 |
| Ending inventory quantity..... | *** | *** | *** | *** | *** | ▲*** | ▲*** | ▲*** | ▲*** |
| Vietnam: | | | | | | | | | |
| Quantity....................... | 83,335 | 81,526 | 111,356 | 81,063 | 99,475 | ▲33.6 | ▼(2.2) | ▲36.6 | ▲22.7 |
| Value........................... | 58,289 | 52,830 | 68,358 | 49,519 | 79,950 | ▲17.3 | ▼(9.4) | ▲29.4 | ▲61.5 |
| Unit value.................... | $0.70 | $0.65 | $0.61 | $0.61 | $0.80 | ▼(12.2) | ▼(7.4) | ▼(5.3) | ▲31.6 |
| Ending inventory quantity..... | *** | *** | *** | *** | *** | ▼*** | ▼*** | ▲*** | ▲*** |
| Subject sources: | | | | | | | | | |
| Quantity....................... | 311,397 | 319,212 | 351,660 | 269,150 | 348,856 | ▲12.9 | ▲2.5 | ▲10.2 | ▲29.6 |
| Value........................... | 310,738 | 276,168 | 295,562 | 222,157 | 416,328 | ▼(4.9) | ▼(11.1) | ▲7.0 | ▲87.4 |
| Unit value.................... | $1.00 | $0.87 | $0.84 | $0.83 | $1.19 | ▼(15.8) | ▼(13.3) | ▼(2.9) | ▲44.6 |
| Ending inventory quantity..... | 40,379 | 34,647 | 33,654 | 35,204 | 61,525 | ▼(16.7) | ▼(14.2) | ▼(2.9) | ▲74.8 |

Table continued.

**Table C-2 Continued**
**Raw honey:  Summary data concerning the U.S. market excluding two U.S. producers \*\*\*, by period**
Quantity=1,000 pounds; Value=1,000 dollars; Yield=pounds per colony; Unit values, unit labor costs, and unit expenses=dollars per pound; Period changes=percent--exceptions noted

| | Reported data | | | | | Period changes | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Calendar year | | | Jan-Sep | | Comparison years | | Jan-Sep |
| | 2018 | 2019 | 2020 | 2020 | 2021 | 2018-20 | 2018-19 | 2019-20 | 2020-21 |
| **Adjusted U.S. imports from (fn2): Continued** | | | | | | | | | |
| Canada: | | | | | | | | | |
|   Quantity................................................... | 32,142 | 16,333 | 8,614 | 6,891 | 3,971 | ▼(73.2) | ▼(49.2) | ▼(47.3) | ▼(42.4) |
|   Value........................................................ | 45,656 | 23,275 | 12,873 | 10,018 | 7,345 | ▼(71.8) | ▼(49.0) | ▼(44.7) | ▼(26.7) |
|   Unit value................................................ | $1.42 | $1.42 | $1.49 | $1.45 | $1.85 | ▲5.2 | ▲0.3 | ▲4.9 | ▲27.2 |
| Ukraine: | | | | | | | | | |
|   Quantity................................................... | 18,168 | 19,051 | 24,161 | 16,652 | 12,883 | ▲33.0 | ▲4.9 | ▲26.8 | ▼(22.6) |
|   Value........................................................ | 17,067 | 17,381 | 20,139 | 13,799 | 13,296 | ▲18.0 | ▲1.8 | ▲15.9 | ▼(3.6) |
|   Unit value................................................ | $0.94 | $0.91 | $0.83 | $0.83 | $1.03 | ▼(11.3) | ▼(2.9) | ▼(8.6) | ▲24.5 |
|   Ending inventory quantity..................... | *** | *** | *** | *** | *** | ▼*** | ▼*** | ▲*** | ▼*** |
| All other sources: | | | | | | | | | |
|   Quantity................................................... | 34,902 | 23,375 | 30,857 | 23,929 | 23,146 | ▼(11.6) | ▼(33.0) | ▲32.0 | ▼(3.3) |
|   Value........................................................ | 64,403 | 50,456 | 59,925 | 46,967 | 61,172 | ▼(7.0) | ▼(21.7) | ▲18.8 | ▲30.2 |
|   Unit value................................................ | $1.85 | $2.16 | $1.94 | $1.96 | $2.64 | ▲5.2 | ▲17.0 | ▼(10.0) | ▲34.7 |
| Nonsubject sources: | | | | | | | | | |
|   Quantity................................................... | 85,212 | 58,760 | 63,633 | 47,473 | 40,000 | ▼(25.3) | ▼(31.0) | ▲8.3 | ▼(15.7) |
|   Value........................................................ | 127,125 | 91,112 | 92,938 | 70,784 | 81,814 | ▼(26.9) | ▼(28.3) | ▲2.0 | ▲15.6 |
|   Unit value................................................ | $1.49 | $1.55 | $1.46 | $1.49 | $2.05 | ▼(2.1) | ▲3.9 | ▼(5.8) | ▲37.2 |
|   Ending inventory quantity..................... | 12,182 | 7,491 | 9,237 | 7,975 | 5,620 | ▼(24.2) | ▼(38.5) | ▲23.3 | ▼(29.5) |
| All import sources: | | | | | | | | | |
|   Quantity................................................... | 396,609 | 377,972 | 415,292 | 316,622 | 388,856 | ▲4.7 | ▼(4.7) | ▲9.9 | ▲22.8 |
|   Value........................................................ | 437,863 | 367,279 | 388,500 | 292,941 | 498,141 | ▼(11.3) | ▼(16.1) | ▲5.8 | ▲70.0 |
|   Unit value................................................ | $1.10 | $0.97 | $0.94 | $0.93 | $1.28 | ▼(15.3) | ▼(12.0) | ▼(3.7) | ▲38.5 |
|   Ending inventory quantity..................... | 52,561 | 42,137 | 42,891 | 43,179 | 67,146 | ▼(18.4) | ▼(19.8) | ▲1.8 | ▲55.5 |
| **Included U.S. producers' data based on third-party data sources:** | | | | | | | | | |
|   Production quantity (fn3)........................ | *** | *** | *** | *** | *** | ▼*** | ▲*** | ▼*** | ▼(14.4) |
|   Production yield (fn3).............................. | *** | *** | *** | *** | *** | ▲*** | ▲*** | ▼*** | ▼(7.6) |
|   U.S. shipments (fn4): | | | | | | | | | |
|     Quantity.............................................. | *** | *** | *** | *** | *** | ▼*** | ▲*** | ▼*** | ▲*** |
|     Value................................................... | *** | *** | *** | *** | *** | ▼*** | ▼*** | ▼*** | ▲*** |
|     Unit value........................................... | *** | *** | *** | *** | *** | ▼*** | ▼*** | ▲*** | ▲*** |
|   Export shipments: | | | | | | | | | |
|     Quantity.............................................. | *** | *** | *** | *** | *** | ▲*** | ▲*** | ▲*** | ▼*** |
|     Value................................................... | *** | *** | *** | *** | *** | ▲*** | ▲*** | ▼*** | ▼*** |
|     Unit value........................................... | *** | *** | *** | *** | *** | ▼*** | ▼*** | ▲*** | ▼*** |
| **Included U.S. producers' data based on Commission questionnaires:** | | | | | | | | | |
|   Large U.S. producers': | | | | | | | | | |
|     Ending inventory quantity................. | *** | *** | *** | *** | *** | ▲*** | ▲*** | ▲*** | ▼*** |
|     Inventories/U.S. shipments (fn1)...... | *** | *** | *** | *** | *** | ▲*** | ▲*** | ▲*** | ▼*** |
|     Production workers............................ | *** | *** | *** | *** | *** | ▲*** | ▲*** | ▲*** | ▼*** |
|     Hours worked (1,000s)..................... | *** | *** | *** | *** | *** | ▲*** | ▲*** | ▼*** | ▼*** |
|     Wages paid ($1,000)......................... | *** | *** | *** | *** | *** | ▲*** | ▲*** | ▲*** | ▼*** |
|     Hourly wages (dollars per hour)...... | *** | *** | *** | *** | *** | ▲*** | ▲*** | ▲*** | ▲*** |
|     Productivity (pounds per hour)........ | *** | *** | *** | *** | *** | ▲*** | ▲*** | ▲*** | ▲*** |
|     Unit labor costs................................ | *** | *** | *** | *** | *** | ▲*** | ▼*** | ▲*** | ▲*** |
|   All U.S. producers': | | | | | | | | | |
|     Ending inventory quantity................. | *** | *** | *** | fn5 | fn5 | ▲*** | ▲*** | ▲*** | fn5 |
|     Inventories/U.S. shipments (fn1)...... | *** | *** | *** | fn5 | fn5 | ▲*** | ▲*** | ▲*** | fn5 |
|     Production workers............................ | *** | *** | *** | fn5 | fn5 | ▲*** | ▲*** | ▲*** | fn5 |
|     Hours worked (1,000s)..................... | *** | *** | *** | fn5 | fn5 | ▲*** | ▲*** | ▼*** | fn5 |
|     Wages paid ($1,000)......................... | *** | *** | *** | fn5 | fn5 | ▲*** | ▲*** | ▲*** | fn5 |
|     Hourly wages (dollars per hour)...... | *** | *** | *** | fn5 | fn5 | ▲*** | ▲*** | ▲*** | fn5 |
|     Productivity (pounds per hour)........ | *** | *** | *** | fn5 | fn5 | ▼*** | ▲*** | ▼*** | fn5 |
|     Unit labor costs................................ | *** | *** | *** | fn5 | fn5 | ▲*** | ▼*** | ▲*** | fn5 |

Table continued.

**Table C-2 Continued**
**Raw honey:  Summary data concerning the U.S. market excluding two U.S. producers ***, by period**
Quantity=1,000 pounds; Value=1,000 dollars; Yield=pounds per colony; Unit values, unit labor costs, and unit expenses=dollars per pound; Period changes=percent--exceptions noted

| | Reported data | | | | | Period changes | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Calendar year | | Jan-Sep | | | Comparison years | | Jan-Sep |
| | 2018 | 2019 | 2020 | 2020 | 2021 | 2018-20 | 2018-19 | 2019-20 | 2020-21 |
| **Included Large U.S. producers':** | | | | | | | | | |
| Net sales: | | | | | | | | | |
| Quantity............................................ | *** | *** | *** | *** | *** | ▲ *** | ▼ *** | ▲ *** | ▲ *** |
| Value................................................ | *** | *** | *** | *** | *** | ▼ *** | ▼ *** | ▲ *** | ▲ *** |
| Unit value......................................... | *** | *** | *** | *** | *** | ▼ *** | ▼ *** | ▲ *** | ▲ *** |
| Operating expenses............................ | *** | *** | *** | *** | *** | ▼ *** | ▼ *** | ▼ *** | ▲ *** |
| Operating income or (loss) (fn6)............ | *** | *** | *** | *** | *** | ▼ *** | ▼ *** | ▲ *** | ▲ *** |
| Net income or (loss) (fn6)..................... | *** | *** | *** | *** | *** | ▲ *** | ▼ *** | ▲ *** | ▲ *** |
| Unit operating expenses...................... | *** | *** | *** | *** | *** | ▲ *** | ▲ *** | ▲ *** | ▲ *** |
| Unit operating income or (loss) (fn6)...... | *** | *** | *** | *** | *** | ▼ *** | ▼ *** | ▲ *** | ▲ *** |
| Unit net income or (loss) (fn6)............... | *** | *** | *** | *** | *** | ▲ *** | ▼ *** | ▲ *** | ▲ *** |
| Operating expenses/sales (fn1)............. | *** | *** | *** | *** | *** | ▲ *** | ▲ *** | ▼ *** | ▼ *** |
| Operating income or (loss)/sales (fn1)..... | *** | *** | *** | *** | *** | ▼ *** | ▼ *** | ▲ *** | ▲ *** |
| Net income or (loss)/sales (fn1)............. | *** | *** | *** | *** | *** | ▲ *** | ▼ *** | ▲ *** | ▲ *** |
| Capital expenditures............................ | *** | *** | *** | *** | *** | ▼ *** | ▲ *** | ▼ *** | ▼ *** |
| Research and development expenses........ | *** | *** | *** | *** | *** | ▲ *** | ▲ *** | ▲ *** | ▲ *** |
| Net assets......................................... | *** | *** | *** | *** | *** | ▲ *** | ▲ *** | ▲ *** | *** |
| **Included All U.S. producers':** | | | | | | | | | |
| Net sales: | | | | | | | | | |
| Quantity............................................ | *** | *** | *** | fn5 | fn5 | ▲ *** | ▲ *** | ▲ *** | fn5 |
| Value................................................ | *** | *** | *** | fn5 | fn5 | ▼ *** | ▼ *** | ▲ *** | fn5 |
| Unit value......................................... | *** | *** | *** | fn5 | fn5 | ▼ *** | ▼ *** | ▲ *** | fn5 |
| Operating expenses............................ | *** | *** | *** | fn5 | fn5 | ▼ *** | ▼ *** | ▼ *** | fn5 |
| Operating income or (loss) (fn6)............ | *** | *** | *** | fn5 | fn5 | ▼ *** | ▼ *** | ▲ *** | fn5 |
| Net income or (loss) (fn6)..................... | *** | *** | *** | fn5 | fn5 | ▲ *** | ▼ *** | ▲ *** | fn5 |
| Unit operating expenses...................... | *** | *** | *** | fn5 | fn5 | ▲ *** | ▲ *** | ▲ *** | fn5 |
| Unit operating income or (loss) (fn6)...... | *** | *** | *** | fn5 | fn5 | ▼ *** | ▼ *** | ▲ *** | fn5 |
| Unit net income or (loss) (fn6)............... | *** | *** | *** | fn5 | fn5 | ▲ *** | ▼ *** | ▲ *** | fn5 |
| Operating expenses/sales (fn1)............. | *** | *** | *** | fn5 | fn5 | ▲ *** | ▲ *** | ▼ *** | fn5 |
| Operating income or (loss)/sales (fn1)....... | *** | *** | *** | fn5 | fn5 | ▼ *** | ▼ *** | ▲ *** | fn5 |
| Net income or (loss)/sales (fn1)................ | *** | *** | *** | fn5 | fn5 | ▲ *** | ▼ *** | ▲ *** | fn5 |

Note.--Shares and ratios shown as "0.0" percent represent non-zero values less than "0.05" percent (if positive) and greater than "(0.05)" percent (if negative). Zeroes, null values, and undefined calculations are suppressed and shown as "---". Period changes preceded by a " ▲" represent an increase, while period changes preceded by a " ▼" represent a decrease.

fn1.--Reported data are in percent and period changes are in percentage points.
fn2.--Imports data were adjusted to remove re-exports as reported in official U.S. export statistics of the U.S. Department of Commerce. See Part IV for more detail.
fn3.--Domestic production and yield interim period data are the annual data for each period as reported by NASS.
fn4.--U.S. shipments are NASS production adjusted to remove domestic exports as reported in official U.S. export statistics of the U.S Department of Commerce. Interim period derived using full year NASS data adjusted for January to September using monthly shipments data from questionnaire responses to the preliminary investigation. See part III for more detail.
fn5.--Interim period not shown for all producers as Commission questionnaire did not collect interim data for small raw honey producers.
fn6.--Percent changes only calculated when both comparison values represent profits;  The directional change in profitability provided when one or both comparison values represent a loss.

Source: Compiled from official U.S. agricultural statistics National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022, from official U.S. export statistics of the U.S. Department of Commerce using schedule B number 0409.00.0055, accessed February 22, 2022, and from data submitted in response to Commission questionnaires. U.S. import statistics are based on imports for consumption and associated values are reported on a landed duty paid value basis.

**APPENDIX D**

**QUESTIONNAIRE RESPONSES REGARDING THE DOMESTIC LIKE PRODUCT**

Table D-1: U.S. producers', U.S. importers', and U.S. purchasers' numeric responses comparing raw honey not-packaged for retail sale to raw honey packaged for retail sale .........................D-4

Table D-2: U.S. producers' narrative responses to the domestic like product factors ...............D-5

Table D-3: U.S. importers' narrative responses to the domestic like product factors ..............D-12

Table D-4: U.S. purchasers' narrative responses to the domestic like product factors ............D-18

D-3

**Table D-1**

**Raw honey:  Count of firms' responses to the six factors comparing raw honey not packaged for retail sale to raw honey packaged for retail sale**

Count in number of firms

| Item | Firm type | Fully | Mostly | Somewhat | Never |
|------|-----------|-------|--------|----------|-------|
| Physical characteristics | U.S. producers | 9 | 6 | 13 | 44 |
| Interchangeability | U.S. producers | 6 | 3 | 10 | 50 |
| Channels | U.S. producers | 2 | 3 | 10 | 54 |
| Manufacturing | U.S. producers | 4 | 4 | 10 | 51 |
| Perceptions | U.S. producers | 5 | 3 | 12 | 50 |
| Price | U.S. producers | 1 | 4 | 8 | 55 |
| Physical characteristics | U.S. importers | 8 | 4 | 2 | 1 |
| Interchangeability | U.S. importers | 9 | 2 | 2 | 1 |
| Channels | U.S. importers | 3 | 4 | 4 | 0 |
| Manufacturing | U.S. importers | 1 | 8 | 4 | 0 |
| Perceptions | U.S. importers | 5 | 2 | 3 | 1 |
| Price | U.S. importers | 2 | 7 | 3 | 1 |
| Physical characteristics | U.S. purchasers | 5 | 2 | 2 | 1 |
| Interchangeability | U.S. purchasers | 3 | 4 | 2 | 1 |
| Channels | U.S. purchasers | 0 | 3 | 6 | 2 |
| Manufacturing | U.S. purchasers | 1 | 4 | 5 | 1 |
| Perceptions | U.S. purchasers | 2 | 3 | 3 | 2 |
| Price | U.S. purchasers | 2 | 1 | 5 | 2 |

Source:  Compiled from data submitted in response to Commission questionnaires.

**Table D-2**

**Raw honey:  U.S producers' narrative responses to the six-factor like product factors comparing raw honey not packaged for retail sale to raw honey packaged for retail sale**

| Item | Narrative |
|---|---|
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |

| Item | Narrative |
|---|---|
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |

| Item | Narrative |
|------|-----------|
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |

D-7

| Item | Narrative |
|------|-----------|
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |

| Item | Narrative |
|---|---|
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |

| Item | Narrative |
|------|-----------|
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |

| Item | Narrative |
|------|-----------|
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |

Source:  Compiled from data submitted in response to Commission questionnaires.

D-11

**Table D-3**

**Raw honey:  U.S importers' narrative responses to the six-factor like product factors comparing raw honey not packaged for retail sale to raw honey packaged for retail sale**

| Item | Narrative |
|------|-----------|
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |

| Item | Narrative |
|---|---|
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |

D-13

| Item | Narrative |
|------|-----------|
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |

| Item | Narrative |
|------|-----------|
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |

| Item | Narrative |
|------|-----------|
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |

| Item | Narrative |
|------|-----------|
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |

Source:  Compiled from data submitted in response to Commission questionnaires.

**Table D-4**

**Raw honey:  U.S purchasers' narrative responses to the six-factor like product factors comparing raw honey not packaged for retail sale to raw honey packaged for retail sale**

| Item | Narrative |
|---|---|
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |

| Item | Narrative |
|---|---|
| Physical characteristics | *** |
| Physical characteristics | *** |
| Physical characteristics | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |

| Item | Narrative |
|------|-----------|
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Interchangeability | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |
| Channels | *** |

D-20

| Item | Narrative |
|---|---|
| Channels | *** |
| Channels | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |
| Manufacturing | *** |

| Item | Narrative |
|---|---|
| Manufacturing | *** |
| Manufacturing | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Perceptions | *** |
| Price | *** |

| Item | Narrative |
|------|-----------|
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |
| Price | *** |

Source:  Compiled from data submitted in response to Commission questionnaires.

**APPENDIX E**

**U.S. SHIPMENTS BY COLOR**

Table E-1: Large U.S. producers' U.S. shipments, by color and period ...................................... E-4

Table E-2: U.S. importers' U.S. shipments of imports from Argentina, by color and period ...... E-5

Table E-3: U.S. importers' U.S. shipments of imports from Brazil, by color and period ............. E-6

Table E-4: U.S. importers' U.S. shipments of imports from India, by color and period .............. E-7

Table E-5: U.S. importers' U.S. shipments of imports from Vietnam, by color and period ........ E-8

Table E-6: U.S. importers' U.S. shipments of imports from subject sources, by color and period ........................................................................................................................................ E-9

Table E-7: U.S. importers' U.S. shipments of imports from nonsubject sources, by color and period ...................................................................................................................................... E-10

Table E-8: U.S. importers' U.S. shipments of imports from all import sources, by color and period ...................................................................................................................................... E-11

Table E-9: U.S. producers' and U.S. importers' U.S. shipments unit values by source, honey color, and period .......................................................................................................................... E-12

**Table E-1**
**Raw honey: Large U.S. producers' U.S. shipments, by color and period**

Quantity in 1,000 pounds; Value in 1,000 dollars; Unit values in dollars per pound; Shares in percent

| Honey color | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| White or lighter | Quantity | 18,093 | 19,093 | 20,926 | 16,526 | 19,156 |
| Extra light amber | Quantity | 8,971 | 7,689 | 8,604 | 6,866 | 8,311 |
| Light amber | Quantity | 6,854 | 6,832 | 6,671 | 5,326 | 4,996 |
| Amber or darker | Quantity | 681 | 624 | 790 | 492 | 359 |
| All honey colors | Quantity | 34,599 | 34,238 | 36,992 | 29,210 | 32,822 |
| White or lighter | Value | 31,754 | 29,966 | 33,286 | 26,435 | 32,347 |
| Extra light amber | Value | 16,795 | 12,670 | 13,393 | 10,347 | 14,629 |
| Light amber | Value | 11,845 | 10,507 | 10,657 | 8,643 | 9,777 |
| Amber or darker | Value | 1,091 | 782 | 1,089 | 690 | 704 |
| All honey colors | Value | 61,485 | 53,924 | 58,425 | 46,115 | 57,457 |
| White or lighter | Unit value | 1.76 | 1.57 | 1.59 | 1.60 | 1.69 |
| Extra light amber | Unit value | 1.87 | 1.65 | 1.56 | 1.51 | 1.76 |
| Light amber | Unit value | 1.73 | 1.54 | 1.60 | 1.62 | 1.96 |
| Amber or darker | Unit value | 1.60 | 1.25 | 1.38 | 1.40 | 1.96 |
| All honey colors | Unit value | 1.78 | 1.57 | 1.58 | 1.58 | 1.75 |
| White or lighter | Share of quantity | 52.3 | 55.8 | 56.6 | 56.6 | 58.4 |
| Extra light amber | Share of quantity | 25.9 | 22.5 | 23.3 | 23.5 | 25.3 |
| Light amber | Share of quantity | 19.8 | 20.0 | 18.0 | 18.2 | 15.2 |
| Amber or darker | Share of quantity | 2.0 | 1.8 | 2.1 | 1.7 | 1.1 |
| All honey colors | Share of quantity | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| White or lighter | Share of value | 51.6 | 55.6 | 57.0 | 57.3 | 56.3 |
| Extra light amber | Share of value | 27.3 | 23.5 | 22.9 | 22.4 | 25.5 |
| Light amber | Share of value | 19.3 | 19.5 | 18.2 | 18.7 | 17.0 |
| Amber or darker | Share of value | 1.8 | 1.5 | 1.9 | 1.5 | 1.2 |
| All honey colors | Share of value | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source:  Compiled from data submitted in response to Commission questionnaires.

E-4

**Table E-2**
**Raw honey: U.S. importers' U.S. shipments of imports from Argentina, by color and period**

Quantity in 1,000 pounds; Value in 1,000 dollars; Unit values in dollars per pound; Shares in percent

| Honey color | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| White or lighter | Quantity | *** | *** | *** | *** | *** |
| Extra light amber | Quantity | *** | *** | *** | *** | *** |
| Light amber | Quantity | *** | *** | *** | *** | *** |
| Amber or darker | Quantity | *** | *** | *** | *** | *** |
| All honey colors | Quantity | *** | *** | *** | *** | *** |
| White or lighter | Value | *** | *** | *** | *** | *** |
| Extra light amber | Value | *** | *** | *** | *** | *** |
| Light amber | Value | *** | *** | *** | *** | *** |
| Amber or darker | Value | *** | *** | *** | *** | *** |
| All honey colors | Value | *** | *** | *** | *** | *** |
| White or lighter | Unit value | *** | *** | *** | *** | *** |
| Extra light amber | Unit value | *** | *** | *** | *** | *** |
| Light amber | Unit value | *** | *** | *** | *** | *** |
| Amber or darker | Unit value | *** | *** | *** | *** | *** |
| All honey colors | Unit value | *** | *** | *** | *** | *** |
| White or lighter | Share of quantity | *** | *** | *** | *** | *** |
| Extra light amber | Share of quantity | *** | *** | *** | *** | *** |
| Light amber | Share of quantity | *** | *** | *** | *** | *** |
| Amber or darker | Share of quantity | *** | *** | *** | *** | *** |
| All honey colors | Share of quantity | *** | *** | *** | *** | *** |
| White or lighter | Share of value | *** | *** | *** | *** | *** |
| Extra light amber | Share of value | *** | *** | *** | *** | *** |
| Light amber | Share of value | *** | *** | *** | *** | *** |
| Amber or darker | Share of value | *** | *** | *** | *** | *** |
| All honey colors | Share of value | *** | *** | *** | *** | *** |

Source:  Compiled from data submitted in response to Commission questionnaires.

Note:  Shares and ratios shown as "0.0" represent values greater than zero, but less than "0.05" percent.
Zeroes, null values, and undefined calculations are suppressed and shown as "---".

**Table E-3**
**Raw honey: U.S. importers' U.S. shipments of imports from Brazil, by color and period**

Quantity in 1,000 pounds; Value in 1,000 dollars; Unit values in dollars per pound; Shares in percent

| Honey color | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| White or lighter | Quantity | *** | *** | *** | *** | *** |
| Extra light amber | Quantity | *** | *** | *** | *** | *** |
| Light amber | Quantity | *** | *** | *** | *** | *** |
| Amber or darker | Quantity | *** | *** | *** | *** | *** |
| All honey colors | Quantity | *** | *** | *** | *** | *** |
| White or lighter | Value | *** | *** | *** | *** | *** |
| Extra light amber | Value | *** | *** | *** | *** | *** |
| Light amber | Value | *** | *** | *** | *** | *** |
| Amber or darker | Value | *** | *** | *** | *** | *** |
| All honey colors | Value | *** | *** | *** | *** | *** |
| White or lighter | Unit value | *** | *** | *** | *** | *** |
| Extra light amber | Unit value | *** | *** | *** | *** | *** |
| Light amber | Unit value | *** | *** | *** | *** | *** |
| Amber or darker | Unit value | *** | *** | *** | *** | *** |
| All honey colors | Unit value | *** | *** | *** | *** | *** |
| White or lighter | Share of quantity | *** | *** | *** | *** | *** |
| Extra light amber | Share of quantity | *** | *** | *** | *** | *** |
| Light amber | Share of quantity | *** | *** | *** | *** | *** |
| Amber or darker | Share of quantity | *** | *** | *** | *** | *** |
| All honey colors | Share of quantity | *** | *** | *** | *** | *** |
| White or lighter | Share of value | *** | *** | *** | *** | *** |
| Extra light amber | Share of value | *** | *** | *** | *** | *** |
| Light amber | Share of value | *** | *** | *** | *** | *** |
| Amber or darker | Share of value | *** | *** | *** | *** | *** |
| All honey colors | Share of value | *** | *** | *** | *** | *** |

Source:  Compiled from data submitted in response to Commission questionnaires.

Note:  Shares and ratios shown as "0.0" represent values greater than zero, but less than "0.05" percent.
Zeroes, null values, and undefined calculations are suppressed and shown as "---".

**Table E-4**
**Raw honey: U.S. importers' U.S. shipments of imports from India, by color and period**

Quantity in 1,000 pounds; Value in 1,000 dollars; Unit values in dollars per pound; Shares in percent

| Honey color | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| White or lighter | Quantity | *** | *** | *** | *** | *** |
| Extra light amber | Quantity | *** | *** | *** | *** | *** |
| Light amber | Quantity | *** | *** | *** | *** | *** |
| Amber or darker | Quantity | *** | *** | *** | *** | *** |
| All honey colors | Quantity | *** | *** | *** | *** | *** |
| White or lighter | Value | *** | *** | *** | *** | *** |
| Extra light amber | Value | *** | *** | *** | *** | *** |
| Light amber | Value | *** | *** | *** | *** | *** |
| Amber or darker | Value | *** | *** | *** | *** | *** |
| All honey colors | Value | *** | *** | *** | *** | *** |
| White or lighter | Unit value | *** | *** | *** | *** | *** |
| Extra light amber | Unit value | *** | *** | *** | *** | *** |
| Light amber | Unit value | *** | *** | *** | *** | *** |
| Amber or darker | Unit value | *** | *** | *** | *** | *** |
| All honey colors | Unit value | *** | *** | *** | *** | *** |
| White or lighter | Share of quantity | *** | *** | *** | *** | *** |
| Extra light amber | Share of quantity | *** | *** | *** | *** | *** |
| Light amber | Share of quantity | *** | *** | *** | *** | *** |
| Amber or darker | Share of quantity | *** | *** | *** | *** | *** |
| All honey colors | Share of quantity | *** | *** | *** | *** | *** |
| White or lighter | Share of value | *** | *** | *** | *** | *** |
| Extra light amber | Share of value | *** | *** | *** | *** | *** |
| Light amber | Share of value | *** | *** | *** | *** | *** |
| Amber or darker | Share of value | *** | *** | *** | *** | *** |
| All honey colors | Share of value | *** | *** | *** | *** | *** |

Source:  Compiled from data submitted in response to Commission questionnaires.

Note:  Shares and ratios shown as "0.0" represent values greater than zero, but less than "0.05" percent.
Zeroes, null values, and undefined calculations are suppressed and shown as "---".

**Table E-5**
**Raw honey: U.S. importers' U.S. shipments of imports from Vietnam, by color and period**

Quantity in 1,000 pounds; Value in 1,000 dollars; Unit values in dollars per pound; Shares in percent

| Honey color | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| White or lighter | Quantity | *** | *** | *** | *** | *** |
| Extra light amber | Quantity | *** | *** | *** | *** | *** |
| Light amber | Quantity | *** | *** | *** | *** | *** |
| Amber or darker | Quantity | *** | *** | *** | *** | *** |
| All honey colors | Quantity | *** | *** | *** | *** | *** |
| White or lighter | Value | *** | *** | *** | *** | *** |
| Extra light amber | Value | *** | *** | *** | *** | *** |
| Light amber | Value | *** | *** | *** | *** | *** |
| Amber or darker | Value | *** | *** | *** | *** | *** |
| All honey colors | Value | *** | *** | *** | *** | *** |
| White or lighter | Unit value | *** | *** | *** | *** | *** |
| Extra light amber | Unit value | *** | *** | *** | *** | *** |
| Light amber | Unit value | *** | *** | *** | *** | *** |
| Amber or darker | Unit value | *** | *** | *** | *** | *** |
| All honey colors | Unit value | *** | *** | *** | *** | *** |
| White or lighter | Share of quantity | *** | *** | *** | *** | *** |
| Extra light amber | Share of quantity | *** | *** | *** | *** | *** |
| Light amber | Share of quantity | *** | *** | *** | *** | *** |
| Amber or darker | Share of quantity | *** | *** | *** | *** | *** |
| All honey colors | Share of quantity | *** | *** | *** | *** | *** |
| White or lighter | Share of value | *** | *** | *** | *** | *** |
| Extra light amber | Share of value | *** | *** | *** | *** | *** |
| Light amber | Share of value | *** | *** | *** | *** | *** |
| Amber or darker | Share of value | *** | *** | *** | *** | *** |
| All honey colors | Share of value | *** | *** | *** | *** | *** |

Source:  Compiled from data submitted in response to Commission questionnaires.

Note:  Shares and ratios shown as "0.0" represent values greater than zero, but less than "0.05" percent. Zeroes, null values, and undefined calculations are suppressed and shown as "---".

**Table E-6**
**Raw honey: U.S. importers' U.S. shipments of imports from subject sources, by color and period**

Quantity in 1,000 pounds; Value in 1,000 dollars; Unit values in dollars per pound; Shares in percent

| Honey color | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| White or lighter | Quantity | *** | *** | *** | *** | *** |
| Extra light amber | Quantity | *** | *** | *** | *** | *** |
| Light amber | Quantity | *** | *** | *** | *** | *** |
| Amber or darker | Quantity | *** | *** | *** | *** | *** |
| All honey colors | Quantity | *** | *** | *** | *** | *** |
| White or lighter | Value | *** | *** | *** | *** | *** |
| Extra light amber | Value | *** | *** | *** | *** | *** |
| Light amber | Value | *** | *** | *** | *** | *** |
| Amber or darker | Value | *** | *** | *** | *** | *** |
| All honey colors | Value | *** | *** | *** | *** | *** |
| White or lighter | Unit value | *** | *** | *** | *** | *** |
| Extra light amber | Unit value | *** | *** | *** | *** | *** |
| Light amber | Unit value | *** | *** | *** | *** | *** |
| Amber or darker | Unit value | *** | *** | *** | *** | *** |
| All honey colors | Unit value | *** | *** | *** | *** | *** |
| White or lighter | Share of quantity | *** | *** | *** | *** | *** |
| Extra light amber | Share of quantity | *** | *** | *** | *** | *** |
| Light amber | Share of quantity | *** | *** | *** | *** | *** |
| Amber or darker | Share of quantity | *** | *** | *** | *** | *** |
| All honey colors | Share of quantity | *** | *** | *** | *** | *** |
| White or lighter | Share of value | *** | *** | *** | *** | *** |
| Extra light amber | Share of value | *** | *** | *** | *** | *** |
| Light amber | Share of value | *** | *** | *** | *** | *** |
| Amber or darker | Share of value | *** | *** | *** | *** | *** |
| All honey colors | Share of value | *** | *** | *** | *** | *** |

Source:  Compiled from data submitted in response to Commission questionnaires.

Note:  Shares and ratios shown as "0.0" represent values greater than zero, but less than "0.05" percent. Zeroes, null values, and undefined calculations are suppressed and shown as "---".

**Table E-7**
**Raw honey: U.S. importers' U.S. shipments of imports from nonsubject sources, by color and period**

Quantity in 1,000 pounds; Value in 1,000 dollars; Unit values in dollars per pound; Shares in percent

| Honey color | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| White or lighter | Quantity | *** | *** | *** | *** | *** |
| Extra light amber | Quantity | *** | *** | *** | *** | *** |
| Light amber | Quantity | *** | *** | *** | *** | *** |
| Amber or darker | Quantity | *** | *** | *** | *** | *** |
| All honey colors | Quantity | *** | *** | *** | *** | *** |
| White or lighter | Value | *** | *** | *** | *** | *** |
| Extra light amber | Value | *** | *** | *** | *** | *** |
| Light amber | Value | *** | *** | *** | *** | *** |
| Amber or darker | Value | *** | *** | *** | *** | *** |
| All honey colors | Value | *** | *** | *** | *** | *** |
| White or lighter | Unit value | *** | *** | *** | *** | *** |
| Extra light amber | Unit value | *** | *** | *** | *** | *** |
| Light amber | Unit value | *** | *** | *** | *** | *** |
| Amber or darker | Unit value | *** | *** | *** | *** | *** |
| All honey colors | Unit value | *** | *** | *** | *** | *** |
| White or lighter | Share of quantity | *** | *** | *** | *** | *** |
| Extra light amber | Share of quantity | *** | *** | *** | *** | *** |
| Light amber | Share of quantity | *** | *** | *** | *** | *** |
| Amber or darker | Share of quantity | *** | *** | *** | *** | *** |
| All honey colors | Share of quantity | *** | *** | *** | *** | *** |
| White or lighter | Share of value | *** | *** | *** | *** | *** |
| Extra light amber | Share of value | *** | *** | *** | *** | *** |
| Light amber | Share of value | *** | *** | *** | *** | *** |
| Amber or darker | Share of value | *** | *** | *** | *** | *** |
| All honey colors | Share of value | *** | *** | *** | *** | *** |

Source:  Compiled from data submitted in response to Commission questionnaires.

Note:  Shares and ratios shown as "0.0" represent values greater than zero, but less than "0.05" percent. Zeroes, null values, and undefined calculations are suppressed and shown as "---".

**Table E-8**
**Raw honey: U.S. importers' U.S. shipments of imports from all import sources, by color and period**

Quantity in 1,000 pounds; Value in 1,000 dollars; Unit values in dollars per pound; Shares in percent

| Honey color | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| White or lighter | Quantity | *** | *** | *** | *** | *** |
| Extra light amber | Quantity | *** | *** | *** | *** | *** |
| Light amber | Quantity | *** | *** | *** | *** | *** |
| Amber or darker | Quantity | *** | *** | *** | *** | *** |
| All honey colors | Quantity | *** | *** | *** | *** | *** |
| White or lighter | Value | *** | *** | *** | *** | *** |
| Extra light amber | Value | *** | *** | *** | *** | *** |
| Light amber | Value | *** | *** | *** | *** | *** |
| Amber or darker | Value | *** | *** | *** | *** | *** |
| All honey colors | Value | *** | *** | *** | *** | *** |
| White or lighter | Unit value | *** | *** | *** | *** | *** |
| Extra light amber | Unit value | *** | *** | *** | *** | *** |
| Light amber | Unit value | *** | *** | *** | *** | *** |
| Amber or darker | Unit value | *** | *** | *** | *** | *** |
| All honey colors | Unit value | *** | *** | *** | *** | *** |
| White or lighter | Share of quantity | *** | *** | *** | *** | *** |
| Extra light amber | Share of quantity | *** | *** | *** | *** | *** |
| Light amber | Share of quantity | *** | *** | *** | *** | *** |
| Amber or darker | Share of quantity | *** | *** | *** | *** | *** |
| All honey colors | Share of quantity | *** | *** | *** | *** | *** |
| White or lighter | Share of value | *** | *** | *** | *** | *** |
| Extra light amber | Share of value | *** | *** | *** | *** | *** |
| Light amber | Share of value | *** | *** | *** | *** | *** |
| Amber or darker | Share of value | *** | *** | *** | *** | *** |
| All honey colors | Share of value | *** | *** | *** | *** | *** |

Source:  Compiled from data submitted in response to Commission questionnaires.

Note:  Shares and ratios shown as "0.0" represent values greater than zero, but less than "0.05" percent. Zeroes, null values, and undefined calculations are suppressed and shown as "---".

**Table E-9**
**Raw honey: U.S. producers' and importers' U.S. shipments unit values by source, color, and period**

Unit values in dollars per pound

| Source | Honey color | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| United States | White or lighter | 1.76 | 1.57 | 1.59 | 1.60 | 1.69 |
| Argentina | White or lighter | *** | *** | *** | *** | *** |
| Brazil | White or lighter | *** | *** | *** | *** | *** |
| India | White or lighter | *** | *** | *** | *** | *** |
| Vietnam | White or lighter | *** | *** | *** | *** | *** |
| Subject sources | White or lighter | *** | *** | *** | *** | *** |
| Nonsubject sources | White or lighter | *** | *** | *** | *** | *** |
| All import sources | White or lighter | *** | *** | *** | *** | *** |
| United States | Extra light amber | 1.87 | 1.65 | 1.56 | 1.51 | 1.76 |
| Argentina | Extra light amber | *** | *** | *** | *** | *** |
| Brazil | Extra light amber | *** | *** | *** | *** | *** |
| India | Extra light amber | *** | *** | *** | *** | *** |
| Vietnam | Extra light amber | *** | *** | *** | *** | *** |
| Subject sources | Extra light amber | *** | *** | *** | *** | *** |
| Nonsubject sources | Extra light amber | *** | *** | *** | *** | *** |
| All import sources | Extra light amber | *** | *** | *** | *** | *** |
| United States | Light amber | 1.73 | 1.54 | 1.60 | 1.62 | 1.96 |
| Argentina | Light amber | *** | *** | *** | *** | *** |
| Brazil | Light amber | *** | *** | *** | *** | *** |
| India | Light amber | *** | *** | *** | *** | *** |
| Vietnam | Light amber | *** | *** | *** | *** | *** |
| Subject sources | Light amber | *** | *** | *** | *** | *** |
| Nonsubject sources | Light amber | *** | *** | *** | *** | *** |
| All import sources | Light amber | *** | *** | *** | *** | *** |

Table continued.

**Table E-9 continued**
**Raw honey: U.S. producers' and importers' U.S. shipments unit values by source, color, and period**

Unit values in dollars per pound

| Source | Honey color | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| United States | Amber or darker | 1.60 | 1.25 | 1.38 | 1.40 | 1.96 |
| Argentina | Amber or darker | *** | *** | *** | *** | *** |
| Brazil | Amber or darker | *** | *** | *** | *** | *** |
| India | Amber or darker | *** | *** | *** | *** | *** |
| Vietnam | Amber or darker | *** | *** | *** | *** | *** |
| Subject sources | Amber or darker | *** | *** | *** | *** | *** |
| Nonsubject sources | Amber or darker | *** | *** | *** | *** | *** |
| All import sources | Amber or darker | *** | *** | *** | *** | *** |
| United States | All honey colors | 1.78 | 1.57 | 1.58 | 1.58 | 1.75 |
| Argentina | All honey colors | *** | *** | *** | *** | *** |
| Brazil | All honey colors | *** | *** | *** | *** | *** |
| India | All honey colors | *** | *** | *** | *** | *** |
| Vietnam | All honey colors | *** | *** | *** | *** | *** |
| Subject sources | All honey colors | *** | *** | *** | *** | *** |
| Nonsubject sources | All honey colors | *** | *** | *** | *** | *** |
| All import sources | All honey colors | *** | *** | *** | *** | *** |

Source:  Compiled from data submitted in response to Commission questionnaires.

Note:  Shares and ratios shown as "0.0" represent values greater than zero, but less than "0.05" percent. Zeroes, null values, and undefined calculations are suppressed and shown as "---".

**APPENDIX F**

**U.S. SHIPMENTS BY PRODUCT TYPE**

Table F-1: Larger U.S. producers' U.S. shipments, by product type and period ........................ F-4

Table F-2: U.S. importers' U.S. shipments of imports from Argentina, by product type and period ........................................................................................................................ F-5

Table F-3: U.S. importers' U.S. shipments of imports from Brazil, by product type and period. F-6

Table F-4: U.S. importers' U.S. shipments of imports from India, by product type and period . F-7

Table F-5: U.S. importers' U.S. shipments of imports from Vietnam, by product type and period ........................................................................................................................ F-8

Table F-6: U.S. importers' U.S. shipments of imports from subject sources, by product type and period ........................................................................................................................ F-9

Table F-7: U.S. importers' U.S. shipments of imports from nonsubject sources, by product type and period ...................................................................................................................... F-10

Table F-8: U.S. importers' U.S. shipments of imports from all import sources, by product type and period ...................................................................................................................... F-11

Table F-9: U.S. producers' and U.S. importers' U.S. shipments unit values by source, and period ...................................................................................................................... F-12

**Table F-1**
**Raw honey: Larger U.S. producers' U.S. shipments, by product type and period**

Quantity in 1,000 pounds; Value in 1,000 dollars; Unit values in dollars per pound; Shares in percent

| Product type | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| Organic | Quantity | --- | --- | --- | --- | --- |
| Conventional | Quantity | 34,599 | 34,238 | 36,992 | 29,210 | 32,822 |
| All product types | Quantity | 34,599 | 34,238 | 36,992 | 29,210 | 32,822 |
| Organic | Value | --- | --- | --- | --- | --- |
| Conventional | Value | 61,485 | 53,924 | 58,425 | 46,115 | 57,457 |
| All product types | Value | 61,485 | 53,924 | 58,425 | 46,115 | 57,457 |
| Organic | Unit value | --- | --- | --- | --- | --- |
| Conventional | Unit value | 1.78 | 1.57 | 1.58 | 1.58 | 1.75 |
| All product types | Unit value | 1.78 | 1.57 | 1.58 | 1.58 | 1.75 |
| Organic | Share of quantity | --- | --- | --- | --- | --- |
| Conventional | Share of quantity | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| All product types | Share of quantity | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Organic | Share of value | --- | --- | --- | --- | --- |
| Conventional | Share of value | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| All product types | Share of value | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source:  Compiled from data submitted in response to Commission questionnaires.

Note:  Shares and ratios shown as "0.0" represent values greater than zero, but less than "0.05" percent.
Zeroes, null values, and undefined calculations are suppressed and shown as "---".

**Table F-2**
**Raw honey: U.S. importers' U.S. shipments of imports from Argentina, by product type and period**

Quantity in 1,000 pounds; Value in 1,000 dollars; Unit values in dollars per pound; Shares in percent

| Product type | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| Organic | Quantity | 449 | 570 | 3,687 | 2,192 | 1,942 |
| Conventional | Quantity | 79,390 | 79,812 | 83,887 | 65,947 | 76,762 |
| All product types | Quantity | 79,839 | 80,382 | 87,574 | 68,139 | 78,703 |
| Organic | Value | 729 | 673 | 4,369 | 2,489 | 2,756 |
| Conventional | Value | 88,728 | 82,915 | 92,511 | 71,101 | 124,837 |
| All product types | Value | 89,457 | 83,588 | 96,880 | 73,591 | 127,592 |
| Organic | Unit value | 1.62 | 1.18 | 1.19 | 1.14 | 1.42 |
| Conventional | Unit value | 1.12 | 1.04 | 1.10 | 1.08 | 1.63 |
| All product types | Unit value | 1.12 | 1.04 | 1.11 | 1.08 | 1.62 |
| Organic | Share of quantity | 0.6 | 0.7 | 4.2 | 3.2 | 2.5 |
| Conventional | Share of quantity | 99.4 | 99.3 | 95.8 | 96.8 | 97.5 |
| All product types | Share of quantity | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Organic | Share of value | 0.8 | 0.8 | 4.5 | 3.4 | 2.2 |
| Conventional | Share of value | 99.2 | 99.2 | 95.5 | 96.6 | 97.8 |
| All product types | Share of value | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022. U.S. import statistics are based on imports for consumption and landed duty paid value.

**Table F-3**
**Raw honey: U.S. importers' U.S. shipments of imports from Brazil, by product type and period**

Quantity in 1,000 pounds; Value in 1,000 dollars; Unit values in dollars per pound; Shares in percent

| Product type | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| Organic | Quantity | 47,347 | 46,999 | 65,844 | 52,299 | 63,044 |
| Conventional | Quantity | 4,662 | 5,694 | 9,528 | 6,769 | 5,800 |
| All product types | Quantity | 52,009 | 52,693 | 75,371 | 59,068 | 68,843 |
| Organic | Value | 74,278 | 51,351 | 63,018 | 48,270 | 100,101 |
| Conventional | Value | 7,704 | 6,777 | 10,202 | 6,387 | 9,315 |
| All product types | Value | 81,982 | 58,128 | 73,220 | 54,657 | 109,415 |
| Organic | Unit value | 1.57 | 1.09 | 0.96 | 0.92 | 1.59 |
| Conventional | Unit value | 1.65 | 1.19 | 1.07 | 0.94 | 1.61 |
| All product types | Unit value | 1.58 | 1.10 | 0.97 | 0.93 | 1.59 |
| Organic | Share of quantity | 91.0 | 89.2 | 87.4 | 88.5 | 91.6 |
| Conventional | Share of quantity | 9.0 | 10.8 | 12.6 | 11.5 | 8.4 |
| All product types | Share of quantity | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Organic | Share of value | 90.6 | 88.3 | 86.1 | 88.3 | 91.5 |
| Conventional | Share of value | 9.4 | 11.7 | 13.9 | 11.7 | 8.5 |
| All product types | Share of value | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022. U.S. import statistics are based on imports for consumption and landed duty paid value.

**Table F-4**
**Raw honey: U.S. importers' U.S. shipments of imports from India, by product type and period**

Quantity in 1,000 pounds; Value in 1,000 dollars; Unit values in dollars per pound; Shares in percent

| Product type | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| Organic | Quantity | 731 | 1,246 | 2,653 | 1,526 | 5,508 |
| Conventional | Quantity | 95,484 | 108,066 | 79,964 | 64,040 | 101,395 |
| All product types | Quantity | 96,215 | 109,312 | 82,617 | 65,566 | 106,903 |
| Organic | Value | 931 | 1,108 | 2,125 | 1,255 | 6,273 |
| Conventional | Value | 80,079 | 85,163 | 60,517 | 48,603 | 99,374 |
| All product types | Value | 81,011 | 86,271 | 62,641 | 49,858 | 105,647 |
| Organic | Unit value | 1.27 | 0.89 | 0.80 | 0.82 | 1.14 |
| Conventional | Unit value | 0.84 | 0.79 | 0.76 | 0.76 | 0.98 |
| All product types | Unit value | 0.84 | 0.79 | 0.76 | 0.76 | 0.99 |
| Organic | Share of quantity | 0.8 | 1.1 | 3.2 | 2.3 | 5.2 |
| Conventional | Share of quantity | 99.2 | 98.9 | 96.8 | 97.7 | 94.8 |
| All product types | Share of quantity | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Organic | Share of value | 1.1 | 1.3 | 3.4 | 2.5 | 5.9 |
| Conventional | Share of value | 98.9 | 98.7 | 96.6 | 97.5 | 94.1 |
| All product types | Share of value | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022. U.S. import statistics are based on imports for consumption and landed duty paid value.

**Table F-5**
**Raw honey: U.S. importers' U.S. shipments of imports from Vietnam, by product type and period**

Quantity in 1,000 pounds; Value in 1,000 dollars; Unit values in dollars per pound; Shares in percent

| Product type | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| Organic | Quantity | --- | 421 | 502 | 502 | 496 |
| Conventional | Quantity | 86,325 | 81,105 | 110,854 | 80,561 | 98,978 |
| All product types | Quantity | 86,325 | 81,526 | 111,356 | 81,063 | 99,475 |
| Organic | Value | --- | 272 | 298 | 298 | 384 |
| Conventional | Value | 61,769 | 52,559 | 68,060 | 49,221 | 79,566 |
| All product types | Value | 61,769 | 52,830 | 68,358 | 49,519 | 79,950 |
| Organic | Unit value | --- | 0.64 | 0.59 | 0.59 | 0.77 |
| Conventional | Unit value | 0.72 | 0.65 | 0.61 | 0.61 | 0.80 |
| All product types | Unit value | 0.72 | 0.65 | 0.61 | 0.61 | 0.80 |
| Organic | Share of quantity | --- | 0.5 | 0.5 | 0.6 | 0.5 |
| Conventional | Share of quantity | 100.0 | 99.5 | 99.5 | 99.4 | 99.5 |
| All product types | Share of quantity | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Organic | Share of value | --- | 0.5 | 0.4 | 0.6 | 0.5 |
| Conventional | Share of value | 100.0 | 99.5 | 99.6 | 99.4 | 99.5 |
| All product types | Share of value | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022. U.S. import statistics are based on imports for consumption and landed duty paid value.

Note:  Shares and ratios shown as "0.0" represent values greater than zero, but less than "0.05" percent. Zeroes, null values, and undefined calculations are suppressed and shown as "---".

**Table F-6**
**Raw honey: U.S. importers' U.S. shipments of imports from subject sources, by product type and period**

Quantity in 1,000 pounds; Value in 1,000 dollars; Unit values in dollars per pound; Shares in percent

| Product type | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| Organic | Quantity | 48,527 | 49,237 | 72,686 | 56,519 | 70,990 |
| Conventional | Quantity | 265,860 | 274,676 | 284,233 | 217,317 | 282,935 |
| All product types | Quantity | 314,387 | 323,913 | 356,918 | 273,836 | 353,925 |
| Organic | Value | 75,938 | 53,404 | 69,810 | 52,312 | 109,513 |
| Conventional | Value | 238,280 | 227,413 | 231,291 | 175,312 | 313,092 |
| All product types | Value | 314,218 | 280,817 | 301,100 | 227,624 | 422,605 |
| Organic | Unit value | 1.56 | 1.08 | 0.96 | 0.93 | 1.54 |
| Conventional | Unit value | 0.90 | 0.83 | 0.81 | 0.81 | 1.11 |
| All product types | Unit value | 1.00 | 0.87 | 0.84 | 0.83 | 1.19 |
| Organic | Share of quantity | 15.4 | 15.2 | 20.4 | 20.6 | 20.1 |
| Conventional | Share of quantity | 84.6 | 84.8 | 79.6 | 79.4 | 79.9 |
| All product types | Share of quantity | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Organic | Share of value | 24.2 | 19.0 | 23.2 | 23.0 | 25.9 |
| Conventional | Share of value | 75.8 | 81.0 | 76.8 | 77.0 | 74.1 |
| All product types | Share of value | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022. U.S. import statistics are based on imports for consumption and landed duty paid value.

**Table F-7**
**Raw honey: U.S. importers' U.S. shipments of imports from nonsubject sources, by product type and period**

Quantity in 1,000 pounds; Value in 1,000 dollars; Unit values in dollars per pound; Shares in percent

| Product type | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| Organic | Quantity | 3,186 | 3,323 | 7,775 | 5,124 | 3,592 |
| Conventional | Quantity | 84,875 | 57,873 | 56,752 | 42,348 | 36,530 |
| All product types | Quantity | 88,061 | 61,196 | 64,528 | 47,473 | 40,122 |
| Organic | Value | 6,656 | 5,288 | 9,695 | 6,683 | 6,214 |
| Conventional | Value | 124,157 | 90,055 | 84,922 | 64,101 | 75,865 |
| All product types | Value | 130,813 | 95,342 | 94,618 | 70,784 | 82,079 |
| Organic | Unit value | 2.09 | 1.59 | 1.25 | 1.30 | 1.73 |
| Conventional | Unit value | 1.46 | 1.56 | 1.50 | 1.51 | 2.08 |
| All product types | Unit value | 1.49 | 1.56 | 1.47 | 1.49 | 2.05 |
| Organic | Share of quantity | 3.6 | 5.4 | 12.0 | 10.8 | 9.0 |
| Conventional | Share of quantity | 96.4 | 94.6 | 88.0 | 89.2 | 91.0 |
| All product types | Share of quantity | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Organic | Share of value | 5.1 | 5.5 | 10.2 | 9.4 | 7.6 |
| Conventional | Share of value | 94.9 | 94.5 | 89.8 | 90.6 | 92.4 |
| All product types | Share of value | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022. U.S. import statistics are based on imports for consumption and landed duty paid value.

**Table F-8**
**Raw honey: U.S. importers' U.S. shipments of imports from all imports sources, by product type and period**

Quantity in 1,000 pounds; Value in 1,000 dollars; Unit values in dollars per pound; Shares in percent

| Product type | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| Organic | Quantity | 51,712 | 52,560 | 80,461 | 61,643 | 74,582 |
| Conventional | Quantity | 350,735 | 332,549 | 340,985 | 259,665 | 319,465 |
| All product types | Quantity | 402,448 | 385,109 | 421,446 | 321,309 | 394,047 |
| Organic | Value | 82,594 | 58,692 | 79,505 | 58,994 | 115,727 |
| Conventional | Value | 362,437 | 317,468 | 316,213 | 239,413 | 388,957 |
| All product types | Value | 445,031 | 376,160 | 395,718 | 298,408 | 504,684 |
| Organic | Unit value | 1.60 | 1.12 | 0.99 | 0.96 | 1.55 |
| Conventional | Unit value | 1.03 | 0.95 | 0.93 | 0.92 | 1.22 |
| All product types | Unit value | 1.11 | 0.98 | 0.94 | 0.93 | 1.28 |
| Organic | Share of quantity | 12.8 | 13.6 | 19.1 | 19.2 | 18.9 |
| Conventional | Share of quantity | 87.2 | 86.4 | 80.9 | 80.8 | 81.1 |
| All product types | Share of quantity | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Organic | Share of value | 18.6 | 15.6 | 20.1 | 19.8 | 22.9 |
| Conventional | Share of value | 81.4 | 84.4 | 79.9 | 80.2 | 77.1 |
| All product types | Share of value | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022. U.S. import statistics are based on imports for consumption and landed duty paid value.

**Table F-9**
**Raw honey: U.S. producers' and U.S. importers' U.S. shipments unit values by source, product type, and period**

Unit values in dollars per pound

| Source | Honey color | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|--------|-------------|------|------|------|--------------|--------------|
| United States | Organic | --- | --- | --- | --- | --- |
| Argentina | Organic | 1.62 | 1.18 | 1.19 | 1.14 | 1.42 |
| Brazil | Organic | 1.57 | 1.09 | 0.96 | 0.92 | 1.59 |
| India | Organic | 1.27 | 0.89 | 0.80 | 0.82 | 1.14 |
| Vietnam | Organic | --- | 0.64 | 0.59 | 0.59 | 0.77 |
| Subject sources | Organic | 1.56 | 1.08 | 0.96 | 0.93 | 1.54 |
| Nonsubject sources | Organic | 2.09 | 1.59 | 1.25 | 1.30 | 1.73 |
| All import sources | Organic | 1.60 | 1.12 | 0.99 | 0.96 | 1.55 |
| United States | Conventional | 1.78 | 1.57 | 1.58 | 1.58 | 1.75 |
| Argentina | Conventional | 1.12 | 1.04 | 1.10 | 1.08 | 1.63 |
| Brazil | Conventional | 1.65 | 1.19 | 1.07 | 0.94 | 1.61 |
| India | Conventional | 0.84 | 0.79 | 0.76 | 0.76 | 0.98 |
| Vietnam | Conventional | 0.72 | 0.65 | 0.61 | 0.61 | 0.80 |
| Subject sources | Conventional | 0.90 | 0.83 | 0.81 | 0.81 | 1.11 |
| Nonsubject sources | Conventional | 1.46 | 1.56 | 1.50 | 1.51 | 2.08 |
| All import sources | Conventional | 1.03 | 0.95 | 0.93 | 0.92 | 1.22 |
| United States | All types | 1.78 | 1.57 | 1.58 | 1.58 | 1.75 |
| Argentina | All types | 1.12 | 1.04 | 1.11 | 1.08 | 1.62 |
| Brazil | All types | 1.58 | 1.10 | 0.97 | 0.93 | 1.59 |
| India | All types | 0.84 | 0.79 | 0.76 | 0.76 | 0.99 |
| Vietnam | All types | 0.72 | 0.65 | 0.61 | 0.61 | 0.80 |
| Subject sources | All types | 1.00 | 0.87 | 0.84 | 0.83 | 1.19 |
| Nonsubject sources | All types | 1.49 | 1.56 | 1.47 | 1.49 | 2.05 |
| All import sources | All types | 1.11 | 0.98 | 0.94 | 0.93 | 1.28 |

Source: Compiled from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022. U.S. import statistics are based on imports for consumption and landed duty paid value.

Note:  Shares and ratios shown as "0.0" represent values greater than zero, but less than "0.05" percent. Zeroes, null values, and undefined calculations are suppressed and shown as "---".

**APPENDIX G**

**APPARENT CONSUMPTION AND INVENTORIES WITH FULL YEAR 2021**

Table G-1: Apparent U.S. consumption and market shares based on quantity including full year 2021, by source and period ................................................................................................................G-4

Figure G-1: Apparent U.S. consumption based on quantity including full year 2021, by source and period ................................................................................................................G-5

Table G-2: Apparent U.S. consumption and market shares based on value including full year 2021, by source and period ................................................................................................................G-6

Figure G-2: Apparent U.S. consumption based on value including full year 2021, by source and period ................................................................................................................G-7

Table G-3: U.S producers' ending stocks and their ratio to select items, by period .................G-8

G-3

**Table G-1**
**Raw honey: Apparent U.S. consumption and market shares based on quantity including full year 2021, by source and period**

Quantity in 1,000 pounds; Share in percent

| Source | Measure | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|
| U.S. producers | Quantity | 150,778 | 153,222 | 141,694 | 121,693 |
| Argentina | Quantity | 79,839 | 78,083 | 84,935 | 94,337 |
| Brazil | Quantity | 52,009 | 52,693 | 75,371 | 70,395 |
| India | Quantity | 96,215 | 106,910 | 79,997 | 122,505 |
| Vietnam | Quantity | 83,335 | 81,526 | 111,356 | 123,224 |
| Subject sources | Quantity | 311,397 | 319,212 | 351,660 | 410,461 |
| Canada | Quantity | 32,142 | 16,333 | 8,614 | 6,214 |
| Ukraine | Quantity | 18,168 | 19,051 | 24,161 | 13,024 |
| All other sources | Quantity | 34,902 | 23,375 | 30,857 | 36,034 |
| Nonsubject sources | Quantity | 85,212 | 58,760 | 63,633 | 55,272 |
| All import sources | Quantity | 396,609 | 377,972 | 415,292 | 465,732 |
| All sources | Quantity | 547,387 | 531,194 | 556,986 | 587,425 |
| U.S. producers | Share | 27.5 | 28.8 | 25.4 | 20.7 |
| Argentina | Share | 14.6 | 14.7 | 15.2 | 16.1 |
| Brazil | Share | 9.5 | 9.9 | 13.5 | 12.0 |
| India | Share | 17.6 | 20.1 | 14.4 | 20.9 |
| Vietnam | Share | 15.2 | 15.3 | 20.0 | 21.0 |
| Subject sources | Share | 56.9 | 60.1 | 63.1 | 69.9 |
| Canada | Share | 5.9 | 3.1 | 1.5 | 1.1 |
| Ukraine | Share | 3.3 | 3.6 | 4.3 | 2.2 |
| All other sources | Share | 6.4 | 4.4 | 5.5 | 6.1 |
| Nonsubject sources | Share | 15.6 | 11.1 | 11.4 | 9.4 |
| All import sources | Share | 72.5 | 71.2 | 74.6 | 79.3 |
| All sources | Share | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from official U.S. agricultural statistics National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022 and from official U.S. export statistics of the U.S. Department of Commerce using schedule B number 0409.00.0055, accessed February 22, 2022. U.S. import statistics are based on imports for consumption and landed duty paid value and U.S. exports statistics are based on foreign-origin exports (also known as re-exports). Re-exports are deducted from each individual country source based on submitted questionnaire experience. Domestic exports (not shown separately in the table) are netted out of the NASS data used for U.S. producers.

**Figure G-1**
**Raw honey: Apparent U.S. consumption based on quantity including full year 2021, by source and period**



Source: Compiled from official U.S. agricultural statistics National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022 and from official U.S. export statistics of the U.S. Department of Commerce using schedule B number 0409.00.0055, accessed February 22, 2022. U.S. import statistics are based on imports for consumption and landed duty paid value and U.S. exports statistics are based on foreign-origin exports (also known as re-exports). Re-exports are deducted from each individual country source based on submitted questionnaire experience. Domestic exports are netted out of the NASS data used for U.S. producers.

**Table G-2**
**Raw honey: Apparent U.S. consumption and market shares based on value including full year 2021, by source and period**

Value in 1,000 dollars; Share in percent

| Source | Measure | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|
| U.S. producers | Value | 335,134 | 307,192 | 301,592 | 313,536 |
| Argentina | Value | 89,457 | 81,194 | 94,106 | 153,780 |
| Brazil | Value | 81,982 | 58,128 | 73,220 | 113,606 |
| India | Value | 81,011 | 84,015 | 59,877 | 122,999 |
| Vietnam | Value | 58,289 | 52,830 | 68,358 | 99,390 |
| Subject sources | Value | 310,738 | 276,168 | 295,562 | 489,775 |
| Canada | Value | 45,656 | 23,275 | 12,873 | 12,524 |
| Ukraine | Value | 17,067 | 17,381 | 20,139 | 13,484 |
| All other sources | Value | 64,403 | 50,456 | 59,925 | 92,241 |
| Nonsubject sources | Value | 127,125 | 91,112 | 92,938 | 118,249 |
| All import sources | Value | 437,863 | 367,279 | 388,500 | 608,024 |
| All sources | Value | 772,997 | 674,471 | 690,092 | 921,560 |
| U.S. producers | Share | 43.4 | 45.5 | 43.7 | 34.0 |
| Argentina | Share | 11.6 | 12.0 | 13.6 | 16.7 |
| Brazil | Share | 10.6 | 8.6 | 10.6 | 12.3 |
| India | Share | 10.5 | 12.5 | 8.7 | 13.3 |
| Vietnam | Share | 7.5 | 7.8 | 9.9 | 10.8 |
| Subject sources | Share | 40.2 | 40.9 | 42.8 | 53.1 |
| Canada | Share | 5.9 | 3.5 | 1.9 | 1.4 |
| Ukraine | Share | 2.2 | 2.6 | 2.9 | 1.5 |
| All other sources | Share | 8.3 | 7.5 | 8.7 | 10.0 |
| Nonsubject sources | Share | 16.4 | 13.5 | 13.5 | 12.8 |
| All import sources | Share | 56.6 | 54.5 | 56.3 | 66.0 |
| All sources | Share | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from official U.S. agricultural statistics National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022 and from official U.S. export statistics of the U.S. Department of Commerce using schedule B number 0409.00.0055, accessed February 22, 2022. U.S. import statistics are based on imports for consumption and landed duty paid value and U.S. exports statistics are based on foreign-origin exports (also known as re-exports). Re-exports are deducted from each individual country source based on submitted questionnaire experience. Domestic exports (not shown separately in the table) are netted out of the NASS data used for U.S. producers.

**Figure G-2**
**Raw honey: Apparent U.S. consumption based on value including full year 2021, by source and period**



Source: Compiled from official U.S. agricultural statistics National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022 and from official U.S. export statistics of the U.S. Department of Commerce using schedule B number 0409.00.0055, accessed February 22, 2022. U.S. import statistics are based on imports for consumption and landed duty paid value and U.S. exports statistics are based on foreign-origin exports (also known as re-exports). Re-exports are deducted from each individual country source based on submitted questionnaire experience. Domestic exports are netted out of the NASS data used for U.S. producers.

**Table G-3**
**Raw honey: U.S producers' ending stocks and their ratio to select items, by period**

Quantity in 1,000 pounds; Inventory ratios in percent

| Item | 2018 | 2019 | 2020 | 2021 |
|------|------|------|------|------|
| Ending stocks quantity | 29,303 | 40,861 | 39,715 | 23,527 |
| Inventory ratio to U.S. production | 19.0 | 26.0 | 26.9 | 18.6 |
| Inventory ratio to U.S. shipments | 19.4 | 26.7 | 28.0 | 19.3 |

Source:  Compiled from data reported by the National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), accessed March 20, 2022.

**APPENDIX H**

**RELATED PARTY EXCLUSION TRADE DATA**

Table H-1: U.S. producers' production and average yield per colony excluding two U.S. producers *** and ***, by period ............................................................H-4

Figure H-1: U.S. producers' production and average yield per colony excluding two U.S. producers *** and ***, by period ............................................................H-4

Table H-2: U.S. producers' shipments by location of shipment excluding two U.S. producers' *** and ***, by period ............................................................H-5

Table H-3: Large U.S. producers' inventories and their ratio to select items excluding two U.S. producers *** and ***, by period ............................................................H-5

Table H-4: All U.S. producers' inventories and their ratio to select items excluding two U.S. producers *** and ***, by period ............................................................H-6

Table H-5: Large U.S. producers' employment related information excluding two U.S. producers' *** and ***, by item and period ............................................................H-6

Table H-6: All U.S. producers' employment related information excluding two U.S. producers *** and ***, by item and period ............................................................H-6

Table H-7: Apparent U.S. consumption and market shares based on quantity, by source and period ............................................................H-7

Table H-8: Apparent U.S. consumption and market shares based on value, by source and period ............................................................H-8

H-3

**Table H-1**
**Raw honey: U.S. producers' production and average yield per colony excluding two U.S.
producers *** and ***, by period**

Quantity in 1,000 pounds; Yield in pounds per colony

| Item | 2018 | 2019 | 2020 | 2021 |
|------|------|------|------|------|
| Production (1,000 pounds) | *** | *** | *** | *** |
| Yield (pounds per colony) | *** | *** | *** | *** |

Source:  Compiled from data reported by the National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), accessed March 20, 2022 and from data submitted in response to Commission questionnaires.

Note: Data presented for 2021 appear under interim period Jan-Sep 2021 in table C-2 as footnoted in that table.

**Figure H-1**
**Raw honey: U.S. producers' production and average yield per colony excluding two U.S.
producers *** and ***, by period**

*       *       *       *       *       *       *

Source:  Compiled from data reported by the National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), accessed March 20, 2022 and from data submitted in response to Commission questionnaires.

H-4

**Table H-2**
**Raw honey: U.S producers' shipments by location of shipment excluding two U.S. producers \*\*\* and \*\*\*, by period**

Quantity in 1,000 pounds; Value in 1,000 dollars; Unit values in dollars per pound; Shares in percent

| Item | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|------|---------|------|------|------|--------------|--------------|
| U.S. shipments | Quantity | *** | *** | *** | *** | *** |
| Export shipments | Quantity | *** | *** | *** | *** | *** |
| Total shipments | Quantity | *** | *** | *** | *** | *** |
| U.S. shipments | Value | *** | *** | *** | *** | *** |
| Export shipments | Value | *** | *** | *** | *** | *** |
| Total shipments | Value | *** | *** | *** | *** | *** |
| U.S. shipments | Unit value | *** | *** | *** | *** | *** |
| Export shipments | Unit value | *** | *** | *** | *** | *** |
| Total shipments | Unit value | *** | *** | *** | *** | *** |
| U.S. shipments | Share of quantity | *** | *** | *** | *** | *** |
| Export shipments | Share of quantity | *** | *** | *** | *** | *** |
| Total shipments | Share of quantity | *** | *** | *** | *** | *** |
| U.S. shipments | Share of value | *** | *** | *** | *** | *** |
| Export shipments | Share of value | *** | *** | *** | *** | *** |
| Total shipments | Share of value | *** | *** | *** | *** | *** |

Source:  Compiled from data reported by the National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), accessed March 20, 2022, domestic U.S. exports reported by the Census Bureau of the U.S. Department of Commerce using schedule B number 0409.00.0055, accessed February 22, 2022 and from data submitted in response to Commission questionnaires.

Note:  Partial year period U.S. shipments are derived using the full year NASS data for 2020 and 2021 adjusted down for the partial year period using the share of annual U.S. producer shipments reported between January to September in questionnaire responses to the preliminary investigation and further adjusted to exclude two U.S. producers.

**Table H-3**
**Raw honey: Large U.S. producers' inventories and their ratio to select items excluding two U.S. producers \*\*\* and \*\*\*, by period**

Quantity in 1,000 pounds; Inventory ratios in percent

| Item | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|------|------|------|------|--------------|--------------|
| End-of-period inventory quantity | *** | *** | *** | *** | *** |
| Inventory ratio to U.S. production | *** | *** | *** | *** | *** |
| Inventory ratio to U.S. shipments | *** | *** | *** | *** | *** |
| Inventory ratio to total shipments | *** | *** | *** | *** | *** |

Source:  Compiled from data submitted in response to Commission questionnaires.

H-5

**Table H-4**
**Raw honey: All U.S. producers' inventories and their ratio to select items excluding two U.S. producers *** and ***, by period**

Quantity in 1,000 pounds; Inventory ratios in percent

| Item | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|------|------|------|------|--------------|--------------|
| End-of-period inventory quantity | *** | *** | *** | *** | *** |
| Inventory ratio to U.S. production | *** | *** | *** | *** | *** |
| Inventory ratio to U.S. shipments | *** | *** | *** | *** | *** |
| Inventory ratio to total shipments | *** | *** | *** | *** | *** |

Source:  Compiled from data submitted in response to Commission questionnaires.

**Table H-5**
**Raw honey: Large U.S. producers' employment related information excluding two U.S. producers' *** and ***, by item and period**

Quantity in 1,000 pounds; Inventory ratios in percent

| Item | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|------|------|------|------|--------------|--------------|
| Production and related workers (PRWs) (number) | *** | *** | *** | *** | *** |
| Total hours worked (1,000 hours) | *** | *** | *** | *** | *** |
| Wages paid ($1,000) | *** | *** | *** | *** | *** |
| Hours worked per PRW (hours) | *** | *** | *** | *** | *** |
| Hourly wages (dollars per hour) | *** | *** | *** | *** | *** |
| Productivity (pounds per hour) | *** | *** | *** | *** | *** |
| Unit labor costs (dollars per pound) | *** | *** | *** | *** | *** |

Source:  Compiled from data submitted in response to Commission questionnaires.

Note: Wage based metrics includes large producer compensated and the estimated large producer non-compensated wage data.

**Table H-6**
**Raw honey: All U.S. producers' employment related information excluding two U.S. producers *** and ***, by item and period**

| Item | 2018 | 2019 | 2020 |
|------|------|------|------|
| Production and related workers (PRWs) (number) | *** | *** | *** |
| Total hours worked (1,000 hours) | *** | *** | *** |
| Hours worked per PRW (hours) | *** | *** | *** |
| Wages paid ($1,000) | *** | *** | *** |
| Hourly wages (dollars per hour) | *** | *** | *** |
| Productivity (pounds per hour) | *** | *** | *** |
| Unit labor costs (dollars per pound) | *** | *** | *** |

Source:  Compiled from data submitted in response to Commission questionnaires.

Note: Wage based metrics for all U.S. producers includes large producer compensated, the estimated large producer non-compensated and derived small producers wage data.

**Table H-7**
**Raw honey: Apparent U.S. consumption and market shares based on quantity, by source and period**

Quantity in 1,000 pounds; Shares in percent

| Source | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| Included U.S. producers | Quantity | *** | *** | *** | *** | *** |
| Excluded U.S. producers | Quantity | *** | *** | *** | *** | *** |
| All U.S. producers | Quantity | 150,778 | 153,222 | 141,694 | 82,357 | 70,732 |
| Argentina | Quantity | 79,839 | 78,083 | 84,935 | 65,788 | 78,703 |
| Brazil | Quantity | 52,009 | 52,693 | 75,371 | 59,068 | 64,776 |
| India | Quantity | 96,215 | 106,910 | 79,997 | 63,231 | 105,902 |
| Vietnam | Quantity | 83,335 | 81,526 | 111,356 | 81,063 | 99,475 |
| Subject sources | Quantity | 311,397 | 319,212 | 351,660 | 269,150 | 348,856 |
| Canada | Quantity | 32,142 | 16,333 | 8,614 | 6,891 | 3,971 |
| Ukraine | Quantity | 18,168 | 19,051 | 24,161 | 16,652 | 12,883 |
| All other sources | Quantity | 34,902 | 23,375 | 30,857 | 23,929 | 23,146 |
| Nonsubject sources | Quantity | 85,212 | 58,760 | 63,633 | 47,473 | 40,000 |
| All import sources | Quantity | 396,609 | 377,972 | 415,292 | 316,622 | 388,856 |
| All sources | Quantity | 547,387 | 531,194 | 556,986 | 398,979 | 459,587 |
| Included U.S. producers | Share | *** | *** | *** | *** | *** |
| Excluded U.S. producers | Share | *** | *** | *** | *** | *** |
| All U.S. producers | Share | 27.5 | 28.8 | 25.4 | 20.6 | 15.4 |
| Argentina | Share | 14.6 | 14.7 | 15.2 | 16.5 | 17.1 |
| Brazil | Share | 9.5 | 9.9 | 13.5 | 14.8 | 14.1 |
| India | Share | 17.6 | 20.1 | 14.4 | 15.8 | 23.0 |
| Vietnam | Share | 15.2 | 15.3 | 20.0 | 20.3 | 21.6 |
| Subject sources | Share | 56.9 | 60.1 | 63.1 | 67.5 | 75.9 |
| Canada | Share | 5.9 | 3.1 | 1.5 | 1.7 | 0.9 |
| Ukraine | Share | 3.3 | 3.6 | 4.3 | 4.2 | 2.8 |
| All other sources | Share | 6.4 | 4.4 | 5.5 | 6.0 | 5.0 |
| Nonsubject sources | Share | 15.6 | 11.1 | 11.4 | 11.9 | 8.7 |
| All import sources | Share | 72.5 | 71.2 | 74.6 | 79.4 | 84.6 |
| All sources | Share | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from official U.S. agricultural statistics National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022 and from official U.S. export statistics of the U.S. Department of Commerce using schedule B number 0409.00.0055, accessed February 22, 2022. U.S. import statistics are based on imports for consumption and landed duty paid value and U.S. exports statistics are based on foreign-origin exports (also known as re-exports). Re-exports are deducted from each individual country source based on submitted export shipments by source as reported in U.S. importer questionnaire responses. Domestic exports (not shown separately in the table) are netted out of the NASS data used for U.S. producers.

**Table H-8**
**Raw honey: Apparent U.S. consumption and market shares based on value, by source and period**

Value in 1,000 dollars; Shares in percent

| Source | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| Included U.S. producers | Value | *** | *** | *** | *** | *** |
| Excluded U.S. producers | Value | *** | *** | *** | *** | *** |
| All U.S. producers | Value | 335,134 | 307,192 | 301,592 | 175,295 | 182,237 |
| Argentina | Value | 89,457 | 81,194 | 94,106 | 70,852 | 127,592 |
| Brazil | Value | 81,982 | 58,128 | 73,220 | 54,657 | 103,908 |
| India | Value | 81,011 | 84,015 | 59,877 | 47,129 | 104,878 |
| Vietnam | Value | 58,289 | 52,830 | 68,358 | 49,519 | 79,950 |
| Subject sources | Value | 310,738 | 276,168 | 295,562 | 222,157 | 416,328 |
| Canada | Value | 45,656 | 23,275 | 12,873 | 10,018 | 7,345 |
| Ukraine | Value | 17,067 | 17,381 | 20,139 | 13,799 | 13,296 |
| All other sources | Value | 64,403 | 50,456 | 59,925 | 46,967 | 61,172 |
| Nonsubject sources | Value | 127,125 | 91,112 | 92,938 | 70,784 | 81,814 |
| All import sources | Value | 437,863 | 367,279 | 388,500 | 292,941 | 498,141 |
| All sources | Value | 772,997 | 674,471 | 690,092 | 468,236 | 680,379 |
| Included U.S. producers | Share | *** | *** | *** | *** | *** |
| Excluded U.S. producers | Share | *** | *** | *** | *** | *** |
| All U.S. producers | Share | 43.4 | 45.5 | 43.7 | 37.4 | 26.8 |
| Argentina | Share | 11.6 | 12.0 | 13.6 | 15.1 | 18.8 |
| Brazil | Share | 10.6 | 8.6 | 10.6 | 11.7 | 15.3 |
| India | Share | 10.5 | 12.5 | 8.7 | 10.1 | 15.4 |
| Vietnam | Share | 7.5 | 7.8 | 9.9 | 10.6 | 11.8 |
| Subject sources | Share | 40.2 | 40.9 | 42.8 | 47.4 | 61.2 |
| Canada | Share | 5.9 | 3.5 | 1.9 | 2.1 | 1.1 |
| Ukraine | Share | 2.2 | 2.6 | 2.9 | 2.9 | 2.0 |
| All other sources | Share | 8.3 | 7.5 | 8.7 | 10.0 | 9.0 |
| Nonsubject sources | Share | 16.4 | 13.5 | 13.5 | 15.1 | 12.0 |
| All import sources | Share | 56.6 | 54.5 | 56.3 | 62.6 | 73.2 |
| All sources | Share | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Compiled from official U.S. agricultural statistics National Agriculture Statistics Services (NASS) of the U.S. Department of Agriculture (USDA), from official U.S. import statistics of the U.S. Department of Commerce using statistical reporting numbers 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065, accessed February 18, 2022 and from official U.S. export statistics of the U.S. Department of Commerce using schedule B number 0409.00.0055, accessed February 22, 2022. U.S. import statistics are based on imports for consumption and landed duty paid value and U.S. exports statistics are based on foreign-origin exports (also known as re-exports). Re-exports are deducted from each individual country source based on submitted export shipments by source as reported in U.S. importer questionnaire responses. Domestic exports (not shown separately in the table) are netted out of the NASS data used for U.S. producers.

**APPENDIX J**

**PURCHASE PRICES FOR NONSUBJECT UKRAINE**

***Contains Business Proprietary Information***

Tables J-1 to J-3 present purchase price data reported for raw honey imported from nonsubject Ukraine for pricing products 1, 2, and 3. No purchase price data were reported for pricing product 4. Figures J-1 to J-3 correspond to figures V-1 to V-3.

**Table J-1**
**Raw honey:  Weighted-average prices and quantities of purchases of domestic and imported product 1, by quarter**

Quantity in 1,000 pounds; Prices in dollars per pound

| Period | U.S. purchase price | U.S. quantity | Ukraine purchase price | Ukraine quantity |
|--------|---------------------|---------------|------------------------|------------------|
| 2018 Q1 | 2.06 | 4,648 | *** | *** |
| 2018 Q2 | *** | *** | *** | *** |
| 2018 Q3 | 2.01 | 9,296 | *** | *** |
| 2018 Q4 | 1.95 | 8,867 | *** | *** |
| 2019 Q1 | 1.98 | 1,245 | *** | *** |
| 2019 Q2 | *** | *** | *** | *** |
| 2019 Q3 | 1.78 | 11,904 | *** | *** |
| 2019 Q4 | 1.68 | 8,578 | *** | *** |
| 2020 Q1 | 1.60 | 4,450 | *** | *** |
| 2020 Q2 | *** | *** | *** | *** |
| 2020 Q3 | 1.55 | 13,635 | *** | *** |
| 2020 Q4 | 1.49 | 14,589 | *** | *** |
| 2021 Q1 | 1.70 | 4,099 | *** | *** |
| 2021 Q2 | *** | *** | *** | *** |
| 2021 Q3 | 2.29 | 8,311 | *** | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

Note: Product 1: Raw white honey (0 – 34 mm), packaged in 55-gallon drums.
.

J-3

*Contains Business Proprietary Information*

**Table J-2**
**Raw honey:  Weighted-average prices and quantities of purchases of domestic and imported product 2, by quarter**

Quantity in 1,000 pounds; Prices in dollars per pound

| Period | U.S. purchase price | U.S. quantity | Ukraine purchase price | Ukraine quantity |
|---|---|---|---|---|
| 2018 Q1 | 2.16 | 4,977 | 1.10 | 1,746 |
| 2018 Q2 | 1.86 | 11,935 | 1.14 | 1,080 |
| 2018 Q3 | 2.05 | 6,140 | 1.05 | 1,380 |
| 2018 Q4 | 2.01 | 4,586 | 1.03 | 2,469 |
| 2019 Q1 | 1.89 | 1,384 | 1.02 | 4,559 |
| 2019 Q2 | 1.70 | 10,432 | 1.00 | 2,679 |
| 2019 Q3 | 1.89 | 5,246 | 1.00 | 2,149 |
| 2019 Q4 | 1.82 | 2,223 | 1.02 | 891 |
| 2020 Q1 | 1.59 | 1,056 | 0.94 | 2,235 |
| 2020 Q2 | *** | *** | 0.93 | 3,475 |
| 2020 Q3 | *** | *** | 0.90 | 2,648 |
| 2020 Q4 | 1.52 | 6,752 | 0.92 | 3,325 |
| 2021 Q1 | 1.78 | 4,629 | 0.93 | 4,495 |
| 2021 Q2 | 1.68 | 7,400 | 1.08 | 5,065 |
| 2021 Q3 | 2.24 | 5,620 | 1.25 | 1,645 |

Source: Compiled from data submitted in response to Commission questionnaires.

Note: Product 2: Raw extra light amber honey (35 – 50 mm), packaged in 55-gallon drums.
.

J-4

*Contains Business Proprietary Information*

**Table J-3**
**Raw honey:  Weighted-average prices and quantities of purchases of domestic and imported product 3, by quarter**

Quantity in 1,000 pounds; Prices in dollars per pound

| Period | U.S. purchase price | U.S. quantity | Ukraine purchase price | Ukraine quantity |
|---|---|---|---|---|
| 2018 Q1 | 1.95 | 988 | *** | *** |
| 2018 Q2 | *** | *** | *** | *** |
| 2018 Q3 | 1.98 | 2,288 | *** | *** |
| 2018 Q4 | 1.87 | 3,339 | *** | *** |
| 2019 Q1 | 1.79 | 1,406 | *** | *** |
| 2019 Q2 | *** | *** | *** | *** |
| 2019 Q3 | 1.85 | 3,015 | *** | *** |
| 2019 Q4 | 1.80 | 3,406 | *** | *** |
| 2020 Q1 | 1.54 | 1,433 | *** | *** |
| 2020 Q2 | 1.30 | 7,055 | *** | *** |
| 2020 Q3 | 1.70 | 4,573 | *** | *** |
| 2020 Q4 | 1.68 | 2,892 | *** | *** |
| 2021 Q1 | 1.79 | 1,331 | *** | *** |
| 2021 Q2 | 1.60 | 4,613 | *** | *** |
| 2021 Q3 | 2.10 | 3,046 | *** | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

Note: Product 3: Raw light amber honey (51 – 85 mm), packaged in 55-gallon drums.
.

*Contains Business Proprietary Information*

**Figure J-1**
**Raw honey: Weighted-average f.o.b. prices and quantities of domestic and imported product 1, by source and quarter**

\*     \*     \*     \*     \*     \*     \*

*Contains Business Proprietary Information*

**Figure J-2**
**Raw honey: Weighted-average f.o.b. prices and quantities of domestic and imported product 2, by source and quarter**

*        *        *        *        *        *        *

*Contains Business Proprietary Information*

**Figure J-3**
**Raw honey: Weighted-average f.o.b. prices and quantities of domestic and imported product 3, by source and quarter**

\*        \*        \*        \*        \*        \*        \*

**APPENDIX K**

**EXCLUDED PURCHASE PRICE DATA FROM CERTAIN U.S. PURCHASERS**

K-1

The purchase price data reported by five U.S. purchasers *** were excluded from the data presented in Part V, and are presented in tables K-1 through K-4. Data are excluded for purchaser *** because many other purchasers reported sourcing their purchases from the firm. Reported purchase price data reported for *** was minimal and accounted for less than *** percent of reported purchases of responding purchasers. Additionally, purchase price data from ingredient and end users *** were excluded because they sourced from packers that had already reported purchase price data, reported purchase prices for products that were ***, and were only able to report prices were sold in bulk containers rather than 55 gallon drums, as specified in the purchase price product definitions in Part V.

Purchase price data for pricing product 1 were reported by *** for their purchases from U.S. producers. Purchase price data for product 2 were reported by *** for purchases from U.S. producers. Purchasers *** All excluded purchasers *** reported purchase price data for product 3, and purchasers *** reported purchase price data for product 4.

**Table K-1**
**Raw honey:  Excluded firms weighted-average purchase prices and quantities of purchases of domestic and imported subject product 1, by quarter**

Quantity in 1,000 pounds; Price in dollars per pound

| Period | Purchase price product | ***'s U.S. purchase price | ***'s U.S. quantity | ***'s U.S. purchase price | ***'s U.S. quantity |
|--------|------------------------|---------------------------|---------------------|---------------------------|---------------------|
| 2018 Q1 | Product 1 | *** | *** | *** | *** |
| 2018 Q2 | Product 1 | *** | *** | *** | *** |
| 2018 Q3 | Product 1 | *** | *** | *** | *** |
| 2018 Q4 | Product 1 | *** | *** | *** | *** |
| 2019 Q1 | Product 1 | *** | *** | *** | *** |
| 2019 Q2 | Product 1 | *** | *** | *** | *** |
| 2019 Q3 | Product 1 | *** | *** | *** | *** |
| 2019 Q4 | Product 1 | *** | *** | *** | *** |
| 2020 Q1 | Product 1 | *** | *** | *** | *** |
| 2020 Q2 | Product 1 | *** | *** | *** | *** |
| 2020 Q3 | Product 1 | *** | *** | *** | *** |
| 2020 Q4 | Product 1 | *** | *** | *** | *** |
| 2021 Q1 | Product 1 | *** | *** | *** | *** |
| 2021 Q2 | Product 1 | *** | *** | *** | *** |
| 2021 Q3 | Product 1 | *** | *** | *** | *** |

Compiled from data submitted in response to Commission questionnaires.

K-3

**Table K-2**
**Raw honey:  Excluded firms weighted-average purchase prices and quantities of purchases of domestic and imported subject product 2, by quarter**

Quantity in 1,000 pounds; Price in dollars per pound

| Period | Purchase price product | ***'s U.S. purchase price | ***'s U.S. quantity |
|---|---|---|---|
| 2018 Q1 | Product 2 | *** | *** |
| 2018 Q2 | Product 2 | *** | *** |
| 2018 Q3 | Product 2 | *** | *** |
| 2018 Q4 | Product 2 | *** | *** |
| 2019 Q1 | Product 2 | *** | *** |
| 2019 Q2 | Product 2 | *** | *** |
| 2019 Q3 | Product 2 | *** | *** |
| 2019 Q4 | Product 2 | *** | *** |
| 2020 Q1 | Product 2 | *** | *** |
| 2020 Q2 | Product 2 | *** | *** |
| 2020 Q3 | Product 2 | *** | *** |
| 2020 Q4 | Product 2 | *** | *** |
| 2021 Q1 | Product 2 | *** | *** |
| 2021 Q2 | Product 2 | *** | *** |
| 2021 Q3 | Product 2 | *** | *** |

Compiled from data submitted in response to Commission questionnaires.

**Table K-3**
**Raw honey:  Excluded firms weighted-average purchase prices and quantities of purchases of domestic and imported subject product 3, by quarter**

Quantity in 1,000 pounds; Price in dollars per pound

| Period | Purchase price product | ***'s U.S. purchase price | ***'s U.S. quantity | ***'s U.S. purchase price | ***'s U.S. quantity |
|---|---|---|---|---|---|
| 2018 Q1 | Product 3 | *** | *** | *** | *** |
| 2018 Q2 | Product 3 | *** | *** | *** | *** |
| 2018 Q3 | Product 3 | *** | *** | *** | *** |
| 2018 Q4 | Product 3 | *** | *** | *** | *** |
| 2019 Q1 | Product 3 | *** | *** | *** | *** |
| 2019 Q2 | Product 3 | *** | *** | *** | *** |
| 2019 Q3 | Product 3 | *** | *** | *** | *** |
| 2019 Q4 | Product 3 | *** | *** | *** | *** |
| 2020 Q1 | Product 3 | *** | *** | *** | *** |
| 2020 Q2 | Product 3 | *** | *** | *** | *** |
| 2020 Q3 | Product 3 | *** | *** | *** | *** |
| 2020 Q4 | Product 3 | *** | *** | *** | *** |
| 2021 Q1 | Product 3 | *** | *** | *** | *** |
| 2021 Q2 | Product 3 | *** | *** | *** | *** |
| 2021 Q3 | Product 3 | *** | *** | *** | *** |

| Period | Purchase price product | ***'s subject source purchase price | ***'s subject source quantity | ***'s subject source purchase price | ***'s subject source quantity |
|---|---|---|---|---|---|
| 2018 Q1 | Product 3 | *** | *** | *** | *** |
| 2018 Q2 | Product 3 | *** | *** | *** | *** |
| 2018 Q3 | Product 3 | *** | *** | *** | *** |
| 2018 Q4 | Product 3 | *** | *** | *** | *** |
| 2019 Q1 | Product 3 | *** | *** | *** | *** |
| 2019 Q2 | Product 3 | *** | *** | *** | *** |
| 2019 Q3 | Product 3 | *** | *** | *** | *** |
| 2019 Q4 | Product 3 | *** | *** | *** | *** |
| 2020 Q1 | Product 3 | *** | *** | *** | *** |
| 2020 Q2 | Product 3 | *** | *** | *** | *** |
| 2020 Q3 | Product 3 | *** | *** | *** | *** |
| 2020 Q4 | Product 3 | *** | *** | *** | *** |
| 2021 Q1 | Product 3 | *** | *** | *** | *** |
| 2021 Q2 | Product 3 | *** | *** | *** | *** |
| 2021 Q3 | Product 3 | *** | *** | *** | *** |

Table continued.

K-5

**Table K-3 continued**
**Raw honey:  Excluded firms weighted-average purchase prices and quantities of purchases of domestic and imported subject product 3, by quarter**

Quantity in 1,000 pounds; Price in dollars per pound

| Period | Purchase price product | ***'s subject source purchase price | ***'s subject source quantity | ***'s subject source purchase price | ***'s subject source quantity |
|---|---|---|---|---|---|
| 2018 Q1 | Product 3 | *** | *** | *** | *** |
| 2018 Q2 | Product 3 | *** | *** | *** | *** |
| 2018 Q3 | Product 3 | *** | *** | *** | *** |
| 2018 Q4 | Product 3 | *** | *** | *** | *** |
| 2019 Q1 | Product 3 | *** | *** | *** | *** |
| 2019 Q2 | Product 3 | *** | *** | *** | *** |
| 2019 Q3 | Product 3 | *** | *** | *** | *** |
| 2019 Q4 | Product 3 | *** | *** | *** | *** |
| 2020 Q1 | Product 3 | *** | *** | *** | *** |
| 2020 Q2 | Product 3 | *** | *** | *** | *** |
| 2020 Q3 | Product 3 | *** | *** | *** | *** |
| 2020 Q4 | Product 3 | *** | *** | *** | *** |
| 2021 Q1 | Product 3 | *** | *** | *** | *** |
| 2021 Q2 | Product 3 | *** | *** | *** | *** |
| 2021 Q3 | Product 3 | *** | *** | *** | *** |

Compiled from data submitted in response to Commission questionnaires.

**Table K-4**
**Raw honey:  Excluded firms weighted-average purchase prices and quantities of purchases of domestic and imported subject product 4, by quarter**

Quantity in 1,000 pounds; Price in dollars per pound

| Period | Purchase price product | ***'s U.S. purchase price | ***'s U.S. quantity | ***'s subject source purchase price | ***'s subject source quantity | ***'s subject source purchase price | ***'s subject source quantity |
|---|---|---|---|---|---|---|---|
| 2018 Q1 | Product 4 | *** | *** | *** | *** | *** | *** |
| 2018 Q2 | Product 4 | *** | *** | *** | *** | *** | *** |
| 2018 Q3 | Product 4 | *** | *** | *** | *** | *** | *** |
| 2018 Q4 | Product 4 | *** | *** | *** | *** | *** | *** |
| 2019 Q1 | Product 4 | *** | *** | *** | *** | *** | *** |
| 2019 Q2 | Product 4 | *** | *** | *** | *** | *** | *** |
| 2019 Q3 | Product 4 | *** | *** | *** | *** | *** | *** |
| 2019 Q4 | Product 4 | *** | *** | *** | *** | *** | *** |
| 2020 Q1 | Product 4 | *** | *** | *** | *** | *** | *** |
| 2020 Q2 | Product 4 | *** | *** | *** | *** | *** | *** |
| 2020 Q3 | Product 4 | *** | *** | *** | *** | *** | *** |
| 2020 Q4 | Product 4 | *** | *** | *** | *** | *** | *** |
| 2021 Q1 | Product 4 | *** | *** | *** | *** | *** | *** |
| 2021 Q2 | Product 4 | *** | *** | *** | *** | *** | *** |
| 2021 Q3 | Product 4 | *** | *** | *** | *** | *** | *** |

Compiled from data submitted in response to Commission questionnaires.

**APPENDIX L**

**PRICE DATA FROM USDA/AMS**

The U.S. Department of Agriculture's Agricultural Marketing Service ("USDA/AMS") publishes monthly domestic and import prices in the National Honey Report.[1] The National Honey Report publishes prices by color, floral source, and U.S. state or import country, and presents either a single price or a low and high price for each available combination depending on the number of transactions in that month. Tables L-1 to L-4 present the simple average prices reported for each color/country source combination by month, and correspond to figures V-6 to V-9.[2] [3] These price items are similar to the purchase price products in tables V-1 to V-4.

---

[1] The National Honey Report states that the data are generally for volumes of 10,000 pounds or greater. Domestic prices presented are for "prices paid to beekeepers for extracted, unprocessed honey in major producing states by packers, handlers and other large users, cents per pound, f.o.b. or delivered nearby, containers exchanged or returned, prompt delivery & payment unless otherwise stated." Import prices are "Prices paid to importers for bulk honey, duty paid, containers included, cents per pound, ex-dock or point of entry unless otherwise stated."

[2] In instances for which there were only a single price reported, this price is reported as both the high and low price.

[3] Staff calculated simple averages for each month, by origin and color, by dividing the sum of prices by the number of observations. The National Honey Report does not have quantities associated with each price or price range; therefore, staff are unable to calculate weighted average prices using USDA/AMS data.

L-3

**Table L-1**
**Raw honey:  Simple-average f.o.b. prices of domestic and imported product 1, and margins of underselling/(overselling), by month**
Price in dollars per pound, margin in percent

| Period | U.S. price | Argentina price | Argentina margin | Brazil price | Brazil margin | India price | India margin |
|--------|-----------|-----------------|------------------|--------------|---------------|-------------|--------------|
| 2018 M01 | 2.11 | 1.38 | 34.9 | 1.95 | 7.7 | --- | --- |
| 2018 M02 | 2.09 | 1.35 | 35.5 | 2.06 | 1.5 | --- | --- |
| 2018 M03 | 2.13 | 1.82 | 14.2 | 1.95 | 8.2 | 0.93 | 56.2 |
| 2018 M04 | 2.25 | 1.56 | 30.5 | 1.70 | 24.4 | 0.97 | 57.0 |
| 2018 M05 | 2.27 | 1.29 | 43.2 | 1.72 | 24.3 | 0.95 | 58.3 |
| 2018 M06 | 2.18 | 1.32 | 39.5 | 1.84 | 15.8 | 0.99 | 54.8 |
| 2018 M07 | 2.63 | 1.31 | 50.2 | 1.70 | 35.4 | 0.99 | 62.5 |
| 2018 M08 | 2.16 | 1.31 | 39.3 | --- | --- | 0.92 | 57.4 |
| 2018 M09 | 1.96 | 1.25 | 36.3 | 1.66 | 15.4 | 0.99 | 49.8 |
| 2018 M10 | 1.91 | 1.28 | 33.1 | 1.71 | 10.3 | 0.94 | 50.7 |
| 2018 M11 | 1.89 | 1.28 | 32.4 | --- | --- | 0.94 | 50.4 |
| 2018 M12 | 1.89 | 1.23 | 34.8 | 1.99 | (5.4) | 0.94 | 50.5 |
| 2019 M01 | 1.90 | 1.23 | 35.4 | --- | --- | --- | --- |
| 2019 M02 | 1.79 | 1.24 | 30.8 | 1.30 | 27.5 | 0.94 | 47.6 |
| 2019 M03 | 2.01 | 1.23 | 39.2 | --- | --- | --- | --- |
| 2019 M04 | 2.60 | 1.18 | 54.6 | --- | --- | 0.87 | 66.5 |
| 2019 M05 | 1.99 | 1.18 | 40.9 | --- | --- | 0.83 | 58.2 |
| 2019 M06 | 2.09 | 1.17 | 44.3 | --- | --- | 0.83 | 60.4 |
| 2019 M07 | 1.97 | 1.17 | 40.6 | --- | --- | 0.84 | 57.5 |
| 2019 M08 | 1.90 | 1.14 | 40.4 | 1.47 | 22.8 | 0.82 | 57.2 |
| 2019 M09 | 1.76 | 1.13 | 35.9 | --- | --- | 0.82 | 53.3 |
| 2019 M10 | 1.84 | 1.13 | 38.4 | --- | --- | 0.83 | 54.9 |
| 2019 M11 | 1.73 | 1.13 | 34.9 | --- | --- | 0.83 | 52.1 |
| 2019 M12 | 1.82 | 1.13 | 38.1 | 1.75 | 4.0 | 0.79 | 56.7 |
| 2020 M01 | 1.76 | 1.15 | 34.9 | --- | --- | 0.83 | 52.9 |
| 2020 M02 | 1.57 | 1.16 | 25.7 | --- | --- | 0.78 | 50.2 |
| 2020 M03 | 1.55 | 1.16 | 25.2 | 0.96 | 38.1 | --- | --- |
| 2020 M04 | 1.53 | 1.19 | 22.3 | --- | --- | --- | --- |
| 2020 M05 | 1.71 | 1.19 | 30.5 | --- | --- | --- | --- |
| 2020 M06 | 1.69 | 1.29 | 23.5 | --- | --- | 0.85 | 49.9 |
| 2020 M07 | 1.64 | 1.29 | 21.4 | --- | --- | 0.82 | 50.0 |
| 2020 M08 | 1.72 | 1.31 | 24.1 | --- | --- | 0.79 | 54.4 |
| 2020 M09 | 1.68 | 1.27 | 24.6 | --- | --- | 0.75 | 55.5 |
| 2020 M10 | 1.60 | 1.30 | 18.7 | 1.16 | 27.3 | 0.74 | 54.0 |
| 2020 M11 | 1.65 | 1.32 | 19.8 | 1.51 | 8.8 | --- | --- |
| 2020 M12 | 1.64 | 1.37 | 16.2 | 1.63 | 0.7 | --- | --- |

Table continued on next page.

**Table L-1 continued**
**Raw honey:  Simple-average f.o.b. prices of domestic and imported product 1, and margins of underselling/(overselling), by month**
Price in dollars per pound, margin in percent

| Period | U.S. price | Argentina price | Argentina margin | Brazil price | Brazil margin | India price | India margin |
|--------|-----------|-----------------|------------------|--------------|---------------|-------------|--------------|
| 2021 M01 | 1.76 | 1.32 | 25.2 | --- | --- | --- | --- |
| 2021 M02 | 1.63 | 1.39 | 14.6 | 1.75 | (7.3) | 1.18 | 27.7 |
| 2021 M03 | 1.83 | 1.47 | 19.6 | 1.79 | 2.4 | 0.96 | 47.9 |
| 2021 M04 | 1.82 | 1.58 | 13.3 | --- | --- | 1.04 | 42.7 |
| 2021 M05 | 1.85 | 1.58 | 14.8 | 1.75 | 5.5 | 1.01 | 45.6 |
| 2021 M06 | 1.98 | 1.72 | 13.2 | --- | --- | 1.09 | 45.1 |
| 2021 M07 | 1.98 | 1.86 | 6.1 | 1.90 | 3.8 | 1.01 | 48.7 |
| 2021 M08 | 2.23 | 1.86 | 16.6 | --- | --- | 1.08 | 51.6 |
| 2021 M09 | 2.28 | 1.86 | 18.5 | --- | --- | 1.03 | 54.8 |

Table continued on next page.

**Table L-1 continued**
**Raw honey:  Simple-average f.o.b. prices of domestic and imported product 1, and margins of underselling/(overselling), by month**
Price in dollars per pound, margin in percent

| Period | U.S. price | Ukraine price | Ukraine margin | Vietnam price | Vietnam margin | Subject price | Subject margin |
|--------|-----------|---------------|----------------|---------------|----------------|---------------|----------------|
| 2018 M01 | 2.11 | --- | --- | --- | --- | 1.66 | 21.3 |
| 2018 M02 | 2.09 | --- | --- | --- | --- | 1.71 | 18.5 |
| 2018 M03 | 2.13 | --- | --- | --- | --- | 1.63 | 23.2 |
| 2018 M04 | 2.25 | --- | --- | --- | --- | 1.39 | 38.3 |
| 2018 M05 | 2.27 | --- | --- | --- | --- | 1.25 | 45.1 |
| 2018 M06 | 2.18 | 1.01 | 53.6 | --- | --- | 1.24 | 43.0 |
| 2018 M07 | 2.63 | 1.04 | 60.4 | --- | --- | 1.27 | 51.7 |
| 2018 M08 | 2.16 | 1.07 | 50.7 | --- | --- | 1.13 | 47.5 |
| 2018 M09 | 1.96 | --- | --- | --- | --- | 1.29 | 34.5 |
| 2018 M10 | 1.91 | --- | --- | --- | --- | 1.23 | 35.6 |
| 2018 M11 | 1.89 | 1.03 | 45.4 | --- | --- | 1.13 | 40.1 |
| 2018 M12 | 1.89 | 1.01 | 46.5 | --- | --- | 1.22 | 35.3 |
| 2019 M01 | 1.90 | 0.98 | 48.4 | --- | --- | 1.10 | 41.9 |
| 2019 M02 | 1.79 | --- | --- | --- | --- | 1.13 | 36.8 |
| 2019 M03 | 2.01 | --- | --- | --- | --- | 1.23 | 39.2 |
| 2019 M04 | 2.60 | --- | --- | --- | --- | 1.03 | 60.6 |
| 2019 M05 | 1.99 | --- | --- | --- | --- | 0.95 | 52.4 |
| 2019 M06 | 2.09 | 0.93 | 55.6 | --- | --- | 0.99 | 53.0 |
| 2019 M07 | 1.97 | 0.93 | 52.7 | --- | --- | 0.99 | 49.8 |
| 2019 M08 | 1.90 | --- | --- | --- | --- | 1.07 | 43.6 |
| 2019 M09 | 1.76 | --- | --- | --- | --- | 0.98 | 44.6 |
| 2019 M10 | 1.84 | --- | --- | --- | --- | 1.03 | 43.9 |
| 2019 M11 | 1.73 | 0.95 | 45.1 | --- | --- | 1.01 | 41.8 |
| 2019 M12 | 1.82 | --- | --- | --- | --- | 1.12 | 38.7 |
| 2020 M01 | 1.76 | --- | --- | --- | --- | 0.99 | 43.9 |
| 2020 M02 | 1.57 | 0.96 | 38.7 | --- | --- | 1.02 | 35.1 |
| 2020 M03 | 1.55 | 0.91 | 41.6 | --- | --- | 1.01 | 34.9 |
| 2020 M04 | 1.53 | 0.93 | 39.6 | --- | --- | 1.06 | 30.9 |
| 2020 M05 | 1.71 | 0.92 | 46.3 | --- | --- | 1.06 | 38.4 |
| 2020 M06 | 1.69 | 0.89 | 47.2 | --- | --- | 1.01 | 40.2 |
| 2020 M07 | 1.64 | 0.90 | 45.0 | --- | --- | 0.96 | 41.6 |
| 2020 M08 | 1.72 | 0.91 | 47.1 | --- | --- | 1.08 | 37.4 |
| 2020 M09 | 1.68 | --- | --- | --- | --- | 1.10 | 34.9 |
| 2020 M10 | 1.60 | --- | --- | --- | --- | 1.12 | 29.7 |
| 2020 M11 | 1.65 | --- | --- | --- | --- | 1.41 | 14.3 |
| 2020 M12 | 1.64 | 0.85 | 48.1 | --- | --- | 1.37 | 16.4 |

Table continued on next page.

L-6

**Table L-1 continued**
**Raw honey:  Simple-average f.o.b. prices of domestic and imported product 1, and margins of underselling/(overselling), by month**
Price in dollars per pound, margin in percent

| Period | U.S. price | Ukraine price | Ukraine margin | Vietnam price | Vietnam margin | Subject price | Subject margin |
|--------|-----------|---------------|----------------|---------------|----------------|---------------|----------------|
| 2021 M01 | 1.76 | --- | --- | --- | --- | 1.32 | 25.2 |
| 2021 M02 | 1.63 | 0.93 | 43.0 | --- | --- | 1.33 | 18.5 |
| 2021 M03 | 1.83 | 0.93 | 49.3 | --- | --- | 1.41 | 23.0 |
| 2021 M04 | 1.82 | 1.01 | 44.8 | --- | --- | 1.21 | 33.6 |
| 2021 M05 | 1.85 | 1.05 | 43.3 | --- | --- | 1.33 | 28.2 |
| 2021 M06 | 1.98 | --- | --- | --- | --- | 1.51 | 23.8 |
| 2021 M07 | 1.98 | --- | --- | --- | --- | 1.53 | 22.7 |
| 2021 M08 | 2.23 | 1.70 | 23.9 | --- | --- | 1.52 | 32.1 |
| 2021 M09 | 2.28 | --- | --- | --- | --- | 1.44 | 36.6 |

Source: Compiled from USDA/AMS data, accessed November 23, 2021.
Note: Product 1: White honey (0 – 34 mm).

L-7

**Table L-2**
**Raw honey:  Simple-average f.o.b. prices of domestic and imported product 2, and margins of underselling/(overselling), by month**
Price in dollars per pound, margin in percent

| Period | U.S. price | Argentina price | Argentina margin | Brazil price | Brazil margin | India price | India margin |
|--------|-----------|-----------------|------------------|--------------|---------------|-------------|--------------|
| 2018 M01 | 2.02 | 1.36 | 32.8 | 2.01 | 0.7 | 0.99 | 51.1 |
| 2018 M02 | 2.00 | 1.27 | 36.4 | 1.91 | 4.6 | 0.91 | 54.4 |
| 2018 M03 | 2.23 | 1.50 | 32.8 | 1.94 | 13.4 | 0.97 | 56.6 |
| 2018 M04 | 2.28 | 1.36 | 40.4 | 1.92 | 15.6 | 1.00 | 56.3 |
| 2018 M05 | 2.40 | 1.33 | 44.6 | 2.00 | 16.7 | 0.92 | 61.8 |
| 2018 M06 | 2.26 | 1.28 | 43.4 | 2.00 | 11.5 | 0.91 | 59.6 |
| 2018 M07 | 2.41 | 1.31 | 45.8 | 1.70 | 29.6 | 0.93 | 61.4 |
| 2018 M08 | 2.10 | 1.21 | 42.5 | 1.66 | 21.1 | 0.92 | 56.1 |
| 2018 M09 | 1.93 | 1.20 | 37.9 | 1.97 | (2.0) | 0.90 | 53.4 |
| 2018 M10 | 1.85 | 1.17 | 36.8 | --- | --- | 0.91 | 50.8 |
| 2018 M11 | 1.90 | 1.23 | 35.4 | --- | --- | 0.93 | 51.2 |
| 2018 M12 | 1.93 | 1.17 | 39.6 | --- | --- | 0.90 | 53.6 |
| 2019 M01 | 1.95 | 1.16 | 40.6 | 1.35 | 30.6 | 0.90 | 53.6 |
| 2019 M02 | 1.82 | 1.18 | 35.1 | 1.99 | (9.5) | 0.94 | 48.3 |
| 2019 M03 | 1.89 | 1.17 | 37.8 | --- | --- | 0.89 | 52.8 |
| 2019 M04 | 2.29 | 1.18 | 48.4 | --- | --- | 0.87 | 61.9 |
| 2019 M05 | 2.06 | 1.18 | 42.6 | 1.68 | 18.7 | 0.83 | 60.0 |
| 2019 M06 | 2.02 | 1.16 | 42.5 | 1.18 | 41.6 | 0.82 | 59.7 |
| 2019 M07 | 1.93 | 1.16 | 40.0 | 1.18 | 38.8 | 0.81 | 58.0 |
| 2019 M08 | 1.89 | 1.17 | 38.4 | 1.19 | 37.1 | 0.81 | 57.3 |
| 2019 M09 | 1.78 | 1.09 | 38.8 | 1.18 | 33.8 | 0.80 | 55.4 |
| 2019 M10 | 1.73 | 1.13 | 34.7 | 1.10 | 36.6 | 0.84 | 51.4 |
| 2019 M11 | 1.85 | 1.15 | 37.8 | 1.00 | 45.9 | 0.79 | 57.3 |
| 2019 M12 | 1.76 | 1.12 | 36.1 | 1.24 | 29.7 | 0.81 | 54.0 |
| 2020 M01 | 1.82 | 1.14 | 37.1 | 1.37 | 24.6 | 0.85 | 53.3 |
| 2020 M02 | 1.50 | 1.16 | 22.9 | 1.37 | 8.9 | 0.82 | 45.5 |
| 2020 M03 | 1.55 | 1.15 | 25.8 | 0.99 | 36.5 | 0.79 | 49.4 |
| 2020 M04 | 2.00 | 1.18 | 41.3 | 0.98 | 51.0 | 0.80 | 60.3 |
| 2020 M05 | 1.64 | 1.18 | 28.5 | 0.97 | 41.2 | 0.78 | 52.5 |
| 2020 M06 | 1.75 | 1.28 | 27.0 | 0.99 | 43.3 | 0.79 | 54.8 |
| 2020 M07 | 1.72 | 1.27 | 26.5 | 0.98 | 43.4 | 0.81 | 53.2 |
| 2020 M08 | 1.82 | 1.25 | 31.6 | --- | --- | 0.76 | 58.5 |
| 2020 M09 | 1.71 | 1.26 | 26.6 | 0.94 | 45.0 | 0.76 | 55.8 |
| 2020 M10 | 1.75 | 1.31 | 25.3 | 1.24 | 29.1 | 0.77 | 56.2 |
| 2020 M11 | 1.66 | 1.31 | 21.0 | --- | --- | 0.75 | 55.0 |
| 2020 M12 | 1.65 | 1.42 | 14.2 | --- | --- | 0.72 | 56.4 |

Table continued on next page.

**Table L-2 continued**
**Raw honey:  Simple-average f.o.b. prices of domestic and imported product 2, and margins of underselling/(overselling), by month**
Price in dollars per pound, margin in percent

| Period | U.S. price | Argentina price | Argentina margin | Brazil price | Brazil margin | India price | India margin |
|--------|-----------|-----------------|------------------|--------------|---------------|-------------|--------------|
| 2021 M01 | 1.67 | 1.40 | 16.3 | 1.48 | 11.3 | 0.73 | 56.3 |
| 2021 M02 | 1.62 | 1.42 | 12.3 | 1.83 | (13.1) | 0.93 | 42.9 |
| 2021 M03 | 1.78 | 1.42 | 20.2 | 1.79 | (0.8) | 0.99 | 44.4 |
| 2021 M04 | 1.80 | 1.69 | 6.0 | 1.83 | (1.7) | 1.03 | 42.8 |
| 2021 M05 | 1.57 | 1.85 | (17.8) | 1.79 | (14.3) | 1.03 | 34.6 |
| 2021 M06 | 1.93 | 1.85 | 4.2 | 1.78 | 7.8 | 1.03 | 46.8 |
| 2021 M07 | 2.04 | 1.83 | 10.4 | --- | --- | 1.09 | 46.6 |
| 2021 M08 | 2.29 | 1.86 | 18.6 | --- | --- | 1.13 | 50.8 |
| 2021 M09 | 2.27 | 1.86 | 18.0 | --- | --- | 1.21 | 46.6 |

Table continued on next page.

L-9

Appx441

**Table L-2 continued**
**Raw honey:  Simple-average f.o.b. prices of domestic and imported product 2, and margins of underselling/(overselling), by month**
Price in dollars per pound, margin in percent

| Period | U.S. price | Ukraine price | Ukraine margin | Vietnam price | Vietnam margin | Subject price | Subject margin |
|--------|-----------|---------------|----------------|---------------|----------------|---------------|----------------|
| 2018 M01 | 2.02 | --- | --- | --- | --- | 1.45 | 28.2 |
| 2018 M02 | 2.00 | --- | --- | --- | --- | 1.36 | 31.8 |
| 2018 M03 | 2.23 | --- | --- | --- | --- | 1.47 | 34.3 |
| 2018 M04 | 2.28 | --- | --- | --- | --- | 1.32 | 42.1 |
| 2018 M05 | 2.40 | 1.09 | 54.5 | --- | --- | 1.37 | 42.9 |
| 2018 M06 | 2.26 | 1.09 | 51.7 | --- | --- | 1.35 | 40.1 |
| 2018 M07 | 2.41 | 1.09 | 54.7 | --- | --- | 1.21 | 49.8 |
| 2018 M08 | 2.10 | 1.09 | 48.2 | --- | --- | 1.16 | 44.8 |
| 2018 M09 | 1.93 | --- | --- | --- | --- | 1.51 | 21.8 |
| 2018 M10 | 1.85 | 1.03 | 44.4 | --- | --- | 1.04 | 44.0 |
| 2018 M11 | 1.90 | --- | --- | --- | --- | 1.13 | 40.7 |
| 2018 M12 | 1.93 | --- | --- | --- | --- | 0.99 | 48.9 |
| 2019 M01 | 1.95 | 0.93 | 52.2 | --- | --- | 1.05 | 46.1 |
| 2019 M02 | 1.82 | --- | --- | --- | --- | 1.37 | 24.6 |
| 2019 M03 | 1.89 | --- | --- | --- | --- | 1.03 | 45.3 |
| 2019 M04 | 2.29 | 1.01 | 55.8 | --- | --- | 1.02 | 55.4 |
| 2019 M05 | 2.06 | 0.93 | 54.9 | --- | --- | 1.19 | 42.5 |
| 2019 M06 | 2.02 | 0.93 | 54.0 | --- | --- | 1.01 | 50.0 |
| 2019 M07 | 1.93 | 0.93 | 51.8 | --- | --- | 1.01 | 47.8 |
| 2019 M08 | 1.89 | --- | --- | --- | --- | 1.03 | 45.7 |
| 2019 M09 | 1.78 | --- | --- | --- | --- | 0.97 | 45.8 |
| 2019 M10 | 1.73 | --- | --- | --- | --- | 1.01 | 41.8 |
| 2019 M11 | 1.85 | 0.95 | 48.6 | --- | --- | 1.01 | 45.5 |
| 2019 M12 | 1.76 | --- | --- | --- | --- | 1.06 | 39.9 |
| 2020 M01 | 1.82 | 0.97 | 46.6 | --- | --- | 1.10 | 39.5 |
| 2020 M02 | 1.50 | 0.91 | 39.8 | --- | --- | 1.07 | 28.6 |
| 2020 M03 | 1.55 | 0.91 | 41.6 | --- | --- | 1.00 | 35.8 |
| 2020 M04 | 2.00 | 0.93 | 53.8 | --- | --- | 0.97 | 51.6 |
| 2020 M05 | 1.64 | 0.92 | 44.0 | --- | --- | 0.92 | 43.7 |
| 2020 M06 | 1.75 | 0.93 | 46.8 | --- | --- | 0.96 | 45.4 |
| 2020 M07 | 1.72 | 0.94 | 45.7 | --- | --- | 0.96 | 44.4 |
| 2020 M08 | 1.82 | 0.93 | 49.2 | --- | --- | 0.98 | 46.4 |
| 2020 M09 | 1.71 | 0.89 | 48.2 | --- | --- | 0.96 | 43.9 |
| 2020 M10 | 1.75 | --- | --- | --- | --- | 1.10 | 36.9 |
| 2020 M11 | 1.66 | 0.92 | 44.4 | --- | --- | 1.07 | 35.3 |
| 2020 M12 | 1.65 | 0.85 | 48.5 | --- | --- | 1.00 | 39.7 |

Table continued on next page.

**Table L-2 continued**
**Raw honey:  Simple-average f.o.b. prices of domestic and imported product 2, and margins of underselling/(overselling), by month**

Price in dollars per pound, margin in percent

| Period | U.S. price | Ukraine price | Ukraine margin | Vietnam price | Vietnam margin | Subject price | Subject margin |
|--------|-----------|---------------|----------------|---------------|----------------|---------------|----------------|
| 2021 M01 | 1.67 | 0.90 | 46.1 | --- | --- | 1.18 | 29.2 |
| 2021 M02 | 1.62 | 0.95 | 41.2 | --- | --- | 1.25 | 22.8 |
| 2021 M03 | 1.78 | 0.85 | 52.1 | --- | --- | 1.32 | 25.7 |
| 2021 M04 | 1.80 | 1.02 | 43.3 | --- | --- | 1.38 | 23.2 |
| 2021 M05 | 1.57 | 0.91 | 42.2 | --- | --- | 1.46 | 6.8 |
| 2021 M06 | 1.93 | 0.96 | 50.1 | --- | --- | 1.41 | 26.6 |
| 2021 M07 | 2.04 | --- | --- | --- | --- | 1.46 | 28.5 |
| 2021 M08 | 2.29 | --- | --- | --- | --- | 1.49 | 34.7 |
| 2021 M09 | 2.27 | --- | --- | --- | --- | 1.60 | 29.4 |

Source: Compiled from USDA/AMS data, accessed November 23, 2021.

Note: Product 2: Extra light amber honey (35 – 50 mm).

**Table L-3**
**Raw honey:  Simple-average f.o.b. prices of domestic and imported product 3, and margins of underselling/(overselling), by month**
Price in dollars per pound, margin in percent

| Period | U.S. price | Argentina price | Argentina margin | Brazil price | Brazil margin | India price | India margin |
|--------|-----------|-----------------|------------------|--------------|---------------|-------------|--------------|
| 2018 M01 | 1.73 | 1.20 | 30.5 | 1.93 | (11.5) | 1.40 | 19.2 |
| 2018 M02 | 1.86 | 1.20 | 35.4 | 1.91 | (2.6) | 1.00 | 46.2 |
| 2018 M03 | 1.83 | 1.20 | 34.2 | 1.90 | (4.1) | 0.92 | 49.6 |
| 2018 M04 | 1.76 | 1.22 | 30.8 | 1.87 | (6.5) | 0.95 | 45.8 |
| 2018 M05 | 1.91 | 1.20 | 37.1 | 1.76 | 7.8 | 0.91 | 52.6 |
| 2018 M06 | 1.85 | 1.19 | 35.5 | 1.80 | 2.8 | 0.91 | 51.0 |
| 2018 M07 | 1.92 | 1.20 | 37.5 | 1.71 | 10.9 | 0.91 | 52.8 |
| 2018 M08 | 1.77 | 1.20 | 32.3 | 1.70 | 4.4 | 0.90 | 49.4 |
| 2018 M09 | 1.84 | 0.98 | 47.1 | 1.56 | 15.4 | 0.90 | 51.2 |
| 2018 M10 | 1.75 | 1.14 | 35.1 | 1.63 | 6.8 | 0.90 | 48.7 |
| 2018 M11 | 1.83 | 1.10 | 40.2 | 1.53 | 16.8 | 0.92 | 50.1 |
| 2018 M12 | 1.81 | 1.12 | 38.1 | 1.68 | 7.2 | 0.89 | 50.8 |
| 2019 M01 | 1.80 | 1.07 | 40.7 | 1.32 | 26.8 | 0.90 | 50.1 |
| 2019 M02 | 1.75 | 1.04 | 40.6 | 1.39 | 20.6 | 0.90 | 48.7 |
| 2019 M03 | 1.80 | 1.09 | 39.4 | 1.65 | 8.5 | 0.89 | 50.5 |
| 2019 M04 | 1.81 | --- | --- | --- | --- | 0.88 | 51.4 |
| 2019 M05 | 1.93 | 1.08 | 44.2 | 1.32 | 31.5 | 0.83 | 57.2 |
| 2019 M06 | 1.88 | 1.08 | 42.8 | 1.18 | 37.2 | 0.81 | 57.1 |
| 2019 M07 | 1.75 | 1.08 | 38.4 | 1.27 | 27.5 | 0.81 | 53.7 |
| 2019 M08 | 1.92 | 1.08 | 44.1 | 1.22 | 36.5 | 0.79 | 58.8 |
| 2019 M09 | 1.55 | 1.07 | 31.4 | 1.22 | 21.5 | 0.80 | 48.7 |
| 2019 M10 | 1.75 | 1.04 | 40.8 | 1.17 | 33.3 | 0.75 | 57.1 |
| 2019 M11 | 1.60 | 1.05 | 34.4 | 1.15 | 28.3 | 0.98 | 39.1 |
| 2019 M12 | 1.62 | 1.06 | 34.4 | 1.11 | 31.5 | 0.81 | 50.0 |
| 2020 M01 | 1.56 | 1.10 | 30.0 | 1.05 | 32.7 | 0.80 | 48.9 |
| 2020 M02 | 1.59 | 1.15 | 28.0 | 0.91 | 42.8 | 0.82 | 48.7 |
| 2020 M03 | 1.50 | 1.15 | 23.7 | 0.94 | 37.3 | 0.75 | 50.0 |
| 2020 M04 | 1.69 | 1.17 | 30.7 | 0.94 | 44.4 | 0.79 | 53.3 |
| 2020 M05 | 1.78 | 1.15 | 35.2 | 0.96 | 45.8 | 0.83 | 53.2 |
| 2020 M06 | 1.69 | --- | --- | 1.06 | 37.4 | 0.77 | 54.2 |
| 2020 M07 | 1.65 | 1.25 | 24.3 | 0.94 | 43.0 | 0.82 | 50.6 |
| 2020 M08 | 1.68 | 1.34 | 20.3 | 1.00 | 40.6 | 0.75 | 55.5 |
| 2020 M09 | 1.67 | 1.33 | 20.6 | 0.91 | 45.4 | 0.74 | 56.1 |
| 2020 M10 | 1.72 | 1.24 | 28.2 | 0.94 | 45.5 | 0.73 | 57.6 |
| 2020 M11 | 1.81 | 1.22 | 32.7 | 1.22 | 32.7 | 0.72 | 60.1 |
| 2020 M12 | 1.64 | 1.17 | 28.5 | 0.96 | 41.4 | 0.72 | 56.0 |

Table continued on next page.

**Table L-3 continued**
**Raw honey:  Simple-average f.o.b. prices of domestic and imported product 3, and margins of underselling/(overselling), by month**
Price in dollars per pound, margin in percent

| Period | U.S. price | Argentina price | Argentina margin | Brazil price | Brazil margin | India price | India margin |
|---|---|---|---|---|---|---|---|
| 2021 M01 | 1.73 | 1.33 | 23.2 | 1.25 | 27.5 | 0.81 | 53.0 |
| 2021 M02 | 1.54 | --- | --- | 1.37 | 11.1 | 0.81 | 47.3 |
| 2021 M03 | 1.93 | 1.71 | 11.2 | 1.15 | 40.4 | 0.88 | 54.5 |
| 2021 M04 | 1.70 | 1.70 | --- | 1.79 | (5.3) | 0.94 | 44.8 |
| 2021 M05 | 1.70 | 1.78 | (4.5) | 1.53 | 10.3 | 1.03 | 39.8 |
| 2021 M06 | 1.92 | --- | --- | 1.73 | 9.9 | 1.04 | 46.0 |
| 2021 M07 | 1.89 | 1.75 | 7.3 | 1.82 | 3.8 | 0.96 | 49.2 |
| 2021 M08 | 2.10 | 1.82 | 13.5 | 1.73 | 18.0 | 1.12 | 47.0 |
| 2021 M09 | 2.21 | 1.90 | 13.9 | 1.92 | 13.2 | 1.17 | 47.2 |

Table continued on next page.

L-13

Appx445

**Table L-3 continued**
**Raw honey:  Simple-average f.o.b. prices of domestic and imported product 3, and margins of underselling/(overselling), by month**
Price in dollars per pound, margin in percent

| Period | U.S. price | Ukraine price | Ukraine margin | Vietnam price | Vietnam margin | Subject price | Subject margin |
|--------|-----------|---------------|----------------|---------------|----------------|---------------|----------------|
| 2018 M01 | 1.73 | --- | --- | 1.12 | 35.1 | 1.41 | 18.6 |
| 2018 M02 | 1.86 | --- | --- | 0.91 | 51.0 | 1.20 | 35.2 |
| 2018 M03 | 1.83 | --- | --- | 0.90 | 50.7 | 1.17 | 36.0 |
| 2018 M04 | 1.76 | 0.90 | 48.7 | 0.89 | 49.6 | 1.13 | 35.7 |
| 2018 M05 | 1.91 | 1.09 | 42.9 | 0.88 | 53.9 | 1.21 | 36.4 |
| 2018 M06 | 1.85 | 1.09 | 41.0 | 1.00 | 46.1 | 1.15 | 37.9 |
| 2018 M07 | 1.92 | 1.09 | 43.2 | 0.88 | 54.4 | 1.16 | 39.8 |
| 2018 M08 | 1.77 | --- | --- | 0.85 | 52.0 | 1.11 | 37.5 |
| 2018 M09 | 1.84 | --- | --- | 0.86 | 53.3 | 1.07 | 41.7 |
| 2018 M10 | 1.75 | --- | --- | 0.86 | 51.1 | 1.08 | 38.0 |
| 2018 M11 | 1.83 | 1.01 | 44.9 | 0.87 | 52.8 | 1.08 | 40.9 |
| 2018 M12 | 1.81 | 1.09 | 39.8 | 0.85 | 53.0 | 1.17 | 35.3 |
| 2019 M01 | 1.80 | --- | --- | 0.86 | 52.6 | 1.02 | 43.5 |
| 2019 M02 | 1.75 | --- | --- | 0.85 | 51.4 | 1.08 | 38.4 |
| 2019 M03 | 1.80 | 0.93 | 48.3 | 0.83 | 54.1 | 1.13 | 37.1 |
| 2019 M04 | 1.81 | --- | --- | 0.83 | 54.1 | 0.86 | 52.8 |
| 2019 M05 | 1.93 | 0.93 | 51.8 | 0.83 | 57.0 | 0.97 | 49.8 |
| 2019 M06 | 1.88 | --- | --- | 0.85 | 54.7 | 0.94 | 49.8 |
| 2019 M07 | 1.75 | 0.93 | 46.7 | 0.83 | 52.5 | 1.00 | 42.9 |
| 2019 M08 | 1.92 | --- | --- | 0.76 | 60.5 | 0.93 | 51.7 |
| 2019 M09 | 1.55 | --- | --- | 0.76 | 51.1 | 0.93 | 40.3 |
| 2019 M10 | 1.75 | 0.93 | 46.8 | 0.75 | 57.1 | 0.94 | 46.5 |
| 2019 M11 | 1.60 | 0.95 | 40.6 | 0.77 | 52.2 | 1.00 | 37.4 |
| 2019 M12 | 1.62 | --- | --- | 0.77 | 52.7 | 0.94 | 41.7 |
| 2020 M01 | 1.56 | --- | --- | 0.73 | 53.3 | 0.92 | 41.1 |
| 2020 M02 | 1.59 | --- | --- | 0.77 | 51.6 | 0.89 | 43.8 |
| 2020 M03 | 1.50 | 0.94 | 37.7 | 0.73 | 51.3 | 0.90 | 40.0 |
| 2020 M04 | 1.69 | --- | --- | 0.74 | 56.1 | 0.89 | 47.1 |
| 2020 M05 | 1.78 | --- | --- | 0.71 | 60.3 | 0.92 | 48.1 |
| 2020 M06 | 1.69 | --- | --- | 0.73 | 56.7 | 0.83 | 50.6 |
| 2020 M07 | 1.65 | --- | --- | 0.71 | 57.3 | 0.90 | 45.6 |
| 2020 M08 | 1.68 | 0.95 | 43.3 | 0.71 | 57.6 | 0.96 | 43.0 |
| 2020 M09 | 1.67 | --- | --- | 0.71 | 57.6 | 0.92 | 45.1 |
| 2020 M10 | 1.72 | --- | --- | 0.74 | 57.3 | 0.92 | 46.8 |
| 2020 M11 | 1.81 | 0.89 | 51.0 | 0.72 | 60.1 | 0.95 | 47.3 |
| 2020 M12 | 1.64 | 0.86 | 47.8 | 0.70 | 57.3 | 0.89 | 45.4 |

Table continued on next page.

**Table L-3 continued**
**Raw honey:  Simple-average f.o.b. prices of domestic and imported product 3, and margins of underselling/(overselling), by month**

Price in dollars per pound, margin in percent

| Period | U.S. price | Ukraine price | Ukraine margin | Vietnam price | Vietnam margin | Subject price | Subject margin |
|--------|-----------|---------------|----------------|---------------|----------------|---------------|----------------|
| 2021 M01 | 1.73 | --- | --- | 0.77 | 55.7 | 1.04 | 40.0 |
| 2021 M02 | 1.54 | 0.85 | 44.7 | 0.77 | 49.9 | 0.92 | 40.0 |
| 2021 M03 | 1.93 | --- | --- | 0.80 | 58.8 | 1.18 | 38.7 |
| 2021 M04 | 1.70 | 1.02 | 40.0 | 0.86 | 49.4 | 1.24 | 27.3 |
| 2021 M05 | 1.70 | --- | --- | 0.90 | 47.2 | 1.26 | 26.1 |
| 2021 M06 | 1.92 | 0.96 | 49.9 | 0.90 | 53.1 | 1.23 | 35.8 |
| 2021 M07 | 1.89 | --- | --- | 1.34 | 29.2 | 1.57 | 16.8 |
| 2021 M08 | 2.10 | --- | --- | 1.07 | 49.2 | 1.49 | 29.2 |
| 2021 M09 | 2.21 | --- | --- | --- | --- | 1.61 | 26.9 |

Source: Compiled from USDA/AMS data, accessed November 23, 2021.
Note: Product 3: Light amber honey (51 – 85 mm).

**Table L-4**
**Raw honey:  Simple-average f.o.b. prices of domestic and imported product 4, and margins of underselling/(overselling), by month**
Price in dollars per pound, margin in percent

| Period | U.S. price | Argentina price | Argentina margin | Brazil price | Brazil margin | India price | India margin |
|--------|-----------|-----------------|------------------|--------------|---------------|-------------|--------------|
| 2018 M01 | --- | --- | --- | 1.88 | --- | 1.07 | --- |
| 2018 M02 | 1.60 | --- | --- | 1.89 | (18.1) | --- | --- |
| 2018 M03 | 2.00 | --- | --- | 1.89 | 5.5 | 1.07 | 46.5 |
| 2018 M04 | --- | --- | --- | --- | --- | --- | --- |
| 2018 M05 | 1.70 | --- | --- | 1.67 | 1.8 | --- | --- |
| 2018 M06 | --- | --- | --- | 1.67 | --- | --- | --- |
| 2018 M07 | --- | --- | --- | --- | --- | --- | --- |
| 2018 M08 | --- | --- | --- | 1.67 | --- | --- | --- |
| 2018 M09 | 1.62 | --- | --- | --- | --- | --- | --- |
| 2018 M10 | 1.90 | --- | --- | 1.67 | 12.1 | --- | --- |
| 2018 M11 | 1.63 | --- | --- | 1.67 | (2.8) | --- | --- |
| 2018 M12 | 1.45 | --- | --- | --- | --- | --- | --- |
| 2019 M01 | 1.80 | --- | --- | 1.25 | 30.6 | --- | --- |
| 2019 M02 | --- | --- | --- | 1.25 | --- | --- | --- |
| 2019 M03 | 1.55 | --- | --- | 1.25 | 19.4 | --- | --- |
| 2019 M04 | --- | --- | --- | --- | --- | --- | --- |
| 2019 M05 | 0.70 | --- | --- | --- | --- | --- | --- |
| 2019 M06 | 0.91 | --- | --- | --- | --- | 0.76 | 16.3 |
| 2019 M07 | 1.68 | --- | --- | --- | --- | 0.73 | 56.4 |
| 2019 M08 | 1.86 | --- | --- | 1.17 | 37.0 | 0.76 | 59.1 |
| 2019 M09 | 1.96 | --- | --- | 1.17 | 40.4 | --- | --- |
| 2019 M10 | 1.34 | --- | --- | --- | --- | --- | --- |
| 2019 M11 | 1.76 | --- | --- | 1.17 | 33.4 | --- | --- |
| 2019 M12 | 1.63 | --- | --- | --- | --- | --- | --- |
| 2020 M01 | 1.80 | --- | --- | 0.89 | 50.8 | --- | --- |
| 2020 M02 | 1.60 | --- | --- | 0.84 | 47.5 | 0.78 | 51.3 |
| 2020 M03 | 1.65 | --- | --- | 0.97 | 41.2 | --- | --- |
| 2020 M04 | 1.60 | 1.15 | 28.1 | 0.89 | 44.5 | --- | --- |
| 2020 M05 | 1.82 | --- | --- | 0.95 | 47.8 | --- | --- |
| 2020 M06 | 1.66 | --- | --- | 0.94 | 43.3 | --- | --- |
| 2020 M07 | 1.57 | --- | --- | --- | --- | --- | --- |
| 2020 M08 | 1.90 | --- | --- | 0.90 | 52.9 | --- | --- |
| 2020 M09 | 1.69 | 1.30 | 22.8 | --- | --- | --- | --- |
| 2020 M10 | 1.65 | 1.27 | 22.9 | --- | --- | --- | --- |
| 2020 M11 | 1.72 | 1.50 | 12.9 | 0.85 | 50.6 | --- | --- |
| 2020 M12 | 1.58 | 1.18 | 25.1 | 0.86 | 45.7 | --- | --- |

Table continued on next page.

L-16

**Table L-4 continued**
**Raw honey:  Simple-average f.o.b. prices of domestic and imported product 4, and margins of underselling/(overselling), by month**
Price in dollars per pound, margin in percent

| Period | U.S. price | Argentina price | Argentina margin | Brazil price | Brazil margin | India price | India margin |
|---|---|---|---|---|---|---|---|
| 2021 M01 | 1.78 | 1.45 | 18.3 | 1.57 | 11.5 | --- | --- |
| 2021 M02 | 1.50 | --- | --- | 1.30 | 13.3 | --- | --- |
| 2021 M03 | 1.84 | --- | --- | --- | --- | --- | --- |
| 2021 M04 | 1.94 | --- | --- | 1.30 | 33.0 | 1.19 | 38.6 |
| 2021 M05 | 2.05 | --- | --- | 1.84 | 10.2 | --- | --- |
| 2021 M06 | --- | --- | --- | 1.84 | --- | 1.00 | --- |
| 2021 M07 | 2.00 | --- | --- | --- | --- | --- | --- |
| 2021 M08 | 2.27 | --- | --- | 1.75 | 22.9 | --- | --- |
| 2021 M09 | 2.16 | --- | --- | --- | --- | 1.19 | 45.0 |

Table continued on next page.

**Table L-4 continued**
**Raw honey:  Simple-average f.o.b. prices of domestic and imported product 4, and margins of underselling/(overselling), by month**
Price in dollars per pound, margin in percent

| Period | U.S. price | Ukraine price | Ukraine margin | Vietnam price | Vietnam margin | Subject price | Subject margin |
|--------|-----------|---------------|----------------|---------------|----------------|---------------|----------------|
| 2018 M01 | --- | --- | --- | 0.95 | --- | 1.30 | --- |
| 2018 M02 | 1.60 | --- | --- | 0.85 | 47.2 | 1.37 | 14.5 |
| 2018 M03 | 2.00 | --- | --- | 1.00 | 50.3 | 1.32 | 34.1 |
| 2018 M04 | --- | --- | --- | 0.81 | --- | 0.81 | --- |
| 2018 M05 | 1.70 | --- | --- | --- | --- | 1.67 | 1.8 |
| 2018 M06 | --- | --- | --- | --- | --- | 1.67 | --- |
| 2018 M07 | --- | --- | --- | 0.68 | --- | 0.68 | --- |
| 2018 M08 | --- | --- | --- | --- | --- | 1.67 | --- |
| 2018 M09 | 1.62 | --- | --- | 0.68 | 57.9 | 0.68 | 57.9 |
| 2018 M10 | 1.90 | --- | --- | 0.68 | 64.2 | 1.18 | 38.1 |
| 2018 M11 | 1.63 | --- | --- | 0.68 | 58.2 | 1.18 | 27.7 |
| 2018 M12 | 1.45 | --- | --- | 0.68 | 53.1 | 0.68 | 53.1 |
| 2019 M01 | 1.80 | --- | --- | 0.68 | 62.2 | 0.97 | 46.4 |
| 2019 M02 | --- | --- | --- | --- | --- | 1.25 | --- |
| 2019 M03 | 1.55 | --- | --- | --- | --- | 1.25 | 19.4 |
| 2019 M04 | --- | --- | --- | 0.75 | --- | 0.75 | --- |
| 2019 M05 | 0.70 | --- | --- | 0.75 | (7.1) | 0.75 | (7.1) |
| 2019 M06 | 0.91 | --- | --- | 0.72 | 20.7 | 0.74 | 18.5 |
| 2019 M07 | 1.68 | --- | --- | --- | --- | 0.73 | 56.4 |
| 2019 M08 | 1.86 | --- | --- | 0.67 | 63.9 | 0.87 | 53.3 |
| 2019 M09 | 1.96 | --- | --- | 0.71 | 63.8 | 0.94 | 52.1 |
| 2019 M10 | 1.34 | --- | --- | 0.68 | 49.2 | 0.68 | 49.2 |
| 2019 M11 | 1.76 | --- | --- | 0.69 | 60.7 | 0.93 | 47.0 |
| 2019 M12 | 1.63 | --- | --- | 0.66 | 59.7 | 0.66 | 59.7 |
| 2020 M01 | 1.80 | --- | --- | 0.67 | 62.8 | 0.81 | 54.8 |
| 2020 M02 | 1.60 | --- | --- | 0.66 | 59.1 | 0.76 | 52.6 |
| 2020 M03 | 1.65 | --- | --- | --- | --- | 0.97 | 41.2 |
| 2020 M04 | 1.60 | --- | --- | --- | --- | 0.98 | 39.1 |
| 2020 M05 | 1.82 | --- | --- | --- | --- | 0.95 | 47.8 |
| 2020 M06 | 1.66 | --- | --- | --- | --- | 0.94 | 43.3 |
| 2020 M07 | 1.57 | --- | --- | --- | --- | --- | --- |
| 2020 M08 | 1.90 | --- | --- | 0.66 | 65.3 | 0.82 | 57.0 |
| 2020 M09 | 1.69 | --- | --- | 0.66 | 60.8 | 0.98 | 41.8 |
| 2020 M10 | 1.65 | --- | --- | --- | --- | 1.27 | 22.9 |
| 2020 M11 | 1.72 | --- | --- | --- | --- | 1.18 | 31.8 |
| 2020 M12 | 1.58 | --- | --- | --- | --- | 0.96 | 38.8 |

Table continued on next page.

**Table L-4 continued**
**Raw honey:  Simple-average f.o.b. prices of domestic and imported product 4, and margins of underselling/(overselling), by month**
Price in dollars per pound, margin in percent

| Period | U.S. price | Ukraine price | Ukraine margin | Vietnam price | Vietnam margin | Subject price | Subject margin |
|---|---|---|---|---|---|---|---|
| 2021 M01 | 1.78 | --- | --- | --- | --- | 1.51 | 14.9 |
| 2021 M02 | 1.50 | --- | --- | --- | --- | 1.30 | 13.3 |
| 2021 M03 | 1.84 | --- | --- | --- | --- | --- | --- |
| 2021 M04 | 1.94 | --- | --- | --- | --- | 1.26 | 34.9 |
| 2021 M05 | 2.05 | --- | --- | --- | --- | 1.84 | 10.2 |
| 2021 M06 | --- | --- | --- | --- | --- | 1.42 | --- |
| 2021 M07 | 2.00 | --- | --- | --- | --- | --- | --- |
| 2021 M08 | 2.27 | --- | --- | 0.97 | 57.3 | 1.36 | 40.1 |
| 2021 M09 | 2.16 | --- | --- | 1.10 | 49.4 | 1.14 | 47.2 |

Source: Compiled from USDA/AMS data, accessed November 23, 2021.
Note: Product 4: Amber honey (greater than 86 mm).

L-19

**APPENDIX M**

**FINANCIAL RESULTS EXCLUDING \*\*\***

M-1

Table M-1 presents the raw honey operations of all U.S. producers excluding U.S. producers ***, and table M-2 presents the corresponding changes in average unit values.

**Table M-1**
**Raw honey: Results of operations of <u>all U.S. producers</u> excluding ***, by item and period**

Quantity in 1,000 pounds; value in 1,000 dollars; ratios in percent; unit values in dollars per pound; count in number of firms reporting

| Item | Measure | 2018 | 2019 | 2020 |
|------|---------|------|------|------|
| Total net sales | Quantity | *** | *** | *** |
| Total net sales | Value | *** | *** | *** |
| Operating expenses | Value | *** | *** | *** |
| Operating income or (loss) | Value | *** | *** | *** |
| All other expenses | Value | *** | *** | *** |
| Insurance/government program income | Value | *** | *** | *** |
| All other income | Value | *** | *** | *** |
| Net income or (loss) | Value | *** | *** | *** |
| Operating expenses | Ratio to NS | *** | *** | *** |
| Operating income or (loss) | Ratio to NS | *** | *** | *** |
| All other expenses | Ratio to NS | *** | *** | *** |
| Insurance/government program income | Ratio to NS | *** | *** | *** |
| All other income | Ratio to NS | *** | *** | *** |
| Net income or (loss) | Ratio to NS | *** | *** | *** |
| Total net sales | Unit value | *** | *** | *** |
| Operating expenses | Unit value | *** | *** | *** |
| Operating income or (loss) | Unit value | *** | *** | *** |
| All other expenses | Unit value | *** | *** | *** |
| Insurance/government program income | Unit value | *** | *** | *** |
| All other income | Unit value | *** | *** | *** |
| Net income or (loss) | Unit value | *** | *** | *** |
| Operating losses | Count | *** | *** | *** |
| Net losses | Count | *** | *** | *** |
| Data | Count | *** | *** | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

M-3

**Table M-2**
**Raw honey: Changes in AUVs for <u>all U.S. producers</u> excluding \*\*\* between comparison periods**

Unit values in dollars per pound

| Item | Changes Measured In | 2018-20 | 2018-19 | 2019-20 |
|------|--------------------|---------|---------|---------|
| Total net sales | Percent | \*\*\* | \*\*\* | \*\*\* |
| Operating expenses | Percent | \*\*\* | \*\*\* | \*\*\* |
| Total net sales | Unit value | \*\*\* | \*\*\* | \*\*\* |
| Operating expenses | Unit value | \*\*\* | \*\*\* | \*\*\* |
| Operating income or (loss) | Unit value | \*\*\* | \*\*\* | \*\*\* |
| All other expenses | Unit value | \*\*\* | \*\*\* | \*\*\* |
| Insurance/government program income | Unit value | \*\*\* | \*\*\* | \*\*\* |
| All other income | Unit value | \*\*\* | \*\*\* | \*\*\* |
| Net income or (loss) | Unit value | \*\*\* | \*\*\* | \*\*\* |

Source: Compiled from data submitted in response to Commission questionnaires.

M-4

Table M-3 presents the raw honey operations of all large U.S. producers excluding U.S. producers ***, and table M-4 presents the corresponding changes in average unit values.

**Table M-3**
**Raw honey: Results of operations of <u>large U.S. producers</u> excluding \*\*\*, by item and period**

Quantity in 1,000 pounds; value in 1,000 dollars; ratios in percent; unit values in dollars per pound; count in number of firms reporting

| Item | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|------|---------|------|------|------|--------------|--------------|
| Total net sales | Quantity | *** | *** | *** | *** | *** |
| Total net sales | Value | *** | *** | *** | *** | *** |
| Operating expenses | Value | *** | *** | *** | *** | *** |
| Operating income or (loss) | Value | *** | *** | *** | *** | *** |
| All other expenses | Value | *** | *** | *** | *** | *** |
| Insurance/government program income | Value | *** | *** | *** | *** | *** |
| All other income | Value | *** | *** | *** | *** | *** |
| Net income or (loss) | Value | *** | *** | *** | *** | *** |
| Depreciation/amortization | Value | *** | *** | *** | *** | *** |
| Cash flow | Value | *** | *** | *** | *** | *** |
| Operating expenses | Ratio to NS | *** | *** | *** | *** | *** |
| Operating income or (loss) | Ratio to NS | *** | *** | *** | *** | *** |
| All other expenses | Ratio to NS | *** | *** | *** | *** | *** |
| Insurance/government program income | Ratio to NS | *** | *** | *** | *** | *** |
| All other income | Ratio to NS | *** | *** | *** | *** | *** |
| Net income or (loss) | Ratio to NS | *** | *** | *** | *** | *** |
| Total net sales | Unit value | *** | *** | *** | *** | *** |
| Operating expenses | Unit value | *** | *** | *** | *** | *** |
| Operating income or (loss) | Unit value | *** | *** | *** | *** | *** |
| All other expenses | Unit value | *** | *** | *** | *** | *** |
| Insurance/government program income | Unit value | *** | *** | *** | *** | *** |
| All other income | Unit value | *** | *** | *** | *** | *** |
| Net income or (loss) | Unit value | *** | *** | *** | *** | *** |
| Operating losses | Count | *** | *** | *** | *** | *** |
| Net losses | Count | *** | *** | *** | *** | *** |
| Data | Count | *** | *** | *** | *** | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

M-5

**Table M-4**
**Raw honey: Changes in AUVs for <u>large U.S. producers</u> excluding \*\*\* between comparison periods**

Unit values in dollars per pound

| Item | Changes Measured In | 2018-20 | 2018-19 | 2019-20 | Jan-Sep 2020-21 |
|---|---|---|---|---|---|
| Total net sales | Percent | *** | *** | *** | *** |
| Operating expenses | Percent | *** | *** | *** | *** |
| Total net sales | Unit value | *** | *** | *** | *** |
| Operating expenses | Unit value | *** | *** | *** | *** |
| Operating income or (loss ) | Unit value | *** | *** | *** | *** |
| All other expenses | Unit value | *** | *** | *** | *** |
| Insurance or government program income | Unit value | *** | *** | *** | *** |
| All other income | Unit value | *** | *** | *** | *** |
| Net income or (loss) | Unit value | *** | *** | *** | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

Note:  Unit values shown as "(0.00)" represent values less than "0.00" but more than "(0.005)."

**APPENDIX N**

**ALTERNATIVE FINANCIAL RESULTS**

N-1

Tables N-1 and N-2 present the raw honey operations of all U.S. producers and large U.S. producers, respectively, excluding U.S. producers ***.

**Table N-1**
**Raw honey: Results of operations of <u>all U.S. producers</u> excluding ***, by item and period**

Quantity in 1,000 pounds; value in 1,000 dollars; ratios in percent; unit values in dollars per pound; count in number of firms reporting

| Item | Measure | 2018 | 2019 | 2020 |
|------|---------|------|------|------|
| Total net sales | Quantity | *** | *** | *** |
| Total net sales | Value | *** | *** | *** |
| Operating expenses | Value | *** | *** | *** |
| Operating income or (loss) | Value | *** | *** | *** |
| All other expenses | Value | *** | *** | *** |
| Insurance/government program income | Value | *** | *** | *** |
| All other income | Value | *** | *** | *** |
| Net income or (loss) | Value | *** | *** | *** |
| Operating expenses | Ratio to NS | *** | *** | *** |
| Operating income or (loss) | Ratio to NS | *** | *** | *** |
| All other expenses | Ratio to NS | *** | *** | *** |
| Insurance/government program income | Ratio to NS | *** | *** | *** |
| All other income | Ratio to NS | *** | *** | *** |
| Net income or (loss) | Ratio to NS | *** | *** | *** |
| Total net sales | Unit value | *** | *** | *** |
| Operating expenses | Unit value | *** | *** | *** |
| Operating income or (loss) | Unit value | *** | *** | *** |
| All other expenses | Unit value | *** | *** | *** |
| Insurance/government program income | Unit value | *** | *** | *** |
| All other income | Unit value | *** | *** | *** |
| Net income or (loss) | Unit value | *** | *** | *** |
| Operating losses | Count | *** | *** | *** |
| Net losses | Count | *** | *** | *** |
| Data | Count | *** | *** | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

**Table N-2**
**Raw honey: Results of operations of <u>large U.S. producers</u> excluding \*\*\*, by item and period**

Quantity in 1,000 pounds; value in 1,000 dollars; ratios in percent; unit values in dollars per pound; count in number of firms reporting

| Item | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| Total net sales | Quantity | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Total net sales | Value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Operating expenses | Value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Operating income or (loss) | Value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| All other expenses | Value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Insurance/government program income | Value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| All other income | Value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Net income or (loss) | Value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Operating expenses | Ratio to NS | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Operating income or (loss) | Ratio to NS | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| All other expenses | Ratio to NS | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Insurance/government program income | Ratio to NS | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| All other income | Ratio to NS | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Net income or (loss) | Ratio to NS | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Total net sales | Unit value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Operating expenses | Unit value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Operating income or (loss) | Unit value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| All other expenses | Unit value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Insurance/government program income | Unit value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| All other income | Unit value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Net income or (loss) | Unit value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Operating losses | Count | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Net losses | Count | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Data | Count | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |

Source: Compiled from data submitted in response to Commission questionnaires.

Tables N-3 and N-4 present the raw honey operations results of all U.S. producers and large U.S. producers, respectively, with adjustments made to the financial data reported by *** to estimate what the industry's results would have been had these companies sold the amount of raw honey they produced in each period. The companies' data were adjusted by using reported production in each period for the total net sales quantities, while their total net sales values were calculated based on the amount of honey produced multiplied by their net sales AUVs (calculated from submissions prior to adjustments) for each period.[1] Since a company's relative sales revenue was used to allocate its shared operating expenses, changing the companies' sales revenues also resulted in changes to operating expenses.

---

[1] ***.

**Table N-3**
**Raw honey: Estimated results of operations of <u>all U.S. producers</u> with adjustments made to the data reported by \*\*\*, by item and period**

Quantity in 1,000 pounds; value in 1,000 dollars; ratios in percent; unit values in dollars per pound; count in number of firms reporting

| Item | Measure | 2018 | 2019 | 2020 |
|------|---------|------|------|------|
| Total net sales | Quantity | \*\*\* | \*\*\* | \*\*\* |
| Total net sales | Value | \*\*\* | \*\*\* | \*\*\* |
| Operating expenses | Value | \*\*\* | \*\*\* | \*\*\* |
| Operating income or (loss) | Value | \*\*\* | \*\*\* | \*\*\* |
| All other expenses | Value | \*\*\* | \*\*\* | \*\*\* |
| Insurance/government program income | Value | \*\*\* | \*\*\* | \*\*\* |
| All other income | Value | \*\*\* | \*\*\* | \*\*\* |
| Net income or (loss) | Value | \*\*\* | \*\*\* | \*\*\* |
| Operating expenses | Ratio to NS | \*\*\* | \*\*\* | \*\*\* |
| Operating income or (loss) | Ratio to NS | \*\*\* | \*\*\* | \*\*\* |
| All other expenses | Ratio to NS | \*\*\* | \*\*\* | \*\*\* |
| Insurance/government program income | Ratio to NS | \*\*\* | \*\*\* | \*\*\* |
| All other income | Ratio to NS | \*\*\* | \*\*\* | \*\*\* |
| Net income or (loss) | Ratio to NS | \*\*\* | \*\*\* | \*\*\* |
| Total net sales | Unit value | \*\*\* | \*\*\* | \*\*\* |
| Operating expenses | Unit value | \*\*\* | \*\*\* | \*\*\* |
| Operating income or (loss) | Unit value | \*\*\* | \*\*\* | \*\*\* |
| All other expenses | Unit value | \*\*\* | \*\*\* | \*\*\* |
| Insurance/government program income | Unit value | \*\*\* | \*\*\* | \*\*\* |
| All other income | Unit value | \*\*\* | \*\*\* | \*\*\* |
| Net income or (loss) | Unit value | \*\*\* | \*\*\* | \*\*\* |
| Operating losses | Count | \*\*\* | \*\*\* | \*\*\* |
| Net losses | Count | \*\*\* | \*\*\* | \*\*\* |
| Data | Count | \*\*\* | \*\*\* | \*\*\* |

Source: Compiled from data submitted in response to Commission questionnaires.

N-6

**Table N-4**
**Raw honey: Estimated results of operations of <u>large U.S. producers</u> with adjustments made to the data reported by \*\*\*, by item and period**

Quantity in 1,000 pounds; value in 1,000 dollars; ratios in percent; unit values in dollars per pound; count in number of firms reporting

| Item | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|---|---|---|---|---|---|---|
| Total net sales | Quantity | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Total net sales | Value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Operating expenses | Value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Operating income or (loss) | Value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| All other expenses | Value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Insurance/government program income | Value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| All other income | Value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Net income or (loss) | Value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Operating expenses | Ratio to NS | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Operating income or (loss) | Ratio to NS | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| All other expenses | Ratio to NS | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Insurance/government program income | Ratio to NS | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| All other income | Ratio to NS | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Net income or (loss) | Ratio to NS | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Total net sales | Unit value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Operating expenses | Unit value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Operating income or (loss) | Unit value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| All other expenses | Unit value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Insurance/government program income | Unit value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| All other income | Unit value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Net income or (loss) | Unit value | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Operating losses | Count | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Net losses | Count | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |
| Data | Count | \*\*\* | \*\*\* | \*\*\* | \*\*\* | \*\*\* |

Source: Compiled from data submitted in response to Commission questionnaires.

**APPENDIX O**

**EXPANDED DOMESTIC LIKE PRODUCT FINANCIAL RESULTS**

O-1

Tables O-1 and O-2 show select financial results of within-scope raw honey and out-of-scope honey packaged for retail sale for all U.S. producers and large U.S. producers, respectively.[1]

**Table O-1**
**Expanded like product: Results of operations of <u>all U.S. producers</u> for raw honey and the incremental value of raw honey packaged for retail sale, by item and period**

Quantity in 1,000 pounds; value in 1,000 dollars; ratios in percent; unit values in dollars per pound

| Item | Measure | 2018 | 2019 | 2020 |
|------|---------|------|------|------|
| Total net sales | Quantity | *** | *** | *** |
| Total net sales | Value | *** | *** | *** |
| Operating expenses | Value | *** | *** | *** |
| Operating income or (loss) | Value | *** | *** | *** |
| Operating expenses | Ratio to NS | *** | *** | *** |
| Operating income or (loss) | Ratio to NS | *** | *** | *** |
| Total net sales | Unit value | *** | *** | *** |
| Operating expenses | Unit value | *** | *** | *** |
| Operating income or (loss) | Unit value | *** | *** | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

**Table O-2**
**Expanded like product: Results of operations of <u>large U.S. producers</u> for raw honey and the incremental value of raw honey packaged for retail sale, by item and period**

Quantity in 1,000 pounds; value in 1,000 dollars; ratios in percent; unit values in dollars per pound

| Item | Measure | 2018 | 2019 | 2020 | Jan-Sep 2020 | Jan-Sep 2021 |
|------|---------|------|------|------|--------------|--------------|
| Total net sales | Quantity | *** | *** | *** | *** | *** |
| Total net sales | Value | *** | *** | *** | *** | *** |
| Operating expenses | Value | *** | *** | *** | *** | *** |
| Operating income or (loss) | Value | *** | *** | *** | *** | *** |
| Operating expenses | Ratio to NS | *** | *** | *** | *** | *** |
| Operating income or (loss) | Ratio to NS | *** | *** | *** | *** | *** |
| Total net sales | Unit value | *** | *** | *** | *** | *** |
| Operating expenses | Unit value | *** | *** | *** | *** | *** |
| Operating income or (loss) | Unit value | *** | *** | *** | *** | *** |

Source: Compiled from data submitted in response to Commission questionnaires.

---

[1] Only the sales quantity of honey packaged for retail sale was collected from small U.S. producers. U.S. producers' questionnaire responses, section II-3. Therefore, the incremental value of sales and operating expenses were calculated from the large U.S. producers' reported data, and were applied to the corresponding quantities of reported sales.

*PAGE INTENTIONALLY LEFT BLANK*

Views of the Commission

Non-Confidential

Appx471-543

## Views of the Commission

Based on the record in the final phase of these investigations, we determine that an industry in the United States is materially injured by reason of imports of raw honey from Argentina, Brazil, India, and Vietnam found by the U.S. Department of Commerce ("Commerce") to be sold in the United States at less than fair value.  We find that critical circumstances exist with respect to imports of raw honey from Vietnam that are subject to Commerce's final affirmative critical circumstances determination.[1]  We also find that critical circumstances do not exist with respect to imports of raw honey from Argentina that are subject to Commerce's final affirmative critical circumstances determination.

## I.    Background

The American Honey Producers Association and the Sioux Honey Association ("SHA") (collectively, "Petitioners") filed the petitions in these investigations on April 21, 2021, alleging that an industry in the United States is materially injured and threatened with material injury by reason of less-than-fair-value ("LTFV") imports of raw honey from Argentina, Brazil, India, Ukraine,[2] and Vietnam.[3]  Representatives from members of the associations provided written testimony, appeared at the hearing accompanied by counsel, and submitted joint prehearing and posthearing briefs, and final comments.[4]

Several respondent entities participated in the final phase investigations.  The National Honey Packers & Dealers Association ("NHPDA") provided written testimony, appeared at the hearing accompanied by counsel, and submitted prehearing and posthearing briefs, and final comments.[5]  Purchasers Bimbo Bakeries USA, Inc. ("Bimbo Bakeries"), General Mills Operations, LLC ("General Mills"), Post Holdings, Inc. ("Post"), and Smithfield Foods, Inc. ("Smithfield")

---

[1] Commissioner Johanson has made a negative critical circumstances finding with respect to imports of raw honey from Vietnam that are subject to Commerce's final affirmative critical circumstances determination.  *See* Separate Views of Commissioner David S. Johanson.

[2] The petition as originally filed included imports of raw honey from Ukraine.  On March 24, 2022, citing the war in Ukraine, Petitioners filed a letter with the Commission and Commerce withdrawing the petition as to imports of raw honey from Ukraine.  The Commission and Commerce subsequently terminated their respective investigations with respect to raw honey from Ukraine. Confidential Report, Memorandum INV-UU-043 (Apr. 28, 2022) ("CR") and Public Report, USITC Pub. 5327 (May 2022) ("PR") at Table I-1; *Raw Honey from Ukraine; Termination of Investigation*, 87 Fed. Reg. 20462 (Apr. 7, 2022).

[3] CR/PR at I-1.

[4] In light of the restrictions on access to the Commission building due to the COVID-19 pandemic, the Commission conducted its hearing through written witness testimony and a videoconference held on April 13, 2022, as set forth in procedures provided to the parties.  *Raw Honey From Argentina, Brazil, India, Ukraine, and Vietnam, Scheduling of the Final Phase of Antidumping Duty Investigations,* 86 Fed. Reg. 70144 (Dec. 9, 2021).

[5] The Export Packers Company Limited and Sweet Harvest Foods, both importers of the subject merchandise, joined with NHPDA in submitting a separate appendix to NHPDA's Prehearing brief addressing critical circumstances.  *See* NHPDA's Prehearing Brief, Appendix A.  A representative from Sweet Harvest Honey also appeared at the hearing, accompanied by counsel.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

(collectively, "Ingredient Purchasers") provided written testimony, appeared at the hearing accompanied by counsel, and submitted prehearing and posthearing written statements.[6]

U.S. industry data are based on data reported by the National Agriculture Statistics Services of the U.S. Department of Agriculture ("USDA/NASS") and the questionnaire responses of 84 firms that accounted for 31.2 percent of U.S. production of raw honey during 2020 as reported by USDA/NASS.[7]  U.S. imports are based on official import statistics and the questionnaire responses of 25 importers that represent 101.5 percent of U.S. imports from subject sources and 71.8 percent of U.S. imports from nonsubject sources in 2020 based on official import statistics.[8]  The Commission received 21 usable questionnaire responses from firms that had purchased raw honey during the period of investigation ("POI") (January 2018-September 2021).[9]  Foreign industry data are based on the questionnaire responses of 53 firms that reported exports to the United States equivalent to 94.3 percent of U.S. imports of raw honey from Argentina, Brazil, India, and Vietnam during 2020 as reported in official U.S. import statistics.[10]

## II.    Domestic Like Product

### A.    In General

In determining whether an industry in the United States is materially injured or threatened with material injury by reason of imports of subject merchandise, the Commission first defines the "domestic like product" and the "industry."[11]  Section 771(4)(A) of the Tariff Act of 1930, as amended ("the Tariff Act"), defines the relevant domestic industry as the "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total production of

---

[6] Because purchasers of the subject merchandise are not interested parties, they submitted brief written statements rather than briefs.  A representative from the American Bakers' Association also presented written testimony and appeared at the hearing in opposition to the imposition of duties.

[7] CR/PR at III-2.

[8] CR/PR at I-5, IV-1 n.2.  The ***.

[9] CR/PR at II-2.

[10] CR/PR at I-5.  Industry data for Argentina are based on 13 firms that provided foreign producer questionnaires to the Commission.  These firms' exports to the United States accounted for approximately 97.1 percent of U.S. imports of raw honey from Argentina in 2020.  CR/PR at VII-3. Industry data for Brazil are based on 10 firms that provided foreign producer questionnaires to the Commission.  These firms' exports to the United States accounted for approximately four-fifths, *i.e.*, 81.6 percent, of U.S. imports of raw honey from Brazil in 2020.  CR/PR at VII-10.  Industry data for India are based on nine firms that provided foreign producer questionnaires to the Commission.  These firms' exports to the United States accounted for approximately 105.6 percent of U.S. imports of raw honey from India in 2020.  CR/PR at VII-16.  Industry data for Vietnam are based on 21 firms that provided foreign producer questionnaires to the Commission.  These firms' exports to the United States accounted for approximately 92.1 percent of U.S. imports of raw honey from Vietnam in 2020.  CR/PR at VII-22.

[11] 19 U.S.C. § 1677(4)(A).

the product."[12]  In turn, the Tariff Act defines "domestic like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation."[13]

By statute, the Commission's "domestic like product" analysis begins with the "article subject to an investigation," *i.e.*, the subject merchandise as determined by Commerce.[14] Therefore, Commerce's determination as to the scope of the imported merchandise that is subsidized and/or sold at less than fair value is "necessarily the starting point of the Commission's like product analysis."[15]  The Commission then defines the domestic like product in light of the imported articles Commerce has identified.[16]  The decision regarding the appropriate domestic like product(s) in an investigation is a factual determination, and the Commission has applied the statutory standard of "like" or "most similar in characteristics and uses" on a case-by-case basis.[17]  No single factor is dispositive, and the Commission may consider other factors it deems relevant based on the facts of a particular investigation.[18]  The Commission looks for clear dividing lines among possible like products and disregards minor variations.[19]

---

[12] 19 U.S.C. § 1677(4)(A).

[13] 19 U.S.C. § 1677(10).

[14] 19 U.S.C. § 1677(10).  The Commission must accept Commerce's determination as to the scope of the imported merchandise that is subsidized and/or sold at less than fair value.  *See, e.g.*, *USEC, Inc. v. United States*, 34 Fed. App'x 725, 730 (Fed. Cir. 2002) ("The ITC may not modify the class or kind of imported merchandise examined by Commerce."); *Algoma Steel Corp. v. United States,* 688 F. Supp. 639, 644 (Ct. Int'l Trade 1988), *aff'd,* 865 F.2d 240 (Fed. Cir.), *cert. denied,* 492 U.S. 919 (1989).

[15] *Cleo Inc. v. United States,* 501 F.3d 1291, 1298 (Fed. Cir. 2007); *see also Hitachi Metals, Ltd. v. United States*, Case No. 19-1289, slip op. at 8-9 (Fed. Cir. 2020) (the statute requires the Commission to start with Commerce's subject merchandise in reaching its own like product determination).

[16] *Cleo*, 501 F.3d at 1298 n.1 ("Commerce's {scope} finding does not control the Commission's {like product} determination."); *Hosiden Corp. v. Advanced Display Mfrs.,* 85 F.3d 1561, 1568 (Fed. Cir. 1996) (the Commission may find a single like product corresponding to several different classes or kinds defined by Commerce); *Torrington Co. v. United States*, 747 F. Supp. 744, 748–52 (Ct. Int'l Trade 1990), *aff'd,* 938 F.2d 1278 (Fed. Cir. 1991) (affirming the Commission's determination defining six like products in investigations where Commerce found five classes or kinds).

[17] *See, e.g., Cleo Inc. v. United States,* 501 F.3d 1291, 1299 (Fed. Cir. 2007); *NEC Corp. v. Dep't of Commerce*, 36 F. Supp. 2d 380, 383 (Ct. Int'l Trade 1998); *Nippon Steel Corp. v. United States,* 19 CIT 450, 455 (1995); *Torrington Co. v. United States,* 747 F. Supp. 744, 749 n.3 (Ct. Int'l Trade 1990), *aff'd,* 938 F.2d 1278 (Fed. Cir. 1991) ("every like product determination 'must be made on the particular record at issue' and the 'unique facts of each case'").  The Commission generally considers a number of factors, including the following:  (1) physical characteristics and uses; (2) interchangeability; (3) channels of distribution; (4) customer and producer perceptions of the products; (5) common manufacturing facilities, production processes, and production employees; and, where appropriate, (6) price.  *See Nippon,* 19 CIT at 455 n.4; *Timken Co. v. United States,* 913 F. Supp. 580, 584 (Ct. Int'l Trade 1996).

[18] *See, e.g.*, S. Rep. No. 96-249 at 90-91 (1979).

[19] *Nippon*, 19 CIT at 455; *Torrington*, 747 F. Supp. at 748-49; *see also* S. Rep. No. 96-249 at 90-91 (Congress has indicated that the like product standard should not be interpreted in "such a narrow fashion as to permit minor differences in physical characteristics or uses to lead to the conclusion that (Continued...)

### B.    Product Description

Commerce defined the scope of the imported merchandise under investigation as:

> {R}aw honey.  Raw honey is honey as it exists in the beehive or as obtained by extraction, settling and skimming, or coarse straining.  Raw honey has not been filtered to a level that results in the removal of most or all of the pollen, *e.g.,* a level that removes pollen to below 25 microns.  The subject products include all grades, floral sources and colors of raw honey and also include organic raw honey.
>
> Excluded from the scope is any honey that is packaged for retail sale (*e.g.,* in bottles or other retail containers of five (5) lbs. or less).
>
> The merchandise subject to this investigation is currently classifiable under statistical subheading 0409.00.0005, 0409.00.0035, 0409.00.0045, 0409.00.0056, and 0409.00.0065 of the Harmonized Tariff Schedule of the United States (HTSUS).  Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of this investigation is dispositive.[20]

As is evident from the above scope description, these investigations concern raw honey, *i.e.,* honey that has not had most or all of the pollen filtered out, a process performed by "packers."[21]  Processing by packers also includes the heating, straining, and FDA grading of the honey.[22]  Once processed, the honey is packaged for retail, food service, industrial food manufacturing, and other industrial uses, such as cosmetics.[23]  In addition to the scope not including processed honey, the scope language specifically excludes any honey bottled for retail sale.

---

the product and article are not 'like' each other, nor should the definition of 'like product' be interpreted in such a fashion as to prevent consideration of an industry adversely affected by the imports under consideration.").

[20] *Raw Honey From Argentina: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances,* 87 Fed. Reg. 22179 (Apr. 14, 2022); *Raw Honey From Brazil: Final Determination of Sales at Less Than Fair Value,* 87 Fed. Reg. 22182 (Apr. 14, 2022); *Raw Honey From India: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 87 Fed. Reg. 22188 (Apr. 14, 2022); *Raw Honey From the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances,* 87 Fed. Reg. 22184 (Apr. 14, 2022).

[21] Processors of raw honey are known as packers.  CR/PR at I-27.

[22] Petitioners' Prehearing Brief at 8 n.10 and Exhibit 4, para. 7.  Beekeepers may also perform a certain amount of processing.  CR/PR at I-26 to I-27.

[23] CR/PR at I-3.  Retail honey is often labeled "raw and unfiltered" even though it has in fact been processed to some extent.  Petitioners' Prehearing Brief at 8 n.10 and Exhibit 4, para. 7.  Petitioners' witness stated that it is filtered to 150 microns instead of 25 microns.  Hearing Tr. at 144 (Blumenthal).

The USDA describes filtered honey as having most of the pollen grains, air bubbles, or other materials normally found in suspension, removed.[24]  While the scope language provides 25 microns as an example of the level of filtration that occurs during the processing of raw honey, this level does not appear in honey grading standards or in FDA guidance documents related to the labeling of honey.[25]  Rather, 25 microns is an estimate of the size of pollen grains.[26]

### C.  Arguments of the Parties

*Petitioners' Arguments*.  Petitioners argue that the Commission should define a single domestic like product, coextensive with Commerce's scope, as it did in its preliminary determinations.  They contend that the Commission correctly rejected Respondents' arguments in the preliminary phase to define the domestic like product more broadly than Commerce's scope definition to include a downstream product, processed honey.[27]

Petitioners also argue that consistent with the like product definition in the preliminary phase of these investigations, the Commission should not include raw honey packaged for retail sale in its definition of the domestic like product.  They maintain that retail packaged raw honey, which is explicitly excluded from Commerce's scope definition and represents roughly 3 percent of beekeepers' sales, differs in important ways from raw honey packaged in bulk containers.[28]  Petitioners highlight a survey of market participants in the Commission's final phase questionnaires concerning the comparability of raw honey packaged in bulk and that packaged for retail sale.  They maintain that the survey results confirm that raw honey packaged for retail sale differs from raw honey sold in bulk containers.[29]

*Respondents' Arguments*.  None of the Respondents addressed the issue of the domestic like product definition in the final phase of these investigations.

---

[24] CR/PR at I-16.

[25] CR/PR at I-16.

[26] CR/PR at I-16.  The Ingredient Purchasers report that they purchase in-scope raw honey from processors or packers of raw honey for use in products such as ***.  The purchased honey is often ***. *See* Ingredient Purchasers' Posthearing Statement, Answers to Commissioner Questions at 10-13.  They maintain the honey they purchase is in-scope raw honey because ***. *See* CR/PR at II-2 n.12; Ingredient Purchasers' Posthearing Statement, Answers to Commissioner Questions at 19-21.  Petitioners dispute that Ingredient Purchasers purchase raw honey and argue that ***.  Petitioners' Prehearing Brief at 49 and Exhibit 8 at paras. 4, 6, 8, and 10 and Attachments B, C and D (***).  We assume, for the sake of argument, that the Ingredient Purchasers purchased in-scope raw honey and we have therefore included their questionnaire responses as purchasers.  We did not, however, include their pricing data in the price comparisons in order to avoid double counting, as those quantities were already included in the price comparisons as sales from importers to processor/packers.  Furthermore, the purchases by Ingredient Purchasers from processor/packers were at a different level of trade than the sales from domestic producers or importers to processor/packers.

[27] Petitioners' Prehearing Brief at 5-7.

[28] Petitioners' Prehearing Brief at 7-9.

[29] Petitioners' Prehearing Brief at 8-9.

### D.    Analysis

In its preliminary determinations, the Commission defined a single domestic like product coextensive with the scope.  It rejected Respondents' arguments that it should expand the domestic like product beyond Commerce's scope definition to include processed honey and raw honey in retail packaging.[30]

In considering Respondents' arguments that it should define the domestic like product more broadly to include processed honey, the Commission indicated that it generally does not define a domestic like product more broadly than the scope definition to include a downstream product such as processed honey.  The Commission observed that such an expansion would include firms in the domestic industry (honey packers) whose interests are adverse to the members of the industry (beekeepers) producing the articles (raw honey) subject to investigation.  It also declined to apply a semi-finished like product analysis, stating that such an analysis examines whether different articles within the scope at different stages of processing should be included in the same definition of the domestic like product.[31]

The Commission considered whether to include raw honey in retail packaging (also excluded from the scope definition) in its definition of the domestic like product.  In doing so, the Commission applied its traditional six-factor like product analysis.  The Commission found that raw honey in bulk and raw honey packaged for retail sale share the same physical characteristics other than packaging and may be produced in the same facilities and with the same employees.  It found, however, that differences in packaging and price appear to limit interchangeability as a practical matter, and that raw honey in bulk packaging and packaged for retail sale are sold through different channels of distribution.  The Commission also noted that information concerning producer and customer perceptions of raw honey in bulk and retail packaging was limited.  Finally, it stated that raw honey sold in retail packaging would necessarily be priced higher than that sold in bulk containers.[32]

Given these differences, the Commission determined in its preliminary determinations not to include raw honey in retail packaging in its domestic like product definition and defined the domestic like product coextensive with Commerce's scope definition to include raw honey other than that in retail packaging.  The Commission indicated, however, that it would seek additional information relevant to the analysis of this issue in any final phase investigations.[33]

In the final phase of the investigations, the Commission issued questionnaires designed to gather additional information concerning the comparability of raw honey in retail packaging and other raw honey from domestic producers, importers, and purchasers for each of the six domestic like product factors.[34]

---

[30] *Raw Honey from Argentina, Brazil, India, Ukraine, and Vietnam*, Inv Nos. 731-TA-1560-1564 (Preliminary), USITC Pub. 5204 (June 2021) ("Preliminary Determinations") at 10-14.

[31] Preliminary Determinations, USITC Pub. 5204 at 10, 10 n.35.

[32] Preliminary Determinations, USITC Pub. 5204 at 12-13.

[33] Preliminary Determinations, USITC Pub. 5204 at 12-13.

[34] In its comments on draft questionnaires in the final phase of the investigations, NHPDA requested that the Commission seek additional information concerning raw honey in retail packaging.  NHPDA's Comments on Draft Questionnaires (Sept. 10, 2021) at 5-8.  NHPDA did not, however, pursue any domestic like product arguments in the final phase.

In their questionnaire responses, domestic producers generally reported that raw honey in retail packaging is not at all comparable or similar to other raw honey with respect to any of the six domestic like product factors the Commission typically analyzes.[35] The majority of domestic producers reported that raw honey in retail packaging is "never" comparable to other raw honey for each of the six factors.[36]

A majority of purchasers reported that raw honey in different packaging is "somewhat" or "never" comparable for four domestic like product factors: Channels of distribution, manufacturing facilities and employees, producer and customer perceptions, and price. A majority of purchasers indicated that raw honey in different packaging is "fully" or "mostly" comparable with respect to two domestic like product factors: physical characteristics and uses, and interchangeability. Importers reported substantially more comparability between raw honey in different packaging: a majority of importers reported that raw honey in different packaging was "fully" or "mostly" comparable with respect to each domestic like product factor.[37]

Market participants were also asked in the questionnaires to discuss the reasons for the ratings of comparability they provided. While there were a wide range of comments, many of the comments do not address the comparability of retail packaged raw honey and bulk raw honey and instead appear addressed to processed honey.[38] Those comments that do make the proper comparison tend to support the Commission's findings in its preliminary investigations with respect to the six domestic like product factors.[39]

Thus, the comparability information collected in the final phase and limited additional information[40] continue to support defining a single domestic like product coextensive with

---

[35] The Commission generally considers the following factors: (1) physical characteristics and uses; (2) interchangeability; (3) channels of distribution; (4) customer and producer perceptions of the products; (5) common manufacturing facilities, production processes, and production employees; and, where appropriate, (6) price.

[36] *See* CR/PR at Table D-1.

[37] *See* CR/PR at Table D-1.

[38] *See* CR/PR at Tables D-2 to D-4.

[39] The comments indicate that the physical characteristics of raw honey in different packaging are the same but that different packaging of raw honey limits interchangeability. The comments also confirm that raw honey in retail packaging is sold through different channels of distribution: raw honey in retail packaging is sold to retail customers while bulk raw honey is sold to processors. While the comments suggest some overlap in manufacturing facilities, production processes, and production employees, the comments also indicate that raw honey in retail packaging is priced higher than bulk raw honey. With respect to producer and customer perceptions concerning raw honey in retail packaging, market participants' opinions varied widely but suggest comparability to bulk raw honey insofar as the raw honey is the same honey despite being packaged differently. *See* CR/PR at Tables D-2 to D-4.

[40] The record in the final phase indicates that raw honey in retail packaging is sold at higher prices than bulk honey. The financial data staff collected on these sales reflect higher sales values for combined sales. *Compare* CR/PR at Table VI-1 ($1.58 to $1.78 per pound) *with* Table O-1 ($1.62 to $1.82 per pound).

Petitioners have also identified new information in the final phase of the investigations pertinent to the Commission's analysis of raw honey in retail packaging. They attach an exhibit to their (Continued...)

Commerce's scope, as the Commission did in its preliminary determinations. Moreover, no party has argued to the contrary in the final phase. Consequently, we define a single domestic like product consisting of raw honey coextensive with the scope of the investigations.

## III. Domestic Industry

The domestic industry is defined as the domestic "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product."[41] In defining the domestic industry, the Commission's general practice has been to include in the industry producers of all domestic production of the like product, whether toll-produced, captively consumed, or sold in the domestic merchant market.

We consider below whether appropriate circumstances exist to exclude two related parties from the domestic industry pursuant to the related parties provision.[42] This provision of the statute allows the Commission, if appropriate circumstances exist, to exclude from the domestic industry producers that are related to an exporter or importer of subject merchandise, or which are themselves importers.[43] Exclusion of such a producer is within the Commission's discretion based upon the facts presented in each investigation.[44]

---

prehearing brief showing higher prices for honey sold at retail than raw honey sold in bulk. Petitioners' Prehearing Brief at 9 and Exhibit 5. They also highlight two questionnaire responses commenting on the limited interchangeability of raw honey in retail packaging and bulk raw honey. Petitioners' Prehearing Brief at 9 n.12. As noted, Respondents did not address the domestic like product issue in the final phase.

[41] 19 U.S.C. § 1677(4)(A).

[42] 19 U.S.C. § 1677(4)(B).

[43] *See Torrington Co. v. United States*, 790 F. Supp. 1161, 1168 (Ct. Int'l Trade 1992), *aff'd without opinion*, 991 F.2d 809 (Fed. Cir. 1993); *Sandvik AB v. United States*, 721 F. Supp. 1322, 1331-32 (Ct. Int'l Trade 1989), *aff'd mem*., 904 F.2d 46 (Fed. Cir. 1990); *Empire Plow Co. v. United States*, 675 F. Supp. 1348, 1352 (Ct. Int'l Trade 1987).

[44] The primary factors the Commission has examined in deciding whether appropriate circumstances exist to exclude a related party include the following:

(1) the percentage of domestic production attributable to the importing producer;

(2) the reason the U.S. producer has decided to import the product subject to investigation (whether the firm benefits from the LTFV sales or subsidies or whether the firm must import in order to enable it to continue production and compete in the U.S. market);

(3) whether inclusion or exclusion of the related party will skew the data for the rest of the industry;

(4) the ratio of import shipments to U.S. production for the imported product; and

(5) whether the primary interest of the importing producer lies in domestic production or importation. *Changzhou Trina Solar Energy Co. v. USITC*, 100 F. Supp.3d 1314, 1326-31 (Ct. Int'l. Trade 2015), *aff'd*, 879 F. 3d 1377 (Fed. Cir. 2018); *see also Torrington Co. v. United States*, 790 F. Supp. at 1168.

In the final phase of the investigations, the record indicates that *** and *** are related parties subject to possible exclusion because of their affiliation with a U.S. importer of subject merchandise.[45]

## A.   Arguments of the Parties

*Petitioners' Arguments.* Petitioners argue that the record shows that appropriate circumstances exist to exclude *** and *** from the definition of the domestic industry because they oppose imposition of duties, produce far less raw honey domestically than imported by their affiliate, and account for a small percentage of domestic production. Petitioners also initially stated that ***, and therefore it is "not necessary" to exclude them.[46]

Petitioners, however, reversed their position in their posthearing brief, indicating that the two related parties should be excluded from the domestic industry because each of their responses to the Commission's producer questionnaire were reflective of Respondents' position and not that of domestic producers.[47]  They further observed that the domestic industry would ***.[48]

*Respondents' Arguments.*  None of the Respondents addressed the issue of related parties.

## B.   Analysis

We discuss below whether appropriate circumstances exist to exclude the two related parties from the domestic industry.[49]

*** *and* ***.  Both *** and *** are domestic producers controlled by an importer of subject merchandise and eligible for possible exclusion as related parties.  ***, an importer and purchaser of subject merchandise during the POI.[50]  *** is owned by the CEO and Board

---

[45] CR/PR at III-8 and Table III-2.

[46] Petitioners' Prehearing Brief at 10-11.

[47] Petitioners' Posthearing Brief at 1 n.1.

[48] Petitioners' Posthearing Brief, Answers to Commissioner Questions at 23-26.  Petitioners' reversal was in response to a question from Chair Kearns regarding the logic of not excluding a firm from the domestic industry because its effect on the data is small and whether the related parties' narrative or more qualitative responses to U.S. producer questionnaires also skewed the data collected in the staff report.  Hearing Tr. at 160-61 (Kearns).

[49] In its preliminary determinations, the Commission found that the two domestic producers – *** and *** – met the statutory definition of a related party because they were related to an importer of subject merchandise.  The Commission did not, however, find appropriate circumstances to exclude the two domestic producers because the record did not indicate that ***.  The Commission, however, stated that it would reexamine their possible exclusion from the definition of the domestic industry in any final phase investigations.  Preliminary Determinations, USITC Pub. 5204 at 14-16; *Confidential Preliminary Determinations,* EDIS Doc. 744844 at 18-22, 22 n.66.

[50] CR/PR at Table III-2; *** Producer Questionnaire at III-9.  It is therefore a related party, pursuant to 19 U.S.C. § 1677(4)(B)(ii)(II).  The firm also reported that ***.  *** Producer Questionnaire at III-9.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Chairman of the same importer ***.[51]  Because the importer and domestic producer are controlled by the same individual, the domestic producer *** is a related party.[52]  *** and *** accounted for *** percent and *** percent respectively of reported domestic raw honey production in 2020, and both firms *** the petition.[53]

    *** imported *** pounds of subject merchandise from *** in 2018, and *** pounds from *** in 2019; it did not import subject merchandise in 2020 or interim 2021.[54]  The ratio of its subject imports to *** U.S. production was *** percent in 2018 and *** percent in 2019,[55] and the ratio of its subject imports to *** U.S. production was *** percent in 2018 and *** percent in 2019.[56]

    *** explained that it ***.[57]  However, ***.[58]

    *** and *** also did not directly compete with subject imports; both reported ***, and all their shipments were ***.[59]  Thus, they were both arguably shielded from the effects of the subject imports during the POI.

    Moreover, the primary interests of *** and *** do not appear to have been aligned with their domestic production operations, but rather lay with their parent company's importation and purchases of subject imports.  The ratio of their parent's subject imports to their domestic production was *** for two years of the POI and their parent also purchased substantial quantities of subject merchandise throughout the POI that far exceeded the related parties' domestic production.[60]  As previously discussed, both firms oppose the petitions.  In fact, ***.[61]  We recognize that *** did not import subject merchandise during 2020 or interim

---

[51] ***.  U.S. Producer Questionnaire of *** at I-7 and I-8.  ***.  Questionnaire of *** at I-5.  ***.  Importer Questionnaire of *** at 1.

[52] 19 U.S.C. § 1677(4)(B)(ii)(III).

[53] CR/PR at Table III-1.

[54] CR/PR at Table III-20.

[55] CR/PR at Table III-21.

[56] CR/PR at Table III-20.

[57] CR/PR at Tables III-20 and III-22.

[58] *** reported purchases from other importers of subject imports from *** totaling *** pounds in 2018, *** pounds in 2019, *** pounds in 2020, and *** pounds during interim 2021.  *** reported purchases from other importers of combined subject sources were *** pounds in 2018, *** pounds in 2019, *** pounds in 2020 and *** pounds during interim 2021.  It noted in its questionnaire response ***.  CR/PR at Table III-20.  Its purchaser questionnaire indicates that it *** in 2020.  *See* *** Purchaser Questionnaire at III-24.

[59] *See* U.S. Producer Questionnaires at III-5 and III-9.  These transfers are, however, reported at market value which suggests they are not entirely shielded from pricing trends in the U.S. market.  *See* U.S. Producer Questionnaires at III-9.

[60] *See* CR/PR at Table III-21.  As noted, most of the purchases do ***.

[61] *See* Hearing Tr. at 181-186 (Wenger).  Eric Wenger and Brent Barkman also appeared at the Commission's staff conference in opposition to the imposition of duties.  *See* Conf. Tr. at 163-170 (Wenger), 192 (Barkman).

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

2021,[62] and that *** and *** are both "large domestic producers,"[63] which increased their domestic production and made appreciable capital investments over the course of the POI.[64] However, ***, which were significantly more than these related producers' domestic production, along with the direct corporate control of the two related domestic producers, are (in addition to its substantial importation of subject imports from Brazil during 2018 and 2019) factors that weigh in favor of exclusion of the two related parties. Given this record, we find that appropriate circumstances exist to exclude *** and *** from the domestic industry as related parties in the final phase of these investigations.

Consequently, we define the domestic industry to consist of all domestic producers of raw honey, with the exception of *** and ***.

## IV.    Cumulation[65]

For purposes of evaluating the volume and effects for a determination of material injury by reason of subject imports, section 771(7)(G)(i) of the Tariff Act requires the Commission to cumulate subject imports from all countries as to which petitions were filed and/or investigations self-initiated by Commerce on the same day, if such imports compete with each other and with the domestic like product in the U.S. market. In assessing whether subject imports compete with each other and with the domestic like product, the Commission generally has considered four factors:

(1)    the degree of fungibility between subject imports from different countries and between subject imports and the domestic like product, including consideration of specific customer requirements and other quality related questions;

---

[62] ***. CR/PR at Table III-20 Note.

[63] Beekeepers with over 3,800 bee colonies were considered "large." Forty-seven large beekeepers reported data to the Commission. CR/PR at III-2. *** reported *** bee colonies in 2020 while *** reported *** colonies. U.S. Producer Questionnaires at III-5.

[64] *See* CR/PR at Table I-1.

[65] Pursuant to Section 771(24) of the Tariff Act, imports from a subject country of merchandise corresponding to a domestic like product that account for less than 3 percent of all such merchandise imported into the United States during the most recent 12 months for which data are available preceding the filing of the petition shall be deemed negligible. 19 U.S.C. §§ 1671b(a), 1673b(a), 1677(24)(A)(i), 1677(24)(B); *see also* 15 C.F.R. § 2013.1 (developing countries for purposes of 19 U.S.C. § 1677(36)).

During the most recent 12-month period preceding the filing of the petitions in these investigations, April 2020 through March 2021, official import statistics indicate that subject imports from Argentina accounted for 20.3 percent of total U.S. imports of raw honey, subject imports from Brazil accounted for 19.2 percent of total U.S. imports of raw honey, subject imports from India accounted for 19.2 percent of total U.S. imports of raw honey, and subject imports from Vietnam accounted for 26.1 percent of total U.S. imports of raw honey. CR/PR at Table IV-5. Because imports for all four investigations were above the negligibility threshold, we find that imports with respect to each subject investigation are not negligible.

(2)    the presence of sales or offers to sell in the same geographic markets of subject imports from different countries and the domestic like product;

(3)    the existence of common or similar channels of distribution for subject imports from different countries and the domestic like product; and

(4)    whether the subject imports are simultaneously present in the market.[66]

While no single factor is necessarily determinative, and the list of factors is not exclusive, these factors are intended to provide the Commission with a framework for determining whether the subject imports compete with each other and with the domestic like product.[67]  Only a "reasonable overlap" of competition is required.[68]

### A.    Arguments of the Parties

*Petitioners' Arguments.*  Petitioners argue that the Commission should cumulatively assess subject imports from Argentina, Brazil, India, and Vietnam for purposes of present material injury.[69]  They contend that there is an overlap of colors of raw honey imported from each subject country and domestically produced raw honey.  Petitioners further contend that colors of honey next to each on the color spectrum (*e.g.,* white and extra light amber) are also somewhat substitutable and the routine blending of domestically produced raw honey and the subject imports further supports a finding of substitutability of honey from subject and domestic sources.  While most raw honey from Brazil is organic, they maintain that it competes based on price with conventional raw honey from other sources.[70]

With respect to channels of distribution, Petitioners argue that raw honey from each subject country and the domestic like product are primarily sold to packers.  Petitioners argue that raw honey from domestic and subject sources is sold to all regions of United States.  Finally, Petitioners argue that subject imports from all four subject countries and the domestic like product were present in the U.S. market in each year of the POI.[71]

*Respondents' Arguments.*  Respondents do not address cumulation for present material injury.

---

[66] *See Certain Cast-Iron Pipe Fittings from Brazil, the Republic of Korea, and Taiwan*, Inv. Nos. 731-TA-278-280 (Final), USITC Pub. 1845 (May 1986), *aff'd, Fundicao Tupy, S.A. v. United States*, 678 F. Supp. 898 (Ct. Int'l Trade), *aff'd*, 859 F.2d 915 (Fed. Cir. 1988).

[67] *See, e.g.*, *Wieland Werke, AG v. United States*, 718 F. Supp. 50 (Ct. Int'l Trade 1989).

[68] The Statement of Administrative Action (SAA) to the Uruguay Round Agreements Act (URAA), expressly states that "the new section will not affect current Commission practice under which the statutory requirement is satisfied if there is a reasonable overlap of competition."  H.R. Rep. No. 103-316, Vol. I at 848 (1994) (*citing Fundicao Tupy, S.A. v. United States*, 678 F. Supp. at 902; *see Goss Graphic Sys., Inc. v. United States*, 33 F. Supp. 2d 1082, 1087 (Ct. Int'l Trade 1998) ("cumulation does not require two products to be highly fungible"); *Wieland Werke, AG*, 718 F. Supp. at 52 ("Completely overlapping markets are not required.").

[69] Petitioners' Prehearing Brief at 12-16.

[70] Petitioners' Prehearing Brief at 13-15.

[71] Petitioners' Prehearing Brief at 15-16.

14

### B.    Analysis

As an initial matter, Petitioners filed all antidumping duty petitions on the same day,[72] April 21, 2021.[73]  In addition, we find a reasonable overlap of competition among subject imports from both subject countries, and between subject imports from each source and the domestic like product, for reasons described below.

*Fungibility.*  The record in the final phase of these investigations indicates that raw honey is at least moderately fungible, regardless of source, despite some reported limitations on interchangeability between raw honey from different sources.  The great majority of reporting U.S. producers reported that raw honey from each subject country was always interchangeable with the domestic like product as was raw honey from different subject countries.[74]  U.S. importers reported less interchangeability.  A majority of importers indicated that the domestic like product was frequently interchangeable with subject imports from Argentina.  However, a majority of importers reported that the domestic like product was never interchangeable with subject imports from Brazil and Vietnam and sometimes interchangeable with subject imports from India.[75]  In comparing subject imports from Argentina, Brazil, and India, a majority of importers indicated that they were sometimes or never interchangeable.[76]  A majority of importers reported subject imports from Vietnam were never interchangeable with subject imports from Argentina and Brazil, although they reported subject imports from Vietnam were sometimes interchangeable with subject imports from India.[77]

Purchasers also reported somewhat limited interchangeability for raw honey from domestic and subject sources.  A majority of purchasers indicated that the domestically produced product was at least sometimes interchangeable with subject imports from Argentina.[78]  However, a majority of purchasers indicated that the domestic like product was never interchangeable with subject imports from Brazil and Vietnam and a majority of purchasers reported that the domestic product was sometimes or never interchangeable with subject imports from India.[79]  A majority of purchasers reported that subject imports from Brazil were never interchangeable with subject imports from Vietnam.[80]  In contrast, a majority of purchasers reported that subject imports from Brazil and India were sometimes interchangeable.[81]  Otherwise when comparing imports from different subject countries, a majority of purchasers reported that they were sometimes or never interchangeable.[82]

---

[72] *See* 19 U.S.C. § 1677(7)(G)(i).

[73] CR/PR at Table I-1.  None of the statutory exceptions to cumulation apply.  *See* 19 U.S.C. § 1677(7)(G)(ii).

[74] CR/PR at Table II-15.

[75] CR/PR at Table II-16.

[76] CR/PR at Table II-16.

[77] CR/PR at Table II-16.

[78] CR/PR at Table II-17.

[79] CR/PR at Table II-17.

[80] CR/PR at Table II-17.

[81] CR/PR at Table II-17.

[82] CR/PR at Table II-17.

The interchangeability of raw honey from different sources was reported to be limited by the darker color and stronger flavor of raw honey from Vietnam, as well as an organic designation for the majority of raw honey from Brazil.[83]  Nonetheless, despite differences in the types of raw honey available from different sources,[84] there is substantial overlap in the colors and flavors[85] of raw honey for shipments of the domestic like product and imports from subject countries.  Extra light amber honey comprised 23.3 percent of U.S. shipments of domestically produced raw honey, *** percent of U.S shipments of honey from Argentina, *** percent of U.S shipments of honey from Brazil, and *** percent of U.S shipments of honey from India.[86]  While there were fewer U.S. shipments of extra light amber raw honey from Vietnam, there was overlap in light amber honey from Vietnam with honey from the other subject sources and the domestic like product.[87]  *** U.S. shipments of raw honey from Vietnam were light amber as were 18.0 percent of U.S. shipments of domestically produced raw honey, *** percent of U.S. shipments of honey from Argentina, *** percent of U.S shipments of honey from Brazil, and *** percent of U.S shipments of raw honey from India.[88]  A majority of reporting purchasers also reported that colors of raw honey next to each other on the color spectrum (white and extra light amber, extra light amber and light amber, and light amber and amber) were sometimes interchangeable.[89]

Purchasers also reported that the domestic like product and subject imports were comparable for important purchasing factors such as color and quality.  Purchasers were asked about the importance of 21 purchasing factors.  The five most important factors as reported by purchasers were:  1) availability, 2) reliability of supply, 3) quality meets industry standards, 4) color, and 5) flavor.[90]  A plurality or a majority of purchasers rated the domestic like product as comparable to subject imports from Argentina and Brazil for three of the five factors (color, flavor, and quality meets industry standards).[91]  A plurality or a majority of purchasers rated the domestic like product as comparable or superior to subject imports from India with respect to

---

[83] CR/PR at II-34 and II-41.

[84] Just under 90 percent of the subject imports from Brazil were organic raw honey while the vast majority of imports from every other subject country was conventional as was domestic production.  *See* CR/PR at Table IV-11.  Nonetheless, a majority of purchasers reported that subject imports from Brazil were at least sometimes interchangeable with subject imports from Argentina and a majority of purchasers reported that subject imports from Brazil were sometimes interchangeable with subject imports from India.  CR/PR at Table II-17.

[85] CR/PR at Table IV-10 and Fig. IV-4.  In general, lighter-colored honeys (*e.g.*, clover honey) are milder than darker-colored honeys (*e.g.*, buckwheat honey) which have a stronger flavor.  CR/PR at I-23.

[86] CR/PR at Table IV-10.

[87] CR/PR at Table IV-10.

[88] CR/PR at Table IV-10.

[89] CR/PR at Table II-7.  Most U.S. producers reported that these color pairs were always interchangeable.  CR/PR at Table II-5.  U.S. importers mostly reported that the color pairs were sometimes or never interchangeable.  *See* CR/PR at Table II-6.

[90] *See* CR/PR at Table II-11.

[91] CR/PR at Table II-14.  A majority rated the domestic product as inferior to subject imports from Argentina and Brazil for availability and reliability of supply.  CR/PR at Table II-14.

three of five factors (color, flavor, and quality meets industry standards).[92]  A plurality or a majority of purchasers rated the domestic like product as comparable or superior to subject imports from Vietnam with respect to three of the five factors (color, flavor, and quality meets industry standards).[93]

The routine consolidating and blending of raw honey from different sources by packers, including different countries, suggests that raw honey from different sources is often used interchangeably despite some differences in color and flavor.[94]  Further, the pricing data show substantial numbers of pricing observations between the domestic like product and subject imports from the four subject countries for the four pricing products.[95]  Purchase price data reported by responding firms accounted for approximately 74.9 percent of U.S. producers' U.S. shipments in 2020, 87.4 percent of importers' U.S. shipments of raw honey from Argentina, 84.4 percent of shipments from Brazil, 55.8 percent from India, and 46.8 percent of raw honey from Vietnam in 2020.[96]

Thus, although there are some limitations on the interchangeability of the subject imports from each country and the domestic like product as reflected in the market participants' questionnaire responses, raw honey within each color category regardless of source can at least sometimes be used interchangeably.  Further, the overlap in raw honey colors/ flavors and the widespread practice by purchasers of blending raw honey from different sources,[97] indicate that the domestic product and subject imports have a moderate degree of fungibility.

*Channels of Distribution*.  Responding large U.S. producers and importers reported that over half of their total U.S. shipments of domestically produced raw honey were commercial shipments to firms other than co-ops, such as packers/processors.[98]

*Geographic Overlap*.  During the POI, U.S. producers reported selling raw honey to all regions of the United States and U.S. importers reported selling raw honey to all regions in the contiguous United States.[99]

---

[92] CR/PR at Table II-14.  A majority of purchasers rated the domestic product as inferior to subject imports from India for availability and reliability of supply.  CR/PR at Table II-14.

[93] CR/PR at Table II-14.  A majority of purchasers rated the domestic product as inferior to subject imports from India for availability and reliability of supply.  CR/PR at Table II-14.

[94] CR/PR at I-18, I-23, I-27, II-16.  ***.  NHPDA's Posthearing Brief, Exhibit 9 (Wenger Affidavit). The Ingredient Purchasers argue that ***.  Ingredient Purchasers' Posthearing Statement at 3-5.

[95] The pricing products were based on honey color, specifically, raw white honey, raw extra light amber honey, raw light amber honey, and raw amber honey.  CR/PR at V-6.

[96] CR/PR at V-6.

[97] CR/PR at II-16.  *See also* Petitioners' Prehearing Brief, Exhibit 7 (examples of retail honey containing blends of honey from multiple countries).

[98] *See* CR/PR at II-1, Table II-1.  A substantial portion of the domestic industry's shipments were to cooperatives which function as a packer/processor in the market. *Id.*

[99] CR/PR at Table II-2.  Importers did not report sales in Alaska, Hawaii, Puerto Rico or the U.S. Virgin Islands.  *Id.*  A substantial portion of imports from each subject country also entered the United States in the Eastern region.  *See* CR/PR at Table IV-12.

17

*Simultaneous Presence in Market*.  The record indicates that subject imports from each subject country and the domestic like product were present in the U.S. market throughout the POI.[100]

*Conclusion*.  The record indicates that the domestic like product and imports from each subject source overlap in terms of channels of distribution, geographic markets, and presence in the U.S. market.  That overlap, together with the degree of fungibility discussed above, indicate a reasonable overlap of competition.  In light of the foregoing, we find a reasonable overlap of competition between the domestic like product and imports from each subject country and among imports from each subject country.  We consequently analyze subject imports from Argentina, Brazil, India, and Vietnam on a cumulated basis for our analysis of whether there is material injury by reason of subject imports.

## V.    Material Injury by Reason of Subject Imports

Based on the record in the final phase of these investigations, we find that an industry in the United States is materially injured by reason of cumulated subject imports of raw honey from Argentina, Brazil, India, and Vietnam.

### A.    Legal Standards

In the final phase of antidumping and countervailing duty investigations, the Commission determines whether an industry in the United States is materially injured or threatened with material injury by reason of the imports under investigation.[101]  In making this determination, the Commission must consider the volume of subject imports, their effect on prices for the domestic like product, and their impact on domestic producers of the domestic like product, but only in the context of U.S. production operations.[102]  The statute defines "material injury" as "harm which is not inconsequential, immaterial, or unimportant."[103]  In assessing whether the domestic industry is materially injured by reason of subject imports, we consider all relevant economic factors that bear on the state of the industry in the United States.[104]  No single factor is dispositive, and all relevant factors are considered "within the context of the business cycle and conditions of competition that are distinctive to the affected industry."[105]

---

[100] *See* CR/PR at Table IV-13.  Imports from each subject source were present in every month during January 2018 through December 2021.  *Id.*  The pricing data also show purchases of the domestic product during each quarter from January-March 2018 to July-September 2021.  *See* CR/PR at Tables V-4 to V-7.

[101] 19 U.S.C. §§ 1671d(b), 1673d(b).

[102] 19 U.S.C. § 1677(7)(B).  The Commission "may consider such other economic factors as are relevant to the determination" but shall "identify each {such} factor ... and explain in full its relevance to the determination."  19 U.S.C. § 1677(7)(B).

[103] 19 U.S.C. § 1677(7)(A).

[104] 19 U.S.C. § 1677(7)(C)(iii).

[105] 19 U.S.C. § 1677(7)(C)(iii).

18

Although the statute requires the Commission to determine whether the domestic industry is "materially injured or threatened with material injury by reason of" unfairly traded imports,[106] it does not define the phrase "by reason of," indicating that this aspect of the injury analysis is left to the Commission's reasonable exercise of its discretion.[107]  In identifying a causal link, if any, between subject imports and material injury to the domestic industry, the Commission examines the facts of record that relate to the significance of the volume and price effects of the subject imports and any impact of those imports on the condition of the domestic industry.  This evaluation under the "by reason of" standard must ensure that subject imports are more than a minimal or tangential cause of injury and that there is a sufficient causal, not merely a temporal, nexus between subject imports and material injury.[108]

In many investigations, there are other economic factors at work, some or all of which may also be having adverse effects on the domestic industry.  Such economic factors might include nonsubject imports; changes in technology, demand, or consumer tastes; competition among domestic producers; or management decisions by domestic producers.  The legislative history explains that the Commission must examine factors other than subject imports to ensure that it is not attributing injury from other factors to the subject imports, thereby inflating an otherwise tangential cause of injury into one that satisfies the statutory material injury threshold.[109]  In performing its examination, however, the Commission need not isolate

---

[106] 19 U.S.C. §§ 1671d(b), 1673d(b).

[107] *Angus Chemical Co. v. United States*, 140 F.3d 1478, 1484-85 (Fed. Cir. 1998) ("{T}he statute does not 'compel the commissioners' to employ {a particular methodology}."), *aff'g*, 944 F. Supp. 943, 951 (Ct. Int'l Trade 1996).

[108] The Federal Circuit, in addressing the causation standard of the statute, observed that "{a}s long as its effects are not merely incidental, tangential, or trivial, the foreign product sold at less than fair value meets the causation requirement*." Nippon Steel Corp. v. USITC*, 345 F.3d 1379, 1384 (Fed. Cir. 2003).  This was further ratified in *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867, 873 (Fed. Cir. 2008), where the Federal Circuit, quoting *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 722 (Fed. Cir. 1997), stated that "this court requires evidence in the record 'to show that the harm occurred "by reason of" the LTFV imports, not by reason of a minimal or tangential contribution to material harm caused by LTFV goods.'"  *See also Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1357 (Fed. Cir. 2006); *Taiwan Semiconductor Industry Ass'n v. USITC*, 266 F.3d 1339, 1345 (Fed. Cir. 2001).

[109] SAA at 851-52 ("{T}he Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports."); S. Rep. 96-249 at 75 (1979) (the Commission "will consider information which indicates that harm is caused by factors other than less-than-fair-value imports."); H.R. Rep. 96-317 at 47 (1979) ("in examining the overall injury being experienced by a domestic industry, the ITC will take into account evidence presented to it which demonstrates that the harm attributed by the petitioner to the subsidized or dumped imports is attributable to such other factors;" those factors include "the volume and prices of nonsubsidized imports or imports sold at fair value, contraction in demand or changes in patterns of consumption, trade restrictive practices of and competition between the foreign and domestic producers, developments in technology and the export performance and productivity of the domestic industry"); *accord Mittal Steel*, 542 F.3d at 877.

19

the injury caused by other factors from injury caused by unfairly traded imports.[110]  Nor does the "by reason of" standard require that unfairly traded imports be the "principal" cause of injury or contemplate that injury from unfairly traded imports be weighed against other factors, such as nonsubject imports, which may be contributing to overall injury to an industry.[111]  It is clear that the existence of injury caused by other factors does not compel a negative determination.[112]

Assessment of whether material injury to the domestic industry is "by reason of" subject imports "does not require the Commission to address the causation issue in any particular way" as long as "the injury to the domestic industry can reasonably be attributed to the subject imports."[113]  The Commission ensures that it has "evidence in the record" to "show that the harm occurred 'by reason of' the LTFV imports," and that it is "not attributing injury from other

---

[110] SAA at 851-52 ("{T}he Commission need not isolate the injury caused by other factors from injury caused by unfair imports."); *Taiwan Semiconductor Industry Ass'n,* 266 F.3d at 1345 ("{T}he Commission need not isolate the injury caused by other factors from injury caused by unfair imports ... . Rather, the Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports." (emphasis in original)); *Asociacion de Productores de Salmon y Trucha de Chile AG v. United States,* 180 F. Supp. 2d 1360, 1375 (Ct. Int'l Trade 2002) ("{t}he Commission is not required to isolate the effects of subject imports from other factors contributing to injury" or make "bright-line distinctions" between the effects of subject imports and other causes.); *see also Softwood Lumber from Canada,* Inv. Nos. 701-TA-414 and 731-TA-928 (Remand), USITC Pub. 3658 at 100-01 (Dec. 2003) (Commission recognized that "{i}f an alleged other factor is found not to have or threaten to have injurious effects to the domestic industry, *i.e.*, it is not an 'other causal factor,' then there is nothing to further examine regarding attribution to injury"), *citing Gerald Metals,* 132 F.3d at 722 (the statute "does not suggest that an importer of LTFV goods can escape countervailing duties by finding some tangential or minor cause unrelated to the LTFV goods that contributed to the harmful effects on domestic market prices.").

[111] S. Rep. 96-249 at 74-75; H.R. Rep. 96-317 at 47.

[112] *See Nippon Steel Corp.,* 345 F.3d at 1381 ("an affirmative material-injury determination under the statute requires no more than a substantial-factor showing.  That is, the 'dumping' need not be the sole or principal cause of injury.").

[113] *Mittal Steel,* 542 F.3d at 876, 878; *see also id.* at 873 ("While the Commission may not enter an affirmative determination unless it finds that a domestic industry is materially injured 'by reason of' subject imports, the Commission is not required to follow a single methodology for making that determination ... {and has} broad discretion with respect to its choice of methodology."), *citing United States Steel Group v. United States,* 96 F.3d 1352, 1362 (Fed. Cir. 1996) and S. Rep. 96-249 at 75.  In its decision in *Swiff-Train v. United States,* 793 F.3d 1355 (Fed. Cir. 2015), the Federal Circuit affirmed the Commission's causation analysis as comporting with the Court's guidance in *Mittal*.

20

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

sources to the subject imports." [114] The Federal Circuit has examined and affirmed various Commission methodologies and has disavowed "rigid adherence to a specific formula." [115]

The question of whether the material injury threshold for subject imports is satisfied notwithstanding any injury from other factors is factual, subject to review under the substantial evidence standard. [116] Congress has delegated this factual finding to the Commission because of the agency's institutional expertise in resolving injury issues. [117]

### B.      Conditions of Competition and the Business Cycle

The following conditions of competition inform our analysis of whether there is material injury by reason of subject imports. [118]

### 1.      Demand Considerations

Demand for raw honey is driven by demand for the downstream products in which processed honey is used, such as cereals, baked goods, pharmaceutical products, and hair care products, as well as the demand for processed honey in the retail sector. [119] Raw honey is sold by beekeepers and importers to packers, which process and sell honey to retailers, the food

---

[114] *Mittal Steel*, 542 F.3d at 873 (quoting from *Gerald Metals*, 132 F.3d at 722), 877-79. We note that one relevant "other factor" may involve the presence of price-competitive nonsubject imports in the U.S. market, particularly when a commodity product is at issue. In appropriate cases, the Commission collects information regarding nonsubject imports and producers in nonsubject countries in order to conduct its analysis.

[115] *Nucor Corp. v. United States*, 414 F.3d 1331, 1336, 1341 (Fed. Cir. 2005); *see also Mittal Steel*, 542 F.3d at 879 ("*Bratsk* did not read into the antidumping statute a Procrustean formula for determining whether a domestic injury was 'by reason' of subject imports.").

[116] We provide in our discussion below a full analysis of other factors alleged to have caused any material injury experienced by the domestic industry.

[117] *Mittal Steel*, 542 F.3d at 873; *Nippon Steel Corp.*, 458 F.3d at 1350, *citing U.S. Steel Group*, 96 F.3d at 1357; S. Rep. 96-249 at 75 ("The determination of the ITC with respect to causation is ... complex and difficult, and is a matter for the judgment of the ITC.").

[118] The parties have not addressed application of the captive production provision in the final phase of these investigations. The captive production provision can be applied only if, as a threshold matter, significant production of the domestic like product is internally transferred and significant production is sold in the merchant market. In the final phase of these investigations, internal consumption by larger firms ranged between 3.0 percent and 3.9 percent of the domestic industry's total U.S. shipments of raw honey during the POI, and accounted for 3.0 percent in 2020. CR/PR at Table III-14. While a roughly equal portion of the larger firms' shipments, between 3.0 percent and 3.5 percent, were transferred to related firms, most were reported by domestic producers, \*\*\*, which have been excluded from the domestic industry. *See* CR/PR at Table III-14 and U.S. Producer Questionnaires at III-5. By contrast, the commercial U.S. shipments ranged between 93.0 percent and 93.8 percent of the larger firms total U.S. shipments during the POI, and accounted for 93.8 percent in 2020. CR/PR at Table III-14. Because of the relatively modest amount of domestic production internally transferred, we conclude that the threshold criterion is not satisfied and that the captive production provision does not apply in the final phase of these investigations.

[119] CR/PR at I-23 and II-11.

service industry, and industrial customers as a bulk food ingredient.[120] Almost all raw honey gets processed to a degree and raw honey accounts for almost all of the cost of processed honey.[121] Purchasers reported that changes in demand for the end uses of processed honey affected the demand for raw honey.[122]

Most market participants reported that U.S. demand for raw honey had increased since January 1, 2018.[123] Demand reportedly increased in all three categories of uses in the downstream markets.[124] The record indicates that the COVID-19 pandemic caused demand to increase due to an increase in demand for honey products at home.[125] Apparent U.S. consumption increased by 1.8 percent from 2018 to 2020, decreasing from 547.4 million in 2018 to 531.2 million in 2019, before increasing to 557.0 million in 2020; it was higher in interim 2021, at 459.6 million pounds, than in interim 2020, at 369.0 million pounds.[126] In full year 2021, apparent U.S. consumption was 587.4 million pounds.[127]

## 2.    Supply Considerations

The domestic industry was the second largest source of supply to the U.S. market throughout the POI.[128] Domestic production decreased irregularly over the POI, initially increasing from *** pounds in 2018 to *** pounds in 2019, before decreasing to *** pounds in 2020, for an overall decrease of *** percent.[129] It was *** pounds in interim 2020 and *** pounds in interim 2021.[130] Domestic production in full year 2021 was *** pounds.[131] The number of colonies in the United States decreased throughout the POI from 2.8 million colonies in 2018 and 2019 to 2.7 million colonies in 2020 and full year 2021.[132] Beekeepers usually operate at full capacity and can only increase production if they increase the number of their hives.[133] The average yield per colony for the domestic industry also fluctuated from year-to-

---

[120] CR/PR at I-30.

[121] CR/PR at II-1, II-10.

[122] CR/PR at II-10.

[123] CR/PR at Table II-8.

[124] CR/PR at Table II-8.

[125] *See* CR/PR at II-18. *See also*, Petitioners' Posthearing Brief at Answers to Commissioner Questions, p. 2; NHPDA's Prehearing Brief at 7-8; and Ingredient Purchasers' Prehearing Statement at 1.

[126] CR/PR at Table C-2.

[127] CR/PR at Table G-1.

[128] CR/PR at Table IV-14.

[129] CR/PR at Tables C-2 and H-1.

[130] CR/PR at Table C-2.

[131] CR/PR at Table H-1. Interim period production is based on full year NASS data. CR at Table C-2 n.3. Accordingly, actual production during the nine-month interim periods was likely somewhat lower, although production is seasonal and relatively few beekeepers engage in raw honey production during the fourth quarter. CR/PR at II-17, III-21 & Table III-2.

[132] CR/PR at Tables III-6 and III-7.

[133] CR/PR at II-6. Petitioners estimated that it takes three to four months for a new hive to reach capacity. *See id.*

22

year, initially increasing from \*\*\* per colony in 2018 to \*\*\* pounds per colony in 2019, before decreasing to \*\*\* pounds per colony in 2020 and \*\*\* pounds per colony in full year 2021.[134]

Raw honey production is primarily located in Midwestern states such as North Dakota and South Dakota, but beekeepers are located across the United States.[135]  As noted above, virtually all raw honey is processed and packaged.  Petitioner SHA is a cooperative that processes, packages, and markets honey for its beekeeper members.  Members are required to sell virtually all of their production to the cooperative and are paid a share of the proceeds at the end of the year.[136]  SHA reported \*\*\* pounds of production by its members in 2020.[137]

Colony collapse disorder ("CCD") and Varroa mites, which carry bee viruses, have historically been major challenges, and both remain major problems for the industry.[138] Beekeepers reported difficulty maintaining their hives during the POI; beekeepers reported having to replace hives each year due to losses from CCD and Varroa mites.[139]

Weather is another major factor affecting yield.  Beekeepers cited weather events such as hurricanes, fires, heat, drought, excessive rain/flooding, cold/freeze, thunderstorms, and hail as reducing yield during the POI.[140]  Raw honey production is seasonal, but it is often held in inventory and sold throughout year.[141]

Beekeepers also reported that labor costs have risen because they have had difficulty in finding enough labor, and some beekeepers thus increased reliance on temporary agricultural foreign workers through the H2A visa program.[142]

The domestic industry's share of apparent U.S. consumption by quantity decreased irregularly throughout the POI, increasing from \*\*\* percent in 2018 to \*\*\* percent in 2019, before decreasing to \*\*\* percent in 2020; its share of apparent U.S. consumption was lower in

---

[134] CR/PR at H-1.

[135] CR/PR at Tables III-4 and III-5.  Over 40 percent of beekeepers' colonies were located in the Midwest throughout the POI.  *Id*. at Table III-5.  However, "{b}eekeepers are often migratory moving their hives as needed to areas in need of bees' pollination services or areas rich in certain flora to promote production of a distinct type of honey."  CR/PR at II-2.  About two-thirds of colonies are subject to migration.  CR/PR at I-25.  The migration is generally from north in the summer to south in the winter, as well as to California during almond season (January to March) and several other states for pollination of crops such as melons.  *Id*. at I-20-21 and I-25.

[136] CR/PR at I-17 and VI-7.

[137] Petition at 4, Exhibit GEN-1.  Slightly fewer than half of the reporting beekeepers were members of SHA.  CR/PR at VI-7.

[138] *See* CR/PR at Tables III-3 and III-7.  *See also id.* at I-28.  CCD became a significant problem in 2006.  *Id*.  As a result of the disorder, U.S. producers \*\*\*.  *E.g.*, CR/PR at Table III-3.  Varroa mites were introduced to the U.S. bee population in the 1980s.  *Honey from China*, Inv. No. TA-406-13, USITC Pub. 2715 (Jan. 1994) at II-7 n.12.

[139] CR/PR at Table III-3.

[140] CR/PR at Table III-3.

[141] CR/PR at II-17, II-24.  Honey can be stored in inventory for up to 20 years, but the quality of the honey may degrade.  CR/PR at II-6.

[142] CR/PR at Table III-3.

interim 2021, at *** percent, than in interim 2020, at *** percent.[143]  Its share of apparent U.S. consumption in full year 2021 was 20.7 percent.[144]

Cumulated subject imports' share of apparent U.S. consumption increased from 56.9 percent in 2018 to 60.1 percent in 2019 and 63.1 percent in 2020; it was higher in interim 2021, at 75.9 percent, than in interim 2020, at 67.5 percent.[145]  Their share of apparent U.S. consumption in full year 2021 was 69.9 percent.[146]

Nonsubject imports' share of apparent U.S. consumption decreased from 15.6 percent in 2018 to 11.1 percent in 2019, increasing to 11.4 percent in 2020; it was lower in interim 2021 than in interim 2020, at 8.7 percent and 11.9 percent, respectively.[147]  Their share of apparent U.S. consumption in full year 2021 was 9.4 percent.[148]  The largest sources of nonsubject imports during the POI were Canada, Mexico, and New Zealand.[149]  Honey from China remains subject to an antidumping duty order.[150]

### 3.    Substitutability and Other Conditions

We find that there is at least a moderate degree of substitutability between domestically produced raw honey and cumulated subject imports and that price is an important factor in purchasing decisions.

While the record indicates that product specifications are an important factor in purchasing decisions and some purchasers may have optimized their recipes to work with certain blends, it also indicates that packers blend honey from different sources and across different colors, including domestic and subject sources, suggesting interchangeability of honey from different sources.[151]  Market participants indicated that honey across different colors can sometimes be used interchangeably, particularly if the colors are close, for example white and extra-light amber honey.[152]  Moreover, when comparing domestic raw honey with subject imports, more than half of responding purchasers reported that the products were comparable with respect to factors pertaining to product quality and characteristics, including product quality meeting industry standards, product range, product specifications, and product consistency as well as honey color and flavor.[153]

As discussed previously, U.S. producers and importers differed in their reports of interchangeability between the domestic like product and subject imports; domestic producers

---

[143] CR/PR at Table C-2 and Table H-7.

[144] CR/PR at Table G-1.

[145] CR/PR at Tables C-2 and H-7.

[146] CR/PR at Table G-1.

[147] CR/PR at Table C-2.

[148] CR/PR at Table G-1.

[149] CR/PR at II-6.

[150] CR/PR at I-8; *Honey From the People's Republic of China: Continuation of Antidumping Duty Order*, 83 Fed. Reg. 18277 (Apr. 26, 2018).

[151] CR/PR at I-18, I-21, I-27, II-1, II-16.  *See also* Hearing Tr. at 169 (Blumenthal), and 224, 226, 290 (Bash).

[152] CR/PR at II-13-14 and Tables II-5-7.

[153] CR/PR at Table II-14.

indicated that product from domestic and subject sources were generally interchangeable, while importers argued that substitutability is limited by end uses based on organic designations, honey color, and floral source.[154]  Additionally, purchaser responses were mixed on the comparability of raw honey by source.  A plurality of responding purchasers indicated that domestic raw honey, when compared to subject imports from Argentina, Brazil, and nonsubject sources, was comparable or inferior on all factors that were rated as very important to purchasers.[155]  A plurality of purchasers indicated that domestic raw honey is comparable or inferior to honey from India and Vietnam on 19 of 20 and 16 of 20 factors respectively.[156]  Eight of 21 purchasers also reported purchasing subject imports instead of the domestic like product.[157]

Raw honey is produced from nectar from different floral sources, which determines the color and flavor of the honey, and some purchasers require specific color and flavor profiles.[158]  Lighter-colored processed honey is generally sold at retail, while darker honey is more often used as an ingredient in food production and, to a lesser extent, in food service applications.[159]  The domestic industry mostly shipped white, extra light amber, and light amber honey, while subject imports were more of the extra light amber and light amber varietals of honey.[160]  Furthermore, the production of organic honey in the United States is limited and subject imports from Brazil are primarily organic raw honey.[161]  Thus, the record indicates that customer specifications regarding the color and flavor of raw honey, as well as an organic designation, may moderate substitutability to some extent.[162]

The record further indicates that price is an important factor in purchasing decisions for raw honey.  The most frequently cited top three factors firms consider in their purchasing

---

[154] CR/PR at II-34 and Tables II-15 and II-16.  Specifically, the majority of U.S. producers indicated that product from all sources were always interchangeable.  CR/PR at II-34 and Table II-15.  On the other hand, most importers reported that the domestic like product and product from Argentina were frequently interchangeable or sometimes interchangeable, a majority of importers reported that raw honey from India is sometimes interchangeable with the domestic like product, while most importers reported that raw honey from Brazil and Vietnam is never interchangeable with the domestic like product.  CR/PR at II-34 and Table II-16.

[155] CR/PR at II-27 and Table II-14.  The one exception is the comparison of honey flavor of U.S. raw honey as compared to Brazilian raw honey, for which eight purchasers reported that the flavor of raw honey from the United States is superior and eight purchasers reported that it is comparable to raw honey from Brazil.  *Id*.

[156] CR/PR at Table II-14.

[157] CR/PR at V-27.  Five purchasers reported purchasing raw honey from Argentina instead of the domestic like product; four reported purchasing raw honey from Brazil instead of the domestic like product; six reported purchasing raw honey from India instead of the domestic like product; and seven reported purchasing raw honey from Vietnam instead of the domestic like product.  *Id*.  Only one of these purchasers, ***, reported that price was a primary reason in purchasing subject imports instead of the domestic product.  *Id*.

[158] CR/PR at I-23, II-12, II-14.

[159] CR/PR at II-11 and Table II-4.

[160] CR/PR at IV-16 and Table IV-10.

[161] CR/PR at IV-19 and Table IV-11.

[162] *See, e.g.,* CR/PR at II-11-15.

25

decisions were price/cost (14 firms), specifications/certifications (12 firms), and quality and availability (11 firms each).[163]  Fifteen of 21 purchasers reported that price is very important.[164]  Additionally, most responding purchasers (12 of 21) reported that they sometimes purchase the lowest-priced product.  Two reported that they always purchased the lowest priced product, four reported usually, and three reported never purchasing the lowest priced product.[165]

The primary components of raw honey are fructose, glucose, and water, produced by honeybees.  Beekeepers use stacked wooden "bee" boxes that contain bee colony hives; they then extract the raw honey from the boxes and seal it in 55-gallon drums for sale to packers.[166]  Virtually all raw honey is processed and packed; some beekeepers pack their own honey, while others sell to independent packers or cooperatives such as SHA.[167]  Packers or processors subsequently sell processed honey to retailers, the food service industry, and to industrial customers for bulk food ingredients.[168]

Twenty-six of 39 responding domestic producers and 17 of 23 responding importers indicated that the price of raw materials has increased during the POI, with both groups reporting the cost of lumber (used to produce the boxes containing the hives) and fuel (used to transport the hives) as factors contributing to increased raw material costs.[169]  Domestic producers also reported rising costs for bee feed and sugar and inflation as additional factors in the increasing price of raw materials.[170]

Domestic raw honey production is seasonal, with production occurring in summer, and while evidence reflects that there may be peak purchasing activity within the first six to nine months following crop production, honey can be held in inventory for sale at a later time.[171]  Many beekeepers who produce raw honey also provide commercial pollination services, primarily for almond crops in California during January to March.[172]  In addition to transporting bees for pollination services, beekeepers may transport their bees throughout the year for foraging purposes and to enhance colony survival and growth.[173]

Raw honey is primarily sold from inventory.  U.S. producers reported that most of their shipments (89.0 percent) were from U.S. inventories with reported lead times generally ranging from 7 to 45 days, while the remaining 11.0 percent were produced-to-order with lead times of 3 to 180 days.[174]  Importers reported that 48.0 percent of their shipments were from U.S. inventories, 28.7 percent were produced-to-order, and 23.4 percent were from foreign inventories.  They generally reported lead times averaging 1 to 90 days for product from U.S. inventories and 45 to 120 days from foreign inventories, and 14 to 90 days for product

---

[163] CR/PR at Table II-10.
[164] CR/PR at Table II-11.
[165] CR/PR at II-23.
[166] CR/PR at V-1.
[167] CR/PR at I-27.
[168] CR/PR at II-17.
[169] CR/PR at V-1.
[170] CR/PR at V-1.
[171] CR/PR at II-17.
[172] CR/PR at I-20-21.
[173] CR/PR at I-25.
[174] CR/PR at II-24.

produced-to-order.[175]  U.S. producers reported that 48.8 percent of their commercial U.S. shipments were made pursuant to annual contracts and 31.1 percent through short-term contracts, while subject importers reported that 3.6 percent of their shipments were made through annual contracts and 90.7 percent through short-term contracts.[176]

### C.    Volume of Subject Imports

Section 771(7)(C)(i) of the Tariff Act provides that the "Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."[177]

The volume of cumulated subject imports increased by 12.9 percent from 2018 to 2020, from 311.4 million pounds in 2018 to 319.2 million pounds in 2019, and to 351.7 million pounds in 2020; it was 29.6 percent higher in interim 2021 at 348.9 million pounds than in interim 2020 at 269.2 million pounds.[178]

Subject imports' share of apparent U.S. consumption, by quantity, increased by 6.2 percentage points from 2018 to 2020, increasing from 56.9 percent in 2018 to 60.1 percent in 2019, and 63.1 percent in 2020; their share was also higher in interim 2021, at 75.9 percent, than in interim 2020, at 67.5 percent.[179]  The ratio of subject imports to total domestic production increased by 37.7 percentage points from 2018 to 2020.  The ratio increased from 204.1 percent in 2018 to 206.4 percent in 2019 and 241.8 percent in 2020.[180]

---

[175] CR/PR at II-24-25.

[176] CR/PR at Table V-2.

[177] 19 U.S.C. § 1677(7)(C)(i).

[178] CR/PR at Tables C-2 and G-1.  By value, cumulated subject import volume decreased from $310.7 million in 2018 to $276.2 million in 2019 and $295.6 million in 2020; it was $222.2 million in interim 2020 and $416.3 million in interim 2021.  *Id.*

U.S. importers' shipments of cumulated subject imports increased by 24.4 percent from 2018 to 2020, from 292.2 million pounds in 2018 to 334.9 million pounds in 2019, and 363.5 million pounds in 2020; they were 10.1 percent higher in interim 2021 (303.5 million pounds) than in interim 2020 (275.7 million pounds).  CR/PR at Table E-6.

Because U.S. imports and U.S. producer shipments are based on publicly available data (official import statistics and USDA/NASS data), certain market information such as imports, and U.S. producers' production and shipments are available for all 12 months of 2021.  *See* CR/PR at Tables III-4 to III-9 and Appendix G.  The absolute volume of subject imports in 2021 was 410.5 million pounds, which is a 16.7 percent increase from 2020.  Re-exports have been subtracted from the subject import totals. CR/PR at Table IV-14, C-2.

[179] CR/PR at Table C-2.  For the full year 2021, subject imports' share of apparent U.S. consumption increased to 69.9 percent, for an overall increase of 13 percentage points from 2018 to 2021.  CR/PR at Table G-1.  By value, the market share of cumulated subject imports increased from 40.2 percent in 2018 to 40.9 percent in 2019, and 42.8 percent in 2020; it was higher in interim 2021, at 61.2 percent than in interim 2020, at 47.4 percent.  CR/PR at Table C-2.

[180] CR/PR at Table IV-3 (including all USDA/NASS production).

Based on the foregoing, we find that the volume of cumulated subject imports, and their increase, were significant both in absolute terms and relative to production and consumption in the United States.[181]

**D.    Price Effects of the Subject Imports**

Section 771(7)(C)(ii) of the Tariff Act provides that, in evaluating the price effects of the subject imports, the Commission shall consider whether

> (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

> (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.[182]

As previous discussed in Section V.B.3, we find that the domestic like product and cumulated subject imports have at least a moderate degree of substitutability, and that price is an important factor in purchasing decisions for raw honey.

The Commission collected quarterly purchase price data from purchasers of raw honey concerning their purchases of four different colors of raw honey: white, extra light amber, light amber, and amber in 55-gallon drums.[183] Sixteen purchasers provided usable quarterly purchase price data for the four pricing products, although not all firms reported pricing for all products for all quarters.[184] Purchase price data reported by responding firms accounted for

---

[181] Respondents have argued that the volume of subject imports was not significant because imports were needed in the U.S. market and subject imports compete only to a limited extent with domestically produced raw honey. We address these arguments and others in our discussion of the impact of the subject imports on the domestic industry in Sections VI.D and VI.E below.

[182] 19 U.S.C. § 1677(7)(C)(ii).

[183] CR/PR at V-6. The four products were defined as:

**Product 1.**-- Raw white honey (0 − 34 mm), packaged in 55-gallon drums.

**Product 2.**-- Raw extra light amber honey (35 − 50 mm), packaged in 55-gallon drums.

**Product 3.**-- Raw light amber honey (51 − 85 mm), packaged in 55-gallon drums.

**Product 4.**-- Raw amber honey (greater than 86 mm), packaged in 55-gallon drums. *Id.*

The specification in millimeters (mm) refers to the Pfund grade which indicates the darkness of the honey. CR/PR at V-6 n.19.

[184] At NHPDA's request, the Commission collected pricing data from purchasers for the four pricing products. NHPDA's Comments on Draft Questionnaires (Sept. 10, 2021) at 3, 10-11 ("Soliciting pricing data from purchasers would ensure the most comprehensive and representative dataset, because the packers account for all or nearly all sales of imported and domestically produced raw honey in the U.S. market.") (internal quotation marks omitted).

28

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

approximately three-fourths, *i.e.*, 74.9 percent, of U.S. producers' U.S. shipments and two-thirds, *i.e.*, 66.7 percent, of importers' U.S. shipments of subject imports in 2020.[185]

The Commission's pricing data show pervasive underselling. Subject imports were priced below domestically produced product in 182 of 194 available quarterly comparisons from the first quarter of 2018 through the third quarter of 2021, at margins ranging up to 60.7 percent and an average underselling margin of 37.2 percent.[186] The quantity of subject imports that undersold the domestic like product during the POI was 818.2 million pounds while 51.1 million pounds oversold the domestic like product.[187] Underselling by subject imports accounted for 94 percent of the quarterly comparisons and 94 percent of the volume encompassed by the pricing data.

The Commission also gathered price data for January 2018-September 2021 from the National Honey Report published by USDA's Agricultural Marketing Service ("AMS") for the same four colors of raw honey used for the purchaser pricing data: white, extra light amber, light amber, and amber.[188] The AMS monthly price data are consistent with the Commission's purchaser data, showing widespread underselling by the subject imports over the POI. Subject imports were sold at lower prices in 505 of 523 instances.[189] The Commission's lost sales and lost revenues survey of purchasers corroborates that subject imports were lower priced than the domestic like product during the POI.[190] Domestic producers also reported losing sales and having to lower their prices due to competition from the subject imports.

Given the importance of price in purchasing decisions, and the extensive pricing data, as well as other record information showing that cumulated subject imports were lower priced than the domestic product as reviewed above, we find that there has been significant price underselling of the domestic like product by subject imports, and as this underselling occurred, subject imports captured sales from the domestic industry and gained market share at the

---

[185] CR/PR at V-6. The data accounted for 87.4 percent of importers' U.S. shipments of raw honey from Argentina, 84.4 percent of shipments from Brazil, 55.8 percent from India, and 46.9 percent of raw honey from Vietnam in 2020. *Id.* Purchases by the Ingredient Purchasers *** were excluded from the dataset because their downstream purchases of honey from packers had already been reported as purchases by the packers and often were a blend of honey from different sources. *See* CR/PR at V-5 n.16. In addition, purchases by Ingredient Purchasers from packers are at a different level of trade than purchases by packers from producers or importers.

[186] CR/PR at Table V-11. Subject imports oversold the domestic like product at an average margin of 7.4 percent at margins ranging up to 16.2 percent. *Id.*

[187] CR/PR at Table V-11.

[188] CR/PR at V-22 and Appendix L. Unlike Commission pricing data, the AMS data do not specify container size but reported sales are generally over 10,000 pounds. CR/PR at L-3 n.1.

[189] CR/PR at V-22. The consistent underselling by the subject imports in the AMS data is most easily observed in figures V-6 to V-9. CR/PR at V-23 and V-24.

[190] Eight of 21 responding purchasers reported purchasing subject imports instead of domestic raw honey and all eight purchasers reported that subject imports were priced lower than the domestic like product. CR/PR at V-27.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

direct expense of the domestic industry.[191]  Cumulated subject imports gained 6.2 percentage points of market share from 2018 to 2020, and the domestic industry lost *** percentage points of market share during that timeframe.[192]  In addition, cumulated subject imports gained 8.4 percentage points of market share between the interim 2020 and interim 2021 periods, while the domestic industry lost *** percentage points of market share during that timeframe.[193]

We have also considered price trends during the POI.  Although the domestic industry's raw honey prices increased during the POI as a whole, that overall trend obscures the price declines in domestically produced raw honey that occurred over the greater portion of the POI, from the first quarter of 2018 to the fourth quarter of 2020.[194]  The Commission's purchase price data for domestically produced honey indicate that the purchase price of domestically produced product 1 fell 27.6 percent, the price of product 2 fell 29.7 percent, the price of product 3 fell 13.8 percent, and the price of product 4 fell 18.6 percent over the three-year period.[195]  The purchase price data show that prices for domestically produced raw honey generally declined until the latter portion of 2020, before beginning to increase, in late 2020 and into the first three quarters of 2021.[196]  AMS data show price decreases from 2018 through 2020 for the same four colors of domestically produced raw honey with price increases not beginning until 2021.[197]  Similarly, the domestic industry's net sales average unit values

---

[191] Respondents have suggested that the higher quality of domestically produced honey may account for the underselling.  Ingredient Purchasers' Prehearing Statement at 27.  The record does not support this argument.  For instance, purchasers view domestically produced raw honey as comparable to raw honey from Argentina with respect to flavor and "quality meets minimum standards," yet raw honey from Argentina consistently undersold the domestic like product.  CR/PR at Tables II-14 and V-12.  In general, purchasers also reported that suppliers of the subject imports were more frequently able to meet minimum quality specifications than suppliers of domestically priced honey.  *See* CR/PR at Table II-12.  Respondents also argued that a preference for domestically produced local honey explains the underselling.  NHPDA's Posthearing Brief at 8.  Most purchasers, however, reported that buying locally sourced honey was not an important purchasing factor.  CR/PR at II-24, Table II-11.

[192] CR/PR at Table C-2.

[193] CR/PR at Table C-2.  From 2018 to 2021, subject imports gained 13.0 percentage points of market share and the domestic industry lost *** percentage points of market share.  CR/PR at Table G-1.  From 2018 to 2020, subject imports gained 6.2 percentage points of market share and the domestic industry lost *** percentage points of market share.  *See* CR/PR at Table C-2.  Petitioner SHA also reported that it bought subject imports instead of domestic products because of their lower price.  CR/PR at V-32.

[194] As discussed below, prices increased in interim 2021 when importers gained knowledge in late 2020 about the imminent filing of the petitions, and prices continued to increase during the pendency of the investigations.

[195] CR/PR at Table V-8 and Tables V-4 to V-7 (calculated percentage declines from first quarter 2018 to fourth quarter 2020).

[196] *See* CR/PR at Figs. V-1 to V-5.

[197] *See* CR/PR at Figs. V-6 to V-9.  The AMS data include reports from both domestic producer and purchasers while the Commission's questionnaire data are from 20 purchasers.  *See* CR/PR at V-5 and L-3 n1.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

("AUVs") declined *** percent from 2018 to 2020.[198]  Generally, purchase price data for subject imports followed this same pattern, *i.e.*, declining from 2018 to the beginning of the POI through the latter portion of 2020, before beginning to increase in late 2020 and into the first three quarters of 2021.[199]

Given the declines in the domestic industry's prices for raw honey from 2018 to 2020, in conjunction with the pervasive underselling by subject imports, we consider whether subject imports depressed the domestic industry's prices to a significant degree during this period. Domestic producers reported having to lower their prices due to competition from the subject imports[200] during a time when declining prices would not be expected given the overall increase in demand, as discussed above.[201]  The substantial price declines also cannot be explained by domestic industry cost reductions.  Although the domestic industry experienced some cost reductions, they were small compared to price declines,[202] and its unit net sales value declined to a greater degree, causing the ratio of its operating expenses to its net sales values to remain high and over *** percent throughout the POI, and increase from 2018 to 2020.[203]  Thus, instead of being able to maintain or even increase its prices consistent with rising demand and being able also to increase prices to at least cover operating expenses, the domestic industry faced declining prices for raw honey.[204]

While prices for domestically produced raw honey did begin to increase beginning in the second half of 2020, we find that these increases were at least partly attributable to the behavior of subject imports' prices.  When importers became aware in late 2020 that petitions were likely to be filed commencing these investigations, domestic prices for both imported and domestically produced raw honey increased, and continued to increase during the pendency of

---

[198]  The domestic industry's net sales values decreased from $*** per pound in 2018 to $*** per pound in 2019, before increasing to $*** per pound in 2020.  CR/PR at Table C-2.

[199]  CR/PR at V-18, Fig. V-5.

[200]  Responding U.S. producers generally reported having to reduce prices.  Of the 47 responding large U.S. producers, 40 reported that they had to reduce prices and 12 reported that they had to roll back announced price increases.  CR/PR at V-25.  In addition, five small producers reported that they had to reduce prices, and two reported having to roll back announced price increases.  CR/PR at V-25 nn.24 & 25.

[201]  *Supra* Section V.B.1.  CR/PR at Tables C-2 and G-1.

[202]  The domestic industry's unit operating expenses decreased *** percent from 2018 through 2020, while prices for the two most important domestic industry pricing products fell more than 25 percent.  CR/PR at Table C-2; CR/PR at Table V-8 and Tables V-4 to V-7 (calculated percentage declines from first quarter 2018 to fourth quarter 2020).

[203]  The industry operating expenses as a ratio to net sales increased from *** percent in 2018 to *** percent in 2019 before declining to *** percent in 2020.  CR/PR at Tables C-2 and M-1.

[204]  CR/PR at Tables C-2 and M-1.  Most members of the industry were already reporting losses, and certain beekeepers chose to inventory their honey rather than sell at prices they believed to be too low.  CR/PR at VI-13 to VI-14.

31

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

the investigations.[205]  Indeed, the \*\*\*, acknowledged the effect of these investigations on domestic prices, indicating that the investigations had an effect on pricing.[206] [207]

In our view, the increases in market prices after the filing of the petitions indicate that low-priced subject imports, which pervasively undersold the domestic product, materially contributed to the domestic price declines from 2018 to 2020.[208] [209]  Given the price declines

---

[205] *See* CR/PR at Figs. V-5 to V-9.  We recognize that the purchase price data show prices increasing earlier than the AMS data but the general trends are consistent with importer knowledge of the imminent filing of the petitions and the pendency of the investigations affecting prices in late 2020 into 2021.

[206] Petitioners' Prehearing Brief, Exhibit 4, Attachment 1 (\*\*\*).  *See also* Petitioners' Prehearing Brief, Exhibit 4 at 5-6 (Blumenthal declaration) (noting 2021 improvements in market conditions); Hearing Tr at 24 Blumenthal (substantial improvements in pricing since filing of petitions as importers raised prices).

NHPDA argues that the possibility of an antidumping duty case was known in the market in early 2020, when prices were still falling, demonstrating that general knowledge regarding the filing of the petitions does not account for the improvements in prices in the market in 2021.  *See, e.g.,* Hearing Tr. at 280-81 (Campbell).  As evidence, NHPDA cites an agenda item for a January 2020 annual NHPDA meeting that purportedly concerned the possibility of a trade case being filed.  The item on the agenda, however, indicated only an overview of the AD/CVD process and did not refer to the possibility of a new trade case being filed.  *See* NHPDA's Posthearing Brief at 10 and Exhibit 10 (agenda item "Overview of Antidumping/Countervailing Duty Petition Process").  Petitioners claim that, beginning in late 2020, the prospect of the investigations led importers to increase their prices.  Hearing Tr. at 26 (Hiatt).  As Petitioners describe, it was only after a virtual meeting of the AHPA and its counsel on November 10, 2020, discussing the upcoming case at which representatives of packers and importers were present that it became known to NHPDA members with any degree of certainty that the petitions in these investigations would be imminently filed.  Petitioners' Prehearing Brief at 59, Exhibit 3 at 5-6 (Hiatt Declaration); Hearing Tr. at 352 (Cannon).  Further, \*\*\*.  Petitioners' Prehearing Brief Exhibit 3 Attachment 1.

[207] We find that the pendency of the investigations affected the pricing of the subject imports in the post-petition period.  *See* SAA at 854 ("{w}hen the Commission finds evidence on the record of a significant change in data concerning the imports or their effects subsequent to the filing of the petition or the imposition of provisional duties, the Commission may presume that such change is related to the pendency of the investigation").  *See also* 19 U.S.C. § 1677(7)(I) (Commission considers whether any change in the volume, price effects, or impact of imports of the subject merchandise since the filing of the petition is related to pendency of investigation).

[208] NHPDA has suggested that an increase in demand accounts for the increase in prices in 2021.  Hearing Tr. at 280 (Campbell).  The record does not support this argument.  While the record shows that apparent U.S. consumption was 15.2 percent higher in interim 2021 than in interim 2020, full year data for 2021 show a 5.5 percent increase.  *See* CR/PR at Tables C-2 and M-1.  In any case, the record does not indicate that there was such a substantial increase in demand that would alone account for the sharp increase in subject import prices observed in 2021.  *See* CR/PR at Fig. V-5 (subject import prices).

[209] Commissioner Schmidtlein does not agree that post-petition effects are evidence of price depression earlier in the POI before the petition was filed.  Rather, in her view, these price increases do not weigh against a finding of price depression because she accords them less weight as post-petition effects, pursuant to 19 USC § 1677(7)(I).

from 2018 to 2020 during a time of strong and increasing demand, in conjunction with the significant underselling detailed above, and the subject imports' dominant share of the U.S. market , we find that low-priced subject imports depressed prices for domestically produced raw honey to a significant degree.[210]

In sum, we find that the significant underselling by cumulated subject imports enabled the subject imports to gain sales and market share from the domestic industry and depressed the domestic industry's prices to a significant degree.[211] We therefore find that cumulated subject imports had significant price effects.

### E.     Impact of the Subject Imports[212]

Section 771(7)(C)(iii) of the Tariff Act provides that examining the impact of subject imports, the Commission "shall evaluate all relevant economic factors which have a bearing on

---

[210] Respondents argue that weak demand for retail honey and the splintering of the market into local markets caused price declines. *See* NHPDA's Posthearing Brief, Exhibit 1 at 6-7. The record does not support their argument that demand for local honey had a large impact on the market downstream or that there were regional honey markets. The record shows that purchasers did not view "buying local" as an important purchasing factor, and that demand for honey for sale at retail was growing as was demand for honey for use as a food ingredient and for food service. *See* CR/PR at II-24, Tables II-8 and II-11. Moreover, purchasers and importers almost unanimously reported that domestic retail demand increased, rather than decreased. CR/PR at Table II-8. In any case, we observe downward price trends for the subject imports for all four pricing products from 2018 to 2020. *See* CR/PR at Fig. V-5. Consequently, even if respondents were correct that different colors of honey tended to go to different downstream markets, differential demand for downstream uses would not be the cause of price declines observed for all four honey colors in the market.

[211] Respondents also argue that subject imports did not cause the observed price declines because they were serving different downstream markets than the domestic like product. NHPDA's Prehearing Brief at 53-55. The record does not support NHPDA's argument of attenuated competition. First, the record shows that there was substantial overlap in the honey colors shipped by domestic and subject sources and that domestically produced and imported raw honey were competing head-to-head for sales to the same purchasers, packers, who, in turn, consolidated and mixed raw honey from different sources to create blends of processed honey to be sold to the different end use segments – ingredient, retail, and food service industries. CR/PR at Table IV-10 and Fig. IV-4. NHPDA acknowledges raw honey from different sources does compete within color/product categories, arguing light amber raw honey from India and Vietnam competed vigorously for sales to packers. NHPDA's Posthearing Brief, Exhibit 1 at 3. We also observe that prices for the domestic like product, though higher than subject import prices, generally followed the same trends as prices for the subject imports. *See, e.g.,* CR/PR at Figs. V-1 to V-6. In our view, this overlap in honey colors and purchasers and correlation in prices, in addition to the large share of the market held by subject imports, indicate that the subject imports were affecting prices for the domestic like product during the POI.

[212] The statute instructs the Commission to consider the "magnitude of the dumping margin" in an antidumping proceeding as part of its consideration of the impact of imports. 19 U.S.C. § 1677(7)(C)(iii)(V). In its final determination of sales at less than fair value concerning imports of raw honey from Argentina, Commerce found dumping margins ranging from 9.17 to 49.44 percent. *Raw Honey From Argentina: Final Determination of Sales at Less Than Fair Value and Final Affirmative* (Continued...)

33

the state of the industry."[213]  These factors include output, sales, inventories, capacity utilization, market share, employment, wages, productivity, gross profits, net profits, operating profits, cash flow, return on investment, return on capital, ability to raise capital, ability to service debts, research and development ("R&D"), and factors affecting domestic prices.  No single factor is dispositive and all relevant factors are considered "within the context of the business cycle and conditions of competition that are distinctive to the affected industry."[214]

The domestic industry began the period with operating losses, and by many measures of its output and financial performance, its condition worsened from 2018 to 2020.[215]  As low-priced cumulated subject imports captured market share from the domestic industry and depressed its prices, the domestic industry's output indicators fell, and its financial condition deteriorated as domestic producers incurred reduced sales and revenues.  The domestic industry's financial condition improved in interim 2021 when its prices and sales values increased after the filing of the petitions.  Nonetheless, the domestic industry continued to report lower production and shipments and it continued to lose market share to lower-priced subject imports.

---

*Determination of Critical Circumstances*, 87 Fed. Reg. 22179, 22181 (Apr. 14, 2022).  In its final determination of sales at less than fair value concerning imports of raw honey from Brazil, Commerce found dumping margins of 7.89 and 83.72 percent.  *Raw Honey From Brazil: Final Determination of Sales at Less Than Fair Value*, 87 Fed. Reg. 22182, 22183 (Apr. 14, 2022).  In its final determination of sales at less than fair value concerning imports of raw honey from India, Commerce found dumping margins ranging from 5.52 to 6.24 percent*.  Raw Honey From India: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances,* 87 Fed. Reg. 22188, 22189 (Apr. 14, 2022).  Finally, in its final determination of sales at less than fair value concerning imports of raw honey from Vietnam, Commerce found dumping margins ranging from 58.74 to 61.27 percent.  *Raw Honey From Vietnam: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 87 Fed. Reg. 22184, 22185 (Apr. 14, 2022).

In considering the dumping margins, we take into account in our analysis the fact that Commerce has made final findings that all subject producers in Argentina, Brazil, India, and Vietnam are selling subject imports in the United States at less than fair value.  Further, our analysis of the significant underselling of subject imports and their large underselling margins, described in both the price effects discussion and below, is particularly probative to an assessment of the impact of the subject imports.

[213] 19 U.S.C. § 1677(7)(C)(iii); *see also* SAA at 851 and 885 ("In material injury determinations, the Commission considers, in addition to imports, other factors that may be contributing to overall injury.  While these factors, in some cases, may account for the injury to the domestic industry, they also may demonstrate that an industry is facing difficulties from a variety of sources and is vulnerable to dumped or subsidized imports.").

[214] 19 U.S.C. § 1677(7)(C)(iii).  This provision was amended by the Trade Preferences Extension Act ("TPEA") of 2015, Pub. L. 114-27.

[215] As discussed above, information concerning the domestic industry is based on USDA/NASS data (colonies, yield, production, and shipments) and questionnaire data from 84 beekeepers who provided financial information to the Commission.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Despite an overall increase in apparent U.S. consumption from 2018 to 2020, the domestic industry's production[216] and U.S. shipments[217] declined *** percent and *** percent respectively.[218] Similarly, the industry's output indicators were lower in interim 2021 than in interim 2020 notwithstanding higher apparent U.S. consumption.[219] The number of beekeepers' colonies and their yield declined over the POI.[220] Even with its production declining, the domestic industry's end-of-period inventories increased by 35.6 percent from 2018 to 2020 before falling in 2021.[221] U.S. producers' reported level of inventories increased during the POI, which, as a ratio to U.S. producers' U.S. shipments, increased from *** percent in 2018 to *** percent in 2019 and to *** percent in 2020.[222]

As cumulated subject imports increased, the domestic industry's market share decreased by 6.8 percentage points from 2018 to 2021 (initially increasing from *** percent in 2018 to *** percent in 2019, before falling to *** percent in 2020 and 20.7 percent in 2021).[223]

---

[216] U.S. beekeepers' production decreased by *** percent from 2018 to 2020, increasing from *** pounds in 2018 to *** pounds in 2019 and then decreasing to *** pounds in 2020. CR/PR at Table C-2.

[217] U.S. beekeepers' U.S. shipments decreased by *** percent from 2018 to 2020, increasing from *** pounds in 2018 to *** pounds in 2019 and then decreasing to *** pounds in 2020. CR/PR at Table C-2. The industry's exports, a relatively small portion of its total shipments, increased from 3.2 million pounds in 2018 to 5.9 million pounds in 2020. CR/PR at Table III-13.

[218] According to the Commission's questionnaire data, the quantity of the domestic industry's net sales increased from 2018 to 2020 despite NASS data showing that the broader industry's U.S. shipments declined over the same period. *See* CR/PR at Table C-2 and III-13. It is likely that the inconsistency resulted from the net sales quantities being reported by just over 30 percent of the industry. The net sales quantities of the broader industry likely declined along with its U.S. shipments.

[219] U.S. beekeepers' production was lower in interim 2021 (*** pounds) than in interim 2020 (*** pounds). CR/PR at Table C-2. Beekeepers' U.S. shipments were *** percent lower in interim 2021 (*** pounds) than in interim 2020 (*** pounds). CR/PR at Table C-2.

[220] The number of beekeepers' colonies declined over the period from 2.8 million colonies in 2018 and 2019 to 2.7 million colonies in 2020 and 2021. CR/PR at Table III-6. Production yield increased from 54.5 pound per colony in 2018 to 55.8 pound per colony in 2019; yield then fell to 54.5 pound per colony in 2020 and 46.9 pound per colony in 2021. CR/PR at Table III-8.

[221] Beekeepers' end-of-period inventories increased from 29.3 million pounds in 2018 to 40.9 million pounds in 2019 and 39.7 million pounds in 2020; they were lower in 2021 at 23.5 million pounds. CR/PR at Table G-3 (NASS data). Data from the Commission's questionnaires show the same trends. *See* CR/PR at Table III-19. *** domestic producer, ***, and *** declined to sell their honey or found that packers were no longer interested in their honey due to low market prices. CR/PR at VI-13 to VI-14. *See also* Hearing Tr. at 253 (Campbell) (domestic producers holding inventory in anticipation of higher prices after filing of petitions).

[222] CR/PR at Table C-2. According to the NASS data, the domestic producers' ratio of inventory to U.S. shipments increased from 19.4 percent in 2018 to 26.7 percent in 2019 and 28.0 percent in 2020 before decreasing to 19.3 percent in full year 2021. CR/PR at Table G-3.

[223] CR/PR at Tables C-2 and G-1.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

The industry's market share was also lower in interim 2021 (\*\*\* percent) than in interim 2020 (\*\*\* percent).[224]

The domestic industry's financial indicia generally deteriorated from 2018 to 2020 and were somewhat improved in interim 2021 compared to interim 2020.[225]  Revenues declined by \*\*\* percent from 2018 to 2020, first decreasing from $\*\*\* in 2018 to $\*\*\* in 2019, and then increasing to $\*\*\* in 2020.[226]  The industry's operating expenses  declined by \*\*\* percent from 2018 to 2020, decreasing from $\*\*\* in 2018 to $\*\*\* in 2019 and $\*\*\* in 2020.[227]  The domestic industry's ratio of operating expenses to net sales increased from \*\*\* percent in 2018 to \*\*\* percent in 2019, before falling to \*\*\* percent in 2020.[228]

The domestic industry's operating losses increased from $\*\*\* in 2018 to $\*\*\* in 2019, and then decreased to $\*\*\* in 2020.[229]  The industry's operating income margin was negative \*\*\* percent in 2018, negative \*\*\* percent in 2019, and negative \*\*\* percent in 2020.[230]

The domestic industry's increased income from government programs enabled it to reduce its net losses from 2018 to 2020.[231]  It reported net losses of $\*\*\* in 2018, $\*\*\* in 2019 and $\*\*\* in 2020.[232]  The industry's net income margin was negative \*\*\* percent in 2018, negative \*\*\* percent in 2019, and negative \*\*\* percent in 2020.[233]  Total net assets by large producers increased, while the industry's negative return on assets fluctuated from 2018 to

---

[224] CR/PR at Table C-2.  By value, the domestic industry's market share increased overall by \*\*\* percentage points from 2018 to 2020, first increasing from \*\*\* percent in 2018 to \*\*\* percent in 2019 before decreasing to \*\*\* percent in 2020; it was lower in interim 2021 (\*\*\* percent) than in interim 2020 (\*\*\* percent).  *Id.*

[225] CR/PR at Table C-2.  Large beekeepers are firms that reported having 3,800 or more bee colonies during the POI.  CR/PR at III-2.  They were asked to report more information (including interim data) than firms with fewer than 3,800 colonies.  CR/PR at VI-1 n.4.  Thus, the interim data of the 41 large beekeepers is not necessarily comparable with full-year data reported by the 79 beekeepers that includes data from smaller beekeepers.

[226] Large beekeepers reported greater revenue in interim 2021 ($\*\*\*) than in interim 2020 ($\*\*\*).  CR/PR at Table C-2.

[227] CR/PR at Table C-2.  Large beekeepers reported higher operating expenses in interim 2021 ($\*\*\*) than in interim 2020 ($\*\*\*).  *Id.*

[228] CR/PR at Table C-2.  Large beekeepers' ratio of operating expenses to net sales revenues was \*\*\* percent in interim 2020 and \*\*\* percent in interim 2021.  CR/PR at Table C-2.

[229] CR/PR at Table C-2.  The large producers reported operating losses of $\*\*\* in interim 2020 and $\*\*\* in interim 2021.  *Id.*  \*\*\* of 78 beekeepers reported operating losses in 2018, \*\*\* reported losses in 2019, and \*\*\* reported losses in 2020.  CR/PR at Table M-1.

[230] CR/PR at Table C-2.  Large beekeepers' operating income margin was negative \*\*\* percent in interim 2020 and negative \*\*\* percent in interim 2021.  *Id.*

[231] Certain government programs provide assistance to beekeepers.  *See* CR/PR at VI-15 n.43.  Income received from these programs decreased from $\*\*\* in 2018 to $\*\*\* in 2019 and then increased to $\*\*\* in 2020.  CR/PR at Table M-1.

[232] CR/PR at Table C-2.  The large producers reported net losses of $\*\*\* in interim 2020 and $\*\*\* in interim 2021.  *Id.*

[233] CR/PR at Table C-2.  Large beekeepers' net income margin was negative \*\*\* percent in interim 2020 and negative \*\*\* percent in interim 2021.

2020.[234] Capital expenditures reported by large beekeepers increased from $*** in 2018 to $*** in 2019, and then fell to $*** in 2020.[235]

In contrast to its other indicators, the domestic industry's employment indicators showed some improvement from 2018 to 2020. Information from questionnaires showed that the domestic industry's employment (measured in production-related workers ("PRWs")) increased from *** PRWs in 2018 to *** PRWs in 2019 and *** PRWs in 2020.[236] Hours worked increased from 2018 to 2020, increasing from *** hours in 2018 to *** hours in 2019 and 2020.[237] Wages paid increased from $*** in 2018 to $*** in 2019 and $*** in 2020.[238] Productivity (measured in pounds per 1,000 hours) increased from *** pounds in 2018 to *** pounds in 2019, and then fell to *** pounds in 2020.[239]

In sum, the record shows that the domestic industry's increasingly poor performance from 2018 to 2020 occurred as low-priced cumulated subject imports increased in volume and captured sales and market share from the domestic industry. Cumulated subject imports significantly undersold the domestically produced raw honey and depressed domestic producers' prices. Because of the significant depression of domestic producers' prices and the industry's reduced sales, the industry's revenues were lower than they otherwise would have been. Even with an increase in apparent U.S. consumption the domestic industry's production, shipments, prices, revenues, and market share all declined overall from 2018 to 2020. As a result, the domestic industry reported relatively large operating and net losses from 2018 to 2020. In interim 2021 after the petitions were filed, the industry continued to lose market share to the subject imports although its losses diminished due to increased revenues from higher raw honey prices.[240]

Respondents argue that beekeepers earn much of their income from pollination services and that the Commission should evaluate the industry's performance based on financial results for both honey production and pollination services.[241] Doing so, however, would be improper

---

[234] *See* CR/PR at VI-16. Large beekeepers' reported total assets were *** in 2018, *** in 2019 and *** in 2020. CR/PR at Table C-2.

[235] CR/PR at Table C-2. Large beekeepers' capital expenditures were $*** in interim 2020 and $*** in interim 2021. CR/PR at Table C-2. Large firms reported capital expenditures of $*** interim 2020 and $*** in interim 2021. *Id.* Large firms incurred R&D expenses of $*** in 2018, $*** in 2019 and $*** in 2020. CR/PR at Table C-2. Their R&D expenses were $*** in interim 2020 and $*** in interim 2021. *Id.*

[236] CR/PR at Table C-2. Large beekeepers reported employing *** workers in interim 2020 and *** workers in interim 2021. *Id.*

[237] CR/PR at Table C-2. Large beekeepers reported *** hours worked in interim 2020, and in interim 2021. *Id.*

[238] CR/PR at Table C-2. Large beekeepers reported $*** wages paid in interim 2020 $*** paid in interim 2021. *Id.*

[239] CR/PR at Table C-2. Large beekeepers reported productivity of *** pounds per hour in interim 2020 and *** pounds per hour in interim 2021. *Id.*

[240] *See* CR/PR at VI-2. Many domestic producers reported negative effects on their operations and investment as a result of low raw honey prices due to the subject imports. CR/PR at Tables VI-7 and VI-8.

[241] NHPDA's Prehearing Brief at 71-72; NHPDA's Posthearing Brief at 31.

under the statute,[242] and the record does not support Respondents' argument that beekeepers are significantly sacrificing their raw honey production in order to provide pollination services.[243]

Respondents additionally observe that subject imports are needed to serve the U.S. market because apparent U.S. consumption exceeds the domestic industry's production and shipments. However, Respondents' claims ignore the domestic industry's declining U.S. shipments and growing inventories of raw honey[244] during the POI as the domestic industry's raw honey was undersold by the subject imports.[245]

──────────────────

[242] The statute states that "{t}he effect of dumped imports … shall be assessed in relation to the United States production of a domestic like product if available data permit the separate identification of production in terms of such criteria as the production process or the producer's profits." 19 U.S.C. 1677(4)(D). In accordance with the statute, we focus on beekeepers' raw honey operations and do not broaden our consideration of beekeepers' operations to include pollination services as urged by NHPDA. As is often the case in Commission investigations, firms such as steel producers, use their assets to produce more than one product, and expenses and revenue must be allocated among the different products. CR/PR at VI-10, VI-10 n.23. In these investigations, staff indicated that the amount of production costs that were allocated to raw honey were likely somewhat understated because of the difference in the amount of time spent between commercial pollination and raw honey production, particularly for companies that reported only shared operating expenses (*i.e.,* all small producers and some large producers). CR/PR at VI-10 n.26.

[243] Beekeepers provide pollination for a relatively short period January-March during the offseason for raw honey production. Raw honey production primarily occurs during April-September. CR/PR at III-21, VI-8 n.14. While the domestic industry's yield per colony was lower than honey industries in Brazil, India, and Vietnam, this is not unexpected. The domestic industry's yield per colony is lower than that of honey industries in countries with a tropical climate permitting honey production during more months of the year. *See* Prehearing Report, Memorandum INV-UU-031 at Table II-3 (domestic industry's yield similar to yield Argentina and Ukraine); CR/PR at II-17; Hearing Tr. 200 (Crown) (noting longer production seasons in India and Vietnam).

[244] As noted, some beekeepers chose not to sell their honey at prevailing market prices or found that packers were no longer interested in their raw honey due to low market prices. CR/PR at VI-13 to VI-14.

[245] The Commission has repeatedly explained that "there is no short supply provision in the statute" and "the fact that the domestic industry may not be able to supply all of demand does not mean the industry may not be materially injured or threatened with material injury by reason of subject imports." *Softwood Lumber from Canada*, Inv. Nos. 701-TA-414 and 731-TA-928 (Article 1904 NAFTA Remand) at 108, n.310 (Dec. 2003). *See also, Small Diameter Graphite Electrodes from China*, Inv. No. 731-TA-1143 (Final), USITC Pub. 4062 (Feb. 2009) at 22-23; *Sodium Hexametaphosphate from China,* Inv. No. 731-TA-1110 (Final), USITC Pub. 3984 (March 2008) at 27, n.109); *Electrolytic Manganese Dioxide from China and Australia*, Inv. Nos. 731-TA-1124-25 (Preliminary), USITC Pub. 3955 (Oct. 2007) at 18, n.122; *Certain Lined Paper School Supplies from China, India, and Indonesia*, Inv. Nos. 701-TA-442-443 and 731-TA-10995-1097 (Final), USITC Pub. 3884 (Sept. 2006) at 25, n.192, and at 58, n.49; *Certain Activated Carbon from China*, Inv. No. 731-TA-1103 (Preliminary), USITC Pub. 3852 (May 2006) at 19, n.134; *Metal Calendar Slides from Japan*, Inv. No. 731-TA-1094 (Preliminary), USITC Pub. 3792 (Aug. 2005) at 9, n.45 ("To the extent that Respondents claim that the Commission is legally unable to make an affirmative finding of material injury by reason of subject imports because the domestic industry is incapable of supplying domestic demand, they are incorrect.").

38

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Respondents further contend that subject imports were needed to serve the downstream ingredient market (food manufacturers) which they claim the domestic industry cannot serve.[246]  However, Ingredient Purchasers' purchases do not explain the volume of subject imports during the POI.[247]  Respondents' arguments also overlook the substantial overlap in extra light amber and light amber raw honey produced domestically and which accounted for the majority of the subject imports.[248]  Respondents further argue that darker colored raw honey in general, and darker raw honey from Vietnam in particular, is needed by certain food manufacturers because of its floral sources and flavor profile.[249]  The record indicates, however, that the Ingredient Purchasers purchased low-priced blended honey from multiple countries.[250]  Rather than particular flavors or floral sources, the greater availability and lower prices of the subject imports primarily account for the Ingredient Purchasers'

---

[246] Ingredient Purchasers' Prehearing Statement at 12; NHPDA's Prehearing Brief at 4-5, 37-38; NHPDA's Posthearing Brief at 1-2.

[247] The Ingredient Purchasers' reported purchases of subject imports totaled *** from January 2018 to September 2021—less than *** percent of subject imports that entered during the period.  *See* CR/PR at Tables V-13 and C-2.  The Ingredient Purchasers acknowledge that their purchases were of blended honey from various countries and that all of their purchases were from packers or processors of raw honey rather than beekeepers.  Despite purchasing honey from processors, they insist the honey has not been filtered to 25 microns, so it remains raw honey rather than processed honey.  *See* CR/PR at II-2 n.12; Ingredient Purchasers' Posthearing Statement, Answers to Commissioner Questions at 19-21.

[248] CR/PR at Fig. IV-4; Table E-6.  Respondents assert that product from Vietnam is required in the market because of its dark color.  However, over half of the product from Vietnam was of light amber honey during the POI, a product the domestic industry produces.  *See* CR/PR at Tables E-1 and E-5 (large producers' U.S. shipments were between 18 and 20 percent light amber from 2018 to 2020).  Most of importers' shipments of subject imports were light amber or lighter as were the domestic industry's shipments.  CR/PR at Tables E-1 and E-6.  Further, the greatest increase in subject imports from 2018 to 2020 was in light amber, followed by extra light amber, and then the darkest honey, amber.  CR/PR at Table E-6.  Thus, it was not "dark" honey leading the increase in subject imports.  Eighty percent of the increase in subject imports was in light amber and extra light amber.  These two colors accounted for over 40 percent of the domestic industry's shipments.  *See* CR/PR at Tables E-1 and E-6.

[249] *See* Ingredient Purchasers' Prehearing Statement at 6-8, NHPDA's Prehearing Brief at 53-55.

[250] Bimbo Bakeries Purchaser's Questionnaire at 11; General Mill's Purchaser's Questionnaire at 12-13, 35, 37; Post' Purchaser's Questionnaire at 12, 14; Smithfield Purchaser's Questionnaire at 10.  The Ingredient Purchasers' *** suggests their purchases were not motivated by flavor or floral sources.  CR/PR at V-6 to V-7 n.16.  Indeed, their purchase contracts specify price, source, and color but often not floral categories or usually flavors.  NHPDA's Posthearing Brief Exhibit 10 (contracts); Petitioner's Posthearing Brief Exhibit 1 at 10, Ex. 4 paras 6-7. (Blumenthal Declaration).

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

purchases.[251]  While NHPDA also claims that imports of organic raw honey from subject sources do not take sales from domestic raw honey, the record does not support this claim.[252]

NHPDA additionally argues that Petitioner SHA imported from subject sources and negotiated low prices, and that SHA was therefore partly responsible for the increase in subject imports and their low prices.[253]  We disagree with Respondents' interpretation of the record. The imports by SHA (a cooperative of U.S. beekeepers) instead demonstrate that the SHA needed low-priced imports in order to compete in the U.S. market due to low prices.[254]

---

[251] The record shows that amber raw honey from Vietnam was generally the lowest-priced raw honey from subject sources suggesting it is not a specialty product. *See* CR/PR at Tables E-2 to E-5. *See also* CR/PR at Figs. V-3 to V-4 and Appendix K (Ingredient Purchasers') (downstream purchase prices lower than domestic producers' prices).  Moreover, the Ingredient Purchasers do not claim that the flavor of their products was improved by switching sources of honey. *See* Hearing Tr. at 232 (Bash), 233-34 (Bertrand, Pizer), 234 (Crown).  In explaining their purchases, three of four of the Ingredient Purchasers' questionnaire responses report that greater availability accounts for their purchases of raw honey from Vietnam.  Two of the four also indicate that either subject imports were low-priced or that domestic honey is a "premium" product. *See* CR/PR at Table V-15 (***).  Petitioners provide ***. Petitioners Prehearing Brief, Exhibit 8 and Attachment D.

[252] Respondents highlight that the majority of the subject imports from Brazil are of organic raw honey and there is virtually no domestically produced organic raw honey.  They maintain, therefore, that organic raw honey from Brazil is not competing with domestic raw honey. *See* NHPDA's Prehearing Brief at 9-11; NHPDA's Posthearing Brief at 6-7.  First, however, it is clear that some processed organic honey from Brazil is directly competing with processed conventional honey at retail.  To this extent, organic honey is competing with conventional honey regardless of the organic label. *See* NHPDA's Prehearing Brief, Exhibit 51 (samples of retail honey from grocery stores).  While organic honey may be required as an ingredient in certain foods, the portion of demand that requires organic honey rather than conventional honey is unclear. *See* NHPDA's Posthearing Brief, Exhibit 1 at 12 (estimating *** to *** percent of shipments of organic honey were to the retail market).  Organic raw honey from Brazil was also competing no differently than other subject imports in the U.S. market in terms of pricing. Even though approximately 90 percent of raw honey from Brazil was organic honey, its prices tracked imports from other subject countries that were overwhelmingly not organic. *See* Figs. IV-5, V-2, and V-3. Importers' shipments of raw organic honey from Brazil were lower priced than conventional raw honey from Brazil suggesting that major raw honey purchasers do not treat raw organic honey from Brazil as a premium product in the U.S. market. *See* CR/PR at Table F-3.  Purchasers also indicated raw honey from Brazil was at least sometimes interchangeable with that from Argentina and India.  CR/PR at Table II-17. Thus, the record does not indicate, as Respondents argue, that raw honey from Brazil is not competing with other raw honey in the U.S. market.

[253] NHPDA's Final Comments at 3-4.

[254] SHA explained that domestically produced raw honey from its members could not compete at the price level of subject imports, so it had to blend imports with domestic honey in order to meet competition from the subject imports.  Petitioners' Posthearing Brief, Exhibit 1 at 5-7 (citing increasing demands of customers for lower-priced honey). *See also Wooden Bedroom Furniture from China*, Inv. No. 731-TA-1058 (Final), USITC Pub. 3743 (Dec. 2004) at 27, *quoting* S. Rep. No. 100-171, 100th Cong., 1st Sess. 117 (1988) ("The domestic industry may be materially injured by reason of unfair imports even if some producers themselves import in order to stay in business").  The emails also in fact show that ***. *See* NHPDA's Prehearing Brief, Exhibit 50 (collecting emails).

In our analysis of the impact of cumulated subject imports on the domestic industry, we have taken into account whether there are other factors that may have had an adverse impact on the industry during the POI to ensure that we are not attributing injury from other factors to cumulated subject imports. Accordingly, we have examined the role of nonsubject imports and demand. Nonsubject imports accounted for a much smaller share of the market as compared to subject imports.[255] Furthermore, they declined overall during the POI in absolute terms and as a share of the U.S market as subject imports were increasing.[256] Nonsubject imports supplied 15.6 percent of the market in 2018, 11.1 percent in 2019, and 11.4 percent in 2020.[257] We also note that the AUVs for nonsubject imports were well above the AUVs for subject imports throughout the POI and nonsubject imports' AUVs declined only slightly from 2018 to 2020 while subject imports' AUVs declined to a much greater extent.[258] Thus, the worsening of the domestic industry's condition due to low prices for raw honey cannot be explained by nonsubject imports. Further, as noted above, apparent U.S. consumption for raw honey generally increased during the POI. Accordingly, changes in consumption trends do not explain the industry's deteriorating condition.[259] We consequently conclude that other causes cannot explain the injury we have attributed to the cumulated subject imports.

We accordingly find that cumulated subject imports had a significant impact on the domestic industry.

## VI.  Critical Circumstances

### A.  Legal Standards

In its final antidumping duty determinations concerning raw honey from Argentina and Vietnam, Commerce found that critical circumstances exist with respect to certain producers/exporters in Argentina and Vietnam.[260] Because we have determined that the domestic industry is materially injured by reason of subject imports from Argentina and Vietnam, we must further determine "whether the imports subject to the affirmative

---

[255] CR/PR at Tables IV-14 and C-2.

[256] CR/PR at Tables IV-14 and C-2.

[257] CR/PR at Tables IV-14 and C-2. They accounted for 11.9 percent of apparent U.S. consumption in interim 2020 and 8.7 percent in interim 2021. *Id.*

[258] The AUVs for nonsubject imports were $1.49 per pound in 2018, $1.55 per pound in 2019, $1.46 per pound in 2020, $1.49 per pound in interim 2020, and $2.05 per pound in interim 2021. By contrast, the AUVs for subject imports were $1.00 per pound in 2018, $0.87 per pound in 2019, $0.84 per pound in 2020, $0.83 per pound in interim 2020, and $1.19 per pound in interim 2021. *Id.* While imports of raw honey from Ukraine were priced below the domestic product during the POI, the volume of those imports was substantially less than the subject imports. *See* CR/PR at Figs. J-1 to J-3 and Table IV-14. The market share of nonsubject imports from Ukraine increased from 3.3 percent in 2018 to 3.6 percent in 2019 and 4.3 percent in 2020. Their share was 4.2 percent in interim 2020 and 2.8 percent in interim 2021.

[259] CR/PR at Tables IV-14 and C-2. As we have discussed, we do not find that there was a decline in consumption in the downstream retail market for honey that would explain the observed declines in the industry's shipments and market share during the POI.

[260] 87 Fed. Reg. 22179 and 87 Fed. Reg. 22184.

{Commerce critical circumstances} determination ... are likely to undermine seriously the remedial effect of the antidumping {and/or countervailing duty} order{s} to be issued."[261]  The SAA indicates that the Commission is to determine "whether, by massively increasing imports prior to the effective date of relief, the importers have seriously undermined the remedial effect of the order" and specifically "whether the surge in imports prior to the suspension of liquidation, rather than the failure to provide retroactive relief, is likely to seriously undermine the remedial effect of the order."[262]  The legislative history for the critical circumstances provision indicates that the provision was designed "to deter exporters whose merchandise is subject to an investigation from circumventing the intent of the law by increasing their exports to the United States during the period between initiation of an investigation and a preliminary determination by {Commerce}."[263]  An affirmative critical circumstances determination by the Commission, in conjunction with an affirmative determination of material injury by reason of subject imports, would normally result in the retroactive imposition of duties for those imports subject to the affirmative Commerce critical circumstances determination for a period 90 days prior to the suspension of liquidation.

The statute provides that, in making this determination, the Commission shall consider, among other factors it considers relevant,

> (I) the timing and the volume of the imports,
>
> (II) a rapid increase in inventories of the imports, and
>
> (III) any other circumstances indicating that the remedial effect of the {order} will be seriously undermined.[264]

In considering the timing and volume of subject imports, the Commission's practice is to consider import quantities prior to the filing of the petitions and those subsequent to the filing of the petitions using monthly statistics on the record regarding those firms for which Commerce has made an affirmative critical circumstances determination.[265]

### B.    Party Arguments

*Petitioners' Arguments.*  Petitioners argue that the Commission should make affirmative findings with respect to subject imports from Argentina and Vietnam subject to Commerce's affirmative critical circumstances determinations.  They claim that subject imports from

---

[261] 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii).

[262] SAA at 877.

[263] *ICC Industries, Inc. v United States,* 812 F.2d 694, 700 (Fed. Cir. 1987), *quoting* H.R. Rep. No. 96-317 at 63 (1979), *aff'g* 632 F. Supp. 36 (Ct. Int'l Trade 1986).  *See* 19 U.S.C. §§ 1671b(e)(2), 1673b(e)(2).

[264] 19 U.S.C. §§ 1671d(b)(4)(A)(ii), 1673d(b)(4)(A)(ii).

[265] *See Lined Paper School Supplies from China, India, and Indonesia,* Inv. Nos. 701-TA-442-43, 731-TA-1095-97, USITC Pub. 3884 at 46-48 (Sept. 2006); *Carbazole Violet Pigment from China and India,* Inv. Nos. 701-TA-437 and 731-TA-1060-61 (Final), USITC Pub. 3744 at 26 (Dec. 2004); *Certain Frozen Fish Fillets from Vietnam,* Inv. No. 731-TA-1012 (Final), USITC Pub. 3617 at 20-22 (Aug. 2003).

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Vietnam surged into the United States after the filing of the petitions in April 2021 and before Commerce's preliminary determination in November 2021.  Using six-month pre- and post-periods, they calculate that subject imports from Vietnam increased to almost 88 million pounds in the 6 months after the petition was filed, an increase of 83 percent compared to the six months prior to the filing of the petition.[266]

Petitioners argue that importers' inventories of subject imports from Vietnam were *** percent higher in September 2021 than in September 2020.  They also claim that *** is stockpiling raw honey from Vietnam, importing *** pounds in August 2021.[267]  Petitioners contend that such a stockpiling of imports is the type of behavior that the critical circumstances provision is designed to deter.  They also observe that subject imports from Vietnam continued to undersell the domestic product in interim 2021, and will further injure a U.S. industry that is already extremely vulnerable.[268]

Petitioners similarly argue that imports from Argentina subject to Commerce's critical circumstances determination increased by 55.3 percent in the six months after the filing of the petition in April 2021.  Petitioners view the increase, from *** pounds to over *** pounds, as designed to "beat" the imposition of provisional duties in November 2021.  They also calculate that end-of-period inventories held by importers were *** percent higher in September 2021 at *** pounds than in September 2020.  Moreover, they claim that underselling by the subject imports from Argentina continued during interim 2021 and the domestic industry remains vulnerable to further injury.[269]

Finally, Petitioners maintain that imports subject to Commerce's critical circumstances determinations are substantial relative to the U.S. market for raw honey.  They calculate the post-petition imports from Vietnam and Argentina subject to Commerce's critical circumstances determination are equivalent to one-fifth and 13 percent, respectively of apparent U.S. consumption in interim 2021.[270]

*Respondents' Arguments.*  NHPDA, Sweet Harvest Foods, and Export Packers Company Limited (collectively, "Joint Respondents") argue that while there have been post-petition increases in the imports and inventories of raw honey from Argentina and Vietnam, the moderately increased quantities are unlikely to have much impact on the U.S. market, as they are small compared to the U.S. market, and are needed to fill a gap caused by the decline in non-subject imports over the POI and the withdrawal of imports from Ukraine from the U.S. market.  They argue that packers and other customers are not holding excess levels of raw honey in inventory and that the majority of the increase in subject imports subject to critical circumstances has been sold out of inventory and will no longer affect the market.[271]

---

[266] Petitioners' Prehearing Brief at 105-108.

[267] Petitioners argue that ***.  Petitioners' Posthearing Brief, Exhibit 2, Slide 36.

[268] Petitioners' Prehearing Brief at 108-111.

[269] Petitioners' Prehearing Brief at 111-114.

[270] Petitioners' Posthearing Brief at 14-15.

[271] *See* NHPDA's Posthearing Brief at 14.

43

Joint Respondents also argue that the increases reflect seasonal import patterns and supply chain disruptions.[272]  They urge the Commission to recognize that domestic raw honey prices have been rising during 2021 as demand increases, and the domestic industry is profitable and increasing its U.S. shipments, which, they claim, indicates that increased imports are unlikely to undermine import relief.[273]  Joint Respondents  assert that the domestic industry also serves a relatively small portion of the market and imports are needed to serve the market, particularly given the war in Ukraine's likely constraining effect on imports from Ukraine.[274]

### C.    Analysis

On April 7, 2022, Commerce issued its final affirmative determinations in its antidumping duty investigations regarding Argentina and Vietnam.[275]  For raw honey from Argentina, Commerce found that critical circumstances exist for raw honey from ACA Coop, Haedo, CIPSA, and other producers/exporters with the exception of NEXCO.[276]  For raw honey from Vietnam, Commerce found that critical circumstances exist for raw honey from Ban Me Thuot and DakHoney, the eligible separate rate companies, and the Vietnam-wide entity.[277]

We first consider the appropriate period for comparison of pre-petition and post-petition levels of subject imports from Argentina and Vietnam.  The petitions were filed on April 21, 2021.[278]  In previous investigations, the Commission has relied on a shorter comparison

---

[272] NHPDA's Prehearing Brief, Appendix A at 12-16.  *See also* NHPDA's Posthearing Brief, Exhibit 2, Answer 3.

[273] *See* NHPDA's Posthearing Brief, Exhibit 2, Answer 1.

[274] NHPDA's Prehearing Brief, Appendix A at 21-27.  NHPDA's Posthearing Brief, Exhibit 2, Answers 4 and 5.  Specifically, Respondents assert that the cessation of exports from Ukraine has tightened global supply, necessitating an increased need for subject imports to fill that gap ("there is no support for an affirmative critical circumstances finding, in the face of declining non-subject (including Ukrainian) imports, which are far greater in quantity than the post-petition increases in Vietnamese and Argentinean imports, as well as any remaining inventories thereof.").  NHPDA's Prehearing Brief, Appendix A at 26-27.

[275] *Raw Honey From Argentina: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances,* 87 Fed. Reg. 22179 (Apr. 14, 2022); *Raw Honey From the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 87 Fed. Reg. 22184 (Apr. 14, 2022).

[276] *Raw Honey From Argentina: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances,* 87 Fed. Reg. 22180 (Apr. 14, 2022); CR/PR at IV-11.

[277] Thus, all producers/exporters are included in Commerce's affirmative critical circumstances determination.  *Raw Honey From the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 87 Fed. Reg. 22185 (Apr. 14, 2022); CR/PR at IV-11.

[278] Because the petition was filed in the second half of April, that month is included in the "pre-petition" comparison period, consistent with Commission practice. *See, e.g., Small Vertical Shaft Engines from China*, Inv. Nos. 701-TA-643 and 731-TA-1493 (Final), USITC Pub. 5185 at 43; *Carbon and Certain Alloy Steel Wire Rod from South Africa and Ukraine*,  Inv. Nos. 731-TA-1353 and 1356 (Final), USITC Pub. 4766 at 8, n.20 (March 2018); *Steel Wire Garment Hangers from Vietnam*, Inv. Nos. 701-TA-487 and 731-TA-1198 (Final), USITC Pub. 4371 at 6 (January 2013).

period when Commerce's preliminary determination applicable to the subject imports at issue fell within the six-month post-petition period the Commission typically considers.[279]  This is not the case in these investigations, however, as Commerce's preliminary determinations were issued on November 17, 2021, after the last month in the six-month post-petition period of May 2021 through October 2021.[280]  We therefore compare the volume of subject imports six months prior to the filing of the petitions (November 2020-April 2021) with the volume of subject imports in the six months after the filing of the petitions (May 2021-October 2021) for purposes of our critical circumstances analysis in both investigations.

### 1.    Argentina Investigation

Subject imports from Argentina subject to Commerce's affirmative critical circumstances determination increased from *** pounds in the pre-petition period to *** pounds in the post-petition period, an increase of *** percent.[281]  The post-petition imports were equivalent to *** percent of apparent U.S. consumption in interim 2021.[282]

End-of-period inventories of subject merchandise from Argentina held by U.S. importers increased from *** pounds on April 21, 2021 to *** pounds on October 31, 2021, a 274 percent increase.[283]  Ending inventories of subject imports from Argentina subject to Commerce's critical circumstances determination held by importers were *** pounds on September 30, 2021, representing 2.5 percent of apparent U.S. consumption in the interim 2021 period.[284]

As we have discussed above in Section V.E, prices for the domestic like product and subject imports increased in interim 2021 in response to general knowledge of the imminent filing of the petitions and the pendency of the investigations.  Prices for white, extra light amber, and light amber raw honey from Argentina increased from the first quarter of 2021 (January through March) through the second and third quarter of 2021 (April through September) (a rough equivalence to the six-month post-petition period) to a level that either oversold the domestic like product or undersold the domestic like product during the post-

---

[279] *Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United Kingdom,* Inv. Nos. 701-TA-545-547, 731-TA-1291-1297 (Final), USITC Pub. 4638 at 49-50 (Sept. 2016); *Certain Corrosion-Resistance Steel Products from China, India, Italy, Korea, and Taiwan*, Inv. No. 701-TA-534-537 and 731-TA-1274-1278 (Final), USITC Pub. 4630 at 35-40 (July 2016); *Carbon and Certain Steel Wire Rod from China*, Inv. Nos. 701-TA-512, 731-TA-1248 (Final), USITC Pub. 4509 at 25-26 (Jan. 2015) (using five-month periods because preliminary Commerce countervailing duty determination was during the sixth month after the petition).

[280] CR/PR at Table I-1.  Petitioners and Respondents agreed that six-month comparison periods are appropriate.  *See* Petitioners' Prehearing Brief at 105, 111; NHPDA's Posthearing Brief, Exhibit 2, Answer 3.

[281] CR/PR at Table IV-6.

[282] CR/PR at Tables IV-6 and C-2.

[283] CR/PR at Table IV-7.

[284] CR/PR at Tables IV-7 and C-2.  The inventories of subject imports from Argentina subject to Commerce's critical circumstances determination increased by *** pounds from September to October 2021, from *** pounds as of September 30, 2021 to *** pounds as of October 31, 2021.  If this volume were included in the calculation above, the volume of inventories as of October 31, 2021 as a share of U.S. consumption in interim 2021 would be *** percent.  CR/PR Tables IV-7 and C-2.

petition period.[285]  Prices of subject imports from Argentina were higher than domestic prices for pricing products 1, 2 and 3 in the second quarter of 2021, and the underselling margins recorded for these imports in the third quarter of 2021 were significantly below those recorded in nearly all prior quarters of the POI.

Although there was an increase in the volume of subject imports from Argentina subject to Commerce's critical circumstances determination and U.S. inventories of imports from Argentina during the post-petition period, apparent U.S. consumption was higher in interim 2021 than interim 2020 by 15.2 percent, and the increase in import volume from Argentina continued the upward pre-petition trend that began in January 2021.[286]  Moreover, the import volume totals fluctuated on a month-to-month basis during the post-petition period, with an increase recorded in some months and a decrease recorded in others, but each of the post-petition monthly volume totals remained within a limited range of each other.[287]  Inventories of imports from Argentina subject to Commerce's critical circumstances determination (*** pounds) were not disproportionate relative to inventories from other subject sources.[288]  With respect to pricing in the post-petition period,[289] prices of subject imports from Argentina increased to levels above those in the pre-petition period and the margins of underselling were significantly below those recorded in nearly all prior quarters of the POI.[290]  These data do not clearly indicate a "rush" by Argentinian producers to export substantial volumes of product to the U.S. market at lower prices before a deposit requirement takes effect.

In light of these considerations, we find that the imports from Argentina subject to Commerce's affirmative critical circumstances determination will not seriously undermine the remedial effect of the antidumping duty order with respect to raw honey from Argentina.  We therefore make a negative critical circumstances finding with respect to subject imports from Argentina subject to Commerce's affirmative determination of critical circumstances.

### 2.    Vietnam Investigation

As noted above, raw honey imports from Vietnam from all Vietnamese producers/exporters are subject to Commerce's affirmative critical circumstances determination.  These imports increased from 48.0 million pounds in the pre-petition period to

---

[285] *See* CR/PR at Figs. V-1 to V-3.

[286] CR/PR at Figure IV-2.  Moreover, we observe that the volume of imports from Argentina subject to Commerce's affirmative critical circumstances in the post-petition period (*** pounds), was *** the volume of total Argentinian subject imports during the equivalent period in 2020 (49.7 million pounds), and less than the volume recorded in the equivalent period in 2018 (53.0 million pounds). CR/PR at Tables IV-6 and IV-13.

[287] CR/PR at Table IV-6.

[288] The inventory total for Argentina (*** pounds) sits within the range of inventories of subject imports as of September 30, 2021 from Brazil (*** pounds) and from India (*** pounds), and well below the total for Vietnam (at *** pounds), as further discussed below.  CR/PR at Table C-2.

[289] *See* CR/PR at Table E-2.

[290] CR/PR at Tables V-4, V-5 and V-6.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

87.9 million pounds in the post-petition period, an increase of 83.2 percent.[291]  The 87.9 million pounds of subject imports in the post-petition period are equivalent to 19.1 percent of apparent U.S. consumption in the interim 2021 period.[292]  The volume of subject imports from Vietnam in four of the six months of the post-petition period (July, August, September, and October 2021) significantly exceeded the volume of subject imports from Vietnam recorded in any prior month of the POI.[293]

In addition, subject imports from Vietnam increased rapidly in each of the first four months of the post-petition period, reversing a downward trend from December 2020 to April 2021.[294]  The volume of subject imports from Vietnam increased by 53 percent from April to May 2021, by 23 percent further from May to June 2021, by 85 percent further from June to July 2021, and by 97 percent further from July to August 2021.[295]  Subject imports from Vietnam then receded during the last two months of the post-petition period, *i.e.*, from August to September 2021, and again from September to October 2021.[296]

Importers' inventories of subject imports from Vietnam subject to Commerce's affirmative determination increased from \*\*\* pounds on April 30, 2021 (the last month of the pre-petition period) to \*\*\* pounds on October 31, 2021 (the last month of the post-petition period),[297] almost a threefold increase over their April 2021 level.[298]  Several importers increased their inventories of subject imports from Vietnam from April 2021 to October 2021 before provisional duties came into effect in November 2021.[299]  The volume of inventories as of September 30, 2021 was equivalent to \*\*\* percent of apparent U.S. consumption during the interim 2021 period.[300]

In addition, as reviewed above, prices for the domestic like product and subject imports increased in interim 2021 in response to general knowledge of the imminent filing of the

---

[291] CR/PR at Table IV-8.

[292] *See* CR/PR at Tables IV-8 and C-2.

[293] CR/PR at Table IV-13.

[294] *See* CR/PR at

[295] *See* CR/PR at Table IV-8.  Rather than continuing to increase at a steady rate, monthly subject imports from Vietnam surged to period highs, increasing from 3.9 million pounds in April 2021 to 27.1 million pounds in August 2021, almost seven times the April level.

[296] As discussed, even while receding, the volumes recorded in September and October 2021 still remained higher than the volume recorded in any prior month of the period of investigation aside from the immediately preceding month (August 2021).

[297] CR/PR at Table IV-9.

[298] The inventories on September 30, 2021 also were more than twice that of total inventories of subject merchandise from Vietnam on September 30, 2020.  *See* CR at Tables IV-9 and VII-22.

[299] Specifically, \*\*\* pounds; \*\*\* pounds; \*\*\* pounds; \*\*\* pounds; \*\*\* pounds; \*\*\* pounds; the \*\*\* pounds; and \*\*\* pounds.  Supplemental Importer Questionnaires at I-3.  As noted, honey can be stored for many years.  CR/PR at II-6.

[300] Calculated from CR/PR at Table IV-9 and Table C-2.  The volume of inventories of subject imports from Vietnam increased by \*\*\* pounds from September to October 2021, from \*\*\* pounds as of September 30, 2021 to \*\*\* pounds as of October 31, 2021.  If this volume were included in the calculation above, the volume of inventories as of October 31, 2021 as a share of U.S. consumption in interim 2021 would be \*\*\* percent.  CR/PR Tables IV-9 and C-2.

petitions and the pendency of the investigations.  However, unlike subject imports from Argentina, subject imports from Vietnam continued to undersell the domestic like product by wide margins during the second and third quarters of 2021 (again, a rough equivalence to the six-month post-petition period).[301]

The Commission views the timing of subject imports from Vietnam in the post-petition period as significant and probative.  While apparent U.S. consumption was higher in interim 2021 than interim 2020 by 15.2 percent, importers' U.S. shipments of subject imports from Vietnam were only 2.8 percent higher, a modest increase that does not explain why importers would sharply increase their imports from Vietnam during the post-petition period.[302] Moreover, the rapid increase in subject imports from Vietnam occurred during the first four months of the post-petition period, which precede the retroactive liability period under the critical circumstances provision (*i.e.*, 90 days prior to the date of publication of Commerce's preliminary antidumping determination on November 23, 2021, which is August 25, 2021).  This timing, together with the associated volume of subject imports in the post-petition period, suggest that the volume of imports in the post-petition period was not simply responding to increased demand or a continued upward trend of imports from Vietnam, but rather a deliberate effort to enter product into the U.S. market in substantial and increasing volumes while evading potential exposure to the retroactive application of antidumping duties.  Further, the volume and increase in volume of subject imports from Vietnam in the post-petition period is substantial, with subject import volumes from Vietnam in the post-petition period comprising nearly *** percent of apparent U.S. consumption.[303] [304]  The rapid and substantial increase in

---

[301] *See* CR/PR at Figs. V-3 and V-4. Importers' shipments of subject imports from Vietnam were only $*** per pound higher at $*** per pound in interim 2021 than $*** per pound in interim 2020. *See* CR/PR at Table E-5.  This price increase was less than that recorded by any of the other countries subject to these investigations: an increase of $*** per pound for imports from Argentina; an increase of $*** per pound for imports from Brazil; and an increase of $*** per pound for imports from India. *See* CR/PR at Table E-2, Table E-3, and Table E-4.

[302] *See* CR/PR at Tables C-2 and E-5.

[303] As noted, the post-petition period (May - October 2021) import volume for Vietnam was 87.9 million pounds.  NHPDA argues the increase reflects seasonal variation in import patterns and imports from Vietnam have previously increased by similar amounts when comparing import totals from the same pre- and post-petition periods in previous years.  NHPDA's Posthearing Brief, Exhibit 2, Answer 3. In our view, there is no clear and substantiated seasonality pattern to imports of raw honey.  Even if there is some seasonality, when comparing subject imports from Vietnam in the same months as the post-petition and pre-petition periods in past years, they are not as large as the 83 percent increase in 2021. Petitioners' Posthearing Brief, Exhibit 1 at 40; Petitioners' Final Comments at 12.  *See also* CR/PR at Figs. IV-6 and IV-7.  Moreover, unlike the case with Argentina, the post-petition volume was well above the volumes recorded in the same period of the prior years of the period of investigation (61.7 million pounds in May-October 2020; 44.5 million pounds in May-October 2019; and 50.5 million pounds in May-October 2018).  CR/PR at Table IV-13.

[304] We also do not find Respondents' explanation that imports were needed to serve the market, particularly given the war in Ukraine, to be persuasive.  Russia's invasion of Ukraine did not occur until the end of February 2022, well after the surge of imports from Vietnam during the post-petition period. (Continued...)

48

inventories of subject imports from Vietnam provides further evidence that importers were stockpiling subject imports rather than just responding to U.S. market conditions.[305]

Respondents argue that importers have now sold off much of their inventory, but regardless of where the imported honey is in the supply chain, the volume associated with these inventories is large and increased substantially in the post-petition period and is likely to place downward pressure on prices until it is consumed by end users, particularly given the continued underselling by subject imports from Vietnam at wide margins.[306] Moreover, notwithstanding higher prices, the domestic industry continued to report losses even with higher prices in interim 2021. Its operating expenses-to-net sales ratio remained at over *** percent. The industry's shipments declined, and it continued to lose market share.

Given the volume and timing of imports, including the sharp increase in the volume of post-petition imports prior to the retroactive liability period under the critical circumstances provision, the rapid increase in and size of inventories, and the continued underselling of the domestic like product by wide margins, we find that the remedial effect of the antidumping duty order with respect to subject imports from Vietnam will likely be seriously undermined. We therefore make an affirmative critical circumstances finding with respect to subject imports from Vietnam subject to Commerce's affirmative determination of critical circumstances.

## VII. Conclusion

For the reasons stated above, we determine that an industry in the United States is materially injured by reason of subject imports of raw honey from Argentina, Brazil, India, and Vietnam found by Commerce to be sold in the United States at less than fair value. We find that critical circumstances exist with respect to imports of raw honey from Vietnam that are subject to Commerce's final affirmative critical circumstances determination.[307] We also find that critical circumstances do not exist with respect to imports of raw honey from Argentina that are subject to Commerce's final affirmative critical circumstances determination.

---

Nor does the record support Respondents' claim that shipping delays caused the increase in subject imports. Respondents have only offered evidence of general shipping delays rather than particular delayed orders. They do not provide with sufficient specificity how the timing of the shipping delays corresponded to increases in the monthly volume of subject imports during the post-petition period. NHPDA's Prehearing Brief, Appendix A at 12-16.

[305] Raw honey from Vietnam typically is used as an ingredient in food products. NHPDA's Prehearing Brief at 37. The honey, however, is a relatively small share of the total cost of the food product, and demand for the honey is relatively inelastic. CR/PR at II-11 to II-12 and II-41. It is therefore likely that the increased imports and inventories of subject imports from Vietnam remained in inventory somewhere in the supply chain and were not immediately consumed.

[306] *See* NHPDA's Prehearing Brief, Appendix A at 10-12, 19-20; NHPDA's Posthearing Brief at 14-15. One of the largest importers of subject imports and ***" NHPDA's Posthearing Br. Exh. 4 at para 14 (Nubern Affidavit). However, this statement ***. ***. NHPDA's Posthearing Br. Exh. 4.

As to raw honey held downstream, we note that the Ingredient Purchasers fully participated in the final phase of these investigations, yet ***, one of the Ingredient Purchasers who participated in the final phase of these investigations.

[307] Commissioner Johanson dissenting.

49

Separate Views of
Commissioner David S. Johanson

Non-Confidential

Appx544-553

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

### Separate Views of Commissioner David S. Johanson

While I join the Commission's Views on material injury in their entirety, I write separately as I do not join the Commission's affirmative determination of critical circumstances regarding Vietnam and instead make a negative critical circumstances determination with regard to raw honey from that country.  I join, however, the majority's discussion of the legal standards and the parties' arguments regarding critical circumstances (Sections VI.A. and VI.B.) as well as the majority's reasoning regarding the use of a 6-month period of comparison and its negative critical circumstances determination regarding raw honey imports from Argentina (Section VI.C.1.).

As discussed below, I do not find that the increase in imports and inventories of subject raw honey from Vietnam in the post-petition comparison period would be likely to "undermine seriously the remedial effect of the antidumping order" as (1) increased imports were consumed prior to the order and thus could no longer compete against domestic products; and (2) the petition and order have already proven they can provide relief to the domestic industry.

## I.    Unfairly traded imports in the post-petition period were consumed

### A.    Importer and purchaser stockpiles of unfairly traded products were depleted by the time of the order

Subject imports from Vietnam during the six months following the filing of the petition exceeded the increase in U.S. importers' U.S. inventories of raw honey from Vietnam: subject imports from Vietnam totaled 87.9 million pounds from May 2021 through October 2021, while U.S. importers' inventories increased by only *** pounds.[1] Thus, importers had sold off *** percent of those imports by the end of October 2021.[2] Respondents assert that from November 2021 to March 2022, importers' inventories of raw honey from Vietnam decreased another *** percent as they sold off products to purchasers, based on data from eight importers.[3] Respondents also assert that packers' inventories decreased *** percent, based on data from five packers.[4]

Petitioners assert that Respondents' data regarding inventory declines may not be representative of importers and purchasers as a whole, based on the claim that ***.[5] The evidence, however, does not support Petitioners' claim.

---

[1] NHPDA Post-Hearing Br. 13; CR/PR at Tables IV-8 & IV-9.

[2] Calculated from CR/PR at Tables IV-8 & IV-9.

[3] NHPDA Posthrg. Br. 14.

[4] NHPDA Posthrg. Br. 14.

[5] Pet. Posthearing Br. 14. Petitioners also point out that Respondents did not provide data regarding final inventory levels from ***. Pet. Final Comments 14. ***. *** Importer QR at II-9a; CR/PR at Table V-13.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

1.     \*\*\*

\*\*\* reported purchasing \*\*\* pounds of raw honey from Vietnam in 2018, \*\*\* pounds in 2019, and \*\*\* in 2020, at an average rate of about \*\*\* pounds per quarter.[6] It sourced about \*\*\*.[7]

According to Petitioners' prehearing brief, \*\*\*.[8] In their posthearing brief, Petitioners intimated that this honey may be \*\*\*.[9] Yet, the declarations that Petitioners supplied to support their assertions instead attest only that \*\*\*.[10] That does not support that \*\*\*.[11]

Recent inventory figures for \*\*\* are on the record. It reported that it possessed \*\*\*.[12] \*\*\*.[13]

I do not find that the existence of the remaining \*\*\* inventories in themselves is likely to undermine seriously the remedial effect of the order for two reasons. First, the \*\*\* pounds of honey from Vietnam that \*\*\* had in stock at the end of the first quarter of 2022 equaled only \*\*\* percent of U.S. apparent consumption in 2021.[14]

Second, even if these inventories had not been available to \*\*\*, that would not necessarily mean that \*\*\* would have bought domestic products instead. In the case of \*\*\*.[15] Only two percent or less of U.S. producers' shipments are amber or darker.[16] Due to some purchasers' continued preference for honey from Vietnam, importers including \*\*\* continued to import and sell honey from Vietnam even with interim deposit requirements in place and at higher prices than domestically produced honey.[17] Purchasers buying Vietnamese honey with 400 percent interim deposit requirements would be more likely to buy it at final deposit rates of about 60 percent.[18]

2.     **Increasing demand has and will absorb more domestic production**

An additional factor that explains why inventories of imports from Vietnam have been drawn down so extensively, also mitigating any impact that remaining stocks of unfairly traded

---

[6] \*\*\* purchaser QR at II-2f. \*\*\*. \*\*\* purchaser QR at III-31(c).

[7] \*\*\* purchaser QR at II-7.

[8] Petitioner Prehearing Br. 109-110 (emphasis added, citations omitted).

[9] Pet. Posthearing Br. 14. *See also* Pet. Posthearing Br. answers at 30 (\*\*\*).

[10] Pet. Prehearing Br. Exh. 5 at ¶ 24 \*\*\*.

[11] \*\*\* Purchaser QR at II-2f; Petitioner Prehearing Br. 110. \*\*\*. \*\*\* Purchaser QR at 13.

[12] NHPDA Posthearing Br. Exh. 4 at Nubern Dec. attachment 2.

[13] NHPDA Posthearing Br. Exh. 4 at Nubern Dec. ¶¶ 9-10.

[14] Calculated from CR/PR at Table G-1 and NHPDA Posthearing Br. Exh. 4 at Nubern Dec. attachment 2.

[15] \*\*\* purchaser QR at III-31c.

[16] CR/PR at Table E-1.

[17] Hearing Tr. 213 & 229-30 (Nubern), 275 (Neves); Ingredient Purchasers' Post-Hearing Br. 10-12.

[18] Raw Honey from the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, 87 Fed. Reg. 22,184, 22,185 (Dep't Commerce April 14, 2022) (final duty rates).

imports may have, is that demand for honey increased in 2021 and is likely to continue to increase indefinitely. Apparent consumption of raw honey was 587.4 million pounds in 2021, an increase of 5.5 percent or 30.4 million pounds from apparent consumption in 2020.[19] Apparent consumption is an imperfect guide to actual consumption, but there was a strong consensus among market participants that actual demand for honey was and is rising due to a number of factors that are leading Americans to consume more honey.[20] Thus, at least some of the substantial increase in apparent consumption likely reflected increased actual consumption.

> **3.     Poor honey yield in the United States in 2021, and orders on other subject countries, led to more rapid diminution of import inventories**

Yet another factor eliminating inventories prior to the order is that the U.S. industry produced and shipped significantly less domestic honey in 2021 than it had in 2020 because U.S. production decreased by *** percent or *** pounds from 2020 to 2021.[21] This production decline occurred primarily as 2021 was a bad year for honey production in the United States: overall U.S. producers' average yield per colony decreased 13.9 percent from 2020 to 2021, likely due at least in part to drought conditions in some important states and unusually high honeybee mortality in 2020-2021.[22] Some U.S. producers liquidated inventory to meet the supply shortfall, but overall apparent consumption of U.S.- produced honey declined 20 million pounds from 2020 to 2021.[23]

After the six-month post-petition period ended, little honey from Vietnam was imported because of provisional deposit requirements of over 400 percent imposed in November – and what was imported subject to those requirements was fairly traded. Thus, even ordinary consumption levels prior to the issuance of the order in April 2022 would have greatly depleted the additional supplies of subject imports that had arrived after the petition. Further, as discussed above, those supplies were being depleted at a greater than ordinary rate.  With less domestically produced honey on the market than in previous years (and little new U.S. production feasible until spring), consumers would have had to consume millions of pounds more imported raw honey in 2021 and early 2022 just to maintain their previous levels of honey consumption, let alone to increase it. While imports and inventories of honey from other

---

[19] CR/PR Table G-1.

[20] *See supra* Section V.B.2; CR/PR at II-18 ("U.S. producers cited two main reasons for increases in both U.S. and foreign demand for honey: perceived health benefits and the desire to 'eat local.' Importers and purchasers cited similar reasons … including population growth, perceived health/nutrition benefits of honey, and the impact of the COVID-19 pandemic.").

[21] CR/PR at Table C-2. Interim production data in table C-2 are actually for the full year 2021. CR/PR Table C-2 fn.3.

[22] Hrg. Tr. 185 (Wenger) (drought); CR/PR at Tables III-3 & III-8 (low yield); Nathalie Steinhauer et al., "United States Honey Bee Colony Losses 2020-2021: Preliminary Results" at 1-2 (June 23, 2021), EDIS Doc. No. 766825.

[23] CR/PR at Table G-1.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

countries also increased, and were higher in interim 2021 than in interim 2020,[24] those increases also would be likely to be matched by reduced imports following imposition of interim deposit requirements on honey imports from Argentina, Brazil, and India at the same time as Vietnam, further exacerbating market shortages.

> ### 4. Supply shortages following the petitions confirm that inventories of subject merchandise were being exhausted

A majority of purchasers (15 of 20) reported that suppliers declined to supply them following the filing of the petition, while six U.S. producers and 14 importers reported refusing to supply purchasers during that period.[25] When purchasers could not get sufficient supply after the petition was filed, they would have drawn down their own stockpiles.

Thus, while subject imports and importers' inventories of subject imports from Vietnam increased after the petition, much if not all of that buildup had been physically eliminated by the time the order took effect in order to satisfy increased demand and to replace diminished volumes of domestically produced and imported honey.

## II.    Improved Market Conditions and Performance of the Domestic Industry

Another factor relevant to whether post-petition imports are likely to "seriously undermine" the remedial effect of the order is that both market conditions and the domestic industry's performance have improved markedly since the petition was filed, or even before the petition when market participants learned it was imminent.

Comparing interim 2021 to interim 2020, large domestic producers' net sales were *** percent higher, and their operating and net losses were smaller, their operating margin improved from negative *** percent to negative *** percent, and their net margin improved from negative *** percent to negative *** percent.[26]

The industry still incurred operating losses during the interim 2021 period, but I attach less weight to this fact than I otherwise would for three reasons.

First, domestic honey yields in 2021 were much lower than in previous years for reasons largely unrelated to subject imports, as discussed above.

Second, reliable access to government programs such as disaster assistance makes net profits relatively more important than they are for other industries for purposes such as investment decisions. Net losses were considerably smaller than operating losses.

Third, beekeepers on average make less money from honey production than they do from commercial pollination fees; they also sell other products such as beeswax.[27] Our injury analysis focuses on the domestic like product, raw honey, but provision of pollination services

---

[24] Imports from all subject sources other than Vietnam were 61.3 million pounds greater in interim 2021 than in interim 2020. Calculated from CR/PR Table C-2. Nonsubject imports were 7.5 million pounds lower in interim 2021 than in interim 2020. Calculated from CR/PR Table C-2.

[25] CR/PR at II-9.

[26] CR/PR at Table C-2. Interim period financial data was not collected from small producers but these represented a small share of the total production represented in questionnaire responses.

[27] CR/PR at Table VI-5.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

by beekeepers is a condition of competition that affects how honey producers respond to price increases. For purposes of deciding how many colonies to operate, beekeepers will consider how much they will earn from all sources of beekeeping revenue that those colonies can generate. As beekeepers normally operate at full capacity and cannot increase honey production without increasing the number of hives they use,[28] this means that decisions to increase honey production also depend on income from other products. Thus, producers would invest more in bee colonies and honey production when prices increase even if they still earn a small loss on honey production. Thus, any "undermining" that could be associated with small losses on honey production is less "serious."

Finally, the domestic industry's condition has continued to improve since the end of interim 2021. As the president of Sioux Honey declared,

> The filing of this case has had a substantial beneficial impact on pricing in the U.S. market. … {W}e had set our plan to offer an average price of ***. These increases have proven very beneficial to our member beekeepers and the communities in which they operate.[29]

As noted above, domestic producers' inventories were at the lowest levels on record by the end of 2021,[30] and rising demand will give domestic producers even more opportunity to liquidate inventories and raise prices. The recent reduction of imports from Ukraine will put additional upward pressure on U.S. honey prices.[31]

## III.    The Critical Circumstances Standard Has Not Been Satisfied

Finally, I note that the statute permits an affirmative finding of critical circumstances only if it is "likely" that the remedial effect of the order will be "seriously" undermined. In my view, the record contains clear evidence that the increase in unfairly traded subject imports in the six-month period following the petition was largely if not entirely eliminated in the next six months before the order, and the domestic industry's condition sharply improved. The record lacks evidence that could resolve the exact size of any diminished amount of unfairly traded merchandise that might remain, such as evidence regarding final inventory levels of most importers and purchasers, the propensity of end users to hold inventory, actual consumption, and the rate at which fairly traded imports arrived immediately before the order to replace unfairly traded ones. While it is possible that enough remained to have an impact, the statute permits an affirmative critical circumstances finding only if the imports subject to the Department of Commerce's critical circumstances determination "likely" will "undermine seriously" the order's remedial effect. Given the evidence in this record, I cannot find that this standard is met.

---

[28] CR/PR at II-6.
[29] Pet. Prehearing Br. Exh. 4 (Blumenthal Dec.) ¶ 22.
[30] CR/PR at Table G-3.
[31] CR/PR at II-18.

19 U.S.C. § 1673

**19 USC 1673: Antidumping duties imposed**
Text contains those laws in effect on April 21, 2024

**From Title 19-CUSTOMS DUTIES**
CHAPTER 4-TARIFF ACT OF 1930
Part II-Imposition of Antidumping Duties
**Jump To:**
Source Credit
Miscellaneous
Amendments
Effective Date

# §1673. Antidumping duties imposed

If-
(1) the administering authority determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, and
(2) the Commission determines that-
(A) an industry in the United States-
(i) is materially injured, or
(ii) is threatened with material injury, or

(B) the establishment of an industry in the United States is materially retarded,

by reason of imports of that merchandise or by reason of sales (or the likelihood of sales) of that merchandise for importation,

then there shall be imposed upon such merchandise an antidumping duty, in addition to any other duty imposed, in an amount equal to the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise. For purposes of this section and section 1673d(b)(1) of this title, a reference to the sale of foreign merchandise includes the entering into of any leasing arrangement regarding the merchandise that is equivalent to the sale of the merchandise.

(June 17, 1930, ch. 497, title VII, §731, as added Pub. L. 96–39, title I, §101, July 26, 1979, 93 Stat. 162 ; amended Pub. L. 98–573, title VI, §602(b), Oct. 30, 1984, 98 Stat. 3024 ; Pub. L. 103–465, title II, §233(a)(1)(A), (2)(A)(i), Dec. 8, 1994, 108 Stat. 4898 .)

### EDITORIAL NOTES

### AMENDMENTS

**1994**-Pub. L. 103–465 substituted "normal value exceeds the export price (or the constructed export price)" for "foreign market value exceeds the United States price" in concluding provisions.

**1984**-Pub. L. 98–573 inserted "or by reason of sales (or the likelihood of sales) of that merchandise for importation" after "by reason of imports of that merchandise" in par. (2), and inserted sentence at end providing that for purposes of this section and section 1673d(b)(1) of this title, a reference to the sale of foreign merchandise includes the entering into of any leasing arrangement regarding the merchandise that is equivalent to the sale of the merchandise.

### STATUTORY NOTES AND RELATED SUBSIDIARIES

### EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

### EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–573 applicable with respect to investigations initiated by petition or by the administering authority under parts I and II of this subtitle, and to reviews begun under section 1675 of this

title, on or after Oct. 30, 1984, see section 626(b)(1) of Pub. L. 98–573, as amended, set out as a note under section 1671 of this title.

## EFFECTIVE DATE

Part effective Jan. 1, 1980, see section 107 of Pub. L. 96–39, set out as a note under section 1671 of this title.

1

19 U.S.C. § 1673b

**19 USC 1673b: Preliminary determinations**
Text contains those laws in effect on April 21, 2024

**From Title 19-CUSTOMS DUTIES**
    CHAPTER 4-TARIFF ACT OF 1930
    Part II-Imposition of Antidumping Duties
**Jump To:**
    <u>Source Credit</u>
    <u>Miscellaneous</u>
    <u>Amendments</u>
    <u>Effective Date</u>

# §1673b. Preliminary determinations

**(a) Determination by Commission of reasonable indication of injury**

**(1) General rule**

Except in the case of a petition dismissed by the administering authority under section 1673a(c)(3) of this title, the Commission, within the time specified in paragraph (2), shall determine, based on the information available to it at the time of the determination, whether there is a reasonable indication that-
    (A) an industry in the United States-
        (i) is materially injured, or
        (ii) is threatened with material injury, or

    (B) the establishment of an industry in the United States is materially retarded,

by reason of imports of the subject merchandise and that imports of the subject merchandise are not negligible. If the Commission finds that imports of the subject merchandise are negligible or otherwise makes a negative determination under this paragraph, the investigation shall be terminated.

**(2) Time for Commission determination**

The Commission shall make the determination described in paragraph (1)-
    (A) in the case of a petition filed under section 1673a(b) of this title-
        (i) within 45 days after the date on which the petition is filed, or
        (ii) if the time has been extended pursuant to section 1673a(c)(1)(B) of this title, within 25 days after the date on which the Commission receives notice from the administering authority of initiation of the investigation, and

    (B) in the case of an investigation initiated under section 1673a(a) of this title, within 45 days after the date on which the Commission receives notice from the administering authority that an investigation has been initiated under such section.

**(b) Preliminary determination by administering authority**

**(1) Period of antidumping duty investigation**

**(A) In general**

Except as provided in subparagraph (B), within 140 days after the date on which the administering authority initiates an investigation under section 1673a(c) of this title, or an investigation is initiated under section 1673a(a) of this title, but not before an affirmative determination by the Commission under subsection (a) of this section, the administering authority shall make a determination, based upon the information available to it at the time of the determination, of whether there is a reasonable basis to believe or suspect that the merchandise is being sold, or is likely to be sold, at less than fair value.

**(B) If certain short life cycle merchandise involved**

If a petition filed under section 1673a(b) of this title, or an investigation initiated under section 1673a(a) of this title, concerns short life cycle merchandise that is included in a product category established under section 1673h(a) of this title, subparagraph (A) shall be applied-
    (i) by substituting "100 days" for "140 days" if manufacturers that are second offenders account for a significant proportion of the merchandise under investigation, and
    (ii) by substituting "80 days" for "140 days" if manufacturers that are multiple offenders account for a significant proportion of the merchandise under investigation.

**(C) Definitions of offenders**

For purposes of subparagraph (B)-

(i) The term "second offender" means a manufacturer that is specified in 2 affirmative dumping determinations (within the meaning of section 1673h of this title) as the manufacturer of short life cycle merchandise that is-

    (I) specified in both such determinations, and

    (II) within the scope of the product category referred to in subparagraph (B).

(ii) The term "multiple offender" means a manufacturer that is specified in 3 or more affirmative dumping determinations (within the meaning of section 1673h of this title) as the manufacturer of short life cycle merchandise that is-

    (I) specified in each of such determinations, and

    (II) within the scope of the product category referred to in subparagraph (B).

**(2) Preliminary determination under waiver of verification**

Within 75 days after the initiation of an investigation, the administering authority shall cause an official designated for such purpose to review the information concerning the case received during the first 60 days of the investigation, and, if there appears to be sufficient information available upon which the preliminary determination can reasonably be based, to disclose to the petitioner and any interested party, then a party to the proceedings that requests such disclosure, all available nonconfidential information and all other information which is disclosed pursuant to section 1677f of this title. Within 3 days (not counting Saturdays, Sundays, or legal public holidays) after such disclosure, the petitioner and each party which is an interested party described in subparagraph (C), (D), (E), (F), or (G) of section 1677(9) of this title to whom such disclosure was made may furnish to the administering authority an irrevocable written waiver of verification of the information received by the authority, and an agreement that it is willing to have a preliminary determination made on the basis of the record then available to the authority. If a timely waiver and agreement have been received from the petitioner and each party which is an interested party described in subparagraph (C), (D), (E), (F), or (G) of section 1677(9) of this title to whom the disclosure was made, and the authority finds that sufficient information is then available upon which the preliminary determination can reasonably be based, a preliminary determination shall be made within 90 days after the initiation of the investigation on the basis of the record established during the first 60 days after the investigation was initiated.

**(3) De minimis dumping margin**

In making a determination under this subsection, the administering authority shall disregard any weighted average dumping margin that is de minimis. For purposes of the preceding sentence, a weighted average dumping margin is de minimis if the administering authority determines that it is less than 2 percent ad valorem or the equivalent specific rate for the subject merchandise.

**(c) Extension of period in extraordinarily complicated cases**

**(1) In general**

If-

    (A) the petitioner makes a timely request for an extension of the period within which the determination must be made under subsection (b)(1), or

    (B) the administering authority concludes that the parties concerned are cooperating and determines that-

        (i) the case is extraordinarily complicated by reason of-

            (I) the number and complexity of the transactions to be investigated or adjustments to be considered,

            (II) the novelty of the issues presented, or

            (III) the number of firms whose activities must be investigated, and

        (ii) additional time is necessary to make the preliminary determination,

then the administering authority may postpone making the preliminary determination under subsection (b)(1) until not later than the 190th day after the date on which the administering authority initiates an investigation under section 1673a(c) of this title, or an investigation is initiated under section 1673a(a) of this title. No extension of a determination date may be made under this paragraph for any investigation in which a determination date provided for in subsection (b)(1)(B) applies unless the petitioner submits written notice to the administering authority of its consent to the extension.

**(2) Notice of postponement**

The administering authority shall notify the parties to the investigation, not later than 20 days before the date on which the preliminary determination would otherwise be required under subsection (b)(1), if it intends to postpone making the preliminary determination under paragraph (1). The notification shall include an explanation of the reasons for the postponement, and notice of the postponement shall be published in the Federal Register.

**(d) Effect of determination by the administering authority**

If the preliminary determination of the administering authority under subsection (b) of this section is affirmative, the administering authority-

    (1)(A) shall-

        (i) determine an estimated weighted average dumping margin for each exporter and producer individually investigated, and

(ii) determine, in accordance with section 1673d(c)(5) of this title, an estimated all-others rate for all exporters and producers not individually investigated, and

(B) shall order the posting of a cash deposit, bond, or other security, as the administering authority deems appropriate, for each entry of the subject merchandise in an amount based on the estimated weighted average dumping margin or the estimated all-others rate, whichever is applicable,

(2) shall order the suspension of liquidation of all entries of merchandise subject to the determination which are entered, or withdrawn from warehouse, for consumption on or after the later of-

(A) the date on which notice of the determination is published in the Federal Register, or

(B) the date that is 60 days after the date on which notice of the determination to initiate the investigation is published in the Federal Register, and

(3) shall make available to the Commission all information upon which such determination was based and which the Commission considers relevant to its injury determination, under such procedures as the administering authority and the Commission may establish to prevent disclosure, other than with the consent of the party providing it or under protective order, of any information to which confidential treatment has been given by the administering authority.

The instructions of the administering authority under paragraphs (1) and (2) may not remain in effect for more than 4 months, except that the administering authority may, at the request of exporters representing a significant proportion of exports of the subject merchandise, extend that 4-month period to not more than 6 months.

**(e) Critical circumstances determinations**

**(1) In general**

If a petitioner alleges critical circumstances in its original petition, or by amendment at any time more than 20 days before the date of a final determination by the administering authority, then the administering authority shall promptly (at any time after the initiation of the investigation under this part) determine, on the basis of the information available to it at that time, whether there is a reasonable basis to believe or suspect that-

(A)(i) there is a history of dumping and material injury by reason of dumped imports in the United States or elsewhere of the subject merchandise, or

(ii) the person by whom, or for whose account, the merchandise was imported knew or should have known that the exporter was selling the subject merchandise at less than its fair value and that there was likely to be material injury by reason of such sales, and

(B) there have been massive imports of the subject merchandise over a relatively short period.

The administering authority shall be treated as having made an affirmative determination under subparagraph (A) in any investigation to which subsection (b)(1)(B) is applied.

**(2) Suspension of liquidation**

If the determination of the administering authority under paragraph (1) is affirmative, then any suspension of liquidation ordered under subsection (d)(2) shall apply, or, if notice of such suspension of liquidation is already published, be amended to apply, to unliquidated entries of merchandise entered, or withdrawn from warehouse, for consumption on or after the later of-

(A) the date which is 90 days before the date on which the suspension of liquidation was first ordered, or

(B) the date on which notice of the determination to initiate the investigation is published in the Federal Register.

**(f) Notice of determination**

Whenever the Commission or the administering authority makes a determination under this section, the Commission or the administering authority, as the case may be, shall notify the petitioner, and other parties to the investigation, and the Commission or the administering authority (whichever is appropriate) of its determination. The administering authority shall include with such notification the facts and conclusions on which its determination is based. Not later than 5 days after the date on which the determination is required to be made under subsection (a)(2), the Commission shall transmit to the administering authority the facts and conclusions on which its determination is based.

(June 17, 1930, ch. 497, title VII, §733, as added Pub. L. 96–39, title I, §101, July 26, 1979, 93 Stat. 163 ; amended Pub. L. 99–514, title XVIII, §1886(a)(2), Oct. 22, 1986, 100 Stat. 2921 ; Pub. L. 100–418, title I, §§1323(b), 1324(b)(2), 1326(d)(1), Aug. 23, 1988, 102 Stat. 1198 , 1201, 1204; Pub. L. 103–465, title II, §§212(b)(2)(A), (C)–(E), 213(a), 214(b)(1), 215(b), 219(a), (c)(1), 233(a)(6)(A)(viii)–(x), (B), Dec. 8, 1994, 108 Stat. 4848–4852 , 4855, 4857, 4901.)

**EDITORIAL NOTES**

## AMENDMENTS

**1994**-Subsec. (a). Pub. L. 103–465, §212(b)(2)(A), amended heading and text of subsec. (a) generally. Prior to amendment, text read as follows: "Except in the case of a petition dismissed by the administering

authority under section 1673a(c)(3) of this title, the Commission, within 45 days after the date on which a petition is filed under section 1673a(b) of this title or on which it receives notice from the administering authority of an investigation commenced under section 1673a(a) of this title, shall make a determination, based upon the best information available to it at the time of the determination, of whether there is a reasonable indication that-

"(1) an industry in the United States-

"(A) is materially injured, or

"(B) is threatened with material injury, or

"(2) the establishment of an industry in the United States is materially retarded,

by reason of imports of the merchandise which is the subject of the investigation by the administering authority. If that determination is negative, the investigation shall be terminated.

Subsec. (b)(1)(A). Pub. L. 103–465, §219(a)(2), struck out at end "If the determination of the administering authority under this subsection is affirmative, the determination shall include the estimated average amount by which the foreign market value exceeds the United States price."

Pub. L. 103–465, §§212(b)(2)(C)(i), 233(a)(6)(A)(viii), substituted "140 days after the date on which the administering authority initiates an investigation under section 1673a(c) of this title" for "160 days after the date on which a petition is filed under section 1673a(b) of this title", "initiated" for "commenced", and "information" for "best information".

Subsec. (b)(1)(B). Pub. L. 103–465, §§212(b)(2)(C)(ii), 233(a)(6)(A)(viii), in introductory provisions, substituted "initiated" for "commenced", in cl. (i), substituted "100" for "120" and "140" for "160", and in cl. (ii), substituted "80" for "100" and "140" for "160".

Subsec. (b)(2). Pub. L. 103–465, §233(a)(6)(A)(ix), (B), substituted "initiation" for "commencement" after "90 days after the" and "initiated" for "commenced".

Subsec. (b)(3). Pub. L. 103–465, §213(a), added par. (3).

Subsec. (c)(1). Pub. L. 103–465, §§212(b)(2)(D), 233(a)(6)(A)(x), in concluding provisions, substituted "190th day after the date on which the administering authority initiates an investigation under section 1673a(c) of this title" for "210th day after the date on which a petition is filed under section 1673a(b) of this title" and "initiated" for "commenced".

Subsec. (d). Pub. L. 103–465, §215(b)(1)(B), inserted concluding provisions.

Subsec. (d)(1). Pub. L. 103–465, §219(a)(1)(D), added par. (1). Former par. (1) redesignated (2).

Pub. L. 103–465, §215(b)(1)(A), substituted "warehouse, for consumption on or after the later of-" and subpars. (A) and (B) for "warehouse, for consumption on or after the date of publication of the notice of the determination in the Federal Register,".

Subsec. (d)(2). Pub. L. 103–465, §219(a)(1)(A)–(C), redesignated par. (1) as (2), inserted "and" at end, and struck out former par. (2) which read as follows: "shall order the posting of a cash deposit, bond, or other security, as it deems appropriate, for each entry of the merchandise concerned equal to the estimated average amount by which the foreign market value exceeds the United States price, and".

Subsec. (e)(1). Pub. L. 103–465, §214(b)(1), in introductory provisions, substituted "information" for "best information" and amended subpars. (A) and (B) generally. Prior to amendment, subpars. (A) and (B) read as follows:

"(A)(i) there is a history of dumping in the United States or elsewhere of the class or kind of the merchandise which is the subject of the investigation, or

"(ii) the person by whom, or for whose account, the merchandise was imported knew or should have known that the exporter was selling the merchandise which is the subject of the investigation at less than its fair value, and

"(B) there have been massive imports of the class or kind of merchandise which is the subject of the investigation over a relatively short period."

Subsec. (e)(2). Pub. L. 103–465, §§215(b)(2), 219(c)(1), substituted "subsection (d)(2)" for "subsection (d)(1)" and "warehouse, for consumption on or after the later of-" and subpars. (A) and (B) for "warehouse, for consumption on or after the date which is 90 days before the date on which suspension of liquidation was first ordered."

Subsec. (f). Pub. L. 103–465, §212(b)(2)(E), amended heading and text of subsec. (f) generally. Prior to amendment, text read as follows: "Whenever the Commission or the administering authority makes a determination under this section, it shall notify the petitioner, other parties to the investigation, and the other agency of its determination and of the facts and conclusions of law upon which the determination is based, and it shall publish notice of its determination in the Federal Register."

**1988**-Subsec. (b)(1). Pub. L. 100–418, §1323(b)(1), amended par. (1) generally. Prior to amendment, par. (1) read as follows: "Within 160 days after the date on which a petition is filed under section 1673a(b) of this title, or an investigation is commenced under section 1673a(a) of this title, but not before an affirmative determination by the Commission under subsection (a) of this section, the administering authority shall make a determination, based upon the best information available to it at the time of the determination, of

whether there is a reasonable basis to believe or suspect that the merchandise is being sold, or is likely to be sold at less than fair value. If the determination of the administering authority under this subsection is affirmative, the determination shall include the estimated average amount by which the foreign market value exceeds the United States price."

Subsec. (b)(2). Pub. L. 100–418, §1326(d)(1), substituted "(F), or (G)" for "or (F)" in two places.

Subsec. (c)(1). Pub. L. 100–418, §1323(b)(2), inserted sentence at end relating to notice for extensions under subsec. (b)(1)(B).

Subsec. (e)(1). Pub. L. 100–418, §1324(b)(2), inserted "(at any time after the initiation of the investigation under this part)" after "promptly" in introductory provisions.

Pub. L. 100–418, §1323(b)(3), inserted sentence at end relating to investigations in which subsec. (b)(1)(B) is applied.

**1986**-Subsec. (b)(2). Pub. L. 99–514 inserted reference to subpar. (F) of section 1677(9) of this title in two places.

STATUTORY NOTES AND RELATED SUBSIDIARIES

### EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

### EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by section 1323(b) of Pub. L. 100–418 effective Aug. 23, 1988, amendment by section 1324(b)(2) of Pub. L. 100–418 applicable with respect to investigations initiated after Aug. 23, 1988, and amendment by section 1326(d)(1) of Pub. L. 100–418 applicable with respect to investigations initiated after Aug. 23, 1988, and to reviews initiated under section 1673e(c) or 1675 of this title after Aug. 23, 1988, see section 1337(a) to (c) of Pub. L. 100–418, set out as a note under section 1671 of this title.

### PLAN AMENDMENTS NOT REQUIRED UNTIL JANUARY 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§1101–1147 and 1171–1177] or title XVIII [§§1801–1899A] of Pub. L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, as amended, set out as a note under section 401 of Title 26, Internal Revenue Code.

1

19 U.S.C. § 1673d

**19 USC 1673d: Final determinations**
Text contains those laws in effect on April 21, 2024

**From Title 19-CUSTOMS DUTIES**
  CHAPTER 4-TARIFF ACT OF 1930
  Part II-Imposition of Antidumping Duties
**Jump To:**
  <u>Source Credit</u>
  <u>Miscellaneous</u>
  <u>Amendments</u>
  <u>Effective Date</u>

# §1673d. Final determinations

## (a) Final determination by administering authority

### (1) General rule

Within 75 days after the date of its preliminary determination under section 1673b(b) of this title, the administering authority shall make a final determination of whether the subject merchandise is being, or is likely to be, sold in the United States at less than its fair value.

### (2) Extension of period for determination

The administering authority may postpone making the final determination under paragraph (1) until not later than the 135th day after the date on which it published notice of its preliminary determination under section 1673b(b) of this title if a request in writing for such a postponement is made by-

  (A) exporters who account for a significant proportion of exports of the merchandise which is the subject of the investigation, in a proceeding in which the preliminary determination by the administering authority under section 1673b(b) of this title was affirmative, or

  (B) the petitioner, in a proceeding in which the preliminary determination by the administering authority under section 1673b(b) of this title was negative.

### (3) Critical circumstances determinations

If the final determination of the administering authority is affirmative, then that determination, in any investigation in which the presence of critical circumstances has been alleged under section 1673b(e) of this title, shall also contain a finding of whether-

  (A)(i) there is a history of dumping and material injury by reason of dumped imports in the United States or elsewhere of the subject merchandise, or

  (ii) the person by whom, or for whose account, the merchandise was imported knew or should have known that the exporter was selling the subject merchandise at less than its fair value and that there would be material injury by reason of such sales, and

  (B) there have been massive imports of the subject merchandise over a relatively short period.

Such findings may be affirmative even though the preliminary determination under section 1673b(e)(1) of this title was negative.

### (4) De minimis dumping margin

In making a determination under this subsection, the administering authority shall disregard any weighted average dumping margin that is de minimis as defined in section 1673b(b)(3) of this title.

## (b) Final determination by Commission

### (1) In general

The Commission shall make a final determination of whether-
  (A) an industry in the United States-
    (i) is materially injured, or
    (ii) is threatened with material injury, or

  (B) the establishment of an industry in the United States is materially retarded,

by reason of imports, or sales (or the likelihood of sales) for importation, of the merchandise with respect to which the administering authority has made an affirmative determination under subsection (a)(1). If the Commission determines that imports of the subject merchandise are negligible, the investigation shall be terminated.

### (2) Period for injury determination following affirmative preliminary determination by administering authority

If the preliminary determination by the administering authority under section 1673b(b) of this title is affirmative, then the Commission shall make the determination required by paragraph (1) before the later of-

(A) the 120th day after the day on which the administering authority makes its affirmative preliminary determination under section 1673b(b) of this title, or

(B) the 45th day after the day on which the administering authority makes its affirmative final determination under subsection (a).

**(3) Period for injury determination following negative preliminary determination by administering authority**

If the preliminary determination by the administering authority under section 1673b(b) of this title is negative, and its final determination under subsection (a) is affirmative, then the final determination by the Commission under this subsection shall be made within 75 days after the date of that affirmative final determination.

**(4) Certain additional findings**

(A) Commission standard for retroactive application.-

(i) In general.-If the finding of the administering authority under subsection (a)(3) is affirmative, then the final determination of the Commission shall include a finding as to whether the imports subject to the affirmative determination under subsection (a)(3) are likely to undermine seriously the remedial effect of the antidumping duty order to be issued under section 1673e of this title.

(ii) Factors to consider.-In making the evaluation under clause (i), the Commission shall consider, among other factors it considers relevant-

(I) the timing and the volume of the imports,

(II) a rapid increase in inventories of the imports, and

(III) any other circumstances indicating that the remedial effect of the antidumping order will be seriously undermined.

(B) If the final determination of the Commission is that there is no material injury but that there is threat of material injury, then its determination shall also include a finding as to whether material injury by reason of the imports of the merchandise with respect to which the administering authority has made an affirmative determination under subsection (a) would have been found but for any suspension of liquidation of entries of the merchandise.

## (c) Effect of final determinations

**(1) Effect of affirmative determination by the administering authority**

If the determination of the administering authority under subsection (a) is affirmative, then-

(A) the administering authority shall make available to the Commission all information upon which such determination was based and which the Commission considers relevant to its determination, under such procedures as the administering authority and the Commission may establish to prevent disclosure, other than with the consent of the party providing it or under protective order, of any information as to which confidential treatment has been given by the administering authority,

(B)(i) the administering authority shall-

(I) determine the estimated weighted average dumping margin for each exporter and producer individually investigated, and

(II) determine, in accordance with paragraph (5), the estimated all-others rate for all exporters and producers not individually investigated, and

(ii) the administering authority shall order the posting of a cash deposit, bond, or other security, as the administering authority deems appropriate, for each entry of the subject merchandise in an amount based on the estimated weighted average dumping margin or the estimated all-others rate, whichever is applicable, and

(C) in cases where the preliminary determination by the administering authority under section 1673b(b) of this title was negative, the administering authority shall order the suspension of liquidation under section 1673b(d)(2) of this title.

**(2) Issuance of order; effect of negative determination**

If the determinations of the administering authority and the Commission under subsections (a)(1) and (b)(1) are affirmative, then the administering authority shall issue an antidumping duty order under section 1673e(a) of this title. If either of such determinations is negative, the investigation shall be terminated upon the publication of notice of that negative determination and the administering authority shall-

(A) terminate the suspension of liquidation under section 1673b(d)(2) of this title, and

(B) release any bond or other security, and refund any cash deposit, required under section 1673b(d)(1)(B) of this title.

**(3) Effect of negative determinations under subsections (a)(3) and (b)(4)(A)**

If the determination of the administering authority or the Commission under subsection (a)(3) or (b)(4)(A), respectively, is negative, then the administering authority shall-

(A) terminate any retroactive suspension of liquidation required under paragraph (4) or section 1673b(e)(2) of this title, and

(B) release any bond or other security, and refund any cash deposit required, under section 1673b(d)(1)(B) of this title with respect to entries of the merchandise the liquidation of which was suspended retroactively under section 1673b(e)(2) of this title.

**(4) Effect of affirmative determination under subsection (a)(3)**

If the determination of the administering authority under subsection (a)(3) is affirmative, then the administering authority shall-

(A) in cases where the preliminary determinations by the administering authority under sections 1673b(b) and 1673b(e)(1) of this title were both affirmative, continue the retroactive suspension of liquidation and the posting of a cash deposit, bond, or other security previously ordered under section 1673b(e)(2) of this title;

(B) in cases where the preliminary determination by the administering authority under section 1673b(b) of this title was affirmative, but the preliminary determination under section 1673b(e)(1) of this title was negative, shall modify any suspension of liquidation and security requirement previously ordered under section 1673b(d) of this title to apply to unliquidated entries of merchandise entered, or withdrawn from warehouse, for consumption on or after the date which is 90 days before the date on which suspension of liquidation was first ordered; or

(C) in cases where the preliminary determination by the administering authority under section 1673b(b) of this title was negative, shall apply any suspension of liquidation and security requirement ordered under subsection (c)(1)(B) to unliquidated entries of merchandise entered, or withdrawn from warehouse, for consumption on or after the date which is 90 days before the date on which suspension of liquidation is first ordered.

**(5) Method for determining estimated all-others rate**

**(A) General rule**

For purposes of this subsection and section 1673b(d) of this title, the estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely under section 1677e of this title.

**(B) Exception**

If the estimated weighted average dumping margins established for all exporters and producers individually investigated are zero or de minimis margins, or are determined entirely under section 1677e of this title, the administering authority may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated.

**(d) Publication of notice of determinations**

Whenever the administering authority or the Commission makes a determination under this section, it shall notify the petitioner, other parties to the investigation, and the other agency of its determination and of the facts and conclusions of law upon which the determination is based, and it shall publish notice of its determination in the Federal Register.

**(e) Correction of ministerial errors**

The administering authority shall establish procedures for the correction of ministerial errors in final determinations within a reasonable time after the determinations are issued under this section. Such procedures shall ensure opportunity for interested parties to present their views regarding any such errors. As used in this subsection, the term "ministerial error" includes errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which the administering authority considers ministerial.

(June 17, 1930, ch. 497, title VII, §735, as added Pub. L. 96–39, title I, §101, July 26, 1979, 93 Stat. 169 ; amended Pub. L. 98–573, title VI, §§602(c), 605(b), Oct. 30, 1984, 98 Stat. 3024 , 3028; Pub. L. 100–418, title I, §§1324(b)(3), 1333(a), Aug. 23, 1988, 102 Stat. 1201 , 1209; Pub. L. 103–465, title II, §§212(b)(2)(B), 213(b), 214(b)(2), 219(b), (c)(6)–(8), 233(a)(5)(V), Dec. 8, 1994, 108 Stat. 4849–4851 , 4856, 4857, 4900; Pub. L. 104–295, §20(b)(6), Oct. 11, 1996, 110 Stat. 3527 .)

**EDITORIAL NOTES**

**AMENDMENTS**

**1996**-Subsec. (a)(3)(A)(i). Pub. L. 104–295 amended Pub. L. 103–465, §214(b)(2)(A)(i). See 1994 Amendment note below.

**1994**-Subsec. (a)(1). Pub. L. 103–465, §233(a)(5)(V), substituted "subject merchandise" for "merchandise which was the subject of the investigation".

Subsec. (a)(3)(A)(i). Pub. L. 103–465, §214(b)(2)(A)(i), as amended by Pub. L. 104–295, inserted "and material injury by reason of dumped imports" after "history of dumping" and substituted "subject merchandise" for "class or kind of merchandise which is the subject of the investigation".

Subsec. (a)(3)(A)(ii). Pub. L. 103–465, §214(b)(2)(A)(ii), substituted "subject merchandise at less than its fair value and that there would be material injury by reason of such sales" for "merchandise which is the

subject of the investigation at less than its fair value".

Subsec. (a)(3)(B). Pub. L. 103–465, §214(b)(2)(A)(iii), substituted "subject merchandise" for "merchandise which is the subject of the investigation".

Subsec. (a)(4). Pub. L. 103–465, §213(b), added par. (4).

Subsec. (b)(1). Pub. L. 103–465, §212(b)(2)(B), inserted at end of concluding provisions "If the Commission determines that imports of the subject merchandise are negligible, the investigation shall be terminated."

Subsec. (b)(4)(A). Pub. L. 103–465, §214(b)(2)(B), amended subpar. (A) generally, substituting present provisions for provisions requiring, in the case of an affirmative critical circumstances determination, a further finding as to whether retroactive imposition of antidumping duties on the subject merchandise would be necessary to prevent recurrence of material injury caused by massive imports of the merchandise over a relatively short period of time.

Subsec. (c)(1). Pub. L. 103–465, §219(b)(1), struck out "and" at end of subpar. (A), added subpar. (B), and redesignated former subpar. (B) as (C) and substituted "the suspension of liquidation under section 1673b(d)(2) of this title" for "under paragraphs (1) and (2) of section 1673b(d) of this title the suspension of liquidation and the posting of a cash deposit, bond, or other security".

Subsec. (c)(2)(A). Pub. L. 103–465, §219(c)(6), substituted "1673b(d)(2)" for "1671b(d)(1)".

Subsec. (c)(2)(B). Pub. L. 103–465, §219(c)(7), substituted "1673b(d)(1)(B)" for "1673b(d)(2)".

Subsec. (c)(3)(B). Pub. L. 103–465, §219(c)(8), substituted "1673b(d)(1)(B)" for "1673b(d)(2)".

Subsec. (c)(5). Pub. L. 103–465, §219(b)(2), added par. (5).

**1988**—Subsec. (b)(4)(A). Pub. L. 100–418, §1324(b)(3), amended subpar. (A) generally. Prior to amendment, subpar. (A) read as follows: "If the finding of the administering authority under subsection (a)(2) of this section is affirmative, then the final determination of the Commission shall include a finding as to whether the material injury is by reason of massive imports described in subsection (a)(3) of this section to an extent that, in order to prevent such material injury from recurring, it is necessary to impose the duty imposed by section 1673 of this title retroactively on those imports."

Subsec. (e). Pub. L. 100–418, §1333(a), added subsec. (e).

**1984**—Subsec. (a)(3). Pub. L. 98–573, §605(b)(1), inserted provision that such findings may be affirmative even though the preliminary determination under section 1673b(e)(1) of this title was negative.

Subsec. (b)(1). Pub. L. 98–573, §602(c), inserted ", or sales (or the likelihood of sales) for importation," in provisions after subpar. (B).

Subsec. (c)(3)(A). Pub. L. 98–573, §605(b)(3), inserted reference to par. (4).

Subsec. (c)(4). Pub. L. 98–573, §605(b)(2), added par. (4).

### Statutory Notes and Related Subsidiaries

## Effective Date of 1994 Amendment

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

## Effective Date of 1988 Amendment

Amendment by section 1333(a) of Pub. L. 100–418 effective Aug. 23, 1988, and amendment by section 1324(b)(3) of Pub. L. 100–418 applicable with respect to investigations initiated after Aug. 23, 1988, see section 1337(a), (c) of Pub. L. 100–418, set out as a note under section 1671 of this title.

## Effective Date of 1984 Amendment

Amendment by section 602(c) of Pub. L. 98–573 applicable with respect to investigations initiated by petition or by the administering authority under parts I and II of this subtitle, and to reviews begun under section 1675 of this title, on or after Oct. 30, 1984, and amendment by section 605(b) of Pub. L. 98–573 effective Oct. 30, 1984, see section 626(a), (b)(1) of Pub. L. 98–573, as amended, set out as a note under section 1671 of this title.

19 U.S.C. § 1673e

---

**19 USC 1673e: Assessment of duty**
Text contains those laws in effect on April 21, 2024

**From Title 19-CUSTOMS DUTIES**
    CHAPTER 4-TARIFF ACT OF 1930
    Part II-Imposition of Antidumping Duties
**Jump To:**
    <u>Source Credit</u>
    <u>Miscellaneous</u>
    <u>Amendments</u>
    <u>Effective Date</u>

---

# §1673e. Assessment of duty

**(a) Publication of antidumping duty order**

Within 7 days after being notified by the Commission of an affirmative determination under section 1673d(b) of this title, the administering authority shall publish an antidumping duty order which-

(1) directs customs officers to assess an antidumping duty equal to the amount by which the normal value of the merchandise exceeds the export price (or the constructed export price) of the merchandise, within 6 months after the date on which the administering authority receives satisfactory information upon which the assessment may be based, but in no event later than-

(A) 12 months after the end of the annual accounting period of the manufacturer or exporter within which the merchandise is entered, or withdrawn from warehouse, for consumption, or

(B) in the case of merchandise not sold prior to its importation into the United States, 12 months after the end of the annual accounting period of the manufacturer or exporter within which it is sold in the United States to a person who is not the exporter of that merchandise,

(2) includes a description of the subject merchandise, in such detail as the administering authority deems necessary, and

(3) requires the deposit of estimated antidumping duties pending liquidation of entries of merchandise at the same time as estimated normal customs duties on that merchandise are deposited.

**(b) Imposition of duty**

**(1) General rule**

If the Commission, in its final determination under section 1673d(b) of this title, finds material injury or threat of material injury which, but for the suspension of liquidation under section 1673b(d)(2) of this title would have led to a finding of material injury, then entries of the subject merchandise, the liquidation of which has been suspended under section 1673b(d)(2) of this title, shall be subject to the imposition of antidumping duties under section 1673 of this title.

**(2) Special rule**

If the Commission, in its final determination under section 1673d(b) of this title, finds threat of material injury, other than threat of material injury described in paragraph (1), or material retardation of the establishment of an industry in the United States, then subject merchandise which is entered, or withdrawn from warehouse, for consumption on or after the date of publication of notice of an affirmative determination of the Commission under section 1673d(b) of this title shall be subject to the assessment of antidumping duties under section 1673 of this title, and the administering authority shall release any bond or other security, and refund any cash deposit made, to secure the payment of antidumping duties with respect to entries of the merchandise entered, or withdrawn from warehouse, for consumption before that date.

**(c) Security in lieu of estimated duty pending early determination of duty**

**(1) Conditions for waiver of deposit of estimated duties**

The administering authority may permit, for not more than 90 days after the date of publication of an order under subsection (a), the posting of a bond or other security in lieu of the deposit of estimated antidumping duties required under subsection (a)(3) if-

(A) the investigation has not been designated as extraordinarily complicated by reason of-

(i) the number and complexity of the transactions to be investigated or adjustments to be considered,

(ii) the novelty of the issues presented, or

(iii) the number of firms whose activities must be investigated,

(B) the final determination in the investigation has not been postponed under section 1673d(a)(2)(A) of this title;

(C) on the basis of information presented to the administering authority by any manufacturer, producer, or exporter in such form and within such time as the administering authority may require, the administering authority is satisfied that a determination will be made, within 90 days after the date of publication of an order under subsection (a), of the normal value and the export price (or the constructed export price) for all merchandise of such manufacturer, producer, or exporter described in that order which was entered, or withdrawn from warehouse, for consumption on or after the date of publication of-

    (i) an affirmative preliminary determination by the administering authority under section 1673b(b) of this title, or

    (ii) if its determination under section 1673b(b) of this title was negative, an affirmative final determination by the administering authority under section 1673d(a) of this title,

and before the date of publication of the affirmative final determination by the Commission under section 1673d(b) of this title;

    (D) the party described in subparagraph (C) provides credible evidence that the amount by which the normal value of the merchandise exceeds the export price (or the constructed export price) of the merchandise is significantly less than the amount of such excess specified in the antidumping duty order published under subsection (a); and

    (E) the data concerning the normal value and the export price (or the constructed export price) apply to sales in the usual commercial quantities and in the ordinary course of trade and the number of such sales are sufficient to form an adequate basis for comparison.

**(2) Notice; hearing**

If the administering authority permits the posting of a bond or other security in lieu of the deposit of estimated antidumping duties under paragraph (1), it shall-

    (A) publish notice of its action in the Federal Register, and

    (B) upon the request of any interested party, hold a hearing in accordance with section 1677c of this title before determining the normal value and the export price (or the constructed export price) of the merchandise.

**(3) Determinations to be basis of antidumping duty**

The administering authority shall publish notice in the Federal Register of the results of its determination of normal value and export price (or the constructed export price), and that determination shall be the basis for the assessment of antidumping duties on entries of merchandise to which the notice under this subsection applies and also shall be the basis for the deposit of estimated antidumping duties on future entries of merchandise of manufacturers, producers, or exporters described in paragraph (1) to which the order issued under subsection (a) applies.

**(4) Provision of business proprietary information; written comments**

Before determining whether to permit the posting of bond or other security under paragraph (1) in lieu of the deposit of estimated antidumping duties, the administering authority shall-

    (A) make all business proprietary information supplied to the administering authority under paragraph (1) available under a protective order in accordance with section 1677f(c) of this title to all interested parties described in subparagraph (C), (D), (E), (F), or (G) of section 1677(9) of this title, and

    (B) afford all interested parties an opportunity to file written comments on whether the posting of bond or other security under paragraph (1) in lieu of the deposit of estimated antidumping duties should be permitted.

**(d) Special rule for regional industries**

**(1) In general**

In an investigation in which the Commission makes a regional industry determination under section 1677(4)(C) of this title, the administering authority shall, to the maximum extent possible, direct that duties be assessed only on the subject merchandise of the specific exporters or producers that exported the subject merchandise for sale in the region concerned during the period of investigation.

**(2) Exception for new exporters and producers**

After publication of the antidumping duty order, if the administering authority finds that a new exporter or producer is exporting the subject merchandise for sale in the region concerned, the administering authority shall direct that duties be assessed on the subject merchandise of the new exporter or producer consistent with the provisions of section 1675(a)(2)(B) of this title.

(June 17, 1930, ch. 497, title VII, §736, as added Pub. L. 96–39, title I, §101, July 26, 1979, 93 Stat. 172 ; amended Pub. L. 99–514, title XVIII, §1886(a)(7), Oct. 22, 1986, 100 Stat. 2922 ; Pub. L. 100–418, title I, §1325, Aug. 23, 1988, 102 Stat. 1201 ; Pub. L. 103–465, title II, §§218(b)(2), 219(c)(9), 233(a)(1)(C), (2)(A)(iii), (5)(W)–(Y), Dec. 8, 1994, 108 Stat. 4855 , 4857, 4898, 4900.)

**EDITORIAL NOTES**

## AMENDMENTS

**1994**-Subsec. (a)(1). Pub. L. 103–465, §233(a)(1)(C), (2)(A)(iii), substituted "normal value" for "foreign market value" and "export price (or the constructed export price)" for "United States price".

Subsec. (a)(2). Pub. L. 103–465, §233(a)(5)(W), substituted "subject merchandise" for "class or kind of merchandise to which it applies".

Subsec. (b)(1). Pub. L. 103–465, §§219(c)(9), 233(a)(5)(X), substituted "1673b(d)(2)" for "1673b(d)(1)" in two places and "subject merchandise" for "merchandise subject to the antidumping duty order".

Subsec. (b)(2). Pub. L. 103–465, §233(a)(5)(Y), substituted "subject merchandise" for "merchandise subject to an antidumping duty order".

Subsec. (c). Pub. L. 103–465, §233(a)(1)(C), (2)(A)(iii), substituted "normal value" for "foreign market value" and "export price (or the constructed export price)" for "United States price" in pars. (1)(C) to (E), (2)(B), and (3).

Subsec. (d). Pub. L. 103–465, §218(b)(2), added subsec. (d).

**1988**-Subsec. (c)(1). Pub. L. 100–418, §1325(a), amended par. (1) generally, designating existing provisions as cl. (C) and adding cls. (A), (B), (D), and (E).

Subsec. (c)(4). Pub. L. 100–418, §1325(b), added par. (4).

**1986**-Subsec. (c)(1). Pub. L. 99–514 inserted ", and was sold to any person that is not related to such manufacturer, producer, or exporter," before "on or after the date".

### Statutory Notes and Related Subsidiaries

## Effective Date of 1994 Amendment

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

## Effective Date of 1988 Amendment

Amendment by Pub. L. 100–418 applicable with respect to investigations initiated after Aug. 23, 1988, and to reviews initiated under section 1673e(c) or 1675 of this title after Aug. 23, 1988, see section 1337(b) of Pub. L. 100–418, set out as a note under section 1671 of this title.

## Plan Amendments Not Required Until January 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§1101–1147 and 1171–1177] or title XVIII [§§1801–1899A] of Pub. L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, as amended, set out as a note under section 401 of Title 26, Internal Revenue Code.

(Form 19)

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

## CAFC Court Nos. 2024-1370, 2024-1371

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

    ☑    the filing has been prepared using a proportionally-spaced typeface and includes 9,194 words.

    ☐    the filing has been prepared using a monospaced typeface and includes _____ lines of text.

    ☐    the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: April 22, 2024        Signature:   /s/ Gregory J. Spak

                                Name:      Gregory J. Spak

(Form 31)

# CERTIFICATE OF CONFIDENTIAL MATERIAL

## CAFC Court Nos. 2024-1370, 2024-1371

The foregoing document contains 40 unique words (including numbers) marked confidential.

☐ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: April 22, 2024         Signature:    /s/ Gregory J. Spak

                             Name:            Gregory J. Spak