**Nos. 24-1370, -1371**

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

SWEET HARVEST FOODS, EXPORT PACKERS COMPANY LTD.,
HONEY HOLDING I, DBA HONEY SOLUTIONS,
SUNLAND TRADING INC., AND NATIONAL HONEY
PACKERS & DEALERS ASSOCIATION,

*Plaintiffs-Appellants,*

v.

UNITED STATES,

*Defendant-Appellee,*

AMERICAN HONEY PRODUCERS ASSOCIATION,
SIOUX HONEY ASSOCIATION,

*Defendant-Intervenors-Appellees.*

_____

Appeal from the United States Court of International Trade in
Consol. Case No. 1:22-CV-00188, Senior Judge Leo M. Gordon

## NON-CONFIDENTIAL RESPONSE BRIEF OF
## DEFENDANT-APPELLEE UNITED STATES

**MICHAEL H. HALDENSTEIN**
Attorney for Defendant-Appellee
U.S. International Trade Commission
Office of the General Counsel
500 E Street SW, Suite 707
Washington, DC 20436
Telephone (202) 205-3041

**DOMINIC L. BIANCHI**
General Counsel
Telephone (202) 205-3061

**ANDREA C. CASSON**
Assistant General Counsel for
  Litigation
Telephone (202) 205-3105

**Dated: July 19, 2024**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................v

STATEMENT OF RELATED CASES ...............................................1

STATEMENT OF THE ISSUES ......................................................1

STATEMENT OF THE CASE ..........................................................2

STATEMENT OF FACTS..................................................................4

I.     Introduction.........................................................................4

II.    Commerce's Critical Circumstances Determinations ........5

III.   The Commission's Critical Circumstances Determination............7

       A.    Legal Standard .......................................................7

       B.    The Commission's Investigation and Findings for
             Critical Circumstances ..........................................9

IV.    The Lower Court's Decision ...........................................15

SUMMARY OF THE ARGUMENT..............................................19

ARGUMENT ...............................................................................23

       I.    Standard of Review .............................................23

       II.   The Commission Considered the Correct Imports and
             Inventories Subject to Commerce's Final Determination
             of Critical Circumstances .....................................26

             A.    The Statute and SAA Provide for Commerce and
                   the Commission to Consider Imports that Entered
                   the United States After the Filing of the Petition
                   but Prior to Provisional Relief .................26

             B.    The Statute Unambiguously Indicates that the
                   Commission Shall Consider the Rapid Increase in
                   Inventories Prior to Suspension of Liquidation
                   when Inventories Would Be Increasing .......28

C.   The Lower Court Correctly Relied on the SAA in Rejecting Appellants' Interpretation of the Statute Requiring Later Inventory Data ...............................31

D.   Assessment of the Increase in Inventories Prior to Suspension of Liquidation Is Consistent with the Statutory Scheme of Deterring a Surge in Imports Prior to Suspension of Liquidation .........................32

E.   Appellants Wrongly Claim the Commission Should Have Only Considered Imports and Inventories During a 90-Day Period .......................34

III.   Appellants' Arguments for Inventory Level Data Rewrite the Statute and Wrongly Assume the Remedial Effect of an Order Begins upon Publication ......................37

A.   Appellants' Inventory Levels Argument Rewrites the Statute................................................................37

B.   Appellants Wrongly Assume the Remedial Effect of the Antidumping Duty Order Begins When the Order is Issued .........................................................40

IV.   The Commission's Critical Circumstances Determination Is Supported by Substantial Evidence and in Accordance with Law............................................................44

A.   The Decline in Inventories During the Period of Remedial Relief Does Not Show the Order's Remedial Effect Was Not Undermined ...................44

B.   The Commission Reasonably Found that the Import Surge Was Not for Immediate Consumption and Addressed Arguments Concerning Sold Off Inventories...............................46

C.   The Commission Addressed Other Inventory Evidence Appellants Claim Was Ignored.................48

D. The Commission Did Not Accept Petitioners' Claims of Stockpiling Honey by End Users ...........................50

E. Appellants Did Not Exhaust Their Administrative Remedies and Abandoned Their Argument that the Commission's Determination is Unsupported by Substantial Evidence Because of the Absence of End User Data ...........................................................52

F. The Commission Reasonably Did Not Attempt to Collect Data from End Users ....................................54

V. The Commission Conducted the Proper Prospective Analysis ...........................................................56

A. The Commission Conducted a Forward-Looking Analysis of Whether Relief Would be Undermined.................56

B. The Term "Likely" in the Statute Does Not Require the Commission to Ignore the Remedial Effect of an Order Prior to its Issuance.....................................57

VI. Appellants' Reliance on the Dissent is Misguided ............................59

CONCLUSION.......................................................................61

**CONFIDENTIAL MATERIAL REDACTED**

Within this brief, confidential material has been redacted on pages 48, 49, 54, and 55. The material omitted on pages 48-49 identifies an importer and is confidential information importers provided to the Commission concerning their inventories. The information omitted from page 54 is the name of a purchaser and a description of its confidential purchasing patterns; and confidential information omitted from page 55 contains names of importers and purchasers and a description of their commercial relationships that includes the proportion of purchases accounted for by a purchaser.

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Anvar v. Dwyer*,
    82 F.4th 1 (1st Cir. 2023) ................................................................................53

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984) ......................................................................25

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ..............................................................................17, 24

*Cleo, Inc. v. United States*,
    501 F.3d 1291 (Fed. Cir. 2007) ......................................................................24

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) ..............................................................................59, 60

*Corley v. United States*,
    556 U.S. 303 (2009) ........................................................................................30

*Grupo Industrial Camesa v. United States*,
    85 F.3d 1577 (Fed. Cir. 1996) ......................................................................60

*Hibbs v. Winn*,
    542 U.S. 88 (2004) ........................................................................................30

*Hitachi Metals, Ltd. v. United States*,
    949 F.3d 710 (Fed. Cir. 2020) ......................................................................25

*ICC Indus., Inc. v. United States*,
    632 F. Supp. 36 (Ct. Int'l Trade 1986) ......................................................5, 33

*ICC Indus., Inc. v. United States*,
    812 F.2d 694 (Fed. Cir. 1987) ................................................................5, 32, 33

*Kyocera Solar, Inc. v. United States*,
    844 F.3d 1334 (Fed. Cir. 2016) ......................................................................24

*Loper Bright Enters. v. Raimondo*,
    603 U.S. ___, 144 S. Ct. 2244 (June 28, 2024), *available at* 2024
    WL 3208360 ............................................................................................17, 24

**Cases (cont'd)**                                                      **Page(s)**

*Matsushita Elec. Indus., Ltd. v. United States*,
    750 F.2d 927 (Fed. Cir. 1984) ...........................................................49

*MTD Prods., Inc. v. United States*,
    2023 WL 2535885 (Ct. Int'l Trade Mar. 16, 2023)...............................18, 33, 57

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) .......................................24, 25, 26, 50

*Nucor Corp. v. United States*,
    318 F. Supp. 2d 1207 (Ct. Int'l Trade 2004) .....................................26

*Sandvik Steel Co. v. United States*,
    164 F.3d 596 (Fed. Cir. 1998) ...........................................................54

*Siemens Energy, Inc. v. United States*,
    806 F.3d 1367 (Fed. Cir. 2015) .........................................................59

*SKF USA, INC. v. United States*,
    263 F.3d 1369 (Fed. Cir. 2001) ........................................................32

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944).................................................................17, 25

*Splane v. West*,
    216 F.3d 1058 (Fed. Cir. 2000) ........................................................30

*Stauffer v. Brooks Bros. Grp., Inc.*
    758 F.3d 1314 (Fed. Cir. 2014) .........................................................53

*Taiwan Semiconductors Indus. Ass'n v. Int'l Trade Comm'n*,
    266 F.3d 1339 (Fed. Cir. 2001) ........................................................24

*Timken U.S. Corp. v. United States*,
    421 F.3d 1350 (Fed. Cir. 2005) ........................................................26

*U.S. Steel Grp. v. United States*,
    96 F.3d 1352 (Fed. Cir. 1996) ..........................................................25

# TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                              **Page(s)**

*United States v. Great Am. Ins. Co. of New York,*
    738 F.3d 1320 (Fed. Cir. 2013) .........................................................53

*USEC v. United States,*
    34 F. App'x 725 (Fed. Cir. 2002) .....................................................49

**Statutes**

19 U.S.C. § 1516a(a)(2)(B)(i).............................................................23

19 U.S.C. § 1516a(b)(1)(B)(i).............................................................23

19 U.S.C. § 1671b(e) ...........................................................................4

19 U.S.C. § 1671d(a)(2) .......................................................................4

19 U.S.C. § 1671d(b)(4)(A) ..................................................................4

19 U.S.C. § 1673b(e) ............................................................................4

19 U.S.C. § 1673d(a)(3)...........................................................2, 4, 5, 36

19 U.S.C. § 1673d(a)(3)(B) .....................................................1, 28, 36

19 U.S.C. § 1673d(b)(4) ........................................................................4

19 U.S.C. § 1673d(b)(4)(A) ....................................................3, 4, 16, 31

19 U.S.C. § 1673d(b)(4)(A)(i) .....................................................*passim*

19 U.S.C. § 1673d(b)(4)(A)(ii) ....................................................*passim*

19 U.S.C. § 1673e ........................................................................*passim*

19 U.S.C § 1673e(a)............................................................................43

19 U.S.C § 1673e(b)............................................................................43

19 U.S.C. § 1673e(b)(1)..................................................................42, 43

19 U.S.C. § 1673e(b)(2)......................................................................43

# TABLE OF AUTHORITIES (cont'd)

**Statutes (cont'd)**                                                              **Page(s)**

19 U.S.C. § 1677(7)(F)(i)(V) ................................................................38

19 U.S.C. § 3512(d) ......................................................................7, 32

28 U.S.C. § 2639(a)(1) ........................................................................23

19 U.S.C. § 3511(a) ..............................................................................32

Pub. L. 103–465, 108 Stat. 4809 (1994)
   (Uruguay Round Agreements Act) ........................................7, 25, 32

**Regulatory Materials**

19 C.F.R. § 207.20(b) ....................................................................53, 54

87 Fed. Reg. 2,127 (Dep't of Commerce) (Jan. 13, 2022) ............6, 27, 36

87 Fed. Reg. 7,800 (Dep't of Commerce) (Feb. 10, 2022).................6, 41

87 Fed. Reg. 35,501 (Dep't of Commerce) (June 10, 2022) .......15, 39, 41, 58

**Legislative History Materials**

H.R. Rep. 103-316, vol. I (1994) .....................................................*passim*

H.R. Rep. 96-317 (1979).................................................................32, 33

**U.S. International Trade Commission Investigations**

*Small Vertical Shaft Engines from China*,
   Inv. Nos. 701-TA-643 and 731-TA-1493 (Final), USITC Pub.
   5185 (Apr. 2021)..................................................................................57

## STATEMENT OF RELATED CASES

Counsel for Defendant-Appellee, the U.S. International Trade Commission (the "Commission"), is not aware of any other appeal in or from the same civil action or proceeding in the lower court that was previously before this Court or any other appellate court.

## STATEMENT OF THE ISSUES

The Commission submits that the issues raised in this case are properly framed as:

1)      Did the Commission correctly focus its statutorily-required consideration of the "rapid increase in inventories of the imports" (19 U.S.C. § 1673d(b)(4)(A)(ii)) on the imports that massively increased during the "relatively short period" subject to the Department of Commerce's ("Commerce") finding of critical circumstances under 19 U.S.C. § 1673d(a)(3)(B)?

2)      Was the Commission's finding that there was a "rapid increase in inventories of the imports" subject to Commerce's finding of critical circumstances supported by substantial evidence and in accordance with law?

3)      Was the Commission required to collect additional data concerning end user inventories if Appellants never requested the data and then abandoned the argument in the lower court?

# STATEMENT OF THE CASE

In April 2021, the Honey Producers Association and the Sioux Honey Association (collectively, "Petitioners") filed an antidumping petition with the Commission and Commerce covering raw honey from Argentina, Brazil, India, Ukraine,[1] and Vietnam. Appx471. At the completion of its investigations, the Commission reached affirmative final determinations, unanimously finding that the domestic industry was materially injured by cumulated subject imports from Argentina, Brazil, India, and Vietnam that Commerce had determined were sold in the United States at less than fair value ("LTFV"). Appx471; Appx041.[2]

Commerce made affirmative "critical circumstances" determinations with respect to imports from Argentina and imports from Vietnam in its final determinations pursuant to 19 U.S.C. § 1673d(a)(3). The statute therefore required

---

[1] The petition as originally filed included imports of raw honey from Ukraine. On March 24, 2022, citing the war in Ukraine, Petitioners filed a letter with the Commission and Commerce withdrawing the petition as to imports of raw honey from Ukraine. The Commission and Commerce subsequently terminated their respective investigations with respect to raw honey from Ukraine. Appx471 (n.2).

[2] The confidential versions of the Commission's Views and Report are found at Appx471-543 and Appx32380-32764, respectively. The public version of the Views and Report is contained in USITC Publication 5327 found at Appx033-470. *Raw Honey from Argentina, Brazil, India, and Vietnam*, Inv. Nos. 731-TA-1560-1562 and 731-TA-1564 (Final), USITC Pub. 5327 (May 2022) ("USITC Pub 5327").

the Commission, because it made affirmative present material injury determinations, to also make critical circumstances determinations with respect to imports from both countries. *See* 19 U.S.C. § 1673d(b)(4)(A). This required the Commission to determine, for each country, whether the imports subject to Commerce's affirmative critical circumstances determinations were "likely to undermine seriously the remedial effect of the antidumping order to be issued {by Commerce}." 19 U.S.C. § 1673d(b)(4)(A)(i). Upon this examination, the Commission reached an affirmative critical circumstances determination with respect to imports from Vietnam and a negative critical circumstances determination with respect to imports from Argentina. USITC Pub. No. 5327 (Appx081-089).[3]

Several importers of raw honey from Vietnam and the National Honey Packers and Dealers Association ("NHPDA") (collectively, "Plaintiffs") appealed the Commission's critical circumstances determination as to raw honey from Vietnam to the Court of International Trade ("CIT" or "lower court"). In November 2023, the lower court sustained the Commission's critical

---

[3] The Commission's affirmative critical circumstances determination on imports from Vietnam reflects the findings of all Commissioners with the exception of Commissioner Johanson who filed separate views. *See* Appx544-553.

circumstances determination in its entirety. *Sweet Harvest Foods v. United States*, 669 F. Supp. 3d 1346 (Ct. Int'l Trade 2023) (Appx001-032).

Export Packers Company Ltd., Honey Holding I, dba Honey Solutions, Sunland Trading Inc., NHPDA, and Sweet Harvest Foods (collectively, "Appellants") filed appeals Nos. 24-1370 and 24-1371 challenging the decision of the lower court in *Sweet Harvest Foods*. This Court subsequently consolidated the cases into the above-captioned appeal.

## STATEMENT OF FACTS

### I. Introduction

"Critical circumstances" is a provision in both the countervailing and antidumping duty statutes that allows for the imposition of duties 90 days prior to the date that suspension of liquidation and cash deposit requirements (provisional measures or duties) normally begin. *See* 19 U.S.C. §§ 1671b(e), 1673b(e). Both Commerce and the Commission must make separate final affirmative critical circumstances determinations, under different criteria, for retroactive duties to be imposed. *See id.* at §§ 1671d(a)(2), 1671d(b)(4)(A), 1673d(a)(3), 1673d (b)(4)(A).

If Commerce makes an affirmative determination of critical circumstances in its parallel antidumping investigation, the Commission must make an additional finding concerning critical circumstances when it has found that the domestic industry is materially injured. *See* 19 U.S.C. §§ 1673d(b)(4), 1673d(a)(3). The

critical circumstances provision requires the Commission to find whether imports subject to Commerce's affirmative determination under 19 U.S.C. § 1673d(a)(3) are likely to undermine seriously the remedial effect of the antidumping order. 19 U.S.C. § 1673d(b)(4)(A)(ii). The purpose of the provision is to deter importers and exporters from rushing in imports before suspension of liquidation when provisional duties take effect. *ICC Indus., Inc. v. United States*, 812 F.2d 694, 700 (Fed. Cir. 1987), *aff'g*, 632 F. Supp. 36 (Ct. Int'l Trade 1986).

## II.    Commerce's Critical Circumstances Determinations

Commerce issued a preliminary determination in its antidumping duty investigation of raw honey from Vietnam on November 23, 2021, preliminarily finding that raw honey from Vietnam was sold in the United States at LTFV. *See* 86 Fed. Reg. 66,526 (Nov. 23, 2020) (Appx37011-37013). It suspended liquidation of entries of subject dumped merchandise and imposed provisional antidumping duties on entries of subject dumped merchandise beginning on November 23, 2021. *See* 86 Fed. Reg. at 66,528 (Appx37013). For raw honey from Vietnam, the cash deposit rate ranged from 410.93 to 413.99 percent. 86 Fed. Reg. at 66,527 (Appx37012).

On December 3, 2021, by letter to Commerce, Petitioners amended the petition to allege that critical circumstances existed in the antidumping duty investigation with respect to raw honey from Vietnam. On January 13, 2022,

Commerce issued a preliminary affirmative critical circumstances determination in its antidumping investigation with respect to raw honey from Vietnam. *See* 87 Fed. Reg. 2,127 (Jan. 13, 2022). At Commerce's direction, U.S. Customs and Border Protection ("CBP") suspended liquidation of any unliquidated entries of raw honey from Vietnam entered, or withdrawn from warehouse for consumption, on or after August 25, 2021, which is 90 days prior to November 23, 2021, the date of publication of the preliminary determination. *See* 87 Fed. Reg. at 2,130. Additionally, Commerce directed CBP to require cash deposits from importers equal to the estimated preliminary dumping rates for the additional 90 days. *See* 87 Fed. Reg. 7,800 (Feb. 10, 2022) (correcting notice of January 13, 2022, that omitted cash deposit requirement).

On April 14, 2022, Commerce issued a final determination finding that raw honey from Vietnam was sold in the United States at LTFV. *See* 87 Fed. Reg. 22,184 (April 14, 2022) (Appx37008-37009). Commerce also made a final determination that critical circumstances existed for raw honey from Vietnam. 87 Fed. Reg. at 22,185 (Appx37009). Commerce's determination of critical circumstances included all producers/exporters of raw honey in Vietnam. Appx534 (n.277).

## III. The Commission's Critical Circumstances Determination

### A. Legal Standard

As noted, the Commission is statutorily required to determine "whether the imports subject to the affirmative {Commerce critical circumstances} determination . . . are likely to undermine seriously the remedial effect of the antidumping duty order to be issued." 19 U.S.C. § 1673d(b)(4)(A)(i). In evaluating this issue, as required by statute, the Commission considers the "timing and the volume of the imports" subject to Commerce's affirmative critical circumstances determinations, the "rapid increase in inventories of the imports," as well as "any other circumstances indicating that the remedial effect of the antidumping duty order will be seriously undermined." 19 U.S.C. § 1673d(b)(4)(A)(ii).

The Statement of Administrative Action accompanying the Uruguay Round Agreements Act indicates that the Commission should analyze the period prior to the effective date of the order as the Commission's critical circumstances determination is focused "on whether an order's effectiveness is undermined by increasing shipments prior to the effective date of the order." H.R. Rep. 103-316, vol. I at 877 (1994) (hereinafter, "SAA"). The SAA is "an authoritative expression by the United States concerning the interpretation and application" of the statute, 19 U.S.C. § 3512(d). The SAA additionally explains that the Commission should

determine "whether, by massively increasing imports prior to the effective date of relief, the importers have seriously undermined the remedial effect of the order" and "whether the surge in imports *prior to the suspension of liquidation*, rather than the failure to provide retroactive relief, is likely to seriously undermine the remedial effect of the order." SAA at 877 (emphasis added).

Thus, the Commission analyzes the likely effects of the surge in imports entering *prior* to suspension of liquidation, which normally are not yet subject to antidumping duties. Specifically, consistent with the Congressional mandate to analyze whether the imports are likely to seriously undermine the remedial effect of the order, the Commission focuses on the imports that entered after the filing of the petition and prior to suspension of liquidation at which time the order imposes duties. This is essentially the same body of imports that Commerce evaluates. *See* SAA at 876 (Commerce determines whether "there have been massive imports of the subject merchandise over a relatively short period of time (*i.e.,* a surge of imports) prior to the suspension of liquidation . . . .").[4]

------

[4] In their "Legal Standard" and elsewhere, Appellants provide an incorrect statement of the law. They wrongly contend that the Commission must assess whether "the specific entries from that 90-day period are 'likely to undermine seriously' the antidumping duty order." Appellants' Brief ("Br.") at 12, 15. However, as explained *infra* in Section II.E, rather than considering only 90 days of entries for its determination, the Commission is statutorily required to determine "whether the imports subject to the affirmative {Commerce critical circumstances}

8

### B. The Commission's Investigation and Findings for Critical Circumstances

In analyzing critical circumstances, the Commission, like Commerce, examines imports in the six months after the petition was filed and before suspension of liquidation when cash deposits (provisional antidumping duties) begin to be collected. The period in this case ran from May 2021 to October 2021. Appx534-535. The Commission therefore compiled official import statistics for imports of raw honey from Vietnam from November 2020 to October 2021 in order to assess the timing and volume of the imports in the post-petition period. Appx32509-32510 (Table IV-8 and Fig. IV-3). These data would enable the Commission to compare the volume of subject imports from Vietnam six months prior to the filing of the petition (November 2020-April 2021) with the volume of subject imports from Vietnam in the six months after the filing of the petition (May 2021-October 2021) for purposes of its critical circumstances analysis.[5] Appx535.

---

determination . . . are likely to undermine seriously the remedial effect of the antidumping duty order to be issued." 19 U.S.C. § 1673d(b)(4)(A)(i).

[5] In certain instances not applicable in the current investigations, the Commission may alter the comparison periods if Commerce makes its preliminary determination before the end of the six-month period after the filing of the petition. (In such cases the Commission would not have a full six months of post-petition data to use for comparison purposes).

The Commission additionally collected data from importers in order to assess the increase in inventories of subject imports from Vietnam entering during the period April 2021 to October 2021. Appx32510 (Table IV-9). The Commission's inventory data also reflected the increases in inventories reported by individual importers. Appx539 (n.299).

The Commission focused on the two factors in the statute for its analysis of whether the remedial effect of the antidumping duty order on raw honey from Vietnam would be seriously undermined. *See* 19 U.S.C. § 1673d(b)(4)(A)(ii).

*Factor 1: "{T}he timing and the volume of the imports"*

In assessing the "timing and volume" of imports subject to Commerce's affirmative critical circumstances determination, the Commission followed its typical approach of comparing the volume of imports subject to Commerce's determination over the six months prior to the filing of the petition with the volume of imports over the six months after the filing of the petition. *See* Appx534 (Commission Views, discussing Commission's choice of periods). The Commission found that both the timing and volume of the subject imports from Vietnam supported a finding that the remedial effect of the antidumping duty order would be seriously undermined. Appx540.

First, in findings uncontested by Appellants, the Commission found that there was a rapid increase in subject imports from Vietnam in unprecedented

monthly volumes that were large relative to apparent U.S. consumption. Appx538.

Subject imports from Vietnam increased 83.2 percent — from 48.0 million pounds

in the pre-petition period to 87.9 million pounds in the post-petition period. The

imports in the post-petition period were equivalent to 19.1 percent of apparent U.S.

consumption in interim 2021 (January 2021 - September 2021). Appx537-538. As

the Commission explained, "subject imports from Vietnam increased rapidly in

each of the first four months of the post-petition period, reversing a downward

trend from December 2020 to April 2021." Appx538. The Commission found that

the timing of the subject imports from Vietnam in the post-petition period was

important as it showed importers were likely attempting to avoid provisional

duties. Appx540.

Moreover, the rapid increase in subject imports from Vietnam occurred

during the first four months of the post-petition period, which preceded the

retroactive liability period under the critical circumstances provision (*i.e.,* 90 days

prior to the date of publication of Commerce's preliminary antidumping

determination on November 23, 2021, which is August 25, 2021). After August

2021, when retroactive duties could apply, subject imports from Vietnam stopped

increasing. *See* Appx32509-32510 (Table IV-8 & Fig. IV-3). The Commission

found a "deliberate effort to enter product into the U.S. market in substantial and

increasing volumes while evading potential exposure to the retroactive application of antidumping duties." Appx540.

*Factor 2: "{A} rapid increase in inventories of the imports"*

The Commission explained that it was unlikely that the surge in subject imports from Vietnam prior to import relief was needed to serve demand. The import surge resulted in inventories nearly tripling. Several importers increased their inventories of subject imports from Vietnam from April 2021 to October 2021 before provisional duties came into effect in November 2021. Appx539 (n.299). Although apparent consumption was 15.2 percent higher in interim 2021 compared to interim 2020, importers' shipments of subject imports from Vietnam were only 2.8 percent higher. Appx540. The small increase in importers' shipments of raw honey from Vietnam indicated that subject imports from Vietnam increased so they could evade antidumping duties and be inventoried for later use, rather than serve current demand. Appx540. The Commission found that the "rapid and substantial increase in inventories of subject imports from Vietnam provides further evidence that importers were stockpiling subject imports rather than just responding to U.S. market conditions." Appx541.

Thus, the Commission found that the two factors specified in the statute — the timing and the volume of the imports and the rapid increase in inventories of the imports — supported its critical circumstances determination. Appx540-541.

Further, responding to arguments concerning sold-off inventories in 2022, the Commission stated:

> Respondents argue that importers have now sold off much of their inventory, but regardless of where the imported honey is in the supply chain, the volume associated with these inventories is large and increased substantially in the post-petition period and is likely to place downward pressure on prices until it is consumed by end users, particularly given the continued underselling by subject imports from Vietnam at wide margins.

Appx541. The Commission also noted that demand for honey for use in food products is relatively inelastic, making it even more unlikely the increased imports and inventories of honey would be immediately consumed no matter how low the raw honey was priced. Appx541 (n.305). Rather, it was likely that the raw honey would remain in the supply chain because the record showed it was likely not for immediate consumption. Appx540-541; Appx541 (n.305). The supply chain could include importers, packers, or end users. Thus, contrary to Appellants' claim, Br. at 41-42, the Commission never made a finding concerning end user stockpiling of inventories because there were no end user inventory data. Instead, the Commission found that it did not matter where the raw honey was in the supply chain if it had not yet been consumed. Appx541 (n.305).

*Other Factors the Commission Found Relevant*

In addition to the timing and volume of the imports and the rapid increase in inventories of the imports, the statute provides that the Commission may consider

"other factors it believes to be relevant" to whether the remedial effect of the order will be undermined. 19 U.S.C. § 1673d(b)(4)(A)(ii). The Commission accordingly emphasized additional factors it found supported its finding that the antidumping duty order would be seriously undermined.

The Commission found that "prices for the domestic like product and subject imports increased in interim 2021 in response to general knowledge of the imminent filing of the petition and the pendency of the investigations." Appx539. Unlike subject imports from Argentina however, subject imports from Vietnam continued to undersell the domestic like product by wide margins during the second and third quarters of 2021. Appx539.

The Commission further found that the domestic industry's condition remained weak in interim 2021. Appx542. It continued to report losses even with higher prices in interim 2021, and its operating expenses-to-net sales ratio remained over 100 percent. Appx542. It reported declining shipments and market share. Appx542.

The poor condition of the industry and the continued underselling by subject imports from Vietnam further indicated that the relief provided by the antidumping duty order was likely to be undermined by the large volumes of subject imports from Vietnam that remained in inventory and were underselling the domestic product despite the pendency of the investigations. Appx542.

The affirmative findings of critical circumstances by Commerce and the Commission meant that duties on raw honey from Vietnam would be made retroactive by 90 days. Rather than applying to entries of raw honey from Vietnam on or after November 23, 2021, duties were payable on entries on or after August 25, 2021. *See* 87 Fed. Reg. 35,501, 35,502 (June 10, 2022) (final antidumping duty orders, describing the history of the investigation).

The Commission also conducted a critical circumstances examination for imports from Argentina, using data from the same period that it used for the evaluation of subject imports from Vietnam. Appx32507-32508. The Commission found that the imports from Argentina subject to Commerce's affirmative critical circumstances determination would not seriously undermine the remedial effect of the antidumping duty order with respect to raw honey from that country. Appx535-537.

## IV. The Lower Court's Decision

Appellants filed a motion for judgment on the agency record in the lower court, challenging only the Commission's critical circumstances determination on imports from Vietnam. *Sweet Harvest Foods et al. v. United States*, Consol. Court No. 22-00188 (Ct. Int'l Trade Nov. 17, 2023 ). Judge Leo M. Gordon denied the motion and affirmed the Commission's challenged determination.

The lower court affirmed the Commission on the same issues Appellants raise in this appeal. The court rejected plaintiffs' argument that the statute requires the Commission to consider end-of-investigation inventory levels, well after the effective date of the order. It found plaintiffs' arguments "confusing" as they argued that the statute was both plain on its face and also did not specify a time for the Commission to assess the increase in inventories. Appx009.

Judge Gordon also considered and rejected the argument that the forward-looking or prospective nature of the statute "logically" requires the Commission to gather and give dispositive weight to inventory levels at the end of the investigation. Appx013. Judge Gordon found that plaintiffs' "focus on the absence of the term 'provisional measures,' as well as the forward-looking nature of the phrase 'order to be issued,' is misplaced in light of the full context of § 1673d(b)(4)(A)." Appx013.

The lower court also agreed with the Commission that the "remedial effect" of the order begins at suspension of liquidation, when duties are first imposed, rather than when the order is issued, as argued by plaintiffs. Appx012-013. The lower court then rejected the claim that the Commission should have only considered imports entering during the 90 days prior to suspension of liquidation. Appx013-015.

The lower court agreed with the Commission that the issue, as properly analyzed, was whether the subject imports entering during the period after the filing of the petition and prior to suspension of liquidation were likely to seriously undermine the remedial effect of the antidumping order. Appx014-015. The court explained that this was logical, as opposed to plaintiffs' contention that the Commission should have considered whether the remedial effect of the order would be seriously undermined only without the retroactive application of duties for 90 days. Appx014-015. Further, the court rejected plaintiffs' alternative argument that the statute requires the Commission to evaluate both historical data on import levels and contemporaneous data on inventory levels, and that the Commission failed to do the latter. Appx015-016.[6]

The lower court also addressed challenges to the evidence supporting the Commission's determination, while noting that plaintiffs agreed with the Commission's findings concerning the large increase in imports and did not challenge the Commission's methodology. Appx016. The court found the "data

_____

[6] In rejecting plaintiffs' statutory claim, the lower court cited to *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842-845 (1984). *See* Appx007-008; Appx016. As explained, *infra,* the Commission's and the lower court's analysis and interpretation of the statute is equally correct under *Loper Bright Enterprises v. Raimondo,* 603 U.S. ___, 144 S. Ct. 2244 (June 28, 2024), *available at* 2024 WL 3208360, and *Skidmore v. Swift & Co.,* 323 U.S. 134 (1944).

17

available on the record did not support Plaintiffs' assertions" that importers had sold off most of their inventories. Appx021. The court also rejected claims that the Commission should have collected later importer inventory data or end user inventory data. The court found that plaintiffs' argument was undercut by their failure to request collection of these data from importers and end users. Appx023. Plaintiffs also had stated at oral argument that they were no longer pressing their data collection arguments and that their argument was that the Commission failed to consider evidence on the record. Appx023 (n.5).

The court next rejected plaintiffs' argument that there were shortages of domestic honey that should have been considered by the Commission. Appx025. The court agreed with the Commission that there was no evidence of such shortages. Appx025-026. The court also agreed with the Commission that plaintiffs' argument concerning a lack of substitutability between domestic honey and subject imports from Vietnam was meritless. Appx027-028.

The court addressed a claim that the Commission had not conducted a forward-looking analysis as it had done in a previous critical circumstances case affirmed by the CIT in *MTD Products, Inc. v. United States*, Ct. No. 21-264, 2023 WL 2535885 (Ct. Int'l Trade Mar. 16, 2023). Appx030. It rejected claims based on Commissioner Johanson's dissent, and it agreed with the court in *MTD Products* that a dissenting opinion does not undermine the findings of the majority

because both can be supported by substantial evidence. Appx031-032. The court accordingly denied plaintiffs' motions for judgment on the agency record and affirmed the Commission's critical circumstances determination.

## SUMMARY OF THE ARGUMENT

The statute specifies two statutory factors for the Commission to consider, and Appellants do not challenge the Commission's factual findings with respect to either factor. Appellants do not dispute the Commission's finding that "the timing and the volume of the imports" support the Commission's critical circumstances determination, and they do not deny that there was "a rapid increase in inventories of the imports" from Vietnam prior to suspension of liquidation. Congress also provided the Commission with the authority to identify other factors "it considers relevant" to its analysis, and Appellants do not challenge the Commission's analysis of other factors it considered in its analysis critical circumstances.

The Commission followed the specific requirements of the statute and first considered "the timing and volume of the imports" of raw honey from Vietnam subject to Commerce's critical circumstances finding. The Commission found that the volume of subject imports from Vietnam in the post-petition period increased rapidly and was substantial relative to apparent U.S. consumption. Appx539-541. The timing and volume of the imports reflected an effort to evade the relief provided by the November provisional antidumping measures, as well as to assure

19

entry of the imports prior to the August date on which retroactive measures could potentially be applied. Appx540.

The Commission also found that the second statutory factor, the "rapid increase in inventories of the imports," supported an affirmative finding of critical circumstances. Inventories of subject imports from Vietnam almost tripled during post-petition period (April 30, 2021- October 31, 2021) and were not explained by consumption patterns. Appx538, Appx541. The uncontested record evidence showing a rapid increase in inventories stockpiled before provisional duties constitutes substantial evidence supporting the Commission's finding concerning the second statutory factor. The Commission concluded that "{t}he rapid and substantial increase in inventories of subject imports from Vietnam provides further evidence that importers were stockpiling subject imports rather than just responding to U.S. market conditions." Appx541.

Appellants claim that the statute specifically directs the Commission to consider inventory levels at the end of the period of investigation. But the critical circumstances statute, while requiring consideration of rapid increases in inventories during the pre-suspension period, does not mention static inventory levels, remaining inventories, or declining inventories. Rather, the statute indicates the Commission is to consider "a rapid increase in inventories of the imports"

subject to Commerce's critical circumstances determination. 19 U.S.C.

§ 1673d(b)(4)(A)(ii)(II)

Such a rapid increase in inventories would occur prior to suspension of liquidation when imports subject to Commerce's critical circumstances determination were entering. As imports subject to Commerce's critical circumstances determination only enter prior to suspension of liquidation, inventory levels of those imports after suspension of liquidation will necessarily be declining rather than increasing.

Thus, prior to suspension of liquidation must be the time for the Commission to consider the increase in inventories. This conclusion is also consistent with the authoritative SAA's focus on increasing imports prior to suspension of liquidation. Appellants' claim the statute requires consideration of inventories much later —when they would not be increasing — is therefore contradicted by, and contrary to, the statute's explicit reference to increasing inventories.

Appellants maintain that the antidumping order's effective date is upon publication, but as the lower court properly observed, this is contrary to the terms of the order itself and the SAA which indicates that the effective date of the order is at suspension of liquidation. The critical circumstances statute also references the specific statutory provision, 19 U.S.C. § 1673e, which makes duties effective

as of suspension of liquidation.  It imposes duties on entries whose liquidation has been suspended when the Commission makes a present material injury determination.

Therefore, as provided for in the statute and SAA, the Commission focused on imports and the increase in inventories before suspension of liquidation and the start of collection of duties in November 2021.  Accordingly, the Commission obtained and relied on inventory data from April 2021 to October 2021, to assess how quickly inventories had increased before suspension of liquidation and when provisional duties began to be collected.  Responding to arguments below, the lower court also correctly confirmed that the period prior to the effective date of relief was the appropriate focus of the Commission's analysis of the increase in inventories of the imports subject to Commerce's finding of critical circumstances.

None of Appellants' current claims bear upon the Commission's findings concerning statutory factors.  Instead, Appellants argue that the Commission should have given dispositive weight to later declining inventory levels — a consideration not mentioned in the statute.  They claim that the Commission disregarded evidence that importers' inventories were sold off after liquidation was suspended and duties began to be collected.

Notwithstanding Appellants' claims to the contrary, the Commission addressed this argument and its reasons for not placing more weight on evidence of

declining importers' inventories.  The Commission explained that the stockpiled imports were not for immediate consumption, likely still in the supply chain, and would place downward pressure on prices until consumed by end users.

Appellants also seek to revive their argument, abandoned below, that the Commission should have collected additional data to track end users' inventories long after the period of investigation ended in September 2021.  This argument should be rejected because, as the lower court found, Appellants failed to avail themselves of the opportunity to request collection of these data when they commented on the Commission's questionnaires, or at any other time during the Commission's investigations.  The lower court also found that Appellants were no longer pursuing their data collection arguments.

## ARGUMENT

## I.  Standard of Review

This Court applies the same standard of review as the Court of International Trade, which means that this Court again assesses whether the Commission's determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. §§ 1516a(b)(1)(B)(i), (a)(2)(B)(i).[7]

---

[7] The Commission's determinations are presumed to be correct, and the burden is on the party challenging a determination to demonstrate otherwise. 28 U.S.C. § 2639(a)(1).

Although this Court performs anew the lower court's review on appeal, this Court has stated that it will give "great weight to 'the informed opinion of the Court of International Trade.'" *Cleo, Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (quoting *Nippon Steel Corp. v. United States,* 458 F.3d 1345, 1351 (Fed. Cir. 2006)); *Kyocera Solar, Inc. v. United States*, 844 F.3d 1334, 1338 (Fed. Cir. 2016); *see also Taiwan Semiconductors Indus. Ass'n v. Int'l Trade Comm'n*, 266 F.3d 1339, 1343-44 (Fed. Cir. 2001) ("{T}his court will not ignore the informed opinion of the {CIT} in performing its review. That court reviewed the record in considerable detail. Its opinion deserves due respect.") (citations omitted).

Appellants claim that the Commission misconstrued the statute insofar as it declined to consider data concerning end-of-investigation levels of inventories of the critical circumstances entries. *See, e.g.,* Br. at 18-19. While the lower court rejected Appellants' statutory interpretation under *Chevron*, consideration of this question under any standard leads to the same result, *viz.*, that the statute authorized the challenged Commission action. *See Loper Bright Enters. v. Raimondo*, 603 U.S. ___, 144 S. Ct. 2244, 2269 (June 28, 2024), *available at* 2024 WL 3208360, at *19 (Slip Op. at 29) (describing "the question that matters" as "Does the statute authorize the challenged agency action?"). As set forth in the argument section of this brief, the interpretation of the Commission (and the CIT), based on its specialized experience, evinced thorough consideration and valid

reasoning, was consistent with the agency's approach in other investigations, and is at the minimum persuasive. *See Skidmore v. Swift & Co.,* 323 U.S. 134, 139-40 (1944). Furthermore, in assessing the correct interpretation of this statute, the Court has the benefit of the SAA, which provides an authoritative interpretation of the URAA provisions amended or added in the URAA, including the one at issue here (which was amended by the URAA). *See* SAA at 103-104, 106-107 (reciting amendments).

While Appellants do not challenge the Commission's methodology with respect to the import surge (*see* Appx016) and concede many of the specific factual findings pertaining to statutory factors, they do challenge certain other factual findings. *See, e.g.,* Br. at 34-44. Under the substantial evidence standard, this Court will affirm the Commission's determination if it is supported by the record as a whole, even if some evidence detracts from the Commission's conclusion. *Hitachi Metals, Ltd. v. United States,* 949 F.3d 710, 716 (Fed. Cir. 2020); *see also Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562-64 (Fed. Cir. 1984). "It is the Commission's task to evaluate the evidence it collects during its investigation" and "{c}ertain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process." *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996). If "the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the

expert factfinder – here the majority of the Presidentially-appointed, Senate-approved Commissioners – to decide which side's evidence to believe." *Nippon Steel*, 458 F.3d at 1359.

Because the Commission "is presumed to have considered all of the evidence on the record," it is "not required to explicitly address every piece of evidence presented by the parties" during an investigation. *Nucor Corp. v. United States,* 318 F. Supp. 2d 1207, 1247 (Ct. Int'l Trade 2004). Instead, the Commission need only address the "issues material to {its} determination" so that the "'path of the agency may reasonably be discerned.'" *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1354 (Fed. Cir. 2005) (quoting SAA at 892).

## II. The Commission Considered the Correct Imports and Inventories Subject to Commerce's Final Determination of Critical Circumstances

### A. The Statute and SAA Provide for Commerce and the Commission to Consider Imports that Entered the United States After the Filing of the Petition but Prior to Provisional Relief

The statute states that "the final determination of the Commission shall include a finding as to whether *the imports subject to the affirmative determination under subsection (a)(3)* are likely to undermine seriously the remedial effect of the antidumping duty order to be issued under section 1673e of this title." 19 U.S.C. § 1673d(b)(4)(A)(i) (emphasis added).

Commerce makes its determination of critical circumstances under subsection (a)(3) of the statute with respect to imports in the post-petition period

prior to suspension of liquidation. As the SAA explains, Commerce examines whether "there have been massive imports of the subject merchandise over a relatively short period of time (*i.e.,* a surge of imports) prior to the suspension of liquidation." SAA at 876. This is what Commerce did in its investigation of raw honey from Vietnam when it examined imports during a post-petition period that ended in November 2021. *See* 87 Fed. Reg. at 2,129 (preliminary determination of critical circumstances for Vietnam); 87 Fed. Reg. at 22,185 (Appx37009) (final determination of critical circumstances).

The statute further indicates that imports subject to Commerce's determination are to be considered by the Commission in assessing the volume of imports and the increase in inventories. The Commission is to evaluate "the timing and volume of *the imports*" and the "rapid increase in inventories of *the imports*{.}" 19 U.S.C. § 1673d(b)(4)(A)(ii)(I) and (II) (emphases added).

The statute's specific reference to the "increase in inventories of the imports" indicates the Commission is to evaluate the increase prior to suspension of liquidation. Although inventories could increase after suspension of liquidation, such an increase in inventories would not be of imports subject to Commerce's affirmative critical circumstances determination.

Like the statute, the SAA makes clear that the Commission evaluates whether there has been a "surge in imports prior to suspension of liquidation."

SAA at 877. This is the same period in which Commerce determines whether there were "massive imports of the subject merchandise over a relatively short period." 19 U.S.C. § 1673d(a)(3)(B). *See* SAA at 876 ("Commerce determines {whether} there have been massive imports of the subject merchandise over a relatively short period of time (*i.e.,* a surge of imports) *prior* to the suspension of liquidation{.}") (emphasis added).

The Commission therefore makes its findings concerning imports and the increase in inventories in the post-petition period prior to suspension of liquidation and imposition of provisional duties. These imports coincide with the period for which Commerce makes its finding of critical circumstances. The Commission does not consider imports during later months when entries were not subject to Commerce's finding of critical circumstances but would be subject to antidumping duties.

**B.      The Statute Unambiguously Indicates that the Commission Shall Consider the Rapid Increase in Inventories Prior to Suspension of Liquidation when Inventories Would Be Increasing**

Despite arguing that the "plain language" of the statute means the Commission must assess inventory levels before the order is issued, Appellants also claim the "inventory provision . . . may not explicitly state the timeframe," Br. at 29, or "**when** the increase should be evaluated." Br. at 31 (emphasis original); *see also* Br. at 18.

Appellants are mistaken. There is no ambiguity concerning when the increase should be evaluated. The imports considered by Commerce and the Commission only enter after the filing of the petition and prior to suspension of liquidation, so this is the only period in which "a rapid increase in inventories of the imports" subject to Commerce's critical circumstances determination could occur. An increase in inventories of the imports subject to Commerce's critical circumstances determination would not feasibly occur months after the imports stopped entering the United States.

Thus, the statutory provision by definition applies to a timeframe when inventories could be rapidly increasing as a result of imports subject to Commerce's critical circumstances determination entering the United States. The Commission must analyze the increase in inventories after the filing of the petition and prior to suspension of liquidation because this is when imports subject to Commerce's critical circumstances determination enter the United States. This should be the end of the analysis concerning when the Commission should analyze "a rapid increase in inventories of the imports" subject to Commerce's critical circumstances determination. 19 U.S.C. § 1673d(b)(4)(A)(ii)(II).

Appellants argue the Commission must assess the increase "right before the order" is issued. Br. at 19. This is several months after imports subject to Commerce's critical circumstances determination entered the United States,

however, and inventories would not be increasing at that time. Appellants'
interpretation would nullify the express statutory direction to examine, among
other factors, any rapid increase in inventories of the {critical circumstances}
imports in order to aid the Commission in finding whether those imports "are
likely to undermine seriously the remedial effect" of the order. 19 U.S.C. §
1673d(b)(4)(A)(i). The Commission logically needs to examine the inventory
levels prior to imposition of provisional duties in order to assess whether there was
an inventory stockpile that could undermine relief.

Appellants' proposed interpretation of the statute would lead to an
incongruous result that would render the rapidly-increasing inventory provision
meaningless. Under Appellants' interpretation requiring assessment of the rapid
increase in inventories months after the imports in question stopped entering,
inventories inevitably would never be increasing, and the consideration of whether
imports rapidly increased would become a nullity. Under the "most basic
interpretative canons . . . '{a} statute should be construed so that effect is given to
all its provisions, so that no part will be inoperative or superfluous, void or
insignificant.'" *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs
v. Winn*, 542 U.S. 88, 101 (2004)). *See also Splane v. West*, 216 F.3d 1058, 1068-
69 (Fed. Cir. 2000) ("{C}anons of construction {} require us to give effect to the
clear language of a statute and avoid rendering any portions meaningless or

superfluous.").  Appellants' statutory construction requiring the Commission to assess the rapid increase in inventories before the order is published would similarly rob the increasing inventories provision of any meaning.

### C. The Lower Court Correctly Relied on the SAA in Rejecting Appellants' Interpretation of the Statute Requiring Later Inventory Data

Relying on the SAA and the statute, the lower court found that the Commission's focus on "imports and inventories in the post-petition period prior to suspension of liquidation{,} makes sense given that the statute directs Commerce to focus its critical circumstances analysis on the same time period."  Appx017 (quotation omitted).  The court agreed with the Commission that it must therefore evaluate the increase in inventories of the imports subject to Commerce's determination and not how they are sold or their remaining level.  Appx018 (quoting Commission's Brief at 28).

Moreover, the lower court did not simply defer to the Commission's reasonable interpretation of the statute.  It found that "{p}laintiffs' arguments do not demonstrate how Congress has spoken directly, nor how the plain language of § 1673d(b)(4)(A) compels their desired outcome."  Appx010.  It also found that plaintiffs had not supported their statutory interpretation with legislative history or other sources. Appx016-017.

Appellants dismiss the lower court's discussion of the SAA as "irrelevant" to interpreting the inventories provision because the SAA only concerns the import surge. Br. at 29. This Court has previously recognized, however, that the SAA expresses the intent of Congress. "The SAA, of course, is more than mere legislative history." *SKF USA, INC. v. United States*, 263 F.3d 1369, 1373 n.3 (Fed. Cir. 2001). As noted, Congress has indicated:

> The statement of administrative action approved by the Congress under {19 U.S.C. § 3511(a)} shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.

*Id.* (quoting 19 U.S.C. § 3512(d)). Accordingly, reliance on the SAA is entirely proper, if not mandatory in interpreting the critical circumstances statute, and Appellants' failure to address the SAA or the lower court's analysis is telling.

### D.    Assessment of the Increase in Inventories Prior to Suspension of Liquidation Is Consistent with the Statutory Scheme of Deterring a Surge in Imports Prior to Suspension of Liquidation

This Court explained in *ICC Industries* that the critical circumstances provision is designed "to deter exporters whose merchandise is subject to an investigation from circumventing the intent of the law by increasing their exports to the United States during the period between initiation of an investigation and a preliminary determination by {Commerce}." *ICC Indus.*, 812 F.2d at 700 (quoting

H.R. Rep. 96-317at 63 (1979)), *aff'g*, 632 F. Supp. 36 (Ct. Int'l Trade 1986).

Similarly, the Court of International Trade observed that the provision's "purpose is to prevent clever importers from circumventing impending antidumping and countervailing duties by rushing in their shipments before the duties take effect." *MTD Prods.,* 2023 WL 2535885, at *1 (citing H.R. Rep. 96–317, at 63).

In order to prevent importers from building up inventories prior to duties, the statutory provisions for Commerce and the Commission focus on the period between the filing of the petition and suspension of liquidation when provisional duties are imposed. SAA at 876-77. Accordingly, both agencies assess whether there has been a surge in subject imports, and the Commission considers whether there was a rapid increase in inventories of the imports during the period. A large enough volume of the imports and increase in inventories can indicate that relief will be undermined. *Id.*

Appellants argue that a rapid increase in inventories during the period prior to suspension of liquidation should be ignored if importers have sold off their inventories prior to the issuance of the order. Br. at 24. Appellants' reading of the provision would undermine the purpose of the statutory scheme because it would enable importers to import massive amounts of product so long as they could sell it downstream prior to the issuance of the order. Such a rule could encourage, rather than deter, imports prior to suspension of liquidation because it would be a green

light to importers that they would not face the possibility of retroactive duties if they sold off their inventories before the order is issued.

Appellants' arguments that later inventory data are needed and that the Commission should only consider imports during a 90-day period to determine whether retroactive relief is warranted are also contradicted by the SAA. The SAA states "that the Commission is to determine whether the surge in imports prior to the suspension of liquidation, rather than the failure to provide retroactive relief, is likely to seriously undermine the remedial effect of the order." SAA at 877. In sum, Appellants' proposed reading of the critical circumstances provision is contrary to the SAA and would undermine the provision's purpose of deterring a surge in imports prior to suspension of liquidation and imposition of duties.

### E. Appellants Wrongly Claim the Commission Should Have Only Considered Imports and Inventories During a 90-Day Period

Appellants state that they have not appealed the Commission's findings concerning the timing and volume of the imports. *See* Br. at 29. Notwithstanding their apparent acknowledgement that the Commission considered imports during the proper timeframe, Appellants incorrectly state that only 90 days of imports subject to retroactive suspension of liquidation should be considered by the Commission in its analysis of critical circumstances. They do so throughout their brief, including in their legal standard section and statement of the issues. *See, e.g.,* Br. at 15 (The Commission must determine whether "the specific entries from

that 90-day period are 'likely to undermine seriously' the antidumping duty order."); *Id. at* 36 ("{T}he relevant imports (those entering 90 days before the suspension of liquidation)" must undermine the remedial effect of the order); *Id.* at 40 ("{T}he imported honey in question {is} the honey entering 90 days prior to the publication of Commerce's preliminary determination").  The lower court addressed Appellants' fundamental error, yet they misconstrue the relevant provisions applicable to Commerce and the Commission and ignore the lower court's discussion of the issue.[8]  *See* Appx013-015.

A review of the statutory provisions indicates that Commerce's and the Commission's consideration of the volume of imports is not limited to 90 days. The critical circumstances provision instructs the Commission to consider the timing and volume of imports and the rapid increase in inventories of the imports that are subject to Commerce's critical circumstances finding.  "{T}he final determination of the Commission shall include a finding as to whether *the imports subject to the affirmative determination under subsection (a)(3)* are likely to undermine seriously the remedial effect of the antidumping duty order to be issued

---

[8] Although plaintiffs raised the 90-day issue below, they did not challenge the Commission's analysis of the import surge.  *See* Appx016 ("Notably, Plaintiffs do not dispute that there was a substantial increase in the 'timing and volume of the imports' relevant to the ITC's critical circumstances analysis under § 1673d(b)(4)(A)(ii)(I).").

under section 1673e of this title." 19 U.S.C. § 1673d(b)(4)(A)(i) (emphasis added).

Subsection (a)(3) sets forth criteria for Commerce's critical circumstances determinations. *See* 19 U.S.C. § 1673d(a)(3). It provides for Commerce to assess whether "there have been massive imports of the subject merchandise over a relatively short period." 19 U.S.C. § 1673d(a)(3)(B). Commerce considers imports in the post-petition period prior to suspension of liquidation. *See* 87 Fed. Reg. at 2,129-30 (preliminary determination of critical circumstances for Vietnam) ("Commerce has previously considered a 'relatively short period' beginning with the filing of the petition and ending with the preliminary determination."); 87 Fed. Reg. at 22,185 (Appx37008-37009) (final determination of critical circumstances). In this case, the post-petition period started in April 2021 with the filing of the petition and ran until suspension of liquidation in November 2021. *See* 87 Fed. Reg. at 2,129-30.

The SAA also indicates that the Commission and Commerce consider subject imports in the post-petition period prior to suspension of liquidation rather than the 90 days of imports Appellants contend are at issue. It states that the "Commission is to determine whether the surge in imports prior to the suspension of liquidation, rather than the failure to provide retroactive relief, is likely to seriously undermine the remedial effect of the order." SAA at 877. The issue for

36

the Commission was, as it properly analyzed, whether the subject imports entering during the period after the filing of the petition and prior to suspension of liquidation were likely to seriously undermine the remedial effect of the antidumping duty order. The issue was not, as Appellants suggest, whether an extra 90 days of duties were needed to prevent the remedial effect of the order from being undermined.

## III. Appellants' Arguments for Inventory Level Data Rewrite the Statute and Wrongly Assume the Remedial Effect of an Order Begins upon Publication

### A. Appellants' Inventory Levels Argument Rewrites the Statute

In their "Legal Standard" and elsewhere, Appellants mischaracterize the inventory provision. Appellants claim that the statute "specifically directs that the Commission evaluate the level of the critical circumstances inventories{,}" that "inventory levels" is a "statutorily required factor{,}" and that "the statute states that the Commission 'shall consider' inventory levels." Br. at 15, 18, 20. Appellants even criticize the lower court's finding that the Commission should consider the increase in inventories because "{t}he statute also requires, however, that the Commission evaluate *the level* of inventories, in recognition that *the level* of inventories will determine whether any large increase in imports will have an effect after the order is issued." Br. at 29-30 (emphasis added).

The statute does not say what Appellants claim it does. The statute nowhere tells the Commission to evaluate the "level of inventories." The statute indicates the Commission is to consider "the timing and the volume of the imports" and "a rapid increase in inventories of the imports." 19 U.S.C. § 1673d(b)(4)(A)(ii). A "rapid increase in inventories" is not the same as "inventory levels," or "remaining inventories."

The distinction between a "rapid increase in inventories" and inventory levels is important.[9] First, the statute specifically indicates that the Commission should evaluate the inventories at a time when they could be increasing, which is prior to suspension of liquidation — not later when the imports entering are no longer subject to Commerce's critical circumstances determination and are subject to provisional duties. Thus, Appellants are mistaken that "the inventory provision does not state **when** the increase should be evaluated." Br. at 31(emphasis original).

Second, the term "rapid increase" suggest the Commission is to assess the speed of the increase in inventories of the imports to see if it qualifies as "rapid."

---

[9] In contrast to the critical circumstances provision, the provision applicable to the Commission's threat of material injury determinations simply indicates that the Commission is to consider "inventories of the subject merchandise" rather than the increase in inventories. 19 U.S.C. § 1677(7)(F)(i)(V).

If inventories are increasing rapidly, this indicates that the imports are not for immediate consumption, are being stockpiled before the effective date of relief, and are aimed at supplying the market during the period of relief, potentially undermining that relief. The Commission in this case specifically found that "{t}he rapid and substantial increase in inventories of subject imports from Vietnam provides further evidence that importers were stockpiling subject imports rather than just responding to U.S. market conditions." Appx541.

Therefore, contrary to Appellants' claims, the statute does not compel the Commission to evaluate the remaining level of inventories before Commerce issues the antidumping duty order. In this case for instance, liquidation was suspended in November 2021, but the antidumping duty order was not published until June 2022. 86 Fed. Reg. at 66,526 (Appx37011); 87 Fed. Reg. at 35,501.

The Commission can consider declining inventories because the Commission is to "consider other factors it considers relevant," 19 U.S.C. § 1673d(b)(4)(A)(ii), but the statute does not compel the Commission to find later inventory levels — which would be declining and not increasing — a relevant factor. It is for the Commission to decide what factors it considers relevant and not Appellants.

**B. Appellants Wrongly Assume the Remedial Effect of the Antidumping Duty Order Begins When the Order is Issued**

Underlying Appellants' argument for later inventory data is their mistaken premise that the antidumping duty order was not effective until issued. Appellants contend that the "remedial effect" of the order, the term used in the critical circumstances provision, only begins upon publication of the order. Br. at 32-33. Their position is contradicted by the statute, the antidumping duty order itself, and the SAA. All three indicate that the remedial effect of the order begins at the time of suspension of liquidation when the order is, by its own terms, effective.

First, because remedial relief begins at suspension of liquidation and the cash deposit requirements imposed at that time, the whole statutory scheme provides for Commerce and the Commission to analyze imports between the filing of the petition and the suspension of liquidation. Commerce considers the surge in the imports prior to suspension of liquidation, and the Commission in turn considers the timing and volume of those imports and the increase in inventories prior to suspension of liquidation – not later imports or remaining inventories after duties begin to be collected.

Appellants' argument ignores the reality of several months of actual relief by the time the order is published. The antidumping duty orders also clearly state that duties will be collected on entries for which liquidation was suspended on or after November 23, 2021, except for duties on raw honey from Vietnam which were

40

made retroactive by 90 days from November 23, 2021 to August 25, 2021. 87 Fed. Reg. at 35,502.[10] Cash deposits under the provisional measures period had already been collected for several months by the time the antidumping duty order was finally issued (November 23, 2021—June 10, 2022).[11] When duties begin to be collected is therefore the time that the order would normally begin having a "remedial effect"— the term used in the statute.

Further, the SAA confirms that the *effective date* of the antidumping duty order, rather than its issuance date as Appellants contend, is the proper time for the Commission's analysis. "Critical circumstances determinations focus on whether an order's effectiveness is undermined by increasing shipments prior to the *effective date of the order*." SAA at 877 (emphasis added). Similarly, the SAA states that the Commission is required to determine "whether, by massively increasing imports prior to the *effective date of relief*, the importers have seriously

---

[10] The antidumping duty orders state that for entries of raw honey from Argentina, Brazil, and India, the orders are effective as of November 23, 2021, the date of publication of the preliminary determinations in the Federal Register. For raw honey from Vietnam, "antidumping duties will be assessed on unliquidated entries of raw honey from Vietnam entered, or withdrawn from warehouse, for consumption, on or after August 25, 2021, which is 90 days prior to the date of publication of the Vietnam Preliminary Determination." 87 Fed. Reg. at 35,502.

[11] As noted, in February 2022, Commerce ordered additional cash deposits covering the 90-day period prior to November 23, 2021. *See* 87 Fed. Reg. at 7,800 (correcting notice of January 13, 2022, that omitted cash deposit requirement).

undermined the *remedial effect* of the order." *See Id.* (emphasis added). Likewise, the SAA indicates that the Commission is to focus on the "surge in imports prior to the suspension of liquidation" in determining whether the relief will be undermined. *See Id.* The SAA's reference to "massively increasing imports prior to the effective date of relief" also parallels its discussion of Commerce's examination of "massive imports" prior to suspension of liquidation. *Id.* at 876-77. These descriptions of the time for the Commission's analysis of imports indicate that the effective date of the antidumping order means when duties were first collected at suspension of liquidation. Accordingly, this is when the order would be expected to begin having the "remedial effect" referenced in the statute.

Appellants contend that Congress did not make clear in the critical circumstances statute that it intended to encompass any period of relief before the issuance of the antidumping duty order. Br. at 32. This is not true. The critical circumstances provision specifically refers to 19 U.S.C. § 1673e, the statutory provision that makes entries for which liquidation has been suspended subject to antidumping duties.

In particular, the critical circumstances provision refers to the "antidumping duty order to be issued *under section 1673e of this title*." 19 U.S.C. § 1673d(b)(4)(A)(i) (emphasis added). Section 1673e describes in detail how and when antidumping duties are imposed. The "General Rule" set forth in 19 U.S.C.

§ 1673e(b)(1) imposes duties as of suspension of liquidation. It indicates that

entries whose liquidation has been suspended shall be subject to assessment of

antidumping duties when, as in this case, the Commission has made a material

injury determination.[12] Given the specific reference to section 1673e that makes

entries whose liquidation has been suspended subject to assessment of antidumping

duties, Appellants' argument that the statute does not mention provisional

measures is beside the point.[13] Br. at 32.

The SAA's description of U.S. law also confirms that the order is effective

as of suspension of liquidation when the Commission finds present material injury.

"First, as under current U.S. law, national authorities may apply definitive

antidumping duties from the date of application of provisional measures if the final

injury determination is based on present material injury." SAA at 816. The SAA

further explains "that national authorities may apply final antidumping duties up to

---

[12] When the Commission makes a threat of material injury determination, duties are imposed as of the date of publication of the Commission's final determination under the "Special Rule." 19 U.S.C. § 1673e(b)(2). The Commission does not make a critical circumstances determination under such circumstances because duties cannot be applied retroactively.

[13] Section 1673e also specifically distinguishes between "Publication of antidumping duty order" in 19 U.S.C § 1673e(a) and "Imposition of duty" in 19 U.S.C §1673e(b). This further reinforces the distinction between the time duties are effective and the publication date of the order.

ninety days prior to the application of provisional measures if the authorities determine that 'critical circumstances' exist." *Id.* Therefore, contrary to Appellants' argument that Congress needed to use the term "provisional measures" in the critical circumstances provision, Congress specifically indicated in the statute and SAA that the final duties will be assessed on entries whose liquidation was suspended in the provisional measures period.

The lower court considered and properly rejected plaintiffs' argument. The lower court precisely discussed the SAA language and the provisions of the antidumping duty order in finding that the effective date of the order and its remedial effect begin at suspension of liquidation when provisional duties are imposed. Appx012-013. Appellants' claim that "the CIT concluded that the 'effective date' of an antidumping duty order is not the first day on which an order goes into effect," Br. at 32, overlooks that the court found the order itself states that duties are effective at suspension of liquidation. Appx013.

## IV. The Commission's Critical Circumstances Determination Is Supported by Substantial Evidence and in Accordance with Law

### A. The Decline in Inventories During the Period of Remedial Relief Does Not Show the Order's Remedial Effect Was Not Undermined

Appellants argue that the inventories of raw honey from Vietnam that the Commission found had nearly tripled by the end of October 2021 were consumed by the time of the issuance of the antidumping order in June of 2022. They

contend a later decline in inventories detracts from the Commission's analysis of the increase in inventories. Br. at 20-24.

First of all, as argued above, the statute does not provide for an evaluation of inventory levels after duties begin to be collected at suspension of liquidation. Because imports entering after November 2021 were not subject to Commerce's critical circumstances determination, the inventories of imports subject to Commerce's critical circumstances determination would necessarily decline. Furthermore, the decline in importers' inventories only shows that inventories were being sold off *after* the effective date of the order and during the period that the order was to provide relief.

In this case for example, provisional duties began to be collected in November 2021, and imports entering would no longer be subject to Commerce's critical circumstances determination. At that point, inventories of imports subject to Commerce's determination that had previously entered would likely decline. Whenever the inventories that existed prior to provisional duties were consumed, they had an effect in the marketplace undermining remedial relief. To the extent the inventories were sold off, they affected prices and captured sales that could have gone to the domestic industry. To the extent the raw honey remained in the inventory of importers, packers, or end users, the raw honey represented potential future lost sales and depressed prices because it was imported at low prices prior to

the imposition of provisional duties. If end users were holding the raw honey from Vietnam, their purchases would be reduced because they did not need to obtain raw honey from other sources such as the domestic industry.

Therefore, contrary to Appellants' argument, the Commission did not need to track inventories after November 2021 to know that the imported raw honey would undermine the order's remedial effect. The Commission knew that the inventories that had rapidly increased would be sold *after* the order's effective date of relief in November 2021 and would undermine the effectiveness of the order. As the Commission observed, regardless of where the imports were in the supply chain, the inventories would place downward pressure on prices until consumed by end users, particularly given the continued underselling. Appx541.

**B. The Commission Reasonably Found that the Import Surge Was Not for Immediate Consumption and Addressed Arguments Concerning Sold Off Inventories**

The Commission found the surge in subject imports from Vietnam and the nearly tripling of inventories of raw honey from Vietnam prior to import relief was not for immediate consumption or a reaction to market conditions such as increased demand. Appx540. Although apparent consumption was 15.2 percent higher in interim 2021, importers' shipments of subject imports from Vietnam were only 2.8 percent higher. These data, in addition to the rapid increase in inventories, indicated the subject imports from Vietnam increased so they could

evade antidumping duties and be stockpiled for later use rather than serve current demand.  Appx540.

Further, directly responding to arguments concerning sold-off inventories in 2022, the Commission stated "{r}espondents argue that importers have now sold off much of their inventory, but regardless of where the imported honey is in the supply chain, the volume associated with these inventories is large and increased substantially in the post-petition period and is likely to place downward pressure on prices until it is consumed by end users, particularly given the continued underselling by subject imports from Vietnam at wide margins."  Appx541.  The Commission also noted that demand for honey for use in food products is relatively inelastic, making it even less likely the increased imports and inventories of raw honey would be immediately consumed no matter how low the raw honey was priced.  Rather, it was likely that the honey would remain in the supply chain because the record showed it was likely not for immediate consumption. Appx540-541, Appx541 (n.305).  The supply chain could include importers, packers, or end users.

Thus, contrary to Appellants' arguments claiming 2022 importer inventory data were ignored, the Commission discussed importers' inventories in 2022.  Br. at 21, 40.  The Commission addressed arguments that 2022 inventories had declined, but it rejected Appellants' contention that declining importers'

inventories meant that the raw honey had been consumed and was not undermining the order's effect. The Commission, as detailed above, found the raw honey was likely still in the supply chain. Appx541 (nn.305 & 306). *See also* Appx022-023 (quoting Commission and rejecting argument that its conclusions were based on assumptions and guesswork).

## C. The Commission Addressed Other Inventory Evidence Appellants Claim Was Ignored

The Commission rejected the argument that the inventories of raw honey were consumed given the record evidence concerning their rapid increase, apparent consumption, shipments, and the elasticity of demand. Appx541, Appx541 (n.306). Appellants argue that the Commission ignored contradictory evidence in the record indicating that inventories were consumed. They claim that "importers and packers testified to the fact that such inventories were sold off and consumed prior to the issuance of the order," yet Appellants also state that "the record did not establish whether or not the imports in question were, in fact, consumed by end users." Br. at 39-40.

The Commission found that from April 2021 to October 2021, before provisional duties, eight importers reported large increases in their inventories of raw honey from Vietnam. Appx539 (n.299) (listing increases). The Commission also observed that one large importer, notwithstanding its [other evidence ], reported elevated inventories in March 2022, and its inventories were

not much lower than they had been in October 2021.  Appx541-542 (n.306)

(quoting Appx31806).

Appellants assert that the Commission overlooked that other importers also

submitted affidavits stating that there was no buildup of inventories and that their

customers tend not to hold inventories of honey.  Br. at 39-40 (citing importer and

packer affidavits).  These affidavits track the affidavit quoted by the Commission

that claimed [ different circumstances ].  *See* Appx31774-

31776; Appx31779-31782; Appx31784-31786; Appx31789-31791; Appx31799-

31801; Appx31804-31806.  "The ITC is not required to explicitly address every

piece of evidence presented by the parties . . . ."  *USEC v. United States*, 34 F.

App'x 725, 730 (Fed. Cir. 2002).  The Commission simply found the inventory

data more probative than importers' self-serving declarations.  *See Matsushita*

*Elec. Indus., Ltd. v. United States*, 750 F.2d 927, 934 (Fed. Cir. 1984).

Appellants' argument that more weight must be assigned to a later inventory

level is premised on their mistaken belief that the remedial effect of an order

begins upon its publication.  As explained *supra* in Section III.B, there is no

support in the statute or legislative history for their position.

Furthermore, the Commission reasonably placed greater weight on the

statutorily mandated factor of increasing inventories prior to suspension of

liquidation when the remedial effect of the order begins.  Appellants essentially ask

this Court to reweigh evidence considered by the Commission, but as this Court has stated, if "the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the expert factfinder – here the majority of the Presidentially-appointed, Senate-approved Commissioners – to decide which side's evidence to believe." *Nippon Steel*, 458 F.3d at 1359.

The lower court also considered and rejected the same argument by plaintiffs. It found the Commission appropriately rejected the arguments. Appx021 ("The ITC next considered and rejected Plaintiffs' contentions that importers had sold off most of their inventory. In fact, the data available on the record did not support Plaintiffs' assertions.").

### D. The Commission Did Not Accept Petitioners' Claims of Stockpiling Honey by End Users

Appellants emphasize a claim by petitioners that a large firm purchased a large volume of honey before provisional duties, and they claim this was the "key fact" underlying the Commission's determination. Br. at 42, 44. This is simply untrue. The Commission never found that end users were stockpiling raw honey downstream or unquestioningly accepted Petitioners' allegations as Appellants contend.

The Commission noted Petitioners' argument when summarizing party arguments. Appx531 ("They also claim that {an importer} is stockpiling raw honey from Vietnam, importing {a large amount} in August 2021."). The

Commission also observed that large industrial users were respondents that filed briefs with the Commission in the investigations but it did not "blame the parties" as Appellants contend. Rather, it simply noted that large industrial users could have provided information or even commented on their holdings of raw honey from Vietnam in 2022 to shed light on the issue. *See* Appx542 (n.306).

Furthermore, rather than relying on the level of end user inventories as Appellants contend, the Commission specifically indicated that the record did not show the level of end users' inventories. Appx542 (n.306). *See also* Appx022 (noting Commission acknowledged lack of information on honey held downstream by end users).

Thus, contrary to Appellants' description of the Commission's explanation, the Commission never found that end users were hoarding raw honey. Nor did the Commission rely on Petitioners' claim that a single importer imported a large amount of raw honey from Vietnam in August 2021. To the contrary, the Commission relied upon statutory factors, namely "the volume and timing of imports, including the sharp increase in the volume of post-petition imports prior to the retroactive liability period under the critical circumstances provision, the rapid increase in and size of inventories," along with subject imports from Vietnam continuing to undersell the domestic like product by wide margins, among other factors. *See* Appx541-542. Appellants dispute none of these findings, and they

constitute substantial evidence supporting the Commission's affirmative determination of critical circumstances.

**E.** **Appellants Did Not Exhaust Their Administrative Remedies and Abandoned Their Argument that the Commission's Determination is Unsupported by Substantial Evidence Because of the Absence of End User Data**

Appellants argue that "the remedial effect of the order should be measured at the end-user level." Br. at 37. They contend that the necessary end user data was not in the record, should have been collected, and without the end user data, the Commission's conclusions were speculative and unsupported by substantial evidence. Br. at 35-37.

Appellants raised this same argument before the lower court, arguing that the Commission needed 2022 inventory information from importers and end users. The lower court rejected the claim that such data were needed, finding that it was not unreasonable for the Commission to make an affirmative determination without data that plaintiffs never asked to be collected. Appx022-023.

The lower court additionally found that plaintiffs abandoned their argument that the record evidence was insufficient. "Plaintiffs confirmed that they are no longer pressing the argument that the record was incomplete and that the ITC should have collected 2022 inventory data. Appx023 (n.5) (citing oral argument testimony). Appellants now seek to revive their argument that the record was incomplete without end user inventory information, but Appellants abandoned this

52

argument before the lower court and has therefore waived the argument. An argument abandoned before the lower court cannot be resurrected on appeal. *Anvar v. Dwyer*, 82 F.4th 1, 7 n.2 (1st. Cir. 2023) ("{P}laintiffs later abandoned that argument and, therefore, cannot resurrect it on appeal."). *See also Stauffer v. Brooks Bros. Grp, Inc*. 758 F.3d 1314, (Fed. Cir. 2014) (arguments not properly raised before district court are waived); *United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived.").

Further, as the Commission pointed out below, the Commission's rules specifically indicate that parties must request collection of new information in their comments on draft questionnaires. 19 C.F.R. § 207.20(b). The Commission rules do, however, permit parties to request collection of new information upon a showing "that there is a compelling need for the information and that the information could not have been requested in the comments on the draft questionnaires." *Id.* The Commission's letter to parties accompanying the draft questionnaires asked that parties "identify any issues that would affect the due date and the data collection period in the questionnaires." Appx17096.

Although they filed comments on the draft questionnaires, Appellants did not request that the Commission seek inventory data from end users of honey. In

fact, they never argued any more inventory information was needed at all. *See*

Appx022-023. Nor did they seek at any point later request such information under

the compelling need exception in Rule 207.20(b). It is well settled that:

> No one is entitled to judicial relief for a supposed or
> threatened injury until the prescribed administrative
> remedy has been exhausted, … since it is a general rule
> that courts should not topple over administrative decisions
> unless the administrative body not only has erred but has
> erred against objection made at the time appropriate under
> its practice.

*Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998) (quotations

omitted).

The Court should not countenance Appellants' arguments that the

Commission needed more inventory data to track inventories given that it never

requested that the Commission collect the data and then abandoned the argument

below.

## F. The Commission Reasonably Did Not Attempt to Collect Data from End Users

In any event, collection of end user data was not practical. As the staff

report explains "{a}lmost all honey is blended" and comes from a variety of

sources including different countries. Appx32435. [ Firm name ], a large end

user of raw honey from Vietnam, is a good example. It reported that it purchased a

[ certain honey ].

Appx32559. Other industrial users also reported purchasing blends of raw honey

54

from different sources, including different countries. Appx37790-37792 (Bash, Haines, and Bertrand). Furthermore, the food service portion of the market, as well as large industrial users consume honey from Vietnam. *See* Appx29608 ("{I}mports of light and dark amber honeys from Vietnam and India primarily meet the demand in the Ingredient and Food Service segments.").

The Commission sent out purchaser questionnaires, as is routine in final investigations, but purchasers are not necessarily end users. Sixteen of 21 responding purchasers reported purchasing raw honey from Vietnam, but only *four* of 21 responding purchasers were end users. *See* Appx32421 (text & n.10). To obtain end user information, the Commission would have needed to send out questionnaires specifically seeking information from end users it had identified rather than simply adding questions to its purchaser questionnaires.

Additionally, importers in this industry do not typically sell to end users, making tracking the honey even more difficult. The largest importer of raw honey from Vietnam during 2020 was [ Firm name ]. Appx32497. Its three biggest purchasers were [ Firm names ], accounting for over [ % ] its purchases in 2020. Appx4828. These purchasers blend and pack raw honey from different sources and sell the blended honey downstream until it reaches end users. Packers and importers are blending honey from different sources and end users would not necessarily know what blend

of honey they had in inventory.  As a result, tracking imports of raw honey from Vietnam downstream until it ultimately is consumed is not as simple as sending questionnaires to end users.  End users also would not necessarily know when the honey they purchased was imported (*i.e.,* whether it was imported before or after suspension of liquidation).

## V.    The Commission Conducted the Proper Prospective Analysis

### A.    The Commission Conducted a Forward-Looking Analysis of Whether Relief Would be Undermined

Appellants argue that the Commission failed to perform a prospective analysis, primarily because the Commission did not collect later inventory data. Br. at 20-27.  The Commission conducted a prospective analysis and evaluated the likely effects of the inventories, the weak condition of the domestic industry, and the continued underselling by subject imports from Vietnam in determining that remedial relief was likely to be undermined.  It disagreed with respondents that the surge in imports that led to inventories nearly tripling had been consumed.  It found that the rapid increase in inventories and other conditions indicated that inventories were likely still in the supply chain and would therefore still have an effect.  Appx539; Appx541; Appx541 (n.305); Appx542.  Thus, its analysis was forward-looking.

The lower court specifically rejected Appellants' argument that the Commission failed to do a forward-looking analysis.  It acknowledged that the

Commission had conducted a different forward-looking analysis in another critical circumstances determination challenged at the CIT. Appx029-031 (citing *MTD Products*, 2023 WL 2535885). The Commission determination in *MTD Products*, however, concerned engines in lawnmowers for which seasonal demand was tied to lawn mowers. As a result, the analysis was necessarily different from that in a case concerning raw honey. *Small Vertical Shaft Engines from China*, Inv. Nos. 701-TA-643 and 731-TA-1493 (Final), USITC Pub. 5185 at 47 (Apr. 2021) ("{I}imports entered during the period where domestic producers and purchasers typically negotiate and set prices for engines delivered for the 2021 lawn mower season."). Notwithstanding the different analysis in the case on lawn mower engines, the lower court rejected arguments that the Commission did not conduct a forward-looking analysis. Appx029-031. This Court should similarly reject any claim that the Commission's analysis was not sufficiently forward-looking.

### B. The Term "Likely" in the Statute Does Not Require the Commission to Ignore the Remedial Effect of an Order Prior to its Issuance

Appellants argue that the use of the term "likely" requires a purely prospective analysis of the period after the order is issued. They argue that Congress would have used the present tense if it intended for the Commission to consider whether the remedial effect of the order is undermined beginning at

suspension of liquidation when the duties are effective and not after the issuance of the order.  Br. at 33-34.

Appellants overlook that Congress in the SAA described the inquiry in the present tense and past tense to make clear the Commission is to consider what has happened and what likely would happen. "{T}he Commission is already required to determine whether, by massively increasing imports prior to the effective date of relief, the importers *have seriously undermined* the remedial effect of the order." SAA at 877 (emphasis added).  The SAA also describes the determination in the present tense: "Critical circumstances determinations focus on whether an order's effectiveness is undermined by increasing shipments prior to the effective date of the order."  *Id.*  These descriptions indicate that the Commission is to consider imports and the increase in inventories prior to suspension of liquidation, and whether the remedial relief provided by the antidumping duty order starting at suspension of liquidation is likely to be undermined.

Also unavailing is Appellants' claim that the use of the term "likely" or "order to be issued" requires that the Commission only consider what will occur after the order is issued.  Appx018.  The SAA and the statutory reference to issuance of the order under section 1673e, as well as the effective date spelled out in the order itself all indicate that the remedial effect of the order begins at its effective date at suspension of liquidation.  SAA at 877; 87 Fed. Reg. at 35,502.

Indeed, the entire statutory scheme for Commerce and the Commission focuses on data prior to suspension of liquidation because this is the point in time when the remedial effect of the order begins. Accordingly, the Commission makes its critical circumstances determination with the understanding that an order has had a remedial effect since suspension of liquidation and will continue to have a remedial effect after issuance of the order.

## VI. Appellants' Reliance on the Dissent is Misguided

Appellants do not discuss the Commission's findings with respect to the statutory factors and other factors the Commission found relevant as is provided for in the statute. Instead, Appellants rely heavily on the dissent. Br. at 9-10, 25-27, 38-39, 42 (discussing dissent). For instance, with respect to rapid increase in inventories prior to the order's effective date, Appellants do not address the data supporting the Commission's finding and instead argue importers' inventories later declined.

That the dissenting Commissioner may have weighed the evidence differently, does not provide grounds to overrule the Commission's determination. Indeed, "{a}lthough individual Commissioners reach{} divergent conclusions, '{t}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Siemens Energy, Inc. v. United States*, 806 F. 3d 1367,

1372 (Fed. Cir. 2015) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620) (1966); *see also Grupo Industrial Camesa v. United States*, 85 F.3d 1577, 1582 (Fed. Cir. 1996) ("Although {a party} points to evidence supporting the dissenting commissioners' decision that the domestic industry was not materially injured, this does not mean that the Commission's affirmative determination is unsupported by substantial evidence.") (also citing *Consolo*, 383 U.S. at 619-20). Indeed, the lower court properly rejected Appellants' argument that the dissent undermines the Commission's critical circumstances determination. *See* Appx030-032.

Appellants also make a series of unsupported claims about the dissent's findings. They assert that the dissent found that "most of the Vietnamese raw honey imported during the critical circumstances period had been sold off, and thus was not in a position to 'undermine seriously' the antidumping duty order{.}" Br. at 9 (citing Appx547). They next claim Commissioner Johanson found that "any remaining stocks of Vietnamese raw honey were only a small portion of U.S. apparent consumption{.}" *Id.* (citing Appx547). But these claims are incorrect. The dissent actually found that *one* importer's inventories had been sold off and *its* remaining stock was small relative to apparent U.S. consumption. *See* Appx547 (citing Appx31804-31806).[14]

---

[14] The Commission found that the importer in question reported only slightly diminished inventories in April 2022. *See* Appx542 (n.306). Appellants also

Moreover, the dissent did not "recognize{}" that raw honey imported in the post-petition period had been sold off and consumed or that end users consume raw honey promptly and do not hold inventories. Br. at 38 (citing Appx545-546). In fact, Commissioner Johanson specifically commented on the absence of evidence concerning the propensity of end users to hold inventory and the final inventory levels of most importers and purchasers. Appx552-553. *See also* Appx031 (quoting dissent). In sum, Appellants reliance on purported findings of the dissent is unavailing. They exaggerate the dissent's findings, and the findings are not relevant under the standard of review.

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court affirm the Commission's final determination.

---

argue that drought conditions led to supply shortages of domestic honey that would increase the need for imports, but as the lower court explained, the record did not show shortages or low inventories of domestically produced raw honey. *See* Appx023-026.

Respectfully submitted,

*/s/     Michael H. Haldenstein*

Dominic L. Bianchi
    General Counsel
Andrea C. Casson
    Assistant General Counsel for Litigation
Michael H. Haldenstein
    Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street SW, Suite 707
Washington, DC 20436
Tel:  (202) 205-3041
Fax:  (202) 205-3111
michael.haldenstein@usitc.gov

*Counsel for*
*Defendant-Appellee United States*

Date:  July 19, 2024

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(g)(1) of the Federal Rules of Appellate Procedure and

Federal Circuit Rule 32(b)(3), I hereby certify that the attached brief complies with

the type-volume limitation and typeface requirements Federal Rule of Appellate

Procedure 32(a)(7) and Federal Circuit Rules 32(b)(1) and 32(b)(2).  The brief has

been prepared in a proportionally spaced typeface using Microsoft Office 365, in

Times New Roman 14-point font.  The brief contains a total of 13,459 words,

obtained from the word-count function of the word-processing system, including

all footnotes, annotations, and claim language.

*/s/    Michael H. Haldenstein*
Michael H. Haldenstein
    Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street SW, Suite 707
Washington, DC 20436
Tel:  (202) 205-3041
Fax:  (202) 205-3111
michael.haldenstein@usitc.gov

*Counsel for Defendant-Appellee*
*United States*

Date:  July 19, 2024

## CERTIFICATE OF COMPLIANCE FOR BRIEF
## CONTAINING MATERIAL SUBJECT TO PROTECTIVE ORDER

This brief complies with the limitations on confidential material as set forth in Fed. Cir. R. 25.1(d)(1).  This brief contains 28 unique words (including numbers) marked as confidential, not including those words marked as confidential in Plaintiffs-Appellants opening briefs, which does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).  All such confidential material has been properly identified with required bracketing, page headers, and labeled redactions (in the nonconfidential version of the brief).

/s/     *Michael H. Haldenstein*

Michael H. Haldenstein
   Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street SW, Suite 707
Washington, DC 20436
Tel:  (202) 205-3041
Fax:  (202) 205-3111
michael.haldenstein@usitc.gov

*Counsel for*
*Defendant-Appellee United States*

Date:  July 19, 2024

# CERTIFICATE OF SERVICE

I, Michael H. Haldenstein, hereby certify that, on July 19, 2024, I caused a copy of the foregoing **CONFIDENTIAL RESPONSE BRIEF OF DEFENDANT-APPELLEE UNITED STATES**, to be served on counsel of record via the Commission's electronic secure file transfer system, BOX, per the written agreement of counsel for all parties.

*/s/    Michael H. Haldenstein*
Michael H. Haldenstein
   Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street SW, Suite 707
Washington, DC 20436
Tel:  (202) 205-3041
Fax:  (202) 205-3111
michael.haldenstein@usitc.gov

*Counsel for*
*Defendant-Appellee United States*